No. 22-13992

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

LEROY PERNELL et al.,

*Plaintiffs-Appellees,*

v.

BRIAN LAMB et al.,

*Defendants-Appellants.*

———————————

On Appeal from U.S. District Court for the Northern District of Florida
Case No.:  4:22-cv-304-MW-MAF

———————————

**PLAINTIFFS-APPELLEES' RESPONSE OPPOSING DEFENDANTS-
APPELLANTS' MOTION FOR A STAY PENDING APPEAL**

———————————

Jerry C. Edwards
Fla. Bar No. 1003437
ACLU FOUNDATION OF FLORIDA
933 Lee Rd., Ste. 102
Orlando, FL  32810
(786) 363-1107
jedwards@aclufl.org

Leah Watson*
Emerson Sykes
Laura Moraff
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad St., Fl. 18
New York, NY 10004

Daniel B. Tilley
Fla. Bar No. 102882
Caroline McNamara
Fla. Bar No. 1038312
Jacqueline Azis
Fla. Bar No. 101057
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Ste. 400
Miami, FL  33134
(786) 363-2714
dtilley@aclufl.org
cmcnarama@aclufl.org
jazis@aclufl.org

*Counsel list continued on next page.*

(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
lmoraff@aclu.org

Alexsis Johnson
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 217-1690
amjohnson@naacpldf.org

Jason Leckerman
BALLARD SPAHR, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Lauren A. Johnson
Jin Hee Lee
Santino Coleman
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
700 14th Street, Ste. 600
Washington, D.C. 20005
(202) 682-1300
ljohnson@naacpldf.org
jlee@naacpldf.org
scoleman@naacpldf.org

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main St., Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

* Admitted *pro hac vice*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellees certify that the following individuals and entities may have an interest in the outcome of this case or appeal:

1. Almond, Russell, *Plaintiff-Appellee*

2. American Civil Liberties Union Foundation of Florida, *Attorneys for Plaintiffs-Appellees*

3. American Civil Liberties Union Foundation, *Attorneys for Plaintiffs-Appellees*

4. Austin, Sharon Wright, *Plaintiff-Appellee*

5. Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6. Ballard Spahr LLP, *Attorneys for Plaintiffs-Appellees*

7. Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

8. Boaz, Timothy, *Defendant-Appellant (*Novoa*, No. 22-13994)*

9. Callahan, Sandra, *Defendant-Appellant (*Novoa*, No. 22-13994)*

10. Carrere, Michael, *Defendant-Appellant (*Novoa*, No. 22-13994)*

11. Cerio, Timothy, *Defendant-Appellant*

12. Coleman, Santino, *Attorney for Plaintiffs-Appellees*

13. Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

14. Cooper, Charles J., *Attorney for Defendants-Appellants*

15. Corcoran, Richard, *Defendant-Appellant*

16. Dauphin, Johana, *Plaintiff-Appellee*

17. Diaz, Jr., Manny, *Defendant-Appellant*

*18.* Donnelly, N. Rogan, *Defendant-Appellant (*Novoa – *No. 22-13994)*

19. Dorsey, Dana Thompson, *Plaintiff-Appellee*

20. Dunn, Marvin, *Plaintiff-Appellee*

21. Edge, Aubrey, *Defendant-Appellant*

22. Edinger, Gary, *Attorney for Plaintiffs-Appellees (*Novoa – *No. 22-13994)*

*23.* Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

24. Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

25. First Amendment Forum at University of South Florida, *Plaintiff-Appellee (*Novoa – *No. 22-13994)*

26. Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

27. Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

28. Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

29. Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

30. Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

31. Foundation for Individual Rights and Expression, *Attorney for Plaintiffs-Appellees (*Novoa – *No. 22-13994)*

32. Frost, Patricia, *Defendant-Appellant*

33.  Gabadage, Nimna, *Defendant-Appellant*

34.  Gary S. Edinger & Associates PA, Gainesville, FL, *Attorney for Plaintiffs-Appellees (*Novoa *– No. 22-13994)*

35.  Greubel, Greg, *Attorney for Plaintiffs-Appellees (*Novoa *– No. 22-13994)*

36.  Griffin, Michael, *Defendant-Appellant (*Novoa *– No. 22-13994)*

*37.*  Haddock, Edward, *Defendant-Appellant*

38.  Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

39.  Horton, Oscar, *Defendant-Appellant (*Novoa *– No. 22-13994)*

40.  Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

41.  Jones, Ken, *Defendant-Appellant*

42.  Jordan, Darlene Luccio, *Defendant-Appellant*

43.  Lamb, Brian, *Defendant-Appellant*

44.  Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

45.  Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

46.  Leftheris, Julie, *Defendant-Appellant (*Novoa *– No. 22-13994)*

47.  Levine, Alan, *Defendant-Appellant*

48.  Lydecker, Charles, *Defendant-Appellant*

49.  Mabatah, Isiuwa Jacqueline, *Attorney for Plaintiffs-Appellees*

50.  Mateer, Craig, *Defendant-Appellant*

51.  McNamara, Caroline A., *Attorney for Plaintiffs-Appellees*

52.  Michael, Deanna, *Defendant-Appellant*

53.  Monbarren, Lauran, *Defendant-Appellant (*Novoa *– No. 22-13994)*

54.  Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

55.  Morris, Joshua, *Attorney for Plaintiffs-Appellees (*Novoa *– No. 22-13994)*

56.  NAACP Legal Defense & Education Fund, *Attorneys for Plaintiffs-Appellees*

57.  Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

58.  Novoa, Adriana, *Plaintiff-Appellee (*Novoa *– No. 22-13994)*

59.  Ohlendorf, John David, *Attorney for Defendants-Appellants*

60.  Palyam, Nithin, *Defendant-Appellant (*Novoa *– No. 22-13994)*

61.  Park, Shelley, *Plaintiff-Appellee*

62.  Patel, Shilen, *Defendant-Appellant (*Novoa *– No. 22-13994)*

63.  Pernell, Leroy, *Plaintiff-Appellee*

64.  Piccolo, Fredrick, *Defendant-Appellant (*Novoa *– No. 22-13994)*

*65.*  Ramer, John, *Attorney for Defendants-Appellants*

66.  Rechek, Samuel, *Plaintiff-Appellee (*Novoa *– No. 22-13994)*

67.  Sandoval, Jennifer, *Plaintiff-Appellee*

68.  Schneider, Jenifer, *Defendant-Appellant (*Novoa *– No. 22-13994)*

69.  Scott, Steven, *Defendant-Appellant*

*70.*  Seixas, Melissa, *Defendant-Appellant (*Novoa *– No. 22-13994)*

71.  Self, William, *Defendant-Appellant*

72.  Silagy, Eric, *Defendant-Appellant*

73. Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees (*Novoa *– No. 22-13994)*

74. Stermon, Kent, *Defendant-Appellant*

75. Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

76. Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

77. Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

78. University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

79. University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

80. University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

81. Walker, Judge Mark E., U.S. District Court for the Northern District of Florida

82. Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

83. Weatherford, William, *Defendant-Appellant (*Novoa *– No. 22-13994)*

84. Wold, Megan M., *Attorney for Defendants-Appellants*

Appellees further state that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

Dated: December 22, 2022                    Respectfully submitted,

                                            */s/ Leah Watson*
                                            Leah Watson

                                            *Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................... vii

INTRODUCTION ............................................................................ 1

BACKGROUND .............................................................................. 5

LEGAL STANDARD ...................................................................... 7

ARGUMENT ................................................................................... 8

I.     The State Has Not Shown It Is Likely to Succeed on the Merits ................... 8

     a.    The Instructors Have Standing to Challenge All of the Stop W.O.K.E. Act's Higher Education Provisions ....................................... 9

     b.    The State Cannot Ban Disfavored Viewpoints from Instruction at Colleges and Universities ................................................. 14

          i.    Instruction in Public Higher Education Is Not Government Speech ................................................................. 14

          ii.    Academic Scholarship and Instruction Do Not Fit the *Garcetti* Framework ................................................. 17

          iii.   The State Cannot Limit Higher Education Instruction to Viewpoints the Legislature Favors ........................... 21

     c.    The Instructors Will Succeed on the Merits of Their Claims Under Any Standard ................................................................ 24

     d.    The Stop W.O.K.E. Act Is Unconstitutionally Vague ...................... 29

