Nos. 22-13992 & 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

---

LEROY PERNELL, ET AL.,

*Plaintiffs–Appellees,*

v.

BRIAN LAMB, ET AL.,

*Defendants–Appellants.*

---

ADRIANA NOVOA, ET AL.,

*Plaintiffs–Appellees,*

v.

MANNY DIAZ, JR., ET AL.,

*Defendants–Appellants.*

---

## REPLY IN SUPPORT OF APPELLANTS' MOTION FOR STAY PENDING APPEAL

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NOS. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

---

CHARLES J. COOPER
JOHN D. OHLENDORF
MEGAN M. WOLD
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Leroy Pernell, et al. v. Brian Lamb, et al.,* 22-13992
*Adriana Novoa, et al. v. Manny Diaz, Jr., et al.,* 22-13994

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. Rule 26.1, I certify that the Certificates of Interested Persons contained in Defendant-Appellants' Motion for Stay Pending Appeal and the other briefs that have been filed in this appeal are, to the best of my knowledge, complete.

Dated: January 5, 2023                    Respectfully submitted,

                                          /s/Charles J. Cooper
                                          Charles J. Cooper

                                          *Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .............................................................................1

ARGUMENT ..................................................................................6

I.    Plaintiffs Lack Standing To Challenge the Act's First, Third, Fifth, and Sixth Concepts. ..........................................................6

II.   The Act Does Not Violate the First Amendment. ..........................................7

      A.    *Bishop* Squarely Controls this Case. ....................................................7

      B.    The Speech at Issue Is Government Speech. ......................................11

III.  The Act Is Not Unconstitutionally Vague. ....................................................18

IV.   Equitable Considerations Favor a Stay..........................................................20

CONCLUSION ................................................................................22

## TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ...............................................21

*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004) ......6, 7

*Amalgamated Transit Union Local 85 v. Port Auth.*,
    39 F.4th 95 (3d Cir. 2022) ................................................17

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) .............................17, 18

*Arnett v. Kennedy*, 416 U.S. 134 (1974) .....................................18

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991).......................1, 2, 3, 4, 5, 7, 8, 9

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019)..........................15

*California v. Texas*, 141 S. Ct. 2104 (2021) ..................................7

*Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237 (6th Cir. 2006).........10

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)...............................16

*Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488 (3d Cir. 1998) ....................12

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) ...........................................12

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................12, 14

*Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*,
    186 F. App'x 885 (11th Cir. 2006) .....................................12, 13

*Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001) ................3

*Grutter v. Bollinger*, 539 U.S. 306 (2003).................................10

*Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018)........................21

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) .....................14

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)....................................4

*Lane v. Franks*, 573 U.S. 228 (2014)........................................16

*Lee v. York Cnty Sch. Div.*, 484 F.3d 687 (4th Cir. 2007).......................15

*Maryland v. King*, 567 U.S. 1301 (2012) ....................................21

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) .........12, 13

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .............................15

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022).........................18

*Pickering v. Bd. of Educ*, 391 U.S. 563 (1968)..................................................16, 17

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ........................11, 12, 13, 14

*Rosenberger v. Univ. of Va.*, 515 U.S. 819 (1995) .............................5, 11, 13, 14, 15

*Rust v. Sullivan*, 500 U.S. 173 (1991)..............................................................11

*San Filippo v. Bongiovanni*, 961 F.2d 1125 (3d Cir. 1992) ....................................18

*Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291 (2014) ..................10, 11

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ..........................................13, 14

*United States v. NTEU*, 513 U.S. 454 (1995) ............................................................9

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) .........................................6

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)....................................................................13, 14

*Waters v. Churchill*, 511 U.S. 661 (1994) ..............................................................18

*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)................................16

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) ................................................17

## **Statutes and Regulations**

FLA. STAT. § 1000.05(4)(a) ....................................................................................9

FLA. STAT. § 1000.05(4)(b)...................................................................................19

Regulation 10.005 .................................................................................................10

