Nos. 22-13992 & 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

LEROY PERNELL, ET AL.,
*Plaintiffs–Appellees*,

v.

BRIAN LAMB, ET AL.,
*Defendants–Appellants*.

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees*,

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants*.

## BRIEF OF DEFENDANTS-APPELLANTS

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NOS. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*

Nos. 22-13992 & 22-13994

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1.    Almond, Russell, *Plaintiff-Appellee*

2.    American Civil Liberties Union Foundation of Florida, Inc., *Attorneys for Plaintiffs-Appellees*

3.    American Civil Liberties Union of New York, *Attorneys for Plaintiffs-Appellees*

4.    Austin, Sharon Wright, *Plaintiff-Appellee*

5.    Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6.    Ballard Spahr LLP, *Attorneys for Plaintiffs-Appellees*

7.    Benjamin, Aaronson, Edinger & Patanzo, P.A., *Attorneys for Plaintiffs-Appellees*

8.    Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

9.    Boaz, Timothy L., *Defendant-Appellant*

10.   Burgess, Tiffani, *Attorney for Plaintiffs-Appellees*

11.   Callahan, Sandra, *Defendant-Appellant*

12.   Carrere, Michael, *Defendant-Appellant*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

13.  Cerio, Timothy M., *Defendant-Appellant*

14.  Coleman, Santino, *Attorney for Plaintiffs-Appellees*

15.  Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

16.  Cooper, Charles J., *Attorney for Defendants-Appellants*

17.  Corcoran, Richard, *Defendant-Appellant*

18.  Dauphin, Johana, *Plaintiff-Appellee*

19.  Diaz, Jr., Manny, *Defendant-Appellant*

20.  Donelly, N. Rogan, *Defendant-Appellant*

21.  Dorsey, Dana Thompson, *Plaintiff-Appellee*

22.  Dunn, Marvin, *Plaintiff-Appellee*

23.  Edge, Aubrey, *Defendant-Appellant*

24.  Edinger, Gary Scott, *Attorney for Plaintiffs-Appellees*

25.  Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

26.  Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

27.  First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

28.  Fitzpatrick, Magistrate Judge Martin A., U.S. District Court for the Northern District of Florida

29.  Florida A&M University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

30.    Florida Board of Governors of the State University System, *Defendant (Dismissed on Nov. 22, 2022)*

31.    Florida International University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

32.    Florida State University Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

33.    Foundation for Individual Rights and Expression, *Attorneys for Plaintiffs-Appellees*

34.    Frost, Patricia, *Defendant-Appellant*

35.    Gabadage, Nimna, *Defendant-Appellant*

36.    Gary S. Edinger & Associates PA – Gainesville, FL, *Attorney for Plaintiffs-Appellees*

37.    Greubel, Greg Harold, *Attorney for Plaintiffs-Appellees*

38.    Griffin, Michael, *Defendant-Appellant*

39.    Haddock, Jr., Edward Ellis, *Defendant-Appellant*

40.    Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

41.    Horton, Oscar, *Defendant-Appellant*

42.    Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

43.    Jones, Kenneth, *Defendant-Appellant*

44.    Jordan, Darlene Luccio, *Defendant-Appellant*

*Pernell, et al. v. Lamb, et al., Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

45.    Lamb, Brian, *Defendant-Appellant*

46.    Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

47.    Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

48.    Leftheris, Julie, *Defendant-Appellant*

49.    Levine, Alan, *Defendant-Appellant*

50.    Lubin, Catharine E., *Attorney for Plaintiffs-Appellees*

51.    Lydecker, Charles, *Defendant-Appellant*

52.    Mabatah, Isiuwa Jacqueline, *Attorney for Plaintiffs-Appellees*

53.    Mateer, Craig, *Defendant-Appellant*

54.    McLaurin, Charles, *Attorney for Plaintiffs-Appellees*

55.    McNamara, Caroline Andrews, *Attorney for Plaintiffs-Appellees*

56.    Michael, Deanna, *Defendant-Appellant*

57.    Monbarren, Lauran, *Defendant-Appellant*

58.    Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

59.    Morris, Joshua ("J.T."), *Attorney for Plaintiffs-Appellees*

60.    NAACP Legal Defense & Educational Fund, Inc., *Attorneys for Plaintiffs-Appellees*

61.    Nascimento, Isabella Salomao, *Attorney for Plaintiffs-Appellees*

62.    Novoa, Adriana, *Plaintiff-Appellee*

63.    Ohlendorf, John David, *Attorney for Defendants-Appellants*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

64.  Palyam, Nithin, *Defendant-Appellant*

65.  Park, Shelley, *Plaintiff-Appellee*

66.  Patel, Shilen, *Defendant-Appellant*

67.  Pernell, Leroy, *Plaintiff-Appellee*

68.  Piccolo, Fredrick, *Defendant-Appellant*

69.  Ramer, John, *Attorney for Defendants-Appellants*

70.  Rechek, Samuel, *Plaintiff-Appellee*

71.  Sandoval, Jennifer, *Plaintiff-Appellee*

72.  Schneider, Jenifer Jasinski, *Defendant-Appellant*

73.  Scott, Steven, *Defendant-Appellant*

74.  Seixas, Melissa, *Defendant-Appellant*

75.  Self, William, *Defendant-Appellant*

76.  Silagy, Eric, *Defendant-Appellant*

77.  Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

78.  Stermon, Kent, *Defendant-Appellant*

79.  Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

80.  Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

81.  Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

82.  University of Central Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

83.    University of Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

84.    University of South Florida Board of Trustees, *Defendant (Dismissed on Nov. 22, 2022)*

85.    Walker, Judge Mark E., U.S. District Court for the Northern District of Florida

86.    Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

87.    Weatherford, William, *Defendant-Appellant*

88.    Wold, Megan M., *Attorney for Defendants-Appellants*

Apart from undisclosed members of Appellees, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: April 17, 2023                    Respectfully submitted,

/s/Charles J. Cooper
Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendant-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns important constitutional questions under the First Amendment and Due Process Clause involving the State's ability to regulate the classroom instruction provided by public employees at public universities and the nature and importance of the State's interest in preventing racial discrimination in public universities. Appellants believe oral argument would assist the Court in deciding these consequential issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ......................................................10

ISSUES PRESENTED...........................................................................10

STATEMENT OF THE CASE...............................................................11

    I.     Factual Background..........................................................11

    II.    Prior Proceedings. .........................................................13

STANDARD OF REVIEW ...................................................................15

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .......................................................................................19

I.     Plaintiffs Lack Standing to Challenge Several of the Act's Provisions......19

II.    The Act Does Not Violate the First Amendment. ........................................24

    A.    Classroom Instruction in Public Universities Is Government
        Speech and Thus Not Entitled to First Amendment Protection. .........24

        1.    The Court's Decision in *Bishop* Forecloses Plaintiffs'
            Claims. ......................................................................................25

        2.    The Speech at Issue Is Government Speech. ............................26

3.    The Court Below Misapplied This Court's Precedent and
Ignored the Principles of the Government Speech Doctrine. ...31

B.    The Act's Educational Provisions Satisfy Any Understanding of
the Standard Established by *Bishop*. ....................................................43

III.    The Challenged Provisions Are Not Unconstitutionally Vague. .................45

IV.    Any Unconstitutional Provisions Are Severable. ...........................................53

V.    The Remaining Equitable Factors Favor Reversal. ........................................54

CONCLUSION ...........................................................................................................55

## TABLE OF AUTHORITIES

**Cases**                                                             **Page**

*Akridge v. Sch. Bd. of Alachua Cnty.*,
  2019 WL 13084482 (N.D. Fla. May 28, 2019) ...................................................52

*Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174 (3d Cir. 2020)......................42, 43

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ...............................................44, 48

*Arnett v. Kennedy*, 416 U.S. 134 (1974)........................................................46, 47

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
  458 U.S. 176 (1982)..........................................................................................37

*Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217 (2000).............26

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)......................................46

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)..........................................*passim*

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ........................................44

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2022) .........................................19

*Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237 (6th Cir. 2006).........39

*Davis v. FEC*, 554 U.S. 724 (2008) ...............................................................19, 20

*Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488 (3d Cir. 1998) ...................6, 29, 38

*Emergency Coal. To Defend Educ. Travel v. U.S. Dep't of the Treasury*,
  545 F.3d 4 (D.C. Cir. 2008)...........................................................................38, 39

*Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332 (6th Cir. 2010)........................29, 30

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................6, 28, 29, 37, 38

*Gilder-Lucas v. Elmore Cnty. Bd. Of Educ.*, 186 F. App'x 885
  (11th Cir. 2006)................................................................................................30

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020)........................15, 16

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..........................................................39

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ......................................37

*High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225 (11th Cir. 1982)...........................47

*Honeyfund.com, Inc. v. DeSantis*,
  2022 WL 3486962 (N.D. Fla. Aug. 18, 2022)...................................................49

*HVLPO2, LLC v. Oxygen Frog, LLC*,
2019 WL 13164663 (N.D. Fla. Feb. 20, 2019) .................................................52

*Johnson-Kurek v. Abu-Absi*, 423 F.3d 590 (6th Cir. 2005) ....................................38

*Jones v. Governor of Fla.*, 975 F.3d 1016 (11th Cir. 2020) ............................45, 47

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)................................................37

*Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007) ....................................30

*Loving v. Virginia*, 388 U.S 1 (1955) .......................................................................1

*Maryland v. King*, 567 U.S. 1301 (2012) ...........................................................9, 55

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.,* 474 F.3d 477 (7th Cir. 2007) ...........7, 29

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .............................................30

*Miller v. Johnson,* 515 U.S. 900 (1995)....................................................................1

*Nat'l Endowment for Arts v. Finley*, 524 U.S. 569 (1998) .....................................34

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987)............................19

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022)...................46, 47

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ........27, 28, 34, 35, 36

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..........................................................35

*Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)................................39

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)................................................................6, 26, 27, 35

*Rust v. Sullivan*, 500 U.S. 173 (1991).......................................................................7

*San Filippo v. Bongiovanni*, 961 F.2d 1125 (3d Cir. 1992) ...................................46

*Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291 (2014) ........39, 40, 43

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)...........................................35

*Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583 (2022)...............................28, 36

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000)............................................15, 54

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ....................................................37

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799 (11th Cir. 2020) .......................47

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
413 U.S. 548 (1973)................................................................................48, 53

*United States v. Lopez*, 514 U.S. 549 (1995)..........................................................37

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995)......................45

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) ......................................22

*Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000) ................................................38

*Vill. of Hoffman v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489 (1982) ..................47

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015)........................................................6, 27, 28, 34, 36

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
   900 F.3d 250 (6th Cir. 2018) ...............................................................19

*Waters v. Churchill*, 511 U.S. 661 (1994) ...............................................................46

*Wieman v. Updegraff*, 344 U.S. 183 (1952) ............................................................37

*Wilborn v. Ocwen Loan Servicing, LLC*,
   2019 WL 12288376 (N.D. Fla. Mar. 17, 2019)...................................52

*Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293 (11th Cir. 2017)..........45, 46, 53

## Constitutions, Statutes, and Regulations

FLA. CONST. art. 9, § 7 ..............................................................................13

15 U.S.C. § 77k..........................................................................................49

26 U.S.C. § 501 .........................................................................................49

28 U.S.C.
   § 1292(a)(1) ........................................................................................10
   § 1331..................................................................................................10

52 U.S.C. § 30116 .....................................................................................49

FLA. STAT.

