22-13992

# In the United States Court of Appeals for the Eleventh Circuit

―――――――――

LeRoy Pernell et al.,

*Plaintiffs-Appellees*,

v.

Brian Lamb et al.,

*Defendants-Appellants*.

―――――――――

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:22-CV-304-MW-MAF

―――――――――

## BRIEF OF PLAINTIFFS-APPELLEES

―――――――――

Leah Watson
Emerson Sykes
Sarah Hinger
Crystal Pardue
Laura Moraff
American Civil Liberties
  Union Foundation
125 Broad Street, Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org

*Counsel list continued on
the following page.*

Jerry C. Edwards
ACLU Foundation of Florida
933 Lee Road, Ste. 102
Orlando, FL 32810
(786) 363-1107

Daniel B. Tilley
Katherine Blankenship
Caroline McNamara
Jacqueline Azis
ACLU Foundation of Florida
4343 W. Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714

Morenike Fajana
Tiffani Burgess
Alexsis Johnson
NAACP LEGAL DEFENSE &
  EDUCATION FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10006
(212) 217-1690

Jin Hee Lee
Charles McLaurin
Santino Coleman
NAACP LEGAL DEFENSE &
  EDUCATION FUND, INC.
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
(202) 682-1300

Jason Leckerman
Catherine Lubin
BALLARD SPAHR, LLP
1735 Market Street, Fl. 51
Philadelphia, PA 19103-7599
(215) 864-8266

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main Street, Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063

*Counsel for Plaintiffs-Appellees*

**CERTFICIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Local Rules 26.1-2, Plaintiffs-Appellees certify that the following persons have or may have an interest in the outcome of this case or appeal, in addition to the individuals and entities named in Defendants-Appellants' initial brief:

1. Almond, Russell, *Plaintiff-Appellee*

2. American Civil Liberties Union Foundation of Florida, Inc., *Attorneys for Plaintiffs-Appellees*

3. American Civil Liberties Union Foundation, *Attorneys for Plaintiffs-Appellees*

4. Austin, Sharon Wright, *Plaintiff-Appellee*,

5. Azis, Jacqueline Nicole, *Attorney for Plaintiffs-Appellees*

6. Ballard Spahr, LLP, *Attorneys for Plaintiffs-Appellees*

7. Benjamin, Aaronson, Edinger, & Pantzano, P.A., *Attorneys for Plaintiffs-Appellees*

8. Blankenship, Katherine, *Attorney for Plaintiffs-Appellees*

9. Boaz, Timothy L., *Defendant-Appellant*

10. Burgess, Tiffani, *Attorney for Plaintiffs-Appellees*

11. Callahan, Sandra, *Defendant-Appellant*

12. Carrere, Michael, *Defendant-Appellant*

13. Cerio, Timothy M., *Defendant-Appellant*

14. Coleman, Santino, *Attorney for Plaintiffs-Appellees*

15. Cooper & Kirk, PLLC, *Attorneys for Defendants-Appellants*

16. Cooper, Charles J., *Attorney for Defendants-Appellants*

17. Corcoran, Richard, *Defendant-Appellant*

18. Dauphin, Johana, *Plaintiff-Appellee*

19. Diaz, Jr., Manny, *Defendant-Appellant*

20. Donnelly, N. Rogan, *Defendant-Appellant*

21. Dunn, Marvin, *Plaintiff-Appellee*

22. Edge, Aubrey, *Defendant-Appellant*

23. Edinger, Gary Scott, *Attorney for Plaintiffs-Appellees*

24. Edwards, Jerry Crawford, *Attorney for Plaintiffs-Appellees*

25. Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

26. First Amendment Forum at University of South Florida, *Plaintiff-Appellee*

27. Fitzpatrick, Magistrate Judge Hon. Martin A., U.S. District Court for the Northern District of Florida

28. Florida A&M University Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

29. Florida Board of Governors of the State University System, *Defendant (dismissed Nov. 22, 2022)*

30. Florida International University Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

31. Florida State University Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

32. Foundation for Individual Rights and Expression, *Attorneys for Plaintiffs-Appellees*

33. Frost, Patricia, *Defendant-Appellant*

34. Gabadage, Nimna, *Defendant-Appellant*

35. Gary S. Edinger & Associates PA — Gainesville, FL, *Attorney for Plaintiffs Appellees*

36. Greubel, Greg Harold, *Attorney for Plaintiffs-Appellees*

37. Griffin, Michael, *Defendant-Appellant*

38. Haddock, Jr., Edward Ellis, *Defendant-Appellant*

39. Hinger, Sarah Ann, *Attorney for Plaintiffs-Appellees*

40. Horton, Oscar, *Defendant-Appellant*

41. Johnson, Alexsis Marie, *Attorney for Plaintiffs-Appellees*

42. Jones, Kenneth, *Defendant-Appellant*

43. Jordan, Darlene Luccio, *Defendant-Appellant*

44. Lamb, Brian, *Defendant-Appellant*

45. Leckerman, Jason Allen, *Attorney for Plaintiffs-Appellees*

46. Lee, Jin Hee, *Attorney for Plaintiffs-Appellees*

47. Leftheris, Julie, *Defendant-Appellant*

48. Levine, Alan, *Defendant-Appellant*

49. Lubin, Catharine E., *Attorney for Plaintiffs-Appellees*

50. Lydecker, Charles, *Defendant-Appellant*

51. Mabatah, Isiuwa Jacqueline, *Attorney for Plaintiffs-Appellees*

52. Mateer, Craig, *Defendant-Appellant*

53. McLaurin, Charles, *Attorney for Plaintiffs-Appellees*

54. McNamara, Caroline Andrews, *Attorney for Plaintiffs-Appellees*

55. Michael, Deanna, *Defendant-Appellant*

56. Monbarren, Lauran, *Defendant-Appellant*

57. Moraff, Laura Beth, *Attorney for Plaintiffs-Appellees*

58. Morris, Joshua ("J.T."), *Attorney for Plaintiffs-Appellees*

59. NAACP Legal Defense & Educational Fund, Inc., *Attorneys for Plaintiffs-Appellees*

60. Novoa, Adriana, *Plaintiff-Appellee*

61. Ohlendorf, John David, *Attorney for Defendants-Appellants*

62. Palyam, Nithin, *Defendant-Appellant*

63. Pardue, Crystal, *Attorney for Plaintiffs-Appellees*

64. Park, Shelley, *Plaintiff-Appellee*

65. Parsons, Emmy*, Attorney for Plaintiffs-Appellees*

66. Patel, Shilen, *Defendant-Appellant*

67. Pernell, LeRoy, *Plaintiff-Appellee*

68. Piccolo, Fredrick, *Defendant-Appellant*

69. Ramer, John, *Attorney for Defendants-Appellants*

70. Rechek, Samuel, *Plaintiff-Appellee*

71. Sandoval, Jennifer, *Plaintiff-Appellee*

72. Schneider, Jenifer Jasinski, *Defendant-Appellant*

73. Scott, Steven, *Defendant-Appellant*

74. Seixas, Melissa, *Defendant-Appellant*

75. Self, William, *Defendant-Appellant*

76. Silagy, Eric, *Defendant-Appellant*

77. Steinbaugh, Adam, *Attorney for Plaintiffs-Appellees*

78. Stermon, Kent, *Defendant-Appellant*

79. Sykes, Emerson James, *Attorney for Plaintiffs-Appellees*

80. Thompson Dorsey, Dana, *Plaintiff-Appellee*

81. Tilley, Daniel Boaz, *Attorney for Plaintiffs-Appellees*

82. Tobin, Charles David, *Attorney for Plaintiffs-Appellees*

83. University of Central Florida Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

84. University of Florida Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

85. University of South Florida Board of Trustees, *Defendant (dismissed Nov. 22, 2022)*

86. Walker, Hon. Judge Mark E., U.S. District Court for the Northern District of Florida

87. Watson, Leah Monique, *Attorney for Plaintiffs-Appellees*

88. Weatherford, William, *Defendant-Appellant*

89.  Wold, Megan M., *Attorney for Defendants-Appellants*

Plaintiffs-Appellees further state that no publicly traded company or

corporation has an interest in the outcome of the case or appeal.

Dated: June 16, 2023

*/s/ Leah Watson*
Leah Watson

*Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees do not oppose the State's request for oral argument.

# TABLE OF CONTENTS

CERTFICIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES.................................................................................. iv

STATEMENT OF THE ISSUES ............................................................................1

INTRODUCTION ...................................................................................................2

STATEMENT OF THE CASE.................................................................................5

   I.   The Stop W.O.K.E. Act........................................................................5

   II.  The Stop W.O.K.E. Act's Effects on the Instructors .......................8

   III. Procedural History ............................................................................10

STANDARD OF REVIEW ...................................................................................11

SUMMARY OF ARGUMENT..............................................................................12

ARGUMENT .........................................................................................................15

   I.   The Instructors Have Standing to Challenge the Stop W.O.K.E. Act ...........15

     A.  The Instructors Must Self-Censor or Risk Discipline ................................15

     B.  Each Concept Chills the Speech of the Instructors .....................................17

   II.  The Stop W.O.K.E. Act Violates the First Amendment................................22

     A. Bishop Requires a Case-by-Case Inquiry ..................................................22

     B.  The Instructors' Free Speech Claims Prevail Under Bishop.......................25

       i.   Context ..............................................................................................25

       ii.  State Interests ...................................................................................26

         a)   The Act is a Viewpoint-Based Restriction ......................................26

         b)   The Act Does Not Reasonably Serve Any Legitimate Pedagogical Purpose .......................................................................................28

       iii. Academic Freedom .........................................................................31

     C.  The Instructors' Classroom Speech Is Not "Government Speech"............32

III.  The Stop W.O.K.E. Act Violates the First and Fourteenth Amendments Because It Is Unconstitutionally Vague ................................................37

   A.  The Act's Chilling Effect on Free Speech Heightens Vagueness Concerns ........................................................................................37

   B.  The Entirety of the Stop W.O.K.E. Act Is Vague ........................40

      i.   The Act Fails to Clearly Define the Particular Conduct It Prohibits .......40

      ii.   The Abstract Concepts Prohibited by the Act Are Vague .......................43

      iii.  The Savings Clause Exacerbates the Act's Vagueness ............................44

      iv.  Violation of the Act Requires No Scienter, and Turns On Listener Reactions ..............................................................................46

   C.  The Act Encourages Arbitrary and Discriminatory Enforcement..............48

   D.  Implementing Regulations Do Not Cure the Act's Vagueness ..................49

IV.  The District Court Correctly Concluded That the Doctrine of Severability Does Not Apply................................................................................51

V.   The Remaining Equitable Factors Favor Affirming the Preliminary Injunction ......................................................................................53

