22-13992

# In the United States Court of Appeals for the Eleventh Circuit

LeRoy Pernell et al.,

*Plaintiffs-Appellees,*

v.

Brian Lamb et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:22-CV-304-MW-MAF

## SUPPLEMENTAL APPENDIX OF PLAINTIFFS-APPELLEES VOLUME 1 of 2

Leah Watson
Emerson Sykes
Sarah Hinger
Crystal Pardue
Laura Moraff
American Civil Liberties
  Union Foundation
125 Broad Street, Fl. 18
New York, NY 10004
(212) 549-2500
lwatson@aclu.org

*Counsel list continued on
the following page.*

Jerry C. Edwards
ACLU Foundation of Florida
933 Lee Road, Ste. 102
Orlando, FL 32810
(786) 363-1107

Daniel B. Tilley
Katherine Blankenship
Caroline McNamara
Jacqueline Azis
ACLU Foundation of Florida
4343 W. Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714

Morenike Fajana
Tiffani Burgess
Alexsis Johnson
NAACP LEGAL DEFENSE &
  EDUCATION FUND, INC.
40 Rector Street, Fl. 5
New York, NY 10006
(212) 217-1690

Jin Hee Lee
Charles McLaurin
Santino Coleman
NAACP LEGAL DEFENSE &
  EDUCATION FUND, INC.
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
(202) 682-1300

Jason Leckerman
Catherine Lubin
BALLARD SPAHR, LLP
1735 Market Street, Fl. 51
Philadelphia, PA 19103-7599
(215) 864-8266

Jacqueline Mabatah
BALLARD SPAHR, LLP
201 S. Main Street, Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063

*Counsel for Plaintiffs-Appellees*

# INDEX TO APPENDIX

| Volume | Tab | Title |
|--------|-----|-------|
| 1 | 13-1 | LeRoy Pernell Declaration |
| 1 | 13-2 | Dana Thompson Dorsey Declaration |
| 1 | 13-3 | Sharon Austin Declaration |
| 1 | 13-4 | Shelley Park Declaration |
| 1 | 13-5 | Jennifer Sandoval Declaration |
| 1 | 13-6 | Russell Almond Declaration |
| 2 | 13-7 | Marvin Dunn Declaration |
| 2 | 13-8 | Johana Dauphin Declaration |
| 2 | 13-9 | Daniel Smith Declaration |
| 2 | 51-1 | Defendants' Memorandum of Law in Support of Motion to Dismiss |
| 2 | 52 | Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction |
| 2 | 60 | Preliminary Injunction Argument Transcript |

13-1

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, et al.,
    *Plaintiffs*,

v.

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et
al.,
    *Defendants*.

Case No.: 4:22-cv- 304

---

**DECLARATION OF LEROY PERNELL IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

I, LeRoy Pernell, hereby declare and state as follows:

**A. Background**

1.  My name is LeRoy Pernell. I am over 18 years of age and identify as an African-American man.

2.  I have personal knowledge of the following facts and if called to testify could and would competently do so.

3.  I have over 40 years of professional experience in higher education. From 2008 onwards, I have worked at Florida A&M University College of Law (FAMU Law), a law school at a historically Black college and university (HBCU). From 2008 to 2015 I served as Dean, and from 2017 to 2019, I

served as Interim Dean. While serving as Dean, I helped FAMU Law achieve full American Bar Association (ABA) accreditation in 2009.

4. Since 2019, I have served as Professor of Law, where my coursework focuses on the criminal legal system. I teach primarily in the areas of criminal procedure, torts, juvenile law, and race and the law. I have published articles and book chapters on criminal procedure, race and the law, torts, and sports law. I also recently published a book, along with Professor Omar Saleem, titled "Cases and Materials on Combatting Racism in Criminal Procedure."

5. With regard to my education, I received a Bachelor of Arts degree in Government from Franklin and Marshall College and a Juris Doctor degree from Ohio State University College of Law (Ohio State Law).

6. After graduating from Ohio State Law, I worked for Columbus Legal Aid and Defender Society representing indigent individuals and juveniles in the criminal legal system, before going into teaching. I then served in various roles as a law professor at Ohio State Law for over 20 years. I also served as Vice Provost in the Office of Minority Affairs at Ohio State Law for about four years. In 1997, I took over as Dean of Northern Illinois University College of Law and served in that role for over 10 years, before joining FAMU Law as Dean.

7. During my career, I have earned numerous awards, honors, and accolades. For example, in 2018, I won the Council on Legal Education Opportunity's CLEO EDGE Award and was inducted into the HBCU Pre-Law Hall of Fame. I was elected to the American Law Institute (ALI) in 2000 and was a member on the ALI consultative group on the Restatement of Torts 3rd. I also served on the board of trustees of the Law School Admissions Council.

## B. FAMU Law's History and Present

8. FAMU Law, as a college in a HBCU, has a rich history of activism in the fight for racial justice. The state of Florida also has a history of punishing FAMU Law severely for that activism.

9. In 1949, after a Black student named Virgil Hawkins applied to the then-segregated University of Florida Law School, the state of Florida decided to open a law school to accommodate Hawkins and other Black law students in Florida. This allowed the state to justify its refusal to integrate the University of Florida under the "separate but equal" doctrine from the United State Supreme Court's opinion in *Plessy v. Ferguson*, 163 U.S. 537 (1896). FAMU Law admitted its first class in 1951.

10. During the Civil Rights Movement of the 1950s and 1960s, Black students attending Florida A&M University (FAMU) and FAMU Law participated in demonstrations protesting segregation. For example, John D. Due, Jr., a

member of the Florida Civil Rights Hall of Fame and FAMU Law graduate,
worked as an attorney in Mississippi during the Freedom Summer on behalf
of the Student Nonviolent Coordinating Committee to monitor violence
against civil rights workers. Due's wife, Patricia Stephens Due, was a
prominent civil rights activist and FAMU student who participated in the first
"jail-in" of the Civil Rights Movement after electing not to pay a fine or bail
for sitting at a "whites only" lunch counter at a Tallahassee Woolworth's
store. Arthenia Joyner, later the Minority Leader of the Florida Senate, is
another example of a civil rights activist who graduated from FAMU Law
during the 1960s.

11. Students and faculty at FAMU Law also frequently represented activists who
were arrested for violating Jim Crow laws in Florida.

12. In response to these efforts, then-Governor W. Haydon Burns, an ardent
segregationist, and the Florida legislature worked together to tarnish FAMU
Law's reputation and minimize its leading role in the civil rights movement.
In 1965, the Florida legislature voted to strip the law school of its funding and
opted instead to fund a new law school at the formerly segregated Florida
State University. Florida State opened its law school in 1966, and FAMU
Law's last class graduated in 1968. The school remained closed for over 30
years.

13. In 2000, after calls from the ABA and others to better diversify the legal profession, the Florida Legislature passed legislation reestablishing FAMU Law. FAMU Law admitted its first class in 2002 and earned ABA provisional approval in 2004, receiving full accreditation in 2009.

14. Today, FAMU Law supports an extremely diverse base of students. As of fall 2021, 73.6% of FAMU Law's total students identified as people of color. 47.6% of its total students identified as Black or African-American. In its fall 2021 first-year class, 75.4% of its students identified as people of color and 46.2% identified as Black or African-American. *See* Attached Exhibit A.

15. FAMU Law's faculty is also diverse. As of fall 2021, 73.2% of its total faculty and 81.8% of its full-time faculty identify as people of color. *See id*. Presently, I estimate that over 80% of FAMU Law's full-time faculty identifies as Black.

## C. My Current Coursework

16. In the fall semester, I will be teaching Constitutional Law II (LAW 5502) and Torts (LAW 5700). In the spring semester, I am still solidifying my courses, but will likely be teaching Criminal Procedure: Pre-Trial Procedure, as well as Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure.

17. Constitutional Law II is an advanced course where we go into more detail on the historical and legal bases for our constitutional framework. Torts is an introductory course that covers the history and development of the legal principles underlying non-contractual civil wrongs, both at common law and under various statutes.

18. In The Role of Race in Criminal Procedure, we address the often-ignored role of race in American criminal justice. This course systematically traces the role that race plays at each major stage of the criminal process, including the application of Equal Protection and Due Process principles.

## D. The Interaction Between House Bill 7 (H.B. 7)[1] and the Content of My Courses

19. On April 22, 2022, Governor Ron DeSantis signed H.B. 7 into law. This law amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

20. As I understand it, H.B. 7 makes it illegal to teach about the existence and manifestations of systemic racism in the legal system. The law does this explicitly by limiting instruction on the racial origin and impact of concepts like "neutrality, objectivity, and racial colorblindness" and also broadly chills instruction in the realm of critical race thinking.

---

[1] Ch. 2022-72, Laws of Fla.

21. From a legal teaching perspective, it is pedagogically appropriate to teach the concepts that H.B. 7 now prohibits, because they are grounded in case law, academic research, and well-recognized analytical frameworks. Moreover, using these concepts—particularly those that pertain to analyzing and understanding systemic inequalities perpetuated by our legal system—is valuable because it helps to inspire and teach students on how to bring about transformative change. By discussing topics like systemic racism, for example, we prepare students to bring about positive change against racism. Discussion of these topics often exposes students to ideas and concepts for the first time, like instances of racism in the criminal justice system, and prompts students to think about their career trajectories and how they can promote change as future lawyers. We cannot begin to address the problems within our legal system without first understanding what needs to be changed.

22. An example of specific material that H.B. 7 could require me to no longer use in one of my courses is *Cases and Materials on Combatting Racism in Criminal Procedure*, the casebook I authored. Last fall, I assigned this casebook in my course on The Role of Race in Criminal Procedure, and the vast majority of the required readings in that course came from the book. *See* Attached Exhibit B. This casebook discusses the ways in which racism became and has remained embedded in our criminal legal system. *See*

SA 9

Attached Exhibit C. This casebook does not conform with H.B. 7's mandate of "colorblindness," and it is hard for a student to conclude that I do not endorse the material in the book when I am the one who authored it and the book includes excerpts of my scholarship. *See id.*

### E. How H.B. 7 Will Impact My Teaching and My Courses

23. H.B. 7 impacts my ability to teach each of my courses, because central to my teaching philosophy is the premise that the legal system is not, and has never been, race-neutral. I ask students to look critically at the legal system from the perspective that the system is very color-conscious and promotes race privilege. For example, when I teach my criminal procedure courses, I start with the idea that all modern criminal procedure is based on race-conscious decision-making. A significant portion of the course involves looking at race in the criminal justice system from a critical point of view, including the racism that led to the murder of Fred Hampton, the Attica Prison Riots, and newer forms of slavery—like prison labor—that continue to this day.

24. This perception of the legal system extends beyond criminal procedure; in Constitutional Law we discuss a number of events from a critical perspective regarding race, including the racial implications of the founding of the Constitution and the enforcement of civil rights. In Torts, we discuss race and tort liability.

25. My ability to fully and accurately present these nuanced and complex issues is directly impacted by the limits H.B. 7 places on using viewpoints like "[s]uch virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist." § 1000.05(4)(a)(8), Fla. Stat.

26. The way I teach, therefore, cannot comport with H.B. 7, as the law directly challenges a foundational notion of my pedagogy: that the legal system is not race-neutral.

27. H.B. 7 also chills student speech in the classroom, as students will be afraid to express their views on race in a way that they now perceive is contrary to Florida law. I fear that fewer students will choose to combat racism as a part of their profession, not only because they won't have received sufficient instruction due to H.B. 7's prohibitions on teaching, but also due to a perception that the state stands in opposition to such a career.

28. I know that I will face negative consequences for teaching students as I had prior to the enactment of H.B. 7, given that such teaching will now be illegal.

29. I am also concerned that the state government will strip FAMU Law of funding if I violate H.B. 7. I spent almost a decade as Dean and Interim Dean of FAMU Law. I left my position as Dean of Northern Illinois University College of Law to come to FAMU Law and help the law school achieve full

accreditation. The success of FAMU Law and its continued financial sustainability, which relies on state funding, are particularly important to me.

30. I expect that we will see a reduction in courses that involve critical race thinking, as professors—especially those without tenure—will not want to take a chance teaching courses that implicate the prohibited concepts, and therefore may run the risk of violating H.B. 7.

31. In my personal opinion, H.B. 7 appears targeted at Black educators, scholars, and thinkers. For one, the legislative proposal that led to H.B. 7, the "Stop Woke Act," focuses on the word "woke," a word that Black people created and popularized. Moreover, H.B. 7 appears to be a direct reaction to the shift in dynamic that occurred in Florida, and around the nation, following the murder of George Floyd, where there was a new-found recognition of ongoing race-motivated violence and racial disparities in America. H.B. 7 appears to be an attempt by the legislature to push back against these conversations and the growing awareness of racism among the populace.

## F. Exhibits

32. Attached as **Ex. A** is a true and correct copy of the ABA's 2021 Standard 509 Information Report for FAMU Law.

33. Attached as **Ex. B** is a true and correct copy of my syllabus from my Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure course that I taught in the fall 2021 semester.

34. Attached as **Ex. C** is a true and correct copy of the title page and table of contents from the *Cases and Materials on Combatting Racism in Criminal Procedure* casebook I authored.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on August 10, 2022.

LeRoy Pernell

# Ex. A

**FLORIDA A&M UNIVERSITY - 2021   Standard 509 Information Report**

201 Beggs Avenue
Orlando, Florida 32801

Phone: 407-254-4010

Website: http://law.famu.edu/

http://www.abarequireddisclosures.org

Report Generated on: 12-14-2021

*ABA*
*Approved*
*Since*
2004



## The Basics

| | |
|---|---|
| Type of school | Public |
| Application deadline | May 31 |
| Application fee | |
| Financial aid deadline | May 1 |

## Academic Calendar

| | |
|---|---|
| Term | Semester |
| Months students may begin studying law | August |
| Months the Law school confers degrees | May, August, December |
| # of credit hours required to earn the JD | 90 |

## Curricular Offerings 2020-2021

| | 2020-2021 |
|---|---|
| Typical first-year section size, excluding Legal Research & Writing | 41 |
| Number of course titles,beyond the first year curricular,offered last year | 71 |
| Number of upper division class room course sections with an enrollment: | |
| Under 25 | 73 |
| 25 to 49 | 27 |
| 50 to 74 | 15 |
| 75 to 99 | 1 |
| 100 + | 0 |
| Number of seats available in law clinics last year | 42 |
| Number of field placements positions filled last year | 175 |
| Number of seats available in simulation courses | 462 |
| Number of seminars | 15 |
| Number of co-curricular offerings | 3 |

## 2021 First Year Class (Oct 6th 2020-Oct 5th 2021)

| | 2021 |
|---|---|
| Completed Applications | 1515 |
| Offers of Admission | 561 |
| Acceptance Rate (Percent) | 37.03% |
| Enrollees from Applicant pool | 130 |
| Enrollment rate from Completed Applications | 8.58% |
| Enrollment rate from Offers of Admission | 23.17% |
| Other first-year enrollees | 0 |

| | All | Full Time | Part Time |
|---|---|---|---|
| Total in First-year class | 130 | 104 | 26 |
| LSAT | All | Full Time | Part Time |
| 75th Percentile | 152 | 152 | 152 |
| 50th Percentile | 149 | 149 | 148 |
| 25th Percentile | 147 | 147 | 146 |
| # not included in LSAT calculations | 0 | 0 | 0 |
| UGPA | All | Full Time | Part Time |
| 75th Percentile | 3.64 | 3.68 | 3.43 |
| 50th Percentile | 3.42 | 3.44 | 3.21 |
| 25th Percentile | 3.15 | 3.23 | 3.03 |
| # not included in UGPA calculations | 3 | 1 | 2 |
| GRE | All | Full Time | Part Time |
| 75th Percentile GRE Verbal Reasoning | 0 | 0 | 0 |
| 50th Percentile GRE Verbal Reasoning | 0 | 0 | 0 |
| 25th Percentile GRE Verbal Reasoning | 0 | 0 | 0 |
| 75th Percentile GRE Quantitative Reasoning | 0 | 0 | 0 |
| 50th Percentile GRE Quantitative Reasoning | 0 | 0 | 0 |
| 25th Percentile GRE Quantitative Reasoning | 0 | 0 | 0 |
| 75th Percentile GRE Analytical Writing | 0 | 0 | 0 |
| 50th Percentile GRE Analytical Writing | 0 | 0 | 0 |
| 25th Percentile GRE Analytical Writing | 0 | 0 | 0 |

## J.D Enrollment as of October 5th 2021

| | JD1 | | | | JD2 | | | | JD3 | | | | JD4 | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | O | T | M | W | O | T | M | W | O | T | M | W | O | T |
| Hispanics of any race | 34 | 9 | 25 | 0 | 20 | 5 | 15 | 0 | 32 | 9 | 23 | 0 | 6 | 1 | 5 | 0 | 92 |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Asian | 1 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 6 |
| Black or African American | 60 | 14 | 46 | 0 | 48 | 10 | 38 | 0 | 86 | 25 | 61 | 0 | 4 | 0 | 4 | 0 | 198 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Two or More Races | 3 | 2 | 1 | 0 | 2 | 0 | 2 | 0 | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 10 |
| Total Minority | 98 | 26 | 72 | 0 | 73 | 17 | 56 | 0 | 125 | 36 | 89 | 0 | 10 | 1 | 9 | 0 | 306 |
| White | 31 | 10 | 21 | 0 | 15 | 9 | 6 | 0 | 53 | 25 | 28 | 0 | 8 | 5 | 3 | 0 | 107 |
| Nonresident Alien | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 |
| Race and Ethnicity Unknown | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Total | 130 | 36 | 94 | 0 | 89 | 26 | 63 | 0 | 178 | 61 | 117 | 0 | 19 | 7 | 12 | 0 | 416 |

## Faculty Resources 2020 - 2021

| | Male | Female | Other | People of Color | Total |
|---|---|---|---|---|---|
| Full-time faculty members | 14 | 19 | 0 | 27 | 33 |
| Non-full-time faculty | 16 | 7 | 0 | 14 | 23 |
| Total | 30 | 26 | 0 | 41 | 56 |

| | Full Time | Part Time | Total |
|---|---|---|---|
| Librarians | 8 | 0 | 8 |
| Administrators | 15 | 0 | 15 |

## J.D. Degrees Awarded 2020-2021

| | |
|---|---|
| Hispanics of any race | 39 |
| American Indian or Alaska Native | 0 |
| Asian | 1 |
| Black or African American | 72 |
| Native Hawaiian or Other Pacific Islander | 1 |
| Two or More Races | 3 |
| Total Minority | 116 |
| White | 37 |
| Nonresident Alien | 1 |
| Race and Ethnicity Unknown | 0 |
| Total | 154 |

## 1L Tuition and Fees 2021 - 2022

| Per Annual: | Resident | Annual Fees | Non-Resident | Annual Fees | Other | Annual Fees |
|---|---|---|---|---|---|---|
| Full-Time | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Part-Time | $ 0 | $ 0 | $ 0 | $ 0 | | |

| Per Credit: | Resident | Annual Fees | Non-Resident | Annual Fees | Other | Annual Fees |
|---|---|---|---|---|---|---|
| Full-Time | $ 456 | $ 13,851 | $ 1,098 | $ 33,112 | $ 0 | $ 0 |
| Part-Time | $ 456 | $ 8,836 | $ 1,098 | $ 21,035 | | |

Tuition Guarantee Program              No

## Grants and Scholarships 2020-2021

| | Total | | Full Time | | Part Time | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total # of students | 472 | 100 | 358 | 76 | 114 | 24 |
| Total # receiving grants | 422 | 89 | 337 | 94 | 85 | 75 |
| Less than 1/2 tuition | 376 | 80 | 300 | 84 | 76 | 67 |
| Half to full tuition | 36 | 8 | 29 | 8 | 7 | 6 |
| Full tuition | 0 | 0 | 0 | 0 | 0 | 0 |
| More than full tuition | 10 | 2 | 8 | 2 | 2 | 2 |
| 75th Percentile grant amount | | | $ 2,213 | | $ 2,213 | |
| 50th Percentile grant amount | | | $ 2,213 | | $ 2,213 | |
| 25th Percentile grant amount | | | $ 713 | | $ 1,500 | |

2

**FLORIDA A&M UNIVERSITY**

SA 16

## Living Expenses 2021-2022

Estimated Living Expenses for singles

| | |
|---|---|
| Living on Campus | $ 0 |
| Living Off Campus | $ 28,644 |
| Living At Home | $ 17,366 |

## Conditional Scholarships 2020-2021

| Students Matriculating in | # Entering with | # Reduced or Eliminated |
|---|---|---|
| 2020-2021 Academic Year | 2 | 1 |
| 2019-2020 Academic Year | 0 | 0 |
| 2018-2019 Academic Year | 0 | 0 |

Please note that due to the COVID-19 pandemic, some schools reduced/eliminated conditional scholarships for the duration of the pandemic.

## Academic Attrition 2020-2021

| | JD1 | | | | | JD2 | | | | JD3 | | | | JD4 | | | | UL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | O | % | T | M | W | O | T | M | W | O | T | M | W | O | % |
| Hispanics of any race | 1 | 1 | 0 | 0 | 5.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Asian | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Black or African American | 7 | 3 | 4 | 0 | 12.3 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.6 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Two or More Races | 1 | 1 | 0 | 0 | 6.7 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2.2 |
| Total Minority | 9 | 5 | 4 | 0 | 9.9 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.8 |
| White | 4 | 3 | 1 | 0 | 19.0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.9 |
| Nonresident Alien | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Race and Ethnicity Unknown | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Total | 13 | 8 | 5 | 0 | 11.6 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.1 |

## Other Attrition 2020-2021

| | JD1 | | | | | JD2 | | | | JD3 | | | | JD4 | | | | UL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | T | M | W | O | % | T | M | W | O | T | M | W | O | T | M | W | O | % |
| Hispanics of any race | 1 | 0 | 1 | 0 | 5.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| American Indian or Alaska Native | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Asian | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Black or African American | 1 | 0 | 1 | 0 | 1.8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Two or More Races | 2 | 2 | 0 | 0 | 13.3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Total Minority | 4 | 2 | 2 | 0 | 4.4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| White | 1 | 1 | 0 | 0 | 4.8 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1.0 |
| Nonresident Alien | 0 | 0 | 0 | 0 | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Race and Ethnicity Unknown | 0 | 0 | 0 | 0 | 0.0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Total | 5 | 3 | 2 | 0 | 4.5 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0.3 |

**FLORIDA A&M UNIVERSITY**

SA 17

| Transfers 2020-2021 | |
|---|---:|
| JD1 Transfers Out | 4 |
| Transfers In* | 2 |
| 75th Percentile JD1 GPA | 0.00 |
| 50th Percentile JD1 GPA | 0.00 |
| 25th Percentile JD1 GPA | 0.00 |
| *GPA Percentiles provided if School has 12 or more transfers in. If more than 5 but less than 12 transfers in only 50th percentile will be provided. | |

4

**FLORIDA A&M UNIVERSITY**

# Ex. B

## FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY COLLEGE OF LAW

## Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure
### *2 credit hours*

## Fall 2021

**COURSE SYLLABUS**

**Professor LeRoy Pernell**                    **leroy.pernell@famu.edu**
**Room   337G**                                **Office Hours: M & W**
**407-254- 4034**                              **4 p.m. – 6 p.m.**

**WELCOME TO ADVANCED TOPICS IN CRIMINAL PROCEDURE: THE ROLE OF RACE IN CRIMINAL PROCEDURE!**

**COURSE DESCRIPTION**

**Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure** is a 2-credit course which addresses the emerging national concern over the unwanted, but often ignored, role of race in American criminal justice. Legal scholars have long noted that race plays a role in how our criminal process works. This course systematically traces the role that race played, at each major stage of the criminal process including the application of Equal Protection and Due Process principles.

**COURSE OBJECTIVES**

At the conclusion of the course, students should have acquired knowledge on the significance that race has played in criminal procedure and the United States Constitutional issues raised.
_____.

**STUDENT LEARNING OUTCOMES**

By the end of this course, you should be able to

- Identify United States Constitutional Issues
-  Understand the civil rights implications of leading criminal procedure doctrine.
- Develop strategies for improving the criminal justice system.
- Be reinforced in the understanding of criminal justice doctrine that may be reflected in bar examinations.

**CLASS SCHEDULE**

Friday 1:00 p.m. – 3:00 p.m.

## REQUIRED MATERIALS

LeRoy Pernell and Omar Saleem,  *CASES AND MATERIALS ON COMBATING RACISM IN CRIMINAL PROCEDURE*, (Vandeplas Publishing 2021) **ISBN:** 978-1-60042-525-7

## TWEN

You must register on TWEN for this class.  Course assignments, notices, schedule changes, etc. will be posted on the TWEN site.  It is the responsibility of each student to regularly check the TWEN site for any changes/modifications to course specifics. The address is http://lawschool.westlaw.com/ then follow the link to TWEN.  Please use a valid famu.edu e-mail address to sign up on the TWEN site.

## CLASS FORMAT

Lecture and Socratic. Significant use of multi-media

## CREDIT HOUR POLICY

This is a 2 credit hour class which complies with the College of Law's Credit Hour Policy as published at the College of Law and in accordance with the American Bar Association Standard 310.

## CLASS ATTENDANCE REQUIREMENTS AND TARDINESS POLICY:

You are enrolled in a professional institution.  Class attendance, participation and punctuality are mandatory.  You are required to attend all class meetings and are to record your attendance daily by signing the attendance roll.  Attendance includes the obligation to arrive on time.  Any student who is late to class will not be allowed to sign the attendance roll and will be considered absent from class.  Questions of "excused" absences or reasons for tardiness will not be entertained.  If you are absent, for whatever reason, you are absent.  If you are not prepared for class on any given day, you are absent for that day.  Please ensure that you read and adhere to the law school's attendance policy, located in the student handbook.  Students who miss more than the allotted number of classes per the student handbook will receive an F and will be automatically dropped from the class.  **It is your responsibility to contact the Associate Dean for Student Services or the Director of Student Affairs during the semester at the earliest time possible if you run into difficulties complying with these standards.**

## EXAMINATIONS AND GRADING SYSTEM

You will have a Final Exam. The final examination given at the end of the semester will determine the remaining 100% of your grade for this course.   The final will be "open book".

This final examination will be 3 hours in length. It will be an essay exam. In addition, there will be formative assessment opportunities provided throughout the semester which are not graded.

The date and time for the final examination will be set by the Dean's office and posted later in the semester.  **Any rescheduling due to conflicts or illness must be done through the Office of the Associate Dean for Academic Affairs and _not_ mentioned to me in order to preserve your anonymity.**

## ACADEMIC HONOR CODE POLICY

Pursuant to the Student Code of Conduct, "[s]tudents at the College of Law are members of both the law school community and the larger University community.  The College of Law adopts as its Honor Code the University's Code of Conduct now and as might be later amended.  As such, the University's Student Code of Conduct shall govern all academic and non-academic misconduct that are not expressly addressed or covered by the College of Law Student Handbook.  All students should review and be knowledgeable about FAMU Regulation 2.012-2.013 University Student Code of Conduct . . ." The University's Academic Honor Policy is located in the FANG Student Handbook, under the Student Code of Conduct- Regulation 2.012 section, beginning on page 55-56.

## POLICY STATEMENT ON NON-DISCRIMINATION

It is the policy of Florida Agricultural and Mechanical University to assure that each member of the University community be permitted to work or attend classes in an environment free from any form of discrimination including race, religion, color, age, disability, sex, marital status, national origin, veteran status and sexual harassment as prohibited by state and federal statutes.  This shall include applicants for admission to the University and employment.

## ADA COMPLIANCE

To comply with the provisions of the Americans with Disabilities Act (ADA), please advise the Office of Student Affairs of any accommodations required to insure participation in this course.  Documentation of disability is required and should be submitted to the Learning Development and Evaluation Center (LDEC).  For additional information please contact the LDEC at (850) 599-3180.

## **OUTLINE AND READING ASSIGNMENTS**

The following pages contain the outline and reading assignments for the course.  Reading assignments are subject to specific direction by the instructor in class, email or by TWEN.

