No. 22-13992

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

**LeRoy Pernell**, *et al.*,
(Plaintiffs/Appellees),

v.

**Brian Lamb**, *et al.*,
(Defendants/Appellants)

---

On Appeal from the United States District Court
for the Northern District of Florida

District Court Docket No. 4:22-CV-304-MW-MAF

---

## BRIEF OF AMICUS CURIAE PEN AMERICAN CENTER

---

James K. Green, Esq.
Florida Bar No: 229466
JAMES K. GREEN P.A.
Flagler Center, Suite 306
501 South Flagler Drive
West Palm Beach, FL 33401
Tel: 561-659-2029
jkg@jameskgreenlaw.com
jameskgreenlaw.com

**Counsel for Amicus Curiae**

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, Amicus, **PEN AMERICA (PEN AMERICAN CENTER)**, hereby certifies that, in addition to those listed in Defendants-Appellants', Pernell Plaintiffs-Appellees', and Novoa Plaintiffs-Appellees' panel briefs the following persons have an interest in the outcome of this case or appeal:

1. Green, James K. *Counsel for Amicus Curiae, PEN American Center*
2. PEN America (PEN American Center), *Amicus Curiae*

Counsel for *amicus* certifies that *Amicus Curiae* PEN American Center has no parent corporations or any other publicly held corporations that own 10% or more of its stock.

## TABLE OF CONTENTS

| | |
|---|---:|
| TABLE OF CONTENTS | ii |
| TABLE OF AUTHORITIES | iii |
| INTEREST OF AMICUS CURIAE | 1 |
| SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 2 |
|   I. Free and Open Classroom Discourse is Foundational to Academic Freedom, a Concept Deeply Rooted in First Amendment Doctrine | 2 |
|   II. Educational Gag Orders are Chilling Speech across the Nation | 3 |
|   III. The Act Constrains Freedom of Inquiry in Violation of the First Amendment | 9 |
| CONCLUSION | 12 |
| CERTIFICATE OF COMPLIANCE | 13 |
| CERTIFICATE OF SERVICE | 13 |

## TABLE OF CITATIONS

**Cases:**

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991) .................................................... 9

*Chandler v. James*, 180 F.3d 1254 (11th Cir. 1999) ................................................ 11

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ............... 10

*Keyishian v. Board of Regents*, 385 U.S. 589 (1967) ................................................ 3

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ............................................. 9

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .............. 10

*Searcey v. Harris*, 888 F.2d 1314 (11th Cir. 1989) .................................................. 11

*Shelton v. Tucker*, 364 U.S. 479 (1960) ..................................................................... 3

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................................... 10

*Stanley v. Georgia*, 394 U.S. 557 (1969) ................................................................. 12

*Sweezy v. New Hampshire,* 354 U.S. 234, 250 (1957) ............................................... 3

*Tinker v. Des Moines School Dist.,* 393 U.S. 503 (1969) .......................................... 9

*United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) ............... 3

**Statutes:**

Fla. Stat. § 1000.05(4) .......................................................................................... 1, 12

Fla. Stat. § 1000.5(6)(f), (9) (2022). .......................................................................... 6

**Other Authorities:**

Allen, Joseph, "Education and Freedom in a Democracy." *Bulletin of the American Association of University Professors (1915-1955)*..................................................2

Fernando, Christine, "Critical race theory bans are adding more anxiety to stressed teachers: 'It's like walking a tightrope'," *USA Today*, (Sept. 8, 2021)..................7

Friedman, Jonathan, and Tager, James, *Educational Gag Orders: Legislative Restrictions on the Freedom to Read, Learn, and Teach* (2021) ...........................4

Golden, Daniel "Muzzled by DeSantis, Critical Race Theory Professors Cancel Courses or Modify Their Teaching," *ProPublica* (Jan. 3, 2023). ..........................8

Hixenbaugh, Mike and Hylton, Antonia, "Southlake school leader tells teachers to balance Holocaust books with 'opposing' views," *NBC News* (Oct 14, 2021)......6

Knowles, Hannah, "Critical race theory ban leads Oklahoma college to cancel class that taught 'white privilege'," *Wash. Post* (May 29, 2021).....................................6