II.    The Balance of Interests Does Not Support Disruption of the Preliminary Injunction ......................................................................... 37

     a.    A Stay Would Irreparably Harm the Instructors ................................ 37

     b.    Denial of a Stay Would Not Cause Irreparable Injury to the State .... 38

     c.    The Public Interest Weighs Against a Stay ....................................... 40

CONCLUSION ............................................................................... 41

CERTIFICATE OF COMPLIANCE .............................................. 43

CERTIFICATE OF SERVICE ....................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ........................................................................ 39

*Adams v. Trs. of the Univ. of N.C.-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) .............................................................. 18

*Albanese v. McGinnis*,
  823 F. Supp. 521 (N.D. Ill. 1993) ....................................................... 33

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ............................................................................ 10

*Bd. of Regents v. Southworth*,
  529 U.S. 217 (2000) ...................................................................... 22, 23

*Bhattacharya v. SUNY Rockland Cmty. Coll.*,
  719 F. App'x 26 (2d Cir. 2017) ........................................................... 18

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991) .................................................. passim

*CAMP Legal Defense Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006) .......................................................... 14

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) .............................................................................. 35

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) ......................................................... 18, 19

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ....................................... 8, 38, 39, 40

*Edwards v. Cal. Univ. of Penn.*,
  156 F.3d 488 (3d Cir. 1998) ............................................................... 20

*Evans-Marshall v. Bd. of Educ.*,
  624 F.3d 332 (6th Cir. 2010) .............................................................. 18

*FF Cosms. FL, Inc. v. City of Miami Beach*,
  866 F.3d 1290 (11th Cir. 2017) ............................................................ 8

*Ga. Muslim Voter Proj. v. Kemp*,
  918 F.3d 1262 (11th Cir. 2019) .......................................................... 38

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ........................................................................17

*Garcia-Mir v. Meese*,
  781 F.2d 1450 (11th Cir. 1986) .........................................................7

*Gorum v. Sessoms*,
  561 F. 3d 179 (3d Cir. 2009) ...........................................................19

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .......................................................................34

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) .......................................................................18

*Hallandale Pro. Fire Fighters Local 2238 v. City of Hallandale*,
  922 F.2d 756 (11th Cir. 1991) ...........................................................9

*Harrell v. The Fla. Bar*,
  608 F.3d 1241 (11th Cir. 2010) ....................................................9, 10

*Healy v. James*,
  408 U.S. 169 (1972) .......................................................................15

*Hill v. Colorado*,
  530 U.S. 703 (2000) .......................................................................29

*Holder v. Humanitarian Law Proj.*,
  561 U.S. 1 (2010) ...........................................................................10

*Johnson v. United States*,
  576 U.S. 591 (2015) ...................................................................30, 31

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) .......................................................29

*Kellner v. NCL (Bah.), Ltd.*,
  753 Fed. App'x 662, 665 (11th Cir. 2018) .......................................40

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ...................................................................passim

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ...............................................4, 5, 40

*Knife Rights, Inc. v. Vance*,
  802 F.3d 377 (2d Cir. 2015) ...........................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .........................................................................9

*Mailloux v. Kiley*,
  448 F.2d 1242 (1st Cir. 1971) .............................................................24

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................39

*Mayer v. Monroe Cnty. Comm'y Sch. Corp.*,
  474 F.3d 477 (7th Cir. 2007) .............................................................18

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ..................................................18, 19, 20

*Miller v. Comm'r*, No. 22-13136,
  2022 U.S. App. LEXIS 26689 (11th Cir. Sept. 22, 2022)....................39

*NAACP v. Button*,
  371 U.S. 415 (1963) .....................................................................29, 35

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
  938 F.3d 424 (3d Cir. 2019) ..............................................................33

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................7, 8, 37, 39

*O'Laughlin v. Palm Beach Cnty.*,
  30 F.4th 1045 (11th Cir. 2022)...........................................................30

*Pernell v. Fla. Bd. of Governors*, No. 4:22-cv-304-MW/MAF,
  2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) .........................passim

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ..........................................................................17

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ..........................................................................17

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ..........................................................................26

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................21, 22, 28

*Searcey v. Harris*,
  888 F.2d 1314 (11th Cir. 1989)..........................................................23

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ......................................................................30

*Shelton v. Tucker*,
  364 U.S. 479 (1960) .....................................................................15, 17

*Shurtleff v. City of Boston*,
   142 S. Ct. 1583 (2022) .................................................................. 15, 16

*Shuttlesworth v. City of Birmingham*,
   382 U.S. 87 (1965) ............................................................................... 35

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ........................................................ 4, 28

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ............................................................. 8

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ................................................................... 15, 16, 30

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   413 U.S. 548 (1973) ............................................................................. 36

*United States v. Bramer*,
   832 F.3d 908 (8th Cir. 2016) ............................................................... 31

*United States v. Caldwell*,
   655 F. App'x 730 (11th Cir. 2016) ....................................................... 31

*United States v. Jones*, No. 20-11841,
   2022 WL 1763403 (11th Cir. June 1, 2022) ....................................... 31

*United States v. Nat'l Treasury Emps. Union*,
   513 U.S. 454 (1995) ............................................................................. 25

*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................. 29

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ....................................................................... 16, 17

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ............................................................................. 16

*Wollschlaeger v. Governor of Fla.*,
   848 F.3d 1293 (2017) ........................................................................... 29

*Wright v. Georgia*,
   373 U.S. 284 (1963) ............................................................................. 35

*Yates v. United States*,
   574 U.S. 528 (2015) ............................................................................. 34

## Statutes & Regulations

*10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022) ..........................................32

Fla. Stat. Ann. § 1000.05(4)(a) (West 2022).....................................................6, 31

§ 1000.005(4)(a)(1)................................................................11

§ 1000.005(4)(a)(2)................................................................11

§ 1000.005(4)(a)(3)................................................................11

§ 1000.005(4)(a)(4)................................................................12

§ 1000.005(4)(a)(5)................................................................13

§ 1000.005(4)(a)(6)................................................................13

§ 1000.005(4)(a)(7)................................................................12

§ 1000.005(4)(a)(8)................................................................13

Fla Stat. Ann. § 1000.05(4)(b) (West 2022) .........................................................6

## Other Authorities

Woke, *Oxford English Dictionary* (3d ed. 2017) ....................................................24

**INTRODUCTION**

The Defendant-Appellants' ("State") motion to stay the preliminary injunction blocking the Stop Wrongs to Our Kids and Employees Act ("Stop W.O.K.E. Act" or "Act") repeats arguments the district court properly rejected and fails to establish that the extraordinary remedy of a stay is warranted. The State has made no showing that irreparable harm will result if university instructors are permitted to teach their students viewpoints disfavored by the legislature. Indeed, the Supreme Court has long recognized that university classrooms are "peculiarly the 'marketplace of ideas,'" and that the health of our democracy rests on robust protections for free speech and academic freedom, including instruction about race and gender that the legislature disfavors. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

The Plaintiffs-Appellees ("Instructors") are esteemed higher education instructors who are committed to providing a quality education to their students. They teach at six public colleges and universities across Florida and collectively bring more than 170 years of experience in higher education. The courses they teach range from undergraduate gender studies to law school criminal procedure and graduate-level statistics. In order to meet the standards of their academic disciplines and to prepare students to excel in their chosen professions, Instructors teach their students a variety of perspectives about topics such as systemic racism, sexism,

colorblindness, and privilege that are integral to their disciplines. Through their instruction, Instructors endorse the foundational principles of their respective disciplines, apprise students of the weight of research supporting these principles, promote frameworks that equip students to critique and understand their own experience as well as the world around them, and facilitate debates with arguments that support or oppose viewpoints about which there is academic disagreement. Instructors adhere to the topics and standards set by their universities, departments, and professional academic bodies. They do not indoctrinate students.