Regulation 10.005(3)(c) .........................................................................................20

## INTRODUCTION

Plaintiffs say that this Court's decision in *Bishop* is not their foe, but rather is their friend, supporting their claim that the First Amendment vests them with the academic freedom to espouse in their classrooms such "pedagogically relevant" personal beliefs as, for example, that "[m]embers of one race ... are morally superior to members of another race." They argue that the Individual Freedom Act's ["IFA"] prohibition on their classroom advocacy of this concept and seven similar concepts cannot survive scrutiny under *Bishop*'s three-factor balancing test for, as this Court put it, "calibrat[ing] the Constitution" in cases such as this. *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991).

One would expect, then, that Plaintiffs would make some effort to explain how their argument can possibly be squared with the *rule* established in *Bishop* as a result of the Court's calibration: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments," and so "the University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id.* at 1077. But Plaintiffs do not even *mention* the *Bishop* Court's unequivocal *rule* that "[t]he University must have the final say in ... a dispute" with a professor "about a matter of content in the courses he teaches." *Id.* at 1076.

1

Plaintiffs cannot expunge these unequivocal passages from *Bishop* simply by ignoring them. But even if they could, a straightforward application of the Court's three-factor balancing test is no less fatal to their constitutional claim.

With respect to the first factor—the classroom context of Dr. Bishop's religious indoctrination—the Court emphasized "the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid." *Id.* at 1074. Just as the university in *Bishop* insisted on "the separation of [Dr. Bishop's] personal views from his professorial duties," *id.* at 1076 n.7, the IFA insists that university professors not use their inherent influence with students to inculcate their personal views endorsing the prohibited concepts. Plaintiffs argue that *their* personal opinions endorsing the concepts are "pedagogically relevant" to their classes, while *Dr. Bishop*'s personal religious beliefs were of "uncertain relevance" to his physiology courses. Doc. 20-1 at 23, 24, 28 ("Novoa Resp."). But the *Bishop* Court expressly accepted that Dr. Bishop's "religious viewpoint" "represents his professional opinion about his subject matter," 926 F.2d at 1077, 1076 n.7. The relevance of Dr. Bishop's personal views to his courses was assumed, and yet the Court upheld the university's (that is, the State's) authority to demand that he keep his personal views to himself.

Plaintiffs argue next that the ban on Dr. Bishop's classroom expression of his "Christian perspective" was not viewpoint based because the case would have come

2

out the same way no matter what religious faith (or even atheism) Dr. Bishop espoused. Doc. 31 at 25 ("Pernell Resp."). But a restriction on religious expression, whether specific to a particular religion or general to any and all religions, is perforce viewpoint discriminatory. *See Good News Club v. Milford Central Sch.*, 533 U.S. 98, 111-112 (2001) ("speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint"); *id.* at 125 (Scalia, J., concurring) ("In *Rosenberger* ... we struck down a similar viewpoint restriction."). The *Bishop* Court's repeated references to Dr. Bishop's religious *viewpoint* was neither accidental nor mistaken.

The second factor balanced in *Bishop*—the university's status as Dr. Bishop's "public employer which may reasonably restrict the speech rights of employees"—also cut against the professor's First Amendment claim, given "the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time." 926 F.2d at 1074. Plaintiffs say that this factor cuts in their favor here, for two reasons.

First, Plaintiffs argue that *Bishop* dealt with a restriction on a single professor, while the IFA restricts professors in all state institutions. Pernell Resp. 25. There is no doubt at all, however, that *Bishop* would have come out the same way if the Court had been reviewing a university-wide policy. Indeed, this Court said as much: "The University necessarily has dominion over what is taught by its professors and may

3

so manage them." 926 F.2d at 1078. Second, Plaintiffs argue that *Bishop* is distinguishable because it involved a classroom speech restriction "imposed by a supervisor and affirmed by the university president," while this case involves restrictions imposed by the *legislature*. Pernell Resp. 25-26. This is true, but Plaintiffs are reading the organization chart for public universities upside down: the *legislature* clearly has the authority to define and prevent invidious discrimination in the universities that it creates and funds, and Plaintiffs can cite no case supporting the notion that a public university has constitutional autonomy from legislative control, let alone that a university president has a constitutional authority to restrict classroom speech that the state legislature lacks.