   § 1000.03(2)(a) ..................................................................................11
   § 1000.05(4)(a) ...................................................................1, 2, 40, 48
   § 1000.05(4)(a)(1)–(8).......................................................................12
   § 1000.05(4)(a)(4).............................................................................49
   § 1000.05(4)(b) ...............................................................2, 8, 12, 40, 50
   § 1000.05(6)(b) ..................................................................................13
   § 1004.05(4)(b) ....................................................................................2

2022 Fla. Laws 2 .......................................................................................11

2022 Fla. Laws 8 .......................................................................................11

2022 Fla. Laws 72 .....................................................................................11

Regulation 10.005 ................................................................................2

Regulation 10.005(3)(c) ......................................................................48

Regulation 10.005(4)(a) ......................................................................13

## **Other Authorities**

*10.005*, *Prohibition of Discrimination in University Training or Instruction*,
    BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022),
    *available at* https://bit.ly/3xqDCX8 ................................................13

Andi Babineau, *White teacher in Texas fired after telling students his race is*
    *'the superior one'*, CNN (Nov. 15, 2022), https://cnn.it/3VCQWl4.................43

*Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2002) .......50, 51

H.G. Koenig, Religion, Spirituality, and Health: The Research and Clinical
    Implications, ISRN PSYCHIATRY, 2012, https://bit.ly/3F7WqyK........................5

*Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://bit.ly/3zcLbB1 .................50

Order, *Falls v. DeSantis*, No. 22-cv-166, Doc. 68 (N.D. Fla. July 8, 2022) ..........21

PATTERN JURY INSTRUCTIONS, CIVIL CASES, ELEVENTH CIRCUIT (2013 revision)
    4.19, 4.22 cmt. 2, https://bit.ly/3OguaWU .......................................51

**INTRODUCTION**

"Members of one race … are morally superior to members of another race."

The People of Florida believe that this proposition is invidiously discriminatory and that it should not be advocated by teachers in Florida's public classrooms. Accordingly, the Florida Legislature prohibited public school teachers and university educators from subjecting students to "instruction" that espouses or otherwise endorses this proposition, along with seven other "concepts" of similar ilk, such as "[m]embers of one race … cannot and should not attempt to treat others without respect to race," and "[a] person, by virtue of his or her race … is inherently racist …." FLA. STAT. § 1000.05(4)(a).

Enacted in April 2022, the statute at issue in this case, the Individual Freedom Act ("Act" and "IFA"), expresses the State's view that classroom indoctrination of students in the eight prohibited concepts violates the fundamental moral principle at the heart of the Equal Protection Clause—that "the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class," *Miller v. Johnson,* 515 U.S. 900, 946 (1995), and that discriminating against people solely because of such immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality," *Loving v. Virginia*, 388 U.S 1, 11 (1955). The Act, it should be noted, does not banish the enumerated concepts from the classroom altogether; to the contrary, it expressly permits

classroom instruction that includes "discussion" of the listed concepts so long as the "instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1004.05(4)(b). And the Act applies only to "instruction," *see id.* § 1000.05(4)(a), and thus does not prevent the State's educators from advocating the concepts, or any other personal views they may hold, in publications, speeches, or other activities outside the classroom or other instructional settings. Nor does the Act, contrary to Plaintiffs' and the district court's claims, reach speeches or debates by guest speakers or other invitees who, unlike the State's own instructors in the classroom, do not speak on behalf of the State. *See* Regulation 10.005 (defining "instruction" to mean teaching "by a university employee" or other person "authorized to provide instruction by the university within a course"). All the Act does is prohibit the State's educators from endorsing the enumerated concepts while teaching the State's curriculum, in the State's classrooms, on the State's time, in return for a State paycheck.

The Plaintiffs in these cases—eight college professors, two students, and a student organization—are not content with classroom discussion of the concepts, objectively without endorsement. The Plaintiff Professors believe and embrace the discriminatory concepts and contend that they have a First Amendment right to inculcate their students with these concepts in their courses. The Plaintiff Students

2

argue that they have a correlative First Amendment right to receive the professors' personal opinions and views endorsing the discriminatory concepts.

The constitutional question in this case thus boils down to this: who decides what is, and is not, to be taught in Florida's college classrooms—individual professors or their employer, the State, in prescribing by law the content requirements and standards that govern public universities in setting their course curricula? That question is not a hard one, for it was squarely resolved in favor of the State by this Court in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), which held that the University of Alabama did not violate a physiology professor's free speech rights by "prevent[ing] him from presenting his religious viewpoint during instructional time, even to the extent that it represents his professional opinion about his subject matter." *Id.* at 1077. The Court was not equivocal in stating the governing rule: "In short, Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute." *Id.* at 1076.

The district court below, however, read *Bishop* to mean precisely the opposite of what it plainly says. After denouncing the Individual Freedom Act as Orwellian "doublespeak," and the State's defense of it as "positively dystopian" and a "Frankenstein's monster," the district court based its First Amendment analysis on what it saw as the sharp distinction between "the State's right to make *content-based*

3

choices in setting the public school curriculum" and the State's "discretion in limiting a professor's ability to express certain *viewpoints* about the content of the curriculum once it is set." App.318 (emphasis in original). A State's authority "to determine the content of its public school curriculum," according to the district court, means that "[a] professor cannot decide to teach something entirely different or do an end-run around the prescribed curriculum by paying lip service to the subject they are supposed to teach and then spend the rest of class time instructing on something else." App.317-18. But a professor is constitutionally entitled, the court below held, to inculcate students in his or her personal viewpoints on matters that are within the scope of the assigned course: "The State of Florida, as an employer and educator, cannot restrict university employees from expressing a disfavored viewpoint about a matter within the established curriculum while instructing on that curriculum. Such viewpoint discrimination 'is poison to a free society.'" App.398 (quoting *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019)) (Alito, J., concurring)). What that means is that once the State chooses to place a subject in the curriculum, it cannot say how that subject is taught. A history professor teaching a course on World War II, for example, would be free to espouse the view that the Holocaust was a hoax and to lament the fact that the Nazis were defeated. Other hypotheticals can be imagined. Thus, under the district court's rule, the professors have the final say over what they

4

teach under a university's banner, and so the court preliminarily enjoined enforcement of the Act.

The district court's First Amendment analysis is fatally flawed at multiple levels.

First, and dispositively, the district court's ruling is squarely at odds with *Bishop*. The district court sought to distinguish *Bishop* on the ground that the university had determined that Dr. Bishop's classroom discussion of his personal religious viewpoints "was not part of its curriculum with respect to the exercise physiology course he taught." App.383. True enough. But the university's determination that Dr. Bishop's personal religious beliefs were outside the course curriculum was based on the fact that *they were his personal religious beliefs*; it did not matter that those "religious viewpoints . . . represent[ed] his professional opinion about his subject matter." 926 F.2d at 1077. The university did not seek to prohibit all classroom discussion of matters touching generally on religion, such as the extensively studied relationship between religion and both mental and physical health. *See, e.g.*, H.G. Koenig, Religion, Spirituality, and Health: The Research and Clinical Implications, ISRN PSYCHIATRY, 2012, https://bit.ly/3F7WqyK. Rather, as this Court emphasized, "[t]he University has simply said that he may not discuss *his religious beliefs or opinions* under the guise of University courses." 926 F.2d at 1076 (emphasis added). And that viewpoint-based restriction on his speech was "within

5

[the University's] powers to control the content of curriculum in the classroom." *Id*. at 1078. The Plaintiff Professors in this case stand on no different First Amendment footing. In their dispute with the State about the content of their courses, including their advocacy of viewpoints contrary to the Individual Freedom Act, the State must have the final say.

Second, quite apart from its conflict with this Court's binding decision in *Bishop*, the decision below cannot be squared with the Supreme Court's "government speech" cases establishing that the speech of public employees, when made "pursuant to their official duties," is not protected by the First Amendment at all. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The leading government speech case in the area of public education is *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), where the Supreme Court made clear that "when the university determines the content of the education it provides, it is the university speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker." *Id*. at 833. This language was read by then-Judge Alito to mean that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998).

Of like import are the government speech cases in which the government provides public funds to private entities or permits them to use public property to

communicate the government's own message. These cases make clear that the government is not restricted by the First Amendment in expressing its own viewpoints. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173 (1991); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200 (2015).

Thus, the Court's government speech cases compel reversal of the decision below even before one gets to the seminal *Garcetti* decision. And while the *Garcetti* Court reserved the question whether its holding governs with full force in the context of classroom instruction—a question not before it—the reasoning of the decision is squarely applicable. Indeed, given that an educator's essential "official dut[y]" *is* classroom speech, applying *Garcetti* to a teacher's instruction is "an easier case for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.,* 474 F.3d 477, 479 (7th Cir. 2007) (Easterbrook, J.).

Third, the implications of the district court's decision are startling, for it anoints individual professors as universities unto themselves, at liberty under the First Amendment to indoctrinate college students in whatever views they please, no matter how contrary to the university's curriculum or how noxious to the People of Florida.

In short, the district court's First Amendment ruling was wrong, and this Court should reverse it.

The district court's Plan B ruling was to declare the Act void, in its entirety, for vagueness, on the theory that it is "impossible" to expect "ordinary persons using ordinary common sense" (the test for vagueness in the public employment context), App.404-05, to understand the meaning of the "loaded and contested" and "utterly ambiguous" term "objective," App.410, 415, in the Act's provision permitting classroom discussion of the prohibited concepts "in an *objective* manner without endorsement," FLA. STAT. 1000.05(4)(b) (emphasis added). The common, everyday distinction between objectively considering and discussing an idea and advocating or endorsing the idea is not at all confounding to ordinary persons, let alone to university instructors. Indeed, our adversarial legal system is founded on the distinction: it is the difference between what lawyers do and what judges do. Indeed, the term "objective" is ubiquitous in our written law, statutory and judicial, and the district court itself has used the term in numerous opinions without offering a definition of its supposedly "utterly ambiguous" meaning. There's nothing vague about the language of the Individual Freedom Act, and this Court should reverse the district court's contrary decision.

Finally, although the district court correctly held that plaintiffs seeking a preliminary injunction have the burden of producing evidence of specific facts sufficient to establish their standing for each of the Act's concepts that they challenge, it erred in concluding that Plaintiffs had done so with respect to at least

8

four of the eight prohibited concepts. No Plaintiff Professor in either case even adequately *alleged*, let alone produced supporting evidence, that they intended to subject students to instruction that would violate the Act's prohibition on advocating concepts 1, 3, 5, and 6. To remedy this jurisdictional deficiency, the district court took it upon itself to parse through the Plaintiff Professors' course materials *beyond* what they had alleged in their complaints and stated in their declarations and briefing, in search of ways in which their teaching could "arguably violate" the concepts that Plaintiffs had not even mentioned. The district court's supplementation of Plaintiffs' submissions exceeded the proper bounds of the judicial role, and this Court should reverse the court's finding that the "Plaintiffs have standing to challenge all eight concepts." App.421.