   A.  Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury .................53

   B.  The State Is Not Harmed by the Injunction of an Unconstitutional Law and the Injunction Is in the Public Interest................................................54

CONCLUSION ...................................................................................55

CERTFICIATE OF COMPLIANCE ......................................................57

CERTFICIATE OF SERVICE ...............................................................57

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Fla. Bar*,
  999 F.2d 1486 (11th Cir. 1993).............................................................16

*Adams v. Trs. of the Univ. of N.C. Wilmington*,
  640 F.3d 550 (4th Cir. 2011)..................................................................34

*Albanese v. McGinnis*,
  823 F. Supp. 521 (N.D. Ill. 1993).........................................................43

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015).......................................................... 29, 30

*Arnett v. Kennedy*,
  416 U.S. 134 (1974)................................................................................38

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979).......................................................................... 16, 21

*Barrett v. Walker Cty. Sch. Dist.*,
  872 F.3d 1209 (11th Cir. 2017)............................................................48

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
  529 U.S. 217 (2000)................................................................................33

*Bethel Sch. Dist. No. 403 v. Fraser*,
  478 U.S. 675 (1986)................................................................................39

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991)................................................... passim

*Bob Jones University v. United States*,
  461 U.S. 604 (1983)................................................................................29

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981)............................................................36

*Buchanan v. Alexander*,
  919 F.3d 847 (5th Cir. 2019)................................................................34

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006)............................................................16

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005)............................................................12

*Chicago v. Morales*,
  527 U.S. 41 (1999)..................................................................................50

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)..............................................................................17
*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971)..............................................................................47
*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014)................................................................34
*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019)............................................................55
*Dream Defs. v. DeSantis*,
  559 F. Supp. 3d 1238 (N.D. Fla. 2021)................................................17
*Edwards v. Calif. Univ. of Pa.*,
  156 F.3d 488 (3d Cir. 1998)................................................................33
*Elrod v. Burns*,
  427 U.S. 347 (1976)..............................................................................53
*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*,
  545 F.3d 4 (D.C. Cir. 2008) ..................................................................31
*Emerson v. Hillsborough Cty.*,
  312 So. 3d 451 (Fla. 2021) ....................................................................52
*Faragher v. Cty. of Boca Raton*,
  524 U.S. 775 (1998)..............................................................................29
*First Nat'l Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978)..............................................................................55
*Fla. Right to Life, Inc. v. Lamar*,
  273 F.3d 1318 (11th Cir. 2001)............................................................47
*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)................................................................ 32, 33, 34
*Gay Lesbian Bisexual All. v. Pryor*,
  110 F.3d 1543 (11th Cir. 1997) ............................................................27
*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)................................................................... 38, 47
*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)................................................................... 23, 24
*Hill v. Colo.*,
  530 U.S. 703 (2000)..............................................................................37
*Homestead Hosp., Inc. v. Miami-Dade Cty.*,
  829 So. 2d 259 (Fla. 3d DCA 2002) ....................................................53

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011) ................................................................42

*Interstate Circuit, Inc. v. City of Dallas*,
  390 U.S. 676 (1968) ............................................................................49

*Johnson-Kurek v. Abu-Absi*,
  423 F.3d 590 (6th Cir. 2005) ...............................................................31

*Keister v. Bell*,
  29 F.4th 1239 (11th Cir. 2022) .............................................................37

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967) ..................................................................... passim

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ...................................................... 53, 54

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) ........................................................ 46, 47

*Leavitt v. Jane L.*,
  518 U.S. 137 (1996) ............................................................................51

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*,
  No. 21-CV-1077-PB, 2023 WL 171392 (D.N.H. Jan. 12, 2023) ................. 42, 46

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................16

*Matal v. Tam*,
  582 U.S. 218 (2017) ............................................................................34

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ...............................................................33

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ........................................................................27

*Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*,
  14 F.3d 1507 (11th Cir. 1994) .............................................................12

*NAACP v. Button*,
  371 U.S. 415 (1963) ............................................................................38

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ............................................................................27

*Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*,
  938 F.3d 424 (3d Cir. 2019) ................................................................43

*O'Laughlin v. Palm Beach Cty.*,
  30 F.4th 1045 (11th Cir. 2022) ............................................................38

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ...............................................................54

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) .................................................................................47

*Piarowski v. Ill. Cmty. Coll. Dist. 515*,
  759 F.2d 625 (7th Cir. 1985) ...................................................................31

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) .................................................................................34

*Pred v. Bd. of Pub. Instruction of Dade Cty.*,
  415 F.2d 851 (5th Cir. 1969) ...................................................................36

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) .................................................................................29

*Reeves v. C.H. Robinson Worldwide, Inc.*,
  594 F.3d 798 (11th Cir. 2010) .................................................................29

*Regan v. Taxation With Representation of Wash.*,
  461 U.S. 540 (1983) .................................................................................27

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ...................................................................................4

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ........................................................................... 24, 31

*Revette v. Int'l Ass'n of Bridge Workers*,
  740 F.2d 892 (11th Cir. 1984) .................................................................12

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) .................................................................................53

*S.E.C. v. Unique Fin. Concepts, Inc.*,
  196 F.3d 1195 (11th Cir. 1999) ...............................................................12

*San Filippo v. Bongiovanni*,
  961 F.2d 1125 (3d Cir. 1992) ..................................................................39

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) .....................................................42

*Searcy, Denney, Scarola, Barnhart & Shipley v. State*,
  209 So. 3d 1181 (Fla. 2017)......................................................................52

*Shurtleff v. City of Boston*,
  142 S. Ct. 1583 (2022) ........................................................... 34, 35, 36

*Shuttlesworth v. Birmingham*,
  382 U.S. 87 (1965).....................................................................................50

vii

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ................................................................ 12, 53

*Smith v. Dep't of Ins.*,
    507 So. 2d 1080 (Fla. 1987) ................................................................ 51, 52

*Smith v. Goguen*,
    415 U.S. 566 (1974) .............................................................................. 38

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ........................................................ passim

*State v. Catalano*,
    104 So. 3d 1069 (Fla. 2012) .................................................................. 52

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................ 16, 21

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ...................................................................... 2, 5, 31

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .............................................................................. 33

*Tonkyro v. Sec'y, Dep't of Veterans Affairs*,
    995 F.3d 828 (11th Cir. 2021) ............................................................... 28

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
    413 U.S. 548 (1973) .............................................................................. 51

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ............................................................. 54

*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995) .............................................................................. 26

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ......................................................................... 21

*Waters v. Churchill*,
    511 U.S. 661 (1994) .............................................................................. 38

*Wieman v. Updegraff*,
    344 U.S. 183 (1952) ...................................................................... 3, 32, 36

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) ........................................... 16, 17, 47, 52

*Wright v. Georgia*,
    373 U.S. 284 (1963) .............................................................................. 50

## Statutes and Regulations

*10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022).................................. 8, 41, 49

Fla. Stat. § 1000.05(4)......................................................................................2, 5

Fla. Stat. § 1000.05(4)(a) ............................................................................ passim

Fla. Stat. § 1000.05(4)(a)(1) .................................................................................18

Fla. Stat. § 1000.05(4)(a)(3) .................................................................................18

Fla. Stat. § 1000.05(4)(a)(5) .................................................................................19

Fla. Stat. § 1000.05(4)(a)(6) ..............................................................................4, 20

Fla. Stat. § 1000.05(4)(a)(7) .................................................................................20

Fla. Stat. § 1000.05(4)(b)........................................................................... 7, 37, 44

## Other Authorities

Kerry Chavez & Kristina M.W. Mitchell, *Exploring Bias in Student Evaluations: Gender, Race, and Ethnicity* (Cambridge Univ. Press 2019), https://www.cambridge.org/core/journals/ps-political-science-and-politics/article/exploring-bias-in-student-evaluations-gender-race-and-ethnicity/91670F6003965C5646680D314CF02FA4#.........................................49

## STATEMENT OF THE ISSUES

(1) Whether the Act violates the First Amendment by banning endorsement of viewpoints disfavored by the legislature while permitting denunciation of the same viewpoints; and

(2) Whether the Act is unconstitutionally vague.

## INTRODUCTION

"No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Despite the Supreme Court's warning, the Stop Wrongs Against Our Kids and Employees Act, Fla. Stat. § 1000.05(4) ("Stop W.O.K.E. Act" or "Act"), limits training and instruction on racism, sexism, and related issues in Florida classrooms to viewpoints approved by the Florida legislature. It prohibits any instruction that "espouses, promotes, advances, inculcates, or compels [a student] to believe" eight ill-defined concepts disfavored by the legislature. At the same time, it permits instructors to promote and inculcate the opposite points of view. It is paradigmatic viewpoint discrimination. Moreover, the prohibited concepts are so abstract and poorly defined that the Act leaves instructors uncertain of what they can and cannot say in the classroom and vulnerable to arbitrary and discriminatory enforcement.

Not since the anti-communist measures of the McCarthy era has a state legislature interfered so directly with the academic freedom of university instructors. It was in that period, when legislatures, like Florida's today, sought to suppress views they disfavored, that the Supreme Court developed the First Amendment principles of academic freedom. As the Court said then, so today: "The Nation's future depends

2

upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (cleaned up).

The Act's very name declares its purpose: to censor viewpoints on issues of racial and sexual equality that the legislature deemed "woke," namely views disfavored by the State on racial justice, affirmative action, racial privilege, and structural inequality. App. 115–18. But that purpose—to suppress ideas disfavored by the State—strikes at the heart of both the First Amendment's prohibition on viewpoint discrimination and its protection of academic freedom.

The Act compels classroom instructors to censor their instruction on specific topics central to their academic scholarship and coursework. The Plaintiffs-Instructors ("Instructors") teach a range of undergraduate and graduate courses, from gender studies to criminal procedure to statistics. They cannot impart their expertise and knowledge, including statements that might be construed as endorsing or promoting banned viewpoints, without risking their professional reputations and livelihoods. And because their universities risk losing necessary state funding if they permit the expression of the prohibited ideas, the Instructors reasonably fear that they will suffer discipline if they teach these issues as they have in the past.

In a system that respects academic freedom, instructors are "exemplars of open-mindedness and free inquiry." *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952)

3

(Frankfurter, J., concurring). But instructors in Florida can no longer perform this vital role. Each of the Instructors in this suit has identified how they would have to circumscribe core tenets of their instruction to comply with the Act, to their students' and their own detriment. They would be required to avoid altogether or to denounce concepts and views that are foundational to their academic fields and scholarship. The Act effectively precludes them from teaching all sides of an issue, including the arguments for and against each position, for fear of "endorsing" a proscribed viewpoint in doing so. An instructor teaching affirmative action, for example, could not offer arguments supporting the practice, but would be free to offer arguments that condemn it—even the Supreme Court is considering such arguments at this very moment. Indeed, it is not even clear that the instructor could assign Supreme Court opinions that since *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), have endorsed race-based affirmative action as constitutional. Fla. Stat. § 1000.05(4)(a)(6); Supplemental Appendix ("SA") 455.