# Advance Topics: Race and Criminal Procedure

Required Casebook : LeRoy Pernell and Omar Saleem, ***Cases and Materials on Racism in Criminal Procedure***, (Vandeplas 2021)

The Presence of Race in the Criminal Justice System Before and after the
Civil War

       Case Book pages 3 - 28

              Dred Scot v. Sanford

              ***The Dredd Scott Decision; Speech by Frederick Douglass***

              ***Armistad*** – In Class Presentation

              United States v. Amy

Race, Criminal Justice and the Fourteenth Amendment

       Casebook pages 29-49

              Brown v. Mississippi

              Powell v. Alabama

              ***Scottsboro: An American Tragedy*** (in class presentation)

*Race and Interrogation*

       *Casebook pages 50-86*

              Brown v. Mississippi (re-visited)

              Chambers v. Florida

              Lyons v. Oklahoma

              Haley v. Ohio

              ***The Central Park Five*** (in class presentation)

              Davis v. North Carolina

              Wright v. Pennsylvania

*Race and the Fourth Amendment*

       *Probable Cause to Seize, casebook pages 87 – 97*

              *Davis v. Mississippi*

              *Whren v. United States*

       *Race and the Determining the Existence of Seizure casebook pages 98 – 111*

              *California v. Hodari*

              *United States v. Mendenhall*

       *Race and Consent to Search, casebook pages 111-117*

              *Bumper v. North Carolina*

              *In Re J.M.*

       *Race and Stop and Frisk casebook pages 118-198*

*Brief for the NAACP in Terry v. Ohio*

*Illinois v. Wardlow*

*Brief for the NAACP in Illinois v. Wardlow*

*Utah v. Strieff, Sotomayor Dissent*

*Floyd v. City of New York*

***Cops expose NYPD's Stop and Frisk Program (part 1)*** (in class presentation)

***Cops expose NYPD's Stop and Frisk Program (part 2) (in*** class presentation)

*Racial Profiling casebook pages 198-228*

*United States v. Brignoni-Ponce*

*United States v. Martinez-Fuerte*

*Maryland State Conference of the NAACP Branches v. Maryland Department of the State Police*

*Kolendar v. Lawson*

***Racial Profiling and Law Enforcement: America in Black and White*** (in class presentation)

*Race and Unreasonable Seizure – the Use of Deadly Force casebook pages 229 – 265*

*Tennessee v. Garner*

*Torres v. Madrid, 592 U.S. ___ (2021)* (TWEN PAGE)

*Graham v. Conner*

*Baxter v. Bracey*

*Race and National Security casebook pages 266 – 279*

*Korematsu v. United States*

*Rasul v. Bush*

***Supreme Court Landmark Case Korematsu v. United States*** (in class presentation)

**Race and the Charging Decision**

*The Decision Not to Prosecute casebook pages 279 – 298*

***A Nation of Law? : Eyes on the Prize Episode 12*** ( in class presentation)

*Inmates of Attica Correctional Facility v. Rockefeller*

*United States v. Cox*

*NAACP v. Levi*

*The Decision to Prosecute: The Selective Prosecution Defense*

 *United States v. Armstrong*

 *United States v. Jackson*

 *United States v. Davis*

 *Yick Wo v. Hopkins*

*Race and the Grand Jury*

*Challenging the Racial Composition of the Grand Jury casebook pages 358 - 393*

 *Strauder v. West Virginia*

 *Cassell v. Texas*

 *Campbell v. Louisiana*

 *Vasquez v. Hillery*

 *Castaneda v. Partida*

*Race and Selection of the Grand Jury Foreperson casebook pages 394-415*

 *Rose v. Mitchell*

 *Hobby v. United States*

*Race and Pretrial Release, casebook pages 418-471*

 *Kinney v. Lenon*

 *United States v. Zarrab*

 *United States . Awadallah*

*Race and Effective Assistance of Counsel casebook pages 472 – 525*

*Public Defender, Eleventh Judicial Circuit of Florida v. Eleventh Judicial Circuit of Florida*

 *Buck v. Davis*

 *Ellis v. Harrison*

 *United States v. Seale*

 ***Murder on a Sunday Morning*** *(in class presentation)*

*Race and Jury Selection casebook pages 526 – 625*

*The Fair Cross Section Requirement*

 *Taylor v. Louisiana*

 *Berghuis v. Smith*

*Holland v. Illinois*

*Challenges for Cause and Peremptory Challenges*

 *Ham v. South Carolina*

 *Tristaino v. Ross*

 *Turner v. Murray*

 *Rosales-Lopez v. United States*

 *Batson v. Kentucky*

 *Powers v. Ohio*

 *Flowers v. Mississippi*

 *United States v. Barber*

*Race and Eyewitness Identification casebook pages 626-693*

 *Constitutional Challenges to Lineups, Showup and Photographic identification*

  *United States v. Jones*

  *State v. Artis*

  *State v. Henderson*

 *Jury Instructions on Cross-Racial Misidentification*

  *State v. Cromedy*

  *Perez v. Glover*

  *United States v. Ingram*

  *State v. Allen*

 *The Use of Expert Testimony on Cross-Racial Misidentification*

  *Brodes v. State*

  *State v. Copeland*

*Prosecutorial Misconduct: Appealing to Jury Racism casebook pages 694-729*

 *People v. Robinson*

 *United States v. Grey*

 *State v. Guthrie*

 *State v. Kirk*

 *United States v. McKendrick*

 *Miller v. North Carolina*

*Race and Jury Misconduct casebook pages 762-802*

*United States v. Benally*

*United States v. Henley*

*Pena-Rodriguez v. Colorado*

*Tharpe v. Sellers*

*Race and Sentencing casebook pages 803-860*

      *Death Penalty*

            *Mccleskey v. Kemp*

            *State v, Loftin*

            *Furman v. Georgia*

            *United States v. Barnes*

      *Disproportionate Sentencing*

            *United States v. Blewett*

            *Dorsey v. United States*

            ***Race on Trial*** *( in class presentation)*

# Ex. C

# Cases and Materials on Combatting Racism in Criminal Procedure

LeRoy Pernell
Professor of Law
Florida Agricultural and Mechanical University
College of Law
Professor Emeritus, Northern Illinois University
College of Law

Omar Saleem
Professor of Law
Florida Agricultural and Mechanical University
College of Law

# Table of Contents

INTRODUCTION ................................................................................................................. 12

**Race and Crime in America** ............................................................................................. **13**

  The Presence of Race in the Criminal Justice System Before and after the Civil War ........................... 13

  Dred Scott v. Sanford ..................................................................................................... 14

  60 U.S. (19 How.) 393 (1857) ......................................................................................... 14

  Note ............................................................................................................................ 21

  United States v. Amy ...................................................................................................... 22

  24 F. Cas. 792 (1859) .................................................................................................... 22

  Daniel John Flanigan, THE CRIMINAL LAW OF SLAVERY AND FREEDOM, 1800-1868, a Thesis Submitted in Partial fulfillment of the Requirements for the Degree of Doctor of Philosophy, Rice University, 1973, Chapter II *From Master to Magistrat*e [ excerpt reprinted by permission of Dr. Daniel John Flanigan, phD] ................................................................................................................. 28

  Note ............................................................................................................................ 47

  Race, Criminal Justice and the Fourteenth Amendment – The Beginnings ............................................ 48

  Brown v. Mississippi ...................................................................................................... 48

  297 U.S. 278 (1936) ...................................................................................................... 48

  Powell v. Alabama ........................................................................................................ 55

  **287 U.S. 45 (1932)** ........................................................................................................ **55**

  Note ............................................................................................................................ 71

**Chapter Two: Race and Confessions** ................................................................................... **74**

  Race, Interrogation, and the Use of Physical Torture and Coercion .................................................... 74

  LeRoy Pernell, *Racial Justice And Federal Habeas Corpus As Postconviction Relief From State Convictions,* 69 MERCER LAW REVIEW 453, 475-477 (2018) (footnotes omitted) (excerpt) ............... 74

  Note ............................................................................................................................ 75

  Race and the Emergence of Psychological Coercion ..................................................................... 78

  Chambers v. Florida ...................................................................................................... 78

  309 U.S. 227 (1940) ...................................................................................................... 78

  Note ............................................................................................................................ 84

  Lyons v. Oklahoma. ....................................................................................................... 85

  322 U.S. 596 (1944) ...................................................................................................... 85

  Note ............................................................................................................................ 90

  Haley v. Ohio. .............................................................................................................. 92

  **332 U.S. 596 (1948)** ........................................................................................................ **92**

Race and Miranda ..................................................................................................... 96

LeRoy Pernell, *Racial Justice and Federal Habeas Corpus As Postconviction Relief From State Convictions*, 69 MERCER LAW REVIEW  453, 478-480 (2018) (excerpt) (footnotes omitted) ............... 96

Race and Coercion After Miranda ................................................................................. 98

Davis v. North Carolina ................................................................................................. 98

**384 U.S. 737 (1966)** ...................................................................................................... 98

Note ............................................................................................................................ 106

Supreme Court of Pennsylvania. ................................................................................. 107

Wright v. Pennsylvania ................................................................................................ 107

November 13, 2008 ...................................................................................................... 107

E.D. Allocatur Docket 2008 ........................................................................................ 107

**Brief for Amicus Curiae** .............................................................................................. 107

(footnotes omitted) ..................................................................................................... 107

**Chapter Three: Race and the Fourth Amendment** ....................................................... 119

Race and Probable Cause to Seize or Arrest for Criminal Activity ............................... 119

Davis v.  Mississippi. .................................................................................................... 119

**394 U.S. 721 (1969)** .................................................................................................... 119

Whren v. United States ................................................................................................ 123

517 U.S. 806 (1996) ..................................................................................................... 123

Note ............................................................................................................................ 131

**The Court in *Whren* states the following:** .................................................................. 131

Race and the Existence of Fourth Amendment Seizure ................................................ 133

California V. Hodari D. ................................................................................................. 133

**499 U.S. 621 (1991)** .................................................................................................... 133

UNITED STATES v.  MENDENHALL. ............................................................................... 138

**446 U.S. 544 (1980)** .................................................................................................... 138

Note ............................................................................................................................ 147

Race and Consent to Search ........................................................................................ 148

Bumper v. State Of North Carolina ............................................................................. 148

391 U.S. 543 (1968) ..................................................................................................... 148

Note ............................................................................................................................ 150

In re J.M. ..................................................................................................................... 150

619 A.2d 497 (D.C. Ct. of App.1992) .......................................................................... 150

Race and Stop and Frisk .................................................................................................................... 156

Supreme Court of the United States. ............................................................................................... 156

SIBRON v. New York ......................................................................................................................... 156

Peters v. New York ........................................................................................................................... 156

Terry v. Ohio ..................................................................................................................................... 156

1967 WL 113672 ............................................................................................................................... 156

Brief for the N.A.A.C.P. Legal Defense and Educational Fund, Inc., as Amicus Curiae ................... 156

Illinois v. Wardlow. .......................................................................................................................... 182

**528 U.S. 119 (2000)** ...................................................................................................................... 182

Supreme Court of the United States ............................................................................................... 186

ILLINOIS v. WARDLOW ..................................................................................................................... 186

No. 98-1036 ....................................................................................................................................... 186

August 9, 1999. ................................................................................................................................. 186

BRIEF FOR THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. AS AMICUS CURIAE IN SUPPORT
OF RESPONDENT .............................................................................................................................. 186

Utah v. Strieff ................................................................................................................................... 196

**136 S.Ct. 2056 (2016)** .................................................................................................................. 196

Floyd v. City Of New York ................................................................................................................ 199

959 F.Supp.2d 540 (S.D. Ny 2013) ................................................................................................... 199

Note .................................................................................................................................................. 251

Challenging Racial Profiling – The Use of Race as Justification for Fourth Amendment Intrusion ....... 251

Note .................................................................................................................................................. 251

United States v. Brignoni-Ponce. .................................................................................................... 252

422 U.S. 873 (1975) .......................................................................................................................... 252

United States v. Martinez-Fuerte ................................................................................................... 259

428 U.S. 543 (1976) .......................................................................................................................... 259

GUIDANCE FOR FEDERAL LAW ENFORCEMENT AGENCIES REGARDING THE USE OF RACE, ETHNICITY,
GENDER, NATIONAL ORIGIN, RELIGION, SEXUAL ORIENTATION, OR GENDER IDENTITY ................... 271

U.S. Department of Justice ............................................................................................................... 271

December 2014 ................................................................................................................................. 271

Combatting the Use of Racial Profiling as Motivation for Intrusion ............................................... 285

Note .................................................................................................................................................. 285

Maryland State Conference of NAACP Branches v. .......................................................................... 285

Maryland Department of State Police, ............................................................................................. 285

3

72 F.Supp.2d 560 (D. Maryland.) ......................................................................................................285

Kolender v. Lawson ...........................................................................................................................291

461 Us 352 (1983) .............................................................................................................................291

Race and Unreasonable Seizure – The Use of Deadly Force................................................................297

Tennessee v. Garner...........................................................................................................................297

471 U.S. 1 (1985)...............................................................................................................................297

THE STATE OF TENNESSEE..................................................................................................................308

v...........................................................................................................................................................308

Cleamtee GARNER, as father and next of kin of Edward Eugene Garner, a deceased minor,
Respondent-Appellee...........................................................................................................................308

October, 1984. ....................................................................................................................................308

**Brief of Amicus Curiae for the Respondent-Appellee** .........................................................................308

Florida Chapter of the National Bar Association, on behalf of The National Bar Association, ............308

Graham V. Connor...............................................................................................................................317

490 U.S. 386 (1989).............................................................................................................................317

Race and "No Knock" Warrants .....................................................................................................325

Note......................................................................................................................................................325

"Black Lives Matter", Police Violence and Proposals for Reform ..........................................................327

History of Police Racial Violence ....................................................................................................327

The Rise of "Black Lives Matter" ....................................................................................................329

Note, The Early History of The Black Lives Matter Movement, And the Implications Thereof, 18 NEV.
L.J. 1091(2018) (excerpt)......................................................................................................................329

Proposals for Police Reform ...............................................................................................................333

Holding Police Civilly Accountable ................................................................................................333

Torres v. Madrid..................................................................................................................................333

769 Fed.Appx. 654 (10th Cir. 2019)......................................................................................................333

Baxter v. Bracey..................................................................................................................................337

590 U.S. ____ (2020) .............................................................................................................................337

Note......................................................................................................................................................342

Race, National Security and the War on Terror ..................................................................................343

Korematsu v. United States..................................................................................................................343

**323 U.S. 214 (1944)**............................................................................................................................343

Rasul v. Bush.......................................................................................................................................348

542 U.S. 466 (2004)............................................................................................................................348

4

**Chapter Four: Race and the Charging Decision** ................................................................................ **358**

The Decision Not to Prosecute .......................................................................................... 358

Inmates of Attica Correctional Facility v. Rockefeller ............................................................ 358

477 F.2d 375 (2d Cir. 1973) ............................................................................................ 358

United States v. Cox ...................................................................................................... 367

342 F.2d 167 (5th Cir. 1965) .......................................................................................... 367

National Association for The Advancement of Colored People v. Levi ................................ 372

418 F.Supp. 1109 (D.C. 1976) ......................................................................................... 372

The Decision to Prosecute: Selective Prosecution Defense ................................................. 382

United States v. Armstrong ............................................................................................ 382

**517 U.S. 456 (1996)** ...................................................................................................... **382**

United States v. Jackson ................................................................................................ 391

2018 WL 748372 (D. NM 2018) ...................................................................................... 391

United States v. Davis .................................................................................................... 411

793 F.3d 712 (7th Cir. 2015) .......................................................................................... 411

Note ............................................................................................................................ 425

United States v. Bass ..................................................................................................... 425

266 F.3d 532 (6th Cir. 2001) .......................................................................................... 425

Note ............................................................................................................................ 434

Yick Wo v. Hopkins ....................................................................................................... 436

118 U.S. 356 (1886) ...................................................................................................... 436

United States v. Clary .................................................................................................... 445

34 F.3d 709 (8th Cir. 1994) ............................................................................................ 445

Note .................................................................................................................................. 451

**Chapter Five: Race and the Grand Jury** ................................................................................... **453**

Challenging the Racial Composition of the Grand Jury ....................................................... 453

Note ............................................................................................................................ 453

Strauder v. West Virginia. .............................................................................................. 453

100 U.S. 303 (1879) ...................................................................................................... 453

Cassell v. Texas. ........................................................................................................... 461

339 U.S. 282 (1950) ...................................................................................................... 461

Note ............................................................................................................................ 464

Campbell v. Louisiana. .................................................................................................. 465

5

523 U.S. 392 (1998).............................................................................................................465

Note...................................................................................................................................472

Sanchez v. State. ..............................................................................................................472

147 Tex.Crim. 436 ( Tex. Ct. App.1944)...........................................................................472

Note...................................................................................................................................478

Vasquez v. Hillery ............................................................................................................479

474 U.S. 254 (1986)...........................................................................................................479

|..........................................................................................................................................479

Note...................................................................................................................................487

Castaneda v. Partida. .......................................................................................................488

430 U.S. 482 (1977)...........................................................................................................488

Race and the Selection of the Foreperson of the Grand Jury ...............................................498

Rose v. Mitchell ...............................................................................................................498

443 U.S. 545 (1979)...........................................................................................................498

Hobby v. United States......................................................................................................517

468 U.S. 339 (1984)...........................................................................................................517

|..........................................................................................................................................517

Race and Prosecutorial Conduct Before the Grand Jury......................................................525

Note...................................................................................................................................525

Chapter Six: Race and Pretrial Release.................................................................................527

Note...................................................................................................................................527

Kinney v. Lenon ...............................................................................................................529

425 F.2d 209 (9th Cir. 1970).............................................................................................529

Preventive Detention: Race and Predictions of Dangerousness............................................532

Note...................................................................................................................................532

United States v. Zarrab .....................................................................................................534

2016 WL 3681423(S.D.N.Y. 2016)....................................................................................534

Note...................................................................................................................................553

United States v. Awadallah ..............................................................................................554

349 F.3d 42 (2nd Cir. 2003) ..............................................................................................554

Chapter Seven: Race and the Effective Assistance of Counsel...............................................593

LeRoy Pernell, Racial Justice and Federal Habeas Corpus as Postconviction Relief from State
Convictions, 69 MERCER LAW REVIEW 453, 459-467 (2018) (excerpt)..................................593

Note..................................................................................................................598

Public Defender, Eleventh Judicial Circuit of Florida v...........................................600

Eleventh Judicial Circuit of Florida .......................................................................600

115 So.3d 261(Fla. 2013)......................................................................................600

Note..................................................................................................................626

Race and Effective Assistance of Counsel ..............................................................627

Buck v. Davis,.....................................................................................................627

137 S.Ct. 759 (2017) ...........................................................................................627

Ellis v. Harrison ..................................................................................................646

91 F.3d 1160 (9th Cir. 2018).................................................................................646

Note..................................................................................................................653

United States v. Seale............................................................................................653

461 F.2d 345 (7th Cir. 1972)..................................................................................653

Chapter Eight: Race and Jury Selection...................................................................661

Note..................................................................................................................661

Race and the Fair Cross-Section Requirement.........................................................661

Taylor v. Louisiana ..............................................................................................661

419 U.S. 522 (1974)..............................................................................................661

Note..................................................................................................................670

Berghuis v. Smith.................................................................................................670

559 U.S. 314 (2010)..............................................................................................670

Note..................................................................................................................682

Race and the Fair Cross-section Requirement: Petit Juries .......................................682

Holland v. Illinois. ...............................................................................................682

493 U.S. 474 (1990)..............................................................................................682

Note..................................................................................................................691

Challenging Juror Selection for Cause and Peremptory Challenges ...........................693

Challenging Potential Jurors for Cause Based on Racial Attitudes ...................693

Note..................................................................................................................693

Ham v. South Carolina..........................................................................................694

409 U.S. 524 (1973)..............................................................................................694

Tristaino v. Ross...................................................................................................700

424 U.S. 589 (1976) .............................................................................................700

Turner v. Murray .................................................................................................704

476 U.S. 28 (1986) .............................................................................................704

Rosales-Lopez v. United States .......................................................................710

451 U.S. 182 (1981) ..........................................................................................710

Race and Peremptory Challenging Jurors During Voir Dire ......................718

Note.....................................................................................................................718

Batson v. Kentucky. ..........................................................................................719

476 U.S. 79 (1986) ............................................................................................719

Powers v. Ohio. .................................................................................................730

499 U.S. 400 (1991) ..........................................................................................730

Note.....................................................................................................................743

Flowers v. Mississippi ......................................................................................745

588 U. S. _____ (2019) | ...................................................................................745

Conducting Voir Dire of Potential Jurors as to Racial Attitudes................769

United States v. Barber .....................................................................................769

80 F.3d 964 (4th Cir. 2019) ...............................................................................769

Note.....................................................................................................................775

**Chapter Nine: Race and Corporeal Identification** ...................................**784**

Note.....................................................................................................................784

Race and Constitutional Challenges to Lineup, Show-up and Photographic Identifications...............784

Note.....................................................................................................................784

United States v. Jones .......................................................................................785

762 F.Supp.2d 270 (D. Mass 2010)..................................................................785

State v.Artis ........................................................................................................787

47 A.3d 419 (App. Ct. Conn. 2012)..................................................................787

Note.....................................................................................................................804

State v. Henderson .............................................................................................804

27 A.3d 872 (N.J. 2011) ....................................................................................804

Note.....................................................................................................................820

Jury Instructions on Cross-Racial Misidentification ....................................821

State v. Cromedy ...............................................................................................821

727 A.2d 457 (N.J. 1999) ..................................................................................821

Note.....................................................................................................................837

Perez v. Glover ................................................................................................838

2012 WI 481122 (D. Nj 2012) .........................................................................838

Note...................................................................................................................841

United States v. Ingram....................................................................................841

600 F.2d 260 (10th Cir. 1979) .........................................................................841

..........................................................................................................................843

State v. Allen .....................................................................................................843

76 Wash.2d 611 (2013) ....................................................................................843

Expert Testimony on Cross-Racial Identification ............................................851

Note...................................................................................................................851

Brodes v. State. .................................................................................................854

250 Ga.App. 323 (2002) ...................................................................................854

Note...................................................................................................................856

**State v. Coley, 32 S.W. 3d 831 (Tenn. 2000), referred to in the ABA Report as holding that expert testimony on the challenges of cross-racial identification was *per se* inadmissible, was overturned in the following case.** ........................................................................856

State v. Copeland. .............................................................................................856

226 S.W.3d 287 (Tenn. 2007)...........................................................................856

Note...................................................................................................................866

**Chapter Ten: Prosecutorial Misconduct and the Appealing to Racial Prejudice** ...............................867

Note...................................................................................................................867

  Opening Statements.........................................................................................869

People v. Robinson............................................................................................869

2019 WI 6693197 ( Colo. 2019).......................................................................869

Note...................................................................................................................876

Cross Examination ............................................................................................876

United States v. Grey ........................................................................................876

422 F.2d 1043 (6th Cir. 1970)...........................................................................876

Note...................................................................................................................878

STATE v. GUTHRIE ..............................................................................................879

194 W.Va. 657 (1995)........................................................................................879

Summation/Closing Arguments .......................................................................888

Note...................................................................................................................888

STATE v.  KIRK...................................................................................................888

157 Idaho 809 (Ct. App.2014) ...................................................................888

Note...................................................................................................896

UNITED STATES v. McKENDRICK ............................................................897

481 F.2d 152 ( 2nd Cir. 1973)...................................................................897

Note...................................................................................................902

Miller, v. North Carolina.........................................................................902

583 F.2d 701 (4th Cir. 1978) ...................................................................902

**Chapter Eleven: Race and Witness Testimony**.............................................**910**

Note...................................................................................................910

United States v. Dow..............................................................................910

Case No. 14,990, Taney, 34 ( Cir. Ct. Md. 1840) .........................................910

Note...................................................................................................915

State v. Monday ...................................................................................916

171 Wash.2d 667 (2011) .........................................................................916

Note...................................................................................................926

McFarland v. SMITH ...............................................................................926

611 F.2d 414 (2nd Cir. 1979)....................................................................926

Note...................................................................................................933

**Chapter Twelve: Race and Change of Venue** .............................................**934**

Note...................................................................................................934

Lozano v. State ....................................................................................936

584 So.2d 19 (3rd Dist. Ct. App. 1991) .......................................................936

Note...................................................................................................939

Mallett v. State....................................................................................939

769 S.W.2d 77 (Mo. 1989) .......................................................................939

**Chapter Thirteen: Race and Jury Misconduct During Deliberations**.....................**949**

Note...................................................................................................949

United States v. Benally .........................................................................950

546 F.3d 1230 (10th Cir. 2008)..................................................................950

UNITED STATES v. HENLEY .....................................................................963

238 F.3d 1111 (9th Cir. 2001)....................................................................963

Note...................................................................................................978

Peña–Rodriguez v. Colorado. ...................................................................979

137 S.Ct. 855 (2017) ..................................................................................... 979

Note ............................................................................................................. 994

Tharpe v. Sellers ......................................................................................... 994

138 S.Ct. 545 (2018) .................................................................................... 994

Chapter Fourteen: Race and Sentencing ..................................................... 997

Race, Eight Amendment, Equal Protection and the Death Penalty ........... 997

Note ............................................................................................................. 997

Mccleskey v. Kemp ...................................................................................... 998

**481 U.S. 279 (1987)** ................................................................................... 998

State v. Loftin .............................................................................................. 1028

146 N.J. 295 (1996) ..................................................................................... 1028

Note ............................................................................................................. 1032

Furman v. Georgia. ...................................................................................... 1032

408 U.S. 238 (1972) ..................................................................................... 1032

United States v. Barnes ............................................................................... 1036

532 F.Supp.2d 625 ( S.D. NY 2008) ............................................................ 1036

Note ............................................................................................................. 1040

Race and Disproportionate Sentencing in Drug Cases ............................... 1042

United States v. Blewett ............................................................................. 1042

Brief of Amicus Curiae NAACP Legal Defense & Educational Fund, Inc. in Support of Defendants-Appellants 2013 WL 5304321 (6th Cir. 2013) ............................................... 1042

Dorsey v. United States ............................................................................... 1051

576 U.S. 260 (2012) ..................................................................................... 1051

SA 42

# Cases and Materials on Combatting Racism in Criminal Procedure

### LeRoy Pernell

### Omar Saleem

INTRODUCTION

**Most text implicitly foster a disconnect between the history of the significance of race in American society and the implementation and the development of modern, constitution-based criminal procedure**

**While brilliant work has been done on the impact of race on specific stages of the criminal process, such as jury selection and racial profiling, this work looks at the casual and pervasive impact of what W.E. B. Dubois termed as ( the "color line")the most significant problem of the twentieth century.**

**Racism and criminal procedure did not develop along two separate paths that occasionally crossed each other, but instead grew intertwined as a cause and effect that is only now seeing the full light of day.**

**As an organizational framework for this book it will first look at the functioning of the criminal justice system as part of American Slavery and race-based suppression.  From there we will look at how race during reconstruction , the criminal justice implementation of Black Code "Jim Crow" laws, lynching, race-based terrorism, prior and during the civil rights movement, and finally, as context and prelude to an examination  of due process implications of specific stages of criminal process and the current challenges of mass incarceration.**

**Along the way and as appropriate discussion of issues of race and criminal procedure will expand beyond the pervasive issue of racial treatment of African Americans to include the significance of race in the criminal process**

13-2

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

     *Plaintiffs*,

v.

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et
al.,

     *Defendants*.

Case No.: 4:22-cv-304

## DECLARATION OF DANA THOMPSON DORSEY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Dana Thompson Dorsey, hereby declare and state as follows:

**A. Background**

1.  My name is Dana Thompson Dorsey. I am over 18 years of age.

2.  I have personal knowledge of the following facts and if called to testify could and would competently do so.

3.  I currently serve as an Associate Professor of Educational Leadership and Policy Studies, with tenure, at the University of South Florida (USF).

4.  I have nearly 15 years of professional experience in higher education. My work focuses on education law and policy, specifically, examining local, state, and federal laws and their impact on minoritized students and communities from pre-kindergarten to graduate school. Generally, my work is centered in

racial equity, but I also consider the law's impact on people that identify as LGBTQ+ and disabled.

5. Higher education has played a pivotal role in both my professional and personal development. I earned a Bachelor in Science degree in Accounting from Lincoln University of Pennsylvania, *cum laude,* and a *Juris Doctorate* from the University of Pittsburgh School of Law.

6. After graduating law school in 1999, I worked as an attorney for two civil defense litigation law firms in Pittsburgh until 2002, concentrating on employment discrimination and products liability.

7. From 2002 until 2004, I also had a private law practice focused on civil rights litigation in which I represented local members of my church in landlord-tenant disputes and students with disabilities in primary and secondary (K-12) schools.

8. I went back to school in 2003 to pursue a PhD in Education from the University of Pittsburgh School of Education, specializing in Social and Comparative Analysis in Education and Policy Studies.

9. During my doctoral program, from 2004 to 2006, I worked part-time for COSMOS Corporation as an evaluation consultant for the National Gang-Free Schools Project. From 2006 until 2008, I began working full-time for COSMOS Corporation as a Senior Research Analyst, conducting policy

research and evaluation related to pre-kindergarten to undergraduate education reform, and juvenile and criminal justice policy issues.

10. In 2007, I received my PhD in Education with a specialization in social and comparative analysis in education and policy studies.

11. In 2008, I left COSMOS Corporation and became the Director of Research and Consulting at the University of Virginia's National Center for Women and Information Technology.  I held this position until 2009.

12. From 2009 to 2010, I served as an Assistant Professor of Education Law and Leadership at the University of Illinois, Springfield.

13. Starting in 2010, I served as an Assistant Professor in the Department of Educational Leadership and Policy at the University of North Carolina at Chapel Hill (UNC Chapel Hill) for seven years.

14. In 2017, I became an Associate Professor at the University of Pittsburgh, with tenure, and served as the Associate Director of Research and Development for the Center for Urban Education until late 2020.

15. From 2020 to 2022, I served as the Endowed Chair and Director of the David C. Anchin Center for the Advancement of Teaching at USF. I was specifically recruited to USF by former Dean Robert Knoeppel to serve as the Director of the Anchin Center and an Associate Professor because of my research focus area and prior experience running a center.

3

16. Throughout my academic career, I have also designed and conducted K-12 professional development programming for school districts and other organizations on racial equity, cultural bias, and culturally proficient policies and practices. I have worked with school districts and organizations in Durham, North Carolina, Chapel Hill, North Carolina, Pittsburgh, Pennsylvania, and Dallas, Texas.

17. In addition to this programming, I provide consulting services and deliver lectures on equity in K-12 schools.

18. Deemed one of National Public Radio's experts on racial equity and education law in 2015, I have been featured on local and national shows discussing race-based admissions, and school segregation and desegregation.

19. I am the inaugural chair of the Diversity, Equity, and Inclusion (DEI) Committee for the Florida Association of Professors of Educational Leadership (FAPEL). This FAPEL committee was recently established to consider approaches to equity in higher education and educational leadership. As chair, I worked with the other committee members to develop the committee's vision and mission. Prior to serving as chair, I spoke in FAPEL's Courageous Conversation series about recent developments in Florida's education law and policies.

20. I have received grant funding from the Spencer, Wallace, and Gates Foundations for my research.

21. In 2015, I received a Spencer Foundation grant to research the intersection of students' rural and racial identities in school districts in Alabama that were not subject to desegregation.

22. In 2018, the Gates Foundation awarded me and several colleagues at the University of Pittsburgh a five-year grant to work with the Dallas Independent School District (DISD) to develop K-12 equity programming specifically for English Language Arts (ELA) and writing. I still currently work with DISD as part of the Gates Foundation grant as a research consultant for the University of Pittsburgh.

23. Recently, two of my colleagues from other universities and I were awarded a 27-month grant from the Wallace Foundation. We are developing and validating a survey to identify future school building leaders and their beliefs about equity, with a focus on racial equity, in education.

24. I have also served as a member of the Bill and Melinda Gates Foundation's Continuous Improvement for Equity Design Team.

## B. My Current Course Offerings

25. I have taught courses at both the undergraduate and graduate levels. In the fall and spring semesters of the 2022—23 school year, I will be teaching School

Law. Additionally, in the spring semester, I will be teaching Critical Race Studies: Research, Policy, and Praxis (Critical Race Studies).

26. School Law is a required graduate level course in USF's College of Education for students pursuing a Master of Education degree specializing in Educational Leadership. In this course, students review court decisions affecting American education with an emphasis on US and state constitutional provisions and Florida state statutes.

27. I also taught School Law in the Summer 2022 term at USF. Prior to teaching at USF, I also taught versions of this course at UNC Chapel Hill and the University of Pittsburgh.

28. Critical Race Studies is an elective course for USF doctoral students at USF that focuses on the development of critical race theory and other race-conscious research frameworks; their treatment of race, racism, and racial justice and injustice; and their contributions to education policy, practice, and leadership praxis. This course will allow students to examine the frameworks as analytical frameworks that provide race-based epistemological, methodological, and pedagogical approaches to the study of everyday inequities in society with a particular emphasis on education policy and practice.

29. I taught Critical Race Studies in the Fall 2021 term. I was asked to create the course while I was teaching at UNC Chapel Hill in 2013. The original course at UNC was titled Critical Race Theory: History, Research and Practice in Education. I also taught it at the University of Pittsburgh.

30. Students in my courses, especially my Critical Race Studies course, frequently bring up questions about race, gender, and sexual orientation. Students are astounded at the way the course encourages them to think about the world around them.

**C. My Research**

31. My research examines education laws, policies and practices, and how they shape educational equity, access, and opportunities for minoritized and underserved populations in various educational contexts. I focus primarily on issues related to school segregation, school discipline and the school-to-prison pipeline, race-based admissions policies in higher education, school choice policies, as well as implicit bias and culturally responsive school policies and practices.

32. I have written various journal articles, including: *From Desegregation to Privatization: A Critical Race Policy Analysis of School Choice and Equal Educational Opportunity in North Carolina*; *Stereotypes, Images, and Discriminatory Action: The White Racial Frame in the Practice of School*

*Leadership*; *Working the Intersections of Interest Convergence and Whiteness as Property in the Affirmative Action Legal Debate*; and *An Examination of the Legal Debate Regarding Race-Based Education Policies from 1849-1964.*

33. My research has been quoted in the *New York Times*, and my articles have been published in research journals such as *Educational Administration Quarterly*; *Educational Policy*; *Race, Ethnicity and Education*; *Education and Urban Society*; and *Teachers College Record*.

**D. The Interaction Between the Stop W.O.K.E. Act[1] and the Content of My Courses**

34. On April 22, 2022, Governor Ron DeSantis signed the Stop W.O.K.E. Act (also known as House Bill 7 or Individual Freedom Act) into law. This law amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

35. It is my understanding that the Stop W.O.K.E. Act was enacted to stop DEI teachings and trainings in K-12 and higher education. It prevents instructors from asserting that the United States is inherently racist or that one race or sex is better than another. It bans topics that make people feel discomfort when instructors are teaching or providing trainings. It also requires that all teaching in higher education must be done from only an "objective" perspective.

---

[1] Ch. 2022-72, Laws of Fla.

8

36. The experiences of women and people of color are often left out of discourse on education. I strongly believe that students should see themselves and their viewpoints reflected in the course materials, assignments, texts, and faculty. Traditionally, Black and Brown perspectives are largely excluded so I intentionally include them in my courses. The Stop W.O.K.E. Act limits my ability to introduce diverse perspectives in both classroom discussion and course curricula, as related to topics of race, gender, gender identity, and sexual orientation.

37. However, there are many educational and societal benefits to learning about issues from different lived experiences and viewpoints. As an instructor, I do not limit or restrict students' viewpoints during class because I know that students come into college from different backgrounds and lived experiences.

38. I believe that higher education should be a place where students can openly share and discuss what they think. The concepts prohibited by the Stop W.O.K.E. Act prevent higher education students from learning about different perspectives and lived experiences.