Morrow, Brendan, "Anti-critical race theory parents reportedly object to teaching Ruby Bridges book," *The Week*, (Jul. 8, 2021) ......................................................6

PEN America, *Index of Educational Gag Orders* (last updated Jan. 6, 2023)..........5

Pollock, Mica, et al., "Supported, Silenced, Subdued, or Speaking Up? K12 Educators' Experiences with the Conflict Campaign, 2021-2022," *Journal of Leadership, Equity, and Research* (forthcoming, 2023) .........................................8

Salvador, Karen "Divisive Concepts Laws and Music Education," National Association for Music Education, at 9 (Jan. 30, 2023), .........................................7

Vock, Daniel C., "GOP furor over 'critical race theory' hits college campuses," *Iowa Capital Dispatch* (Jul. 3, 2021)..................................................................6

Woo, Ashley, et al., Walking on Eggshells—Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics, RAND Corporation, at 12 (2023)................................................................................................................7

Young, Jeremy C. and Friedman, Jonathan, *America's Censored Classrooms* (2022)................................................................................................................5

## INTEREST OF AMICUS CURIAE[1]

*Amicus* PEN America is a nonprofit, nonpartisan public-policy organization with an abiding interest in protecting free expression as the cornerstone of a robust and healthy democracy. PEN America has conducted extensive research into recent efforts to suppress the expression of certain disfavored viewpoints within classrooms across the country. With this brief, *Amicus* seeks to situate the law at issue in this case within a broader context of censorship in the classroom nationwide and to demonstrate that such censorship is constitutionally impermissible.

## SUMMARY OF ARGUMENT

The Florida legislature enacted House Bill 7, titled the "Individual Freedom Act" and referred to as the "Stop WOKE Act," ("The Act"), Fla. Stat. § 1000.05(4), to restrict the teaching of particular topics, with an emphasis on restricting particular viewpoints, in college and university classrooms throughout the state of Florida. Verboten viewpoints include the perspective that affirmative

---

[1] The parties **have consented to the filing of this brief** *amicus curiae*. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No such monetary contributions were made by anyone other than *amicus* and their counsel.

1

action programs exist or that systemic forms of racism, sexism, or other forms of discrimination on the basis of membership in a protected class exist.

Government-imposed curtailment of topics addressed in the classroom undermines the principle of free and open discourse in education, long a democratic bellwether.[2] Viewpoint based restrictions are a particularly insidious form of this type of censorship and warrant even closer scrutiny. In this brief, *Amicus* outlines the free expression interests at stake, situates the Act in the context of a proliferation of similar viewpoint-based legislation that has swept across the country, and demonstrates that the Act is unconstitutional.

## ARGUMENT

I. **Free and Open Classroom Discourse is Foundational to Academic Freedom, a Concept Deeply Rooted in First Amendment Doctrine**

"To impose any strait-jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. … Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Sweezy v.*

---

[2] Allen, Joseph, "Education and Freedom in a Democracy." *Bulletin of the American Association of University Professors (1915-1955)* 23, no. 7 (1937): 558–65, https://doi.org/10.2307/40219535 ("Education in a democracy…must be conducted with a generous welcome to new ideas and methods [and] with tolerance for the opinions of others").

*New Hampshire,* 354 U.S. 234, 250 (1957). The exploration of new ideas and concepts is a foundational aspect of the classroom environment and the Supreme Court of the United States has repeatedly held that the First Amendment protects this process.

The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967), which is, in particular, the "marketplace of ideas." *Id.* (internal quotations omitted). This protection is tied inextricably to democratic norms, furthered via "wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Id.* (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). The furtherance of democratic norms in the form of "vigilant protection of constitutional freedoms" is most vital in the classroom. *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth." *Sweezy,* 354 U.S. at 250.