The Stop W.O.K.E. Act chills Instructors' ability to share their expertise with students without fear of reprisal, because the Act prohibits instruction that "espouses" certain viewpoints the State dislikes. For example, under the State's own reading of the Act, an instructor would violate the Act if they hosted guest speakers to debate for and against race-conscious admissions—only the anti–affirmative action viewpoint is permitted. Mem. & Order Granting in Part & Denying in Part Mot. for Prelim. Inj. ("Op.") at 119, *Pernell v. Fla. Bd. of Governors*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Nov. 17, 2022), ECF No. 63. The Act's blatant viewpoint discrimination, vague terms, and severe punishments—any instructor, including tenured faculty, can be terminated for violating the Act, and their university employer can lose significant funding—drastically chill Instructors' speech. The Stop W.O.K.E. Act forces the Instructors either to refrain from

comprehensive teaching about racial inequality and sexism, or risk running afoul of the law.

To defend the Act, the State makes the remarkable assertion that college and university instructors have no First Amendment interests whatsoever in their classroom teaching and that the State—here, the legislature, not the university—may control this speech entirely. Defs.-Appellants' Mot. to Stay ("Mot.") at 3, ECF No. 7. But First Amendment freedoms do not exist at the whim of the legislature. The pursuit of knowledge through free exchange of ideas in college and university classrooms has long been protected by the First Amendment and guided by the sound pedagogical decisions of the academy itself.

In this appeal, the constitutional questions this Court will eventually review on the preliminary injunction are whether (1) the Stop W.O.K.E. Act unconstitutionally bans viewpoints disfavored by the legislature while permitting denunciation of the same concepts; and (2) the law is unconstitutionally vague due to the lack of fair notice or the State's authority to enforce it in an arbitrary and discriminatory manner. At this stage of the proceeding, however, the only question before this Court is whether the State has met its burden to warrant the exceptional remedy of a stay. It has not.

The district court correctly ruled that Instructors are likely to succeed on the merits, and the State has not established that it has a strong likelihood of success on

appeal. The district court held that "[t]he law officially bans professors from expressing disfavored viewpoints in university classrooms while permitting unfettered expression of the opposite viewpoints" in contravention of the First Amendment, and "is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause." Op. at 2, 108. The State has not remotely established the requisite irreparable harm to justify the extraordinary relief it now seeks.

The District Court recognized Instructors "will suffer irreparable injury because an ongoing First Amendment violation—which the [Stop W.O.K.E. Act] inflicts—constitutes irreparable injury." Op. at 127; *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). Instructors, not the State, would be harmed if the preliminary injunction were lifted. If this Court grants the stay, instructors and students who have already chosen their classes, which will start in less than a month, and received their syllabi, may be forced to make drastic changes to the coursework or cancel the course entirely. Students who have a limited window to take such courses could be forever deprived of receiving the instruction that they have chosen and the university wants to offer.

The district court correctly recognized that, "weighing [Instructors'] First Amendment injury against [the State's], the scale tips decisively in [Instructors'] favor." Op. at 127 (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261,

1272 (11th Cir. 2006)). The State thrived without these censorious prohibitions until July 1, 2022; any harm it now asserts in support of lifting the preliminary injunction is exaggerated at best. Because "[t]he public has no interest in enforcing an unconstitutional [statute]," the preliminary injunction serves the public interest. *KH Outdoor, LLC*, 458 F.3d at 1272. For the reasons discussed below, this Court should deny the State's motion.

## BACKGROUND

Florida legislators enacted the Stop W.O.K.E. Act to muzzle speech on racial justice, diversity, equity, inclusion, and similar topics with which the Act's proponents disagree. Verified Compl. ("Compl.") ¶¶ 74–75, 79–83, 108, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 8, 2022), ECF No. 1. The Act prohibits instruction that "espouses, promotes, advances, inculcates, or compels [students] to believe" eight prohibited concepts:

> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
>
> 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
>
> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Fla. Stat. Ann. § 1000.05(4)(a) (West 2022).

The Act "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* at § 1000.05(4)(b). The law does not define the terms "objective manner" or "endorsement." *Id*.

In response to the Act's passage, Instructors filed a complaint alleging violations of the First and Fourteenth Amendments and moved to enjoin the higher education provisions of the Act. Compl. ¶ 7; Pls.' Mot. for Prelim. Inj., *Pernell*, No.

4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No. 12. After considering arguments in this matter alongside those raised in *Novoa v. Diaz*, No. 22-13994, the district court issued a preliminary injunction. Op. at 136–37.

The district court determined Instructors have a high likelihood of succeeding on the merits of their First Amendment and vagueness claims, because they would need to self-censor instruction on specific topics that are central to their scholarship or risk enforcement against themselves and their universities. *Id.* at 56, 60, 62–63, 64, 65. The district court concluded that the harm to Instructors outweighed any potential harm to the State and that an injunction served the public interest. *Id.* at 127.

## LEGAL STANDARD

"A stay is an intrusion into the ordinary processes of administration and judicial review," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted), and "thus an exceptional response" to a district court's order, *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). When evaluating the propriety of this exceptional remedy, courts consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426 (citation omitted). The party seeking the stay carries the burden as to these factors, and "[t]he first two factors are the most critical." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).

Further, "in considering whether to stay a preliminary injunction . . . [this Court] examine[s] the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (per curiam) (quoting *Lee*, 915 F.3d at 1317).

## ARGUMENT

### I.    The State Has Not Shown It Is Likely to Succeed on the Merits

The State has not demonstrated that it is likely to succeed on the merits. The State (1) disregards controlling precedent under which Instructors' standing is clear, and (2) ignores this Court's holdings protecting the First Amendment rights of the Instructors. Further, the Act (3) constitutes impermissible viewpoint discrimination under any test, and (4) is unconstitutionally vague.

The district court did not abuse its discretion in holding that, absent an injunction, the Stop W.O.K.E. Act would inflict an ongoing violation of the Instructors' First Amendment rights. Op. at 127. This violation of constitutional rights constitutes irreparable injury. *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). In sharp contrast to the absence of any irreparable

harm the State might suffer should the preliminary injunction be stayed, Instructors would immediately face irreparable and ongoing harm, as articulated in the Complaint and declarations considered by the district court. Op. at 55–69.

### a.    The Instructors Have Standing to Challenge All of the Stop W.O.K.E. Act's Higher Education Provisions

Standing is established where plaintiffs (1) suffer an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable to the challenged action of the defendant;" and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

The district court recognized the long-standing principle that "[w]hen First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely 'lest free speech be chilled even before the law or regulation is enforced.'" Op. at 44–45 (quoting *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010)). Recognizing that First Amendment rights are likely to be injured by the existence of a law burdening speech, standing in this context is established when plaintiffs allege a "wish[] to engage in expression that is *at least arguably forbidden by the pertinent law*," *Harrell*, 608 F.3d at 1260 (quoting *Hallandale Pro. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762 (11th Cir. 1991)), and

that there is "at least minimal probability that the challenged rules will be enforced if violated," *id.* (citation omitted).