The final *Bishop* factor was "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." 926 F.2d at 1075. Throughout their briefs, Plaintiffs repeatedly quote the "pall of orthodoxy" dictum from *Keyishian* as an all-purpose trump card decisively supporting their claim. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The *Bishop* Court also quoted this same passage from *Keyishian*, but did not accord it significant, let alone dispositive, weight: *Keyishian's* "pronouncements about academic freedom in [the loyalty oath] context ... cannot be extrapolated to deny schools command of their own courses.... [W]e do not find support to conclude that academic freedom is an

independent First Amendment right. And, in any event, we cannot supplant our discretion for that of the university." 926 F.2d at 1075.

*Bishop* was actually a harder case than this one, for it was decided before *Rosenberger*, *Rust*, and the Supreme Court's subsequent government speech cases. Those cases hold that speech uttered by government employees "pursuant to their official duties" is the government's own speech and thus is not constitutionally protected from the government's restrictions. When the government itself speaks, "it is entitled to say what it wishes." *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 833 (1995). The essential official duty of a public university educator is to speak; that is the very purpose of the job. If any public employees are within the government speech doctrine, surely they are. Plaintiffs, and the court below, argue that public university educators, uniquely among all government employees, lie outside the scope of the doctrine; that they stand alone on a First Amendment pedestal, free to say what they please, no matter what their government employers, including even the State Legislature, think about it. This is not a tenable understanding of the First Amendment.

Finally, Plaintiffs' efforts to rescue the district court's vagueness analysis also fail. The Pernell Plaintiffs dispute the district court's application of the "ordinary, common sense" vagueness standard for public employees, but they fail to grapple with the binding precedent that establishes it. And on the merits, Plaintiffs do no

5

more than regurgitate the district court's vagueness analysis—which is fatally flawed for the reasons explained in our stay application, reasons which Plaintiffs entirely ignore.

## ARGUMENT

### I.    Plaintiffs Lack Standing To Challenge the Act's First, Third, Fifth, and Sixth Concepts.

As explained in our stay application, Doc. 7 at 14-19 ("Mot."), Plaintiffs did not demonstrate—nor even adequately allege—that their intended instruction would plausibly violate every concept in the Act. Nevertheless, the district court searched the record for standing arguments no Plaintiff had made and concluded that Plaintiffs had standing for a preliminary injunction with respect to every provision of the Act. Plaintiffs do not dispute that the district court made their standing arguments for them. But "our system is designed around the premise that" *the parties* "are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

The Pernell Plaintiffs attempt to justify their windfall from the district court by reciting a host of statements from two instructors' declarations. Pernell Resp. 11-14. Missing from the list, however, are citations to places where the Plaintiffs actually made these arguments below. The Novoa Plaintiffs do the same, citing allegations in their complaint to make a new argument for standing never advanced below. Novoa Resp. 28. These arguments, first offered on appeal, are forfeited. *See*

6

*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004); *California v. Texas*, 141 S. Ct. 2104, 2116 (2021).

Professor Novoa contends that Defendants "conceded" she has standing to challenge concept 7 at the pleading stage. Novoa Resp. 26-27. True, and our stay application did not challenge Novoa's standing as to concept 7, either. Rather, we challenged her standing to challenge concept 3, *see* Mot. 17, and the district court's sua sponte conclusion that she *also* has standing to challenge concepts 1, 2, and 5—provisions that she *never expressed any intention* to violate below, *see id.* at 17-18.