The remaining equitable factors also decisively favor reversal of the preliminary injunction, especially given the clarity of the district court's errors on the merits. The State has a compelling—indeed, constitutionally imperative—interest in combating invidious discrimination, and enjoining a state from enforcing its laws is by definition a form of irreparable injury. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers).

The Court should reverse the district court's order granting a preliminary injunction.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this constitutional challenge under 28 U.S.C. § 1331. The District Court entered the preliminary injunction that is the subject of this appeal on November 17, 2022. Defendants filed a timely notice of appeal on November 29, 2022. This Court has jurisdiction over the interlocutory order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

(1)    Whether Plaintiffs have Article III standing to bring a pre-enforcement challenge to each provision of Florida's Individual Freedom Act that regulates public universities;

(2)    Whether the Act's regulation of in-class instruction by public employees triggers First Amendment scrutiny;

(3)    Whether the Act is sufficiently tailored to advance the State's compelling interest in preventing invidious discrimination by public employees at public universities;

(4)    Whether the challenged provisions of the Act are unconstitutionally vague;

(5)    Whether any unconstitutional provisions are severable from the remainder of the Act; and

10

(6)    Whether equitable factors favor reversal of the district court's preliminary injunction.

## STATEMENT OF THE CASE

### I.    Factual Background.

Last spring, pursuant to its authority to "establish education policy, enact education laws, and appropriate and allocate education resources," FLA. STAT. § 1000.03(2)(a), the Florida Legislature passed the Individual Freedom Act. *See* 2022 Fla. Laws 72. Governor DeSantis approved the Act on April 22, and it took effect on July 1. *See id.* § 8.

As relevant here, the Act amended the Education Code to enumerate actions that constitute "discrimination on the basis of race, color, national origin, [or] sex" and are thus prohibited under Section 1000.05(2). *Id.* § 2. Specifically, the Act prohibits "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:"

1.    Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.    A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.    A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

11

4.  Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.  A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.  A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.  A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.  Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Fla. Stat. § 1000.05(4)(a)(1)-(8).

The Act, however, draws a sharp distinction between *indoctrination* and *discussion*: it prohibits all persons from subjecting a student to instruction that advocates these concepts, but at the same time makes clear that it does not "prohibit discussion of the concepts … as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b).

The Florida Board of Governors is vested with the constitutional authority to "adopt regulations to implement [§ 1000.05] as it relates to state universities." FLA. STAT. § 1000.05(6)(b); FLA. CONST. art. 9, § 7. Pursuant to that authority, the Board adopted Regulation 10.005 to implement the Act. *See 10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at* https://bit.ly/3xqDCX8 ("Regulation 10.005"). Under the Regulation, universities are required to adopt their own regulations implementing the Act, and the Board takes enforcement action only against a university that "willfully and knowingly failed to correct a violation of the university regulation." Regulation 10.005(4)(a).

## II.    Prior Proceedings.

This appeal arises from two separate challenges to the Act—*Pernell v. Florida Board of Governors* and *Novoa v. Diaz*.[1] In *Pernell*, the Plaintiffs are six current professors at Florida universities, one professor emeritus who has hosted a university-sponsored bus tour, and one university student. In *Novoa*, the Plaintiffs are one professor at the University of South Florida ("USF"), one USF student, and one USF student group.

---

[1] These two cases were not formally consolidated below, but they were briefed in tandem, argued together, and resulted in the district court's issuance of a single preliminary injunction. On February 23, this Court formally consolidated the appeals of these two cases. *See* Order, *Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992, Doc. 40 (11th Cir. Feb. 23, 2023).

Both sets of Plaintiffs challenged the Act on the grounds, *inter alia*, that it violates their free speech rights under the First Amendment and their rights under the Fourteenth Amendment Due Process Clause's vagueness doctrine. They each sought preliminary injunctive relief. Defendants opposed the motions and also moved to dismiss all claims under Rule 12(b)(1) and (6) for lack of standing and failure to state a claim.

On November 17, the district court granted Plaintiffs' request for a preliminary injunction in principal part. The court concluded that all Plaintiffs except two of the *Pernell* Plaintiffs had standing. App.421-22. Moreover, while the court determined that the standing analysis must be conducted on a provision-by-provision basis, it held that at least one Plaintiff had adequately alleged an injury traceable to each of the Act's eight enumerated concepts, such that the entire Act was properly before it. *See id.* On the merits, the court concluded that the Act restricts Plaintiffs' free speech rights and, applying a balancing test the court drew from this Court's decision in *Bishop*, it held that the Act violates the First Amendment. Finally, it also concluded that two of the Act's provisions are unconstitutionally vague, including the Act's exception allowing "objective" classroom discussion of the eight enumerated concepts—which, the court determined, "commands the entire statute" and thus "renders the [Act] as a whole unconstitutionally vague." App.416 & n.62.

14

The court thus entered a preliminary injunction barring any further enforcement of the Act or of the Board's regulation implementing it. And in a closing section, the court refused to stay its injunction pending any appeal to this Court. Appellants sought a stay from this Court, which also denied the request. Order, *Pernell v. Comm'r of the Fla. State Bd. of Educ.*, No. 22-13992, Doc. 43 (11th Cir. Mar. 16, 2023).

## STANDARD OF REVIEW

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). Those prerequisites are that "(1) [the movant] has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270-71 (11th Cir. 2020). This Court "review[s] the grant of a preliminary injunction for abuse of discretion," and "any underlying legal conclusions *de novo*." *Id.* at 1270. "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner,

… or makes findings of fact that are clearly erroneous." *Id.* (quotation marks omitted).

## SUMMARY OF THE ARGUMENT

I.    The Plaintiffs lack standing to launch their wholesale attack on the Act. Plaintiffs did not demonstrate—nor even adequately allege—that their intended instruction would plausibly violate every concept in the Act. Nevertheless, the district court searched the exhibits in the record for material supporting several bases for standing no Plaintiff had asserted and concluded that Plaintiffs had standing for a preliminary injunction with respect to every provision of the Act. But Plaintiffs' intended instruction—even with the district court's supplemental gloss—does not remotely implicate concepts 1, 3, 5, and 6. Plaintiffs thus lack standing to challenge those provisions.

II.A.   In *Bishop*, this Court squarely held that individual university professors do not possess a right of "academic freedom" under the First Amendment to determine what will be taught in a public-university classroom. When the university and an individual professor disagree about the content, including viewpoints, of what will be taught in class, the Court explained, the university must prevail. Here, the dispute is between the Plaintiff-Professors and the Defendant-Universities over what will be taught in class. *Bishop* alone resolves this case in Defendants' favor.

B.    The Court's holding in *Bishop* is confirmed by the Supreme Court's subsequent government-speech cases, which likewise show that the First Amendment does not grant individual professors the constitutional right to determine the public-university curriculum. When public employees speak pursuant to their official duties, that speech is *government* speech and thus not subject to First Amendment protection. Here, the relevant speech is in-class instruction provided by university professors as the central purpose of their job. Thus, the Court's government-speech cases require the same result as *Bishop*.

C.    Even if the Act were subject to First Amendment scrutiny, the Act would pass it. The Act serves the compelling state interest of preventing invidious discrimination by public employees in public schools. And the Act is narrowly tailored to advance that interest because it applies only to in-class instruction that endorses the specific limited concepts.

III.    None of the Act's provisions is unconstitutionally vague; they are expressed in terms that are commonly used and readily understood in everyday discourse. The invidiously discriminatory meaning of the concept that members of one race or sex are "morally superior" to members of others is easy for anyone to discern. So is the concept that individuals must not try to treat others "without respect to race, color, sex, or national origin." Indeed, while the district court assailed this provision's supposedly inscrutable "triple negative," the court's discussion of the

concept shows that it in fact had no difficulty grasping its plain meaning. And the line between "endors[ing]" the concepts and "discuss[ing]" them "in an objective manner" is apparent to ordinary people, let alone university faculty. Indeed, the whole concept of the rule of law *is built* on this distinction, for all judges must remain objective while hearing disputes under the law. At the very least, the Act clearly satisfies the lower vagueness standard that applies to the regulation of public-employee speech.

IV.    To the extent any provision of the Act is unconstitutional, it should be severed from the remainder of the Act under settled principles. The district court thought otherwise because, in its view, the vagueness of the Act's exception for "objective" discussion of the concepts infected the entire Act. But even if this exception is unconstitutionally vague because the meaning of *objective* is purportedly "impossible" to discern, that conclusion does not mean that the Act's general rule is *also* unconstitutionally vague—for surely no one can genuinely fail to understand what it means to *endorse* the enumerated concepts.

V.    The remainder of the preliminary injunction factors weigh against the relief granted below. The only irreparable harm alleged by Plaintiffs—the infringement of their constitutional rights—collapses along with the merits of their claims. And the district court's injunction harms the State's strong interest in the continued enforcement of its anti-discrimination laws.

18

# ARGUMENT

## I.    Plaintiffs Lack Standing to Challenge Several of the Act's Provisions.

In their complaints and declarations, Plaintiffs did not demonstrate—nor even adequately allege—that their intended teaching would plausibly violate *each one* of the eight concepts the Act forbids. Yet the district court granted Plaintiffs a preliminary injunction against the Act as a whole, including all eight concepts. That decision is clearly wrong, and this Court should reverse.

To obtain a preliminary injunction, Plaintiffs bear the burden of demonstrating "a likelihood of success on the merits," which includes "a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting) (emphasis in original); App.326. And a plaintiff seeking a preliminary injunction must do more than merely *allege* facts sufficient to demonstrate standing. A plaintiff must demonstrate standing "under the heightened standard for evaluating a motion for summary judgment," *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (cleaned up), by "set[ting] forth by affidavit or other evidence specific facts," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2022) (cleaned up); App.327.

Moreover, because "[s]tanding is not dispensed in gross," a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that

19

is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up). Plaintiffs cannot leverage an alleged injury under *one* of the Act's eight concepts into a challenge against—and entitlement to a preliminary injunction barring the enforcement of— *other* prohibited concepts that they have not demonstrated any intention of espousing, not to mention the Act as a whole. Instead, as the district court correctly recognized, "Plaintiffs must also demonstrate standing for each provision of the statute they challenge," by "demonstrat[ing] how their speech arguably implicates each way the [Act's] prohibition could be violated." App.335. Under this provision- by-provision analysis, the district court should have dismissed Plaintiffs' challenges to the Act's concepts 1, 3, 5, and 6, because no Plaintiff—in either of the cases below—adequately alleged that they intended to subject students to instruction espousing those concepts.