And while this Act prohibits the expression of certain views about systemic racism and sexism, if the State were correct, another State would be free to censor instructors from espousing *any* views it disfavors, including questioning climate change, opposing abortion, or for that matter, criticizing the government. In the State's view, instructors' speech deserves no protection, so the government is free to dictate every word. Such a result would entirely upend the Supreme Court's

4

recognition that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250.

## STATEMENT OF THE CASE

Florida's State University System is committed to promoting viewpoint diversity and providing "a learning environment where divergent ideas, opinions, and philosophies, new and old, can be rigorously debated and critically evaluated." Doc. 13, 3–4. Consistent with this goal, institutions within this system created initiatives to promote an inclusive learning environment by hiring instructors with expertise in the experiences of marginalized people, creating committees to examine equity issues in higher education, and providing grants to instructors to pursue research related to diversity and inclusion. *See* SA 4, 46–49, 64, 67–69, 105. Florida's universities redoubled these inclusion efforts following the nationwide reckoning with race and systemic inequality inspired by the killing of George Floyd and Black-led multiracial movement for racial justice. App. 104–06.

### I.    The Stop W.O.K.E. Act

The Stop W.O.K.E. Act was enacted on April 22, 2022, and went into effect on July 1, 2022. App. 88, 119; Fla. Stat. § 1000.05(4). As described by its proponents, the Act sought to stamp out "pernicious ideologies" like "woke[ness]," "Critical Race Theory," "white privilege," and "race-conscious[ness]" from Florida

classrooms. App. 111–12, 115, 293. In hearings, members of the public testified that it would stifle important discussions about race and identity, prevent students from learning full and accurate history, and expose racial and ethnic minorities to increased discrimination. App. 147–50. The bill's sponsors maintained the Act was needed to address indoctrination, although no evidence of indoctrination within the State University System was presented. App. 120.

The Stop W.O.K.E. Act amends the Florida Educational Equity Act, which regulates discrimination against students and employees in the K-20 system. Section (4)(a) provides:

> It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> > 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
> >
> > 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
> >
> > 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
> >
> > 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others

without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Section (4)(b) states:

Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

Fla. Stat. § 1000.05(4)(a)–(b).

7

On August 26, 2022, the Florida Board of Governors ("BOG") issued regulations mandating the investigation of complaints by universities and prompt corrective action for violations, including disciplinary actions or termination for "failure or refusal to comply with the mandate." *10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022) ("BOG 10.005"), § (3)(c).

Where the BOG learns that a university "willfully and knowingly" failed to correct a substantiated violation of the Stop W.O.K.E. Act, "the university will be ineligible for performance funding for the next fiscal year[.]" *Id.* § (4)(d).

## II.    The Stop W.O.K.E. Act's Effects on the Instructors

The Instructors teach courses related to race, sex, systemic inequalities, and privilege at public universities in Florida—courses which include the prohibited concepts under the Act. App. 77–85. As a result, they must self-censor or risk disciplinary action.

Instructor LeRoy Pernell teaches courses on criminal procedure and race and the law at Florida A&M University College of Law. App. 327. He uses a casebook he authored, <u>Cases and Materials on Combatting Racism in Criminal Procedure</u>, which provides argument and evidence that racism is embedded in the criminal legal system and identifies the role of race in each major stage of the criminal process. App. 328; SA 4, 8–10, 12–13.

Instructor Dana Thompson Dorsey teaches courses such as School Law and Critical Race Studies: Research, Policy, and Praxis at the University of South Florida. App. 328. Her coursework focuses on educational equity; examines the impact of local, state, and federal laws on marginalized students; and teaches graduate students how to use research frameworks like Critical Race Theory to analyze the aforementioned issues. SA 46, 51–52.

Instructor Sharon Austin teaches at the University of Florida. App. 328; SA 64. Her courses include Politics of Race at the University of Florida, Black Horror and Social Justice, and African American Politics and Policy. App. 328–29; SA 69–71. She endorses Critical Race Theory as a useful theoretical framework and advocates for race-conscious remedies like affirmative action. App. 329; SA 74–76.

Instructor Shelley Park teaches at the University of Central Florida. App. 329; SA 85. Her courses include Feminist Theories, Theories of Sex & Gender in the Humanities, Race and Technology, and Introduction to Philosophy. *Id.*; SA 86. Instructor Park critiques concepts like merit, objectivity, and colorblindness, and expresses the view that they function to solidify systems of oppression. SA 97.

Instructor Jennifer Sandoval teaches "interpersonal, intercultural, and gender communication" at the University of Central Florida. App. 329–30; SA 104–105. Her coursework "explores ways in which identity and culture affect communication

in various contexts[,]" and includes sections on "whiteness" and racial disparities in academia. App. 330; SA 105, 108.

Instructor Russell Almond teaches courses on statistics and data analysis and an Educational Psychology Colloquium at Florida State University. App. 330; SA 186, 188. As is common in his field and critical to his scholarship, Instructor Almond examines race as a factor in educational measurements and statistical models, identifies statistical bias and measures to counter bias in measurement systems, and considers the impact of white privilege on achievement gaps. App. 330; SA 190–94.

## III.   Procedural History

On August 18, 2022, the Instructors filed a complaint alleging that the Act violates the First and Fourteenth Amendments. App. 33, 77. They moved to enjoin preliminarily the higher education provisions of the Act on the grounds that the Act impermissibly discriminates on the basis of viewpoint and is unconstitutionally vague. App. 34; 302–03.

On November 17, 2022, the district court granted in part and denied in part the motion for preliminary injunction. App. 41. After reviewing Supreme Court and Eleventh Circuit precedent, the district court held: "two things are clear: (1) the First Amendment protects university professors' in-class speech and (2) *Bishop* remains the binding authority guiding this Court's analysis of Plaintiffs' speech claims." App. 321 (referencing *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)).

10

Next, the court held that six professors[1] in the *Pernell* action—the Instructors—had standing because they must "either self-censor[]" or share viewpoints "despite risk of discipline[,]" App. 344, and because they alleged that their instruction would implicate each prohibited concept. App. 346.

Turning to the merits of the First Amendment claims, the court considered the three factors identified in *Bishop*, concluding that the Act constitutes impermissible viewpoint discrimination. App. 397–99. The court also held that the Act's terms were unconstitutionally vague. App. 405, 416.

Finally, the court found that the other preliminary injunction factors weighed in the Instructors' favor. App. 418–19.

## STANDARD OF REVIEW

A preliminary injunction is warranted under Fed. R. Civ. P. 65 where Plaintiffs show: "(1) [they] ha[ve] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause to the [opposing] party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349,

---

[1] The court held that Plaintiff-Instructor Dunn and Plaintiff-Student Dauphin did not have standing for purposes of a preliminary injunction. App. 345, 370.

11

1354 (11th Cir. 2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).

"A district court's grant of a preliminary injunction order involves a mixed standard of review." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999). The "decision to grant the injunction is reviewed for abuse of discretion," while "[q]uestions of law supporting the injunction are reviewed de novo" and "[f]indings of fact are reviewed for clear error." *Id.* (internal citations omitted). This Court's review is "justifiably limited because 'the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success . . . with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief.'" *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1517 (11th Cir. 1994) (quoting *Revette v. Int'l Ass'n of Bridge Workers,* 740 F.2d 892, 893 (11th Cir. 1984) (per curiam)).

## SUMMARY OF ARGUMENT

The district court correctly held that the Stop W.O.K.E. Act impermissibly discriminates on the basis of viewpoint by seeking to suppress politically disfavored ideas. That is, after all, the very purpose of the law.

The district court was guided, as this Court must be, by *Bishop v. Aronov*, 926 F.2d 1066, which requires consideration of three factors on a case-by-case basis to

assess the constitutionality of restrictions on university instructors' speech: (1) context; (2) the university's position as a public employer; and (3) academic freedom interests. App. 380–81 (citing *Bishop*, 926 F.2d at 1074–75). All three factors support the Instructors' claims here.

First, with respect to context, the Act directly and broadly suppresses the speech of thousands of public university instructors with a prophylactic rule banning academic speech, in a context where students are largely adults and there is a long tradition of respecting instructors' freedom to express themselves on topics relevant to the classes they are assigned to teach. Second, in the public university setting, the State's interest in controlling the speech of its employees is reduced. It has long been recognized that the educational mission requires that university instructors be afforded substantial leeway in the views they express, and that public universities be insulated from impermissible censorship by the political branches. Third, and relatedly, the First Amendment principle of academic freedom protects both universities and instructors from impermissible political micromanagement of their speech by the legislature. While the legislature may have a role in directing the subject matters that should be taught, it cannot dictate the *viewpoints* instructors express within those subjects without eviscerating academic freedom.

The State claims that instructors' classroom speech is "government speech," and therefore lacks any First Amendment protection and is fully subject to the

13

legislature's control. State Br. 24. But that argument is foreclosed by *Bishop*, which expressly recognizes that instructors have individual First Amendment rights in their classroom discussion. In any event, no one thinks a university instructor teaching a class is expressing the government's view, and the principle of academic freedom establishes precisely the opposite.

The Act is also unconstitutionally vague, as the district court correctly held. It fails to clearly define the speech it prohibits. It broadly forbids "instruction" that "espouses, promotes, advances, inculcates, or compels" a series of abstract concepts. Fla. Stat. § 1000.05(4)(a). Because the concepts are highly abstract, what falls within the prohibition is far from clear. And the Act sets out a wholly confounding distinction between objectively discussing the concepts, which is permitted, and endorsing or promoting them, which is not. That distinction, virtually impossible to discern in many discussions of contested topics, is far too evanescent to permit the imposition of legal penalties in the classroom. If an instructor assigned a judicial opinion defending affirmative action, for example, and suggested in discussion that the opinion made a convincing argument, would that be impermissible "endorsement" or an "objective" discussion? And the law's vagueness is further exacerbated by the fact that it includes no scienter element, and allows a violation to turn on subjective listener reaction—whether a student was "compelled" by speech to believe a proscribed idea.

14

The district court also properly held the Instructors have standing, adequately demonstrating that they are subject to and chilled by each concept enumerated in the Act, and that severing the unconstitutional provisions would not salvage the Act. Finally, the court correctly held that the remainder of the equitable factors weighed in favor of the preliminary injunction. The loss of the Instructors' First Amendment freedoms constitutes irreparable injury. The State is not harmed by the injunction of this unconstitutional Act, and the State has other means of preventing discrimination in education.