39. The Stop W.O.K.E. Act takes away the opportunity for students to interact with and discover new and different viewpoints in higher education, including those disfavored by government. Students are prohibited from expressing certain viewpoints that are at odds with the dominant perspective. When

9

students and instructors are prohibited from sharing different lived experiences and viewpoints, we risk making the same discriminatory mistakes that have been made in the past.

40. The Stop W.O.K.E. Act will prohibit certain topics in higher education, which will lead to more than a generation of undereducated American citizens; it will lead to generations of uneducated American citizens.

**E. How the Stop W.O.K.E. Act Will Impact My Teaching and My Courses**

41. The Stop W.O.K.E. Act impacts my ability to teach School Law and Critical Race Studies because the courses and my research are directly related to topics prohibited by the Act. My School Law and Critical Race Studies courses build upon the understanding that racism is deeply embedded in American society, including in institutions like education, a position widely accepted and supported by research in my field.  In Critical Race Studies, I am not able to meet the standards my discipline requires without teaching this foundation.

42. I am concerned that I cannot discuss Critical Race Theory at all, which is a foundational and necessary topic that students must understand in Critical Race Studies. Critical Race Theory is foundational for students to understand theories of anti-Blackness, intersectionality, institutional racism, white supremacy, and colorblindness. I believe that it is important for students to receive content related to these topics because we must teach a new generation

about historical shortcomings as related to minoritized communities if we do not want to repeat our past mistakes in this country. It is not my role to tell students what to think, but it is imperative that students have the ability to think and talk through concepts that are disfavored by the state legislature.

43. Moreover, as a scholar of critical race studies, I have written articles that have contributed to the field's growing body of work. I assign two of these articles in my Critical Race Studies course, *Growing C-D-R (Cedar): Working the intersections of interest convergence and whiteness as property in the affirmative action legal debate* and *From Desegregation to Privatization: A Critical Race Policy Analysis of School Choice and Educational Opportunity in North Carolina*. These articles do not comport with the Stop W.O.K.E. Act because they discuss concepts related to white privilege and denounce the concept of colorblindness. It is difficult for a student to conclude that I do not endorse the material in these articles when I authored them.

44. In both of these courses, students read case law and law review articles. Students must understand precedent and *stare decisis*. To fully understand and critically analyze the law, students need to discuss racial equity, theories of school segregation, and the rights of students and teachers. For example, students need to be able to discuss the context and implications of such cases

11

as *Brown v. Board of Education* and *Plessy v. Ferguson*. I cannot facilitate those discussions without addressing the existence of white supremacy.

45.  In School Law, I teach students how to recognize and counter manifestations of racism in schools. I cannot continue to identify systemic racism and sexism in schools, and train students to do the same, if I censor the concepts listed in the Stop W.O.K.E. Act.

46.  Students enrolled in School Law will become school district and building leaders. They must recognize and discuss issues within their schools, such as racial and gender inequities in school funding, school and student assignments, school discipline, special education, Title IX, and student searches. They will not be able to identify or address due process issues or the current manifestations of discriminatory policies and practices in schools without instruction.

47.  Students enroll in Critical Race Studies to learn more about tenets of critical race theory and other racial frameworks used in research that are prohibited by the Stop W.O.K.E. Act. Students are expected to have a basic understanding of Critical Race Theory and other race-conscious frameworks, as theoretical frameworks, as well as their utility, limitations, and application in research, policy and practice.

12

48. We explore the historical development of Critical Race Theory through the more recent frameworks, such as Latino and Latina Critical Legal Theory (LatCrit), Asian Critical Theory (AsianCrit), Queer Critical Theory (QueerCrit), Tribal Critical Race Theory (TribalCrit) and Critical Race Feminism.  I teach the origins of Critical Race Theory and how it addresses issues such as race, racism, and power in our country.

49. Through instruction, assigned readings, and classroom discussion, I show how Critical Race Theory is a useful lens for analyzing systemic inequality in law, policy, and the world around us.

50. In the Summer 2022 term, I received many questions from School Law students concerned about the parameters of the Stop W.O.K.E. Act and the impact it will have on our course curriculum. Students were also concerned about the impact it will have on teaching in K-12 classrooms, particularly related to history, social studies, and civics lessons.

51. The Stop W.O.K.E. Act will cause me to self-censor when discussing topics that relate to or implicate a prohibited concept or risk violating the law.

52. As a result of the Stop W.O.K.E. Act, professors that teach prohibited topics will be forced to water down their courses or to not teach them at all. I believe that this will negatively impact students because they will lose the opportunity to be exposed to different viewpoints. I believe that students need to be

exposed to our country's troubling history of racism and not recognizing color, in a world where color matters a great deal. Colorblindness ignores the subjugation of people of color and is harmful, often a matter of life and death for minoritized groups.

53. Instructors are afraid and concerned about their academic freedom, which is a fear that I have not encountered in my nearly 15 years in higher education.

54. I have had discussions with school leaders and educators about the stress we are all under because of the Stop W.O.K.E. Act. Even before the law was enacted, I know of educators that lost their jobs or that had been demoted because they used certain materials or held open-discussions related to critical race studies. I fear other instructors in my field will be targeted.

55. Now that the Stop W.O.K.E. Act has been enacted, administrators that do not support racial and gender equity efforts will be emboldened to push out faculty that teach and conduct research on such topics.

56. I fear that the Stop W.O.K.E. Act will negatively impact tenure and promotion decisions, primarily harming instructors that conduct race-based research and teach race-based courses, at higher education institutions across the state.

57. As a tenured Associate Professor, I am concerned that the Stop W.O.K.E. Act will negatively impact my post-tenure review and my ability to be promoted

to full professor if I am perceived not to comply with the state law. I plan to pursue promotion next year.

58. Although research has shown that women and instructors of color tend to receive lower evaluations when teaching divisive concepts, I have received positive course evaluations and formed long-lasting relationships with my students over the years. I now fear students not interested in the course concepts will enroll in my courses merely to surveil my teaching and to file a complaint with the university administration.

59. Since I have been a vocal opponent of the Stop W.O.K.E. Act and other measures designed to limit discussions of racism that have been passed in Florida, I fear that complaints about my instruction will not be independently or fairly reviewed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on August 21, 2022.

_____

Dana Thompson Dorsey

15

13-3

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| LEROY PERNELL, DANA THOMPSON DORSEY, SHARON AUSTIN, SHELLEY PARK, JENNIFER SANDOVAL, RUSSELL ALMOND, MARVIN DUNN, and JOHANA DAUPHIN, *Plaintiffs*, <br><br> v. <br><br> FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, BRIAN LAMB, ERIC SILAGY, TIMOTHY M. CERIO, RICHARD CORCORAN, AUBREY EDGE, PATRICIA FROST, NIMNA GABADAGE, EDWARD HADDOCK, KEN JONES, LUCCIO JORDAN, ALAN LEVINE, CHARLES H. LYDECKER, CRAIG MATEER, STEVEN M. SCOTT, WILLIAM SELF, AND KENT STERMON, in their official capacities as members of the Florida Board of Governors of the State University System, MANNY DIAZ JR., in his official capacity as the Commissioner of the Florida State Board of Education, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES, FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES, FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES, FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, and UNIVERSITY OF CENTRAL FLORIDA BOARD OF | Case No.: 4:22-cv- 304_____ |

1

TRUSTEES,
     *Defendants*.

### DECLARATION OF SHARON AUSTIN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Sharon Austin, hereby declare and state as follows:

**A. Background**

1. My name is Sharon Austin. I am over 18 years of age, and identify as a Black woman.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as a Professor of Political Science, with tenure, at the University of Florida (UF). I have been a professor at UF since 2001.

4. I have 30 years of professional experience in higher education. My teaching focuses on American politics. I also teach courses in African American politics, minority politics, American government, public law, and public policy.

5. My research focuses on African-American women's political behavior, African-American mayoral elections, rural African-American political activism, and African-American political behavior.

6. My interest in these areas was influenced by my upbringing in Memphis, Tennessee. I am the daughter of Mississippi Delta sharecroppers who later

moved to the city and worked in factories. I heard my parents, neighbors, and grandparents discuss race relations in the rural South because they all came from the same backgrounds. These conversations encouraged me to dedicate my career to studying race.

7. I received a bachelor's degree in History with a minor in Political Science from Christian Brothers University in Memphis, Tennessee. I received a master's degree in Political Science with a minor in Education from the University of Memphis. I received a PhD in Political Science from the University of Tennessee at Knoxville.

8. While earning my doctorate, I started working as an Assistant Professor of Pan African Studies at the University of Louisville in Kentucky from 1992 until 1995.

9. I served as an Assistant Professor of Political Science and Black Studies starting in fall 1995, for five years at the University of Missouri Columbia. Starting in the summer of 2000, I was promoted to Associate Professor of Political Science and Black Studies. I stayed in this position until 2002.

10. From 2000 until 2001, I also served as a Visiting Scholar of Political Science at the University of Michigan at Ann Arbor while on an unpaid leave from Missouri.

11. During the summer of 2002, I served as an Associate Professor of American Government in the Junior Statesman Program at Yale University.

12. From fall 2001 until fall 2004, I served as a Visiting Associate Professor at the University of Florida. From 2004 until 2018, I served as an Associate Professor, receiving tenure in 2007. Since 2018, I have served as a Professor of Political Science.

13. Starting in 2011 until 2012, I served as the Interim Director of the African American Studies Program at UF. From 2012 until 2019, I served as the Director of the African American Studies Program.

14. I have authored several publications including *Race, Power, and Political Emergence in Memphis*; *The Transformation of Plantation Politics in the Mississippi Delta: Black Politics, Concentrated Poverty, and Social Capital in the Mississippi Delta*; and *The Caribbeanization of Black Politics: Race, Group Consciousness, and Political Participation in America*.

15. I have also published articles in the *National Political Science Review*, *Political Research Quarterly*, *Social Science Quarterly*, the *Journal of Black Studies*, and *Politics and Policy*, as well as several book chapters.

16. I have two forthcoming books, *Political Black Girl Magic: The Elections and Governance of Black Female Mayors* and *Beyond Racial Capitalism: Cooperatives in the African Diaspora*, that will be published next year.

17. I have been a member of the American Political Science Association (APSA) since 1992. I am a member of the 2020—2024 term Editorial Team for the *American Political Science Review* which is the most prestigious journal in the political science discipline. Beginning in December 2022, I will be the first African American lead editor of this journal which was founded in 1906.

18. I have been selected as a University Term Professor at UF for the 2018—2021 and 2021—2024 terms, for excellence in scholarship, teaching, and service.

19. In December 2021, I received the Science Defender Award from the Union of Concerned Scientists.

20. I was inducted into the Edward A. Bouchet Graduate Honor Society's UF Chapter on February 8, 2021 because of my scholarship, leadership, character, service, and advocacy on behalf of under-represented graduate students.

21. In January 2022, I received the David King Defender of Democracy Award from the League of Women Voters of Florida.

22. In April 2022, the Office of Graduate Diversity Initiatives selected me as a Graduate Education Diversity Champion for 2021-22. This award recognizes faculty members who have enhanced and contributed to the overall graduate environment by actively and positively promoting the concept of diversity and improving cross-cultural understanding and inclusivity in the university environment.

23. I was the 2010—2011 Colonel Allen R. and Margaret G. Crow Term Professor of Liberal Arts and Sciences for excellence in scholarship, teaching, and service at UF.

24. In 2008, I received a Best Paper on Blacks and Politics award for my paper *Black Group Consciousness in South Florida*, presented at the Annual Meeting of the Western Political Science Association.

25. I have received several grants for my work in the African American Studies Program at UF. I received a *Support for Workshops and Speaker Series in the Humanities* grant from the Center for the Humanities and Public Sphere in February 2012, March 2015, and February 2016. These grants funded the *Education and Identity of African American Men* workshop in February 2013, the *Legacy and Influence of President Barack Hussein Obama* workshop in February 2016, and the *Black Women in the Academy* workshop in February 2017 at the University of Florida. I also received *Civil Debate Wall* grant from the Bob Graham Center for Public Service in July 2012, which funded an online discussion of African American views about same-sex marriage.

26. I have also received grants for my research and teaching, including a University of Florida Racial Justice Grant to conduct research on Black faculty recruitment and retention, and the university's ties to slavery in 2020; a University of Florida Department of Political Science grant to conduct

6

research on *Racial Group Consciousness and the Haitian Immigrant Quest for Political Incorporation* in 2010; a University of Florida Graham Center Case Study grant to conduct research on *Taking Back the Land: The Battle of Liberty City's Resident against Gentrification* in 2009; a University of Florida Graham Center grant to develop a Latino Politics and Policy course in 2008; a University of Florida Department of Political Science grant to conduct research on *Concentrated Poverty, Social Isolation, and Political Participation in the Southern Black Belt* in 2006; and a University of Florida College of Liberal Arts and Sciences Humanities Enhancement grant to conduct research on *Concentrated Poverty, Social Isolation, and Political Participation in the Southern Black Belt* in 2005.

27. In the Fall 2022 term, I will teach a "Quest 1" course, Politics of Race at UF, and Urban Politics. Quest courses are required for UF's general education curriculum and are designed to contribute to students' intellectual and personal growth. Politics of Race is a multi-disciplinary online course that examines the historical exclusion of Black, Hispanic/Latinx, Asian, international and other students of color from UF and the hostile and unwelcoming environment these students experienced after the University desegregated. We cover topics including, but not limited to, free speech,

7

political correctness, affirmative action, the intersection of on-campus Greek life and racism, and religious discrimination.

28. Students discuss race relations in both the past and present by examining the theories and methodologies in research articles and books. Students also complete an experiential oral history activity, and receive information about current campus units that conduct research on racial issues.

29. I was asked by the Provost's Office to put the Politics of Race course together after the death of George Floyd in 2020 and the political unrest that later ensued. I received a Quest grant to put a course together and created this Politics of Race at UF class.

30. Urban Politics has undergraduate and graduate sections. It examines several political and public policy issues in urban cities such as downtown development, environmental justice, gentrification and urban housing issues, immigration, mayoral elections and governance, political incorporation theories, the city/suburbanization divide, the politics of urban education, urban policing, and urban revitalization efforts. For this course, students use a book I wrote, *The Caribbeanization of Black Politics: Race, Group Consciousness, and Political Participation in America*, and two other books that include chapters that I wrote.

31. In the Spring 2023 term I will teach a "Quest 2" course that I developed over the summer, Black Horror and Social Justice, for the first time and an African American Politics and Policy course (that has both undergraduate and graduate sections). Quest 2 courses are interdisciplinary courses that allow students to examine important societal issues and debate possible solutions to them. Black Horror and Social Justice is an online course. The course will examine Black horror films and the manner in which filmmakers and scholars have used them to advocate for social justice, civil rights, and political issues. We will review films from the past and present, starting with the 1915 *Birth of Nation* film, through modern day films, such as *Get Out*. We will discuss racial stereotypes, the exploitation of Black actors, and the social justice themes in the context of the civil rights and racial justice movements.

32. African American Politics and Policy examines the political behavior of African Americans in the United States from the era of disfranchisement to the current era, including the election of the first Black president. We start the course with a discussion of the denial of "universal freedom" to African Americans during the 1800s and move on to discuss the civil rights and political gains African Americans experienced during the modern civil rights and black power movements in both the Democratic and Republican parties. This course compares and contrasts the events of the current justice and

political movements to those of the past.  We discuss topics such as police brutality against Black people, the Black Lives Matter Movement, gender harassment in Black social justice movements, and violence and discrimination in the #MeToo Movement. I have taught this course almost every year since I have been a professor at UF.

**The Interaction Between House Bill 7 (H.B. 7)[1] and the Content of My Courses**

33. On April 22, 2022, Governor Ron DeSantis signed H.B. 7 into law. This law amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

34. I believe the Stop W.O.K.E. Act is intended to stop discussions of racism. I understand this to mean that instructors teaching courses that discuss race can't provide examples that affect the sensibilities of certain students or make them feel uncomfortable.

35. In all of my courses, we discuss concepts of racial and gender superiority, intersectionality, unconscious bias, privilege and oppression, color blindness, affirmative action, and institutional and systemic racism in the United States.

36. In my African American Politics and Policy course, we discuss deracialization theory, the racist components of American feminism, political incorporation

---

[1] Ch. 2022-72, Laws of Fla.

10

theory, the connections between racism and partisanship, gentrification, reparations theory, racial micro-aggressions, and sexism.

37. These concepts are necessary because many students are not aware of issues related to these concepts, such as Jim Crow or state-sanctioned racial segregation. As an educator, I do not assume that students have previously learned about these concepts. In my experience, most of them have not been exposed to racial theories or African American history and politics.

38. Students that take courses related to race issues, take such courses because they want to learn more since they likely have not previously received instruction on these topics. It is my experience that students want to be taught about these concepts. At UF, most of the students that take my courses are White students and they are enrolling because they want to learn more.

39. These concepts are also appropriate within my field of Political Science because they involve academic research that needs to be done to further the field. I believe that society should not ban these topics, but welcome them and any other novel interdisciplinary theories, as well as the scholars doing the research. These concepts will encourage individuals to participate in important discussions about the role of race in American politics. As a result, they will have a greater understanding of the political conflicts that occur among citizens and among elected officials.

## C. How HB 7 Will Impact My Teaching and My Courses

40. The Stop W.O.K.E. Act impacts my ability to teach all of my courses because they involve teachings and discussion of viewpoints disfavored by the legislature. I will no longer be able to use CRT as theoretical framework in my courses because I cannot maintain this pedagogical approach and not endorse Critical Race Theory as an appropriate lens. In using CRT as a framework, I have, for example, discussed the idea that people of different races carry different unconscious biases; that white people carry certain privileges that Black and Latino people do not; and that racial "colorblindness" can be a tool to oppress people of color. Discussing all of these ideas could be seen as endorsing viewpoints that are now prohibited due to the Stop W.O.K.E. Act.

41. Moreover, many of the authors and articles that I assign in my courses endorse concepts that could be prohibited under the Stop W.O.K.E Act, such as Ibram Kendi, Derrick Bell and Toni Morrison, because they include discussions, for example, that argue that African Americans have been treated in an inferior manner since the institution of slavery began, and they continue to be subjected to, and disadvantaged by, American racism.  According to Bell's work on Critical Race Theory, racism is the norm in America because it provides advantages to whites and disadvantages to Blacks. Bell also coined

12

the term "interest convergence" to argue that the interests of Black Americans only are promoted when they align with those of whites. For example, some White Americans supported desegregation, not because of a moral obligation, but because of America's negative image abroad during the Cold War. American hypocrisy was exposed because they advocated for freedom and democracy abroad while at the same time enforcing a separate but equal society at home. Civil rights advancements finally occurred because of America's desire to improve its image abroad.

42. I make it clear to my students that their grades are not based on their opinions, but on their abilities to analyze the readings to support their opinions. While some students agree with the authors and theories, others disagree and I have no problem with it.

43. Finally, my plan to assign the film *Beloved* in my Black Horror and Social Justice class during the spring 2023 semester, may lead to accusations that I am in violation of this law. *Beloved* is based on the 1988 Pulitzer Prize-winning book of the same title by Toni Morrison. In this book, and in the film, Morrison depicts the atrocities and realities of American slavery, including one slave mother's murder of her daughter so that she would not be enslaved. I also may no longer be able to use the text *Blackballed: The Black and White Politics of Race on America's Campuses* because it endorses concepts

13

SA 75

prohibited under the Stop W.O.K.E. Act, such as white privilege, institutional racism at predominantly white colleges, and advocates for affirmative action to ensure campus diversity.

44. The Stop W.O.K.E. Act therefore forces me to self-censor when discussing topics that relate to or implicate a prohibited concept. If I do not engage in this self-censorship, I will be accused of breaking the law. I believe that I no longer have the academic freedom to teach classes my way, using materials and curriculum that I believe are best for my courses.

45. I believe that the Stop W.O.K.E. Act will negatively affect internal funding to professors and departments that teach viewpoints disfavored by the Florida Legislature, including systemic racism and sexism.

46. I also believe that the Stop W.O.K.E. Act will impact professor recruitment and retention. I believe that instructors that teach courses that include the prohibited concepts will leave Florida universities and it will be difficult to recruit new professors. Instructors will not want to come to Florida because they face possibility of being sued. Young, untenured professors have more to worry about because they could potentially lose their jobs if a person doesn't like a theory or book they used in class. Additionally, instructors are no longer able to teach the courses they want in the ways they want under the Stop W.O.K.E. Act.

47. Students in my courses bring up questions about race, gender, sexual orientation on a frequent basis. I guide student-led discussion on these topics to get them to think and debate. I believe that the Stop W.O.K.E. Act will prevent students from hearing the truth about racism. I believe the Act will negatively impact the quality of education that students receive because they are prohibited from being exposed to viewpoints disfavored by the state legislature. It will also encourage students to challenge professors who use readings and other materials that include prohibited discussions about race. Students will now be able to demand that certain materials and discussions be omitted from courses if they are made to feel uncomfortable. When in reality, American historical, civil rights, and political issues have never made Americans feel comfortable. Unfortunately, "Black history is Black horror" and students need to understand that from the lens of theories (like Critical Race Theory and others) that examine Black history and politics. This is one of the themes of my upcoming Black Horror and Social Justice Quest 2 course.

48. I believe that the Stop W.O.K.E. Act will cause many students to lose respect for university instructors if they have to change their course content or decide not to teach certain topics or courses. I believe that the Stop W.O.K.E. Act is unnecessary because students that are unhappy with their courses or

professors already have the ability to complain in several ways if they feel uncomfortable or discriminated against.

49. I also believe that recruitment of Black students and other students of color will be more difficult under the Stop W.O.K.E. Act because they perceive Black professors as role models and look to them to discuss and understand historic wrongs that have been committed against Black people. Currently, UF does not have very many Black students, only about 6% of the total student population.

50. Black students will be further deterred from enrolling or continuing their education at UF if they see an exodus of Black professors because of the limitations imposed by the Stop W.O.K.E. Act.

51. I believe that the Stop W.O.K.E. Act has caused fear among university faculty. I know many instructors feel bullied and pressured to make changes. Assistant Professors are afraid that they will be sued for breaking the law if they do not make changes to their curriculum.

52. I am concerned about retaliation for myself and for others. I believe that these concerns are greater for lecturers and untenured professors. Many African American Studies professors are hired as lecturers, which means they are on a year-to-year renewal. Generally, more minority people are hired in these positions and they are the instructors that teach courses that are related to race.

They will face serious implications under the Stop W.O.K.E. Act for teaching courses that the university requested.

53. I also believe that the Stop W.O.K.E. Act will negatively impact tenure decisions for instructors that teach courses related to disfavored viewpoints of the legislature because colleagues will be less likely to vote for tenure for those that teach controversial topics. Each year, there have been increases in the evaluations of tenured professors and I believe this process will be used to try to silence outspoken professors that challenge the state government and the Stop W.O.K.E. Act.

54. I believe that the Act targets professors who teach race studies courses and puts us more at risk for punishment, termination, and other negative consequences. There are few minority faculty on the UF campus and they are the same people that tend to teach classes on race, which puts them more at risk of violating the Stop W.O.K.E. Act.

55. I believe the Stop W.O.K.E. Act will deter scholars from seeking out funding for research related to race studies. Grant applications are time consuming and some scholars may think it is a waste time since universities are no longer able support the work. Further, some agencies may no longer want to fund research in Florida because they fear getting sued under the Stop W.O.K.E. Act.

56. I believe that the history of UF ties into what is happening now under the Stop W.O.K.E. Act. Historically, Black students had to protest because they were mistreated and discriminated against. I believe now Black instructors and students are being silenced so they will not discuss the struggle that it took us to get where we are today.

57. I believe that the Stop W.O.K.E. act will chill discussions on campus about racist incidents that have occurred, in turn leaving the door open for new racist incidents to occur. Since I have been at UF I can recall several racist incidents. For example, the Institute of Hispanic-Latino Cultures was defaced with racial slurs. Students dressed in blackface for racist Halloween costumes. Also, a Black female student was harassed and called several vile racial slurs by a white male fraternity member while his fraternity brothers watched in silence. None of the students who committed these acts were punished.

58. I also have been the target of harassment by a known White supremacist by the name of Thomas John (Tom) Kelly. In April 2017, he confronted me and my assistant in the African American Studies main office and made several derogatory statements about Black women, civil rights, Virgil Hawkins (a civil rights pioneer), and Black people generally. A friend called the police on our behalf twice, but they refused to enter the office. My assistant and I had to push him out of the way so that he would follow us into the lobby area

18

where the policemen were located. Since then, Mr. Kelly has emailed me (and other professors and students) several times and made derogatory statements about my assistant and I to the administration. Although I continue to block his email addresses, I still receive them and received a message from him as recently as one month ago. The UF Police Department and members of the administration are aware of this harassment and his occasional appearances on campus. During the fall 2021 semester, I taught my face-to-face class from home online for awhile after being informed that Mr. Kelly was on campus again.

59. I have been very uncomfortable over the years and at times am terrified that he will cause me (and/or other members of our campus community) harm. After the murders of nine African Americans in Buffalo, New York this summer by a White supremacist, I emailed the dean of my college, an associate dean, and UFPD (the University of Florida Police Department) to again express concern about Kelly's threats, harassment, and White supremacist ties (and the fact that he continues to show up unannounced in public areas of the UF campus).

60. I believe that many universities want Black instructors and other instructors of color to teach race topics as a way to attract minority students to the school. Practically every Black instructor that I know at UF in my college, the law

school, and the college of education, though there are not many, is teaching a related topic prohibited by the Stop W.O.K.E. Act.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on <u>August</u> <u>14</u>, <u>2022</u>.

Sharon Austin

20

13-4

Case 4:22-cv-00304-MW-MAF   Document 13-4   Filed 08/24/22   Page 1 of 18
USCA11 Case: 22-13992     Document: 53-1     Date Filed: 06/16/2023     Page: 87 of 242

# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

    *Plaintiffs*,

v.

    Case No.: 4:22-cv-304

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et al.,

    *Defendants*.

## DECLARATION OF SHELLEY PARK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Shelley Park, hereby declare and state as follows:

## A. Background

1. My name is Shelley Park. I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as a tenured Professor of Philosophy and Cultural Studies at the University of Central Florida (UCF).  My research and teaching focuses on Feminist Theory, Critical Race Theory, Queer Theory, Postcolonial Theory, Kinship Studies, Cultural Studies, Motherhood Studies, Philosophies of Love, Care Ethics, and Science & Technology with an emphasis on technologically mediated forms of care and the ways in which

1

these are gendered and racialized.  I currently teach four undergraduate

courses: (1) Feminist Theories, (2) Theories of Sex and Gender in the

Humanities (Theories of Sex and Gender), (3) Race & Technology, and (4)

Introduction to Philosophy.

4.  I obtained my Bachelor of Arts with honors in Philosophy at the University

of Calgary in 1982, my Master's degree in Philosophy from the University

of Calgary in 1984, and my PhD in Philosophy from Duke University in

1990.

5.  I have been teaching in higher education for 35 years.  I was an Instructor of

Philosophy at Duke University from 1987 to 1990 and at the University of

Calgary in Summer 1989.  I have held various roles at UCF.  I was an

Assistant Professor of Philosophy from 1990-96, the Director of the

Women's Studies Program from 1997-2000, Chair of the Department of

Philosophy from 2000-03, and an Associate Professor of Philosophy from

1996-2016.  Since 1992, I have served as Affiliated Faculty in the Women's

Studies Program (now the Women's and Gender Studies Program).  I have

also served as Affiliated Faculty in Texts and Technologies since 2015 and

as a Professor of Philosophy and Cultural Studies since 2016.

6.  In 2019, I was inducted in the UCF Scroll and Quill Society, a prestigious

club for faculty excellence.  That year, I was also nominated for the UCF

award for transforming student lives.  I won a UCF Research Initiative Award in 2018, as well as UCF Teaching Incentive Program Awards in 1995, 2007, 2012, 2017, and 2022.  I was awarded UCF Research Sabbaticals in 2010 and 2017.  I won the College of Arts and Sciences Award for Interdisciplinarity twice, once as Director of the Women's Studies Program (2000) and once as Chair of the Philosophy Department (2002).  I received a Dean's Initiative Award for Learning Community Projects in 1998, National Endowment of Humanities Summer Seminar Awards in 1991 and1996, and a Dean's Initiative Award for Interdisciplinary Courses in 1996.

7.  I am, or have been, a member of the American Philosophical Association; the American Studies Association; the Cultural Studies Association; Feminist Ethics and Social Theory; Florida Philosophical Association; and the International Association of Women Philosophers.

8.  My publications include the book, *Mothering Queerly, Queering Motherhood:  Resisting Monomaternalism in Adoptive, Lesbian, Blended and Polygamous Families*; a co-edited special issue of *Hypatia: A Journal of Feminist Philosophy*, "Contested Terrains: Women of Color, Third World Women, Feminisms, and Geopolitics," and numerous articles and book chapters including: "Gendered Divisions of Labor in the 21st Century

Academy:  Research, Teaching and Service"; "The Feminist Killjoy in the Room:  The Costs of Caring about Diversity"; "The Transracial Adoption of Ethnic Minority Children:  Questions Regarding Legal and Scientific Interpretations of a Child's Best Interests"; and "Research, Teaching and Service:  Why Shouldn't Women's Work Count".

9.  Following the killing of George Floyd in 2020, I worked with my colleagues in the Philosophy Department at UCF to release a unanimous anti-racism statement.  I was one of the drafters of the statement, which supported the Black people, Indigenous people, and other People of Color who challenged systemic racism, protested the militarization of U.S. police forces, and sought racial justice.  The statement reflected a departmental commitment to anti-racist principles in our classroom instruction, research, service, and internal policies and procedures.

10. In the Fall 2022 semester, I will teach Theories of Sex and Gender, a course that introduces recent and contemporary theories of sex and gender and their interplay in larger society.  During the course, students examine post-structuralist theories of gender; feminist theories of sex and gender; biological theories of nature and nurture; developmental systems theories of sex and sexuality; critical race theories related to the intersection of race,

class, gender, and sexuality; and phenomenological theories of the lived experiences of sexual and other orientations.

11. The course focuses on LGBTQIA+ issues, including the social construction of sex, gender, and sexuality.  Students learn the ways that our understandings and experiences of sex, gender, and sexuality both shape and are shaped by historical events and power relations.  They also learn how sex, gender, and sexuality intersect with race and other phenomena such as class and age to perpetuate interlocking systems of oppression, privilege, and structural inequities such as sexism, heterosexism, transphobia, racism, ethnocentrism, classism, ageism, and so forth.  Course readings include materials about how power shapes our understandings of what is "normal" and "deviant" with regard to sex, gender, and sexuality and the impact of those understandings.

12. I will teach Feminist Theories in the Spring 2023 semester.  This course focuses on the theoretical bases of recent and contemporary movements for women's liberation and how both the notion of "women" and the notion of "liberation" has changed over time.  Theoretical perspectives examined include:  liberal, radical, Marxist, intersectional, transnational, postcolonial, decolonial, eco- and cyber- feminisms as well as disability (crip) theory and queer theory.  For each theory, students learn how that theory understands

5

sexism, and how that understanding is linked to its theory of change.  For example, I teach liberal feminism as an enlightenment theory that understands sexism as the treatment of women as less rational, less autonomous, and less deserving of the human rights and freedoms accorded to men.  On this theory, women's liberation (from confinement to home and family) requires fighting for women's equal opportunities to education and careers in order to develop their equal capacity for reason and economic and civic independence.  We then question the assumptions inherent in this theory, including how seeking equality with men sets men as the standard, and the ways meritocracy values the work traditionally performed by men (e.g. paid labor and degrees in business and engineering) over the realms traditionally held by women (e.g. domestic labor and training in the 'helping' professions).

13.  The course defines a feminist broadly as someone who believes sexism exists, is neither desirable nor inevitable, and is committed to doing something to address the status quo.  This makes room for a wide variety of feminist beliefs and commitments while establishing the basic assumptions from which the rest of our discussions will proceed.