## II.   Educational Gag Orders are Chilling Speech across the Nation

The Act is part of recent legislative efforts across the U.S. to restrict teaching and training of particular topics, in K-12 schools, higher education, state agencies and institutions, and workplace settings. As *Amicus'* research catalogs, the majority of these bills target discussions of race, racism, gender, and American

3

history, banning a series of "prohibited" or "divisive" concepts.[3] These bills seek to use state power to exert ideological control over educational institutions, imposing government dictates on teaching and learning. Where enacted, they have chilled educational discussions of topics and viewpoints that the State disfavors.[4] The bills' vague, sweeping language, particularly when coupled with potential imposition of civil and/or criminal penalties, necessarily leads to broad application and interpretation as those covered by their dictates attempt to avoid running afoul of their measures. This chilling effect threatens to effectively ban a wide swath of literature, curricula, and historical materials, from classrooms and institutions across the country. The embrace of these bills demonstrates a disregard for academic freedom and the values of free speech and open inquiry that are enshrined in the First Amendment and that anchor a democratic society. *Amicus* refers to these bills as "educational gag orders."

---

[3] Friedman, Jonathan, and Tager, James, *Educational Gag Orders: Legislative Restrictions on the Freedom to Read, Learn, and Teach* (2021), https://pen.org/report/educational-gag-orders/.

[4] Press Release, *Florida Office of the Governor, Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.

As of May 24, 2023, 306 such bills had been introduced in 45 states since January 2021.[5] Instances of these types of bills being introduced grew 250 percent between 2021 and 2022.[6] Several bills impose civil or criminal penalties–up to $100,000 in one case.[7] At least nine allow for a private cause of action. In the education sphere, this essentially deputizes parents and students to surveil their teachers; for example, at least one state has set up a website to enable reporting. Other states have similarly styled provisions, such as telephone hotlines open for the public to report a teacher who "omits relevant and important context" from a lesson, or measures allowing members of the public to observe teacher training programs. The Act is among the bills with provisions for both the imposition of civil penalties and the option of a cause of action. Fla. Stat. § 1000.5(6)(f), (9) (2022).

Even before these harsher provisions became more commonplace in the sweeping introduction of these bills across the country, the silencing of speech in educational institutions was well underway. In the first several months of 2021, educational gag orders were behind decisions to suspend a sociology course on

---

[5] PEN America, *Index of Educational Gag Orders* (last updated Jan. 6, 2023), https://docs.google.com/spreadsheets/d/1Tj5WQVBmB6SQg-zP_M8uZsQQGH09TxmBY73v23zpyr0/edit#gid=107383712
[6] Young, Jeremy C. and Friedman, Jonathan, *America's Censored Classrooms* (2022), https://pen.org/report/americas-censored-classrooms/
[7] 22 RS BR 69, §(3)(c) (Ky., 2022).

race and ethnicity in Oklahoma,[8] provide professors at Iowa State University written guidance for how to avoid 'drawing scrutiny' for their teaching under their state's Act,[9] instruct teachers that they should balance having books on the Holocaust with those with "opposing views" in Texas,[10] and challenge the teaching of civil rights activist Ruby Bridges's autobiographical picture book about school desegregation in Tennessee.[11]

Entering the 2021-2022 school year, teachers reported feeling nervous, anxious, and concerned about losing their jobs; shared anecdotes of school administrators seeking to change curricula; and noted their own efforts to alter their lessons, due to the enactment of these bills or even administrative "scare tactics" that lack legal teeth but nonetheless cast a long shadow over the

---

[8] Knowles, Hannah, "Critical race theory ban leads Oklahoma college to cancel class that taught 'white privilege'," *Wash. Post* (May 29, 2021), https://www.washingtonpost.com/education/2021/05/29/oklahoma-critical-race-theory-ban/

[9] Vock, Daniel C., "GOP furor over 'critical race theory' hits college campuses," *Iowa Capital Dispatch* (Jul. 3, 2021) https://iowacapitaldispatch.com/2021/07/03/gop-furor-over-critical-race-theory-hits-college-campuses/.

[10] Hixenbaugh, Mike and Hylton, Antonia, "Southlake school leader tells teachers to balance Holocaust books with 'opposing' views," *NBC News* (Oct 14, 2021), https://www.nbcnews.com/news/us-news/southlake-texas-holocaust-books-schools-rcna2965.