Where Instructors allege that their rights are infringed because they cannot know what speech the law's vague terms proscribe, the law itself makes a higher degree of specificity with regard to Instructors' standing impossible. *See, e.g.*, *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 386 n.5 (2d Cir. 2015) (citing *Holder v. Humanitarian Law Proj.,* 561 U.S. 1, 15–16 (2010)) ("[S]pecificity" in alleged intended course of conduct is not "essential to standing, particularly where, as here, a statute is challenged for unconstitutional vagueness."); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (finding standing where, even though plaintiffs did "not plan to propagate untruths" as prohibited by the statute, "erroneous statement is inevitable in free debate").

Here, Instructors more than sufficiently show that their planned instruction is at least arguably prohibited under the Act. The prohibitions on "promot[ion]" and "advanc[ement]," the provision requiring teaching "without endorsement," and each of the prohibited concepts, apply to the Instructors and chill their free speech in the classroom. Compl. ¶¶ 51–55, 152–59. For example, Dr. Park teaches (1) Feminist Theories, (2) Theories of Sex and Gender in the Humanities, (3) Race & Technology, and (4) Introduction to Philosophy. *Id.* ¶ 20. A review of the various theories taught

in Dr. Park's courses makes clear that her instruction is squarely in the crosshairs of the Act:

- Teaching that racism, sexism, and other forms of oppression exist could arguably violate concept one by implying that victims of oppression are "morally superior" to perpetrators. Fla. Stat. Ann. § 1000.005(4)(a)(1); *see also* Decl. of Dr. Shelley Park in Support of Pls.' Mot. for a Prelim. Inj. ("Park Decl.") ¶¶ 10–16, 19–22, 28–35, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No. 13-4.

- Teaching that implicit bias, a common feature of critical race and gender studies, upholds oppressive structures could arguably violate concept two, which prohibits teaching that anyone is "inherently racist, sexist, or oppressive, whether consciously or unconsciously." Fla. Stat. Ann. § 1000.005(4)(a)(2); *see also* Park Decl. ¶¶ 10–16, 19–20, 22–24, 29–30, 33.

- Teaching that people experience privileges due to race, sex, class, and ability could arguably violate concept three, which prohibits teaching that a person's "status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Fla. Stat. Ann. § 1000.005(4)(a)(3); Park Decl. ¶¶ 11, 20–22, 24, 30.

- Teaching that inter-racial and inter-gender relations reflect systems of oppression could arguably violate concept four, because it refers to how people "treat others without respect to race, color, national origin, or sex." Fla. Stat. Ann. § 1000.005(4)(a)(4); Park Decl. ¶¶ 10–17, 20, 24–26, 32.

- Teaching about students' unintentional participation in, and maintenance of, oppressive systems could arguably violate concept seven, which prohibits teaching that anyone "bears responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. Ann. § 1000.005(4)(a)(7); Park Decl. ¶¶ 10–16, 19–23, 25.

- Teaching that terms like "objectivity," "neutrality," and "colorblindness" have been used to maintain a status quo that cements preexisting inequalities as natural and normative, thus reinforcing racist or sexist notions in society, could arguably violate concept eight, which prohibits teaching that "merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist."

Fla. Stat. Ann. § 1000.005(4)(a)(8). Park Decl. ¶¶ 16, 19, 21–22, 29–30.

Similarly, Dr. Sharon Austin teaches (1) Politics of Race at University of Florida, (2) Urban Politics, (3) Black Horror and Social Justice, and (4) African American Politics and Policy courses. Decl. of Dr. Sharon Austin in Support of Pls.' Mot. for a Prelim. Inj. ("Austin Decl.") ¶¶ 27, 31, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No 13-3. In addition to the various concepts listed above, Dr. Austin's instruction clashes with the Act's restrictions as follows:

- Teaching arguments advancing reparations as a potential form of remediation for slavery or other past harms could arguably violate concept five, which prohibits teaching that anyone should receive "adverse treatment because of [] actions committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. Ann. § 1000.005(4)(a)(5); Austin Decl. ¶ 36.

- Teaching texts that advocate for affirmative action programs for campus diversity would undoubtedly violate concept six, as the State conceded, which prohibits the idea that anyone should "receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. Ann. § 1000.005(4)(a)(6); Austin Decl. ¶¶ 27, 35, 43; *see also* Op. at 9 ("At

13

oral argument, [the State] conceded that concept six . . . is another way to describe affirmative action.").

Other Instructors similarly have standing to challenge the higher education provisions of the law. *See* Compl. ¶¶ 10–56, 147–49; Op. at 77–78, 84–85. Faced with clear and controlling precedent and Instructors' detailed allegations, the State cites to out-of-circuit authority on unrelated claims in an attempt to create a higher threshold for standing. But this Court has made clear that a plaintiff may challenge provisions of a regulation that "affect its activities," *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006), and Instructors have done more than enough to show that multiple provisions of the Act least arguably prohibit their planned instruction.

### b.    The State Cannot Ban Disfavored Viewpoints from Instruction at Colleges and Universities

#### i.    Instruction in Public Higher Education Is Not Government Speech

The Supreme Court has long recognized that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. Over six decades ago, the Supreme Court held that a legislative inquiry into the substance of a professor's lecture "unquestionably was an invasion of [the professor's] liberties in the areas of academic freedom and political expression— areas in which government should be extremely reticent to tread." *Sweezy v. New*

14

*Hampshire*, 354 U.S. 234, 250 (1957). Supreme Court precedent "leave[s] no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, '[t]he vigilant protection of constitutional freedom is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (alteration in original) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). This Court, too, has recognized in no uncertain terms that restrictions on a professor's in-class speech "implicate First Amendment freedoms." *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991).

In direct conflict with this precedent, the State asserts that classroom instruction constitutes government speech and "is not protected by the First Amendment at all." Mot. at 21. Courts reject this characterization for good reason.

Outside of the education context, the Supreme Court has held that "when the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1587 (2022). For speech to constitute "government speech," the government must be "*speaking* instead of regulating private expression." *Id.* at 1595. In determining whether speech constitutes "government speech," the Court conducts "a holistic inquiry" based on a variety of considerations, including "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking;

15

and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589–90.

Under this inquiry, Instructors' teaching is not government speech. *First*, historically, "[t]he essentiality of freedom in the community of American universities" has been "almost self-evident." *Sweezy*, 354 U.S. at 250. Unlike "the history of flag flying" examined in *Shurtleff*, 142 S. Ct. at 1591, or "the history of license plates" in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 211 (2015), instructors' in-class speech does not "usually convey the [government's] messages." College and university instructors are encouraged "to exercise their independent judgment," and they "cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them." *Wieman v. Updegraff*, 344 U.S. 183, 196–97 (1952) (Frankfurter, J., concurring).

*Second*, because "[o]ur Nation is deeply committed to safeguarding academic freedom," students are unlikely to perceive their professors' speech as communicating an official government viewpoint. *Keyishian*, 385 U.S. at 603. Indeed, students *expect* that their instructors will espouse diverging views, especially in higher-level seminar-style classes, and students sometimes choose classes based on specific instructors' pedagogy, expertise, or perspectives. Students look to their instructors to "be exemplars of open-mindedness and free inquiry," *Wieman*, 344 U.S. at 196 (Frankfurter, J., concurring), not to "convey[] some message on the

16

property owner's behalf," *Pleasant Grove City v. Summum*, 555 U.S. 460, 471 (2009).

*Third*, the government does not "maintain[] direct control over the messages conveyed" in each university lesson. *See Walker*, 576 U.S. at 213. While universities necessarily decide what courses to offer, the Supreme Court has recognized that "[t]he atmosphere of 'speculation, experiment and creation'" is "essential to the quality of higher education," *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978), and any "unwarranted inhibition upon the free spirit of teachers has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice," *Shelton*, 364 U.S. at 487.