## II.    The Act Does Not Violate the First Amendment.

### A. *Bishop* Squarely Controls this Case.

Plaintiffs' arguments, like the district court's analysis, squarely conflict with this Court's decision in *Bishop*. There, this Court made clear that public-university professors do not hold a First Amendment license to determine what is taught in the classroom. To the contrary, the "University necessarily has dominion over what is taught by its professors and may so manage them." *Bishop*, 926 F.2d at 1078. Ignoring this clear holding of *Bishop*, Plaintiffs argue primarily that *Bishop*'s three-factor balancing test yields a contrary result here. We have already refuted this argument, *supra* at 1-5, and will not repeat those points here. Plaintiffs' remaining arguments about *Bishop* are likewise meritless.

7

Like the district court, Plaintiffs contend that *Bishop* permits the State to regulate curricular speech based on *content*—the *subjects* taught in the curriculum—but not *viewpoint*—the personal viewpoints espoused by educators during classes on those subjects. *Bishop*, Plaintiffs contend, is "derivative of" *Kuhlmeier* and *Pickering*; and because those cases, Plaintiffs say, do not permit viewpoint discrimination, neither does *Bishop*. Novoa Resp. 20-21. Instead, according to Plaintiffs, *Bishop* was about the *relevance* of Dr. Bishop's personal viewpoints; it permitted the State to regulate the speech of a professor "offering personal religious views with little (if any) connection to the course subject matter." Novoa Resp. 24.

*Bishop* expressly *disclaimed* the idea that its analysis was somehow dictated by *Pickering* and *Kuhlmeier*. Instead, because those cases (and related decisions) were "ultimately inconclusive" and not "satisfactorily on point," it had to "frame [its] own analysis." 926 F.2d at 1072-74. And under that analysis, "the University must have the final say" in any dispute with a professor "about a matter of content in the courses he teaches." *Id.* at 1076.

Plaintiffs next argue that following *Bishop* in this case would render "academic freedom" a "nullity." *See* Novoa Resp. 27. In support of this argument, Plaintiffs quote dicta from *Keyishian* and *Sweezy*. Novoa Resp. 4, 17, 27-28; Pernell Resp. 14-15. But the *Bishop* Court quoted the same passages, *see* 926 F.2d at 1075, and yet squarely held that the Supreme "Court's pronouncements about academic

8

freedom" in these cases "cannot be extrapolated to deny schools command of their own courses." *Id.* Indeed, Bishop expressly rejected the claim that "academic freedom is an independent First Amendment right." *Id.*

Plaintiffs lastly attempt to distinguish *Bishop* on its facts. They point out that *Bishop* involved a lone university's action against one professor, while this case involves a state-wide regulation of curricular speech. But the principles articulated by *Bishop* foreclose any suggestion that the Court would have struck down a university-wide or state-wide policy barring professors from espousing their personal religious beliefs in class. It held, after all, that the "University necessarily has dominion over what is taught by its professors and may so manage them." 926 F.2d at 1078.

Nor does the Supreme Court's decision in *NTEU* help Plaintiffs. *NTEU* imposed a greater burden on the government not because it involved a government-wide regulation, but "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment" and took "place outside the workplace." *United States v. NTEU*, 513 U.S. 454, 470 (1995); *see also id.* at 475. Here, in contrast, the speech at issue *only* involves the subject matter of government employment and takes place only *in* the classroom or other instructional setting. The Act applies *only* to "instruction." FLA. STAT. § 1000.05(4)(a). It thus does not apply to Plaintiffs' "academic scholarship," Pernell Resp. 17, speeches outside of class, or

publications. Nor does the Act, contrary to Plaintiffs' and the district court's claims, reach speeches or debates by guest speakers or other invitees who, unlike the State's own educators in the classroom, do not speak with the imprimatur of the State. *See* Regulation 10.005 (defining "instruction" to mean teaching "by a university employee" or other person "authorized to provide instruction by the university within a course.")