In *Pernell*, as we explained in our briefing below, no Plaintiff demonstrated (or even adequately alleged) standing to challenge the Act's concepts 1, 3, 5, 6, and 7. *See Pernell,* MTD Mem., Doc. 51-1 at 12-14 (Sept. 22, 2022). Indeed, no *Pernell* Plaintiff even *claimed any intention* to subject students to instruction that would plausibly violate concepts 1 or 5. *Id*. at 12-13. Only Plaintiff Sandoval mentioned concept 3, but he did not explain what planned teaching would plausibly violate it. *Id*. at 13. And only Plaintiff Almond mentioned concept 6—but again, without addressing how his intended teaching would advocate that some individuals should

be treated *adversely* on account of their race. *Id*. Several *Pernell* Plaintiffs claimed that their teaching would violate the Act's concept 7, but only because they misunderstood that concept to cover teaching that merely *could cause* students to feel guilt or anguish. But this concept, as the district court itself has correctly recognized in another pending challenge to the Act, covers only teaching that instructs students that they *must* feel guilt or anguish over past actions committed by other members of their race in which the students played no part. *Id*. at 13-14; *see* Order, *Falls v. DeSantis*, No. 22-cv-166, Doc. 68 at 9-10 (N.D. Fla. July 8, 2022). None of the *Pernell* Plaintiffs alleged any intent to teach *that*.

Similarly, in *Novoa*, Plaintiff Novoa never even *claimed* that her teaching would violate the Act's concepts 1, 2, 4, 5, 6, and 8. In fact, Plaintiff Novoa alleged *only* that her intended teaching would plausibly violate the Act's concepts 3 and 7.[2] And her claims clearly failed as to concept 3, because she misunderstood that concept to mean that it covered mere descriptions of instances of *past* historical racism. *Novoa*, MTD Mem., Doc. 33-1 at 4-14 (Sept. 30, 2022).

Appellants explained all of this in their preliminary injunction oppositions below. In response, neither the *Pernell* Plaintiffs nor the *Novoa* Plaintiffs made any effort to show that their intended teachings arguably *would* violate the specific

---

[2] As the district court recognized, the *Novoa* Plaintiff Students' standing is derivative of Plaintiff Novoa's standing. App.324-25.

concepts at issue. Instead, the *Pernell* Plaintiffs responded only that their challenge is a "facial" one, that Defendant's concept-by-concept arguments "go to the scope of remedy and are not relevant to the Court's jurisdiction over the claims," and that even if they were relevant, all of the Act's concepts are implicated in the *Pernell* Plaintiffs' vagueness arguments. *Pernell*, MTD Opp., Doc. 55 at 10-13 (Oct. 4, 2022). And the *Novoa* Plaintiffs reasserted Plaintiff Novoa's challenge to the Act's concepts 3 and 7, and further argued that Plaintiff Novoa has blanket standing to "challenge all eight concepts" of the Act because they are vague, overbroad, and viewpoint discriminatory, but without making any assertion as to *what* planned teaching would violate *each* of the Act's concepts. *Novoa*, MTD Opp., Doc. 38 at 10-16 (Oct. 7, 2022).

That should have been the end of the matter. Yet the district court itself filled in the gaps in what Plaintiffs had alleged in their complaints and stated in their declarations and their briefs, parsing their course materials to uncover ways in which Plaintiffs' teaching could "arguably violate" concepts in the Act that the Plaintiffs themselves did not even raise. This judicial intervention was the plainest of errors. "[O]ur system is designed around the premise that" *the parties* "are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

For example, Plaintiff Pernell mentions only concept 8 in his declaration, *Pernell*, Pernell Decl., Doc. 13-1 at ¶ 20 (Aug. 24, 2022), but the district court concluded (without addressing concept 8) that his coursework would arguably violate concepts 3 and 4, App.349. Plaintiff Dorsey did not call out a specific provision of the Act at all, *Pernell*, Dorsey Decl., Doc. 13-2 (Aug. 24, 2022), but the district court concluded that her course assignments might violate concepts 3, 4, and 8, App.350. And even more extraordinary, while Plaintiff Novoa alleged only that her planned teaching might violate concepts 3 and 7, App.218, the district court *sua sponte* concluded her teaching might violate concepts 1, 2, 3, 5 and 7—effectively conferring upon her standing to raise challenges to the Act that she did not plead, App.358-59.

The net result of the district court's supplementation of the Plaintiffs' allegations and arguments was to permit the court's preliminary injunction to apply to all eight of the of the Act's concepts. App.421-22. That was error. Plaintiffs' failure to challenge concepts 1, 3, 5, and 6 means that they *lack* standing to challenge those concepts. Therefore, even if Plaintiffs' claims against the other concepts were to prevail, principles of severability ensure that these concepts remain enforceable. *See infra* at 53-54.

## II.    The Act Does Not Violate the First Amendment.

In the name of preserving "a healthy democracy," App.426, the district court took control of Florida's public-university curriculum away from the State's elected officials. It reached this result by erroneously applying heightened First Amendment scrutiny to what is indisputably government speech, which is wholly unprotected by the First Amendment. The district court's analysis was contrary to *decades* of precedent from both this Court and the Supreme Court regarding in-class speech that owes its existence to a government employee's official duties. And even if some level of heightened scrutiny applied, the Act survives it. This Court should reverse.

### A. Classroom Instruction in Public Universities Is Government Speech and Thus Not Entitled to First Amendment Protection.

This Court's decision in *Bishop v. Aronov* squarely held that public-university professors do not have a First Amendment right to override the university's decisions concerning the content of classroom instruction. That holding presciently anticipated the Supreme Court's government-speech cases, which establish the principle that the speech of public employees made pursuant to their official duties is not protected by the First Amendment. The district court misunderstood and misapplied both *Bishop* and the Supreme Court's government-speech doctrine, and its decision should be reversed.

24

### 1.    The Court's Decision in *Bishop* Forecloses Plaintiffs' Claims.

Over thirty years ago, this Court made clear that the content of classroom instruction at public universities is subject to control by the government (*i.e.*, the university), not individual instructors. In *Bishop v. Aronov*, the Court held that a public university's decision to prohibit an individual physiology professor from sharing his personal religious viewpoints "during instructional time" did not violate the professor's free speech rights. 926 F.2d at 1076-77. Although the Court applied a balancing test, it determined that the university's viewpoint-based restriction on the professor's in-class speech was subject to the mildest of scrutiny—whether it was "reasonable"—and that such restrictions are effectively *per se* reasonable. *See id.*

*Bishop* spoke in no uncertain terms: The university's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077. When an educator and the university "disagree about a matter of content in the courses he teaches," the Court explained "the University must have the final say in such a dispute." *Id.* at 1076-77. Therefore, the University, "as an employer and educator can direct" a professor "to refrain from expression" of particular "viewpoints in the classroom." *Id.* at 1077. The Court summed up the principle succinctly: "The University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078.

*Bishop*'s holding resolves this case. The gravamen of Plaintiff Professors' First Amendment claim is that the Constitution entitles *them* to decide the content of the instruction they offer when teaching the State's prescribed curriculum, in the State's classroom, for a State paycheck. And *Bishop already balanced* the First Amendment interests in this precise context—concluding, again, that "*[t]he University* necessarily has dominion over what is taught by its professors." *Id.* (emphasis added). That square holding should have been the beginning and end of the district court's analysis of Plaintiffs' First Amendment claim.

### 2. The Speech at Issue Is Government Speech.

The result compelled in this case under *Bishop* mirrors the result required under the Supreme Court's government-speech cases, which make clear that the speech at issue here is not protected by the First Amendment at all. Take first the Supreme Court's seminal decision in *Rosenberger*. There, the Court explained that it is "the University speaking" when it "determines the content of the education it provides." 515 U.S. at 833. And when the government "is the speaker," it may "regulate the content of what is or is not expressed," including imposing "viewpoint-based restrictions." *Id.* at 834. The Court confirmed this sentiment in *Board of Regents of University of Wisconsin System v. Southworth*, stating that "speech by an instructor or a professor in the academic context" implicates the "principles applicable to government speech." 529 U.S. 217, 235 (2000). Here, the State of

Florida is specifically regulating "what is or is not expressed" in "the education it provides." Therefore, it is regulating its own speech when it restricts "speech by an instructor or a professor in the academic context." And when "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207.

Second, consider the Supreme Court's government-funding cases. The Court has consistently "refused to hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program" to the exclusion of other viewpoints. *Id.* at 208 (cleaned up). This refusal stems from the Court's recognition "that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833. Here, the State of Florida "appropriates public funds" to support public education at the State's universities. Under these principles, the State of Florida is thus "entitled to say what it wishes" and to specify the "viewpoint" that is taught in the public education that it provides. Under the district court's decision, however, it is the State-funded educators, not the State, who are entitled, uniquely among public employees, to say what they wish in their workplace as part of their job duties.

Third, consider the Court's cases involving the use of public property by private parties to communicate a government message. The Court has made clear that the government may "express its views when it receives assistance from private

sources for the purpose of delivering a government-controlled message." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009). *Pleasant Grove* held that "even when 'accepting a privately donated monument and placing it on city property,'" the government "had 'engaged in expressive conduct'" and was thus entitled to control the content, including the viewpoint, of its message. *Walker*, 576 U.S. at 209 (quoting *Pleasant Grove*, 555 U.S. at 476 (cleaned up)). The Court applied these principles again in *Walker*, holding "that license plate designs proposed by private groups also amounted to government speech" and thus were not subject to First Amendment scrutiny. *See Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583, 1590 (2022) (describing *Walker*). Again, this line of government-speech cases renders the decision below completely untenable. For if the speech of private individuals proposing license plate slogans is government speech, then surely the classroom speech of state-employed educators at state universities is too.

Finally, consider the Supreme Court's 2006 decision in *Garcetti*. There, the Supreme Court explained that when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421-22. And "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* Therefore, a public employer may punish or otherwise regulate an employee's professional

28

speech, and "the employee has no First Amendment cause of action." *Id.* at 418. The classroom speech of public-university professors clearly falls within the rationale of *Garcetti* because these statements are made "pursuant to their official duties." 547 U.S. at 421-22. To be sure, *Garcetti* reserved the question whether its holding applies in full to classroom instruction. *Id.* at 425. But this case invites the Court to make clear that *Bishop* anticipated and answered that reserved question, and that, in any event, on the plain reasoning of *Garcetti* and the other government speech cases, the answer cannot reasonably be in doubt.

Several circuits, including this one, have recognized that the government-speech doctrine applies to in-class instruction by state-employed educators. As then-Judge Alito explained for the Third Circuit in a closely analogous case, "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards*, 156 F.3d at 491. That decision was grounded in "the Supreme Court's jurisprudence concerning the state's ability to say what it wishes when it is the speaker." *Id.* (citing *Rosenberger*, 515 U.S. at 833-34). Writing for the Seventh Circuit, Judge Easterbrook explained that, because "teachers hire out their own speech," applying *Garcetti* to public high school teachers' in-class speech is "an *easier case* for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer*, 474 F.3d at 479 (emphasis added). The Sixth Circuit has likewise applied *Garcetti* to in-class instruction in a public

29

high school. *See Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332 (6th Cir. 2010).[3] Judge Sutton's opinion for the court explained that "[w]hen a teacher teaches," the school has *hired* that speech and, accordingly, the school "can surely 'regulate the content of what is or is not expressed.'" *Id.* at 340 (quoting *Rosenberger*, 515 U.S. at 833). The Fourth Circuit reached the same result: where speech is "curricular in nature," it is "not protected by the First Amendment." *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007) (citing *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368-69 (4th Cir. 1998) (en banc)).