## ARGUMENT

### I.   The Instructors Have Standing to Challenge the Stop W.O.K.E. Act

#### A. The Instructors Must Self-Censor or Risk Discipline

The Instructors have standing because they reasonably fear discipline under the Act if they continue to teach as they have been, and are therefore compelled to censor their classroom speech. Each prohibited concept chills at least one Instructor's speech, and the Instructors are further chilled by the Act's ill-defined concepts, unclear scope of prohibited acts, and vague distinction between objective discussion and endorsement.

Standing is established where plaintiffs demonstrate (1) an "injury-in-fact," (2) fairly traceable to the defendant's challenged action, (3) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–

61 (1992). Here, it is undisputed that the Instructors are subject to the Act, their injuries are traceable to the Act, and would be remedied by the relief sought. The only dispute is whether the Instructors meet the injury-in-fact requirement. *See* State Br. 20–23; SA 337.

In the First Amendment context, the injury-in-fact requirement is "most loosely applied . . . because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *ACLU v. Fla. Bar*, 999 F.2d 1486, 1493–94 (11th Cir. 1993); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). In addition, a party "can bring a pre-enforcement suit when [they] ha[ve] alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (cleaned up).

Particularly where, as here, a law is challenged as vague, the Instructors are not required to *"*confess that [they] will in fact violate that law," because the law itself provides no clear definition of what would constitute a violation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979); *cf. CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006) ("Where a plaintiff alleges that a statute grants unbridled discretion, a plaintiff need only be 'subject to' the provision

16

to establish a constitutional injury.") (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–76 (1988)). In assessing standing at the preliminary injunction stage, courts routinely review allegations from the movant's declarations, in addition to the complaint and legal briefs. *See, e.g.*, *Wollschlaeger*, 848 F.3d at 1304; *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1252, 1257 (N.D. Fla. 2021).

### B. Each Concept Chills the Speech of the Instructors

The State does not dispute that the Instructors are chilled by concepts two, four, and eight.[2] State Br. 20. But the Instructors have standing to challenge all eight prohibitions, because, as the district court properly held, App. 346, they are chilled by the Act in its entirety, including by each concept. The Instructors are chilled not only because they intend to promote viewpoints prohibited by the Act, but also because, given the Act's sweeping and vague prohibition, their instruction could be interpreted as violating the Act's prohibitions even if they do not think they are endorsing a prohibited viewpoint. App. 346, 350–56; SA 94, 107. In addition, as the district court correctly concluded, the Instructors pleaded facts sufficient to establish standing as to the remaining concepts.

---

[2] Instructor Park is chilled by concept two. App. 353; SA 95; *see also* SA 9, 74–75. Instructors Pernell, Thompson Dorsey, Austin, Park, and Almond are chilled by concept four. App. 346, 349–56; SA 9–11, 55–56, 75–76, 92, 193–94. Finally, Instructors Thompson Dorsey, Austin, Park, and Sandoval are chilled by concept eight. App. 349–55; SA 55–56, 75–76, 92, 107–08.

Concept one prohibits instruction that espouses or compels a student to believe "[m]embers of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(1). The district court found Instructor Park is chilled by this concept because her instruction on how one's race, sex, and ability affect privilege could be interpreted as falling under this concept. App. 353, n.32. As Instructor Park testified: "My instruction illuminates the ways in which all of us (myself included) may participate in upholding oppressive structures, intentionally or unintentionally." SA 95. For example, students are engaged in activities that provide "a memorable lesson about what it . . . means (and feels like) to be 'centered' or 'marginalized.'" *Id.* Instructors Thompson Dorsey and Austin are also chilled because their promotion of viewpoints related to the historical disadvantages of Black people arguably conflicts with the concept. SA 56–57, 74–75.

Concept three prohibits instruction that espouses or compels a student to believe "[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(3). The district court found Instructors Pernell, Thompson Dorsey, Austin, Park, Sandoval, and Almond are chilled by this concept based on their promotion of viewpoints related to the existence and ongoing effects of systemic racism in the legal system, their criticism and/or denunciation of colorblindness,

18

their teachings that racism perpetuates certain advantages and disadvantages between members of different races, and that unearned privilege and marginalization shape the experience of others. App. 346, 349–56. For example, Instructor Thompson Dorsey testified:

> The Stop W.O.K.E. Act impacts my ability to teach School Law and Critical Race Studies because [these] courses . . . build upon the understanding that racism is deeply embedded in American society . . . I am concerned that I cannot discuss Critical Race Theory at all, which is a foundational and necessary topic that students must understand in Critical Race Studies.

SA 55; *see also* SA 9–11, 74–76, 95, 107–08, 193–94.

Concept five prohibits instruction that espouses or compels a student to believe "[a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(5). The district court correctly found Instructor Park is chilled by this concept based on her teaching exercise described with respect to concepts one and two, and her promotion of the viewpoint that different people have distinct privileges by virtue of race and that unearned privilege and marginalization shape the experience of others. *See* App. 352–53; SA 95.

Concept six prohibits instruction that espouses or compels a student to believe "[a] person, by virtue of his or her race, color, national origin, or sex should be

discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. § 1000.05(4)(a)(6). The district court found Instructor Austin is chilled by this concept because her instruction on Critical Race Theory, and viewpoints concerning the value of race-conscious remedies and affirmative action, could be interpreted as falling under this concept. App. 350–51; SA 75–76. Instructors Almond and Sandoval are also chilled based on their promotion of viewpoints related to affirmative action in light of the historical exclusion of people of color from particular areas of academic study. SA 107–09, 196–97.

Concept seven prohibits instruction that espouses or compels a student to believe "[a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(7). The district court found Instructor Park is chilled by this concept based on her teaching exercise described with respect to concepts one, two, three, and five. App. 352–53; SA 95. As the court found, because this exercise is premised on the notion that concepts like unearned privilege and oppression are valid, having students participate in the exercise could reasonably make them believe they "bear . . . responsibility" for and must feel guilty about their racial privilege. App. 353, n.32.

The State concedes that the Instructors specifically raise concerns with concepts three, six, and seven, but argues they should be required to allege with specificity *how* their teaching violates the law or how they misunderstand the law's meaning. *See* State Br. 20–21. But the lower court's findings are based on how the Instructors' speech could be perceived, not merely on what they intend, which is the proper inquiry in determining standing.[3] *See Susan B. Anthony List*, 573 U.S. at 163; *Babbitt*, 442 U.S. at 301. The district court correctly found that the Instructors reasonably fear their teaching could be construed to violate the Act; no more is required.

Contrary to the State's assertion, the district court did not "supplement[]" the Instructors' allegations, violating the presentation principle.[4] State Br. 22–23. The district court merely disagreed with the Instructors' and the State's articulation of the legal standard for standing. App. 337. Any fair reading of the Instructors'

---

[3] With regard to concept three, the State further ignores Instructor Sandoval's stated intention to teach about whiteness and race-consciousness as "foundational premise[s]," which arguably conflicts with the concept. App. 354.

[4] The presentation principle requires the parties, rather than the courts, "to frame the issue for decision." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). *Compare id.* at 1578 (finding the principle violated where the appeals court "named three amici and invited them to brief and argue issues framed by the panel, including a question [the plaintiff] never raised."), *with id.* at 1579 n.4 (the principle is not violated when courts call for supplemental briefing or correct a miscalculation of the statute of limitations).

allegations demonstrates that at least one Instructor reasonably fears violating each prohibition in the Act.

The State fundamentally misunderstands the Instructors' argument with respect to their challenge to the Act as a whole. State Br. 22. First, as explained above, the Instructors allege that each of the eight concepts chills their instruction because they cannot distinguish between permissible and prohibited speech concerning that subject. The highly abstract and interrelated nature of the concepts compounds the Act's chilling effect; the concepts overlap, causing the chill to spread wider than a narrow reading of any concept in isolation. Second, the Instructors specifically set forth how the vagueness of individual concepts is compounded by the vagueness of other provisions in the Act, *see infra*, pp. 44–46, thereby making it even more challenging to know what instruction will expose them to liability.

## II.    The Stop W.O.K.E. Act Violates the First Amendment

### A. *Bishop* Requires a Case-by-Case Inquiry

The district court correctly held, and the State does not dispute, that "the Eleventh Circuit's balancing test in *Bishop*" governs this action. App. 307; State Br. 3. In *Bishop*, this Court considered the free speech rights of a physiology professor at a public university who had been instructed, after multiple complaints from students, to refrain from "interjecting his religious preferences and/or beliefs not necessary to class instruction or class materials." 926 F.2d at 1069. Recognizing that

22

the need "to calibrate the Constitution" to the special characteristics of "the university classroom" necessitated a "case-by-case inquiry," the Court identified a series of factors to be examined in each case:

> (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons," specifically with respect "to reasonably control[ling] the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment."

App. 380–81 (quoting *Bishop*, 926 F.2d at 1074–75).

The relevant context in *Bishop* was "the university classroom during specific in-class time." 926 F.2d at 1074. Within this context, this Court deemed that "[t]he University's interest is most obvious when student complaints suggest apparent coercion [by the professor]." *Id.*

Next, this Court considered the University's interest as a "public employer," including its "authority to reasonably control the content of its curriculum," and the tangential and more limited "authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university." *Id.* The Court relied on the "concern for the 'basic educational mission' of the school which gives it authority by the use of 'reasonable restrictions' over in-class speech that it could not censor outside the classroom." *Id.* (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266–67 (1988)). In

*Hazelwood*, the *Bishop* Court's "polestar" for evaluating the school's interests, 926 F.2d at 1074, the Supreme Court held that restrictions on First Amendment rights "in school-sponsored expressive activities" must be "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist.*, 484 U.S. at 273. Because the professor's religious views had nothing to do with the subjects he was paid to teach, the school had authority to prohibit them.

Finally, the Court noted the "somewhat countervailing" "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment" and the "invaluable role academic freedom plays in our public schools, particularly at the post-secondary level." *Bishop*, 926 F.2d at 1075. The Court recognized that First Amendment academic freedom protects both "the independent and uninhibited exchange of ideas among teachers and students" and "autonomous decision making by the academy itself." *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985)). Respecting the university's academic freedom to determine whether religious indoctrination had anything to do with the subjects taught, the Court declined to "supplant [its] discretion for that of the University," "trust[ing] that the University will serve its own interests as well as those of its professors in pursuit of academic freedom." *Id.*

This Court held that directing Dr. Bishop not to continue interposing his irrelevant religious views into a secular class was reasonable in light of the balance of relevant factors. *Id.* at 1076.