14.  In the Spring of 2023, I will also teach Race & Technology, an exploration of the role of race in the production, consumption, and representation of

technology.  The course considers various forms of technology, including facial recognition software, chatbots, search engines, social media, biomedical and reproductive technologies, and technologies for work and leisure.  A basic premise of this course is that technological literacy requires understanding the varied ways in which technologies—from Google's search engine to Amazon's Mechanical Turk and from dating apps to predictive policing—perpetuate inequalities and oppression under the auspices of neutrality.  The course emphasizes the ways systemic racism works in the technological area, not as a "bug" but often as an intrinsic component of design.  In this course, as in others, I teach from an intersectional perspective, urging awareness of the ways in which race is gendered, sexualized, classed, aged, and so forth.  The likelihood of being chosen as a match on a dating app, for example, is radically different for an Asian-American man than for an Asian-American woman.  As a senior level course, all students are challenged to create a final project demonstrating scholarly research and technological literacy relevant to the themes of the class.

15. My courses focus on structural oppression, how it operates, and how we might imagine and create alternative social structures.

7

16. They do not question whether heterosexism, sexism, or racism exist because there is already consensus in my discipline(s).  Likewise, there is a longstanding consensus among feminist philosophers, critical race theorists, and others that notions of merit, objectivity, colorblindness and so forth function to solidify systems of oppression—disguising biased standards as ones that are allegedly neutral.  Thus, my students learn to critically interrogate such concepts.  We study oppression at a macro level; looking for the ways in which it is "baked in" to systems, structures, designs, values, institutions, processes, and traditions.  We do not ascribe sexist, racist or other harmful beliefs to individuals.  To understand macro-level phenomena such as oppression—as I teach my students—one must not focus on individual intentions (whether good, bad, or otherwise).

17. In preparation for this intense study, I spend early weeks establishing class norms of mutual respect, shared progress, intellectual community, and collaborative learning.

**B. The Interaction Between the Stop W.O.K.E. Act and the Content of My Courses**

18.  On April 22, 2022, Governor Ron DeSantis signed the Stop Wrongs Against Our Kids and Employees Act (also known as the Stop W.O.K.E. Act, House Bill 7, or the Individual Freedom Act) into law.  This law

amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts

that instructors are permitted to denounce but are not permitted to advance.

19. I understand the Stop W.O.K.E. Act to mean that I cannot teach students that

meritocracy, excellence, hard work, fairness, neutrality, objectivity, and

racial colorblindness are racist or sexist, or were created by for oppressive

purposes.  I also understand that the Stop W.O.K.E. Act prohibits instruction

that causes students to feel guilty or sad because of their race or sex.

20. In order to teach my courses, I must instruct students on structural racism,

sexism, and heterosexism.  For example, queer studies and feminist scholars

understand and have been trained to view the normative construction of

masculinity (e.g. as dominant, as heterosexual, as white) as inherently

harmful.  My students learn to identify the harmful effects of dominant

social constructions of race and gender.  We discuss historic and present

manifestations of these constructions and consider how values, ideas, and

structures from earlier times re-appear in our contemporary culture.

21. Course materials demonstrate how meritocracy is a myth that works to

reinforce the existing status quo, how common understandings of fairness

ignore an uneven playing field, how work ethic and neutrality favors the

dominant powers, how colorblindness renders us unable to see racism.  In

my courses, students read texts from the following books: Marilyn Frye, *The*

*Politics of Reality: Essays in Feminist Theory*; Judith Butler, *Gender Trouble: Feminism and the Subversion of Identity*; Sara Ahmed, *Queer Phenomenology*: Susan Stryker, ed. *The Transgender Studies Reader*; Ruha Benjamin, *Race After Technology: Abolitionist Tools for the New Jim Code*; and *Algorithms of Oppression* by Safiya Noble.

22. I understand "objectivity" in this context to require teaching arguments in favor of and against any concept. This understanding of objectivity is widely critiqued by philosophers. My discipline—just like any other— requires students to build upon widely accepted foundational principles. The existence of sexism, heterosexism, racism and other forms of oppression and privilege has been well-documented with several decades of empirical research and is the starting place for the work I do inside and outside the classroom.

23. None of my instruction or class discussion singles out individuals, much less students, as racist, sexist, or oppressive. My courses focus oppression at the systemic, not individual level. Similarly, I don't teach or suggest that any person or student should feel guilty or sad about systemic inequalities. I would never do that. At the same time, some students *may* feel bad when they recognize systemic forms of injustice. That is a pretty natural human response.

24. My instruction illuminates the ways in which all of us (myself included) may participate in upholding oppressive structures, intentionally or unintentionally.  For example, in Feminist Theories, I teach bell hooks' classic text, *Feminist Theory from Margin to Center*.  In class, students have the option to answer various questions about their privileges (or lack thereof) related to race, sex, class, and ability.  With each answer, they physically move closer or further from the center of the room (where I dispense candy), representing the social "center."  We debrief on the activity, which students describe as a memorable lesson about what it feels means (and feels like) to be "centered" or "marginalized."  They also learn how privileges shape the experiences of others.  Once more, the focus is on the effects of systems of oppression, not individual motivations.

25. Sometimes students feel guilty when they realize their complicit participation in, or benefit from, systems of oppression through actions they thought were neutral.  They may also feel badly if they recognize their potential complicity with systems that harm themselves or those about whom they care.  Again, this is not a matter of pointing fingers at individual people.

26. My class norms and practices are intended to make the classroom a blame free place where such discomfort can be expressed (if one chooses to do so).

11

We talk about how to approach discomfort as a sign of growth or of struggle. Just as we may struggle with figuring out a math problem, we may struggle with figuring out how to be in relationship to one another and the world. Struggle is part of a process of change and not necessarily a bad thing, especially if we can rely on the support of others while we figure things out. The classroom is a shared place where students learn how to challenge systems of oppression together as a collaborative exercise; no one is singled out.

**27.  C. How HB 7 Will Impact My Teaching and My Courses**

28.   The Stop W.O.K.E. Act impacts my ability to teach because I do not know how I can meet the instructional standards of my discipline without violating the law.  It is impossible to teach this course to the standards of my discipline without discussing systemic inequalities; I would not recognize my courses.  The existence of systemic inequalities is a baseline presumption of the scholarship I produce, read, and teach.  My career has been based on understanding how systems of oppression work, not whether they exist.

29.  The Stop W.O.K.E. Act creates an impossible bind.  If I teach the foundational principles of my discipline as widely accepted, I may run afoul of the Stop W.O.K.E. Act's prohibitions.  As outlined above, my discipline

takes the existence of structural oppressions such as sexism, heterosexism and racism as foundational truths.  If I self-censor and weaken my instruction to present these concepts as debatable, I have not met the ethical standards required by my discipline.  Moreover, my discipline questions the ideals of "merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness," pointing out the ways in which such ideals uphold interlocking systems of oppression such as racism and sexism.  Yet, the Stop W.O.K.E. Act suggests that these concepts must be taught as unquestionable virtues without racist or sexist impact.  I'm not sure how I can teach my courses within the confines of the law.

30.   For at least 30-40 years, my discipline has recognized colorblindness and gender neutrality as concepts that reinforce the racism and sexism in the status quo.  My discipline largely concurs that the notion of objectivity frequently reflects dominant white, straight, male values.  And  that the notion of objectivity as an outgrowth of Eurocentric, colonial thinking that accorded this capacity (a function of reason) solely to white, European men of the upper classes.  To ignore the origins and functions of concepts such as these in my teaching is to fail to teach the history of ideas accurately.  And to ignore the ways in which these concepts function today to privilege some forms of thought over others is also unethical.  Thus to present

colorblindness, gender neutrality, or objectivity s to my students as undisputed virtues, as the Stop W.O.K.E. Act suggests, is to abandon my own scholarly and ethical integrity.

31. I am not sure how I must change my approach to classroom instruction as a result of the Stop W.O.K.E. Act.  I teach through a collaborative learning process whereby students may build classroom glossaries, provide examples to illustrate concepts, and offer presentations.  I do not know how the Stop W.O.K.E. Act applies to statements by students in class.  Formal lecturing is not my primary mode of instruction currently but is a way to ensure the discussions do not venture into prohibited concepts.

32. My goal as a UCF professor is to prepare my students to live and excel in a world that is globally, racially, and gender diverse.  Students need to learn diversity competencies to communicate with colleagues, employers, and clientele in inclusive, equitable, and non-offensive ways.  This is a valuable skill in any career path.  I fear that the Stop W.O.K.E. Act will inhibit, or altogether censor, this instruction and result in students who are unprepared for professional life.

33. I also fear that the Stop W.O.K.E. Act will shrink, and possibly silence, instruction about structures of oppression, which disadvantages students.  Without this knowledge, students from dominant racial, gender, and

sexuality groups will not understand the impact of those systems.  Students

from vulnerable populations will lack the analytic skills necessary to process

their experiences.  Students who are passionate about social justice issues

will feel less supported in their institutions.  The value of student degrees in

affected disciplines will decrease, making students in this field less

marketable to future schools or jobs.

34. As a senior, tenured Professor at UCF with 35 years of teaching experience,

I am not clear what instruction is prohibited by the Stop W.O.K.E. Act.  The

Act will cause me to self-censor or to risk violating the law.  I am concerned

about disciplinary action, including termination, or the expenses of litigation

if I am perceived to violate the Stop W.O.K.E. Act.  And yet, I cannot

abandon the values and professional norms of the discipline(s) to which I

belong.

35. This chilling effect of the law is amplified for other instructors.  A sizable

number of faculty at UCF serve in non-tenured positions, meaning UCF can

choose not to renew their contracts in any year without reason.  No

disciplinary process is required.  I have spoken with more junior, untenured

instructors who are afraid to be perceived as violating the law.  Additionally,

faculty in the arts, humanities, and social sciences are especially vulnerable

because their disciplines are targeted by the Stop W.O.K.E. Act.  Finally,

even before the law, faculty who were Black, Indigenous or People of Color were less likely to be viewed as objective when teaching about racism.  I worry that they will be targeted for complaints.  Ultimately, the Stop W.O.K.E. Act may cause faculty to avoid controversial conversations and self-censor because they feel their employment is at risk.

36. The coupling of the Stop W.O.K.E. Act with House Bill 233, which allows the recording of instructors, effectively deputizes students to enroll in classes they wouldn't otherwise take in hopes of submitting a complaint that silences instruction.  I fear that these students will change the classroom dynamics from a collaborative, joyful culture of shared trust and learning to an atmosphere of fear and antagonism.  I feel pressure to add legalistic disclaimers and modify my lectures so I am not perceived to violate the law when I am not clear exactly what is prohibited.  I have been advised to save recordings of all of my lectures to defend myself against baseless accusations.

37. I do not feel supported by UCF against spurious complaints under the Stop W.O.K.E. Act.  After the law went into effect, UCF removed my department's anti-racism statement from the website, which signaled that the administration's commitment to anti-racism was short-lived or disingenuous. I fear that this preemptive censorship, even when there is no clear violation

of the law, reflects UCF's approach to compliance with the law and any

complaints will not be independently reviewed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and accurate.

Executed on ___August___ _16_, 2022.

_____

Shelley Park

13-5

# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

     *Plaintiffs*,

v.

    Case No.: 4:22-cv-304

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et al.,

    *Defendants*.

---

## DECLARATION OF JENNIFER SANDOVAL IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Jennifer Sandoval, hereby declare and state as follows:

### A. Background

1. My name is Jennifer Sandoval. I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I am an Associate Professor at the Nicholson School of Communication and Media at the University of Central Florida ("UCF"). I started as an Assistant Professor at UCF in 2011, and was promoted to Associate Professor with Tenure in 2017. My research interests include communication and identity, intercultural communication, feminist research methods, and participatory research methods. My work has been published in multiple academic journals,

including the Journal of International Intercultural Communication, the Journal of Intercultural Communication Research, and the Journal of Creative Communications.

4. I teach courses in interpersonal, intercultural, and gender communication. This semester, I will teach a graduate seminar called Intercultural Communication. The course explores ways in which identity and culture affect communication in various contexts.

5. I am also the Assistant Director of Inclusive Culture. I have held this role since Fall of 2019. In this role, I serve as the primary resource for diversity, equity, and inclusion issues in the Nicholson School of Communication and Media. My responsibilities include developing resources to make classrooms more inclusive, helping faculty navigate uncomfortable situations in their classes, and addressing student complaints related to diversity, equity, and inclusion issues.

6. I became the Program Coordinator for the Ph.D. in Strategic Communication in Fall of 2021. In this role, I work on recruitment, admissions, curricula, and assessments for the Program.

7. I served as the Faculty Fellow for Inclusive Excellence from 2017 to 2019. In that role, I developed and implemented equity and inclusion initiatives for UCF faculty.

8.  I have held several positions within the United Faculty of Florida ("UFF") at UCF, including Vice President (2019), Lead Negotiator (2018–2019), Contract Enforcement Chair (2017–2018), and Senator (2016–2019). I will begin another term as a Senator in Fall of 2022. As a Senator, I serve as a faculty representative in our local union council and frequently engage in discussions about union members' teaching and employment considerations and concerns.

9.  I received a Ph.D. in Communication and Culture in 2010 from the University of New Mexico, where I received the Everett Rogers Doctoral Graduate Scholar Award, the Hank R. Trewitt Departmental Service Award, and the Dean's Outstanding Doctoral Applicant Award.  I also earned a Master's of Dispute Resolution from Pepperdine School of Law in 2003.

10. Before joining the UCF faculty in 2011, I worked as a mediator, trainer, instructor, and consultant.

**B. The Interaction Between the Stop W.O.K.E. Act[1] and the Content of My Courses**

11. Based on my information and belief, on April 22, 2022, Governor Ron DeSantis signed H.B. 7 into law. This law amended § 1000.05(4), Fla. Stat.,

---

[1] Ch. 2022-72, Laws of Fla.

to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

12. I understand this to mean that I can be held liable for violating civil rights law if I endorse any of the concepts listed in the law. The provision that prohibits advancing the concept that "A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members often same race, color, national origin, or sex" is particularly concerning to me, because I cannot control how students feel about what I say. I fear that a student who feels psychological stress in my class because of something I said about race or sex will interpret my lesson to advance the concept that the student should feel guilty.

13. Based on my reading of the law and guidance from UCF and UFF, I believe that portions of my course curricula may be prohibited under the Stop W.O.K.E. Act. For example, in my Intercultural Communication seminar this semester, I plan to include a unit on whiteness, as I always do, except that this year, I am risking liability under H.B. 7. I have decided to take this risk, knowing that I have tenure. But because of H.B. 7 I might be disciplined or receive negative reviews based on the perception that I am too "woke." For

example, when I teach students that people of color are underrepresented in our field, in part because of historical discrimination by white academics, students who feel uncomfortable—perhaps because they believe they benefit from the tendency to hire and promote white academics—might decide to complain about me for espousing the view that they bear responsibility for and should feel guilty because of historical discrimination by white people. Now, because of H.B. 7, the consequences of those complaints could be dire.

14. Because I study inequality as a fundamental component of my work, I see my research and teaching as a public good. It is in the public interest for me to educate my students so that they understand the causes and effects of inequality, and can learn to ameliorate it.

15. Additionally, my research suggests that people interpret messages differently depending on factors like race and sex, because those factors affect how they are perceived and treated in this world. I need to teach my students about systemic inequality so that they understand why we need to communicate differently to people with different identities and can produce messages that will be effective for people of all sorts of identities. But my instruction could perceived as violating the Stop W.O.K.E. Act by promoting the concept that my students should not attempt to treat their audience without respect to their racial identities—a concept I'm not even sure how to interpret. Indeed,

Section 2(4)(a)(4) has become the center of conversations and questions I engage in with colleagues, because nobody can figure out what it means.

16. My instruction also may violate Section 2(4)(a)(8), because I explicitly teach that that "racial colorblindness" fundamentally denies the lived reality of people in a system that has an embedded racial hierarchy. I do not believe— and will not teach—that racial colorblindness or its sibling philosophies are appropriate or positive.

17. UCF and UFF's main message around the Stop W.O.K.E. Act is to teach "objectively." My pedagogy is not based on "objectivity." In fact, many fundamental philosophical approaches in subdisciplines of communication studies contest the notion that there is a 30,000-foot view from which everyone would perceive the world in the same way. Positionality is central to my work, and I believe that people perceive the world in all different ways, depending on various identity and circumstantial factors.

18. My work is qualitative, and centered on lived experiences. A more "objective" framework would say that we should only instruct students on knowledge derived from evidence collected through specific and narrowly-defined practices. The evidence for my work comes from conversations and experiences that are just as meaningful as statistics, but they might not be considered "objective."

## C. Interpretation and Enforcement of the Stop W.O.K.E Act at UCF

19. In my capacity as Assistant Director of Inclusive Culture, I was asked to provide Nicholson School of Communication and Media faculty with an update on inclusive culture and the Stop W.O.K.E. Act. Before my presentation, many faculty members spoke with me about their concerns about how H.B. 7 would be enforced, and told me to come prepared to answer questions about what could and could not be taught in professors' courses. For example, film faculty wanted to know whether they needed to change which films they showed in class, and expressed uncertainty as to whether they could still share their views on how and why, for example, women were underrepresented in certain roles. On August 11, 2022, I presented my update, and encouraged professors to include disclaimers in their syllabi stating that assignments of readings and topics for discussion do not equate to endorsement of the author or of one specific perspective on the subject matter.

20. I answered faculty questions as best I could, which sometimes meant confirming that they might face liability for presenting honest, accurate instruction to their students, particularly for gender-nonconforming and darker-skinned professors who are perceived differently when they talk about

gender and race. An overwhelming majority of the professors who have expressed concerns to me are Black or Latinx.

21. Nontenured professors have asked me whether they will be fired or lose job prospects if they continue to teach particular courses that could be seen as espousing some of the viewpoints that the Stop W.O.K.E. Act prohibits, and I am unable to ease their fears, because my read of the Stop W.O.K.E. Act does suggest that some of their courses are no longer legal. For example, I don't believe a professor could teach a course on critical race theory without advancing the view that "[a] person's . . . status as . . . oppressed is necessarily determined by his or her race[.]" Section 2(4)(a)(3).

22. Tenured professors, too, have expressed to me that they worry the Stop W.O.K.E. Act will affect their 5-year reviews. Some are considering whether to eliminate lessons from their syllabi because they think they will be penalized for teaching certain truths accepted in their fields that make some students uncomfortable—for example, that trans people face discrimination and violence because of their sex, or that people of color face additional barriers to educational opportunities because of their race.

23. In July, UCF published FAQs on H.B. 7 to help instructors understand what they can and cannot say. The answers to the FAQs do not alleviate my

concerns. In fact, they only underscore my fear that the vagueness of the law will result in faculty censoring their speech.

24. In response to the question "What does 'in an objective manner without endorsement' mean?" UCF answers: "This language is not defined by Florida law, and the Florida Legislature did not provide guidance on what this language means in the context of implementing or complying with the requirements." UCF proceeds to quote language from the UFF Collective Bargaining Agreement that asserts "employees shall have freedom to present and discuss their own academic subjects, frankly and forthrightly, without fear of censorship," but that statement is simply inconsistent with the Stop W.O.K.E. Act.

25. Some of UCF's responses are not answers at all. For example, in response to the question "What if my course involves instruction on one or more of the 'specified concepts'?" UCF's answer is: "If your course involves the specified concepts, we recommend that you consider how to present and lead discussion of the specified concepts during instruction." There is a link to a UCF webpage that discusses "How to facilitate discussion of discipline-relevant controversial issues in class," but I cannot be sure that following that guidance will save me from liability under the Stop W.O.K.E. Act.

26. According to UCF's FAQs, "including the 'specified concepts' in my instruction" can lead to students filing lawsuits, filing complaints with the Board of Governors, or filing complaints with a standing committee of the Florida Legislature. Based on my information and belief, upon a substantiated finding of a violation, I could be disciplined by my university, and the university would lose all performance-based funding for the following year.

27. UCF's FAQs promote resources on "civil pedagogy." But many scholars in my field believe that framework is based on dominant culture, and white communication practices that do not accommodate racial and ethnic difference or neurodiversity. Instead, the civil pedagogy framework is based on a narrow range of acceptable behaviors that we associate with "professionalism" and "niceness" that are reflected in white practices rather than more diverse spaces.

28. In my capacity as Program Coordinator, I have spoken to many graduate student teaching assistants who are worried that the Stop W.O.K.E. Act will affect their funding.

29. It is already clear that university administrators are reading H.B. 7 to ban speech about diversity and social justice. In June of 2022, UCF removed anti-racism statements from departmental websites. Those statements were deliberately put there to signify that we recognize that racism exists and we

are striving to become a more inclusive campus. Removing the statements signaled to all of us that we are no longer supposed to express those types of views and goals on campus.

## D. Exhibits

1. Syllabus for Intercultural Communication

2. Handout for Nicholson School of Communication about H.B. 7

3. Presentation deck for 8/11 update on Inclusive Culture & H.B. 7

4. Open letter from Florida Faculty

5. UCF's FAQs on H.B. 7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on August 16, 2022.

_____

Jennifer Sandoval

# EXHIBIT A



## Course Description & Note from Dr. Sandoval

In this seminar, we will explore the existing and emerging issues, theories, and questions in intercultural communication. The goal of this course is to critically investigate and reflect on the key theoretical perspectives, concepts, and methodologies that are relevant to the scholarship on culture and communication. We will broaden our understanding of culture from more traditional views (i.e. culture as nation, ethnicity, or race) to the views that are reflexive of the contemporary global conditions and local practices. We will unpack the debates and conversations among scholars in order to understand what is at stake and what is being contested when it comes to theorizing communication from a cultural point of view. The readings in this course will address the concepts and contexts that shape intercultural encounters, including race, gender, sexuality, identity, ideology, discourse, globalization, and postcolonialism. Assignment of readings and topics for discussion do not equal an endorsement of the author or one specific perspective on the subject matter. Finally, as an instructor of this course, my goal is to facilitate your intellectual and personal efforts to develop the ways in which you approach your questions. We all need to engage in continuing learning and unlearning to effectively communicate across difference.

## Course Materials & Resources

All readings will be available here on Webcourses through the library or download. Many of your readings will be taken from The Handbook of Critical Intercultural Communication edited Nakayama and Haluanlani. If you are completely new to this topic you may wish to check out the additional textbooks:

- Allen, B. (2011). Difference matters: Communicating social identity. Waveland Press.
- Haluali, R. (2020). Intercultural communication: A critical perspectives. Cognella
- Sorrells, K. (2015). Intercultural communication: Globalization and social Justice, 2nd Ed. SAGE Publishing

**Instructor Contact and Office Hours**
Jennifer.sandoval@ucf.edu; CMB 202A Wednesdays from 4- 5 p.m.
I am also happy to make appointments for those who cannot make it during the scheduled time and am more than happy to hold virtual/Zoom meetings.

Table of Contents

**Course Description & Note from Dr. Sandoval** ............................................. 1

Course Materials & Resources ......................................................................... 1

**Resources for You** .......................................................................................... 4

**UCF Policy Statements** ................................................................................. 5

**Assignments: 400 points** ............................................................................. 8

**Tentative Course Schedule** ....................................................................... 10

Week 1:     Introduction to the Course.................................................... 10

Week 2:     Historical Foundations and Key Concepts............................ 10

Week 3:     Identity and Intersectionality ............................................... 11

Week 4:     Gender, & Sexuality .............................................................. 11

Week 5:     Whiteness .............................................................................. 12

Week 6:     Body and Embodiment .......................................................... 12

Week 7:      First Celebration of Knowledge ........................................... 13

Week 8:     The Politics of Institutional Diversity ................................... 13

Week 9:     The Health Context................................................................ 13

Week 10:     Challenging Eurocentrism and Ethnocentrism .................. 14

Week 11:     Globalization, Migration & Transnationalism.................... 14

Week 12:     Reflections and Futures of the Field .................................. 15

Week 13:     Workshops .......................................................................... 15

Week 14:     Thanksgiving Wednesday .................................................. 15

Week 15:     Project Presentations.......................................................... 15

Week 16:     Finals Week: Celebration of Knowledge ............................ 15

**A Brief Introduction to my Teaching Philosophy** ....................................... 16

**Learning Goals**

- Understand theoretical perspectives and methodological approaches in intercultural communication scholarship.
- Develop our awareness, self-reflexivity, and capacities as intercultural communicators.
- Understand, critique, and raise awareness of the essential questions, problems, and issues addressed in the field of intercultural communication.
- Engage theories and research methods with attention to the epistemological and ontological assumptions associated with various research paradigms.
- Complete a research proposal using appropriate theoretical concepts, methodology, and analysis.

**Frequently Asked Questions (FAQs)**

Do I need to buy a book?
- Nope! There are many assigned readings for this course but they are all available to download in the modules in your Webcourse.

Okay cool, but do I really have to read ALL of those articles?
- Well…depends on what you are trying to accomplish in the class. You have annotations and discussion questions for every article due every week. If you don't complete them you don't get the points and that will add up quickly to affect your grade.

Do I have to come to class?
- Graduate seminars are designed to center discussion and engagement. I know there are many competing issues in your lives, but we will get so much more out of connecting than working in isolation – I promise!

When are things due and can I turn stuff in late?
- End of day is 11:59 p.m. and that is the deadline on any date listed in the schedule. Should you run into illness or emergencies please contact me as soon as you can so we can adjust your timelines.

How often should I be in Webcourses?
- Honestly, as often as you can. I recommend trying to pop in everyday, or every couple of days at least! Graduate courses are intense and there will be a lot of resources to help you be successful!

How do I get an A?
- Your grade is only one constructed indicator of "success" or "excellence." Don't let it distract you from a balance of well-being and learning. Stay on top of the deadlines, don't turn in first drafts, and just do your best! See the Learning and Metacognition section of your intro module for more information.

**A note on our current context:**
We have been living with compound crises for a long time now. Everything is a lot. We are human beings first and foremost. This syllabus contains a lot of policy information, but we will also be working to create a community of care and to find support in our time together. I love this course and I am looking forward to the engaging conversations we will have and the connections we will create.

**Public health:**
There are currently no protocols regarding COVID 19 at UCF or in the state of FL. However there remain very real risks related to the coronavirus. Do not come to class if you are sick. I will regularly check the county transmissions numbers and during peak contagion may request

3

that we resume wearing masks inside. Monkeypox numbers are high in Florida and there are limited vaccines in Orange County – if you are at particular risk you may be eligible.

**A note on basic needs:**
Your safety and wellbeing are paramount. If you are struggling and feel comfortable doing so, please reach out and let me know so I can get you connected to the appropriate resources. If you need help with housing, food, or basic needs please see this link for the UCF Student Emergency fund.

**Land Acknowledgement**
The University of Central Florida is located on the occupied land of the Seminole and Timucua people. To learn more about the stolen Native territories please see https://native-land.ca/.

## Course Policies:

**Humane and equitable learning environment**
We will commit to entering a brave and safer space together where everyone is able to bring their full authentic self to conscious conversations. Our focus is communicating effectively across difference and we should aim to model that in our engagement. In order to do this well we must center impact over intention and hold each other accountable for harm. We will co-construct our further commitments the first night of class.

**Participation**
We all come from different spaces and experiences. Participation is not about how many words you say in class. It is about contributing to an effective learning environment for yourself and your peers. I encourage you to stretch yourself and engage as much as possible, but we are also living in a context that is pretty consistently exhausting – so we must show grace all around. Please keep in open communication with me!

**Extra Credit**
There is no extra credit.  An 'A' grade cannot be earned by turning in more 'C' level work than the rest of the students. It is possible that a unique opportunity may arise during the semester due to research or special events and if so I will let you know.  Do not request extra credit. If you are struggling with material please make an effort to meet with me early on to give optimal opportunity for improvement.

## Resources for You

**Equity and Inclusion:** The University of Central Florida considers the diversity of its students, faculty, and staff to be a strength and critical to its educational mission. UCF expects every member of the university community to contribute to an inclusive and respectful culture for all in its classrooms, work environments, and at campus events. Dimensions of diversity can include sex, race, age, national origin, ethnicity, gender identity and expression, intellectual and physical ability, sexual orientation, income, faith and non-faith perspectives, socio-economic class, political ideology, education, primary language, family status, military experience, cognitive style, and communication style. The individual intersection of these experiences and characteristics must be valued in our community.

**Title IX** prohibits sex discrimination, including sexual misconduct, sexual violence, sexual harassment, and retaliation. If you or someone you know has been harassed or assaulted, you can find resources available to support the victim, including confidential resources and

4

information concerning reporting options
at www.shield.ucf.edu and http://cares.sdes.ucf.edu/.

If there are aspects of the design, instruction, and/or experiences within this course that result
in barriers to your inclusion or accurate assessment of achievement, please notify the instructor
as soon as possible and/or contact Student Accessibility Services.
For more information on diversity and inclusion, Title IX, accessibility, or UCF's complaint
processes contact:

- Title IX – OIE – http://oie.ucf.edu/ & askanadvocate@ucf.edu
- Disability Accommodation – Student Accessibility Services
  – http://sas.sdes.ucf.edu/ & sas@ucf.edu
- Diversity and Inclusion Training and Events – www.diversity.ucf.edu
- Student Bias Grievances – Just Knights response team – http://jkrt.sdes.ucf.edu/
- UCF Compliance and Ethics Office
  – http://compliance.ucf.edu/ & complianceandethics@ucf.edu
- Ombuds Office – http://www.ombuds.ucf.edu

**Accessibility Services:** Students needing academic accommodation please contact me as soon
as possible so we can work together to ensure your needs are met.  In addition, please make
arrangements with Accessibility Services if needed. If you need accommodations but are not
working with SAS please feel free to reach out to me so we can make sure your learning
environment is appropriate for you!

**The Writing Center:** Free tutoring and resources are available to you at the University Writing
Center.  You can drop in or make an appointment for assistance. – they even have online
appointments available. Look at their resources today – your grade will thank you!! They are
located in 105 Colbourn Hall.

**Health Center and Psychological Counseling Services:** College is stressful and managing your
personal, professional and student lives can take a toll on your body and your emotional health.
Don't forget to take care of yourself and seek help form the resources available right here on
campus.
**University Police**: 407-823-5555, **Counseling Services**: 407-823-2811, **Crisis Line:** 407-823-2811,
**Campus Health Center:** 407-823-2701

**UCF Cares:** During your UCF career, you may experience challenges including struggles with
academics, finances, or your personal well-being. UCF has a multitude of resources available to
all students. Please visit UCFCares.com if you are seeking resources and support, or if you are
worried about a friend or classmate. Free services and information are included for a variety of
student concerns, including but not limited to alcohol use, bias incidents, mental health
concerns, and financial challenges. You can also e-mail ucfcares@ucf.edu with questions or for
additional assistance. You can reach a UCF Cares staff member between 8 a.m. and 5 p.m. by
calling 407-823-5607. If you are in immediate distress, please call Counseling and Psychological
Services to speak directly with a counselor 24/7 at 407-823-2811, or please call 911.

## UCF Policy Statements

### Academic Integrity

Students should familiarize themselves with UCF's Rules of Conduct, According to Section 1,
"Academic Misconduct," students are prohibited from engaging in

1. Unauthorized assistance: Using or attempting to use unauthorized materials, information or study aids in any academic exercise unless specifically authorized by the instructor of record. The unauthorized possession of examination or course-related material also constitutes cheating.
2. Communication to another through written, visual, electronic, or oral means: The presentation of material which has not been studied or learned, but rather was obtained through someone else's efforts and used as part of an examination, course assignment, or project.
3. Commercial Use of Academic Material: Selling of course material to another person, student, and/or uploading course material to a third-party vendor without authorization or without the express written permission of the university and the instructor. Course materials include but are not limited to class notes, Instructor's PowerPoints, course syllabi, tests, quizzes, labs, instruction sheets, homework, study guides, handouts, etc.
4. Falsifying or misrepresenting the student's own academic work.
5. Plagiarism: Using or appropriating another's work without any indication of the source, thereby attempting to convey the impression that such work is the student's own.
6. Multiple Submissions: Submitting the same academic work for credit more than once without the express written permission of the instructor.
7. Helping another violate academic behavior standards.