[11] Morrow, Brendan, "Anti-critical race theory parents reportedly object to teaching Ruby Bridges book," *The Week*, (Jul. 8, 2021) https://theweek.com/news/1002407/anti-critical-race-theory-parents-reportedly-object-to-teaching-ruby-bridges-book

classroom.[12] "We were told not to teach critical race theory—no one was," reported one middle school teacher. "The past two years have made me nervous about teaching Frederick Douglass because I don't think the people in my community know the difference between teaching [Black] history and teaching critical race theory."[13] "I am afraid to even talk about jazz or the blues or Black American music," wrote a first-year music teacher, "because of the connotations of the genre."[14] "I do think that I am going to be a little bit more cautious about the way that I word things," said a Kentucky teacher, "because even though it's not to the point that I'm willing to change my curriculum, I am not also not trying to invite problems in my life." "It's one more step in my thought process, 'Is this how I wanted to teach this subject?'" agreed a teacher in Virginia. "For the first time this year I was like, should I even include parts of those lessons [on the Civil War and Reconstruction]? Which breaks my heart."[15]

---

[12] Fernando, Christine, "Critical race theory bans are adding more anxiety to stressed teachers: 'It's like walking a tightrope'," *USA Today*, (Sept. 8, 2021), https://www.usatoday.com/story/news/education/2021/09/08/critical-race-theory-bans-stress-history-teachers/5618345001/?gnt-cfr=1.

[13] Woo, Ashley, et al., Walking on Eggshells—Teachers' Responses to Classroom Limitations on Race- or Gender-Related Topics, RAND Corporation, at 12 (2023) https://www.rand.org/pubs/research_reports/RRA134-16.html.

[14] Salvador, Karen "Divisive Concepts Laws and Music Education," National Association for Music Education, at 9 (Jan. 30, 2023), https://nafme.org/wp-content/uploads/2023/03/NAfME-Divisive-Concepts-Laws-and-Music-Education-Report.pdf.

[15] Pollock, Mica, et al., "Supported, Silenced, Subdued, or Speaking Up? K12 Educators' Experiences with the Conflict Campaign, 2021-2022," *Journal of*

This chilling effect worsened significantly in Florida during the four and a half months the Act was in effect. In response to the law and the political climate, the University of Central Florida's sociology department canceled every course on race. Florida Gulf Coast University renamed its Center for Critical Race and Ethnic Studies to eliminate the word "critical." And, at Florida State University, an assistant professor who studied critical race theory delayed going up for tenure, at her department chair's suggestion, because of the law – while a graduate instructor weeded out student-suggested questions about White privilege from class discussions.[16]

Like the Act, the current swath of educational gag orders is largely aimed at concepts concerning race, gender, and identity. Yet permitting a precedent of the use of the machinery of government in attempts to limit Americans' ability to express themselves–and particularly in order to block the expression of information, ideas, or theories–by no means ensures such efforts will be limited to the current concepts of focus.

---

*Leadership, Equity, and Research* (forthcoming, 2023), http://schooltalking.org/wp-content/uploads/2023/05/Pollock2023SupportedSilencedSubduedSpeakingUpJLER.docx.pdf.

[16] Golden, Daniel "Muzzled by DeSantis, Critical Race Theory Professors Cancel Courses or Modify Their Teaching," *ProPublica* (Jan. 3, 2023, https://www.propublica.org/article/desantis-critical-race-theory-florida-college-professors.

## III. The Act Constrains Freedom of Inquiry in Violation of the First Amendment

The Supreme Court has held that neither students nor teachers shed their First Amendment rights in the classroom. *See Tinker v. Des Moines School Dist.*, 393 U.S. 503, 511 (1969); *Pickering v. Board of Ed.*, 391 U.S. 563 (1968). This Court, in *Bishop v. Aronov,* has required a case-by-case consideration of three factors to determine the constitutionality of restrictions on university instructors' speech. *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991). Those three factors are: 1. the context, 2. the university's position as a public employer, and 3. academic freedom interests, which strongly disfavor viewpoint-based restrictions on speech. *Id*. at 1074-1075. While there may be other cases in which additional analysis is required to determine the constitutionality of an incursion on free expression in higher education, this court need go no further than applying the three-factor test set forth in *Bishop* to determine that the Act is unconstitutional.