### ii.    Academic Scholarship and Instruction Do Not Fit the *Garcetti* Framework

In *Garcetti v. Ceballos*—a case concerning an assistant district attorney's First Amendment claim of retaliation for recommending dismissal of a prosecution—the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 425 (2006). In its opinion, the Court explicitly declined to extend its holding to "case[s] involving speech related to scholarship or teaching." *Id.* The State argues that "*Bishop* anticipated and answered [*Garcetti*'s] reserved question," Mot. at 24, but this Court in *Bishop* made clear that a university

prohibiting a professor from interjecting his religious beliefs into his physiology class *did* implicate his "interest in academic freedom and free speech"—even though his interest did not "displace the University's interest" in that particular case. *Bishop*, 926 F.3d at 1076.

This Court has not yet considered whether *Garcetti* applies to professors' speech related to scholarship or teaching, but its sister circuits have held that it does not.[1] *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 498, 504, 506 (6th Cir. 2021); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011); *see also Bhattacharya v. SUNY Rockland Cmty. Coll.*, 719 F. App'x 26, 27-28 (2d Cir. 2017) (acknowledging existence of "academic freedom claim where a restriction on speech implicates the content of a teacher's lessons" but concluding the speech at issue "involved neither

---

[1] Some courts have applied *Garcetti* in the context of K-12 teachers' speech. *See, e.g.*, *Mayer v. Monroe Cnty. Comm'y Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007); *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 344 (6th Cir. 2010). But the fact that "the [F]irst [A]mendment does not entitle primary and secondary teachers . . . to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system," *Mayer*, 474 F.3d at 480; *see also Evans-Marshall*, 624 F.3d at 344, does not provide a basis for the Court to deny university instructors the right to educate students by advancing viewpoints relevant to their areas of expertise, whether or not those viewpoints are shared by state legislators. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("[G]iven the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.").

scholarship nor teaching"); *Gorum v. Sessoms*, 561 F. 3d 179, 186 (3d Cir. 2009) (recognizing that "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by [ ] customary employee-speech jurisprudence" but applying the *Garcetti* framework to speech that was not "related to scholarship or teaching").

For example, in *Demers v. Austin*, a professor alleged that his university retaliated against him after he distributed pamphlets and drafts of his book on campus. 746 F.3d at 408. The Ninth Circuit recognized that "teaching and academic writing are at the core of the official duties of teachers and professors," but also that "[s]uch teaching and writing are 'a special concern of the First Amendment.'" *Id.* at 411 (quoting *Keyishian*, 385 U.S. at 603). Because "*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor," the court held that "academic employee speech not covered by *Garcetti* is protected under the First Amendment." *Id.* at 412.

Similarly, in *Meriwether v. Hartop*, the Sixth Circuit recognized that "*Sweezy* and *Keyishian* establish that the First Amendment protects the free-speech rights of professors when they are teaching," 992 F.3d at 505, and *Garcetti* did not overrule these foundational Supreme Court cases, *id.* at 506. The court therefore held that

19

"professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Id.* at 504.

*Edwards v. Cal. Univ. of Penn.*—the only higher education case the State cites for the proposition that in-class university instruction constitutes government speech—is inapplicable, because it concerned a decision about the content of a professor's course, not the viewpoints he could advance within it. 156 F.3d 488 (3d Cir. 1998). In *Edwards*, students complained that the professor was using his Introduction to Educational Media course "to advance religious ideas." *Id.* at 489. The department chair informed the department faculty that "Edwards was teaching from a nonapproved syllabus," and they "voted to reinstate an earlier version of the IEM syllabus." *Id.* at 490. While the court determined that "Edwards d[id] not have a constitutional right to choose curriculum materials in contravention of the University's dictates," the court gave no indication that the university—much less the state legislature—could have limited particular viewpoints that Edwards could express, while permitting opposing viewpoints on the same subject. Moreover, as the Third Circuit acknowledged in *Edwards* with a "but see" citation, this Court has "f[ound] that a public university's restrictions on a professor's in-class speech 'implicate[d] First Amendment freedoms.'" *Id.* at 491 (second alteration in original) (quoting *Bishop*, 926 F.2d at 1075).

### iii.    The State Cannot Limit Higher Education Instruction to Viewpoints the Legislature Favors

While universities have leeway to control the *content* of the education they provide, the state legislature has no authority to control the *viewpoints* that may be taught. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995), is instructive on this point, despite its focus on students' speech. In *Rosenberger*, a university denied a student group's request for funding for its Christian-themed newspaper pursuant to guidelines prohibiting funding for activities that "primarily promote[d]" belief in a particular deity. *Id.* at 825. The Supreme Court held that both the guidelines and the denial of funding violated the First Amendment, because the University "by regulation[] cast disapproval on particular viewpoints of its students" and thus "risk[ed] the suppression of free speech . . . in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836.

The *Rosenberger* Court rejected the idea that "viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

The State makes much of dicta in *Rosenberger* stating that "[w]hen the University determines the *content* of the education it provides, it is the University speaking, and we have permitted the government to regulate the *content* of what is

or is not expressed when it is the speaker or when it enlists private entities to convey its *own message*." *Id.* at 833 (emphasis added). But Florida A&M University Law has not enlisted Professor Pernell, for example, to convey the Florida legislature's own preferred message on issues of race discrimination or colorblindness. Instead, the university has made a content-based decision—that it should offer advanced courses on constitutional law and the role of race in criminal procedure—and given Professor Pernell the freedom to draw from his four decades of professional experience to educate his students on those topics, even if it means advancing viewpoints with which some legislators disagree. While there are certainly content-based decisions that a university must make to ensure it has course offerings in line with its educational mission, *viewpoint*-based restrictions on which ideas professors—who are hired to advance a diversity of views—can advance in their classrooms are presumptively unconstitutional. *Id.* at 828–29.

*Board of Regents v. Southworth*, 529 U.S. 217 (2000), too, emphasized the importance of viewpoint neutrality in regulating speech on campus. In *Southworth*, the Court considered students' claim that a mandatory activities fee violated the First Amendment because it required them to fund student organizations "that engage in political and ideological expression offensive to their personal beliefs." *Id.* at 227. The Court held that the University was "entitled to impose a mandatory fee to sustain an open dialogue" so long as the allocation of funding was viewpoint neutral. *Id.* at

233. In dicta citing *Rosenberger*, the Court noted that *Southworth* did not involve "speech by an instructor or a professor in the academic context, where principles applicable to government speech would have to be considered." *Id.* at 235. This statement does not mean—as the State suggests—that the government can impose viewpoint-based limitations on professors' in-class speech. Mot. at 21. Rather, in context, the Court was leaving open the door to allow a university to consider the *content* of a professor's speech in evaluating their teaching performance or scholarly aptitude.

In *Searcey v. Harris*, this Court recognized "a school's ability to discriminate based on *content* not *viewpoint.*" 888 F.2d 1314, 1319 n.7 (11th Cir. 1989). Indeed, schools must impose some content-based restrictions in order to ensure that they have an adequate number of faculty teaching particular subjects and that their professors are complying with academic standards in their disciplines. Instructors here recognize their universities' authority to make these decisions. They *want* to teach the subjects they were hired to teach, and they are committed to doing so in compliance with the highest professional standards. But they cannot do so without violating the Act, because it inhibits their ability to fully teach particular viewpoints that are relevant to their disciplines and academic standards. *See, e.g.*, Decl. of Dr. Russell G. Almond in Support of Pls.' Mot. for a Prelim. Inj. ¶ 27, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No. 13-6.