Plaintiffs also argue that *Bishop* permits a state university (or its president), but *not* the State Legislature, to regulate professors' in-class speech. This remarkable argument, not surprisingly, is unsupported by citation to any authority. The idea that "[u]niversities, as subordinate organs of the State, have First Amendment rights against" or above "the State or its voters" is antithetical to any proper understanding of State sovereignty. *See Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006). Even *Grutter*, which stated that "universities occupy a special niche in our constitutional tradition," nevertheless *endorsed* the idea that States are entitled to regulate universities. *Grutter v. Bollinger*, 539 U.S. 306, 329, 342 (2003); *see also Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 301 (2014) (plurality); *id.* at 317 (Scalia, J., concurring).

Finally, the potential consequences of Plaintiffs' constitutional theory are frightening. Look no further than Plaintiffs' own discussion of a professor who denies the Holocaust during in-class instruction. Pernell Resp. 27. On Plaintiffs'

account, the State's elected officials are prohibited by the First Amendment from taking action to forbid such instruction. But not to worry, Plaintiffs say, because such a professor "would likely be summoned by her department chair to explain the basis for the lesson and the context surrounding it." Pernell Resp. 27-28. Although the State has faith in its university "department chairs," the Constitution does not require the State's elected officials—and, their bosses, the People of the State—to *simply hope* that administrators at public universities will inquire about the "context surrounding" the professor's teaching that "the Holocaust was a hoax." Plaintiffs purport to be defending "the health of our democracy," Pernell Resp. 1, but nevertheless insist, seemingly unaware of the irony, that questions of the content of classroom instruction "must be taken from the reach of the voters, and thus removed from the realm of public discussion, dialogue, and debate in an election campaign," *Schuette*, 572 U.S. at 312.

**B. The Speech at Issue Is Government Speech.**

*Bishop* presciently anticipated the Supreme Court's government-speech cases. Under *Rosenberger*, it is the State of Florida "speaking" when it "determines the content of the education it provides." 515 U.S. at 833. Under *Rust*, when the State of Florida "appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Id.* (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). Under *Pleasant Grove City v. Summum*, the government may "express its views"

11

when "delivering a government-controlled message"—even when "it receives assistance from private sources for the purpose of delivering [that] message." 555 U.S. 460, 468 (2009). And under *Garcetti v. Ceballos*, when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. 410, 421-22 (2006).

Several circuits have applied the principles from the government-speech cases to in-class speech by public educators. Writing for the Third Circuit, then-Judge Alito relied on *Rosenberger* to hold that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998).[1] The Sixth and Seventh Circuits have reached the same conclusion with respect to high-school educators. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) (Sutton, J.); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (Easterbrook, J.). And this Court applied *Garcetti* in an unpublished opinion holding that a high-school teacher's written responses to

---

[1] Mimicking the district court, Ex.A.28, Plaintiffs attempt to distinguish *Edwards* by pointing to its "but see" citation for *Bishop*. Pernell Resp. 20. But that citation was simply signaling that *Bishop* acknowledged, before *Rosenberger* and the other government speech cases had been decided, that restrictions on professors' speech "implicate" the First Amendment, *Edwards*, 156 F.3d at 491, which it did. The question here is whether the Act's regulations of in-class speech *violate* the First Amendment, and *Edwards* and the other government speech cases, like *Bishop*, make clear that the answer is "no."

questions asked by her principal were "not protected by the First Amendment because she spoke pursuant to her official duties." *Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 886 (11th Cir. 2006) (cleaned up).

Plaintiffs' efforts to avoid these cases are meritless. First, contrary to Plaintiffs' suggestion, Novoa Resp. 33-34, *Garcetti*'s *reservation* of the question whether it applied to the academic context is obviously not a *holding* that it does *not* so apply. And *the reasoning* of *Garcetti* clearly supports its application to classroom teachers, whose essential official duty is speaking. *Mayer*, 474 F.3d at 479.