Finally, this Court, in an unpublished opinion, made short work of a First Amendment claim by a high school teacher who was fired as a result of her written responses to questions asked by her principal. "We apply *Garcetti* … and conclude that [the teacher's] speech was not protected by the First Amendment because she spoke pursuant to her official duties." *Gilder-Lucas v. Elmore Cnty. Bd. Of Educ.*, 186 F. App'x 885, 886 (11th Cir. 2006) (cleaned up).

In sum, all three strands of the Supreme Court's government-speech doctrine apply in this case: public university professors are employed by the State, are funded

---

[3] In a subsequent decision, the Sixth Circuit cabined *Evans-Marshall* to the K-12 context, *see Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), but *Meriwether*'s basis for distinguishing that case from the university context was expressly premised on the notion that academic freedom is an independent First Amendment right of college educators, a view that this Court expressly rejected in *Bishop*, 926 F.2d at 1075.

by the State, and work in the State's classrooms. Thus, while *Bishop* alone requires reversal, even if that case had never been decided, the Supreme Court's subsequent government-speech cases compel the same result: the Individual Freedom Act regulates only government speech and thus does not implicate the First Amendment rights of educators in Florida's public schools.

### 3.    The Court Below Misapplied This Court's Precedent and Ignored the Principles of the Government Speech Doctrine.

The court below read *Bishop* to yield the *precise reasoning that the decision repudiated*: that the State of Florida, instead of having "dominion over what is taught by its professors," 926 F.2d at 1078, is *constitutionally prohibited* from prescribing what is, and is not, to be taught by state-employed educators in its state-funded universities. And according to the district court, university professors are uniquely exempt from the principles of the Supreme Court's government-speech cases. Under this theory, university professors—called the "priests of democracy" by the district court—stand alone among all other public employees, with the First Amendment freedom to say whatever they wish pursuant to their official duties, their employer be damned.[4]

---

[4] The district court correctly concluded that the Plaintiff Students' claims were "coextensive" with the professors' speech rights and thus the students' claims rise or fall with the resolution of the professors' claims. *See* App.322.

i.    Turning first to *Bishop*, the district court erred at multiple levels in applying that decision. For example, the court repeatedly suggested that *Bishop* was effectively an Establishment Clause case. *See* App.381-82, 386 (stating that the case involved "the ever-present specter of an establishment violation" (cleaned up)). But *Bishop* made clear (numerous times) that its holding arose under the Speech Clause and not the Establishment Clause. *See* 926 F.2d at 1078 ("[W]e hold" that the government's decision "was reasonable and within its power to control the content of curriculum in the classroom, *regardless of the Establishment Clause*." (emphasis added)); *id.* at 1077 ("[W]e do not reach the establishment questions raised by Dr. Bishop's conduct.").

The district court also attempted to distinguish *Bishop* on the ground that it involved only one professor. But that, again, conflicts directly with *Bishop's* teaching that "the University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078.

But the district court's most fundamental error, as discussed *supra* at pp. 3-7, was its insistence that *Bishop* drew a distinction between the State's unquestioned authority to control the subjects taught in "the established curriculum," App.383, and professors' freedom to express their personal viewpoints on matters *within* the scope of that curriculum. According to the district court, the State may permissibly ban, wholesale, discussion of a "subject," but once the State decides to permit the

32

*discussion* of a particular "subject," the State's professors have the "academic freedom" to advocate their own *viewpoints* related to that subject. *See* App.385-87, 396.[5]

That distinction is nowhere to be found in *Bishop* and is, in fact, fundamentally inconsistent with it. *Bishop* did not concern the scope of the State's authority to establish which courses will be taught in the curriculum prescribed for its universities. *That* state authority is questioned by no one. Instead, as in this case, *Bishop* concerned "what is taught by its professors," 926 F.2d at 1078—the "course content," *id*. at 1077—and in particular, whether the State could require "that its courses be taught without personal religious bias unnecessarily infecting the teacher or the students." 926 F.2d at 1076. Nor did *Bishop* concern a dispute about the "content" of classroom speech rather than "viewpoint." Dr. Bishop's "Christian perspective," *id*., and his advocacy of intelligent design, *was a component of his professional viewpoint on the physiology curriculum he was teaching*. Indeed, this Court specifically held that the university could "prevent him from presenting his religious viewpoint during instructional time, *even to the extent that it represents his*

---

[5] The subjective malleability of this standard is evidenced in the district court's standing analysis. While the district court assures that the attempt "to teach an introductory botany class through the lens of critical race theory" would not be within the established curriculum, App.383, it nevertheless enjoined enforcement of the Act against a Plaintiff *statistics professor* who teaches through the lens of "systemic discrimination," App.355-56. The district court's distinction between this professor and the hypothetical botany professor is neither explained nor obvious.

*professional opinion about his subject matter*." *Id.* at 1077 (emphasis added); *see id.* at 1076 n.7 (crediting that Professor Bishop's "professional views" as a physiology professor were "informed by his religious beliefs").

Moreover, it is nonsensical to import a distinction between content and viewpoint into the government-speech doctrine. "Were the Free Speech Clause interpreted otherwise, government would not work." *Walker*, 576 U.S. at 207. "Indeed, it is not easy to imagine how government"—and a public university in particular—"could function if it lacked th[e] freedom" to have a viewpoint. *Pleasant Grove*, 555 U.S. at 568; *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view."). Surely a university is entitled to prohibit its political-science professors from inculcating in class the idea that slavery was a beneficent institution and should be legal or its science professors from inculcating in class the idea that eugenics should be used for population control.

The district court repeatedly emphasized that "*Bishop* explicitly adopted a balancing test." App.378. But it failed to appreciate that, as discussed above, *Bishop itself balanced* the First Amendment interest in this precise context and declared the outcome: a university's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." 926 F.2d at 1077. Lower courts are

not free to *reject* the balance specifically struck in *Bishop* by reweighing those factors.

ii.      The district court also largely elided the reasoning of the Supreme Court's government-speech precedent. The district court emphasized that the Court in *Garcetti* reserved the question whether its rule would apply to the academic context—a question not before the *Garcetti* Court. Missing from its analysis is any recognition that courts are bound not only by the result, but also by *the reasoning* of a Supreme Court decision. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.6 (2020) (Kavanaugh, J., concurring).

In an effort to distinguish *Rosenberger*, the district court recast that decision as permitting *only* content-based discrimination and foreclosing viewpoint discrimination when the government regulates in-class speech. To be sure, *Rosenberger* used the word "content" in stating that "it is the University speaking" when it "determines the content of the education it provides." *Rosenberger*, 515 U.S. at 833. But the Court's point in this sentence was about *who was speaking*, not the substance of the speech. Determining who is the speaker—the government or a private individual—is, after all, the dispositive constitutional question. And the *Rosenberger* Court clearly implied that "viewpoint-based restrictions are proper" when the university itself speaks. *See id.* at 834. Indeed, subsequent decisions have cited this same passage from *Rosenberger* for the proposition that the government is

35

"'entitled to say what it wishes'" and to "express *its views*" when it speaks. *Pleasant Grove*, 555 U.S. at 467-68 (quoting *Rosenberger*, 515 U.S. at 833) (emphasis added). That the Supreme Court has used the words "content" and "view" or "viewpoint" interchangeably in government-speech cases simply confirms there is no distinction between "content" and "viewpoint" discrimination when *the government* is speaking. *Compare Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." (citing *Pleasant Grove*, 555 U.S. at 467-68)), *with Shurtleff*, 142 S. Ct. at 1589 ("The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." (citing the same pages of *Pleasant Grove*)).

In short, the principles established by the Supreme Court's government-speech cases make clear that the speech at issue here is government speech and thus is not protected by the First Amendment.

iii.    The district court and Plaintiffs argue that "academic freedom" is an independent constitutional "interest" held uniquely by public university professors—that they alone stand outside the government speech doctrine, free to say what they please in performing their jobs no matter what their public employers think about it. This is not a tenable understanding of the First Amendment.

Both the court below and Plaintiffs ground this supposed right primarily in a trilogy of Supreme Court cases decided during the Cold War era. *See Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957); *Wieman v. Updegraff*, 344 U.S. 183 (1952). They place special reliance on the statement from *Keyishian* that "academic freedom" is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U.S. at 603. The argument does not withstand analysis.

First and foremost, it is foreclosed by *Bishop*, which acknowledged that "abundant cases," including *Keyishian*, "acclaim academic freedom." 926 F.2d at 1075. But their "pronouncements about academic freedom," *Bishop* explained, "cannot be extrapolated to deny schools command of their own courses." *Id.*

Second, as the Supreme Court has repeatedly emphasized, the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). And "States historically have been sovereign" in the field of "education." *United States v. Lopez*, 514 U.S. 549, 564 (1995). Therefore, the "traditional role in the formulation and execution of education policy" belongs to "the States." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 n.30 (1982). This district court's decision, however, "would commit state and federal courts to a new, permanent, and intrusive role" in managing public-

university curriculums that is contrary to "sound principles of federalism." *Garcetti*, 547 U.S. at 423. *Bishop* put it succinctly: "Federal judges should not be ersatz deans or educators." 926 F.2d at 1075.

Third, academic freedom is a right of *institutional*, rather than individual, autonomy. As the en banc Fourth Circuit explained in an exhaustive analysis of academic freedom, it belongs to the *university,* not *individual* professors. *See Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (en banc). *Urofsky* canvassed the very cases on which Plaintiffs rely (and others) and noted that "the Supreme Court has *never* set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom." *Id.* at 412 (emphasis added). Instead, the cases like *Keyishian* all "involve[] restrictions on state employees' rights *as private citizens*"—not as government employees—"to speak and associate." *Id.* at 413-14 (emphasis added). Other courts agree. As then-Judge Alito explained, "academic freedom ha[s] been described" only "as a *university's* freedom." *Edwards*, 156 F.3d at 492 (emphasis added); *see also Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) ("To the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors." (cleaned up)); *Emergency Coal. To Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 19-20 (D.C. Cir. 2008) (Silberman, J., concurring) (noting his "doubts" that

"'academic freedom' is a constitutional right at all and that, should it exist, it inheres in individual professors").

Moreover, the *institutional* right of academic freedom is best understood as one commanding *judicial* deference to the university's academic decisions. The Supreme Court has cited *Keyishian*, for example, as demonstrating *the Supreme Court's* "reluctance to trench on the prerogatives of state and local educational institutions." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

Nor is there merit in Plaintiffs' suggestion that principles of academic freedom permit a state university (or its president), but *not* the State Legislature, to regulate professors' in-class speech. Pernell Stay Resp. at 14-16. The notion that "[u]niversities, as subordinate organs of the State, have First Amendment rights against" or above "the State or its voters" is antithetical to any proper understanding of State sovereignty. *See Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006). Even *Grutter*, which stated that "universities occupy a special niche in our constitutional tradition," nevertheless acknowledged that States are entitled to regulate universities. *See Grutter v. Bollinger*, 539 U.S. 306, 329, 342 (2003). And a majority of the Supreme Court later confirmed that the academic freedom of universities described in *Grutter* does not make them enclaves free from regulation by voters or their elected representatives. *See Schuette v. Coal. to Defend*

*Affirmative Action*, 572 U.S. 291, 301 (2014) (plurality) (*BAMN*); *id.* at 317 (Scalia, J., concurring).