### B. The Instructors' Free Speech Claims Prevail Under *Bishop*

The district court correctly held that "*Bishop*'s balancing test—as applied to the facts before this Court—favors [the Instructors' and Students'] free speech rights over [the State's] enforcement of a viewpoint-discriminatory ban targeting protected speech." App. 397. It is one thing for a university to determine that religious views have no role in a secular class. It is another matter entirely for a state legislature to micromanage the permissible views that may be expressed on subjects indisputably appropriate for the classes being taught. Not surprisingly, each of the three *Bishop* factors weighs heavily in favor of the Instructors here.

### i. Context

While the context of this case, like *Bishop*, involves classroom instruction, the similarity ends there. The Act imposes a viewpoint-based legislative restriction on the scholarly views the Instructors can advance in the courses they were hired to teach. Unlike in *Bishop*, there is no suggestion that the views the Instructors seek to espouse are irrelevant to approved courses. And here it is the legislature censoring views, not the university ensuring that its professors teach the subject matter they are assigned.

25

Moreover, this is not a surgical response by university administrators to a particular problem in a particular class. Instead, the Act is a "prophylactic ban on university employees' speech [that] affects potentially thousands of professors and serves as an ante hoc deterrent that 'chills potential speech before it happens,' and 'gives rise to far more serious concerns than could any single supervisory decision.'" App. 384 (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995)).

### ii.  <u>State Interests</u>

The state interests at stake here and in *Bishop* are also radically different. In *Bishop*, the university sought to avoid religious coercion and the interposition of wholly irrelevant matter into classroom teaching. Here, by contrast, those interests are not present at all. The Act censors the viewpoints instructors can express *within approved courses*. Such viewpoint-based discrimination by the legislature is a political act of censorship, not a state university's reasonable judgement about pedagogy.

### a)  *The Act is a Viewpoint-Based Restriction*

The Stop W.O.K.E. Act is indisputably a viewpoint-based regulation. It prohibits only certain views on a variety of subjects, while permitting expression of opposing points of view on the same subject. App. 386. Viewpoint-based discrimination is constitutionally suspect. *See Speech First*, 32 F.4th at 1126

("'[R]estrictions . . . based on viewpoint are prohibited,' seemingly as a *per se* matter") (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018)).

This Court has "emphasized 'that the dangers of viewpoint discrimination are *heightened* in the university setting.'" *Id.* at 1127 n.6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)). A legislature's ban on the expression of specific views on otherwise permissible subject matter interferes directly with the universities' "chief mission"—"to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Id.* at 1128.

Even in the context of government funding, where the government has wide discretion in choosing how to spend its dollars, the Supreme Court has said that the government may not seek to "suppress[] dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998); *see also Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 548 (1983) ("The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas.") (cleaned up). Yet as its name proclaims, that is precisely what the Stop W.O.K.E. Act seeks to do: to suppress the expression of "woke" ideas.

By contrast, in *Bishop*, this Court stressed that the university was *not* aiming to suppress particular viewpoints, but to limit discussion of irrelevant topics

regardless of the viewpoint. 926 F.2d at 1077–78 ("Should another professor express [different] religious beliefs in the classroom, the University would likely produce a similar memo.").

### b) *The Act Does Not Reasonably Serve Any Legitimate Pedagogical Purpose*

The State's claim that the Act's purpose was to forestall discrimination falls flat. First, this justification is at odds with statements by the Act's sponsors and proponents, who repeatedly emphasized that the Act was designed to suppress particular viewpoints disapproved as "woke." App. 111–12, 115–16, 118–19.

Second, the Act does not target discriminatory conduct, State Br. 44, but protected speech. It is unlike civil rights laws, including Title VII and Title IX, which target conduct and only incidentally restrict speech in some applications. While the Supreme Court has found Title VII to proscribe harassment only when it is so severe or pervasive as to create an abusive work environment, the Act prohibits the mere expression of disfavored ideas before they are spoken, without regard to its effect. *Cf. Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 995 F.3d 828, 837 (11th Cir. 2021) (holding that First Amendment interests "ensure that Title VII does not become a 'general civility code'") (quoting *Faragher v. Cty. of Boca Raton*, 524 U.S. 775, 788

28

(1998)); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010).[5]

Third, the Act restricts far more speech than necessary to remedy any putative discrimination. A state's compelling interest in remedying discrimination must be furthered in a manner that does not unduly restrict speech. The state has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal. *See, e.g.*, *R.A.V. v. St. Paul*, 505 U.S. 377, 395, 404 n.5 (1992) ("We do not doubt that these [anti-discrimination] interests are compelling, and that the ordinance can be said to promote them. But the danger of censorship" requires that the law be "necessary to serve the asserted [compelling] interest." (cleaned up)). Prophylactically excising particular disfavored viewpoints from university classrooms, regardless of whether the speech effectuates any discrimination whatsoever, is anything but narrowly tailored.

The State's reliance on *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015), to explain the "reasonable" relationship between the Act and a governmental interest in prohibiting racial discrimination, State Br. 44, is misplaced. *Arce* reaffirms that

---

[5] The State's citation to *Bob Jones University v. United States*, 461 U.S. 604 (1983) (cited at State Br. 44), is unavailing, as that case involved not an effort to suppress ideas, but the denial of tax-exempt status to schools with admissions policies that on their face excluded students on the basis of race.

the means of pursuing even a legitimate interest must be reasonable and cannot impermissibly burden speech. The *Arce* court held that one provision of the challenged law violated the First Amendment because it "threaten[ed] to chill the teaching of ethnic studies courses . . . without furthering the legitimate pedagogical purpose of reducing racism." 793 F.3d at 986. And in upholding a different provision of the law, the court reasoned that it "target[ed] the design and implementation of courses and curricula and [did] not restrict . . . class discussions." *Id.* at 985. Additionally, *Arce* addressed restrictions on permissible K-12 curriculum, and thus the court was not required to consider the important scope of academic freedom in the higher education context at issue here.

Here, the Act *does* restrict class discussions, in the university setting, and chills speech on pedagogically appropriate subjects. As the district court held, the State's attempt "to dress up [its] interest as a public employer and educator as prohibiting discrimination in university classrooms . . . does not give [the State] a safe harbor in which to enforce viewpoint-based restrictions targeting protected speech." App. 388.

The State's suggestion that without the Act, Holocaust denial and other concerning hypotheticals will be allowed to flourish in Florida's colleges and universities, State Br. 41–43, is unfounded. Viewpoint-neutral academic standards

are more than sufficient to address Holocaust denial, just as they would stop an instructor from teaching that the Earth is flat.

### iii.  **Academic Freedom**

The final *Bishop* factor strongly favors the Instructors. The Act strikes at the very heart of academic freedom—the freedom "to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy*, 354 U.S. at 250. It prohibits espousing views on subjects that are indisputably relevant to the courses the Instructors teach. Academic freedom bars the State from "impos[ing] any strait jacket upon the intellectual leaders in our colleges and universities."[6] *Id.*

Significantly, the Instructors do not challenge a decision made by "the academy itself," as in *Bishop*, 926 F.2d at 1075 (quoting *Ewing*, 474 U.S. at 226 n.12), but the *legislature's* intrusion on the academic freedom of both universities

---

[6] While the State argues that the Instructors enjoy no individual interest in academic freedom, this argument is without merit. The State cites non-binding precedent to support this position but fails to address contrary holdings. For example, the State relies on a concurrence in *Emergency Coalition*, State Br. 38, but ignores the majority explanation: "[a]ssuming that the right to academic freedom exists and that it can be asserted by an individual professor, its contours in this case are certainly similar to those of the right of free speech." *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 12 (D.C. Cir. 2008). Other circuits support this contention. *See Piarowski v. Ill. Cmty. Coll. Dist. 515*, 759 F.2d 625, 629 (7th Cir. 1985) ("[Academic freedom] is used to denote both the freedom of the academy to pursue its ends without interference from the government . . . and the freedom of the individual teacher."); *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir. 2005) ("This is not to say that professors must leave their First Amendment rights at the campus gates. That a teacher does have First Amendment protection under certain circumstances cannot be denied.") (internal marks omitted).

31

and their professors. App. 395–97; SA 383–84. If legislatures can micromanage instructors' classroom speech, censoring views they dislike, academic freedom will be an illusion. Each successive administration or legislative body would be free to censor the ideas they disfavor from public university classroom discussion. *See, e.g.*, *Wieman*, 344 U.S. at 197–98 (Frankfurter, J., concurring).

The State contends that *Bishop* "already balanced the First Amendment interests . . . concluding, again, that '[t]he University necessarily has dominion over what is taught by its professors.'" State Br. 3–4, 25–26 (citing *Bishop*, 926 F. 2d at 1078). But this case involves not a *university's* decision about *content* that is irrelevant to a particular course, but the *legislature's* intrusion into the *viewpoints* individual instructors can express on indisputably relevant subjects.

### C. The Instructors' Classroom Speech Is Not "Government Speech"

The State argues that instructors' classroom speech is "government speech," State Br. 26, subject to the analysis in *Garcetti v. Ceballos*, 547 U.S. 410 (2006); State Br. 28–29. But *Bishop* forecloses this contention that professors' classroom speech is "not protected by the First Amendment." State Br. 36. *Bishop*'s weighing of a professor's "free speech rights" demonstrates that professors' classroom speech is not government speech; otherwise, there would be nothing to balance on a case-by-case basis. 926 F.2d at 1072–74 (noting that "neither teachers nor students 'shed their constitutional rights to [free speech] at the schoolhouse gate,'" (quoting *Tinker*

*v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)), and explaining that there is "no substitute for a case-by-case inquiry" into whether state interests justify an intrusion on those rights). This Court's balancing recognizes that a state university's interests may *sometimes* outweigh those of the instructor. *Id.* at 1076–77. But it also affirms that "[o]ur nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us, not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment . . . ." *Id.* at 1075 (quoting *Keyishian*, 385 U.S. at 603). *Garcetti*, moreover, expressly reserved whether its reasoning applies to "case[s] involving speech related to scholarship or teaching." 547 U.S. at 425.[7]

Consistent with *Bishop*, the Fourth, Fifth, Sixth, and Ninth Circuits all recognize that higher education classroom instruction is protected by the First Amendment, and therefore is not unprotected "government speech." *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (holding that "professors at public

---

[7] The State cites dicta in a case about student activities fees, State Br. 26, which stated that "principles applicable to government speech" would be "considered" when evaluating instructors' in-class speech. *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 235 (2000). But the Court in *Southworth* did not hold that instructors' in-class speech was government speech, and its opinion in no way disturbed *Bishop* as binding Eleventh Circuit precedent. The only case the State cites to support its argument that instructors in the classroom are engaged in government speech that actually involved classroom instruction is *Edwards v. Calif. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998); State Br. 6, 29, 38. This decision is not binding on this Court, and the Third Circuit itself recognized its divergence from established Eleventh Circuit precedent. *Id*. (citing *Bishop*, 926 F.2d at 1075).

universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship"); *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (holding that "classroom discussion" is protected by the First Amendment); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor."); *Adams v. Trs. of the Univ. of N.C. Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) (concluding that "*Garcetti* would not apply in the academic context of a public university").