For more information about Academic Integrity, consult the International Center for Academic Integrity. For more information about plagiarism and misuse of sources, see "Defining and Avoiding Plagiarism: The WPA Statement on Best Practices"

**Responses to Academic Dishonesty, Plagiarism, or Cheating**
Students should also familiarize themselves with the procedures for academic misconduct in UCF's student handbook, _The Golden Rule_ . UCF faculty members have a responsibility for students' education and the value of a UCF degree, and so seek to prevent unethical behavior and when necessary respond to academic misconduct. Penalties can include a failing grade in an assignment or in the course, suspension or expulsion from the university, and/or a "Z Designation" on a student's official transcript indicating academic dishonesty, where the final grade for this course will be preceded by the letter Z. For more information about the Z Designation, see The Golden Rule.

**Course Accessibility Statement**
Students with disabilities who need access to course content due to course design limitations should contact the professor as soon as possible. Students should also connect with Student Accessibility Services (SAS)  (Ferrell Commons 185, sas@ucf.edu, phone 407-823-2371). For students connected with SAS, a Course Accessibility Letter may be created and sent to professors, which informs faculty of potential course access and accommodations that might be necessary and reasonable. Determining reasonable access and accommodations requires consideration of the course design, course learning objectives and the individual academic and course barriers experienced by the student.

Accommodations through SAS are not the only way to increase course accessibility. If you do not have formal assistance through these programs but have any learning challenge please reach out so we can arrange appropriate options for you.

**Campus Safety Statement**

6

Emergencies on campus are rare, but if one should arise during class, everyone needs to work together. Students should be aware of their surroundings and familiar with some basic safety and security concepts.

In case of an emergency, dial 911 for assistance.

- Every UCF classroom contains an emergency procedure guide posted on a wall near the door. Students should make a note of the guide's physical location and review the online version.
- Students should know the evacuation routes from each of their classrooms and have a plan for finding safety in case of an emergency.
- If there is a medical emergency during class, students may need to access a first-aid kit or AED (Automated External Defibrillator). To learn where those are located, see <http://www.ehs.ucf.edu/AEDlocations-UCF> (click on link from menu on left).
- To stay informed about emergency situations, students can sign up to receive UCF text alerts by going to https://my.ucf.edu and logging in. Click on "Student Self Service" located on the left side of the screen in the toolbar, scroll down to the blue "Personal Information" heading on the Student Center screen, click on "UCF Alert", fill out the information, including e-mail address, cell phone number, and cell phone provider, click "Apply" to save the changes, and then click "OK."
- Students with special needs related to emergency situations should speak with their instructors outside of class.
- To learn about how to manage an active-shooter situation on campus or elsewhere, consider viewing this video.

**Deployed Active Duty Military Students**

Students who are deployed active duty military and/or National Guard personnel and require accommodation should contact their instructors as soon as possible after the semester begins and/or after they receive notification of deployment to make related arrangements.

**Make-Up Assignments for Authorized University Events or Co-curricular Activities**

Students who represent the university in an authorized event or activity (for example, student-athletes) and who are unable to meet a course deadline due to a conflict with that event must provide the instructor with documentation in advance to arrange a make-up. No penalty will be applied. For more information, see the UCF policy.

**Religious Observances**

Students must notify me in advance if they intend to miss class for a religious observance. For more information, see the UCF policy.

**Copyright**

This course may contain copyright protected materials such as audio or video clips, images, text materials, etc. These items are being used with regard to the Fair Use doctrine in order to enhance the learning environment. Please do not copy, duplicate, download or distribute these items. The use of these materials is strictly reserved for this online classroom environment and your use only. All copyright materials are credited to the copyright holder.

7

**Assignments: 400 points**

**Reading Annotations and Discussion Questions (10 weeks x 10 points = 100 points)**
- **What it is:** Annotations are an active reading approach that help us structure our engagement with content and retain information. It is a way to take strategic notes while reading your articles and chapters that will create a library of summaries for your future work or exams.
- **Why we do it:** Reading a lot of information can feel overwhelming so having a structured approach can help us be more focused and intentional. In order to best use our "live" class time together we each need to be prepared for those discussions to the best of our ability. These works are important for not only building your intellectual foundation but for engaging in everyday communication across difference. These will also be useful resources for comps, theses/dissertations, and projects.
- **Requirements**: Each week you will have 3 required articles or chapters and your annotations should be approximately 150 words per article. You must complete annotations on 2 of the 3 articles. The rubric and template are in Webcourses. Each annotation will cover the following components: author's primary argument, key terms/concepts/quotations, strengths and weaknesses, connections to other readings or concepts. You will also need to pose 1-2 discussion questions about the article. Each week your annotations are worth 10 points and you must complete 10 of the 11 weeks. They are due on Wednesdays at noon.

**Assumption Paper (50 points)**
- **What this is:** All scholars and learners operate from a set of assumptions which are only occasionally articulated clearly. This brief introductory paper will ask you to engage in self-reflexivity about the intersecting identities, lived experiences, biases, and assumptions you bring to our discussions of identity and communicating across difference.
- **Why we do it:** In order to engage fully in our safer and brave space we have to be aware of our own entry points to this work. By taking the time to thoughtfully interrogate our own positionality we will be able to engage in conscious conversation about these complex topics.
- **Requirements:** approx 3 pages in length, this paper is from your first-person lens and experience and does not require research but should be carefully constructed and connected to the topics of identity and communication across difference.

**A Closer Look Presentation (50 points)**
- **What it is:** In pairs you will create a 10-12 minute presentation that goes deeper in understanding and application of a concept/topic (e.g. embodiment, gender, migration). You will provide an explanation of the concept and contextualize it in our contemporary moment. For example, you might want to talk about (mis)representations of intersectionality in media or the erasure of disability in institutional diversity efforts. You will present these on the applicable topic night.
- **Why we do it:** We could arrange an entire course around most of our weekly topics. This will help us expand our understanding and allow you to engage with an area that speaks directly to you or your interests. Your presentations will provide additional insight as we move into the next readings.
- **Requirements**: The presentations should be a minimum of 5 minutes long and no longer than 15 minutes. You will work with a partner and it should include a deep exploration of a concept, the current issue you are tying it to, and a clear connection. These should

8

be visually interesting, but you can use any format. You will provide a reference page for the sources you use to create your presentation or video.

**Celebrations of Knowledge (50 pts x 2 = 100 points)**
There will be two "exams" covering the readings, lectures, presentations etc. They will be a combination of multiple choice, short answer and essay questions.

**Research Proposal (100 points total)**
The research proposal consists of three separate assignments: the literature review (35 pts), the final paper (50 pts), and a presentation (15 pts) of your project proposal. In pairs you will pick an intercultural communication topic of your choice and propose a study. The literature review will provide appropriate background on the issue of interest. The final paper will include a revised literature review, hypotheses/research questions, a complete method section, planned analysis, and any relevant appendices (e.g., measures). All assignments must adhere to APA style. Students will be required to give a conference style presentation at the end of the course so that we may all benefit from the perspective you are taking.

**Basic Guidelines**
- ❑ *12-15 pages*
  Quality is more important than quantity, however a good literature review is exhaustive and can be quite lengthy when done well. This is a good guideline for the number of text pages – that does not include a cover page, bibliography, or appendices.
- ❑ *APA style*
  If you are not familiar with this –get familiar! Writing styles are used for important reasons, not the least of which so that other readers can find your sources easily. In short, it matters – do it correctly!
- ❑ *Introduction*
  Engage the reader. Present the problem you are going to address/study. Preview the paper and give us a good indication of why this topic/project matters.
- ❑ *Literature Review*
  Cover all the major concepts/topics relevant to your study. Don't just provide simple summaries, but rather synthesize the information in an organized and useful pattern. Apply the theories and information to the study you are proposing.
- ❑ *Method*
  You will provide a detailed description of how you would investigate this question/problem you propose. Include rationale for the methodology, the method, the population, data collection process, ethical considerations and researcher reflexivity.
- ❑ *Bibliography*
  You should have approximately 20-25 scholarly sources in APA style
- ❑ *Presentation*
  You will have the chance to present your proposal to the class in an informal/conference style setting. Be creative, engaging, and professional. Provide a one page handout for the class about your project.

**Grading information:**

| A: (excellent, outstanding) | | | B: (very good, above average) | | |
|---|---|---|---|---|---|
| A | = | 372 – 400 | B+ | = | 348 – 359 |
| A- | = | 360 – 371 | B | = | 332 – 347 |
| | | | B- | = | 320 – 331 |

9

| C: (average college-level) | | | D: (below average, barely passing) | | |
|---|---|---|---|---|---|
| C+ | = | 304 – 319 | D+ | = | 268 – 279 |
| C | = | 292 – 303 | D | = | 252 – 267 |
| C- | = | 280 - 291 | D- | = | 240 – 251 |

## Tentative Course Schedule

*\*No lesson is intended to espouse, promote, advance, inculcate, or compel a particular feeling, perception, viewpoint or belief.*

| Week 1: | Introduction to the Course |
|---|---|
| Aug 24 | **Due**:   Intro Survey (Financial Aid Activity) |
| | Reading Annotation 1 |

**Required readings:**

Croucher, S. M., Sommier, M., & Rahmani, D. (2015). Intercultural communication: Where we've been, where we're going, issues we face. Communication Research and Practice, 1, 71-87. doi:10.1080/22041451.2015.1042422

Moon, D. G. (1996). Concepts of culture: Implications for intercultural communication research. *Communication Quarterly*, 44, 70-84.

Shome, Rhaka Postcolonial Approaches to Communication: Charting the Terrain, Engaging the Intersections. *Communication Theory*, 12(2), 2002. 249-270.

**Additional readings:**

Collier, Mary Jane. "Culture and Communication." Encyclopedia of Communication Theory. Ed. Thousand Oaks, CA: SAGE, 2009. 280-86. SAGE Reference Online.

Giri, V. N. (2009) "Intercultural Communication Theories." Encyclopedia of Communication Theory. Eds. Littlejohn, S. & Foss, K. Thousand Oaks, CA: Sage. 533-38. SAGE Reference Online.

| Week 2: | Historical Foundations and Key Concepts |
|---|---|
| Aug 31 | **Due**:   Reading Annotation 2 |
| | Sign up for Closer Look Video week |

**Required readings:**

Leeds-Hurwitz, W. (1990). Notes on the history of intercultural communication: The Foreign Service Institute and the mandate for intercultural training. Quarterly Journal of Speech, 76, 262-281

Bryant Keith Alexander, Lily A. Arasaratnam, Roberto Avant-Mier, Aisha Durham, Lisa Flores, Wendy Leeds-Hurwitz, S. Lily Mendoza, John Oetzel, Joyce Osland, Yukio Tsuda, Jing Yin & RonaHalualani (2014) Defining and Communicating What "Intercultural" and "Intercultural Communication" Means to Us, *Journal of International and Intercultural Communication*, 7:1, 14-37, DOI: 10.1080/17513057.2014.869524

Xu, K. (2013). Theorizing difference in intercultural communication: A critical dialogic perspective. *Communication Monographs*, 80, 379-397. doi:10.1080/03637751.2013.788250

**Additional readings:**

Arasaratnam, L.A. (2015). Research in Intercultural Communication: Reviewing the Past

10

Decade, *Journal of International and Intercultural Communication*, 8:4, 290-310.

Martin, J.N. & Nakayama, T. K. (2010). Intercultural communication and dialectics revisited. In T. K. Nakayama & R. T. Halualani, (Eds.), *The Handbook of Critical Intercultural Communication*, (pp. 59-83). West Sussex, United Kingdom: Wiley-Blackwell.

| Week 3: | Identity and Intersectionality |
|---|---|

Sept 7                    **Due**:   Reading Annotation 3
                                        Assumption Paper

**Required readings:**

Jackson II , R.L., and Moshin, J. (2010). Identity and difference: Race and the necessity of the discriminating subject. In T. K. Nakayama & R. T. Halualani, (Eds.), *The Handbook of Critical Intercultural Communication*, (pp. 59-83). West Sussex, United Kingdom: Wiley-Blackwell.

Chavez, K. (2012). Doing intersectionality: Power, privilege, and identities in political activist communities. In N. Bardhan & M. P. Orbe (Eds.), Identity research and communication: Intercultural reflections and future directions (pp. 21-32). Lanham, MD: Lexington Books.

Mendoza, S. L., Halualani, R. T., & Drzewiecka, J. A. (2002). Moving the discourse on identities in intercultural communication: Structure, culture, and resignifications. *Communication Quarterly*, 50(3), 312-327.

**Additional readings:**

Crenshaw, K. "Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color". In: Martha Albertson Fineman, Rixanne Mykitiuk, Eds. The Public Nature of Private Violence. (New York: Routledge, 1994), p. 93-118.

Kim, Y. Y. (2007). Ideology, Identity, and Intercultural Communication: An Analysis of Differing Academic Conceptions of Cultural Identity. *Journal of Intercultural Communication Research*, 36(3), 237–253. https://doi.org/10.1080/17475750701737181

Gloria Nziba Pindi "Hybridity and Identity Performance in Diasporic Context: An Autoethnographic Journey of the Self Across Cultures" *Cultural Studies <=> Critical Methodologies*, 18(1) 9-15. 2018. 3-8.

| Week 4: | Gender, & Sexuality |
|---|---|

Sept 14                    **Due**:   Reading Annotation 4

**Required readings:**

Chávez, K. R. (2013) Pushing Boundaries: Queer Intercultural Communication, *Journal of International and Intercultural Communication*, 6:2, 83-95, DOI: 10.1080/17513057.2013.777506

Lengel, L. & Martin S.C. (2010). Situating gender in critical intercultural communication studies. In T.K. Nakayama & R.T. Halualani (Eds). *The handbook of critical intercultural communication*. (pp. 335-347). Malden, MA: Blackwell Publishing.

Calafell, B. M. (2012). Monstrous Femininity: Constructions of Women of Color in the Academy. *Journal of Communication Inquiry*, 36(2), 111–130. https://doi.org/10.1177/0196859912443382

11

**Additional readings:**

Atay, Ahmet. "Intercultural Queer Slippages and Translations." *Queer Intercultural Communication: The Intersectional Politics of Belonging in and Across Differences*, edited by Shinsuke Eguchi and Bernadette Marie Calafell, Rowman and Littlefield, 2020,141-156.

Eguchi, S. (2015) Queer Intercultural Relationality: An Autoethnography of Asian–Black (Dis)Connections in White Gay America, *Journal of International and Intercultural Communication*, 8:1, 27-43, DOI: 10.1080/17513057.2015.991077

Aiello, G., Bakshi, S., Bilge, S., Hall, L., Johnston, L., Pérez, K., & Chávez, K. (2013). Here, and Not Yet Here: A Dialogue at the Intersection of Queer, Trans, and Culture. *Journal of International & Intercultural Communication*, 6(2), 96–117. https://doi.org/10.1080/17513057.2013.778155

The XX and XY lie: our social construction of a sex and gender binary Week 5: Unpacking Whiteness

| Week 5: | Whiteness |
|---|---|
| Sept 21 | **Due**:   Reading Annotation 5 |

**Required readings:**

Moon, D. (2016). "Be/coming" white and the myth of white ignorance: Identity politics in white communities. *Western Journal of Communication*, 80, 282-303. doi:10.1080/10570314.2016.1143562

Warren, J.T. (2010). It really isn't about you: Whiteness and the dangers of thinking you got it. In T.K. Nakayama & R.T. Halualani (Eds). *The handbook of critical intercultural communication*. (pp. 446- 460). Malden, MA: Blackwell Publishing.

Alley-Young, G. (2008). Articulating Identity: Refining Postcolonial and Whiteness Perspectives on Race within Communication Studies. *Review of Communication*, 8(3), 307-321. doi: 10.1080/15358590701845311

**Additional readings:**

Washington, M. (2020). Woke skin, white masks: race and communication studies, *Communication and Critical/Cultural Studies*, 17:2, 261 266, DOI: 10.1080/14791420.2020.1770820

Carrillo Rowe, A. & Malhotra, S. (2006). (Un) hinging whiteness. In M. P. Orbe, B. J. Allen & L.A. Flores (Eds.) The same and different (pp. 166-192). Washington, D.C.: NCA.

hooks, b. (1992). Representations of whiteness. In Black looks: Race and representation. (pp. 165-178). Brooklyn, NY: South End Press.

| Week 6: | Body and Embodiment |
|---|---|
| Sept 28 | Due:   Reading Annotation 6 |

**Required reading:**

Alcoff, L. M. (2006). The phenomenology of racial embodiment. Visible identities: *Race, gender, and the self*. New York, Oxford University: 179-194.

12

Fassett, D. L. (2010). Critical reflections on a pedagogy of ability. In T. K. Nakayama & R. T. Halualani (Eds.), *The handbook of critical intercultural communication* (pp. 461-471). Malden, MA: Blackwell.

Sekimoto, S. (2012). A multimodal approach to identity: Theorizing the self through embodiment, spatiality, and temporality. *Journal of International and Intercultural Communication,* 5(3), 226-243. doi:10.1080/17513057.2012.689314

**Additional readings:**
Kaur-Gill, S.  & Dutta, M.J. (2020) Negotiating the (im)mobility of domestic work: Communicative erasures, disrupted embodiments, and neoliberal Asia, *Journal of International and Intercultural Communication*, 13:2, 130-150, DOI: 10.1080/17513057.2020.1739319

| Week 7: | First Celebration of Knowledge |
|---|---|
| Oct 5 | |

| Week 8: | The Politics of Institutional Diversity |
|---|---|
| Oct 12 | **Due**:   Reading Annotation 7 |

**Required readings:**
Ahmed, S. (2012). On being included: Racism and diversity in institutional life. Durham: Duke University.

Allen, B. J. (2010).A proposal for concerted collaboration between critical scholars of intercultural and organizational communication. I In T.K. Nakayama & R.T. Halualani (Eds.) *The handbook of critical intercultural communication*. Malden, MA: Blackwell.

Cheng,H.I. (2010). A critical reflection on an intercultural communication workshop: Mexicans and Taiwanese working on the US-Mexico border. In T.K. Nakayama & R.T. Halualani (Eds.) *The handbook of critical intercultural communication*. Malden, MA: Blackwell.

**Additional readings:**
Oetzel, J., McDermott, V., Torres, A., & Sanchez, C. (2012). The Impact of Individual Differences and Group Diversity on Group Interaction Climate and Satisfaction: A Test of the Effective Intercultural Workgroup Communication Theory. *Journal of International & Intercultural Communication*, 5(2), 144–167. https://doi.org/10.1080/17513057.2011.640754

DiAngelo, R. (2018). Why does white fragility show up at workplace diversity trainings? Yes! Magazine.

Newkirk, P. (2019). Why diversity initiatives fail: Symbolic gestures and millions of dollars can't overcome apathy. *The Chronicle of Higher Ed.*

| Week 9: | The Health Context |
|---|---|
| Oct 19 | **Due**:   Reading Annotation 8 |
| | Topic and group proposal |

**Required readings:**
Dillard, S., Dutta, M., & Sun, W.-S. (2014). Culture-centered engagement with delivery of health

13

services: Co-constructing meanings of health in the Tzu Chi Foundation through Buddhist philosophy. *Health Communication*, 29, 147-156. doi:10.1080/10410236.2012.729262

Dutta, M. J. (2007). Communicating about culture and health: Theorizing culture-centered and cultural sensitivity approaches. *Communication Theory*, 17(3), 304-328. doi: 10.1111/j.1468-2885.2007.00297.x

Bonilla-Silva, E. (2020). Color-Blind Racism in Pandemic Times. *Sociology of Race and Ethnicity*. https://doi.org/10.1177/2332649220941024

**Additional readings:**
Ramadurai, V., Sharf,B.F., & Sharkey, J.R. (2012). Rural food insecurity in the United States as an overlooked site of struggle in health communication. *Health Communication, 27 (8), 794 -.*

| Week 10: | Challenging Eurocentrism and Ethnocentrism |
|---|---|
| Oct 26 | **Due**:   Reading Annotation 9 |

**Required Reading:**
Shome, R. (2010). Internationalizing critical race communication studies: Transnationality, space, and affect. In T. K. Nakayama & R. T. Halualani (Eds.), *The handbook of critical intercultural communication* (pp. 149-170). Malden, MA: Blackwell.

Covarrubias, P. (2007). (Un)Biased in Western theory: Generative silence in American Indian communication. *Communication Monographs*, 74(2), 265-271.

Miike, Y. (2010). Culture as text and culture as theory: Asiacentricity and its raison d'être in intercultural communication research In T. K. Nakayama & R. T. Halualani (Eds.), *The handbook of critical intercultural communication* (pp. 190-211). Malden, MA: Blackwell.

**Additional readings:**
Asante, M. K. (2002). Intellectual Dislocation: Applying Analytic Afrocentricity to Narratives of Identity. *Howard Journal of Communications*, 13(1), 97–110. https://doi.org/10.1080/106461702753555067

| Week 11: | Globalization, Migration & Transnationalism |
|---|---|
| Nov 2 | **Due**:   Reading Annotation 10 |

**Required readings:**
Michael Lechuga (2020) Mapping migrant vernacular discourses: Mestiza consciousness, nomad thought, and Latina/o/x migrant movement politics in the United States, *Journal of International and Intercultural Communication,* 13:3, 257-273, DOI: 10.1080/17513057.2019.1617332

Kinefuchi, E. (2010). Finding home in migration: Montagnard refugees and post-migration identity. *Journal of International & Intercultural Communication*, 3(3), 228-248. doi: 10.1080/17513057.2010.487220

Asante, M. K. (2006). The Rhetoric of Globalisation: The Europeanisation of Human Ideas. *Journal of Multicultural Discourses*, 1(2), 152-158. doi: 10.2167/md054.0

**Additional readings:**

14

Sorrells, K. (2010). Re-imagining intercultural communication in the context of globalization. In T. K. Nakayama & R. T. Halualani (Eds.), *The handbook of critical intercultural communication* (pp. 171-189). Oxford: Wiley-Blackwell.

| Week 12: | Reflections and Futures of the Field |
|---|---|
| November 9 | **Due**:   Reading Annotation 11 |

**Required readings:**

Chakravartty, P. & Jackson, S. J. (2020) The disavowal of race in communication theory, Communication and *Critical/Cultural Studies*, 17:2, 210-219, DOI: 10.1080/14791420.2020.1771743

Chakravartty, Paula, Rachel Kuo, Victoria Grubbs, and Charlton McIlwain. "#CommunicationSoWhite." *Journal of Communication* 68 (2018): 254-266.

Bernadette Marie Calafell (2020) The Critical Performative Turn in Intercultural Communication, *Journal of Intercultural Communication Research*, DOI: 10.1080/17475759.2020.1740292

**Additional Readings:**

Chávez, Karma R. "Beyond Inclusion: Rethinking Rhetoric's Historical Narrative." *Quarterly Journal of Speech* 101 (2015): 162-172.

| Week 13: | Workshops |
|---|---|
| Nov 16 | **Due**: Literature Review |

| Week 14: | Thanksgiving Wednesday |
|---|---|
| Nov 23 | |

| Week 15: | Project Presentations |
|---|---|
| Nov 30 | |

| Week 16: | Finals Week: Celebration of Knowledge |
|---|---|
| Dec 7 | |

15

**A Brief Introduction to my Teaching Philosophy**

So, here's the thing… I actually never wanted to teach. In fact, my grandmother (despite many wonderful qualities) always told my mother, "we were not college people." Luckily however, I watched my mom enroll in university when I was 12 and begin to change the trajectory for women in my family. I studied with her and went to the library with her, completely enthralled with the level of learning I witnessed. Not knowing many people who had higher levels of education I fumbled my way through my own applications, decisions about my major, course enrollment, and communication with faculty. To add to the basic challenges, I worked full time while in college and transferred to a new institution my junior year. Somehow, I eventually met a professor who took interest in my success. He often laughed when I told him I was going to law school and would say "someday you'll figure out that you need a Ph.D., not a J.D."

Fast forward quite a few years, and he ended up being right, but it was not a clear-cut path for me. Today, I can't imagine doing anything else. My courses focus on ways to effectively and equitably communicate across difference and difficulty. I have the great joy and privilege of watching students develop as human beings and make decisions about how they will engage with the diverse world around them. I continue to find that developing student character and inner potential is the most meaningful contribution I can make.

I strive to enact what Hart (2007) calls a "pedagogy of interiority." Hart says, "Our most sustainable and valuable educational goals do not have much to do with test scores, instead they have something to do with a balance between preparing young people for surviving and thriving in the world while developing their authentic inner potentials. (2007, pg. 2) It is my continual goal to create an environment of curiosity, compassion, and intensive reflection where students come to know themselves and their strengths beyond a single classroom. Teaching the practice of contemplation and reflexivity I invite students to participate in their education in a deeply meaningful way, by moving beyond the basic content competency, toward mindfulness in thought and behavior. Education should be humane, inclusive, and embodied and I continually examine my experiences in the classroom in order to bring those elements into each course.

*A note:*

You do not need an "academic" reason to come see me.  You are welcome to contact me any time and I am happy to discuss your program of study, your education experience, challenges, career choices or anything else that is on your mind. You can also just stop by to grab something from the snack basket☺ If you are unable to come by at posted hours never hesitate to call or email to make other arrangements.

16

# EXHIBIT B



## UNIVERSITY OF CENTRAL FLORIDA

# NSCM Inclusive Culture Updates

Below are summaries and links to information provided to NSCM faculty at the annual work day on August 11, 2022. This is a resource guide and should not be interpreted as legal advice or policy.  Please contact Dr. Sandoval with any questions.

Dr. Jen Sandoval (she/ella)
Jennifer.sandoval@ucf.edu
CMB 202A

## Inclusive Teaching Resources

- Resources from FCTL

- Universal design for learning

- Norton Guide to Equity-minded teaching preview

- Designing for accessibility

## HB7 (Individual Freedom or "Stop Woke Act") Information

Key points: On July 7, 2022 HB7 went into effect in Florida. This bill is contained in the larger anti-discrimination laws for the state. The bill has vague restrictions on faculty instruction related to eight specific "concepts" that are listed below in both the UFF recommendations and the BOG policy draft. Fundamentally, the law does NOT explicitly deny faculty the right to teach their subjects comprehensively. However, I recognize that instructors experience varying degrees of vulnerability depending on their individual identities and positions within the university. Most faculty engage their course topics in good faith with the expectations that students will engage thoughtfully and critically. Higher education is largely intended to promote exploration of new ideas and develop students abilities to evaluate information that is presented to them. My pedagogical and philosophical approaches to teaching are based on my own positionality, my 19 years of teaching experience, and my subject matter expertise. These recommendations are informed by those things as well as a recognition for pragmatism in this moment. Please adapt accordingly and reach out if you would like individual assistance:

- Manage course expectations early and clearly
- Co-construct conversational commitments with your students
- Describe and define critical thinking, theory, and informational literacy
- Consider adding a short, simple syllabus statement (examples below)
- Consider recording lectures, carefully document all material and instruction

*Sample statements:*

- o Simple -
  *Assignment of readings and topics for discussion do not equal an endorsement of the author or one specific perspective on the subject matter. AND/OR*

  *No lesson is intended to espouse, promote, advance, inculcate, or compel a particular feeling, perception, viewpoint or belief.*

- o From my graduate seminar on culture and communication -
  *This course engages a diverse range of topics and perspectives. Thoughtful inquiry into the world we live in requires critical thinking, active listening, and mindfulness of difference. We will unpack the debates and conversations among scholars in order to understand what is at stake and what is being contested when it comes to theorizing communication from a cultural point of view. The readings in this course will address the concepts and contexts that shape intercultural encounters, including race, gender, sexuality, identity, ideology, discourse, globalization, and postcolonialism. Assignment of readings and topics for discussion do not equal an endorsement of the author or one specific perspective on the subject matter.  Finally, as an instructor of this course, my goal is to facilitate your intellectual and personal efforts to develop the ways in which you approach your questions. We all need to engage in continuing learning and unlearning to effectively communicate across difference.*

- ▪ UCF FCTL example syllabus statement
  *Fundamental to University of Central Florida's mission is support for an environment where divergent ideas, theories, and philosophies can be openly exchanged and critically evaluated. Consistent with these principles, this course may involve discussion of ideas that you find uncomfortable, disagreeable, or even offensive. These ideas are intended to be presented in an objective manner and not as an endorsement of what you should personally believe. Objective means that the idea presented can be tested by critical peer review and rigorous debate, and that the idea is supported by credible research. Not all ideas can be supported by objective methods or criteria. Regardless, you may decide that certain ideas are worthy of your personal belief. In this course, however, you may be asked to engage with complex ideas and to demonstrate an understanding of the ideas. Understanding an idea does not mean that you are required to believe it or agree with it.*

- ▪ UFF-FEA syllabus statement
  *Students are encouraged to employ critical thinking and to rely on data and verifiable sources to interrogate all assigned readings and subject matter in this course as a way of determining whether they agree with their classmates and/or their instructor. **No lesson is intended to espouse, promote, advance, inculcate, or compel a particular feeling, perception, viewpoint or belief.***

- ▪ [Bill Summary](#)

- ▪ [UCF FCTL information](#)

- ▪ [Video of forum with UFF, ACLU, and NAACP](#)

**FAQs**

*What does this actually mean for my courses?*
This depends largely on your pedagogical approach and subject matter. However, we know that vulnerability also differs across identities and ranks. Ostensibly, nothing should change because the bill addresses behaviors and messages that are unlikely in your classroom. UFF believes there is a fundamental difference between discussion of "inherent virtues/qualities of ideas" vs empirical effects for categories of people. Keep instruction evidence based.

*Can I talk about difficult topics that might be uncomfortable?*
Yes. See above

*Can I use the same films, clips, artistic examples, exercises I have used in the past?*
Most likely. These are parts of curricular instruction so same ideas above apply.

*Can I use the textbook I prefer?*
Yes

*Should I record my lectures?*
Maybe. There are pros and cons. If you record remember you must retain the recordings as likely public record. If administration asks for copies or to view them, you must provide them. If you feel particularly vulnerable and are sure you are not violating the bill this can be important evidence if for example a student only records one part of the lecture.

*What protections exist for faculty?*
Many – but they will be tested by this type of legislation.
- Annual contract
- UCF policy and regulation
- Collective Bargaining Agreement
- Whistleblower protection
- First Amendment
- Academic Freedom
- Equal Protection/Anti-discrimination laws

*What happens if I am accused of violating HB7?*
The University will conduct a local investigation. If they find a substantiated claim, they are required to send it to the Board of Governors. The BOG will then conduct its own investigation. If you are found to have violated HB7 the disciplinary process in the CBA will commence. The discipline will be decided *locally*. CBA requires *just cause* and *progressive discipline*. UFF, FEA, NEA, and AFT will represent **members** who are charged with violations

**Academic Freedom generally includes**
- liberty to conduct research and draw conclusions rooted in evidence
- right to select course materials and content, pedagogy, make assignments, and assess student performance. (Should be germane to subject matter)
- *Limits*: grading policies, protections against a hostile education environment

### SCOTUS Precedent
   o Keyishian v. Board of Regents of University of State of N.Y. 385, U.S., 589, 603 (1967)
   o Regents of Univ of Cal v. Bakke, 438 U.S. 265, 312 (1978)
   o Sweezy v. State of New Hampshire, 354 U.S. 234, 250 (1957)

## CBA Article 5: ACADEMIC FREEDOM

5.1 *Policy.* It is the policy of the University and the UFF to maintain and encourage full academic freedom. Academic freedom and responsibility are essential to the full development of a true university and apply to teaching, research/creative activities, and assigned service. An employee engaged in such activities shall be free to cultivate a spirit of inquiry and scholarly criticism and to examine ideas in an atmosphere of freedom and confidence.