The Act sets out eight concepts that may not be included in any "training or instruction" that "espouses, promotes, advances, inculcates, or compels" the concepts. Fla. Stat. § 1000.05(4). The law limits the teaching, explanation, or examination of particular sentiments, while simultaneously allowing those sentiments to be condemned. Further, the State's reasoning for implementing this legislation is viewpoint- not schoolwork- or discipline-based. To wit, the State's

9

stated interest in enacting this law is "to fight back against woke indoctrination"[17] and to "put an end to wokeness that is permeating our schools and workforce,"[18] illustrating the State's focus on suppressing a particular set of viewpoints, which will often be relevant to approved courses, in contrast to the actions taken by the university in *Bishop*. *Bishop*, 926 F.2d at 1077-1078 (holding that the university in that case was merely seeking to limit irrelevant discussion in the classroom not to suppress particular viewpoints relevant to coursework).

Viewpoint discrimination is particularly offensive to the First Amendment, as the Supreme Court has repeatedly held. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011)("The State may not burden the speech of others in order to tilt public debate in a preferred direction.") This court, too, has noted that censorship in the form of viewpoint discrimination is among the "most egregious" of First Amendment violations. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279–80 (11th Cir. 2004) (citing *Chandler v. James*, 180 F.3d 1254, 1265

---

[17] Press Release, *Florida Office of the Governor, Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), quoting Governor Ronald DeSantis, https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.

[18] *Id.*, quoting Lieutenant Governor Jeanette Nuñez.

10

(11th Cir. 1999) ("viewpoint discrimination[ ][is] the most egregious form of content-based censorship"); *see also Searcey v. Harris*, 888 F.2d 1314, 1324 (11th Cir. 1989)("The prohibition against viewpoint discrimination is firmly embedded in First Amendment analysis.").

      The Act's viewpoint discrimination is plain and cannot survive any level of constitutional scrutiny, including the test set forth in *Bishop*. Under the Act, teachers in Florida are prohibited from sharing their insights and expertise with their students on the eight banned topics if they fail to adopt the preferred view of the State. In the district court, the State of Florida admitted that one of the banned concepts is, in essence, the concept of affirmative action. That means that teachers could not explain that concept of affirmative action or cite to any existing research or scholarship that explains the positive impacts of affirmative action. On the other hand, they could criticize its historic use to achieve racial equity in academic settings. Beyond teachers, the law also reaches anyone who would come to the classroom to share their perspectives from speaking in support of the eight banned concepts. That would mean that a school could not organize or host an event in which Charlie Crist, the Democratic candidate for Governor of Florida in 2022, and Gov. Ron DeSantis debate affirmative action, because the State has decided that Crist's support for affirmative action cannot be spoken aloud in a school setting.

11

To make matters worse, the Act also infringes on students' right to receive information. The Supreme Court has long recognized that the First Amendment, in addition to ensuring the right to speak, also insures the right to receive information. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969). By eliminating certain viewpoints on important topics from the classroom, the Act denies students the ability to receive a wide array of ideas that will help them best participate in society in violation of their constitutional right to become acquainted with a diversity of viewpoints. It also inhibits their ability to share and to speak in the classroom setting about their lived experience and their own research if it diverges from the State's approved script.

## CONCLUSION

For the foregoing reasons, *Amicus* urges this Court to affirm the District Court.

Dated: June 23, 2023                Respectfully submitted,

/s/ *James K. Green*
JAMES K. GREEN, P.A.
James K. Green, Esq.
Flagler Center, Suite 306
501 South Flagler Drive
West Palm Beach, FL 33401
Tel: 561-659-2029
jkg@jameskgreenlaw.com
jameskgreenlaw.com

**Counsel for Amicus Curiae**

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the attached brief is proportionally spaced, has a typeface of 14 points, and contains 2, 592 words.

Dated: June 23, 2023　　　　　　　　　　/s/ James K. Green

## CERTIFICATE OF SERVICE

I, James K. Green, counsel for Amicus Curiae and a member of the Bar of this Court, certify that on June 23, 2023, a copy of the foregoing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ James K. Green
James K. Green