### c.    The Instructors Will Succeed on the Merits of Their Claims Under Any Standard

The State is unlikely to succeed on the merits of its claims under any standard, including—as the district court's opinion demonstrated—the *Bishop* balancing test. In *Bishop*, this Court considered whether a professor's supervisor violated the First Amendment by instructing him to refrain from "interjecting his religious preferences and/or beliefs not necessary to class discussion or class materials." 926 F.2d at 1069. The Court followed a "case-by-case" approach, balancing an individual professor's academic freedom interests in determining the content of his course against his supervisor's interests in imposing outer bounds on the scope of permissible content in an exercise physiology course. *Id.* at 1074 (quoting *Mailloux v. Kiley,* 448 F.2d 1242, 1243 (1st Cir. 1971) (per curiam)).

The present case is significantly easier. Here, Instructors seek to vindicate all Florida university instructors' academic freedom interests in determining which viewpoints to advance in their classrooms, while the State seeks to justify the legislature's purported interest in banning viewpoints that it has deemed too "woke."[2] The State cannot point to any precedent for the proposition that a legislature's interest in eliminating views it disfavors from university classrooms is

---

[2] "Woke" speech is defined as "alert to racial or social discrimination or injustice." Woke, *Oxford English Dictionary* (3d ed. 2017).

at all legitimate—let alone strong enough to outweigh the "transcendent value" of professors' academic freedom. *See Keyishian*, 385 U.S. at 603.

As the district court's opinion demonstrates, Instructors easily satisfy the balancing test from *Bishop*, as all three of the factors that the *Bishop* court considered—context, the university's position as a public employer, and the predilection for academic freedom—weigh in Instructors' favor. Op. at 93–107.

**Context.** In *Bishop*, the restriction placed on the professor's speech was plainly aimed at the impropriety of religious content in a gym class, not at the particular religious viewpoint; the case would have been identically decided had the professor been advocating atheism rather than Christianity.

Unlike the speech restriction in *Bishop*, the Stop W.O.K.E. Act is not a narrow requirement imposed in response to a particular breach of a university's curricular requirements, but rather a "prophylactic ban on university employees' speech [that] affects potentially thousands of professors and serves as an *ante hoc* deterrent that 'chills potential speech before it happens,' and 'gives rise to far more serious concerns than could any single supervisory decision.'" Op. at 93 (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995)).

**Position as public employer.** *Bishop* involved restrictions on a professor's speech imposed by a supervisor and affirmed by the university president. 926 F.2d 1069. There, this Court noted that the *Keyishian* Court's "pronouncements about

academic freedom" in the context of loyalty oaths "cannot be extrapolated to deny schools command of their courses." *Id.* But here, where the Court must consider restrictions that the *legislature* imposed on instructors throughout Florida, no such extrapolation is required.

Unlike in *Bishop*, the Court in this case need not balance the interest in "independent and uninhibited exchange of ideas among teachers and students" against the interest in "autonomous decisionmaking by the academy itself," *id.* at 1075 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985)), because the legislature is not entitled to its own academic freedom, nor to deference in academic decisions such as what courses to offer, what topics to cover, and how they should be taught, that run counter to those made by the university itself.

As the district court recognized, the State's attempt "to dress up [its] interest as a public employer and educator as prohibiting discrimination in university classrooms . . . does not give [the State] a safe harbor in which to enforce viewpoint-based restrictions targeting protected speech." Op. at 97.

**Academic freedom.** As the district court recognized, here, the Instructors' "free speech claims present an interest in academic freedom of the highest degree," as they "are not attempting to alter the permitted curriculum. Instead, they seek to prevent the State of Florida from imposing its orthodoxy of viewpoint about that curriculum in university classrooms across the state." *Id.* at 105.

*Bishop* considered the "University's authority to reasonably control the *content* of its curriculum, particularly that *content* imparted during class time." 926 F.2d at 1074 (emphasis added). This Court concluded that the university could prevent Dr. Bishop "from presenting his religious viewpoint during instructional time, even to the extent that it represents his professional opinion about his subject matter." *Id.* at 1076. But this language does not mean—as the State suggests—that this Court condoned viewpoint-based discrimination of a professor's in-class speech in *Bishop*. Instead, this Court was concerned that Dr. Bishop had not "fully comprehended the separation of his personal views from his professorial duties that the University demands," *id.* at 1076 n.7, and determined that "the University's interest in the classroom conduct of its professors [were] sufficient . . . to warrant the reasonable restrictions it ha[d] imposed on Dr. Bishop," *id.* at 1076. As this Court stated, "[t]he University has simply said that he may not discuss his religious beliefs or opinions under the guise of University courses." *Id.*

Instructors here do not contend that they have a First Amendment right to promote their views about religion in physiology classes, teach sociology instead of math, or conduct their courses without adhering to standards set by their departments or professional academic bodies. A professor who, for instance, is alleged to have taught her students that the Holocaust was a hoax, *cf.* Mot. at 31, would likely be summoned by her department chair to explain the basis for the lesson and the context

surrounding it. While the university may, as an exercise of its own academic freedom, determine that the professor's lesson failed to meet its academic standards and impose restrictions accordingly, the legislature may not prophylactically prohibit professors from advancing disfavored viewpoints directly relevant to their courses, while permitting them to denounce those same viewpoints.

As the district court held, the Stop W.O.K.E. Act "is antithetical to academic freedom and has cast a leaden pall of orthodoxy over Florida's state universities," and "[n]either the State of Florida's authority to regulate public school curriculum, nor its interest in preventing race or sex discrimination can support its weight." Op. at 106.

Moreover, it is undisputed that the Stop W.O.K.E. Act is a viewpoint-based restriction. Prelim. Inj. Hrg. Tr. at 42, 46, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Oct. 13, 2022). And, as Instructors have demonstrated, this viewpoint-based restriction applies to speech protected under the First Amendment. For these reasons, Instructors argued below that the Stop W.O.K.E. Act is presumptively unconstitutional and should be subject to strict scrutiny. Mem. in Support of Pls.' Mot. for Prelim. Inj. 17–18, 28–29, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No. 13; *see also Rosenberger*, 515 U.S. at 829–30; *Speech First, Inc.*, 32 F.4th at 1127 n.6 ("The Supreme Court has consistently held that the government may not regulate on the basis of viewpoint even within a category of

otherwise proscribable speech"). Because the State's interest in promulgating the Act was silencing disfavored viewpoints—an interest that, far from compelling, is impermissible—the Act cannot survive such scrutiny. But as the district court thoroughly explained, the State is likely to fail on the merits even under a more lenient standard.

### d.   The Stop W.O.K.E. Act Is Unconstitutionally Vague

A law violates the Due Process Clause's prohibition of vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Jones v. Governor of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). The degree of vagueness the Constitution tolerates is informed by the nature of the law, and the "[s]tandards of permissible statutory vagueness are strict in the area of free expression." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (2017) (en banc) (quoting *NAACP v. Button*, 371 U.S. 415, 432 (1963)); *see also Keyishian*, 385 U.S. at 603; *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'" *Keyishian*, 385 U.S. at 604 (quoting *NAACP v. Button*, 371 U.S. at 432–33).

The Supreme Court in *Keyishian* squarely considered laws prohibiting college professors from holding or expressing disfavored views and instructed that a heightened concern with vagueness applies in this context. *Keyishian*, 385 U.S. at 603. Reflecting on the importance of free speech as a foundation for academic freedom, the Court stressed that "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* (quoting *Sweezy*, 354 U.S. at 250).