The Novoa Plaintiffs next assert that Defendants "waived" reliance on a "government-funding theory." Novoa Resp. 37-38. But Defendants' invocation of the government-funding line of government speech cases is not a standalone "theory." Instead, the seminal government-funding case, *Rust*, forms part of the bedrock of the government-speech doctrine—which is why it is cited in the major government-speech cases and on the very pages that Defendants cited below. *See, e.g.*, *Rosenberger*, 515 U.S. at 833; *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). The same goes for the leading government-property case, *Pleasant Grove*. *See Id.*, 576 U.S. at 207; *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022). Therefore, a decision analyzing the government-speech doctrine should at least engage with cases like *Rust*, *Pleasant Grove*, and

13

*Walker*. But as previously explained, the district court did not even cite them. Mot. 22-23.

Plaintiffs also spend several pages arguing that classroom speech by public educators does not qualify as government speech under the three-factor test outlined in *Shurtleff*. Pernell Resp. 15-17. But *Shurtleff* involved speech created by *private persons* in connection with a "government-public engagement." *Shurtleff*, 142 S. Ct. at 1587-1589; *see Walker*, 576 U.S. at 213; *Pleasant Grove*, 555 U.S. at 470-73. Here, in contrast, the State *hires* educators—as government employees—to perform the official duty of teaching the State's curriculum. And speech by "a public employee" is "the government's own speech" if that speech is "'pursuant to [his or her] official duties,'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (quoting *Garcetti*, 547 U.S. at 421), without respect to *Shurtleff*'s three-factor analysis.

Plaintiffs also invoke *Rosenberger*, but the passages they cite dealt with the regulation of *student* speech. *See* Pernell Resp. 21. Their citation of *Southworth* and *Searcey*, *id.* at 22-23, likewise conflates speech by students or private individuals with speech by publicly employed professors providing in-class instruction pursuant to their official duties. As Plaintiffs are forced to admit, *Rosenberger* spelled out a *different* rule for the regulation of the government's speech—namely, that "it is the University speaking" when it "determines the content of the education it provides,"

14

and that "the government" may "regulate the content of what is or is not expressed when it is the speaker." 515 U.S. at 833.

Plaintiffs vastly overstate the extent to which other circuits have interpreted the government speech cases differently in this context. Plaintiffs say *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), "concluded that academic speech—including in the classroom—is *not* government speech subject to *Garcetti*." Novoa Resp. 35 & n.23. But *Buchanan* does not even cite, let alone analyze, *Garcetti*. Plaintiffs also say the Fourth Circuit has refused to apply *Garcetti* to in-class speech, *id.*, but they leave out a crucial detail: The Fourth Circuit has *also* held that speech that is "curricular in nature" is "not protected by the First Amendment." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007).

Plaintiffs also highlight the Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). There, however, the issue was the *compelled speech* of a university professor of a personal *belief* that the professor did not hold—indeed, that he rejected as a matter of religious faith. *See* 992 F.3d at 503. The court highlighted numerous hypotheticals illustrating this point—under the university's view there it "could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of god, or a Soviet émigré to address his students as 'comrades.'" *Id.* at 506. But as the State has maintained throughout this litigation, the First Amendment does not permit the State

to compel "expression of *beliefs* that professors do not hold." Ex.A.9 n.7; *see also West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). And under the Act, no professor is required to express any personal belief that he does not hold. Thus, the result in *Meriwether*, too, is consistent with the State's position. *See* Mot. 24 n.2.

That leaves the Ninth Circuit's decision in *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014).[2] And yes, *Demers* states that "*Garcetti* does not apply to speech related to scholarship or teaching." *See Demers*, 746 F.3d at 406 (internal quotation marks omitted). But even in *Demers*, the relevant speech was *not* in-class curricular speech, but rather the "distributing [of] a short pamphlet and drafts from an in-progress book" unrelated to the professor's classroom instruction. *See id.* at 406-408. *Demers*'s holding in that different context does not dictate the result here.