Finally, cases like *Sweezy* and *Keyishian*, which involved restrictions encompassing a professor's *extracurricular* affiliations and publications, are particularly inapposite here, given the Act's limitation to in-class instruction by State educators. As its text makes plain, the Act regulates only the State's educational "instruction," FLA. STAT. § 1000.05(4)(a). The Act therefore does not regulate a professor's scholarship, research, public speeches, writings, or *anything* other than in-class instruction. Nor does it regulate the speech of those who do not speak on behalf of the State, such as guest speakers or other invitees.

The Act therefore does not prohibit "in-class debate between guest speakers about the merits of" the concepts, as the court below suggested. *See* App.300. An event where guest speakers debate the merits of an issue but the professor does not *endorse* one side or the other of the debate would clearly fall within the Act's express provision permitting "discussion of the concepts" so long as the "instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b).

The district court's extended discussion of a hypothetical speech by Justice Sotomayor thus fails to account for the Act's text. The court imagined a scenario where Justice Sotomayor would be prohibited by the Act from reading a passage of

her book to a class of law students. App.301-02. But guest speakers, again, are not regulated by the Act at all, and merely hosting a guest speaker obviously would not itself be an *endorsement* by the host professor of what the speaker says. The district court's parade-of-horribles hypothetical thus has nothing to do with the statute at issue.[6]

iv.    The implications of the district court's ruling are horrifying. Under the court's reasoning, if a university permits the *discussion* of World War II in a history course within the "established curriculum," then a professor has a First Amendment right to advocate the viewpoint that the Holocaust is a hoax and Nazis were the good guys. Or if a university permits the *discussion* of the Jim Crow era within the "established curriculum," then a professor has a First Amendment right to inculcate the viewpoint that Jim Crow was justified because white people are "superior" to black people. To avoid these results, according to the district court, the university

---

[6] The district court built this hypothetical based on what the court viewed as an assertion by Defendants' counsel at the preliminary-injunction hearing. *See* App.300 (citing Tr. 80). But as the transcript of this somewhat disjointed exchange at argument reveals, counsel was answering a question regarding a professor who brings in a guest speaker to *provide instruction espousing* the prohibited concepts as part of class instruction. Tr. 80. As previously noted, supra at 2, the Board's Regulation defines "instruction" to mean teaching "by a university employee" or other person "authorized to provide instruction by the university within a course." Thus, the Act obviously prohibits a professor from willfully circumventing the Act by enlisting an agent to provide the very same instruction that the professor is prohibited from providing. But simply presenting a concept—whether through a reading assignment, a presentation, or an in-class debate—does not violate the Act if the professor does not *personally endorse* the concept.

would presumably be forced to ban discussion of World War II and Jim Crow altogether. That cannot be the law.

Yet that result is precisely what Plaintiffs contemplate, as shown by Plaintiffs' own discussion of professors who endorse Holocaust denial during in-class instruction. Pernell Stay Resp. at 27. On Plaintiffs' account, the State's elected officials are utterly powerless—indeed, prohibited by *the Constitution*—from doing anything to stop that instruction in a public-university classroom. But not to worry, Plaintiffs say, because a professor who teaches "that the Holocaust was a hoax would likely be summoned by her department chair to explain the basis for the lesson and the context surrounding it." *Id.* Regardless of the level of faith the State has in its university "department chairs," the Constitution does not require the State's elected officials—and, in turn, the People of the State—to *simply hope* that administrators at public universities will "likely" ask to hear "the context surrounding" the endorsement of the idea that "the Holocaust was a hoax." No, the People of the State of Florida, through their elected officials, are entitled to prohibit the State's educators from endorsing that idea as part of instruction to students in a State classroom.

These are not mere wild hypotheticals. The Third Circuit—following then-Judge Alito's opinion in *Edwards*—held that a world history teacher did not have a First Amendment right to, among other things, "questio[n] historical accounts of the

Holocaust, and opin[e] that 'Hitler didn't hate the Jews.'" *Ali v. Woodbridge Twp.*
*Sch. Dist.*, 957 F.3d 174, 178, 184 (3d Cir. 2020). And a white high-school teacher
in Texas was recently fired for telling students that his race "is the superior one"—
using language remarkably similar to concept 1 in the Act. Andi Babineau, *White*
*teacher in Texas fired after telling students his race is 'the superior one'*, CNN (Nov.
15, 2022), https://cnn.it/3VCQWl4. While these examples concern the context of K-
12 instruction, under the district court's reasoning, both of these teachers would have
a First Amendment claim if they were teaching at a university that permitted any
discussion of either World War II or Jim Crow "within the established curriculum."
Despite the differences between the K-12 and university-level contexts, that
reasoning is clearly wrong in both, and this Court should reverse the decision below.

The district court purported to be defending "a healthy democracy." App.426.
But it nevertheless insisted that the question of in-class instruction "must be taken
from the reach of the voters, and thus removed from the realm of public discussion,
dialogue, and debate in an election campaign." *BAMN*, 57 U.S. at 312. That
argument is fundamentally "inconsistent with the underlying premises of a
responsible, functioning democracy." *Id.* at 312.

## B. The Act's Educational Provisions Satisfy Any Understanding of the Standard Established by *Bishop*.

Even if the Court reads *Bishop* as adopting a level of scrutiny marginally more
stringent than rational basis review, that standard still requires, only and at most, that

the Act's provisions be "reasonable." *Bishop*, 926 F.2d at 1076. The Act's educational provisions easily pass that test. As the Ninth Circuit held, educational statutes that, among other things, prohibit teaching classes that "[p]romote resentment toward a race or class of people" or "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals" are "reasonably related to the state's legitimate pedagogical interest in reducing racism." *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up). And *Bishop* itself recognized that a university has an inherent "interest[] in the classroom conduct of its professors." *Bishop*, 926 F.2d at 1076.

In contrast, the district court concluded that the State's regulation of the viewpoints taught in class by its state-employed educators is *never* "reasonable" within the meaning of *Bishop*. *See* App.387-88. The district court held that, even if the interest served by the IFA was to "address the pedagogical concern of reducing racism or prohibiting racial discrimination," a viewpoint-based restriction "is certainly *not* reasonable." App.388 (emphasis in original). That conclusion is untenable. The compelling nature of the government's interest in preventing invidious racial discrimination in public education is so fundamental that it is embodied in our highest law. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983).

But the substance of the district court's holding is that government regulation of *any viewpoint* taught in government-funded courses by government-employed instructors—no matter how compelling the government interest—is *per se* unconstitutional.[7] Under this theory, literally no viewpoint is out of bounds. The district court offered no authority for this extreme proposition, and it certainly does not come from *Bishop*.

### III.    The Challenged Provisions Are Not Unconstitutionally Vague.

The Court should also reverse the district court's ruling that two of the Act's provisions are unconstitutionally vague. "Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). Neither condition is present here.

In the typical speech context, the government must regulate "with narrow specificity"—though "perfect clarity and precise guidance have never been required

---

[7] The district court suggested that Defendants "may" face a higher burden than the burden imposed by *Bishop* because the Act is a "prophylactic ban on expression" applicable to all public instructors. *See* App.387 n.53 (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ("*NTEU*"). But *NTEU* applied a heightened standard only "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment and takes place outside the workplace." 513 U.S. at 470; *see also id.* at 475. *NTEU* is thus simply irrelevant here.

even of regulations that restrict expressive activity." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017). But "[i]n the public employment context," a more lenient standard applies: a provision governing public employees is "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (cleaned up).

For example, although "speech restrictions must generally precisely define the speech they target," as a plurality of the Supreme Court explained, "surely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("[T]he school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."). Therefore, "[g]overnment employee speech must be treated differently" in the vagueness analysis. *See Waters*, 511 U.S. at 673. Recognizing this principle, courts have upheld the termination of public university professors based on, for example, a provision requiring professors "to maintain 'standards of sound scholarship and competent teaching.'" *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992); *see also Arnett v. Kennedy*, 416 U.S. 134, 158-62 (1974) (plurality) (upholding regulation permitting termination for speech that hindered the

"efficiency of the service"). The district court acknowledged that the public-employee standard applies here. App.404-05 And the Act readily satisfies it. *O'Laughlin*, 30 F.4th at 1055.

Each of the challenged provisions uses plain, everyday language that has an "ordinary or natural meaning" commonly known and understood by ordinary people, and certainly by highly educated university instructors. Yes, "the fact that the [Act] uses real words found in an English dictionary does not magically extinguish vagueness concerns." App.404. But courts routinely use dictionaries to confirm that allegedly vague language in fact has an "ordinary meaning" that "is readily understandable." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020). Nor is the Act's language "so standardless" that it invites arbitrary enforcement. *Jones*, 975 F.3d at 1046. Because Plaintiffs challenge the Act on a pre-enforcement basis, their burden to show the risk of discriminatory enforcement is much higher. *See Vill. of Hoffman v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 503 (1982); *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982). And two further features of the Act and the Board's regulation render Plaintiffs' burden insurmountable.

First, "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement." *Jones*, 975 F.3d at 1047. And the scienter requirement in the Act and the Board's Regulation 10.005

47

eliminates any genuine vagueness concerns. The Act uses terms that clearly imply a scienter requirement—restricting only the intentional act of providing classroom instruction that "espouses, promotes, advances, inculcates, or compels [a student] to believe" one of the enumerated concepts. FLA. STAT. § 1000.05(4)(a); *see Arce*, 793 F.3d at 988-89 (noting that verbs like "advocate" and "promote" "impl[y] an affirmative act and intent").

Second, Regulation 10.005 explains that universities should enforce the Act against individual instructors who violate it by first mandating that the instructor "modify" the offending training or instruction, and second by using "disciplinary measures" only "if there is a failure or refusal to comply with the mandate." Regulation 10.005(3)(c). This structure—punishing only a failure or refusal to take corrective action—likewise reduces vagueness concerns. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 580 (1973) ("*Letter Carriers*"). The district court pointed out that discipline is authorized under the Regulation for an instructor's "failure," as well as "refusal," to conform his teaching to the Act. App.415. But even such a "'failure' to comply" can subject the instructor to discipline only *after* the University has informed him precisely what the Act requires and precisely which teachings it has concluded violate it—thus mitigating any potential vagueness concerns.

The district court rejected these considerations and held that the Act is unconstitutionally vague. Its reasoning, however, was limited to just two provisions of the Act. Both of them use plain, commonly understood language and provide fair notice of what the Act prohibits.

A.    The district court first rejected as vague concept 4—that "[m]embers of one race … cannot and should not attempt to treat others without respect to race, …." FLA. STAT. § 1000.05(4)(a)(4). Much of the court's discussion (with respect to this provision and the other one it addressed) incorporated its earlier opinion in another case challenging the Act, *Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962 (N.D. Fla. Aug. 18, 2022), which is currently before this Court on appeal, No. 22-13135 (11th Cir.). The court deemed this concept "unintelligible" largely because of its use of "a rarely seen triple negative." App.405. But this concept simply and clearly bars instructors from endorsing the view that members of one race are powerless to treat others in a color-blind manner, and they should not even try to do so. If this provision is so "unintelligible" as to be unconstitutionally vague, one wonders what is to become of the thousands of far more intricate provisions that riddle the statute books. *See, e.g.*, 15 U.S.C. § 77k; 26 U.S.C. § 501; 52 U.S.C. § 30116.