The Supreme Court has directed, moreover, that courts should "exercise great caution before extending [] government-speech precedents," because they allow the government to "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017); *see also Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1595 (2022) (Alito, J., concurring) ("[I]t can be difficult to tell whether the government is using the [government-speech] doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint'" (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009)). As the district court noted here, "the logical conclusion" of the State's position is that "the State of Florida can issue transcripts to every university professor" to read from in class, and "can regulate

everything that's said in the […] classroom down to the last word of the professor[.]" SA 404.

The State cites *Shurtleff*, but its analysis only confirms that university instructors' classroom speech is *not* government speech. State Br. 28, 36. There, in assessing whether a flag flown above city hall as part of a public forum was government speech, the Court looked to "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 142 S. Ct. at 1589–90.

Those very considerations make clear that an instructor's in-class speech is not government speech. First, as a historical matter, such speech has never been considered "government speech." On the contrary, the Supreme Court has long recognized the free expression rights of instructors, holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. "Colleges and universities serve as the founts of—and the testing grounds for—new ideas," *Speech First, Inc.*, 32 F.4th at 1128, not a place to receive the government's official messages.

Second, no one perceives a professor's in-class instruction to be expressing the official views of the government; on the contrary, we expect that university classrooms will provide "that robust exchange of ideas which discovers truth out of

35

a multitude of tongues, (rather) than through any kind of authoritative selection." *Pred v. Bd. of Pub. Instruction of Dade Cty.*, 415 F.2d 851, 855 (5th Cir. 1969) (quoting *Keyishian*, 385 U.S. at 603 (internal quotations omitted)).[8] We expect higher education instructors to "be exemplars of open-mindedness and free inquiry," *Wieman*, 344 U.S. at 196 (Frankfurter, J., concurring), not mouthpieces for the legislature.

Third, the government—here, the state legislature—does not "actively shape or control" every utterance by every university instructor. *See Shurtleff*, 142 S.Ct. at 1589–90. Course offerings and syllabi are generally approved by the *university*, but not the *legislature*. And even the university's approval of general subject matter does not come close to making the Instructors' lectures and class discussions those of the government. The Instructors create their own syllabi for their courses, write their own lectures and discussion questions, select readings, create assignments, evaluate students' work, and are generally responsible for managing every aspect of their courses without government approval, oversight, or interference—until now. *See, e.g.*, App. 187–88. What professors say in class is not, in short, government speech. And as such, *Bishop* governs its regulation, and does not countenance a state

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

legislature's effort to micromanage classroom discussions by proscribing promotion or advancement of politically disapproved ideas.

### III. The Stop W.O.K.E. Act Violates the First and Fourteenth Amendments Because It Is Unconstitutionally Vague

The district court correctly held that the Stop W.O.K.E. Act is unconstitutionally vague. App. 416. A law violates the Due Process Clause's prohibition of vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colo.*, 530 U.S. 703, 732 (2000). By proscribing any speech that "espouses" or "compels" belief in a series of abstract ideas, while simultaneously permitting their discussion during instruction in an "objective manner without endorsement," the Act leaves instructors at a loss as to what is actually proscribed, and how they can even teach about the concepts without crossing the line. Fla. Stat. § 1000.05(4)(a), § 4(b). And because the lines the law draws are so vague, they invite arbitrary enforcement.

### A. The Act's Chilling Effect on Free Speech Heightens Vagueness Concerns

The fact that the Act seeks to regulate speech "amplifies [vagueness] concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister v. Bell*, 29 F.4th 1239, 1258–59 (11th Cir. 2022) (quoting

37

*Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (explaining that "[w]here a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts"). For this reason, "standards of permissible statutory vagueness" affecting speech "are strict," requiring the government to regulate with "narrow specificity." *Keyishian*, 385 U.S. at 603–04 (quoting *NAACP v. Button*, 371 U.S. 415, 432–33 (1963)). These concerns are magnified still further given the university's status as the "marketplace of ideas." *Id.* at 603.

Perhaps in recognition that the Act cannot survive traditional vagueness scrutiny, the State argues that the standard should be "more lenient" in regulation of the higher education classroom. State Br. 46. But none of the cases it cites supports this proposition. Some do not address a vagueness claim or higher education instruction at all. *See O'Laughlin v. Palm Beach Cty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (holding plaintiffs had "abandoned any vagueness argument they might have intended to present"); *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (considering the applicability of the First Amendment to the discipline of a public employee and mentioning vagueness only in dicta); *Arnett v. Kennedy*, 416 U.S. 134, 162 (1974) (upholding a law concerning dismissal procedures for federal employees by reading it narrowly to "exclud[e] constitutionally protected speech"). Other cases address

38

the difference between civil and criminal laws, but again do not involve classroom speech of university instructors. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) (considering high school student speech). In any event, the district court properly concluded that the Act's terms were vague "even under this 'ordinary person using common sense' test for public employees" advanced by the State. App. 405.

One case the State cites, *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1126 (3d Cir. 1992), did involve a vagueness challenge to a university regulation governing dismissal standards for university faculty. But the case is so different that it only confirms the vagueness of the Act by contrast. There, the court deemed not vague a fairly routine regulation that provided for dismissal for "failure to maintain standards of sound scholarship and competent teaching," as applied to a professor who took advantage of visiting Chinese scholars by, among other things, making them do domestic work at his home and otherwise abusing them. *Id*. at 1137. The court deemed the school's standard, essentially an unprofessional conduct standard, sufficient to provide fair notice to professors that the conduct at issue was not permissible. *Id*. But that is a far cry from the Act, which seeks to micromanage what views instructors can "espouse" on a series of abstractly defined concepts indisputably relevant to the very courses they teach, and requires instructors to distinguish, at their peril, between discussion "in an objective manner without

39

endorsement" and "espousal" or "advancement" of those ideas. Fla. Stat. § 1000.05(4)(a).

The State further asserts, without elaboration, that "[b]ecause Plaintiffs challenge the Act on a pre-enforcement basis, their burden to show the risk of discriminatory enforcement is much higher." State Br. 47. The State cites no precedent for this position nor offers any rationale. A statute is either void for vagueness or it is not. It doesn't become vague once it is enforced.

In short, the State's arguments for a relaxed vagueness standard are unavailing. But in any event, as the district court found, the Act is vague under any version of the vagueness standard.

## B. The Entirety of the Stop W.O.K.E. Act Is Vague

The Act is vague in at least four respects. First, it does not clearly define what concepts are proscribed or even make clear to whom its restrictions apply. Second, it seeks to prohibit abstract ideas. Third, it forces instructors to distinguish, in the context of classroom instruction, the permissible discussion of the prohibited ideas from impermissibly endorsing them, a highly subjective line that they cross at their peril. And fourth, a violation can turn on the impressions of third parties

### i. <u>The Act Fails to Clearly Define the Particular Conduct It Prohibits</u>

The Act does not clearly define the conduct it prohibits. It does not merely prohibit an instructor from personally espousing a concept, but broadly proscribes

any "training or instruction" that "espouses, promotes, advances, inculcates, or compels" a student to believe a prohibited concept. Fla. Stat. § 1000.05(4)(a).[9] In *Keyishian*, the Supreme Court held that similar terms—prohibiting employment of a higher education instructor who "advocates, advises or teaches the [prohibited] doctrine"—were impermissibly vague because they "may well [reach] one who merely advocates the doctrine in the abstract without any attempt to indoctrinate others." 385 U.S. at 599–600. As the *Keyishian* Court recognized, and as everyone who has been taught using the Socratic method well knows, there are many reasons why an instructor might "promote," "advance," or "endorse" a particular viewpoint during class, simply as a means of prompting students to take it seriously, to contest it, to debate it, and to think critically about it. Yet it is entirely unclear whether the Act permits such traditional forms of teaching.

As one court reasoned in striking down as unconstitutionally vague a similar New Hampshire law prohibiting teachers from teaching, advocating, or instructing similarly politically disfavored concepts:

> Consider, for example, the third banned concept, which bars an educator from teaching or advocating "[t]hat an individual should be discriminated against or receive adverse treatment solely or partly because of his or her . . . race." RSA § 193:40, I(c). In the coming months, the Supreme Court will decide whether colleges and universities can continue to use race-conscious admission policies. The

---

[9] The BOG Regulation only makes matters worse, defining instruction not as a particular action by an instructor, but as a "process of teaching or engaging students with content." BOG 10.005(1)(c).

> plaintiffs in those cases assert that such policies improperly favor Black applicants at the expense of white and Asian-American applicants, whereas the defendants argue that the policies are necessary to ensure diversity in higher education. If a high school teacher attempts to explain the diversity argument to her class during a discussion of the case, will she face sanctions for teaching a banned concept? We simply don't know.

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*, No. 21-CV-1077-PB, 2023 WL 171392, at *13 (D.N.H. Jan. 12, 2023); *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020) ("The line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.'") (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011)).

The State itself struggles to articulate what the Act means. Below, it argued that inviting a "guest speaker who promoted one of the eight concepts as part of a classroom debate where all sides of the issue were represented would still run afoul of the law." App. 410; *see also* SA 443–44. Now, it argues that "merely hosting a guest speaker obviously would not itself be an *endorsement*" prohibited by the law. State Br. 41. But later, it states that the Act allows the invitation of guest speakers "if the professor does not *personally endorse* the concept." *Id.* at n.6. So if an instructor agrees in any respect with the invited speaker, he violates the law? What if an instructor posed a question to another speaker in a way that endorsed the view?

Would that be permissible? What if he nodded while the prohibited concept was being defended? The Act does not clarify, and requires instructors to guess at their peril.

### ii.  <u>The Abstract Concepts Prohibited by the Act Are Vague</u>

The breadth and ambiguity of the concepts targeted by the Act further exacerbate the law's vagueness. The often overlapping concepts are themselves highly abstract; they prohibit not simply a set of specific words, but broad ideas. They provide no guidance as to what sorts of comments or arguments might be construed as falling within their broad and general terms. What does it mean to suggest that someone is "morally superior" (concept one)? What "other forms of psychological distress" are covered by concept seven? Prohibited concept four "features a rarely seen triple negative," making it "unclear what is prohibited and even less clear what is permitted." App. 405–06 (citing *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019)); *Albanese v. McGinnis*, 823 F. Supp. 521, 563 (N.D. Ill. 1993) ("Triple negatives are not conducive to comprehension."). The contours of every one of the eight concepts could be the subject of almost limitless academic symposia and philosophical debates. But if an instructor guesses wrong, he has violated the Act.