5.2 *Academic Freedom.* Academic freedom is the freedom to teach, both in and outside the classroom, to conduct research, and to publish the results of that research. Consistent with the exercise of academic responsibility, employees shall have freedom to present and discuss their own academic subjects, frankly and forthrightly, without fear of censorship, and to create and select instructional and course materials, and to determine grades in accordance with University grading policy. Objective and skillful exposition of such subject matter, including the acknowledgment of a variety of scholarly opinions, is the duty of every employee. Employees are also free to address any matter of institutional policy or action. As individuals, employees are free to express their opinions to the larger community on any matter of social, political, economic, or other public interest, without institutional discipline or restraint due to the content of those messages. Unless specifically authorized by the administration, employees' opinions do not reflect the policies or official positions of the University of Central Florida.

5.3 *Academic Responsibility.* Academic freedom is accompanied by corresponding responsibility on the part of employees. University faculty are members of a learned profession. As scholars and educators, they should remember that the public may judge their profession and their institution by what they say and do. Accordingly, they shall:

(a) Be forthright and honest in all professional settings, including teaching, advising, service, and the pursuit and communication of scientific and scholarly knowledge;

(b) Observe and uphold the ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge;

(c) Adhere to their proper roles as teachers, researchers, intellectual mentors, or counselors;

(a) Be forthright and honest in all professional settings, including teaching, advising,

(d) Respect students, staff, and colleagues as individuals; treat them in a professional manner; and avoid any exploitation of such persons for private advantage;

(e) Respect the integrity of the evaluation process, by evaluating students, staff, and colleagues fairly according to the criteria the evaluation process specifies;

(f) Contribute to the orderly and effective functioning of their academic unit i.e., program, department, school and/or college and/or the University;

(g) Observe the regulations of the University, provided they do not contravene the provisions of this Agreement; and

(h) Indicate when appropriate that one is not an institutional representative unless specifically authorized as such.

While the law lists a number of prohibitions (included in detail under the "Reasonable Risk" option below), HB 7 also states that its prohibitions (emphasis added) "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." This means that the law's enforcement mechanisms are focused very much on *feelings and perceptions* of objectivity. Thus, individual members need to decide for themselves how much risk they are comfortable taking in the name of academic freedom. Presumably, student complaints will trigger investigation of HB 7 violations, which will be investigated according to this new Board of Governor's policy.

We suggest that all faculty consider recording and maintaining copies of their lectures, but we strongly recommend it for faculty pursuing the "Reasonable" or "Higher" risk courses of action described below. Faculty should retain copies of the course recordings and should be prepared to turn those recordings over to administrators if requested to do so. Faculty must inform students in the syllabus that they should expect recordings of class lectures and discussion. Further advice below is grouped by risk level: Low Risk, Reasonable Risk, and Higher Risk.

*Low Risk*

1) Don't teach or address any of the topics prohibited in HB 7.
2) Remove all posters and art in your office that "endorse" positions prohibited by HB 7.
3) Don't speak to any of the topics addressed in HB 7 with any student groups you may sponsor.
4) Don't guest lecture on any Florida campus about any of the topics addressed in HB 7.

*Reasonable Risk*

| Prohibition or "Faculty may not endorse the concept that___" | Recommended Approach |
|---|---|
| 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex. | While we doubt this has ever come up, don't make this kind of statement in your classroom, ever. |
| 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously. | Faculty can still 'suggest or assert' that a person, by simple virtue of his/her race, benefits from certain social structures. Underscore that this is not the same thing as claiming that an individual, in their heart of hearts, is racist, sexist, or otherwise oppressive. |
| 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex. | Faculty should remind students that "benefits from" is not synonymous with "status as privileged" and "is harmed by" is not synonymous with "is oppressed." |
| 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex. | Faculty response will depend upon material under discussion, but consider: "if the goal of the policy is to minimize 'X' _outcome, then adopting a 'Y' _approach has been shown to achieve that end." |
| 5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, | Instructors can protect themselves by saying "I am not suggesting anyone bears individual responsibility or should feel |

or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

| | |
|---|---|
| 6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion. | We imagine that this is supposed to stop discussions about affirmative action. Consider the following kind of phrasing: "An affirmative action policy says X, and here's the basis for it according to these scholars/articles. These policies tend to have Y effects on Z populations. If you believe that Y effects are desirable, approval of affirmative action policies might be the outcome." |
| 7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in past by other members of the same race, color, national origin, or sex. | Instructors can protect themselves by saying "I am not suggesting anyone bears individual responsibility or should feel guilt" about [X]. |
| 8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex. | Consider: "Merit-based systems of (insert here) can aggravate racial/sex (etc.) inequalities," and "Those who imagined these systems probably did not have the intent of discriminating, but in practice these are the effects." |

*Higher Risk*

Change nothing and teach as you believe is best based on your scholarship and your expertise in your field. You can serve as a test case for potential litigation or organizing against this law if you are ever investigated or harmed. If you find yourself in this position, contact your chapter's grievance committee or the assigned UFF Labor Relations Specialist.

If you, as a UFF member, experience any discipline, harm, or other adverse action from your supervisor or institution in response to your attempts to navigate the prohibitions in HB 7, you should immediately contact your local union leaders for support. You should also encourage your colleagues to join UFF, as the collective power enforced by a strong local Collective Bargaining Agreement (CBA) is the best defense any faculty member can have against the overreaching, totalitarian authority represented in this law.

UFF supports honesty in education, accurate teaching of American history, and clear, thoughtful analyses of our country's governmental and social institutions for biases toward any group, all to build the public good in Florida and beyond. We will defend any member who is harmed for trying to teach the truth and to give their students the best education possible under the difficult circumstances imposed by this law.

**Board of Governors Policy Language**

10.005 Prohibition of Discrimination in University Training or Instruction

(1) **Definitions**. For purposes of this regulation, the enumerated terms are defined as follows: (a) "*Concepts*" are the following:

1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion. 7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

(b) "*Training*" is defined as a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role. (c) "*Instruction*" is defined as the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university within a course. (d) "*Substantiate*" is defined as establishing the existence or truth of a particular fact through the use of competent evidence. (e) "University regulation" is defined as the regulation required by section (2)(a) below. (f) "Administrator" means the following high level personnel who have been assigned the responsibilities of university-wide academic or administrative functions: university president, provost, senior/executive vice presidents, vice presidents, associate vice presidents, associate/vice provosts, deans, equal opportunity programs director, chief audit executive, and chief compliance officer.

**(2) University Regulation and Content Review** (a) Each university shall have a university regulation that prohibits discrimination on the basis of race, color, national origin, or sex by subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the concepts as defined in paragraph (1)(a). Such university regulation shall contain a method for submitting complaints of alleged violations of the university regulation and the title and contact information of the office(s) designated by the university to receive and maintain such complaints. (b) The university regulation shall include that the prohibition in section (2)(a) does not prohibit discussion of the concepts as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts. (c) Each university shall post the university regulation on a public website where the university commonly publishes regulations. (d) Each university shall periodically review its regulations, policies and institutional training materials to ensure that the content does not violate the university regulation.

**(3) University Investigation and Corrective Action** (a) Each administrator who receives a complaint of an alleged violation of the university regulation shall timely forward such complaint to the office(s) designated to receive such complaints. (b) After reviewing the complaint and obtaining any additional information to aid in the review, the designated office shall direct, supervise, or coordinate the investigation of credible complaints that identify a training or instruction that espouses, promotes, advances, inculcates, or compels a student or employee to believe any of the concepts. (c) In the event the investigation finds that an instruction or training is inconsistent with the university regulation, the university shall inform the Board of Governors through the Office of Inspector General and take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation, issuing disciplinary measures where appropriate and remove, by termination if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate. (d) If the Board of Governors receives a complaint about which it has not been previously informed pursuant paragraph 3(c), it shall refer the complaint to the subject university's Chief Audit Executive to be addressed pursuant paragraphs 3(a)-(c).

**(4) Proceedings to Determine a Substantiated Institutional Violation** (a) Upon receipt of a credible allegation that a university willfully and knowingly failed to correct a violation of the university regulation, the Board of Governors' Office of Inspector General shall conduct an investigation to determine if evidence exists to support the allegation and ineligibility for performance funding. In determining whether a university willfully and knowingly failed to correct a violation, the Office of Inspector General shall consider whether the university made a good faith determination that the complaint did not allege a violation of the university regulation or whether it took prompt corrective action after it substantiated a violation of the university regulation. If it is determined an external qualified investigative firm is necessary to assist with or conduct the investigation, the subject university will be responsible for any costs incurred. (b) The Inspector General shall submit the investigatory findings to the Chair of the university's Board of Trustees, or the Chair's designee, which shall have twenty (20) business days to submit a written response after receipt of such findings. The Office of Inspector General shall provide a rebuttal, if any, to the university within twenty (20) business days after receipt of the university's response. The university's response and the Office of Inspector General's rebuttal to the response, if any, shall be included in a final investigative report provided to the Board of Governor's Audit and Compliance Committee and the Chair of the university's Board of Trustees. (c) The Board of Governor's Audit and Compliance Committee shall make a recommendation to the Board as to whether it should substantiate an allegation that a university willfully and knowingly failed to correct a violation of the university regulation. The Board shall review the investigative report and recommendation and make a final decision regarding whether the alleged willful and knowing failure to correct a violation of the university regulation is substantiated. Such decision will be rendered in writing to the university within twenty (20) business days of the meeting at which the report is considered. (d) If the Board of Governors determines that a university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of section 1000.05(4)(a), Florida Statutes, and failed to take appropriate corrective action, the university will be ineligible for performance funding for the next fiscal year following the year in which the Board of Governors made the determination. (5) Additional Proceedings. A university or the complainant may seek judicial review by filing a petition for writ of certiorari review with the appropriate circuit court within thirty (30) days of the date of the Board's final decision pursuant to Florida Rule of Appellate Procedure 9.190(b)(3). Authority: Section 7(d), art. IX, Fla. Const.; Section 1000.05, Florida Statutes; Section 1001.92, Florida Statutes; History: New _____.

# EXHIBIT C

# NSCM Inclusive Culture

Jennifer A. Sandoval, PhD





# Plan

1 | Reminders about inclusive teaching

2 | Department diversity statements

3 | H B7 guidance

4 | Questions

SA 143



Grace

Accountability

Context of Compound Crises



Plan for

# Inclusive
# Teaching

Pick one thing to
change each semester!

inclusive
language

proactive
accessibility

equity-minded
structure

trauma-informed
approaches

representation
in readings and
scholarship

SA 145

# Inclusive Teaching

focusing on most historically excluded increases accessibility for all



 universal design

 inclusive language

 acknowledge neurodiversity

 trauma informed approaches

# Inclusive Teaching



## Universal Design

1. equitable use
2. flexibility in use
3. simple and intuitive use
4. perceptible information
5. tolerance for error
6. low physical effort
7. size and space for approach and use

SA 147

# Inclusive Teaching



## neurodiversity

- not really any such thing as "neuro typicality"
- processing time
- nonverbal communication differences

SA 148

# Inclusive Teaching



## inclusive language

- identify own bias/scripts
- honor self-identification
- don't assume you know anything about a person's identity
- person centered
- embrace change
- impact over intent

SA 149

# Inclusive Teaching



## Trauma informed practice

- compound crises - unregulated nervous systems
- connect to resources
- self and community care

SA 150

TYPE CAPTION

# Diversity Statement Update





The fun stuff

# HB7



### State of FL

The " law"



### UCF/UFF

Guidelines



### Jen

Perspective

- Contracts

- Collective Bargaining Agreement

- Policies and Regulations

- Whistleblower protection

- First Amendment Outside of Classroom

- Academic Freedom

- Equal Protection law



# Faculty Protections



Key Terms

## Instruction

the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university within a course.

## Training

a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role.

## Concepts

list of 8 things we may not endorse in our classroom instruction

## Substantiate

establishing the existence or truth of a particular fact through the use of competent evidence



✓ Members of one race, color, national origin, or sex are **morally superior** to members of another race, color, national origin, or sex.

✓ A person, by virtue of his or her race, color, national origin, or sex is **inherently** racist, sexist, or oppressive, whether consciously or unconsciously.

✓ A person's **moral character or status** as either privileged or oppressed is necessarily defined by his or her race, color, national origin, or sex.

✓ Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

SA 156



A person, by virtue of his or her race, color, national origin, or sex **bears responsibility** for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

A person, by virtue of his or her race, color, sex, or national origin, bears responsibility for and must feel guilt, anguish, or other **forms of psychological distress because of actions**, in which the person played no part, committed in the past by members of the same race, color, national origin, or sex.

**Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.**

SA 157

# FAQs



textbooks/syllabi



materials/examples



discussions

SA 158

# Syllabus Statements



**Simple:**

- Assignments of readings and topics for discussion do not equate to endorsement of the author or one specific perspective on the subject matter.

**If you want to explain more:**

- Don't over explain

- Don't get too technical

- Examples from FCTL and UFF in handout

SA 159

# Focus on

## Making the best decisions for you



1  Managing expectations

2  Good faith engagement

3  Documenting your stuff

SA 160

# Public Health Note

- no more institutional resources or policies for COVID

- monitor County numbers

- clarify expectations with students

- include accurate information about Monkeypox



SA 161

# THANKS!

jennifer.sandoval@ucf.edu





Hope you feel less like this

And maybe a little more like this

# EXHIBIT D

**Let Our Students Learn!**

In the devastating 2022 Florida legislative session, several bills that limit the freedoms of Florida citizens were signed into law. HB7, or the "Stop Woke Act", restricts educators from covering topics in the classroom that could potentially cause discomfort (See the list here). As faculty in the State University System of Florida we refuse to be censored. We are committed to resisting unconstitutional invasions into public education. We call upon state and university officials to let our students learn! Below is our open letter to the State. We hope you will consider supporting our resistance with your signature.

*An open letter from Florida faculty regarding HB7*

As we face complex social, environmental, health, geopolitical, and fiscal crises, the State of Florida has placed numerous restraints on what can be taught in public classrooms.

Florida HB7, which came into effect on July 1st, 2022, prohibits classroom teachers from *advancing* ideas that may make students uncomfortable. And HB233—passed one year earlier--prohibits educators from *shielding* students from language they may find uncomfortable. Neither law aims to further critical thinking, scientific exploration, informational literacy, or any other aspect of student learning. Instead, these laws function primarily to undermine the ability of teachers to provide students with the knowledge and skills needed to understand and address some of today's most pressing issues. SB7044 further undermines the education of Florida's students by *prohibiting* regular external reviews of our academic programs and protocols by the accrediting agency (SACS) historically entrusted to uphold academic standards for the entire Southern region of the U.S.

As the Association of American University Professors (AAUP) notes, bills such as these infringe on "the right of faculty to teach and of students to learn" and "substitutes political mandates for the considered judgment of professional educators" (AAUP 2021). Educators have the responsibility, as well as the right, to exercise their best professional judgment. We must then resist any law that tells us what concepts we can and cannot use to teach about the natural world and social practices and institutions. All fields of study operate under codes of conduct that inform what we teach and how we teach it. We are not free to alter the facts of history, just as we cannot teach that the earth is flat. State legislators and University administrators who ask us to do so are asking us to abandon our intellectual and moral integrity. We refuse. We must continue to engage in good faith partnership with our students, colleagues, and communities - even in the face of such bad faith legislation. Our commitment remains to those who need and seek to better understand the world they inhabit, with the hope to improve it.

*This statement originated with Dr. Shelley Park, Professor of Philosophy & Cultural Studies, Dr. Talat Rahman, Pegasus Professor of Physics, Dr. Lee Ross, Professor of Criminal Justice, and Dr. Jennifer Sandoval, Associate Professor of Communication, tenured faculty in the State University System of Florida.*

Link to Google Form to add signature to letter

List of Signatures Below:

| # | Name | Title/Role | School |
|---|---|---|---|
| 1 | Jennifer Sandoval | Associate Professor | University of Central Florida |
| 2 | Shelley Park | Professor of Philosophy & Cultural Studies | University of Central Florida |
| 3 | Lee E. Ross | Professor of Criminal Justice | University of Central Florida |
| 4 | Talat S Rahman | Pegasus Professor | University of Central Florida |
| 5 | Robert Cassanello | Assoc Professor | UCF |
| 6 | Laura Gonzales | Assistant Professor | University of Florida |
| 7 | Bruce Janz | Professor, Humanities & Cultural Studies; Co-director, Center for Humanities and Digital Research | University of Central Florida |
| 8 | Claudia Schippert | Associate Professor of Humanities, Religion, and Cultural Studies | UCF |
| 9 | Martha C Brenckle | Professor, Interim WPA | University of Central Florida |
| 10 | Leandra Preston | Senior Lecturer, Women's and Gender Studies | University of Central Florida |
| 11 | Michael Armato | Lecturer | University of Central Florida |
| 12 | Kevin Coffey | Professor | University of Central Florida |
| 13 | Ann Gleig | Dr. | UCF |
| 14 | Dr Reshawna Chapple | Associate Professor of Social Work | College of Health  Professions and Sciences |
| 15 | Brigitte Kovacevich | Associate Professor | University of Central Florida |
| 16 | David Mitchell | Associate Professor | University of Central Florida |
| 17 | Betsy Kalin | Assistant Professor | UCF |
| 18 | Lakelyn E. Taylor | Graduate Teaching Associate | University of Central Florida |
| 19 | Jonathan Conway | Associate Instructor | University of Central Florida |
| 20 | Bridget Rubenking | Associate Professor | University of Central Florida |
| 21 | Michelle Dusseau | Associate Lecturer | University of Central Florida |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 22 | Ben LaPoe | Assistant Professor | Ohio University |
| 23 | Jonathan Beever | Associate Professor of Philosophy | University of Central Florida |
| 24 | Dori Griffin | Associate Professor | School of Art + Art History |
| 25 | Charissa de Bekker | Courtesy Associate Professor | University of Central Florida |
| 26 | Jonathan Cox | Assistant Professor of Sociology | University of Central Florida |
| 27 | Kristina Tollefson | Professor of Theatre | University of Central Florida |
| 28 | Margaret McLaren | Professor of Philosophy | Rollins College |
| 29 | Elizabeth Harris | Associate Lecturer | University of Central Florida |
| 30 | Laurie Shrage | Professor, Philosophy | Florida International University |
| 31 | Jonathan Hernandez | Lecturer | Middle Tennessee State University |
| 32 | Anne E. Duggan | Professor of French studies | Wayne State University |
| 33 | Sandra Wheeler | Associate Lecturer | University of Central Florida |
| 34 | Srivi Ramasubramanian | Professor | Syracuse U |
| 35 | Shana Harris | Assistant Professor | University of Central Florida |
| 36 | Simon Evnine | Professor | University of Miami |
| 37 | Kristy A. Lewis | Assistant Professor of Biology | University of Central Florida |
| 38 | Lisa Logan | Associate Professor | UCF |
| 39 | John Scott | Professor | University of Central Florida |
| 40 | Janice Myatt | Ms | All |
| 41 | Karen Marrero | Associate Professor | Wayne State University |
| 42 | Susan Hubbard | Professor Emerita | UCF |
| 43 | Brett Stockdill | Professor | Northeastern Illinois University |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 44 | Esther Romeyn | Senior Lecturer | University ofFlorida |
| 45 | Michelle Ferrier | Professor | Florida Agricultural & Mechanical University |
| 46 | Jacek Blaszkiewicz | Assistant Professor of Music History | Wayne State University |
| 47 | John Raible | Senior Instructional Designer | University of Central Florida |
| 48 | Rosalind Beiler | Associate Professor of History | University of Central Florida |
| 49 | Richard Chappell | Associate Professor of Philosophy | University of Miami |
| 50 | Jaclyn King | Adjunct | University of Central Florida |
| 51 | Christian Ravela | Associate Professor of Humanities and Cultural Studies | University of Central Florida |
| 52 | Jay Jurie | associate professor (retired) | University of Central Florida |
| 52 | | | |
| 53 | Anna Lindner | Doctoral Candidate | Wayne State University |
| 54 | Angela Rounsaville | Associate Professor | University of Central Florida |
| 55 | Lana Williams | Associate Lecturer | University of Central Florida |
| 56 | Amy Barnickel | Lecturer | UCF |
| 57 | Jane Vaughan | Associate Lecturer | University of Central Florida |
| 58 | Dawn Trouard | Professor Emerita | UCF |
| 59 | Donovan Adams | Assistant Professor | University of Central Florida |
| 60 | Catherine imbesi | Business owner | Edgewater high |
| 61 | Devin Moran | Student | UCF |
| 62 | Megan Lambert | Associate Instructor | University of Central Florida |
| 63 | Matthew Giles | Associate Professor | Ringling College of Art and Design |
| 64 | Stephen M. Fiore | Professor | University of Central Florida |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 65 | Richard H. Harrison II | Associate University Librarian | University of Central Florida |
| 66 | Alison Sutton-Ryan DBH, LCSW, LISAC | Clinical Assistant Professor | Salisbury University |
| 67 | Priti Shah | Professor | University of Michigan |
| 68 | Beatriz Reyes-Foster | Associate Professor | University of Central Florida |
| 69 | Daun Fields | TA | University of Florida |
| 70 | Charles Hughes | Professor | University of Central Florida |
| 71 | Jason Buel | Assistant Professor of Communication | North Carolina Wesleyan University |
| 72 | Brook J. Sadler, Ph.D. | Associate Professor | University of South Florida |
| 72 | | | |
| 73 | Richard Manning | Associate Professor, Philosophy | University of South Florida |
| 74 | Alex Levine | Chair, Department of Philosophy | University of South Florida |
| 75 | Rachel May | Associate Professor | University of South Florida |
| 76 | Anjana Mudambi | Assistant Professor | University of Wisconsin-Milwaukee |
| 77 | Lorrayne Carroll | Associate Professor of English/Women & Gender Studies Faculty (ret.) | University of Southern Maine |
| 78 | Ronald L Claypool | Dr. | Santa Fe College |
| 79 | Sonia Stephens | Associate Professor | University of Central Florida |
| 80 | Kristin Congdon | Professor Emerita, Philosophy and Humanities | UCF |
| 81 | Eve A. Raimon | Professor | University of Southern Maine |
| 82 | Cheryl Hall | Associate Professor | University of South Florida |
| 83 | R. Paul Wiegand | Assistant Professor | Winthrop Univ. (formerly UCF faculty, |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| | | | 2007-2020) |
| 84 | Kathryn Seidel | Dean Emerita and Professor of English (retired) | University of Central Florida |
| 85 | Bruce E. Drushel, Ph.D. | Professor & Chair, Department of Media, Journalism & Film | Miami University |
| 86 | M. Scott Solomon | Director, School of Interdisciplinary Global Studies | University of South Florida |
| 87 | Carole Hinshaw | University librarian | University of central Florida |
| 88 | Mark Klisch, Ph.D. | Clinical Psychologist | University of South Florida, retired |
| 89 | Nessette Falu | Assistant Professor | University of Central Florida |
| 90 | Yan Fernandez | Professor | University of Central Florida |
| 91 | Daryl Gordon | Associate Professor | Adelphi University |
| 92 | Rec. Dr. Donna M. Cox | Professor | University of Dayton (OH) |
| 93 | Diane Price Herndl | Professor and Chair | University of South Florida |
| 94 | Nicole Guenther Discenza | Professor of English | University of South Florida |
| 95 | Harry S. Coverston, Ph.D., J.D. | Assistant Lecturer, Philosophy (retired) | University of Central Florida |
| 96 | Golfo Alexopoulos | Professor | USF |
| 97 | Milton W Wendland | Professor of Instruction | University of South Florida |
| 98 | Jeremy Kelly | Teacher | G-star School of the Arts |
| 99 | Scott Ferguson | Associate Professor | University of South Florida |
| 100 | Summer Qabazard | Assistant Professor of English | The University of South Florida |
| 101 | Jessica Young | Adjunct | University of South Florida |
| 102 | Amy Rust | Associate Professor | University of South Florida |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 103 | Marsha Bryant | Professor & Distinguished Teaching Scholar | U of Florida |
| 104 | Tison Pugh | Pegasus Professor | University of Central Florida |
| 105 | Aaron Augsburger | Assistant Professor | University of South Florida |
| 106 | Roberto Hugh Potter, | Professor of Criminal Justice | University of Central Florida |
| 107 | Steve J. Collins | Associate Professor | University of Central Florida |
| 108 | Alison Cares | Associate Professor | University of Central Florida |
| 109 | Tina Leisner McDermott | Professor, Communication Studies | Antelope Valley College |
| 110 | Jackie Chini | Associate Professor | University of Central Florida |
| 111 | Michael Chini | Associate Professor of Physics | University of Central Florida |
| 112 | Mason Cash | Associate Professor | University of Central Florida |
| 113 | Claire Strom | Professor | Rollins College |
| 114 | Cornelia Flora | Distinguished Professor Emerita | Iowa State University |
| 115 | Ann A Warren | Emerita Instructor of English | Kansas State University |
| 116 | Laurene Tetard | Associate Professor | University of Central Florida |
| 117 | Jose Vazquez | Workplace Safety Manager | University of Central Florida |
| 118 | Christina Hauck | Associate Professor Emeritus | Kansas State University |
| 119 | Kris | Dr. | University of Kansas School of Medicine (former) |
| 120 | Scott Cairns | Professor of English | Seattle Pacific University |
| 121 | Peter Funke | associate professor | USF |
| 122 | Gregory F. Welch | Pegasus Professor and AdventHealth Endowed Chair in Healthcare Simulation | UCF College of Nursing |
| 123 | Garrett Arban | Instructor | University of Central Florida |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 124 | Martin Ottenheimer | Retired Professor | KSU |
| 125 | Sandra Sousa | Associate Professor | University of Central Florida |
| 126 | Stephen Ethridge | Instructor | University of Central Florida |
| 127 | Dr. Daniel Britt | Pegasus Professor of Physics and Planetary Sciences | University of Central Florida |
| 128 | Christian Beck | Associate Lecturer | University of Central Florida |
| 129 | Gary T. Leavens | Professor of Computer Science | University of Central Florida |
| 130 | Esther Milu | Assistant Professor | University of Central Florida |
| 131 | Robert Fitak | Assistant Professor | University of Central Florida |
| 132 | Christine Wargo Deatrick | Lecturer | University of Central Florida |
| 133 | Julie Pomerleau | Senior Instructor | University of Central Florida |
| 134 | Jason Chesnut | Lecturer, Psychology | University of Central Florida |
| 135 | Amy Donley | Associate Professor | University of Central Florida |
| 136 | Vladimir Solonari | Professor | University of Central Florida |
| 137 | vance geiger | Senior Lecturer | UCF |
| 138 | Jacqueline Withers | Associate Instructor | UCF |
| 139 | Daniel Murphree | Associate Professor | Department of History |
| 139 | | | UCF |
| 140 | Bruce Wilson | Professor | University of Central Florida |
| 141 | Jonathan | Knuckey | University of Central Florida |
| 142 | Leslie Connell | Senior Instructor | University of Central Florida |
| 143 | Steven Hornik | Dr. | University of Central Florida |
| 144 | Christina Christie | Visiting Lecturer | University of Central Florida |
| 145 | Sarah Barber | Professor of Anthropology | University of Central Florida |

| # | Name | Title/Role | School |
|---|------|------------|--------|
| 146 | Frank J. Corbishley | The Rev. | University of Miami |
| 147 | J. Marla Toyne | Associate Professor | University of Central Florida |
| 148 | Tremon Kizer | Director of Athletic Bands | University of Central Florida |
| 149 | Annie Wu | Associate Professor | University of Central Florida |
| 150 | Barry Sandler | Associate Professor | NSCM |
| 151 | Barry Sandler | Associate Professor | University of Central Florida |
| 152 | Jamie Vega | Instructor | University of Central Florida |
| 153 | Laura Runge | Professor of English | University of South Florida |
| 154 | Joel M Bergholtz | PhD, Lecturer | UCF |
| 155 | Michelle Taylor | Assistant Professor of Instruction | University of South Florida – Tampa campus |
| 156 | Joel Schneier | Lecturer | University of Central Florida |
| 157 | Richard Hofler | Professor | University of Central Florida |
| 158 | Andrew Dicus | Assistant Professor of English | Flagler College |
| 159 | Lisa Mills | Professor of Film | Nicholson School of Comm, COS, UCF |
| 160 | Linda Goddard | Professor of English | Valencia College |
| 161 | David Ponton III | Assistant Professor | University of South Florida |
| 162 | Joanna Mishtal | Professor | UCF |
| 162 | | | |
| 163 | Diane J Graves | University Librarian and Professor Emerita | Trinity University |
| 164 | Arturo Jimenez-Bacardi | Assistant Professor | University of South Florida |
| 165 | Diane Smith | Professor | Trinity University |
| 166 | Nusaiba Zaman | Graduate Teaching Associate | University of Central Florida |
| 167 | Edd Dickerman | Mr. | AB, Indian University |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 168 | John Gardiner | Assistant Professor | University of Central Florida |
| 169 | Mark L. Kamrath | Professor of English, Co-Director of the Center for Humanities and Digital Research | University of Central Florida |
| 170 | Jennifer Thomas | Associate professor, emeritus | Music |
| 171 | Kendal Broad | Associate Professor | UF |
| 172 | Hyoung Jin Cho | Professor | College of Engineering and Computer Science |
| 173 | Euripides Montagne | Senior Lecturer | University of Central Florida |
| 174 | Irina McLaughlin | instructor | UCF |
| 175 | Nick Myrca Gauthier | Instructor | University Of Central Florida |
| 176 | Elizabeth Dale | Professor | UF |
| 177 | Lucas R. Martindale Johnson | Principal Investigator | Far Western Anthropological Research Group, Inc. |
| 178 | Lisa Johnson | Assistant Professor-in-Residence | University of Nevada, Las Vegas |
| 179 | Amanda Logan | Associate Professor | Northwestern University |
| 180 | Pamela Gilbert | Professor | UF |
| 181 | Heather Nepa | Administrative Assistant | University of Nevada Las Vegas |
| 182 | Nicholas Barron | Dr. | University of Nevada Las Vegas |
| 183 | Christopher A. Pool | University Research Professor | University of Kentucky |
| 184 | Saffy | Student | University of Central Florida |
| 185 | Daniel C Benyshek | Professor | University of Nevada, Las Vegas |
| 186 | Alecia Schrenk | Dr. | University of Nevada, Las Vegas |
| 187 | Gabriela Oré Menéndez | Assistant Professor | University of Nevada Las Vegas |
| 188 | Chris Hawkins | Professor | Public Administration |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 189 | Ruth M. Van Dyke | Professor of Anthropology | Binghamton University - SUNY |
| 190 | Paul Ortiz | Professor of History | University of Florida |
| 191 | Brian Villmoare | Associate Professor | University of Nevada Las Vegas |
| 192 | Sharon Austin | Professor | University of Florida |
| 193 | Dr. Yiorgo Topalidis | Assistant Director | University of Florida |
| 194 | Christina Rivers | Assoc. Prof., Political Science | DePaul University |
| 195 | Amie Kreppel | Professor | University of Florida |
| 196 | Elizabeth Brown | Associate Professor of Psychology | University of North Florida |
| 196 | | | |
| 197 | Stacie Manolis | Retired 35 year Florida teacher | Hernando county schools |
| 198 | Jennifer Lieberman | Associate professor | University of North Florida |
| 199 | Tina Certain | School Board member | Alachua County |
| 200 | David Canton | Director African American Studies | College of Liberal Arts and Sciences |
| 201 | Karen Harry | Dr. | University of Nevada Las Vegas |
| 202 | Avani Vijayalakshmi-Ramanathan | MPH | Florida International University |
| 203 | Mark Law | Distinguished Professor | Engineering |
| 204 | John Hatle | Professor of Biology | University of North Florida |
| 205 | Aida A. Hozic | Associate Professor | University of Florida |
| 206 | Lori Lee | Associate Professor of Anthropology | Flagler College |
| 207 | Nichole Shippen | Professor | City University of New York |
| 208 | Lara Beaty | Professor | LaGuardia Community College, CUNY |

| # | Name | Title/Role | School |
|---|------|-----------|--------|
| 209 | Nick Shrubsole | Associate Lecturer | University of Central Florida |
| 210 | Jessica Alvarez | Graduate student | University of Florida |
| 211 | Dimitris Stamatopoulos | Professor in Balkan and Late Ottoman History | University of Macedonia, Thessaloniki |

# EXHIBIT E

FAQ on HB7 and Instruction and Training

Case 4:22-cv-00304-MW-MAF   Document 13-5   Filed 08/24/22   Page 75 of 81   7/14/22, 1:50 PM
USCA11 Case: 22-13992   Document: 53-1   Date Filed: 06/16/2023   Page: 180 of 242

# FAQ on HB7 and Instruction and Training

Background on the change in law:

In brief, HB 7 amends a current Florida non-discrimination law (Fla. Stat. 1000.05: Florida Educational Equity Act) to provide that an educational institution, including UCF, may not subject any student or employee to training or instruction that "espouses, promotes, advances, inculcates, or compels such student or employee to believe" any of eight "specified concepts" (listed below, each based on race, color, sex, or national origin) because such action would be *per se* discriminatory under the amended statute.