Cases considering vagueness in regulations of public employment contexts outside of higher education do not carve out a separate, diminished "public-employee standard" for vagueness as the State suggests. Mot. at 34. *O'Laughlin v. Palm Beach County*, 30 F.4th 1045, 1055 (11th Cir. 2022), cited by the State, merely restates the notice requirement of the vagueness prohibition and does not address, much less relax, the scrutiny applied to a law infringing free speech, as O'Laughlin had "abandoned any vagueness argument" on appeal. *Id.* And while the district court here concluded that the law's terms were vague "even under this 'ordinary person using common sense' test for public employees" as put forward by the State, Op. at 114, it did not adopt this as the governing standard as the State contends, Mot. at 35.[3]

---

[3] The State additionally asserts without elaboration that "[b]ecause Plaintiffs challenge the Act on a pre-enforcement basis, their burden to show the risk of discriminatory enforcement is much higher." Mot. at 35. Such an undeveloped

Vagueness permeates the entirety of the Stop W.O.K.E. Act, which prohibits "training or instruction that espouses, promotes, advances, inculcates, or compels [a student] to believe" one of the eight banned concepts. Fla. Stat. Ann. § 1000.05(4)(a). The terms of the Stop W.O.K.E. Act do not give the Instructors fair notice of when their speech and expression will be construed to endorse a disfavored viewpoint, and permits arbitrary and discriminatory enforcement. Like the prohibition the Supreme Court found vague in *Keyishian*, which prohibited hiring or retaining a higher education instructor who "wilfully and deliberately advocates, advises or teaches the [prohibited] doctrine," 385 U.S. at 599, the Stop W.O.K.E. Act could be interpreted to prohibit promoting or advancing "the [disfavored] doctrine in the abstract without any attempt to indoctrinate," *id.*, as well as presenting students with viewpoints that promote, or advance the concepts, without any attempt

---

argument certainly fails as a basis to stay the lower court's ruling. Moreover, to the extent the State endeavors to rely on dicta in *Hoffman Estates*, their position is clearly foreclosed by Supreme Court and Circuit precedent. *Johnson v. United States*, 576 U.S. 591, 602 (2015) ("[O]ur *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."); *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); *United States v. Caldwell*, 655 F. App'x 730, 732 (11th Cir. 2016) (recognizing that a law may be unconstitutionally vague even where it "can be read to cover *some* conduct") (citing *Johnson*, 576 U.S. 591); *United States v. Jones*, No. 20-11841, 2022 WL 1763403, at *2 n.1 (11th Cir. June 1, 2022) (quoting *United States v. Bramer*, 832 F.3d 908, 909–10 (8th Cir. 2016) (alterations in original) ("Though [the defendant] need not prove that [the challenged statute] is vague in all its applications, our case law still requires him to show that the statute is vague as applied to his particular conduct.")).

to indoctrinate, *see id.* at 600 (finding vagueness in prohibition on distribution of material "advocating, advising or teaching"). *See also* Op. at 119 (recounting the State's position that inviting a "guest speaker who promoted one of the eight concepts as part of a classroom debate where all sides of the issue were represented would still run afoul of the law"). The law's vagueness is only enhanced by the Board of Governors regulations, which condition the institution's performance funding on compliance with the law. *10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022), available at https://bit.ly/3xqDCX8.

An additional clause, providing the Act "may not be construed to prohibit discussion of the concepts . . . provided . . . instruction is given in an objective manner without endorsement of the concepts," further compounds the law's vagueness. *Id.* at § 1000.05(4)(b). The State contends this clause means that "the Act permits instructors to discuss the concepts without *expressing approval* of them," or by criticizing them. Mot. at 38. As the district court observed, this argument departs from the plain meaning of "objective" as found in the dictionary. Op. at 116. "It suggests that speech *condemning* a viewpoint is objective, but *approving* a viewpoint renders the teaching unobjective." *Id.* at 119 (quoting Mem. in Support of Pls.' Mot. for Prelim. Inj., *Novoa v. Diaz*, No. 4:22-cv-324-MW/MAF (N.D. Fla. Sept. 15, 2022), ECF No. 19); *see also id.* at 122 (recounting college guidance recommending

teaching concepts objectively by "including multiple perspectives on them"). By the State's own concession, the law would prohibit the introduction of viewpoints expressing approval on a topic for debate, regardless of whether the broader curricular objective is to "endorse" the concept or provide "objective" instruction. *Id.* at 119.

As the district court concluded, "[n]o ordinary person would understand 'objective' instruction to allow for this imbalance." *Id.* at 120; *see also id.* at 119 (finding that, under the law, "'objective' instruction allows for only one side of the debate in Florida's public universities—or for no debate at all"); *Keyishian*, 385 U.S. at 601 ("[D]oes the university librarian who recommends the reading of such materials thereby 'advocate the propriety of adopting the doctrine contained therein'?").

The provisions setting out the individual banned concepts introduce additional vagueness in the law. For example, prohibited concept four "features a rarely seen triple negative, resulting in a cacophony of confusion" and making it "unclear what is prohibited and even less clear what is permitted. *Id.* 114–15 (citing *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019) (striking down prohibition on political speech with "a tangle of double negatives that [was] vague enough to ensnare nearly any message" and lacked "a sufficiently definite standard . . . to exercise discretion")); *Albanese v. McGinnis*,

823 F. Supp. 521, 563 (N.D. Ill. 1993) ("Triple negatives are not conducive to comprehension."). As the court concluded, the State's proposed altered definition—that "educators *cannot* endorse the view that members of one demographic *can and should* attempt to treat others *with* respect to the listed characteristics," Op. at 115—is no cure, leaving open ambiguity as to whether the Act "prohibit[s] anything other than colorblindness," "bans topics such as affirmative action and diversity," or permits educators to "acknowledge their students' differing cultural backgrounds." *Id.*

Without discussing the particular definitions, the State contends that because the "ordinary meaning" of the law's terms may be derived from the dictionary, the Act is "readily understandable." Mot. at 35. But as the district court recognized, "[w]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words." Op. at 113 (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015)). Rather, "the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole." *Yates*, 574 U.S. at 537 (2015) (cleaned up).

The State's assertion that the Act contains an implied scienter requirement, "restricting only the *intentional* act of providing classroom instruction," does nothing to cure the vagueness violation. Mot. at 35–36 (emphasis added). First, to

identify such an implied scienter requirement would require this Court to stretch well beyond its narrow authority in interpreting state law. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[I]t is not within our power to construe and narrow state laws."). Moreover, Instructors' contention, and the district court's conclusion, is that materials arguably including the banned concepts could be intentionally presented for a number of reasons, and the law does not distinguish these. Op. at 123. A scienter requirement would not resolve the potential for arbitrary and discriminatory enforcement of the Act. Nor does the potential for vindication in court based on a lack of intent sufficiently mitigate vagueness that chills free speech. *See Keyishian*, 385 U.S. at 604 ("[T]he threat of sanctions may deter almost as potently as the actual application of sanctions.") (cleaned up) (quoting *NAACP v. Button*, 371 U.S. at 433).

Likewise, regulations providing for disciplinary action "if there is a failure or refusal to comply," Mot. at 36, do not give more clarity to the law's terms, prevent chill, or reduce the potential for arbitrary or discriminatory enforcement. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 58–59 (1999) ("Because an officer may issue an order only after prohibited conduct has already occurred . . . [s]uch an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible applications of the law."); *Wright v. Georgia*, 373 U.S. 284, 292 (1963) (a law would violate the vagueness prohibition if individuals were found

guilty "because they disobeyed the officers"); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–91 (1965) (considering a law that prohibited loitering "after having been requested by any police officer to move on" and finding that the law "d[id] not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat") (citations omitted).

Unlike the statute at issue in *U.S. Civil Service Commission v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973), cited by the State, Mot. at 36, neither the Stope W.O.K.E. Act nor its implementing regulations include a mechanism for Instructors to seek advance clarification about how the prohibitions apply to their instruction, leaving them at risk if they chose not to self-censor. *Nat'l Ass'n of Letter Carriers*, 413 U.S. at 580. To be clear, while a mechanism for preclearance would mitigate some of Instructors' vagueness concerns, even if the Act did include such a mechanism, it would still be unconstitutional on First Amendment grounds. Because of the Act's pervasive vagueness, this Court should decline to stay the injunction and make clear that Instructors can continue to teach comprehensively about race and sex. Deciding otherwise would immediately reinstate the chill over Instructors' speech.