Finally, even if this Court were to decide this case under *Pickering*, Plaintiffs' claims would still fail. Under *Pickering*, the Court must balance the employee's interest in speaking as a citizen on a matter of public concern against the State's interest, as employer, in promoting the efficiency of its programs. *Lane v. Franks*, 573 U.S. 228, 236 (2014). Here, recognizing a right of public educators to *contravene* the State's prescribed curriculum would unquestionably "imped[e] the teacher's proper performance of his daily duties in the classroom." *Pickering v. Bd.*

---

[2] Plaintiffs cite two other cases that purportedly "acknowledge" the "existence of 'academic freedom,'" but as Plaintiffs' own parentheticals point out, neither case held that *Garcetti* does not apply to in-class instruction. Pernell Resp. 18-19.

*of Educ*, 391 U.S. 563, 572-73 (1968). Indeed, it would *subvert* the teacher's classroom duties.

Plaintiffs assert that viewpoint discrimination is *per se* unlawful under *Pickering*, Novoa Resp. 21, citing two out-of-circuit cases; but those cases actually hold that viewpoint discrimination may fail *Pickering* when the relevant speech is unrelated to the employee's duties. *See Amalgamated Transit Union Local 85 v. Port Auth.*, 39 F.4th 95, 103 (3d Cir. 2022) (expressive displays on facemasks worn by port authority workers); *Wolfe v. Barnhart*, 446 F.3d 1096, 1097 (10th Cir. 2006) (textbook published by an ALJ). Where, as here, the relevant speech *is the very purpose* of the employee's job, the *Pickering* balance tilts entirely in the government's favor.

Finally, the Act would satisfy even strict scrutiny. As explained, the Act serves the compelling government interest of preventing invidious racial discrimination, Mot. 33, and "reducing racism," *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up). Remarkably, Plaintiffs assert that this government interest identified in *Arce* is not even "a legitimate" interest at the university level. *See* Novoa Resp. 25 n.17.[3] But the State of Florida believes that

---

[3] Plaintiffs effectively concede that the Act is constitutional as applied to K-12 schools. *See* Novoa Resp. 20 n.11; Pernell Resp. 18 n.1.

"reducing racism," *Arce*, 793 F.3d at 985-86, is a compelling interest at both K-12 schools *and* public universities.

## III.    The Act Is Not Unconstitutionally Vague.

Plaintiffs also fail to rebut our showing that the Court is likely to reverse the district court's vagueness analysis. The *Pernell* Plaintiffs dispute the vagueness standard *for public employees* articulated in our stay application (and applied by the court below): whether ordinary persons using ordinary common sense are put on fair notice that certain conduct will put them at risk of discharge. The Pernell Plaintiffs argue that there is no "separate, diminished 'public-employee standard' for vagueness." Pernell Resp. 30. But this Court's precedent says this:

> In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge. Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge.

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022). This standard is based on established Supreme Court and circuit-court precedent. *See Arnett v. Kennedy*, 416 U.S. 134, 159 (1974); *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992); Mot. at 34-35.

Plaintiffs again invoke *Keyishian*, arguing that it requires a "heightened" vagueness standard here. Pernell Resp. 30. But *Keyishian* does not treat with the

status of the Plaintiffs in that case as government employees, or the implications of that status for the vagueness analysis; and since *Keyishian* predates the precedent actually discussing this issue and adopting a more relaxed standard, it cannot possibly cast doubt on that standard's applicability. Nor can *Keyishian*'s analysis of a different set of laws, with very different language, be dispositive of the vagueness issue here.

On the substance, Plaintiffs, like the district court, discuss just two provisions. First, they argue that the Act's exception for "discussion of the [eight] concepts … in an objective manner without endorsement," FLA. STAT. § 1000.05(4)(b), is unconstitutionally vague. But their analysis of this provision merely regurgitates the district court's reasoning that this provision "departs from the plain meaning of 'objective'" by "suggest[ing] that speech condemning a viewpoint is objective, but approving a viewpoint renders the teaching unobjective." Pernell Resp. 32. We explained in our stay application (at 40) why this analysis is contrary to the Act's text and ordinary common usage, and Plaintiffs entirely fail to grapple with our arguments.