Indeed, the hypotheticals posed by the district court in the very next paragraph show that the court had no genuine difficulty whatsoever in cutting through the

49

alleged "cacophony of confusion" purportedly created by the provision's "triple negative." App.405. Ordinary people will not have any difficulty either. Nor will they have any difficulty in seeing that the concept plainly does not ban general discussion of "diversity" or acknowledgement of students "differing cultural backgrounds," App.406—since such discussions do not amount to advocacy of the idea that individuals "cannot and should not attempt to treat others" without respect to their race.

B.     The district court's second and more extended discussion centered around the supposed vagueness of the word "objective" in the Act's provision permitting "discussion of the [eight] concepts … in an *objective* manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b) (emphasis added). It concluded that the concept of "objectivity" is "utterly ambiguous," and that because "this 'objectivity' savings clause commands the entire statute," the Act is unconstitutionally vague *in its entirety*, and Plaintiffs are entitled to a blanket preliminary injunction against *all* of it. App.416 & n.62. Not so.

To discuss a concept "in an objective manner" is, obviously, to discuss it "without distortion by personal feelings, prejudices, or interpretations." *Objective*, MERRIAM-WEBSTER'S DICTIONARY, https://bit.ly/3zcLbB1. In contrast, to "endorse" a concept is "to give approval to" or "support" it. *Endorse*, WEBSTER'S NEW WORLD

COLLEGE DICTIONARY 470 (4th ed. 2002). Therefore, the plain meaning of the Act permits instructors to discuss the concepts without *expressing approval* of them.

The district court insisted that "few terms are as loaded and contested as 'objective.'" App.415. But ordinary people understand the plain, everyday meaning of objectivity. Moreover, the *entire American legal framework* is built upon the belief that it is possible—and indeed, critically necessary to the law's very legitimacy—to distinguish between endorsing and advocating an idea and neutrally and objectively discussing and considering it. That is a line that appears *throughout* the law and that our adversarial legal system trusts its judges, attorneys, and officers to draw *every single day*. This Court's Pattern Jury Instructions, for example, repeatedly instructs juries—ordinary people drawn randomly from the community— to draw this line, instructing them to determine when an action or belief is "objectively reasonable," or to distinguish "objective" conditions from a "plaintiff's subjective feelings." *See, e.g.*, PATTERN JURY INSTRUCTIONS, CIVIL CASES, ELEVENTH CIRCUIT (2013 revision) 4.19, 4.22 cmt. 2, https://bit.ly/3OguaWU. Indeed, while the district court professed to find the Act's use of the term "objective" "utterly ambiguous," App.410, the court itself has used that term on numerous

occasions, without any apparent concern that his readers would be confounded by it.[8]

The court's principal response to this argument was to claim that even if the term "objective" has a commonly understood meaning on its own, "the term loses that meaning" here, because the Act "allows for the most zealous condemnation of the eight concepts—motivated by an instructor's own personal prejudice or biases," but it does not allow endorsement of the concepts by those "who wish to promote the[ir] merits." App.411. Thus, according to the court below, the Act "redefine[s] 'objectivity' in a manner that does not comport with common sense," by allowing "for only one side of the debate in Florida's public universities." *Id.*

This argument is built upon a fundamental and obvious misunderstanding of the Act's text and structure. Yes, of the three possible dispositions towards the eight concepts enumerated by the Act—condemnation, neutral objectivity, and endorsement—Florida's public-university instructors are only prohibited from endorsement. But that is not because the Act somehow "has redefined 'objectivity'" in subsection (4)(b)'s *exception* to the Act's prohibition, *id*.; it is because subsection (4)(a)'s *operative prohibition* only proscribes *endorsing* the concepts, not

---

[8] *See, e.g.*, *Akridge v. Sch. Bd. of Alachua Cnty.*, 2019 WL 13084482, at *5 n.3 (N.D. Fla. May 28, 2019); *Wilborn v. Ocwen Loan Servicing, LLC*, 2019 WL 12288376, at *8 (N.D. Fla. Mar. 17, 2019); *HVLPO2, LLC v. Oxygen Frog, LLC*, 2019 WL 13164663, at *8 (N.D. Fla. Feb. 20, 2019).

*condemning* them. That has nothing to do with subsection (4)(b)'s *exception*—which merely confirms that "discussion of the concepts … in an objective manner" that does not endorse *any* particular view of the concepts remains permissible—so it cannot render subsection (4)(b) unconstitutionally vague.

In sum, even if "the prohibitions may not satisfy those intent on finding fault at any cost," the Act's provisions "are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *Letter Carriers*, 413 U.S. at 578-79. Therefore, the Act's provisions are not unconstitutionally vague.

### IV.    Any Unconstitutional Provisions Are Severable.

Even if Plaintiffs' claims were likely to succeed with respect to one or more of the Act's provisions, the court below erred in declining to sever them from the remainder of the Act. Severability is "a matter of state law," and in Florida unconstitutional provisions are severable even in the absence of a severability clause if "(1) they can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken." *Wollschlaeger*, 848 F.3d at 1317-18 (cleaned up). Here, each of the

provisions of the Act, including each prohibited concept, clearly stands on its own and independently furthers Florida's interest in enacting it. If any portion of the Act is held unconstitutional, it should be severed from the remaining, valid provisions.

The district court concluded that it "need not confront severability because the unconstitutionally vague 'objectivity' savings clause, which governs both the challenged statute and regulation, renders the provisions as a whole unconstitutionally vague." App.416 n.62. But as discussed above, the Act's exception for discussion of the enumerated concepts "in an objective manner" is *not* unconstitutionally vague. And even if it were, the court below did not explain how the purported vagueness of the Act's *exception*—allowing objective discussion of the concepts—could possibly render unconstitutionally vague the Act's *general rule* prohibiting instruction that endorses them. For even if it is "impossible" for college professors to discern when they are discussing the concepts objectively, App.415, the court *never* claimed it is impossible for them to discern when they are affirmatively *endorsing* them. Accordingly, the court erred in declining to conduct a severability analysis.

## V.    The Remaining Equitable Factors Favor Reversal.

The remaining injunction factors likewise militate in favor of reversal. "A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel*, 234 F.3d at 1176 (quotation marks omitted). The district court's principal reason for

concluding that Plaintiffs had shown irreparable injury was its conclusion that an "ongoing First Amendment violation … constitutes irreparable injury" per se. App.418. But because Plaintiffs have little likelihood of showing that the Act *actually violates* their First Amendment freedoms, this presumption does not apply.

The balance of the equities and the public interest weigh decisively in favor of reversing the district court's preliminary injunction. As shown above, the State has a compelling interest in ending discrimination based on race and other immutable characteristics, and enjoining the Act will sanction curricular speech that Florida has determined, in the exercise of its sovereign judgment, is invidiously discriminatory and contrary to the State's most cherished ideals. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *King*, 567 U.S. at 1303 (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers interests as fundamental as those at the heart of Florida's Individual Freedom Act.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed and the preliminary injunction should be vacated.

Dated: April 17, 2023                   Respectfully submitted,

                                        /s/ Charles J. Cooper
                                        Charles J. Cooper
                                        John D. Ohlendorf
                                        Megan M. Wold
                                        John D. Ramer
                                        COOPER & KIRK, PLLC
                                        1523 New Hampshire Avenue, N.W.
                                        Washington, D.C. 20036
                                        Telephone: (202) 220-9600
                                        Facsimile: (202) 220-9601
                                        ccooper@cooperkirk.com
                                        johlendorf@cooperkirk.com
                                        mwold@cooperkirk.com
                                        jramer@cooperkirk.com

                    *Counsel for Defendants-Appellants*

STATUTORY ADDENDUM

# TABLE OF CONTENTS

**<u>Page</u>**

Fʟᴀ. Sᴛᴀᴛ. § 1000.05......................................................................... SA-1

Bd. of Govs. Reg. No. 10.0005................................................. SA-10

West's Florida Statutes Annotated
Title XLVIII. Early Learning-20 Education Code (Chapters 1000-1013)
Chapter 1000. Early Learning-20 General Provisions (Refs & Annos)
Part I. General Provisions

West's F.S.A. § 1000.05

1000.05. Discrimination against students and employees in the Florida
K-20 public education system prohibited; equality of access required

Effective: July 1, 2022
Currentness

(1) This section may be cited as the "Florida Educational Equity Act."

(2)(a) Discrimination on the basis of race, color, national origin, sex, disability, religion, or marital status against a student or an employee in the state system of public K-20 education is prohibited. No person in this state shall, on the basis of race, color, national origin, sex, disability, religion, or marital status, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 education program or activity, or in any employment conditions or practices, conducted by a public educational institution that receives or benefits from federal or state financial assistance.

(b) The criteria for admission to a program or course shall not have the effect of restricting access by persons of a particular race, color, national origin, sex, disability, religion, or marital status.

(c) All public K-20 education classes shall be available to all students without regard to race, color, national origin, sex, disability, religion, or marital status; however, this is not intended to eliminate the provision of programs designed to meet the needs of students with limited proficiency in English, gifted students, or students with disabilities or programs tailored to students with specialized talents or skills.

(d) Students may be separated by sex for a single-gender program as provided under s. 1002.311, for any portion of a class that deals with human reproduction, or during

participation in bodily contact sports. For the purpose of this section, bodily contact sports include wrestling, boxing, rugby, ice hockey, football, basketball, and other sports in which the purpose or major activity involves bodily contact.

(e) Guidance services, counseling services, and financial assistance services in the state public K-20 education system shall be available to students equally. Guidance and counseling services, materials, and promotional events shall stress access to academic and career opportunities for students without regard to race, color, national origin, sex, disability, religion, or marital status.

(3)(a) No person shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club, or intramural athletics offered by a public K-20 educational institution; and no public K-20 educational institution shall provide athletics separately on such basis.

(b) Notwithstanding the requirements of paragraph (a), a public K-20 educational institution may operate or sponsor separate teams for members of each sex if the selection for such teams is based upon competitive skill or the activity involved is a bodily contact sport. However, when a public K-20 educational institution operates or sponsors a team in a particular sport for members of one sex but does not operate or sponsor such a team for members of the other sex, and athletic opportunities for that sex have previously been limited, members of the excluded sex must be allowed to try out for the team offered.

(c) This subsection does not prohibit the grouping of students in physical education classes and activities by ability as assessed by objective standards of individual performance developed and applied without regard to sex. However, when use of a single standard of measuring skill or progress in a physical education class has an adverse effect on members of one sex, the educational institution shall use appropriate standards which do not have such effect.

(d) A public K-20 educational institution which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sexes.

1. The Board of Governors shall determine whether equal opportunities are available at state universities.

2. The Commissioner of Education shall determine whether equal opportunities are available in school districts and Florida College System institutions. In determining whether equal opportunities are available in school districts and Florida College System institutions, the Commissioner of Education shall consider, among other factors:

a. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.

b. The provision of equipment and supplies.

c. Scheduling of games and practice times.

d. Travel and per diem allowances.

e. Opportunities to receive coaching and academic tutoring.

f. Assignment and compensation of coaches and tutors.

g. Provision of locker room, practice, and competitive facilities.

h. Provision of medical and training facilities and services.

i. Provision of housing and dining facilities and services.

j. Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a public school or Florida College System institution operates

or sponsors separate teams do not constitute nonimplementation of this subsection, but the Commissioner of Education shall consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

(e) A public school or Florida College System institution may provide separate toilet, locker room, and shower facilities on the basis of gender, but such facilities shall be comparable to such facilities provided for students of the other sex.