### iii.  **The Savings Clause Exacerbates the Act's Vagueness**

The Act's "savings clause," which is essential to what the law proscribes, only compounds the law's vagueness. Section (b) provides that the prior provision "may not be construed to prohibit discussion of the concepts . . . as part of a larger course of [] instruction, provided such [] instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b). Thus, in order to know what they can and cannot say in class, instructors must constantly ask whether their comments are "objective without endorsement" or could be deemed to "endorse" a proscribed idea. That is a virtually impossible task.

As the district court observed, the use of "objective" in the Act departs from the dictionary meaning of the term. The dictionary definition of "objective" could contemplate the airing of viewpoints both endorsing and rejecting an idea. App. 407 (referencing the dictionary definition of "objective" to mean "expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudice or interpretation") (citing Objective, Merriam-Webster.com, https://bit.ly/3zcLbB1). Section (b) permits only instruction "in an objective manner without endorsement." Fla. Stat. § 1000.05(4)(b). But the law contemplates a sharp, indeed dispositive, distinction between discussion and endorsement. How, then, does an instructor teach both sides of contemporary debates about, say, affirmative action,

structural inequality, or reparations, if presenting one side might well be seen as "espousing" it?

The State's effort to reconcile the two provisions only underscores the problem. The State argues that Section (b) "permits instructors to discuss the concepts without *expressing approval* of them," State Br. 51, and that Section (a) permits *condemnation* of the concepts. State Br. 52–53. As the district court stated, "[n]o ordinary person would understand 'objective' instruction to allow for this imbalance." App. 411. Confusingly, the State argues that Section (a) "has nothing to do with" Section (b). State Br. 52–53. But as the State acknowledges, Section (b) is an exception to Section (a); it speaks in direct reference to the prior section and has no stand-alone meaning. And even if the sections had nothing to do with one another, it would remain entirely unclear whether an instructor should try to teach a concept "objectively," whatever that means under this law, or should affirmatively condemn the concepts.

The State claims that ordinary people know the difference between objectivity and endorsement, because it's the difference between what judges do and what lawyers do. State Br. 51. But is that clear? When a judge writes an opinion affirming the validity of affirmative action, for example, is she not "espousing" or "endorsing" that view? Nowhere else in the law does liability turn on whether a discussion is objective or subjective—and for good reason. Even if objectivity is a laudable ideal

in the abstract, determining whether any particular statement on a matter of controversy is objective or not is, like beauty, in the eye of the beholder. Legal sanctions cannot turn on such evanescent distinctions.

### iv.  Violation of the Act Requires No Scienter, and Turns On Listener Reactions

The Act contains no scienter requirement, further exacerbating its vagueness, because teachers can be caught in its snares without any intent to transgress the law. *Edelblut*, 2023 WL 171392, at *12. And its prohibition on "instruction that . . . compels [a student] to believe" a prohibited concept raises still further vagueness concerns, because it turns on how a listener reacts. Like a law prohibiting actions that have the "effect of influencing," *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 947 (11th Cir. 2023), this provision gives instructors no way of knowing whether their teaching will have the prohibited effect of "compelling" belief in a concept. *Id.*

For example, Instructor Pernell assigns readings from his casebook on racism and criminal procedure. SA 4. Instructor Sandoval includes "Doing intersectionality: Power, privilege, and identities in political activist communities" on the reading list for Intercultural Communication. SA 126. No one can know how an individual student will react to such readings, let alone whether they might "compel" them to believe in a concept. If an instructor offers a "compelling" argument, does she cross

the line? Only the reaction of the student will determine whether the speech is permitted or proscribed.

As this Court recognized in *Wollschlaeger*, laws triggered by the effect of expression on a recipient fail to provide any standard of conduct and turn instead on each individual's perspective. 848 F.3d 1293. What is perceived by one person as harassing, *id.* at 1307, annoying, *Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971), or compelling, Fla. Stat. § 1000.05(4)(a), may not be so perceived by another. As such, the Act is not just imprecise, but provides "no standard of conduct . . . at all." *League of Women Voters*, 66 F.4th at 947 (quoting *Coates*, 402 U.S. at 614).

And because the law lacks a scienter requirement, it offers no "protect[ion] from being caught in [the statute's] net by the necessity of having a specific intent to commit an unlawful act." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972). The prohibition on "instruction" that has the effect of compelling a student to believe a concept cannot be squared with the State's assertion that the Act "impl[ies] a scienter requirement[.]" State Br. 48. *See Grayned*, 408 U.S. at 110 ("[I]t is not within our power to construe and narrow state laws."); *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1329 (11th Cir. 2001) (noting "commitment, as a federal court, to be vigilant against rewriting the terms of state statutes"). Moreover, similar laws have been declared vague even when they have included an explicit scienter

element. *See Keyishian*, 385 U.S. at 599–600 (finding unconstitutional a law that required instructors to act "willfully and deliberately").

### C. The Act Encourages Arbitrary and Discriminatory Enforcement

The risk of arbitrary and discriminatory enforcement under the Act is particularly pronounced because the law expressly seeks to suppress what the State deems "woke" ideas. *See, e.g.*, *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (holding that vague regulations create the "risk that speech will be chilled or effectively censored on the basis of content or viewpoint."). The Instructors who teach race, ethnic, or gender studies courses—disciplines that often require instruction about the Act's prohibited concepts—are acutely chilled in their academic expression and vulnerable to arbitrary and discriminatory enforcement. App. 142.

The departments of African American Studies at Florida State University, Florida International University, and the University of Florida, where instruction involving prohibited concepts would predictably occur, are predominantly staffed by Black instructors. App. 143. Instructors of color are often evaluated more harshly than white instructors when teaching the same material, increasing the likelihood students may perceive and report violations of the Act.[10] SA 60. As Instructor Austin

---

[10] Kerry Chavez & Kristina M.W. Mitchell, *Exploring Bias in Student Evaluations: Gender, Race, and Ethnicity* (Cambridge Univ. Press 2019),

explained, professors of color are more likely to be hired to teach the very courses about race that are most at risk under the Act's prohibitions. SA 78–79.

The Act requires universities to comply with the law and puts them at risk of losing substantial funding if they permit an instructor to "espouse" a prohibited concept. BOG 10.005. That will incentivize stringent enforcement, but without clear guidance about how one can and cannot discuss the prohibited concepts (or even what they encompass), universities in the first instance and the Board of Governors will have broad discretion to target individuals in an arbitrary and discriminatory manner. "Vague standards, unless narrowed by interpretation, encourage erratic administration whether the censor be administrative or judicial; individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 685 (1968) (internal marks omitted).

## D. Implementing Regulations Do Not Cure the Act's Vagueness

The State's assertion that the BOG Regulation minimizes risk of arbitrary enforcement is unpersuasive. State Br. 48. Regulations cannot alter the text of the law itself. Moreover, the Regulation does not attempt to clarify the substance of the law in any manner, but merely specifies the *consequences* of a violation. *See supra*,

---

https://www.cambridge.org/core/journals/ps-political-science-and-politics/article/exploring-bias-in-student-evaluations-gender-race-and-ethnicity/91670F6003965C5646680D314CF02FA4#.

p. 7. The State posits that the enforcement mechanism "reserv[es] . . . punishment to only examples where an employee *refuses to correct* prohibited teaching[.]" SA 359. But as the district court correctly pointed out, BOG Regulation 10.005(3)(c) includes "plain language stat[ing], removal—including termination—may also occur if there is merely a failure to comply with the university's mandate . . . . [and an instructor can be fired if they inadvertently cross the line] in a good-faith attempt to teach objectively[.]" App. 415 (internal alterations and citations omitted). Further regulations providing for disciplinary action "if there is a failure or refusal to comply[,]" State Br. 48, provide no clarity about the law's many unanswered questions, and therefore do nothing to prevent chill or reduce the potential for arbitrary or discriminatory enforcement (internal citations omitted).

The potential for *post hoc* warnings is no cure. The Supreme Court has repeatedly held that retroactive warnings are no remedy for vagueness as they fail to provide notice and are necessarily dependent on individual discretion, allowing for arbitrary and discriminatory enforcement. *See, e.g.*, *Chicago v. Morales*, 527 U.S. 41, 58–59 (1999) ("Because an officer may issue an order only after prohibited conduct as already occurred . . . [s]uch an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible applications of the law."); *Wright v. Georgia*, 373 U.S. 284, 292 (1963); *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90–91 (1965). And while the Court has noted the ability

in that setting to seek advice on the validity of a proposed course of conduct, *see* State Br. 48, it did so only after the Court's lengthy analysis finding the law otherwise constitutionally sound and not as a mechanism to save an unconstitutionally vague law. *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 577–80 (1973). And where, as here, a violation can turn on whether one's discussion of a prohibited topic is perceived as "objective" or "endorsing," inherently slippery concepts, it's not at all clear that a "warning" would even clarify what the instructor can and cannot say the next time the issue comes up in class.

## IV. The District Court Correctly Concluded That the Doctrine of Severability Does Not Apply

The Act cannot be salvaged by severing its unconstitutional provisions. Severability is improper because: (1) removal of either section would fail to cure the Act's constitutional deficiencies; and (2) the overall legislative purpose cannot be accomplished without each section.

Severability of state legislative provisions is "a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Florida law allows for severability when:

> (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

51

*Smith v. Dep't of Ins.*, 507 So. 2d 1080, 1089 (Fla. 1987) (citation omitted).

In determining whether severability is proper, the "key determination is whether the overall legislative intent is still accomplished without the invalid provisions." *Wollschlaeger*, 848 F.3d at 1318 (citation omitted); *Emerson v. Hillsborough Cty.*, 312 So. 3d 451, 460 (Fla. 2021). Where the "taint" of an illegal provision has "infected the entire enactment," severability is not appropriate. *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1196 (Fla. 2017). Where, as here, severing the unconstitutional provisions would alter the scope of the statute and thus contravene the legislative intent, severability is improper.

First, Sections (a) and (b) work hand-in-hand to define, albeit inadequately, what instructors can and cannot say. Accordingly, severing one from the other would not save the statute; it would radically alter its meaning.