The eight specified concepts are:

1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
3. A person's moral character or status as either privileged or oppressed is necessarily defined by his or her race, color, national origin, or sex.
4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.
5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.
6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

Teaching Resources

Teaching Strategies

Course Design

Learning Spaces

Classroom Management

– Attendance

– Civil Pedagogy

– FAQ on HB7 and Instruction and Training

Promoting Academic Integrity

Inclusive Teaching

Faculty Focus

Video Resources

FAQ on HB7 and Instruction and Training    Case 4:22-cv-00304-MW-MAF    Document 13-5    Filed 08/24/22    Page 76 of 81    7/14/22, 1:50 PM

USCA11 Case: 22-13992    Document: 53-1    Date Filed: 06/16/2023    Page: 181 of 242

7.  A person, by virtue of his or her race, color, sex, or national origin, bears responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by members of the same race, color, national origin, or sex.

8.  Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Importantly, the statute provides that the specified concepts can be discussed as part of a larger course of training or instruction, so long as the training or instruction is "given in an objective manner without endorsement of the concepts."

The Florida Board of Governors (BOG) provides the following definition of "**instruction**": the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university within a course.

Instruction is instructor-led class content (i.e., syllabus lectures, assessments, and assigned materials) delivered by a faculty member assigned to a specific course, at specific time and place, and/or in a specific modality to a student enrolled in that course. Because instruction occurs within a course, it does not include faculty speaking engagements outside of a specific course (unless attendance by students within a specific course is mandatory or offered as the only option in exchange for tangible benefits, e.g., extra credit), faculty research outside of a specific course (e.g., publishing scholarly articles), faculty commentary outside of a specific course (e.g., social media), student to student discussions (whether inside or out of class), or to student-generated coursework such as presentations..

The BOG provides the following definition of "**training**": a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role.  Training could occur as part

of employee onboarding, orientation, specialized skills training as part of a volunteer or employed role, or other required activities that qualify as training for a role.  However, where individuals seek out activities on a voluntary basis, e.g., for reasons of personal interest or enrichment, that would not constitute training for purposes of this law.

# HB 7 "SPECIFIED CONCEPTS" FAQ

### *Can I discuss topics or teach concepts in my classroom that may make people feel uncomfortable?*

Yes. The law does not prevent discussion of topics that may be controversial or make some people feel uncomfortable.  However, you may not tell students they should or must feel guilty because they belong to a particular race, color, national origin or sex.  And you should not tell students how to feel or that they need to admit to feeling a certain way about these topics. The legislature's stated purpose in adopting this law was to prohibit coercing students and employees to particular beliefs.

### *What if my course involves instruction on one or more of the "specified concepts"?*

The law requires instruction on one or more of the specified concepts to be conducted "in an objective manner without endorsement of the concepts." Otherwise, the instruction may be viewed as discrimination against your students under Florida law, which has potential consequences.

This does not mean that you are forbidden from discussing such concepts in your course, so long as your discussion is done "in an objective manner without endorsement of the concepts." If your course involves the specified concepts, we recommend that you consider how to present and lead discussion of the specified concepts during instruction.  UCF has several resources available through the FCTL- including a page dedicated to civil pedagogy at https://fctl.ucf.edu/teaching-resources/classroom-management/civil-pedagogy/ – that may be of interest.

### *What about trainings that discuss the "specified concepts"?*

Similar to student instruction, the University may not subject employees or students to a mandatory training that "espouses, promotes, advances, inculcates, or compels [the individual] to believe" any of the eight "specified concepts." The concepts may be discussed as part of a larger course of training as long as they are delivered in an "objective manner without endorsement of the concepts."

### *Can I teach or train about advantages enjoyed by some members of our society?*

Yes. An individual's background and experience may have given that individual advantages or disadvantages different from those experienced by others with different backgrounds and experiences.  It is okay to discuss these kinds of differences as part of instruction or training as long as nobody is told (1) that they should feel guilty or superior about their respective advantages and disadvantages or (2) that they are responsible for or the beneficiary of others not having the same advantages or disadvantages.

### *What about historical events that are racist or sexist, is it okay to talk about them in my class?*

Yes. Discussion about historical events, even events that are difficult to talk about, are important to include as appropriate to the subject(s) of your classes.  However, you may not tell students in your class that they are responsible for those events, or that they should feel guilty because they belong to a particular group that was responsible for the events.

### *I have experienced racism or sexism. Is it okay for me to talk about this in the classroom?*

Yes, it is okay to tell your story.  However, you may not tell students they must feel guilty because they belong to a group that committed racist or sexist acts toward you.

### *How do we teach on the concepts described as "unlawful discrimination" when there is so much scientific evidence to support them?*

FAQ on HB7 and Instruction and Training
Case 4:22-cv-00304-MW-MAF   Document 13-5   Filed 08/24/22   Page 79 of 81   7/14/22, 1:50 PM
USCA11 Case: 22-13992   Document: 53-1   Date Filed: 06/16/2023   Page: 184 of 242

We recognize that this change in law presents a challenge when addressing certain topics. Teaching objectively about any, or all, of the concepts specified in the bill is acceptable and allowed. What the law prohibits is the university (through its trainers or instructors of record) training or instructing employees or students that they are personally responsible for events that occurred in the past or telling them they should feel guilty for these events. This change in law was described by the bill sponsors as one that seeks to ensure that universities do not place guilt or blame on the basis of an individual's race, sex, national origin, or color.

**Can training on cultural competency be required as a condition of employment?**

Yes; however, individuals who take cultural competency training must not be told they should feel guilty because they belong to a particular group (such as a particular race or national origin or sex or color), and they cannot be required to admit to guilt as a condition of their employment.

**What does "in an objective manner without endorsement" mean?**

This language is not defined by Florida law, and the Florida Legislature did not provide guidance on what this language means in the context of implementing or complying with the requirements. However, the University interprets this phrase according to its plain meaning and consistently with faculty members' existing obligations to teach their academic subjects in an objective and skillful manner. *See* UFF UCF Collective Bargaining Agreement ("CBA"), specifically Section 5.2 (Academic Freedom):

> *Consistent with the exercise of academic responsibility, employees shall have freedom to present and discuss their own academic subjects, frankly and forthrightly, without fear of censorship...[o]bjective and skillful disposition of such subject matter, including the acknowledgement of a variety of scholarly opinions, is the duty of every employee.*

Faculty members who teach in disciplines related to the specified concepts can best protect themselves from claims of discrimination by continuing to acknowledge a variety of evidence-based _scholarly_ opinions on academic subjects. Ideas in a course should be founded in scholarly evidence and opinions, just as they must be in a published work.

### How can I present material "in an objective manner without endorsement" if it is my own scholarly research?

Consistent with the dual concepts of academic freedom and academic responsibility, you may present and discuss your own scholarly research without censorship while also being expected to acknowledge a variety of other _scholarly_ opinions in the same subject area.

You may wish to include an explicit statement for your students, whether in your syllabus or verbally during instruction, making it clear that your students are free to form their own opinions about your scholarly research, for or against, after considering the other evidence-based scholarship in the same subject area.

### What are the consequences for including the "specified concepts" in my instruction?

Students who feel they have been subject to instruction on one or more of the "specified concepts" in a way that was not objective, or in a way that involved endorsement of the concepts, can take one of three routes to complain: file a lawsuit, file a complaint with the Board of Governors, or file a complaint with a standing committee of the Florida Legislature. If one of these three bodies makes a "substantiated finding" of a violation, the University will be ineligible for all performance-based funding for the fiscal year following the year in which a violation is found. Additionally, violation of these provisions by a university employee could result in disciplinary action from the University, if you instruct students or train on the "specified concepts" in a manner that violates your responsibility to the institution.

**FACULTY CENTER**

12601 Aquarius Agora Dr.                    Phone: (407) 823-3544
CB1-207                                     Fax: (407) 823-2355
Orlando, FL 32816-0066                      fctl@ucf.edu

13-6

# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| LEROY PERNELL et al.,<br><br>    Plaintiffs,<br><br>            v.<br><br>FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM et al.,<br><br>    Defendants. | Case No.: 4:22-cv-304 |

## DECLARATION OF DR. RUSSELL G. ALMOND IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Dr. Russell Almond, hereby declare and state as follows:

### A. Background

1. My name is Russell Almond. I am over 18 years of age and identify as a white man.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. Since 2010, I have worked as an associate professor of Measurement and Statistics in the Department of Educational Psychology and Learning Systems at Florida State University in Tallahassee, Florida.

4. I received a Bachelor of Science degree in Mathematics from California Institute of Technology, a Master of Arts degree in Statistics from Harvard University, and a Doctor of Philosophy degree in Statistics from Harvard University.

5. After graduating from Harvard, I worked as a research scientist in the StatSci Division of MathSoft, Inc.; as a research associate for RRA, Inc.—a contractor at the Los Alamos National Laboratory; and as a research scientist and senior research scientist in various groups at the Educational Testing Service (ETS). I also served as a visiting lecturer in the Department of Statistics at the University of Pennsylvania's Wharton School of Business and as an acting assistant professor in the Department of Statistics at the University of Washington.

6. My research interests focus on the question of how to gather, track, and monitor evidence of student growth using both traditional sources (e.g., assessments and homework) and non-traditional sources (e.g., simulations and games), especially in situations where multiple dimensions of student proficiency are considered. I am known for my work in Evidence Centered Design, a methodology for building assessments that focus on how observations of student performance provide evidence of knowledge, skills, abilities, and other psychological traits and states.

2

7.  I have earned numerous awards, honors, and accolades, including the National Council on Educational Measurement Award for Outstanding Scientific or Technical Contribution to Educational Measurement in 2000.

8.  I currently serve as a director on the board of the Florida Educational Research Association. I am also a member of the National Council on Measurement in Education, Psychometric Society, Association for Computing Machinery, American Statistical Association, and American Educational Research Association.

9.  In the upcoming school year, I will be teaching Basic Descriptive and Inferential Statistics Applications, Missing Data Analysis, Bayesian Data Analysis, and Educational Psychology Colloquium. I teach Basic Descriptive and Inferential Statistics Applications and lead the Educational Psychology Colloquium every semester, and in alternate years, I teach various seminars on Applied Statistics and Scale and Instrument Design. My courses are entirely geared towards students seeking doctorates and master's degrees— primarily in the College of Education, with some students from other colleges, usually in social science programs.

## B. The Interaction Between House Bill 7 (H.B. 7)[1] and the Content of My Courses

10. On April 22, 2022, Governor Ron DeSantis signed H.B. 7 into law. This law in relevant part amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

11. I understand H.B. 7 to limit my ability to instruct my students on theories arguing that past patterns of discrimination are contributing causes to current discrepancies in achievement between different racial groups, including critical race theory. I feel that persons pursuing careers in educational research must be aware of and understand these theories.

12. Additionally, I understand the eighth prohibited concept in H.B. 7 to substantially restrict my ability to discuss topics that are relevant to what I teach. This prohibited concept limits negative statements about merit, excellence, and hard work. Although these may make a strong difference in the achievement of individuals, they are not important factors when looking at the performance of groups, where differences in talent and effort should average out. However, it has often been insinuated (without supporting

---

[1] Ch. 2022-72, Laws of Fla.

4

evidence) that differences in "merit" or "effort" could account for observed racial differences. This echoes long-discredited theories of eugenics.

13. The eighth prohibited concept also restricts criticism of "colorblind" policies. But it is well documented that colorblind policies are not sufficient to achieve colorblind results.[2] Yet, H.B. 7 seems to limit my ability to articulate that viewpoint. Consequently, I interpret H.B. 7 as compelling me to not deviate from the state-mandated viewpoint on "colorblindness," despite it being contrary to what I believe the evidence supports.

14. With regard to my courses, H.B. 7 will directly impact three of them: Basic Descriptive and Inferential Statistics Applications (EDF 5400), Scale and Instrument Design (EDF 5448), and Educational Psychology Colloquium (EDF 5922).

15. The Basic Descriptive and Inferential Statistics Applications course is an introductory course providing students with the skills necessary to interpret observational and experimental data. In particular, students must learn to properly interpret models where race is included as either an explanatory variable or covariate. My other statistics courses explore more advanced

---

[2] I am defining *colorblind results* as racial distribution in a category of high-status positions being consistent with the racial distribution of the candidate pool (within the limits of sampling variability).

techniques for more complex studies, but the necessity of interpreting models that include race is critical to applying these models in the social science realm.

16. My Scale and Instrument Design course presents a different challenge. Here, the students are taught to build tests and psychological assessments to the American Educational Research Association (AERA), American Psychological Association (APA), and National Council on Measurement in Education (NCME) joint *Standards for Educational and Psychological Assessment*.[3] This includes specific procedures to ensure that test takers are not advantaged or disadvantaged because of their race, as well as methods for testing this.

17. Finally, the Educational Psychology Colloquium is a series of seminars meant to provide professional training for psychometricians that does not fit into the normal coursework. In particular, this is knowledge these students would need to know before taking jobs in testing companies; national, state and local departments of education; and research positions involving educational research. As over half of our students are international, this often

---

[3] American Educational Research Association et al., *Standards for Educational and Psychological Testing* (2014), available at https://www.testingstandards.net/uploads/7/6/6/4/76643089/standards_2014edition.pdf.

means explaining some of the complexities of the history of race in the United States.

18. The purpose of the Educational Psychology Colloquium series is to provide the Measurement and Statistics students with many of the soft skills they need to function as professionals in the testing and educational policy industries. This includes instruction on how to talk about sensitive topic like race without arousing the prejudices and passions of a racially or politically mixed audience. Many of the students are international students, and thus they are mostly unaware of the cultural and political baggage that race has in the United States. As many of them will go on to jobs in the United States, they need to understand all of the political perspectives on race, not just those perspectives favored by the current administration.

19. Race is frequently used as an explanatory variable or covariate in social science (including education) models. In all of my statistics classes, starting from the introductory ones, it is important that my students be aware of the research surrounding race and its effect on educational and other economic outcomes. This includes frank discussions of how past patterns of discriminatory laws and practices affect observed differences between racial groups. This is documented in the text *Reading Educational Research: How*

7

*to Avoid Getting Statistically Snookered* by Gerald W. Bracey,[4] which I have required of my students. *See* Attached Exhibit A at 2. In particular, without a thorough understanding of the various mechanisms by which race affects educational and economic indicators, students can too easily arrive at glib explanations for racial gaps that echo long-discredited theories of eugenics. As some of these students will go on to work in policy research, this will lead to ineffective policies for addressing serious concerns.

20. Additionally, a handout I created in August 2020 and have used since in my Basic Descriptive and Inferential Statistics Applications course violates H.B. 7's prohibited concepts. *See* Attached Exhibit B. This handout discusses the variable of race in the field of statistics. It ties race to colonialism and eugenics, offers a brief overview of the history of discrimination in the United States, and examines the appropriateness of analyzing race in statistics. I caution my students to not make causal inferences about racial disparities, to be selective in measuring race, and to consider the effects of past and ongoing discrimination. I also speak about my white privilege. I am concerned that I cannot use this handout because I speak of my "white privilege" and of

---

[4] Gerald W. Bracey, *Reading Educational Research: How to Avoid Getting Statistically Snookered* (1st ed. 2006).

8

systemic racism—in specific terms, the way past and ongoing racial discrimination are still causing achievement gaps today.

21. Because of the history of tests being used for racial discrimination, designers of high-stakes assessments must attend to strict standards of fairness, many of which are documented in the AERA/APA/NCME joint *Standards.* From my years at ETS, I know how seriously these standards are taken in the testing industry. I also know this from talking with my colleagues at Pearson, American Institutes for Research, the Institute for Educational Sciences (U.S. Department of Education), and the Florida Department of Education. All of these organizations have procedures in place to ensure that assessment instruments are unbiased measures of performance. A full discussion of this requires understanding how cultural differences among racial groups can have a racially differential impact, producing a biased instrument.

22. In particular, social scientists need to distinguish between *impact*—noting a difference between racial groups on some measure—and *bias*—a measure that gives different scores to members of different groups with the same underlying ability (in other words, unfairly advantaging one group over another). One important source of bias is *construct-irrelevant variance*— features of a task which contribute to its difficulty but are unrelated to the construct being measured.  One example I have used to illustrate this is an old

literacy test from the state of Louisiana. *See* Attached Exhibit C. H.B. 7 would prohibit me from using this memorable teaching aid because of the discussion on discrimination and test design fairness that necessarily accompanies this example.

23. Another example of content H.B. 7 directly impacts is in the chapter on Fairness in Testing (Chapter 3) of the AERA/APA/NCME joint *Standards*. This teaching material discusses how potential inequities in school resources available to students from traditionally disadvantaged groups—including racial minorities—affect the quality of the education they receive, which naturally affects their test scores and the validity of conclusions stemming from analyses of those test scores.[5]

24. H.B. 7's text limits my ability to train my students on this aspect of the AERA/APA/NCME joint *Standards*. This is deeply problematic for a few reasons. My program's handbook requires graduates to understand and uphold the AERA/APA/NCME joint *Standards*, including fairness in testing. *See* Attached Exhibit D at 4-5. And as a member of two of those organizations, I am bound by the ethical principles embodied in those standards. Plus, almost all prospective employers of our students expect that our graduates will be

---

[5] American Educational Research Association et al., *supra* note 3 at 66-67.

familiar with the standards and will follow the principles laid out in them.  In fact, the peer review process for state assessments instituted by the U.S. Department of Education evaluates the assessments based on those standards.

25. Absent the ability to fully and openly discuss the context behind why these inequities in school resources exist, I cannot convey the significance of how inequities in school resources affect fairness in testing. Nor can I help the students distinguish between a real disparity that is the result of past discrimination (impact) and an apparent disparity because the measure is not agnostic to the race (or other protected group status) of the examinee.  This could result in poorly designed measurement systems that would be less effective at educating students and lead to policy choices that do not address the correct problem.

26. H.B. 7's sixth prohibited concept also restricts my ability to explain to my students why the AERA/APA/NCME joint *Standards* call for review of assessments by a diverse body of reviewers. Diversity on a large number of factors, including race, gender and religion, is important because members of one group may spot issues that are not readily apparent to members of other groups. I understand H.B. 7's sixth prohibited concept to forbid taking these steps, which are needed to achieve the kind of diversity that is important to

being able to create valid measures of psychological and educational constructs.

27. Basically, H.B. 7's restrictions put me in the position of being forced to choose between my professional obligation to fully teach the joint *Standards* to my students in order to prepare them for their careers and expose them to the full range of psychometric theories accepted in the field and my obligation as a citizen to comply with Florida law.

28. Legal scholar David Schum, in his 1994 book *The Evidential Foundations of Probabilistic Reasoning,* argues that the process of how truth is determined in science is similar to how truth is determined in a court of law. All sides are allowed to present their evidence, and the participant must then weigh that evidence and come to a conclusion. I try to take the same spirit in my classroom. The students are encouraged to bring different perspectives into the classroom and learn through discussion. The instructions on my classroom discussion forums read in part: "Some of these posts may touch on political issues. Please focus discussion on the statistical issues raised and discuss the political ones in other forums. Also remember that just because we disagree, that does not mean we need to be disagreeable." H.B. 7 violates this spirit of open scientific inquiry. It privileges one perspective on understanding the

effect of race on education, economics, and assessment instead of encouraging the open exploration of multiple perspectives.

29. A Florida statute should not require me to choose between following the law and complying with my ethical obligations. Yet, that is exactly what H.B. 7 does. In considering what content to include in my courses moving forward, I must now weigh the consequences of violating H.B. 7 against my duty to instruct my students in accordance with the standards of my profession. Basically, I have to choose between adhering to the state of Florida's favored viewpoint, which will result in my failing to provide my students the full education they need to succeed in their chosen field, or risk punishment for teaching about the significance of race as a variable and covariate in social science models.

## C. How H.B. 7 Will Impact My Teaching and My Courses

30. I feel that the goal of H.B. 7 is to pressure me to self-censor when discussing topics that relate to or implicate a prohibited concept, particularly my viewpoint that we must be conscious of race when seeking to design unbiased measurement systems. I am afraid that I will be punished because a student complains about content in a course of mine. According to Florida Board of Governors proposed regulation 10.005, Florida State could discipline me, including terminating my professorship, in response to a student complaint.

31. I am concerned that H.B. 7 prevents me from teaching content that is critical to my students' success in their statistical fields, particularly educational measurements, and to my own professional obligations as a professor of Measurement and Statistics.

32. Because I created my own handout on race in statistics, I believe H.B. 7 does not allow me to continue to use this handout in my Basic Descriptive and Inferential Statistics Applications course. I am currently having to decide whether to continue including this handout in my future courses by weighing the importance of the concepts discussed against the potential penalties for violating H.B. 7.

33. I feel H.B. 7 forces me to choose between my professional obligation to educate my students based on the industry standards for the fields they will be entering and my duty to follow Florida law.

34. I am also worried that if I violate H.B. 7, whether intentionally or unintentionally, Florida State University could lose significant amounts of funding or have a lawsuit filed against the university for "discrimination" based on something I said in one of my courses.

35. If I omit content that touches upon or implicates H.B. 7's prohibited concepts, I am apprehensive about how my graduate-level students will perform in their

fields after graduation. I am particularly fearful that they could make errors in analysis that harm traditionally disadvantaged groups.

## D. Exhibits

36. Attached as **Ex. A** is a true and correct copy of my Basic Descriptive and Inferential Statistics Applications (EDF 5400) syllabus.

37. Attached as **Ex. B** is a true and correct copy of a handout I use in my Basic Descriptive and Inferential Statistics Applications (EDF 5400) course titled "Some Thoughts about Race." I personally created this document in August 2020.

38. Attached as **Ex. C** is a true and correct copy of an excerpt of a PowerPoint Presentation that I have given since at least 2015 in my Scale and Instrument Design (EDF 5448) course. This part of the presentation covers construct-irrelevant variance and fairness in testing.

39. Attached as **Ex. D** is a true and correct excerpted copy of the Department of Educational Psychology and Learning Systems's Measurement and Statistics Program Handbook, as of December 2018.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on August 24, 2022.

_____

Dr. Russell G. Almond

# Ex. A

# FLORIDA STATE UNIVERSITY

EDUCATIONAL PSYCHOLOGY AND LEARNING SYSTEMS, COLLEGE OF EDUCATION

*Instruction that moves, leadership that inspires,*
*scholarship that makes a difference for the 21st century.*

**A. Course Prefix, Number, Title and Credits**

EDF 5400. Basic Descriptive and Inferential Statistics Applications (4)

**B. Prerequisites or Co-requisites**

None.

**C. Objectives/Description**

This course prepares students to both read and write papers containing basic statistical analyses. Topics covered include descriptive statistics, basic plots and graphing, hypothesis testing, confidence intervals, correlational techniques, and introduction to the general linear model.

After completing this course, the student will be able to:

1. Differentiate between samples and populations and between parameters and sample statistics.
2. Distinguish representative and random sampling from other kinds of sampling and understand the statistical implications.
3. Classify variables as belonging to one of the four different types of measurement scales (Nominal, Ordinal, Interval, and Ratio) and understand the limitations of each type of scale.
4. Construct and interpret common kinds of graphs used in statistical analysis (including histograms, frequency polygons, scatterplots, boxplots, and bar charts).
5. Recognize terms used to describe distributional shapes (e.g., normal, bimodal, skewness, kurtosis) and properly identify distributions for which the term is appropriate.
6. Interpret expressions written in summation notation.
7. Calculate and interpret measures of location (mean, median, and mode) and understand their limitations.
8. Calculate and interpret measures of scale (range, variance, standard deviation, and interquartile range) and understand their limitations.
9. Calculate and interpret z-scores for data which come from a known distribution.
10. Convert between quantiles of a normal distribution (z-scores) and tail probabilities (p-values) using a table of the normal distribution.
11. Interpret Pearson's correlation coefficient and understand its limitations.

12. Apply the basic definition of probability and conditional probability to calculate the probability of events.
13. Recognize when two variables are probabilistically independent.
14. Calculate the standard error of the mean of a simple random sample and interpret the standard error of other statistics.
15. Recognize sources of bias especially in non-random samples.
16. Calculate and interpret confidence intervals for the sample mean, and interpret confidence intervals for other parameters.
17. Perform statistical inference using the null hypothesis framework in simple problems, including:
    a. Writing null hypothesis for common inference situations.
    b. Write alternative hypothesis for one-tailed and two-tailed tests.
    c. Calculate p-values from z-scores and critical values for a given level.
    d. Properly interpret Type I and Type II errors.
    e. Calculate and interpret effect sizes for the difference between two means, and interpreting effect sizes for regressions.
    f. Calculate (using software) and interpret the power for a given experiment.
18. Run and interpret the output of common statistical software for each of the following tests:
    a. One-sample and paired-sample *t*-tests
    b. Simple linear regression with one variable, including regression ANOVA and t-test for the slopes.
    c. Chi-squared tests of goodness of fit and independence
19. Recognize and distinguish situations in which the tests listed in 18 are appropriate.
20. Recognize the simple linear regression model as a basic example of statistical models and perform model checking.
21. Recognize the limitations of the statistical procedures in 18.
22. Write up the results for the statistical techniques covered in 18 following APA conventions.

## D. Required Texts, Readings, and/or other Resources

### Required Text:

Coladarci, T. & Cobb, C. D. (2014). *Fundamentals of statistical reasoning in education (4th ed.)*. Hoboken, NJ: John Wiley & Sons.

Bracey, G. W. (2006). *Reading educational research: How to avoid getting statistically snookered.* Portsmouth, NH: Heinemann.

### Recommended Text:

Glass, G., & Hopkins, K. (1996 or any other year). *Statistical methods in education and psychology.* Boston, MA: Allyn and Bacon.

*Software for Data Analysis:*

The labs and some of the homework for this class will involve analyzing large data sets, made easier by the use of statistical software on a computer.  To this purpose, the class will include demonstration of how to do common data-analysis operations with SPSS. Access to the full version of SPSS for Windows is available for FSU students at no cost in the COE Learning Resource Center (LRC) in 1301 Stone building (M-Th 8AM-10PM, F 8AM-6PM), and other locations on campus (facilities and schedules available at http://us.fsu.edu/index_labs.html). The graduate computers in Strozier also have SPSS installed.  SPSS is also available through the FSU Virtual computer lab.

The use of SPSS is not required.  If students are already familiar with and have access to another statistics package, they are free to use that instead.  However, course instructors and graders will only be able to provide minimal support for other packages.

**E.  Topical Course Outline**

| Lesson Topics | | Reading |
|---|---|---|
| 1 | Common Sense Statistics, Making a Dataset | Ch 1††+Bracey |
| 2 | Variables | Ch 2,3 |
| 3 | Distributional shapes, Graphs | Ch 3 |
| 4 | Measuring Location & Center, and Measuring Variability & Scale | Ch 4, 5 |
| 5 | Normal Distribution and *z*-scores | Ch 6 |
| LRC1 | **Exploratory Data Analysis*** | Ch 7 |
| 6 | Correlation | Ch 7, 8 |
| 7 | Correlation and Regression | Ch 7, 8 |
| 8 | Regression and Prediction | Ch 8 |
| LRC2 | **LRC 2:  Regression*** | Ch 9 |
| 9 | Probability | Ch 9 |
| 10 | Conditional Probability | Ch 10 |
| 11 | Central Limit Theorem | |
| 12 | Inverse Probability (Confidence Intervals) | Ch 12 |
| 13 | Hypothesis Testing (*z* tests) | Ch 11 |
| 14 | Type I and Type II Errors | Ch 13 |
| 15 | Student's *t* test for One Mean, CI for the Mean | Ch 13 |
| 16 | Student's *t* test for Two Independent Samples | Ch 12-14 |
| LRC3 | **LRC 3:  Student's *t* test*** | Ch 14, 19 |
| 17 | Student's *t* test for Two Dependent Samples | Ch 15 |

| 18 | Testing for Correlation and Regression | Ch 17 |
| 19 | Categorical Data | Ch 18 |
| LRC4 | **LRC 4:  Chi-square tests*** | |

†Unless otherwise noted, Chapter numbers refer to Coladarci et al.  (i.e., first week's reading is the first chapter of Coladarci et al, plus all of Bracy.

\* Classes called "LRC X" noted in bold face will be held in the LRC's computer lab.

## F.  Teaching Strategies

The course is offered in a "flipped" format with lectures pre-recorded. Class sessions will contain only short reviews meant to provide students opportunities to seek assistance and ask questions as well as in-class activities to reinforce learning.  Online activities include viewing lectures and online quizzes and tests.  In-class activities include worksheets, problem sets, case studies and discussions.

## G. Field/Clinical Activities
N/A

## H.  Expectations/Attendance

### University Attendance Policy

Excused absences include documented illness, deaths in the immediate family and other documented crises, call to active military duty or jury duty, religious holy days, and official University activities.  These absences will be accommodated in a way that does not arbitrarily penalize students who have a valid excuse. Consideration will also be given to students whose dependent children experience serious illness.

### Netiquette Statement

As this is a blended class, some activities will take place online.  Considering online classes will take place in a variety of settings, it is important to have a reference point for successful participation in this online environment.

Be mindful of the Core Rules of Netiquette taken from Virginia Shea's Book and Website -   "http://www.albion.com/netiquette/corerules.html"

Rule 1:  Remember the Human.

Rule 2:  Adhere to the same standards of behavior online that you follow in real life.

Rule 3:  Know where you are in cyberspace.

Rule 4:  Respect other people's time and bandwidth.

Rule 5:  Make yourself look good online.

Rule 6:  Share expert knowledge.

Rule 7:  Help keep flame wars under control.

Rule 8:  Respect other people's privacy.

Rule 9:  Don't abuse your power.

Rule 10:  Be forgiving of other people's mistakes.

## Sexual Harassment Policy

Sexual harassment is a form of discrimination based on a person's gender. Sexual harassment is contrary to the University's values and moral standards, which recognize the dignity and worth of each person, as well as a violation of federal and state laws and University rules and policies. Sexual harassment cannot and will not be tolerated by the Florida State University, whether by faculty, students, or staff; or by others while on property owned by or under the control of the University.

## Course Expectations

### Class attendance policy

In addition to the valid excuses in the University Policy, the class has the following expectations for class attendance:

- Aside from the first day of class, attendance will not be taken in class.
- *However, in-class participation points (case studies and practice problems) are assigned only to students who are present on that day.*  Students with a valid excuse will be given an alternative assignment.
- Changes to assignment content and/or due dates are routinely announced at the beginning of class, students who miss or who are late for class are responsible for catching up with those announcements.
- Students are responsible for material covered in missed classes.

### Communication Expectations

Clear and regular communication is essential to success in this class. Students need to check their email regularly, be active in class, and be proactive about asking questions. The instructor will respond to emails and posts to the Q&A board within two business days, usually sooner.

### Policy for Late Work

The instructor will track the number of assignments submitted after the posted due date. Students are allowed one free late assignment.  After that, the grade for that assignment will be lowered by 5% for each previously late assignment, unless the student has instructor approval.  Work submitted for problem sets after the answer key has been posted will be assigned a grade of zero unless the student has received instructor approval.