## II.    The Balance of Interests Does Not Support Disruption of the Preliminary Injunction

### a.    A Stay Would Irreparably Harm the Instructors

In determining whether a stay should be granted, the Court must also consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Nken*, 556 at 434. At the time of filing the Complaint, the vague and viewpoint restrictive language of the Stop W.O.K.E. Act prohibited Instructors from teaching their regular, pedagogically sound curricula because doing so arguably advanced the law's "prohibited concepts." Some Instructors feared using their own academic research, casebooks, and articles in their assigned coursework or otherwise incorporating them into their syllabi because the materials endorse prohibited concepts. *See, e.g.*, Compl. ¶¶ 22, 28, 57; Op. at 37. As a result of the Act's vague language, Instructors have no way to determine whether their class instruction would constitute a violation, casting the educational experience they would be able to provide students in the spring semester in a shroud of uncertainty. *See, e.g.*, Decl. of Prof. LeRoy Pernell in Support of Pls.' Mot. for a Prelim. Inj. ("Pernell Decl.") ¶¶ 23–26, 28, *Pernell*, No. 4:22-cv-304-MW/MAF (N.D. Fla. Aug. 24, 2022), ECF No 13-1; Austin Decl. ¶¶ 41, 43. The Act's chilling effect is especially broad given the severity of penalties for violations. Because of the Act's lack of clarity, instructors will err on the side of caution and refrain from teaching subject matter that arguably runs afoul of the Act.

The preliminary injunction stanched the harm and chilling effect of the Act, allowing Instructors to move forward, as usual, with time-sensitive preparations to teach their regular courses. To reverse course once again, when students have already begun enrolling in their courses for the upcoming semester, would cause immediate harm, upending plans the Instructors have made—from what they plan to teach in class or assign in the syllabi, to whether they may they teach their course at all.

A stay of the preliminary injunction also threatens Instructors' ability to continue their work at Florida's higher education institutions more broadly. If the Act were to go into force again, Instructors anticipate a decline in student enrollment in their courses, which would in turn decrease incentives for institutions to continue offering courses and hiring instructors that may implicate any of the Act's prohibited concepts. *See* Pernell Decl. ¶ 30.

### b.    Denial of a Stay Would Not Cause Irreparable Injury to the State

The State has failed to meet its burden of establishing that a denial of a stay would result in irreparable harm. This is especially true given that this Court's review of the preliminary injunction is for abuse of discretion, and any findings of fact are reviewed for clear error. *Lee*, 915 F.3d at 1317. The "failure to show that the injunction would cause irreparable injury is [alone] an adequate and independent basis for denying the motion to stay pending appeal." *Ga. Muslim Voter Proj. v.*

*Kemp*, 918 F.3d 1262, 1268 (11th Cir. 2019) (Pryor, J., concurring). Nor is it sufficient to "simply show[] some possibility of irreparable injury." *Nken*, 556 U.S. at 434–35 (citation omitted). The State bears the burden to identify an irreparable injury they *will* suffer absent a stay, and it has not done so.

Citing to a chambers opinion of Chief Justice Roberts, which is not binding on this Court, the State argues that irreparable injury always occurs when it has been enjoined from enforcing its laws. Mot. at 41 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up)). The State's assertion is not the law, nor should it be. However, Chief Justice Robert's opinion in *King* pertained to *constitutional* legislative enactments. Indeed, the Supreme Court has made clear that any such presumed harm is only applicable to statutes that are constitutional. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("Unless that statute is *unconstitutional,* [enjoining a statute] would seriously and irreparably harm the State.") (emphasis added).

Moreover, the State's position runs contrary to the rule that a movant has an evidentiary burden to show irreparable harm. *See Miller v. Comm'r*, No. 22-13136, 2022 U.S. App. LEXIS 26689, at *2 (11th Cir. Sept. 22, 2022) ("Like other stay applicants, the State here must satisfy all requirements for a stay. . . . One of the things the State *must* show—and one of the two most important—is that it will suffer irreparable harm if a stay is not granted.") (citations and quotations omitted); *Lee*,

915 F.3d at 1326 (discussing arguments the State raised to demonstrate irreparable injury it would suffer if the appellate court did not stay the lower court's preliminary injunction enjoining portions of the state's voting legislation).

### c.    The Public Interest Weighs Against a Stay

The State makes little effort to satisfy its burden to establish that the remaining factor—the public interest—weighs in favor of a stay. Nor could it: Consideration of the public interest weighs decisively against a stay. *See Lee*, 915 F.3d at 1317. The public has no interest in the enforcement of an unconstitutional law. *See id.* at 1327 ("[T]he public interest is served when constitutional rights are protected."); *KH Outdoor, LLC*, 458 F.3d at 1272 ("[There is] no legitimate interest in enforcing an unconstitutional ordinance."). The State's only argument about the public interest, made in passing, is that there is "a compelling interest in ending discrimination based on race and other immutable characteristics" which would be hamstrung absent a stay. Mot. at 41. This is not enough. *See Kellner v. NCL (Bah.), Ltd.*, 753 Fed. App'x 662, 665 (11th Cir. 2018) ("Merely passively referencing or perfunctorily raising [an] argument will not suffice."). As the district court noted, the portions of the Florida Educational Equity Act that the Stop W.O.K.E. Act did not amend remain in full effect to protect Floridians from any discrimination in education. Op. at 128. Indeed, the district court's findings establish that the public would be *disserved* by

lifting the preliminary injunction of the Stop W.O.K.E. Act until the merits of Instructors' claims can be fully considered.

## CONCLUSION

For all of these reasons, this Court should deny the State's motion to stay the preliminary injunction pending appeal.

Dated: December 22, 2022                    Respectfully submitted,

**ACLU FOUNDATION OF FLORIDA**

*/s/ Jerry C. Edwards*
Jerry C. Edwards
Fla. Bar No. 1003437
ACLU FOUNDATION OF FLORIDA
933 Lee Rd., Ste. 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

Daniel B. Tilley
Fla. Bar No. 102882
Caroline McNamara
Fla. Bar No. 1038312
Jacqueline Azis
Fla. Bar No. 101057
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnarama@aclufl.org
jazis@aclufl.org

*Counsel list continued on next page.*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

*/s/ Leah Watson*
Leah Watson*
Emerson Sykes
Laura Moraff
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad St., Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
lmoraff@aclu.org

**NAACP LEGAL DEFENSE & EDUCATION FUND**

*/s/ Lauren A. Johnson*
Lauren A. Johnson
Jin Hee Lee
Santino Coleman
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
700 14th Street, Ste. 600
Washington, D.C. 20005
(202) 682-1300

**BALLARD SPAHR, LLP**

*/s/ Jason Leckerman*
Jason Leckerman
BALLARD SPAHR, LLP
1735 Market St., Fl. 51
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main St., Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

ljohnson@naacpldf.org
jlee@naacpldf.org
scoleman@naacpldf.org

Alexsis Johnson
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10006
(212) 217-1690
amjohnson@naacpldf.org


* Admitted *pro hac vice*

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because this motion contains 9,547 words, in accordance with Plaintiffs-Appellees' unopposed motion for leave to file a brief in excess of the type-volume limitation, which requested a word limit of 10,000 words and was filed simultaneously with this motion.

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated:  December 22, 2022                 */s/ Leah Watson*
                                          Leah Watson

                                          *Counsel for Plaintiffs-Appellees*

43

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit, using the appellate CM/ECF system on December 22, 2022. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated:  December 22, 2022

*/s/ Leah Watson*
Leah Watson

*Counsel for Plaintiffs-Appellees*