Second, the Pernell Plaintiffs also reiterate the district court's criticism of concept 4's use of the "rarely seen triple negative." Pernell Resp. 33. But again, our stay application explained at length (at 37-38) why the district court's analysis of this provision is unsound, and Plaintiffs completely fail to engage with our points.

19

In any event, the Act's implied scienter requirement eliminates any serious vagueness concerns. Plaintiffs respond that the scienter requirement does not help because "materials arguably including the banned concepts could be intentionally presented for a number of reasons," Pernell Resp. 35, but the whole point of the scienter requirement is that it makes clear that an instructor violates the Act only if he intentionally presents the concepts *for a very specific reason barred by the Act*: espousing or inculcating them.

The enforcement mechanism directed by the Board of Governors' implementing regulation further eliminates any vagueness concerns, by providing that universities should enforce the Act against instructors only if they fail or refuse to modify their instruction as directed. Plaintiffs argue that "[t]he regulation provides no clear opportunity for modification before punishment" because it threatens universities with "a loss of millions in funding due to an insufficiently 'appropriate' response." Novoa Resp. 42. That is beside the point, since the regulation also makes clear that an "appropriate" enforcement response—one foreclosing any loss of funding—is one that provides the instructor with an opportunity to cure. Regulation 10.005(3)(c).

## IV.   Equitable Considerations Favor a Stay.

Finally, Plaintiffs' various arguments that they will suffer irreparable harm if the preliminary injunction is stayed are all parasitic on their merits claims. *See*

20

Pernell Resp. 37; Novoa Resp. 14. Because Plaintiffs are not likely to prevail on their claim that the Act *violates* the Constitution, their claims of irreparable harm collapse as well.

By contrast, the district court's preliminary injunction causes the ongoing irreparable harm of preventing Florida from enforcing its law—duly enacted to prevent the inculcation of ideas that the State has deemed racially discriminatory. The irreparable nature of such harm is settled beyond peradventure. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018); *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (cited in Pernell Resp. 39).

Plaintiffs' concern that the Spring semester is approaching and they would have to modify lesson plans and syllabi if a stay is entered are clearly overwrought given that the Act was enacted in April and was in effect for over six weeks before they filed this suit. Plaintiffs also assert that the State can "turn to federal and state laws prohibiting discriminatory conduct," to serve its interest in preventing race and sex discrimination, Novoa Resp. 12, but the whole *raison d'etre* of the Act is Florida's sovereign judgment that these existing laws *are insufficient* to accomplish its goal of preventing invidious discrimination in its schools.

21

## CONCLUSION

The Court should stay the district court's preliminary injunction pending appeal.

Dated: January 5, 2023                    Respectfully submitted,

                                          /s/Charles J. Cooper
                                          Charles J. Cooper
                                          John D. Ohlendorf
                                          Megan M. Wold
                                          John D. Ramer
                                          COOPER & KIRK, PLLC
                                          1523 New Hampshire Avenue, N.W.
                                          Washington, D.C.  20036
                                          Telephone: (202) 220-9600
                                          Facsimile: (202) 220-9601
                                          ccooper@cooperkirk.com
                                          johlendorf@cooperkirk.com
                                          mwold@cooperkirk.com
                                          jramer@cooperkirk.com

                                          *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion contains 4,997 words, excluding the items enumerated in FED. R. APP. P. 32(f), in accordance with Defendants-Appellants' December 28, 2022 motion for excess words, which requested a word limit of 5,000 words.

This motion complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: January 5, 2023          Respectfully submitted,

                        /s/Charles J. Cooper
                        Charles J. Cooper

                        *Counsel for Defendants-Appellants*