(4)(a) It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:

1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2. A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

(b) Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

(5) Public schools and Florida College System institutions shall develop and implement methods and strategies to increase the participation of students of a particular race, color, national origin, sex, disability, or marital status in programs and courses in which students of that particular race, color, national origin, sex, disability, or marital status have been traditionally underrepresented, including, but not limited to, mathematics, science, computer technology, electronics, communications technology, engineering, and career education.

(6)(a) The State Board of Education shall adopt rules to implement this section as it relates to school districts and Florida College System institutions.

(b) The Board of Governors shall adopt regulations to implement this section as it relates to state universities.

(7) The functions of the Office of Equal Educational Opportunity of the Department of Education shall include, but are not limited to:

(a) Requiring all district school boards and Florida College System institution boards of trustees to develop and submit plans for the implementation of this section to the Department of Education.

(b) Conducting periodic reviews of school districts and Florida College System institutions to determine compliance with this section and, after a finding that a school district or a Florida College System institution is not in compliance with this section, notifying the entity of the steps that it must take to attain compliance and performing followup monitoring.

(c) Providing technical assistance, including assisting school districts or Florida College System institutions in identifying unlawful discrimination and instructing them in remedies for correction and prevention of such discrimination and performing followup monitoring.

(d) Conducting studies of the effectiveness of methods and strategies designed to increase the participation of students in programs and courses in which students of a particular race, color, national origin, sex, disability, or marital status have been traditionally underrepresented and monitoring the success of students in such programs or courses, including performing followup monitoring.

(e) Requiring all district school boards and Florida College System institution boards of trustees to submit data and information necessary to determine compliance with this section. The Commissioner of Education shall prescribe the format and the date for submission of such data and any other educational equity data. If any board does not submit the required compliance data or other required educational equity data by the prescribed date, the commissioner shall notify the board of this fact and, if the board does not take appropriate action to immediately submit the required report, the State Board of Education shall impose monetary sanctions.

(f) Based upon rules of the State Board of Education, developing and implementing enforcement mechanisms with appropriate penalties to ensure that public K-12 schools and Florida College System institutions comply with Title IX of the Education Amendments of 1972 and subsection (3) of this section. However, the State Board of Education may not force a public school or Florida College System institution to conduct, nor penalize such entity for not conducting, a program of athletic activity or athletic scholarship for female athletes unless it is an athletic activity approved for women by a recognized association whose purpose is to promote athletics and a

SA-6

conference or league exists to promote interscholastic or intercollegiate competition for women in that athletic activity.

(g) Reporting to the Commissioner of Education any district school board or Florida College System institution board of trustees found to be out of compliance with rules of the State Board of Education adopted as required by paragraph (f) or paragraph (3)(d). To penalize the board, the State Board of Education shall:

1. Declare the school district or Florida College System institution ineligible for competitive state grants.

2. Notwithstanding the provisions of s. 216.192, direct the Chief Financial Officer to withhold general revenue funds sufficient to obtain compliance from the school district or Florida College System institution.

The school district or Florida College System institution shall remain ineligible and the funds shall not be paid until the institution comes into compliance or the State Board of Education approves a plan for compliance.

(8) A public K-20 educational institution must treat discrimination by students or employees or resulting from institutional policies motivated by anti-Semitic intent in an identical manner to discrimination motivated by race. For purposes of this section, the term "anti-Semitism" includes a certain perception of the Jewish people, which may be expressed as hatred toward Jewish people, rhetorical and physical manifestations of anti-Semitism directed toward a person, his or her property, or toward Jewish community institutions or religious facilities.

(a) Examples of anti-Semitism include:

1. Calling for, aiding, or justifying the killing or harming of Jews, often in the name of a radical ideology or an extremist view of religion.

2. Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as a collective, especially, but not exclusively, the

myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.

3. Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, the State of Israel, or even for acts committed by non-Jews.

4. Accusing Jews as a people or the State of Israel of inventing or exaggerating the Holocaust.

5. Accusing Jewish citizens of being more loyal to Israel, or the alleged priorities of Jews worldwide, than to the interest of their own nations.

(b) Examples of anti-Semitism related to Israel include:

1. Demonizing Israel by using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis, drawing comparisons of contemporary Israeli policy to that of the Nazis, or blaming Israel for all inter-religious or political tensions.

2. Applying a double standard to Israel by requiring behavior of Israel that is not expected or demanded of any other democratic nation or focusing peace or human rights investigations only on Israel.

3. Delegitimizing Israel by denying the Jewish people their right to self-determination and denying Israel the right to exist.

However, criticism of Israel that is similar to criticism toward any other country may not be regarded as anti-Semitic.

(c) Nothing in this subsection shall be construed to diminish or infringe upon any right protected under the First Amendment to the United States Constitution, or the State Constitution. Nothing in this subsection shall be construed to conflict with federal or state discrimination laws.

(9) A person aggrieved by a violation of this section or a violation of a rule adopted under this section has a right of action for such equitable relief as the court may determine. The court may also award reasonable attorney's fees and court costs to a prevailing party.

**Credits**

Added by Laws 2002, c. 2002-387, § 7, eff. Jan. 7, 2003. Amended by Laws 2003, c. 2003-261, § 1942, eff. June 26, 2003; Laws 2004, c. 2004-357, § 70, eff. July 1, 2004; Laws 2007, c. 2007-217, § 66, eff. July 1, 2007; Laws 2008, c. 2008-26, § 1, eff. July 1, 2008; Laws 2010, c. 2010-78, § 9, eff. July 1, 2010; Laws 2011, c. 2011-5, § 4, eff. July 6, 2011; Laws 2019, c. 2019-59, § 1, eff. May 31, 2019; Laws 2022, c. 2022-72, § 2, eff. July 1, 2022.

Notes of Decisions (8)

West's F. S. A. § 1000.05, FL ST § 1000.05
Current with laws and joint resolutions in effect from the 2022 Special A Session and 2023 Special B Session of the Twenty-Eighth Legislature. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

(1) Definitions.  For purposes of this regulation, the enumerated terms are defined as follows:

    (a) "Concepts" are the following:

        1.  Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

        2.  A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

        3.  A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

        4.  Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

        5.  A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

        6.  A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

        7.  A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

        8.  Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

    (b) "Training" is defined as a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role.

    (c) "Instruction" is defined as the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university within a course.

    (d) "Substantiate" is defined as establishing the existence or truth of a particular fact through the use of competent evidence.

    (e) "University regulation" is defined as the regulation required by section (2)(a) below.

(f) "Administrator" means the following high-level personnel who have been assigned the responsibilities of university-wide academic or administrative functions: university president, provost, senior/executive vice presidents, vice presidents, associate vice presidents, associate/vice provosts, deans, equal opportunity programs director, chief audit executive, and chief compliance officer.

(2) University Regulation and Content Review
    (a) Each university shall have a university regulation that prohibits discrimination on the basis of race, color, national origin, or sex by subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the concepts as defined in paragraph (1)(a). Such university regulation shall contain a method for submitting complaints of alleged violations of the university regulation and the title and contact information of the office(s) designated by the university to receive and maintain such complaints.
    (b) The university regulation shall include that the prohibition in section (2)(a) does not prohibit discussion of the concepts as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.
    (c) Each university shall post the university regulation on a public website where the university commonly publishes regulations.
    (d) Each university shall periodically review its regulations, policies and institutional training materials to ensure that the content does not violate the university regulation.

(3) University Investigation and Corrective Action
    (a) Each administrator who receives a complaint of an alleged violation of the university regulation shall timely forward such complaint to the office(s) designated to receive such complaints.
    (b) After reviewing the complaint and obtaining any additional information to aid in the review, the designated office shall direct, supervise, or coordinate the investigation of credible complaints that identify a training or instruction that espouses, promotes, advances, inculcates, or compels a student or employee to believe any of the concepts.
    (c) In the event the investigation finds that an instruction or training is inconsistent with the university regulation, the university shall inform the Board of Governors through the Office of Inspector General and take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation, issuing disciplinary measures where appropriate and remove, by

termination if appropriate, the employee(s) that fails or refuses to comply with the mandate.

    (d) If the Board of Governors receives a complaint about which it has not been previously informed pursuant paragraph 3(c), it shall refer the complaint to the subject university's Chief Audit Executive to be addressed pursuant paragraphs 3(a)-(c).

(4) Proceedings to Determine a Substantiated Institutional Violation

    (a) Upon receipt of a credible allegation that a university willfully and knowingly failed to correct a violation of the university regulation, the Board of Governors' Office of Inspector General shall conduct an investigation to determine if evidence exists to support the allegation and ineligibility for performance funding.  In determining whether a university willfully and knowingly failed to correct a violation, the Office of Inspector General shall consider whether the university made a good faith determination that the complaint did not allege a violation of the university regulation or whether it took prompt corrective action after it substantiated a violation of the university regulation.  If it is determined an external qualified investigative firm is necessary to assist with or conduct the investigation, the subject university will be responsible for any costs incurred.

    (b) The Inspector General shall submit the investigatory findings to the Chair of the university's Board of Trustees, or the Chair's designee, which shall have twenty (20) business days to submit a written response after receipt of such findings.  The Office of Inspector General shall provide a rebuttal, if any, to the university within twenty (20) business days after receipt of the university's response.  The university's response and the Office of Inspector General's rebuttal to the response, if any, shall be included in a final investigative report provided to the Board of Governor's Audit and Compliance Committee and the Chair of the university's Board of Trustees.

    (c) The Board of Governor's Audit and Compliance Committee shall make a recommendation to the Board as to whether it should substantiate an allegation that a university willfully and knowingly failed to correct a violation of the university regulation.  The Board shall review the investigative report and recommendation and make a final decision regarding whether the alleged willful and knowing failure to correct a violation of the university regulation is substantiated.  Such decision will be rendered in writing to the university within twenty (20) business days of the meeting at which the report is considered.

    (d) If the Board of Governors determines that a university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of section 1000.05(4)(a), Florida Statutes, and failed to take appropriate corrective action, the university will be ineligible for

performance funding for the next fiscal year following the year in which the Board of Governors made the determination.

(5) Additional Proceedings.

A university or the complainant may seek judicial review by filing a petition for writ of certiorari review with the appropriate circuit court within thirty (30) days of the date of the Board's final decision pursuant to Florida Rule of Appellate Procedure 9.190(b)(3).

Authority: Section 7(d), art. IX, Fla. Const.; Section 1000.05, Florida Statutes; Section 1001.92, Florida Statutes; History: New 08-26-22.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 12,911 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11th CIR. R. 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: April 17, 2023                    /s/Charles J. Cooper
                                         Charles J. Cooper
                                         *Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on April 17, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 17, 2023           /s/Charles J. Cooper
                                        Charles J. Cooper
                                        *Counsel for Defendants-Appellants*