Second, if either section were to be found valid on its own, the legislative purpose could not be accomplished. *Smith*, 507 So. 2d at 1089. As Section (b) is an exception to (a), it makes no sense standing alone. And severing Section (b), the savings clause, would expand the prohibition beyond the legislature's intent. The Florida Supreme Court rejected similar arguments seeking to sever an unconstitutional savings clause, explaining that it "w[ould] not legislate and sever provisions that would effectively expand the scope of the statute's intended breadth." *State v. Catalano*, 104 So. 3d 1069, 1081 (Fla. 2012).

52

In light of the inextricably intertwined nature of the two sections, the third and fourth considerations also weigh against severability.

Finally, it makes no sense to sever individual prohibited "concepts." They all share the same constitutional infirmities; they seek to suppress disfavored viewpoints, and they are impermissibly vague. Moreover, the legislature deemed prohibition of all eight concepts necessary to achieve its purpose, so judicially picking and choosing among the provisions would undermine the legislature's purpose. SA 346, 406; *Homestead Hosp., Inc. v. Miami-Dade Cty.*, 829 So. 2d 259, 263 (Fla. 3d DCA 2002).

## V. The Remaining Equitable Factors Favor Affirming the Preliminary Injunction

### A. Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury

The loss of First Amendment freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Where, as here, "pure speech" is chilled, irreparable injury is presumed. *Siegel*, 234 F.3d at 1178. As such, the district court did not abuse its discretion in concluding that the Instructors' chilled speech constitutes irreparable injury. App. 418 (citing *Speech First, Inc.*, 32 F.4th at1128).

Absent the injunction, the Instructors will be forced to self-censor their instruction or risk disciplinary action. *See supra*, pp. 7–9. Under either scenario, the Instructors' constitutional freedom is compromised. SA 10–11, 58, 74–75, 99, 247. Because the loss of the Instructors' First Amendment freedoms constitutes irreparable injury as a matter of law, and the State has not argued otherwise, this factor weighs in the Instructors' favor.

### B. The State Is Not Harmed by the Injunction of an Unconstitutional Law and the Injunction Is in the Public Interest

The district court properly determined that "the scale tips decisively in [the Instructors'] favor" when weighing the Instructors' First Amendment injuries against the State's interests. App. 418 (citing *KH Outdoor*, 458 F.3d at 1271–72 ("the state 'has no legitimate interest in enforcing an unconstitutional ordinance.'")). The State's expressed interest in ending discrimination is not legitimately served by the Act, *see supra*, pp. 26–29, and as the district court observed, the portions of the Florida Educational Equity Act not amended by the Act all remain in place to prevent discrimination within education in the state. App. 419.

Further, contrary to the State's assertion, State Br. 55, there is "no harm from the state's nonenforcement of invalid legislation." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289–90 (11th Cir. 2013) (harm to state from non-enforcement of likely unconstitutional law is "nebulous" and "ephemeral").

54

Likewise, "[t]he public interest is served when constitutional rights are protected[,]" *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019), and, as the district court noted, "[t]he First Amendment, in particular, serves significant societal interests." App. 418–19 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978)). "Nowhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc.*, 32 F.4th at 1128.

Not since the McCarthy era has this country seen the sort of political censorship and legislative interference with the ideas instructors espouse. If the university is to remain the quintessential "marketplace of ideas," *Keyishian*, 385 U.S. at 603, such political efforts to suppress disfavored ideas cannot be countenanced. The district court did not err in granting the preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of a preliminary injunction.

Dated: June 16, 2023                    Respectfully submitted,

**ACLU FOUNDATION OF**                 **AMERICAN CIVIL LIBERTIES**
**FLORIDA**                            **UNION FOUNDATION**

Jerry C. Edwards                       */s/ Leah Watson*
Fla. Bar No. 1003437                   Leah Watson
ACLU FOUNDATION OF FLORIDA             Emerson Sykes
933 Lee Rd., Ste. 102                  Sarah Hinger
Orlando, FL  32810                     Crystal Pardue
(786) 363-1107                         Laura Moraff

jedwards@aclufl.org

Daniel B. Tilley
Fla. Bar No. 102882
Katherine Blankenship
Fla. Bar No. 1031234
Caroline McNamara
Fla. Bar No. 1038312
Jacqueline Azis
Fla. Bar No. 101057
ACLU FOUNDATION OF FLORIDA
4343 W. Flagler St., Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnarama@aclufl.org
jazis@aclufl.org
KBlankenship@aclufl.org

**BALLARD SPAHR, LLP**

Jason Leckerman
Catherine Lubin
BALLARD SPAHR, LLP
1735 Market St., Fl. 51
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com
lubink@ballardspahr.com

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main St., Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad St., Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
shinger@aclu.org
cpardue@aclu.org
lmoraff@aclu.org

**NAACP LEGAL DEFENSE &
EDUCATION FUND**

Morenike Fajana
Tiffani Burgess
Alexsis Johnson
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
tburgess@naacpldf.org
amjohnson@naacpldf.org

Jin Hee Lee
Charles McLaurin
Santino Coleman
NAACP LEGAL DEFENSE
  AND EDUCATION FUND, INC.
700 14th Street, Ste. 600
Washington, D.C. 20005
(202) 682-1300
jlee@naacpldf.org
cmclaurin@naacpldf.org
scoleman@naacpldf.org

*Counsel for Plaintiffs-Appellees*

56

## CERTFICIATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing brief complies with the typeface rule set forth in Federal Rule of Appellate Procedure 32(a)(5)(A), and type-volume limitation contained in Federal Rule of Appellate Procedure 32(a)(7)(B), because it is typed in a proportionally spaced font, has a type size of 14 points, and contains 12,884 words.

Dated: June 16, 2023                    */s/ Leah Watson*
                                        Leah Watson

                                        *Counsel for Plaintiffs-Appellees*


## CERTFICIATE OF SERVICE

I hereby certify that on June 16, 2023, the foregoing was filed electronically with the Clerk of Court through the appellate CM/ECF system. I further certify that all parties required to be served have been served.

Dated: June 16, 2023                    */s/ Leah Watson*
                                        Leah Watson

                                        *Counsel for Plaintiffs-Appellees*

ADDENDUM

# ADDENDUM

*10.005 Prohibition of Discrimination in University Training or Instruction*,
Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022).…....................... Add. 1

10.005 Prohibition of Discrimination in University Training or Instruction

(1) Definitions.  For purposes of this regulation, the enumerated terms are defined as follows:

    (a) "Concepts" are the following:

        1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

        2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

        3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

        4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

        5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

        6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

        7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

        8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

    (b) "Training" is defined as a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role.

    (c) "Instruction" is defined as the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university within a course.

    (d) "Substantiate" is defined as establishing the existence or truth of a particular fact through the use of competent evidence.

    (e) "University regulation" is defined as the regulation required by section (2)(a) below.

(f) "Administrator" means the following high level personnel who have been assigned the responsibilities of university-wide academic or administrative functions: university president, provost, senior/executive vice presidents, vice presidents, associate vice presidents, associate/vice provosts, deans, equal opportunity programs director, chief audit executive, and chief compliance officer.

(2) University Regulation and Content Review

    (a) Each university shall have a university regulation that prohibits discrimination on the basis of race, color, national origin, or sex by subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the concepts as defined in paragraph (1)(a). Such university regulation shall contain a method for submitting complaints of alleged violations of the university regulation and the title and contact information of the office(s) designated by the university to receive and maintain such complaints.

    (b) The university regulation shall include that the prohibition in section (2)(a) does not prohibit discussion of the concepts as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

    (c) Each university shall post the university regulation on a public website where the university commonly publishes regulations.

    (d) Each university shall periodically review its regulations, policies and institutional training materials to ensure that the content does not violate the university regulation.

(3) University Investigation and Corrective Action

    (a) Each administrator who receives a complaint of an alleged violation of the university regulation shall timely forward such complaint to the office(s) designated to receive such complaints.

    (b) After reviewing the complaint and obtaining any additional information to aid in the review, the designated office shall direct, supervise, or coordinate the investigation of credible complaints that identify a training or instruction that espouses, promotes, advances, inculcates, or compels a student or employee to believe any of the concepts.

    (c) In the event the investigation finds that an instruction or training is inconsistent with the university regulation, the university shall inform the Board of Governors through the Office of Inspector General and take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation, issuing disciplinary measures where appropriate and remove, by

Add. 2

termination if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate.

(d) If the Board of Governors receives a complaint about which it has not been previously informed pursuant paragraph 3(c), it shall refer the complaint to the subject university's Chief Audit Executive to be addressed pursuant paragraphs 3(a)-(c).

(4) Proceedings to Determine a Substantiated Institutional Violation

(a) Upon receipt of a credible allegation that a university willfully and knowingly failed to correct a violation of the university regulation, the Board of Governors' Office of Inspector General shall conduct an investigation to determine if evidence exists to support the allegation and ineligibility for performance funding. In determining whether a university willfully and knowingly failed to correct a violation, the Office of Inspector General shall consider whether the university made a good faith determination that the complaint did not allege a violation of the university regulation or whether it took prompt corrective action after it substantiated a violation of the university regulation. If it is determined an external qualified investigative firm is necessary to assist with or conduct the investigation, the subject university will be responsible for any costs incurred.

(b) The Inspector General shall submit the investigatory findings to the Chair of the university's Board of Trustees, or the Chair's designee, which shall have twenty (20) business days to submit a written response after receipt of such findings. The Office of Inspector General shall provide a rebuttal, if any, to the university within twenty (20) business days after receipt of the university's response. The university's response and the Office of Inspector General's rebuttal to the response, if any, shall be included in a final investigative report provided to the Board of Governor's Audit and Compliance Committee and the Chair of the university's Board of Trustees.

(c) The Board of Governor's Audit and Compliance Committee shall make a recommendation to the Board as to whether it should substantiate an allegation that a university willfully and knowingly failed to correct a violation of the university regulation. The Board shall review the investigative report and recommendation and make a final decision regarding whether the alleged willful and knowing failure to correct a violation of the university regulation is substantiated. Such decision will be rendered in writing to the university within twenty (20) business days of the meeting at which the report is considered.

(d) If the Board of Governors determines that a university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of section 1000.05(4)(a), Florida Statutes, and failed to take appropriate corrective action, the university will be ineligible for

Add. 3

performance funding for the next fiscal year following the year in which the Board of Governors made the determination.

(5)  Additional Proceedings.

A university or the complainant may seek judicial review by filing a petition for writ of certiorari review with the appropriate circuit court within thirty (30) days of the date of the Board's final decision pursuant to Florida Rule of Appellate Procedure 9.190(b)(3).

Authority: Section 7(d), art. IX, Fla. Const.; Section 1000.05, Florida Statutes; Section 1001.92, Florida Statutes; History: New 08-26-22.