### I.  Grading/Evaluation

Final grades will be based on the following combination of evidence:

| | | | |
|---|---|---|---|
| 1. | Participation | 25% | (556 Participation Points) |
| 2. | Problem Sets | 25% | (500 Problem set points) |
| 3. | Labs | 25% | (30 Lab points) |
| 4. | Exams (2) | 25% | (200 Exam points). |

We will use the following means of assessment:

1. *In class and online participation (556 Participation Points; 25% of grade).* The primary purpose of these activities is for formative assessment: if instructors do not know how well the students understand the material, the instructors cannot adapt teaching to meet the students' needs. Participation grades will be based on participation – *not on whether or not the student provides the right answer* – but on the students' honest expression of what they do and do not know. Although instructors will not take attendance, participation points are assigned in class, so students don't show up (excluding excused absences) will have lower participation scores. Participation grades will be based on the following kinds of activities:

   A. *Self-checks (391 participation points; 17.4% of total grade)* – Short, self-graded quizzes are delivered by the learning management system (Canvas) after each lecture segment as well as some other times during the course. Students may repeat these quizzes any number of times, with the highest score contributing to the grade. These are meant as formative assessments for students to assess their comprehension of the class material, and questions about them should be raised in class or on the discussion boards. These are assigned due dates to help students with pacing of the material, but students may revise their answers without penalty up until the last day of class (Friday before Final's week).
   B. *Practice Problems (7 problems, 10 participation points each; all 7 are 3% of total grade)* – This is a worksheet of questions which the students complete normally in class (although some may be moved online for scheduling reasons). Students may discuss the answers while they work. After completion, the students will be supplied the answer (often as a class discussion) and will correct their own work. Students then complete an online self-assessment questionnaire about the topic of the worksheet. Points are given for completing the self-assessment with all answers worth maximum points.
   C. *Case Studies (10 case studies, 10 participation points each; all 10 are 4.4% of total grade)* – A case study consists of a set of materials (usually the description of a research study and SPSS analysis of data from that study, but occasionally a short paper) and a set of questions. Students work in groups to answer the questions. These may be administered face-to-face or through online discussion forums. If through the forums, then points will be awarded based on contributions to the discussion, if face-to-face, then though an online self-assessment questionnaire.
   D. *Miscellaneous Participation (5 participation points; 0.2% of total grade)* – One participation point is awarded for making a self-introduction post in the introductory forum. One participation point is awarded for turning in drafts of Labs 1, 2 and 3 (see Lab Assignments below). One additional point is awarded for being the first author (the one who distributes the feedback to other students) on at least one of the labs.

2. *Problem Sets (5 problem sets, together they are 25% of total grade)* – A problem set is a group of problems related to a specific topic.  Team work is allowed with up to 3 students per team. Students will need to turn the assignment in through the course website for credit (assignments emailed to the instructor may or may not be accepted). The answer key for problem sets will be posted on the course web site after grading. Late submissions will not be accepted after the answer key is posted without permission of the instructor.

3. *Laboratory exercises (3 labs, together they are 25% of total grade)* – The labs consist of a statement of a problem and a set of data.  Students produce a short report (essentially the results section of a scientific paper) using the data to address the problem. Students turn in a draft report which is returned with feedback but no grade (one participation point is awarded for turning in the draft).  The students may then revise the report and turn it in for a grade; usually one week is available between when the feedback is released and the final report is due. Group work is allowed on labs with up to 3 students per group.  *Note:  The labs are a critical part of 5400 and are weighted equally with the exams exam.*  Complete lab instructions along with information on the grading rubrics will be posted on the course website.

4. *Exams (Midterm and Final, together they are 25% of total grade)* – Both the midterm and final will be given online (through the learning management system).  Exams will be open book and students will be allowed to use online resources (including class notes, and online probability calculators).  Students must not consult with others (aside from the course instructors) during the exam.  Exams with students having 3 hours to complete the exam.

*GRADE SCALE*

In computing the final grade each of the four categories will be scaled separately.  That is the 556 participation points together will consist of 25% of the grade, the 500 homework points will be 25% of the grade, the 200 exam points will be 25% of the grade, and the 30 lab points will be 25% of the grade.

A  = 93-100%
A-  = 90-92.9%
B+ = 87-89.9%
B  = 83-86.9%
B-  = 80-82.9%
C+ = 77-79.9%
C  = 73-76.9%
C-  = 70-72.9%
D+ = 67-69.9%
D  = 63-66.9%
D-  = 60-62.9%
F  = below 60%

*Collaboration Policies:*

- Students are also encouraged to use the discussion boards to discuss other course related content.  Instructors and graders will monitor the discussion and will try to answer questions (chances are good that if one student has a question, at least one other student has a similar question).  This is also a good way for students to provide feedback to instructors about which material to review in class.

- Students may work together in groups of 2 or 3 on homework and lab reports. However, *all* team members must participate for this to work well.   Students help their friends much more by offering them a hint towards the solution than by simply giving them the answer.  Using the class discussion boards to discuss the homework is encouraged.

- Students working in teams will sign a statement saying that all partners collaborated fairly on each assignment (students who feel that team members are not properly contributing should contact the instructor). Teams of students should turn in single copies of the group homework assignment or lab report with all names listed.

- The first author of each lab report will turn in the assignment on the course web site and distribute feedback to the rest of the team.  Students working in teams on the labs will be expected to take the first author role for at least one lab assignment.

- Lab assignments must be submitted through Turnitin within the course website.  This will flag possible plagiarism – copying from other students or other sources.  Plagiarism is theft, and it is a serious problem!!  Do not do it at risk of failing the assignment! Links to online resources about plagiarism will be posted on the course web site.


**Free Tutoring from FSU**

On-campus tutoring and writing assistance is available for many courses at Florida State University. For more information, visit the Academic Center for Excellence (ACE) Tutoring Services' comprehensive list of on-campus tutoring options - see http://ace.fsu.edu/tutoring or contact tutor@fsu.edu. High-quality tutoring for fundamental concepts in math, statistics, science and additional subject area tutoring is available by appointment and on a walk-in basis. These services are offered by tutors trained to encourage the highest level of individual academic success while upholding personal academic integrity.

**J.  Honor Code**

The Florida State University Academic Honor Policy outlines the University's expectations for the integrity of students' academic work, the procedures for resolving alleged violations of those expectations, and the rights and responsibilities of students and faculty members throughout the process.  Students are responsible for reading the Academic Honor Policy and for living up to their pledge to ". . . be honest and truthful and . . . [to] strive for personal and institutional integrity at Florida State University."  Florida State University Academic Honor Policy, found at http://fda.fsu.edu/Academics/Academic-Honor-Policy.

Please be aware that using social media to collaborate on and share course exams or assignments with other students that are not identified by the course instructor as group work is a violation of the FSU Academic Honor Policy.

Any violation of the collaboration policies, including exchanging answers electronically, plagiarism or cheating on tests will be considered violations of the Academic Honor Code of FSU.

## F.  Americans with Disabilities Act

Americans With Disabilities Act:
Students with disabilities needing academic accommodation should:
(1) register with and provide documentation to the Student Disability Resource Center; and
(2) bring a letter to the instructor indicating the need for accommodation and what type.

Please note that instructors are not allowed to provide classroom accommodations to a student until appropriate verification from the Student Disability Resource Center has been provided.

This syllabus and other class materials are available in alternative format upon request.

For more information about services available to FSU students with disabilities, contact the:

Student Disability Resource Center
874 Traditions Way
108 Student Services Building
Florida State University
Tallahassee, FL 32306-4167
(850) 644-9566 (voice)
(850) 644-8504 (TDD)
sdrc@admin.fsu.edu
http://www.disabilitycenter.fsu.edu

## K.  Syllabus Change Policy

Except for changes that substantially affect implementation of the evaluation (grading) statement, this syllabus is a guide for the course and is subject to change with advance notice

# Ex. B

# Some Thoughts about Race

Race is a commonly used categorical variable in statistics. Almost every application or questionnaire seems to have a box which asks about *race* or *ethnicity*. National statistics are commonly disaggregated by race, and there are numerous papers comparing "whites" to "others".

Two deaths in 2020 have gotten me thinking more about the construct of *race* and how we use it in statistics. One is the unfortunate death of George Floyd at the hands of law enforcement. The other is the death of Congressman John Lewis, a hero of the civil rights movement. In fact, the graphic novel *March* (Lewis, Aydin & Powell, 2016) has been part of my summer reading.

Race is an interesting construct in that it has a long an complex history, much of it fraught with problems. In particular, it has its roots in colonialism and slavery and its misapplication has resulted in genocide. The worlds of statistics and psychometrics have not be innocent bystanders here. Many prominent statisticians were active in the eugenics movement.

This screed, is my attempt to struggle with what this construct is, what it has been, and how we should tackle it in the 21st century. I am well aware that as an old white dude that I only have one perspective on this, and a privileged one at that. I'm hoping that my musings are helpful in your own thinking about this construct.

## Race is not really a genetic or cultural construct

Although skin color, which is a genetic trait, is commonly used to classify a person into a racical group, racial groups are not really natural genetic sub-populations. For example, "Asian" is a racial group, but Chinese, Koreans, Japanese, and Vietnamese people have distinct genetic pools and cultures. (In fact, Chinese is probably too big a category, too, as there are a large number of different groups within China, e.g., Han, Wu, Uighur, &c). Indians are also called "Asian", but India is quite different from China (even though they share a border). Hutu and Tutsi people are both African, but that did not stop them from fighting a civil war in Rwanda.

Racial groups are also not unified culturally. Latinx refers to a large number of groups who speak Spanish. However, Mexican, Puerto Rican, Central American, South American, Filipino, and European Spanish are all very different. Similar the group "Native Americans" includes a large number of different peoples who have all been lumped together. Even though Hopis and Apaches both live in the American southwest, they have different traditions and religions.

SA 213

## Race arises from colonialism

In 1599, Lope de Vega wrote a play *El neuvo mundo descubierto por Cristóbal Colón* (The New World Discovered by Christopher Columbus). In this play, Columbus is put on trial by Fate, with the Devil as the prosecution and the Christianity as the defense. At issue is whether or not Columbus is justified in colonizing the new world. The verdict that de Vega, a devout Catholic, reaches is that Columbus is justified as he will bring Christianity to the savages. Writing in the 16th century, de Vega is not that far removed from the Spanish Inquisition, which justified torture in this world to save a person's immortal soul.

The association of race and skin color probably dates back to the enslavement of African by early American settlers. As skin color was a convenient marker to separate the enslaved from the free, it became codified. I'm sure that much of this was rationalizing the cruelty of slavery. If people believed in the superiority of the white race the could justify the cruelty of slavery and genocide.

Similarly, the Native Americans were put into a "non-white" savages category. This was used to justify stealing their lands and programs of genocide. They weren't using the land optimally, so we will take it from the "savages" and give it to the "civilized" settlers. Once again, the belief in the superiority of the white race was used to rationalize genocide.

Once the concept of race existed, it hung on socially, even after the end of slavery. In particular, there are a lot of whites who considered race a part of their identity. In many ways, race is defined by whites who don't want to share their sense of superiority with others. Witness the recent question I was asked about race in on a loan application, where there is only one box for "white" but lots of boxes for various categories of "other."

The eugenics movement needs special mention because it is tied so intimately with the history of statistics and psychometrics. Names like Galton and Fisher are responsible for much of the theoretical foundations we use today, but they were also involved with the eugenics movement. When Simon Binet's education test was first brought to the U.S., the purpose was not to as Binet wanted, to seek out people in need ot help, but rather to separate the strong from the "feebleminded." (Frank, 2018, Intelligence Testing and the Beginning of Eugenics, *Owlcation* https://owlcation.com/social-sciences/Intelligence-Testing-and-the-Beginning-of-Eugenics)

Although early researcher showed racial difference on "intelligence" tests, intelligence is an ill-defined concept. In particular, much of what we think about as intelligence is cultural acclimatization. Consider a person from a remote region of the Amazon. If that person was taken to a big city and walked through a red light, the label "stupid" might come to mind. However, if I was to go to deep into the Amazon and step on a poisonous snake, the Amazon native would think I was stupid. Intelligence (which has more to do with the capacity to learn quickly) is different than specific situational knowledge.

2

Fortunately, we've come a long way in our understanding of measurement of both intelligence and achievement. In particular, psychometricians pay a lot of attention to *differential item functioning*—whether people from different racial groups with similar abilities respond differently to test items. We also make sure that tests are reviewed by people from diverse ethnic and racial backgrounds so that language that is either specific to one subgroup or has negative associations for some subgroup is not inadvertently used. Once psychometricians learned to take some of the bias out of the instruments, many of the observed racial differences went away. Others remain, but quite possibly as a function of discrimination.

## Any two groups are different, but is that different important?

Another issue is that if you go to enough decimal points (and implicitly have a big enough sample size) any two groups will be different. Lets use left-handed and right-handed people as a pair of groups that do not have a long history of discrimination. [Okay, I hear you lefties about how mice, scissors and all kinds of other tools are designed by and for righties.] If we looked at all of the left-handed and right-handed people in the United States, then one of the two groups would have a higher average height. But that difference is likely to be a small fraction of an inch: it just wouldn't be important.

On the other hand, the standard deviation for the population of heights is around 3 inches. So the *effect size*, the size of the difference divided by the population standard deviation, is likely to be small. So if you were picking people for your basketball team, you would likely not favor left-handers or right handers. (Actually, the fact that lefties and righties shoot from different angles is probably more important than the height difference, and you really want a mix of lefties and righties to give your team balance.)

This is one of the weaknesses of statistical hypothesis tests, something we will address later in the class. A *significant* difference is merely one for which the sample was big enough to be sure that the different between the two groups is probably not just sampling error. If the sample is huge (thousands or millions) even very tiny differences can be significant. The very next question you should ask every time you learn that a difference is significant is "Is the difference really big enough to be important?"

The second problem is that finding a difference between two groups, especially two naturally occurring groups, is an observation, not a causal analysis. Suppose that we learn that the focal group (which is usually a group that has been historically discriminated against) does not do as well on a certain kind of math item as the reference group (which is the higher status group, usually white males). Does that mean there is some genetic difference between the groups, or is there some environmental or social factor that causes the difference.

3

## There is a history of Discrimination

"Your zip code is a bigger predictor of health and economic outcomes than your genetic code." (Guest David R. Williams on the *Ezra Klein Show*, https://podcasts.apple.com/us/podcast/why-the-coronavirus-is-so-deadly-for-black-america/id1081584611?i=1000474196638, approx 59 min into podcast. [Much of this podcast talks about racial differences before the Coronavirus outbreak, and some about why those same forces result in different outcomes for the virus.])

Before the civil war, Black Americans were mostly enslaved. Although they were given some property after the emancipation and the civil war, this was mostly taken away during the Jim Crow era. There were actually legal barriers to where people of various races could live. Although the Civil Rights movement in the 1960s eliminated some of the legal barriers, cultural ones remained. The past pattern of discrimination has impacted the wealth formation.

Let me give you an example. In 1968, my parents bought a home for around $40,000. They still live in this home, it is worth around $400,000 now. They have paid off their mortgage, so this represents a substantial hunk of savings for my family. Now 1968 is an interesting year. This was the year in which red-lining, a practice which would exclude people of certain races (i.e.,Blacks) from certain neighborhoods became illegal. Even though the law was changed, real estate agents still continued to show Black families home in Black neighborhoods. Not only that, but very few Black families in 1968 (or even today) would have the money needed for the down payment; and they would be considered a credit risk resulting in higher interest payments. Nor did many Black students before 1968 have had the opportunity to go to college and earn a PhD, giving the steady stream of income needed to get an inexpensive home. Although neither my parents, nor my parents are racist, we have certainly benefited (or at least not been disadvantaged) by racist policies.

In education, segregation has had a huge impact. In the United States, education is largely paid for through local taxes, particularly property taxes. This means that the rich get access to better education than the poor. Given that there were active policies (and to this day covert practices) to keep non-whites in poor neighborhoods, that means that they do not get the same schooling resources. Hence, for most of the 20th and the first part of the 21st century, our education system has been separate and unequal.

In Florida, school districts correspond to counties. So the biggest problems are poor rural counties. In New Jersey, the school districts correspond to townships. So Princeton Township, Lawrence Township, and the City of Trenton are all in Mercer County, but have different levels of resources, and hence different qualities of schools. Unsurprisingly, Trenton has the least resources and the largest Black and Latinx populations. Note that the problem occurs more subtly even within Leon County. My wife volunteered at Deer Lake Middle school doing office work

4

(e.g., making copies); however, Deer Lake also served a population that was wealthy enough to have families that could get by on one income, leaving one parent to provide volunteer labor.

Some of the problems could be solved if we were willing to send money from the wealthier school districts to the poorer ones. New Jersey actually tried that experiment. In a lawsuit called *Abbott versus the Board of Education*, parents from several of the poorest districts (mainly urban centers like Camden, Trenton, New Brunswick, Patterson and Newark) sued the state over the constitutional requirement to provide a quality education. As a result, the "Abbott districts" received extra funds from the State. As a result the racial gap closed somewhat. In general, however, such transfers have not proved politically popular.

Ongoing segregation and wealth gaps which are at least partially the result of past discrimination are not the only factor that could be causing achievement gaps. Williams (in the same *Ezra Klein Show* podcast) notes that ongoing discrimination (even if only occasional) causes increases in stress which are particularly bad for health outcomes, but also probably affects other things like education.

The problem mostly arises when we look for simple causal stories. What is happening today with race is actually quite complex. There are a lot of different pathways by which what was originally a social construct to support colonialism can continue to affect outcomes. I have heard this called *causal density*—a situation in which there are so many potential causes and causal pathways that it is difficult to trace the effects of any single cause.

### When to include the Race box

Over the years, I've noticed a certain laziness towards the inclusion of race in scientific studies. In particular, I think people put boxes for *race*, as well as *gender* and *age* on questionnaires, particularly background questionnaires, without thinking. How does *race* relate to the research questions being addressed?

After all, people have a right to privacy. I didn't ask about race in the introduction questionnaire for this class, because it is none of my business. (My business is teaching statistics, and my experience has led me to believe that race has no relationship to the ability to learn statistics.) Constantly asking about race is constantly forcing people to identify with smaller groups and remind them of their exclusion. Why should I do that instead of remind people of what we share, like the fact that we are all associated with FSU?

Its okay to ask about race if race is of legitimate scientific interest. Race could could be interesting for either direct, or indirect reasons. The direct reason is that we think that there might be an interaction with the between the treatment we are exploring and the complex social construct that is race. For example, do people from different racial groups have different reactions from educational

5

games? Or maybe race is directly what we are studying. That is to say, we are trying to untangle the Gordian knot that is race and discrimination and how it affects education, public health, economic welfare, voting patterns, or something else.

The second case where it is okay to ask the race question is if you are concerned about the representativeness of the sample. One way to look at that is to ask, is the racial composition of my sample something can can reasonably arise from random sampling, or do I need to do something to make sure I have enough of particular minority groups in my sample.

One example of this is looking at the racial breakdown of trial juries. Looking at the proportions, it is clear that whites are overrepresented on juries and other groups, particularly, Blacks and Latinx, are overrepresented. Trying to understand why this is happening is difficulty. One explanation is that lawyers are more likely to use challenges to get rid of non-white jurors. Another explanation is that jurors are often selected from voting registration lists, and whites are more likely to be registered to vote.

One more thought: sample size is an issue. In particular, don't do racial comparisons if there are very few (e.g., fewer than 5–10) people from one group in the sample. If you start crossing a bunch of categories together, you can get cells in your data table that only have one or two people in them. There is only one person who fits the category male Latino doctoral student in the Measurement and Statistics program. (Trudes is a great guy, who helped a lot with the design of the 5400 web site, but it would be completely wrong to generalize from him to all Latino males.) If you are looking for information about a minority group with a small or localized population (e.g., Native Americans or Somali refugees) you may need to do something more complex than simple random sampling.

## Closing thoughts

One of the advantages of white privilege is that I got away with living most of my life without the need to think deeply about what race is and how and why we should measure it. Actually, I've put some thought about race here and there over time, but my model of what this construct really is has gotten more complex over time.

Two pieces of advise, which apply to other socially loaded constructs (gender, disability, religion, &c), as well as to race. First, don't just ask the question without thinking about why you are asking the question. What are you going to do with the data? What would you do if you found an imbalance? Asking questions on questionnaires without thinking about why you are asking them is a recipe for sloppy science.

Second, don't leap to causal conclusions from observational studies. There are

6

people who are putting in the hard work to untangle all of the causal pathways that lead from race to performance. The wrong way to do this is to look at a single observed difference and decide it is just a function of genetics, or just of discrimination. Both of those are lazy answers. Going from observed differences to causality always takes careful work and usually synthesizing many sources of evidence.

Finally, as an old white dude, I should definitely not conclude that my ramblings are the final word on race. After all, one aspect of white privilege is that I don't experience racial discrimination routinely. I have learned a lot from listening to other people's opinions, particularly those of Black intellectuals and Black and African students. In that spirit, I would welcome your comments, feedback and stories. Reading about your thoughts and experiences will help me shape my own beliefs, and I hope that reading my ramblings will help you shape your own.

7

SA 219

# Ex. C

# Cognitive and Non-cognitive Items

## "Non-cognitive" constructs and playtesting

# Construct-Irrelevant Variance

- We want to maximize variation in response for reasons related to the construct being measured (signal)

- We want to minimize variation in response for reasons *unrelated* to the construct being measured (noise)

- Good item writing identifies sources of construct-irrelevant variance and minimizes them (or averages over on the test form)

# Negatively worded items

- Avoid negative wording in cognitive items
  - Missing *not* is construct irrelevant mistake
- Negative wordings are used in non-cognitive assessments
  - Agreeability
  - Laziness

# Items arousing strong emotion

- Reading passage about a dying pet
  - Could be very distressing to a person who has suffered a recent loss
- Sometimes impossible to avoid in the context of a history test
  - Slavery
  - Genocide
  - Standards call of introducing such topics only when necessary
- Cultural Sensitivity

# Alternative Explanations

- ## Symptoms that might have a lot of causes

  - ### Fatigue is a symptom of depression, but also of a lot of other things

- ## Non-construct related background knowledge required to answer question

  - ### Dinosaur knowledge helps with reading comprehension

# Fairness

- Actual and appearance are both important
- Face-validity:  Important that items appear to be fair
- Impact:  Different groups will have different mean scores
- DIF:  Given level of construct response is independent of group membership
  - Subgroups might have access to different background knowledge
  - Subgroups might bring different context interpretations to the question

# Question Phrasing

- Is this at appropriate reading level?

- Want to aim several grade levels below target (unless we are testing reading)

- 8th grade level for U.S. Population

- ESL

# Example

Sherlock examined the handle of the fire alarm.  "Are any of your suspects art students?" he asked.

What did Sherlock see on the fire alarm handle that caused him to suspect an art student?

SA 228

# A Truly Bad Test

The State of Louisiana

Literacy Test (This test is to be given to anyone who cannot prove a fifth grade education.)

Do what you are told to do in each statement, nothing more, nothing less. Be careful as one wrong answer denotes failure of the test. You have 10 minutes to complete the test.

1.  Draw a line around the number or letter of this sentence.

2.  Draw a line under the last word in this line.

3.  Cross out the longest word in this line.

4.  Draw a line around the shortest word in this line.

5.  Circle the first, first letter of the alphabet in this line.

6.  In the space below draw three circles, one inside (engulfed by) the other.

7.  Above the letter X make a small cross.

8.  Draw a line through the letter below that comes earliest in the alphabet.

          Z V S B D M K I T P H C

9.  Draw a line through the two letters below that come last in the alphabet.

EDF 5448                          SA 229                                    9

14. Draw a line under the first letter after "h" and draw a line through the second letter after "j".

a b c d e f g h i j k l m n o p q

15. In the space below, write the word "noise" backwards and place a dot over what would be its second letter should it have been written forward.

16. Draw a triangle with a blackened circle that overlaps only its left corner.

17. Look at the line of numbers below, and place on the blank, the number that should come next.

2   4   8   16   ____

18. Look at the line of numbers below, and place on the blank, the number that should come next.

3   6   9   ____   15

19. Draw in the space below, a square with a triangle in it, and within that same triangle draw a circle with a black dot in it.

20. Spell backwards, forwards.

21. Print the word vote upside down, but in the correct order.

SA 230

22. Place a cross over the tenth letter in this line, a line under the first space in this sentence, and circle around the last the in the second line of this sentence.

24. Print a word that looks the same whether it is printed frontwards or backwards.

25. Write down on the line provided, what you read in the triangle below:



Paris
in the
the spring

26. In the third square below, write the second letter of the fourth word.



27. Write right from the left to the right as you see it spelled here.

28. Divide a vertical line in two equal parts by bisecting it with a curved horizontal line that is only straight at its spot bisection of the vertical.

# How is this wrong? Let me count the ways

1. Purpose is not to test literacy, but to discriminate
2. Eligibility criterion not fairly applied
3. Questions ambiguously worded
4. Scoring rubric ambiguous
   1. Raters are inconsistent (& biased)
5. Extreme Speededness (30 questions in 10 min)
6. Passing criteria extreme (all questions must be correct)
7. No face validity (what do these questions have to do with being able to understand and mark a ballot)
8. No validity evidence, but strong evidence of unfair impact!

http://www.slate.com/blogs/the_vault/2013/06/28/voting_rights_and_the_supreme_court_the_impossible_literacy_test_louisiana.html (Hat tip to Boingboing.net)

# Usability Testing & Review

- Expert Review Panel
  - Diversity is important to assess cultural sensitivity
- Pilot test in front of a few potential subjects
  - Think aloud
  - Videotaping
  - Eyetracking
- Capture sample work products for testing evidence rules

# Ex. D

# Program Handbook

# Measurement and Statistics



Department of Educational Psychology & Learning Systems

Florida State University

Update: December 2018

# Table of Contents

Chapter 1: General Information ................................................................................ 4
Mission of the M&S Program ............................................................................... 4
Core Values .......................................................................................................... 4
Faculty in the Measurement & Statistics Program ............................................... 5
Program Staff ........................................................................................................ 5
OASIS, FSU Graduate School, and M&S Canvas Site ........................................ 5
OASIS Staff Contacts ........................................................................................... 6
Financial Aid ......................................................................................................... 6
Documentation ...................................................................................................... 9
Academic Honor Code ........................................................................................ 10
Required First Day Attendance Policy ................................................................ 10
Full-time Student Course Load ........................................................................... 10
Drop/Add or Changes of Schedule ..................................................................... 11
Institutional Review Board (IRB) ....................................................................... 11
Chapter 2: Masters' Program in Measurement and Statistics ............................... 12
Coursework ......................................................................................................... 12
Major Advisor ..................................................................................................... 13
Supervisory Committee and Program of Study .................................................. 13
Recommended Timetable .................................................................................... 14
Masters' Comprehensive Exam (Non-thesis Track) .......................................... 14
Comprehensive Exam ..................................................................................... 14
Evaluation Procedure and Grades ................................................................... 15
Retake Policy ................................................................................................... 15
Thesis Defense (Thesis Track) ........................................................................... 15
Chapter 3: Doctoral Program in Measurement & Statistics .................................. 17
Doctoral Scholarly Engagement Requirement .................................................... 17
Coursework ......................................................................................................... 18
Major Advisor ..................................................................................................... 20
Supervisory Committee and Program of Study .................................................. 20
Recommended Timetable .................................................................................... 21
Qualifying and Preliminary Exams .................................................................... 21
Qualifying Exam ............................................................................................. 21
Preliminary Exam ............................................................................................ 22
Evaluation Procedure and Grades ................................................................... 24
Retake Policy ................................................................................................... 24
Admission to Candidacy ..................................................................................... 24
Doctoral Prospectus ............................................................................................ 25
Dissertation ......................................................................................................... 26
Important Note on Doctoral Credit Hours .......................................................... 28
Chapter 4: Annual Evaluations .............................................................................. 29
Chapter 5: Academic Policies ................................................................................ 30
Transfer of Courses ............................................................................................ 30
Academic Standing: Probation, Dismissal, and Reinstatement .......................... 31

Procedures for Dismissing a Graduate Student ........................................................... 31
Time Limit for Completion of Degree Requirements ............................................. 33
Grade Appeals System ................................................................................................ 33
General Academic Appeals Process (Student Grievances) ...................................... 34
Academic Honor Policy ................................................................................................ 34
Continuous Enrollment in Dissertation Hours ...................................................... 36
Appendix A: Master's Program of Study ...................................................................... 37
Appendix B: Roadmap to a Master's Degree in M&S ................................................ 40
Appendix C: Comprehensive Exam Results Form ...................................................... 41
Appendix D: Doctoral Program of Study ..................................................................... 43
Appendix E: Roadmap to a Ph.D Degree in M&S ...................................................... 47
Appendix F: Qualifying Exam Results Form ............................................................... 48
Appendix G: Preliminary Exam Results Form ............................................................ 50
Appendix H: Admission to Candidacy Form ............................................................... 52
Appendix I: Prospectus Flowchart ............................................................................... 54
Appendix J: Final Dissertation Flowchart ................................................................... 55
Appendix K: Doctoral Student Annual Review Form ................................................. 56

# Chapter 1: General Information

Welcome to the Measurement and Statistics (M&S) Program at Florida State University. This handbook describes the basics of our program, which offers two degrees: Master of Science (M.S.) and Doctor in Philosophy (Ph.D.). M&S is housed within the program area known as Educational Psychology, in the Department of Educational Psychology & Learning Systems in the College of Education.

The policies identified in this document are to be construed in light of existing University policies and with deference to the requirements imposed on graduate education by the University, the Board of Trustees of Florida State University, and the Governing Board of the State University System of Florida. The information outlined is subject to change and students should be alert to announced revisions required by the faculty of the program, the department, College, and University.

## Mission of the M&S Program

The Measurement & Statistics (M&S) program prepares leaders in educational research to serve in various types of professional positions related to collecting, analyzing and interpreting educational statistics. Our mission is to prepare future professors of measurement and statistics at colleges and universities; psychometricians who may work in commercial testing firms; educational-measurement and/or educational-statistics specialists employed by test publishers, regional educational laboratories, and governmental licensing, certification, or assessment units; and directors of measurement activities for schools and school systems.

We also serve the College of Education and Florida State University by teaching education researchers and social-science researchers from other domains to use quantitative approaches appropriately in their areas of application.

## Core Values

Graduates from our program are expected to understand and uphold the core professional values of the key professional organizations to which they will belong, including the American Educational Research Association (AERA), National Council on Measurement in Education (NCME), Psychometric Society, the American Statistical Association (AmStat), and the American Psychological Association (APA).  In particular we expect our students and graduates to:

- Design test and assessments that are fair and reliable and are valid for the purposes to which they will be put.
- Analyze data in a way appropriate to the purpose of the analysis and respectful of the limitations of how the data were collected.
- Honestly report limitations and bounds on inferences, including standard errors and biases, using estimates drawn from data.

- Store, prepare, analyze and report on data about human participants in a way that respects their privacy and dignity.
- Subject to the above constraints, meeting the needs of all stakeholders in a decision process.

## Faculty in the Measurement & Statistics Program

- Russell G. Almond, PhD
- Betsy J. Becker, PhD
- Insu Paek, PhD
- Yanyun Yang, PhD
- Qian Zhang, PhD
- Salih Binici, PhD (adjunct faculty)
- William Yeaton, PhD (adjunct faculty)

## Program Staff

Mary Kate McKee
Academic Support Assistant
(850) 644-8792
MMcKee@campus.fsu.edu
3205D Stone Building

Bryan Richards
Administrative Specialist
(850) 645-7976
brichards@admin.fsu.edu
3210A Stone Building

## OASIS, FSU Graduate School, and M&S Canvas Site

The COE Office of Academic Services and Intern Support (OASIS) is very helpful. Important guidelines and all of the forms described in this handbook are available on the OASIS website: **https://education.fsu.edu/student-resources/student-academic-services-oasis.** The FSU Graduate School also has many important resources and forms at **http://gradschool.fsu.edu/**. You can find additional information and announcements on the M&S Canvas site, which can be accessed by logging into your account (**https://canvas.fsu.edu**).

It is always important for graduate students to consult with OASIS and the Graduate School for the latest requirements, deadlines, and forms. Things often change and deadlines are often earlier than you think!