## Nos. 22-13992 & 22-13994

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————————

LEROY PERNELL ET AL., *Plaintiffs-Appellees*,

v.

BRAIN LAMB ET AL., *Defendants-Appellants*,

———————————————

ADRIAN NOVOA ET AL., *Plaintiffs-Appellees*,

v.

MANNY DIAZ, JR. ET AL., *Defendants-Appellants*,

———————————————

On Appeal from the United States District Court
for the Northern District of Florida,
Nos. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

———————————————

## BRIEF OF THE NATIONAL EDUCATION ASSOCIATION, UNITED FACULTY OF FLORIDA, NATIONAL BLACK LAW STUDENTS ASSOCIATION, AND STAND FOR FREEDOM AS AMICI CURIAE IN SUPPORT OF AFFIRMANCE IN FAVOR OF PLAINTIFFS-APPELLEES

———————————————

Craig Goodmark
GOODMARK LAW FIRM
1425 A Dutch Valley Pl NE
Atlanta, GA 30324
(404) 719-4848

Alice O'Brien
Jason Walta
Michele Bastacky
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7035

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rules 26.1-2, Amici Curiae certify that the following persons have or may have an interest in the outcome of this case or appeal:

1. Almond, Russell, Plaintiff-Appellee

2. American Civil Liberties Union Foundation of Florida, Inc., Attorneys for Plaintiffs-Appellees

3. American Civil Liberties Union Foundation, Attorneys for Plaintiffs-Appellees

4. Austin, Sharon Wright, Plaintiff-Appellee

5. Azis, Jacqueline Nicole, Attorney for Plaintiffs-Appellees

6. Ballard Spahr, LLP, Attorneys for Plaintiffs-Appellees

7. Bastacky, Michele, Attorney for Amici Curiae

8. Benjamin, Aaronson, Edinger, & Pantzano, P.A., Attorneys for Plaintiffs-Appellees

9. Black Law Students Association, Amicus Curiae

10. Blankenship, Katherine, Attorney for Plaintiffs-Appellees

11. Boaz, Timothy L., Defendant-Appellant

12. Burgess, Tiffani, Attorney for Plaintiffs-Appellees

13. Callahan, Sandra, Defendant-Appellant

14. Carrere, Michael, Defendant-Appellant

15.    Cerio, Timothy M., Defendant-Appellant

16.    Coleman, Santino, Attorney for Plaintiffs-Appellees

17.    Cooper & Kirk, PLLC, Attorneys for Defendants-Appellants

18.    Cooper, Charles J., Attorney for Defendants-Appellants

19.    Corcoran, Richard, Defendant-Appellant

20.    Dauphin, Johana, Plaintiff-Appellee

21.    Diaz, Jr., Manny, Defendant-Appellant

22.    Donnelly, N. Rogan, Defendant-Appellant

23.    Dunn, Marvin, Plaintiff-Appellee

24.    Edge, Aubrey, Defendant-Appellant

25.    Edinger, Gary Scott, Attorney for Plaintiffs-Appellees

26.    Edwards, Jerry Crawford, Attorney for Plaintiffs-Appellees

27.    Fajana, Morenike, Attorney for Plaintiffs-Appellees

28.    First Amendment Forum at University of South Florida, Plaintiff- Appellee

29.    Fitzpatrick, Magistrate Judge Hon. Martin A., U.S. District Court for the Northern District of Florida

30.    Florida A&M University Board of Trustees, Defendant (dismissed Nov. 22, 2022)

31.    Florida Board of Governors of the State University System, Defendant (dismissed Nov. 22, 2022)

32.    Florida International University Board of Trustees, Defendant (dismissed Nov. 22, 2022)

33. Florida State University Board of Trustees, Defendant (dismissed Nov. 22, 2022)

34. Foundation for Individual Rights and Expression, Attorneys for Plaintiffs-Appellees

35. Frost, Patricia, Defendant-Appellant

36. Gabadage, Nimna, Defendant-Appellant

37. Gary S. Edinger & Associates PA, Attorney for Plaintiffs Appellees

38. Goodmark, Craig, Attorney for Amici Curiae

39. Greubel, Greg Harold, Attorney for Plaintiffs-Appellees

40. Griffin, Michael, Defendant-Appellant

41. Haddock, Jr., Edward Ellis, Defendant-Appellant

42. Hinger, Sarah Ann, Attorney for Plaintiffs-Appellees

43. Horton, Oscar, Defendant-Appellant

44. Johnson, Alexis Marie, Attorney for Plaintiffs-Appellees

45. Jones, Kenneth, Defendant-Appellant

46. Jordan, Darlene Luccio, Defendant-Appellant

47. Lamb, Brian, Defendant-Appellant

48. Leckerman, Jason Allen, Attorney for Plaintiffs-Appellees

49. Lee, Jin Hee, Attorney for Plaintiffs-Appellees

50. Leftheris, Julie, Defendant-Appellant

51. Levine, Alan, Defendant-Appellant

52.  Lubin, Catharine E., Attorney for Plaintiffs-Appellees

53.  Lydecker, Charles, Defendant-Appellant

54.  Mabatah, Isiuwa Jacqueline, Attorney for Plaintiffs-Appellees

55.  Mateer, Craig, Defendant-Appellant

56.  McLaurin, Charles, Attorney for Plaintiffs-Appellees

57.  McNamara, Caroline Andrews, Attorney for Plaintiffs-Appellees

58.  Michael, Deanna, Defendant-Appellant

59.  Monbarren, Lauran, Defendant-Appellant

60.  Moraff, Laura Beth, Attorney for Plaintiffs-Appellees

61.  Morris, Joshua ("J.T."), Attorney for Plaintiffs-Appellees

62.  NAACP Legal Defense & Educational Fund, Inc., Attorneys for Plaintiffs-Appellees

63.  National Education Association, Amicus Curiae

64.  Novoa, Adriana, Plaintiff-Appellee

65.  O'Brien, Alice, Attorney for Amici Curiae

66.  Ohlendorf, John David, Attorney for Defendants-Appellants

67.  Palyam, Nithin, Defendant-Appellant

68.  Pardue, Crystal, Attorney for Plaintiffs-Appellees

69.  Park, Shelley, Plaintiff-Appellee

70.  Parsons, Emmy, Attorney for Plaintiffs-Appellees

71.  Patel, Shilen, Defendant-Appellant

72.  Pernell, LeRoy, Plaintiff-Appellee

73.  Piccolo, Fredrick, Defendant-Appellant

74.  Ramer, John, Attorney for Defendants-Appellants

75.  Rechek, Samuel, Plaintiff-Appellee

76.  Sandoval, Jennifer, Plaintiff-Appellee

77.  Schneider, Jenifer Jasinski, Defendant-Appellant

78.  Scott, Steven, Defendant-Appellant

79.  Seixas, Melissa, Defendant-Appellant

80.  Self, William, Defendant-Appellant

81.  Silagy, Eric, Defendant-Appellant

82.  Stand For Freedom, Amicus Curiae

83.  Steinbaugh, Adam, Attorney for Plaintiffs-Appellees

84.  Stermon, Kent, Defendant-Appellant

85.  Sykes, Emerson James, Attorney for Plaintiffs-Appellees

86.  Thompson Dorsey, Dana, Plaintiff-Appellee

87.  Tilley, Daniel Boaz, Attorney for Plaintiffs-Appellees

88.  Tobin, Charles David, Attorney for Plaintiffs-Appellees

89.  United Faculty of Florida, Amicus Curiae

90.  University of Central Florida Board of Trustees, Defendant (dismissed Nov. 22, 2022)

91.  University of Florida Board of Trustees, Defendant (dismissed Nov. 22, 2022)

92.  University of South Florida Board of Trustees, Defendant (dismissed Nov. 22, 2022)

93.  Walker, Hon. Judge Mark E., U.S. District Court for the Northern District of Florida

94.  Walta, Jason, Attorney for Amici Curiae

95.  Watson, Leah Monique, Attorney for Plaintiffs-Appellees

96.  Weatherford, William, Defendant-Appellant

97.  Wold, Megan M., Attorney for Defendants-Appellants

Amici further state that no publicly traded company or

corporation has an interest in the outcome of the case or appeal.

/s/ Craig Goodmark
Craig Goodmark
GOODMARK LAW FIRM
1425 A Dutch Valley Pl NE
Atlanta, GA 30324
(404) 719-4848

# TABLE OF CONTENTS

Corporate disclosure statement................................................................C-1

Table of contents ..................................................................................... i

Table of authorities ................................................................................. iii

Statement of Amici Curiae ....................................................................... 1

Issue presented.......................................................................................... 2

Introduction and summary of argument.................................................. 2

Argument .................................................................................................... 3

    I.  The IFA is unconstitutionally vague............................................... 3

        A. This Court's standards for evaluating vagueness ..................... 5

        B. The IFA is is subject to heightened vagueness scrutiny ............ 7

            1.  The IFA implicates First Amendment freedoms.................. 7

            2.  Violations of the IFA result in severe penalties................... 9

            3.  The IFA contains no scienter requirement......................... 13

        C. The IFA fails to provide both fair notice of prohibited conduct
           and clear guidance for enforcement .......................................... 15

            1.  Vaguely defined conduct...................................................... 16

            2.  Vaguely defined concepts ..................................................... 18

            3.  One vaguely defined exception............................................. 22

D. Compliance with the IFA is made even more insoluable by the need to comply with other laws that are currently in force ..... 24

E. Statements and actions by state officials have exacerbated concerns about arbitrary and politicized enforcement ............. 26

II. Allowing the IFA to go into effect will have far-reaching negative consequnces for higher education in Florida ................................. 30

A. The IFA will diminish the ability of Florida's public colleges and universities to attract and retain faculty ........................... 31

B. The IFA will increase bureaucracy and politicization in Florida's public colleges and universities ................................. 33

C. The IFA will leave graduates of Florida's public colleges and universities ill-equipped to participate in the workforce and in our democracy ............................................................................... 34

Conclusion ........................................................................................... 37

Certificate of compliance ..................................................................... 38

Certificate of service ............................................................................ 39

# TABLE OF AUTHORITIES

## Cases

*Adams v. Trustees of UNC-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) .................................................. 9

*Am. Amusement Mach. Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) ............................................ 35, 36

*Brown v. Board of Education,*
    347 U.S. 483 (1954) ........................................................ 35

*Buchanan v. Alexander,*
    919 F.3d 847 (5th Cir. 2019) .................................................. 9

*Burns v. Town of Palm Beach,*
    999 F.3d 1317 (11th Cir. 2021),
    *cert. denied*, 142 S. Ct. 1361 (2022) ................................. 6, 15

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ...................................................... 16, 23

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) ..................................................... 16–17

*Colautti v. Franklin,*
    439 U.S. 379 (1979) ..................................................... 13–14

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) .................................................. 9

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ...................................................... 14

*Doe v. Valencia Coll. Bd. of Trustees,*
    838 F.3d 1207 (11th Cir. 2016) ............................................. 18

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)................................................................. 8

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966)............................................................... 10

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)........................................................... 3, 22

*Grutter v. Bollinger*,
    539 U.S. 306 (2003).................................................... 7, 34, 35

*Haaland v. Brackeen*,
    No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023)......................... 20

*Harrell v. Fla. Bar*,
    608 F.3d 1241 (11th Cir. 2010) ............................................. 14

*Jefferies v. Harris County Cmty. Action Ass'n*,
    615 F.2d 1025 (5th Cir. 1980) ............................................. 28

*Johnson v. United States*,
    576 U.S. 591 (2015)............................................................. 6, 9

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)..................................................... 7, 8, 35

*Local 8027, Am. Fed'n of Teachers-N.H. v. Edelblut*,
    No. 21-CV-1077-PB, 2023 WL 171392
    (D.N.H. Jan. 12, 2023) ......................................... 10, 15, 26

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................. 8, 9

*NAACP v. Button*,
    371 U.S. 415 (1963)..................................................... 5–6, 7

*Pernell v. Fla. Bd. of Governors*,
  No. 4:22-CV-304, 2022 WL 16985720
  (N.D. Fla. Nov. 17, 2022) ............................................................ 17, 18

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) .................................................................. 6, 9–10

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957) ...................................................................... 8, 31–32

*United States v. Biro*,
  143 F.3d 1421 (11th Cir. 1998) ................................................... 6

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ................................................................. 3

*United States v. Fordice*,
  505 U.S. 717 (1992) ...................................................................... 21

*United States v. Panfil*,
  338 F.3d 1299 (11th Cir. 2003) ................................................... 13

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ...................................................................... 5

*Wollschlaeger v. Governor of Fla.*,
  848 F.3d 1293 (11th Cir. 2017) (en banc) ................................... passim

## Statutes and Constitutional Provisions

U.S. Const. amend. 1 ..................................................................... 7, 8, 9, 18
U.S. Const. amend. 14 ................................................................... 3, 4, 15
U.S. Const. amend. 15 ................................................................... 19
U.S. Const. amend. 19 ................................................................... 19

Fla. Stat. § 1000.05 ....................................................................... passim
Fla. Stat. § 1001.92 ....................................................................... 12
Fla. Stat. § 1004.097 ..................................................................... 24–25

## Rules

Fed. R. App. P. 29 ...................................................................................... 1

Fla. Bd. of Govs. Reg. 10.005 ...................................................... 11, 12–13

## Other Authorities

Am. Ass'n of Univ. Professors, *Preliminary Report of the Special
Committee on Academic Freedom and Florida* at 16 (May 24, 2023),
https://www.aaup.org/file/Preliminary_Report_Florida.pdf .............. 32

Patricia Hill Collins, *Intersectionality's Definitional Dilemmas*, 41 Ann.
Rev. Soc. 1 (2015) ................................................................................. 28

Manny Diaz Jr.(@SenMannyDiazJr), Twitter,
https://twitter.com/SenMannyDiazJr .......................................... 27–28

Fla. Dep't of Educ., *Specifications for the 2022-2023 Florida
Instructional Materials Adoption, K-12 Social Studies* (July 2022),
https://www.fldoe.org/core/fileparse.php/5574/urlt/SocialStudies-IM-
Spec.pdf ................................................................................................ 29

Conor Friedersdorf, *What Does DEI Even Mean?*, The Atlantic (Apr. 6.,
2023),
https://www.theatlantic.com/newsletters/archive/2023/04/what-does-
dei-even-mean/673657/ ....................................................................... 20

Patricia Mazzei & Anemona Hartocollis, *Florida Rejects A.P. African
American Studies Class*, N.Y. Times (Jan. 19, 2023),
https://www.nytimes.com/2023/01/19/us/desantis-florida-ap-african-
american-studies.html ......................................................................... 27

Merriam Webster Online Dictionary, https://www.merriam-
webster.com/dictionary/ ................................................................ 16, 17

Office of the Governor, *News Release: Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.......................................................................................... 4

Larry Seward, *Are Florida universities suffering a crisis in the classroom?* (Apr. 27, 2023) (noting reports of "talent leaving and potential new professors choosing jobs out-of-state"), https://www.cbsnews.com/miami/news/are-florida-universities-suffering-a-crisis-in-the-classroom/ .................................................... 32

State Univ. Sys. of Fla., *State University System of Florida's Performance Funding Model Fuels Student Success* (June 30, 2022), https://www.flbog.edu/2022/06/30/state-university-system-of-floridas-performaxnce-funding-model-fuels-student-success/........... 13

## STATEMENT OF AMICI CURIAE

This brief is submitted in support of the Plaintiffs-Appellees on behalf of Amici Curiae National Education Association ("NEA"), United Faculty of Florida ("UFF"), National Black Law Students Association ("NBLSA"), and Stand for Freedom ("SFF").[1]

NEA is the nation's largest professional association representing approximately three million members, who serve as teachers, educators, counselors, and education support professionals in our nation's public schools and institutions of higher education.

UFF is a labor organization that represents over 25,000 faculty members, academic professionals, and graduate assistants at Florida public universities, state colleges, community colleges, K-12 lab schools, and one private university.

---

[1] This brief is filed with the consent of all the parties. *See* Fed. R. App. P. 29(a)(2). Amici state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than Amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

NBLSA is the largest student-run 501(c)(3) non-profit in the country with the mission to increase the number of culturally responsible Black and minority attorneys who excel academically, succeed professionally, and positively impact the community.

SFF is a youth-led organization dedicated to building a system of inclusivity and acceptance in the state of Florida through education.

Amici are united in their concern about the damage caused by laws—like the one at the heart of this case—that impose vague and politicized limitations on instruction in institutions of higher education. Such laws hamper the academic freedom of faculty and severely compromise the ability of students to receive a quality education.

## ISSUE PRESENTED

Whether Fla. Stat. § 1000.05(4) is unconstitutional as applied to public institutions of higher education and their faculties.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amici curiae submit this brief in support of Plaintiffs-Appellees to emphasize and amplify that the district court below was correct in holding that Florida's so-called Individual Freedom Act ("IFA") is void-

as-vague as applied to public institutions of higher education and their faculties. Amici also write to elaborate on some of the harmful consequences that higher education faculty, students, and the state at large will face if the IFA is allowed to go into effect. To put it bluntly, the IFA is hopelessly vague, has already invited arbitrary and discriminatory enforcement, and has no place in higher education. This Court should affirm the district court's order preliminarily enjoining the IFA's enforcement in Florida's public colleges and universities.

## ARGUMENT

## I.    THE IFA IS UNCONSTITUTIONALLY VAGUE

A "vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). That is because vague enactments defy the "first essential of due process of law," which is that every person is entitled to "fair notice of what the law demands of them." *Id.* at 2325 (cleaned up). If a law cannot satisfy this baseline constitutional requirement, it is void and unenforceable. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Enacted in 2022, the IFA operates throughout the Florida public education system—including in both undergraduate and graduate institutions of higher education—to make it unlawful to "subject any student to . . . instruction that espouses, promotes, advances, inculcates, or compels . . . student[s] . . . to believe" in a specified set of concepts dealing with issues of "race, color, national origin, [and] sex." Fla. Stat. § 1000.05(4)(a). In the statement announcing the IFA's passage, Governor DeSantis proclaimed that the IFA was meant to stand up to "woke indoctrination" and would prevent the "far-left woke agenda" from "tak[ing] over our schools."[2]

The IFA is dangerous political theater that falls far short of what the constitutional due process demands. Its many troubling features—including its impingement on academic freedom and placement of faculty at risk of their livelihood—require this Court to apply the most exacting scrutiny for vagueness. And when that scrutiny is applied, the

---

[2] Office of the Governor, *News Release: Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

IFA is deficient in almost every respect. The law fails to give fair notice of its requirements, appears to conflict with other state laws, and invites arbitrary and politicized enforcement.

## A. This Court's Standards for Evaluating Vagueness

There are two grounds on which a law can be found void for vagueness. First, it can fail "to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc). Second, it can "authorize or even encourage arbitrary and discriminatory enforcement." *Id.* at 1319–20 (cleaned up). Accordingly, a statute survives a vagueness challenge only when it can be shown to provide both reasonable notice of what is prohibited and explicit standards for the law's enforcement. *See id.*

The "degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Most importantly, "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415,

432 (1963). Heighted scrutiny for vagueness is also triggered where violations of the challenged law take on a "grave nature" or result in "particularly severe" penalties—such as laws imposing criminal penalties, laws that result in deportation, and laws that revoke professional licensure. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (plurality opinion); *id.* at 1228–31 (Gorsuch, J., concurring); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015); *Wollschlaeger*, 848 F.3d at 1323. Also, more exacting scrutiny applies when the challenged law has no scienter requirement that could otherwise guard against unwitting violations. *See United States v. Biro*, 143 F.3d 1421, 1430 (11th Cir. 1998) ("[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice that the conduct is proscribed."). Even in the absence of heightened scrutiny, a law will still be unconstitutional if "it is so indefinite as really to be no rule or standard at all." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (cleaned up), *cert. denied*, 142 S. Ct. 1361 (2022).

**B.    The IFA is Subject to Heightened Vagueness Scrutiny**

*1. The IFA implicates First Amendment freedoms*

Where a law touches on matters of First Amendment rights, this Court demands "rigorous adherence" to the requirements of fair notice and clear enforcement standards "to ensure that ambiguity does not chill protected speech." *Wollschlaeger*, 848 F.3d at 1320 (cleaned up); *see also Button*, 371 U.S. at 433 ("[G]overnment may regulate in the area" of First Amendment freedoms "only with narrow specificity."). The IFA is such a law. Academic freedom is a matter of "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). Yet the IFA seeks to ban a broad range of amorphously-defined topics, ideas, and areas of inquiry at every level of public higher education—from college freshman lectures, to law school electives, to doctoral seminars.

Higher education occupies "a special niche in our constitutional tradition," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), because if we are not "free to inquire, to study and to evaluate, to gain new maturity

and understanding . . . [,] our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Robust protection of academic freedom is therefore "of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603. As a result, "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021); *see also Sweezy*, 354 U.S. at 249–50 (recognizing that it cannot "be seriously debated" that a professor's "right to lecture" is protected by the Constitution).

This is true notwithstanding the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that public employees generally lack First Amendment protection for speech made "pursuant to their official duties," *id.* at 421. The *Garcetti* Court itself expressly reserved whether its holding could apply "to a case involving speech related to scholarship or teaching." *Id.* at 425. And, in the wake of *Garcetti*, every court of appeals to address the question has held that public college and university professors retain substantial academic

freedom under the First Amendment while engaged in teaching and scholarship. *See Meriwether*, 992 F.3d at 505; *Buchanan v. Alexander*, 919 F.3d 847, 852–53 (5th Cir. 2019); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014); *Adams v. Trustees of UNC-Wilmington*, 640 F.3d 550, 564–65 (4th Cir. 2011). As one of those courts observed, "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court." *Demers*, 746 F.3d at 411. Accordingly, this Court must hold the IFA to rigorous standards of fair notice and clear guidance to ensure that its ambiguities will not chill protected speech. *See Wollschlaeger*, 848 F.3d at 1320.

## 2. *Violations of the IFA result in severe penalties*

The IFA also receives heighted scrutiny for vagueness because violations of the law take on a "grave nature" and result in "particularly severe" penalties. *Dimaya*, 138 S. Ct. at 1213 (plurality opinion); *see also id*. at 1228–31 (Gorsuch, J., concurring). Although this extra degree of scrutiny is generally reserved for criminal laws, *see Johnson*, 576 U.S. at 595, it applies in certain civil contexts as well, *see Dimaya*, 138

S. Ct. at 1212–13. After all, protections against vague laws are "not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966); *see also Dimaya*, 138 S. Ct. at 1226 (Gorsuch, J., concurring) (noting the Founding Era history and tradition of declining to enforce vague civil laws). Here, because an educator's violation of the IFA can result in professional discipline or discharge—and therefore a loss of one's livelihood—the law's contours must be clearly defined to pass constitutional muster. *See Local 8027, Am. Fed'n of Teachers-N.H. v. Edelblut*, No. 21-CV-1077-PB, 2023 WL 171392, at *12 (D.N.H. Jan. 12, 2023) (applying "the most exacting vagueness review" to an enactment similar to the IFA because violators could "be stripped of their teaching credentials and thus deprived of their livelihoods"); *see also Dimaya*, 138 S. Ct. at 1212–13 (Gorsuch, J., concurring) (noting that heightened vagueness scrutiny is appropriate for laws that may "that strip persons of their professional licenses and livelihoods").

For example, when called upon in *Wollschlaeger* to decide a vagueness challenge to a law requiring medical professionals to "refrain

from unnecessarily harassing a patient about firearm ownership during an examination," this Court was particularly concerned about the professional consequences that could result from violating the law. 848 F.3d at 1319 (cleaned up). This Court noted that the professional risks of violating the law were "staggering," as even "[w]ell-intentioned doctors may be hauled before disciplinary boards, their reputations diminished, and their medical careers tarnished." *Id.* at 1323. As a result, this Court concluded that the challenged harassment provision was unconstitutionally vague because "[d]octors deserve more notice before they are subjected to these consequences." *Id.*

The IFA presents a similar risk to faculty members of Florida public institutions of higher education. Regulations implementing the IFA require each institution to receive complaints and conduct investigations to determine if an accused faculty member has violated the law. *See* Fla. Bd. of Govs. Reg. 10.005(3). If such a violation did occur, the implementing regulations require the institution to take corrective action, up to and including "issuing disciplinary measures" and "remov[ing]" the offending employee. *Id.* Moreover, the IFA labels

violations as acts of invidious "discrimination," Fla. Stat.
§ 1000.05(4)(a), meaning that an educator found be in violation would
carry a potentially career-ruining stigma.

Worse yet, Florida law and the IFA's implementing regulations
give institutions strong incentives to over-read and over-enforce the IFA
against faculty members. That is because the institution's own
investigation and corrective measures can be flyspecked by the Board of
Governors or a standing committee of the Legislature, resulting in
significant financial losses to the institution. The Office of Inspector
General for the Board of Governors is authorized to retain an external
firm—at the institution's own expense—to investigate an institution's
response to an alleged violation of the IFA. *See* Fla. Bd. of Govs. Reg.
10.005(4). And, if either the Board of Governors or a standing
committee of the Legislature determines that an institution committed
a violation or did not take appropriate corrective action for a known
violation, the institution becomes ineligible for what is known as

"performance funding" for the next fiscal year.[3] *See id*; Fla. Stat.

§ 1001.92(5). Faced with such costly repercussions, institutions will

naturally take a broad view of what the IFA proscribes and a harsh

view of how severely to punish violators. In circumstances like these,

more searching vagueness review is plainly required. *See Wollschlaeger*,

848 F.3d at 1320 ("Precision and guidance are necessary so that those

enforcing the law do not act in an arbitrary or discriminatory way.")

(cleaned up).

### 3.  *The IFA contains no scienter requirement*

Finally, the IFA is subject to heightened vagueness scrutiny

because it lacks any scienter requirement for a violation. The Supreme

Court "has long recognized that the constitutionality of a vague

statutory standard is closely related to whether that standard

incorporates a requirement of mens rea." *Colautti v. Franklin*, 439 U.S.

---

[3] Withdrawal of performance funding would represent a substantial loss for an institution. In the 2022–23 academic year, the State allocated $560,000,000 in performance funding to Florida's public colleges and universities. *See* State Univ. Sys. of Fla., *State University System of Florida's Performance Funding Model Fuels Student Success* (June 30, 2022), https://www.flbog.edu/2022/06/30/state-university-system-of-floridas-performaxnce-funding-model-fuels-student-success/.

379, 395 (1979), *abrogated on other grounds*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The absence of a scienter element encourages "unscrupulous enforcement," *United States v. Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003), and chills otherwise lawful speech and conduct, *see Harrell v. Fla. Bar*, 608 F.3d 1241, 1255 (11th Cir. 2010) (noting that those subject to such a law will "steer wide of any possible violation lest they be unwittingly ensnared") (cleaned up).

This Court's en banc decision in *Wollschlaeger* is instructive on this point as well. In deciding the vagueness challenge to the law requiring medical professionals to "refrain from unnecessarily harassing a patient about firearm ownership during an examination," this Court noted that a safe harbor for a doctor's "good faith" effort to obtain or convey relevant medical information was "notably absent" from the law. 848 F.3d at 1322. As a result, the law allowed a constitutionally intolerable dilemma where even "[w]ell-intentioned doctors" could face "serious consequences" for violations of the law's imprecise standards. *Id.* at 1323.

- 14 -

The same is true of the IFA. The law has no scienter requirement, meaning that educators are not "protected from being caught in [the statute's] net by the necessity of having a specific intent to commit" a violation. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163 (1972). Even "inadvertent statements that are later deemed to advocate a banned concept can violate the [law]." *Local 8027*, 2023 WL 171392, at *12. Therefore, the "exacting vagueness standard applied in criminal cases should apply here as well." *Id.*

### C.    The IFA Fails to Provide Both Fair Notice of Prohibited Conduct and Clear Guidance for Enforcement

The IFA cannot satisfy the kind of searching vagueness scrutiny that a law of this nature demands. Indeed, even in the absence of heightened scrutiny, the IFA would fail the minimum demands of due process because the law is "so indefinite as really to be no rule or standard at all," *Burns*, 999 F.3d at 1349.

The basic structure of the IFA is that it prohibits (1) certain conduct in relation to (2) certain concepts, subject to (3) a single

exception. However, "vagueness permeates the text" of the IFA at each of these levels. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).

### 1.    *Vaguely defined conduct*

Consider the conduct the IFA addresses. It prohibits educators from "subject[ing] any student . . . to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe" the proscribed concepts. Fla. Stat. § 1000.05(4)(a). But what does it mean to "subject" a student to instruction on a topic? According to standard dictionary definitions, "subject," when used as a transitive verb, means "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying)." Merriam Webster Online Dictionary, "Subject," https://www.merriam-webster.com/dictionary/subject. So, does the IFA only prohibit instruction on the proscribed concepts when students consider it inconvenient or trying? And if so, how is an educator to determine whether students will find instruction on a topic pleasing or exciting versus unpleasant to endure? *See Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) ("Conduct that annoys some people does not annoy

others."); *see also Wollschlaeger*, 848 F.3d at 1322 (striking down as vague a regulation of medical practice that turned on the subjective perceptions of patients).

Likewise, what constitutes instruction that "advances" one of the IFA's proscribed concepts? Dictionary definitions would suggest that the term is capacious enough to include any mention of a proscribed concept—even it is only to criticize the concept as misguided or wrong. *See* Merriam Webster Online Dictionary, "Advance" (defining the transitive verb "advance" to include "bring[ing] forward for notice [or] consideration"), https://www.merriam-webster.com/dictionary/advance. Yet, in this very litigation, the State has taken the position that the IFA does *not* prohibit instruction that condemns or criticizes the proscribed concepts. *See Pernell v. Fla. Bd. of Governors*, No. 4:22-CV-304, 2022 WL 16985720, at *37 (N.D. Fla. Nov. 17, 2022). How, then, is an educator supposed to know what conduct is or is not prohibited?

The law's conduct element also fails to provide any fair notice or guidance for the predictable issue of how an educator can permissibly respond to questions from students that implicate one of the IFA's

proscribed concepts. After all, students possess First Amendment rights that cannot be abridged by their professors, *see Doe v. Valencia Coll. Bd. of Trustees*, 838 F.3d 1207, 1211–12 (11th Cir. 2016), and principles of good pedagogy generally favor engaging with a student's sincere questions. Yet, the IFA provides no guidance as to whether a brief response to such a question would "advance" a proscribed concept in a way that imperils an educator's livelihood.

### 2.    *Vaguely defined concepts*

Vagueness also permeates the IFA's various proscribed concepts. To take one example, the IFA prohibits advancing the concept that "members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(4). As the district court below noted, this concept is "mired in obscurity," "bordering on the unintelligible," and nothing more than a "a cacophony of confusion" that leaves a reader "unclear what is prohibited and even less clear what is permitted." *Pernell*, 2022 WL 16985720, at *44.

Other proscribed concepts may be less of a word salad, but they still leave faculty in an impossible bind. Among them is the concept that a "person's . . . status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(3). No reasonable or intelligent person would dispute that American history is rife with examples of privilege and oppression being necessarily determined by race, color, national origin, or sex. To state the obvious, prior to the passage of the Fifteenth Amendment in 1870, Black Americans were systematically denied the fundamental right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. 15. And, prior the passage of the Nineteenth Amendment, women were systematically denied the same right "on account of sex." *Id.*, amend 19. Yet, if the text of the IFA is meant to be taken seriously, it is deeply questionable whether a law professor is even permitted to teach topics as fundamental as

amendments to the United States Constitution and their historical

contexts without violating the law.[4]

Still other concepts leave key terms undefined, forcing educators

to guess at their meaning. For example, the IFA proscribes instruction

on the concept that a "person, by virtue of his or her race, color, national

origin, or sex, should be discriminated against or receive adverse

treatment to achieve diversity, equity, or inclusion." Fla. Stat.

§ 1000.05(4)(a)(6). But there is no settled definition of "diversity, equity,

or inclusion" that would allow people of common intelligence to know

exactly what this concept includes. *See* Conor Friedersdorf, *What Does*

*DEI Even Mean?*, THE ATLANTIC (Apr. 6., 2023),

https://www.theatlantic.com/newsletters/archive/2023/04/what-does-dei-

even-mean/673657/.

---

[4] Or, to take another example, how could a law professor attempting to comply with the IFA discuss Justice Gorsuch's recent concurring opinion in *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023), which details the painful history of Native American children being systematically taken from their family homes, housed in abusive boarding schools, or put up for adoption—all for the avowedly racist purpose of isolating Indian children from their "savage antecedents"? *Id.* at *20–25 (Gorsuch, J., concurring).

And yet other concepts make violations turn on the subjective reactions of others. In particular, the IFA proscribes instruction on the concept that a "person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(7). It is problematic enough that a violation of this provision turns on inherently subjective and unpredictable questions of whether students would be prompted to have an emotional response to a topic taught in class. *See Wollschlaeger*, 848 F.3d at 1322. But with the inclusion of the broad term "other forms of psychological distress," the law also fails to provide clear guidance as to *what* emotional responses trigger the law's coverage. For example, is shame a form of psychological distress? And does a law professor violate the IFA by assigning Justice Thomas's concurrence in *United States v. Fordice*, 505 U.S. 717 (1992), where he discusses the nation's "*shameful* history of state-enforced segregation"? *Id.* at 748 (Thomas, J., concurring)

(emphasis added). The text of the IFA provides no clear answers to this and so many other questions.

###### 3. *One vaguely defined exception*

If an educator engages in prohibited conduct in relation to one of the IFA's proscribed concepts, the law provides but a single exception for "discussion of the [proscribed] concepts . . . as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05(4)(b). But this exception provides no real solace or predictability for faculty who must comply with the IFA on pain of discipline or firing.

After all, how much larger does the "larger course of . . . instruction" need to be before it insulates discussion of a proscribed concept from becoming a violation? The law provides no guidance to those whose livelihood it threatens or to those who are responsible for its enforcement. Such an indeterminate standard is an open invitation to "arbitrary enforcement." *Grayned*, 408 U.S. at 108–09.

Moreover, this exception seems incompatible with the main rule. Recall that the conduct element of the IFA requires instruction that does things such as "espous[es]," "promot[es]," "inculcat[es]," or "compel[s] a student or employee to believe" one of the proscribed concepts. Fla. Stat. § 1000.05(4)(a). In other words, the conduct element of the IFA already appears to be written in a way that generally wouldn't reach "objective" discussion of the proscribed concepts. Yet the law's exception appears to mandate—not only objective discussion—but an additional (and vague) requirement that the objective discussion occur in the context of a "larger course of . . . instruction." *Id.* § 1000.05(4)(b). The poor fit between the exception and the main rule only adds to the pervasive vagueness of the IFA.

In sum, the text of the IFA is hopelessly vague at every level. The district court was correct to invalidate the law entirely, rather than try to salvage the legislature's flawed work by severing many of the law's provisions. The reality is that "vagueness permeates the text" of the IFA, *Morales*, 527 U.S. at 55, leaving it a law beyond repair.

**D.    Compliance with the IFA is Made Even More Insoluble by the Need to Comply with Other Laws that Are Currently in Force**

As we have explained in detail above, it is already impossible for faculty at public colleges and universities to know what conduct is prohibited or permitted by the IFA. But that task becomes even more treacherous and confusing in light of the fact that Florida has other, seemingly conflicting laws on the books that faculty are required to obey.

Chief among them is the "Campus Free Expression Act," which broadly prohibits public universities from "shield[ing]" students or faculty from "ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097. To accomplish this, the law provides faculty members with broad protection for their "expressive activities" toward students, including "faculty research, lectures, writings, and commentary, whether published or unpublished." *Id*. § 1004.97(2)(f) & (3)(a),(f). If an institution "shield[s]" students from a faculty member's "expressive activities," the law provides a cause of action in which the faculty

member can "obtain declaratory and injunctive relief and may be entitled to damages plus court costs and reasonable attorney fees." *Id*. § 1004.97(4)(a).

Students have similar enforceable rights to express and receive ideas that might be "uncomfortable, unwelcome, disagreeable, or offensive." *Id*. § 1004.97(2)(f) & (3)(a),(f). That is, they have a right to freely express "oral or written communication of ideas," *id*. § 1004.97(2)(f), as well as a right to observe the protected "expressive activities" of faculty (including "faculty research, lectures, writings, and commentary") without "shield[ing]" or limitation by the institution. *Id*. § 1004.97(2)(f) & (3)(a),(f). And, just like faculty, students who face improper shielding have a cause of action against the institution in which they can obtain declaratory and injunctive relief, damages, and attorney fees. *Id*. § 1004.97(4)(a).

When presented with these two different laws that sit side-by-side in the Florida Statutes, what is a faculty member make of his or her rights? Of what can or cannot be taught in the classroom? Of his or her obligations to allow or stifle student discussion of certain topics in the

classroom? Where the Campus Free Expression Act says "go," the IFA seemingly says "stop." And where the IFA places the faculty member in fear of professional ruin for allowing certain "uncomfortable, unwelcome, disagreeable, or offensive" ideas to be aired, the Campus Free Expression Act places the faculty member's employer in jeopardy of legal action and damages if students are shielded from those ideas. Educators "should not be put in a position where they must instruct students on certain concepts but face the threat of job loss if their instruction unintentionally and only by implication crosses the line drawn in [the IFA]." *Local 8027*, 2023 WL 171392, at *14.

### E.    Statements and Actions by State Officials Have Exacerbated Concerns about Arbitrary and Politicized Enforcement

The IFA's vagueness is compounded even further by recent actions by state officials. In particular, various enforcement and implementation actions for the IFA at the K-12 level raise serious concerns about arbitrary and politicized enforcement in higher education as well. These concerns are more than mere abstractions because the IFA itself imposes the same standards and restrictions on

teachers in kindergarten classrooms as it does on professors in doctoral programs and law schools.

The first concerning action involves the State Department of Education's highly publicized rejection of the College Board's proposed Advance Placement African-American Studies curriculum. *See* Patricia Mazzei & Anemona Hartocollis, *Florida Rejects A.P. African American Studies Class*, N.Y. TIMES (Jan. 19, 2023), https://www.nytimes.com/2023/01/19/us/desantis-florida-ap-african-american-studies.html. The Department of Education claimed the curriculum violated state law, *see id.,* and Defendant-Appellant Diaz later took to Twitter to explain the rejection in greater detail. *See* Manny Diaz Jr. (@SenMannyDiazJr), TWITTER (Jan. 20, 2023, 5:35), https://twitter.com/SenMannyDiazJr/status/1616565048767385601. That explanation, however, appeared to reveal the use of the IFA as a tool for arbitrary and politicized censorship. For example, Diaz claimed that the curriculum improperly included lessons on "intersectionality" and readings by authors associated with "intersectionality"—yet that term and theory are nowhere recognized in the IFA as a proscribed

concept.[5] *Id.* Diaz also openly acknowledged that certain lessons were deemed unlawful under the IFA because of the political beliefs of the groups studied or even of the authors of the readings used in the curriculum. *See id.* (rejecting a lesson on the Movement for Black Lives because it "is an organization with stated objectives that include eliminating prisons and jails" and "ending pretrial detention"); *id.* (rejecting curriculum readings because the author "argues that activism, rather than the university system, is the catalyst for social transformation" and because the author's "first book was a study of Black communists in Alabama").

Another concerning action occurred with the Department of Education's recent release of K-12 Social Studies textbook standards.

---

[5] Generally speaking, "intersectionality" is the "insight that race, gender, sexuality, ethnicity, nation, ability, and age operate not as unitary, mutually exclusive entities, but as reciprocally constructing phenomena that in turn shape complex social inequalities." Patricia Hill Collins, *Intersectionality's Definitional Dilemmas*, 41 ANN. REV. SOC. 1, 2 (2015). This is a hardly a novel concept in the law. For example, binding precedent in this circuit has long recognized "race-plus-sex" discrimination claims in which, for example, Black women allege that they were treated as inferior to both Black men and women of other races. *See Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980).

*See* Fla. Dep't of Educ., *Specifications for the 2022-2023 Florida Instructional Materials Adoption, K-12 Social Studies* (July 2022) https://www.fldoe.org/core/fileparse.php/5574/urlt/SocialStudies-IM-Spec.pdf. Again, this action appears to weaponize the IFA in arbitrary and politicized fashion. For example, the textbook standards prohibit the teaching of a broad range of topics and ideas that are not referenced in the IFA itself. *See id.* at 23 (prohibiting references to "Critical Race Theory, Social Justice, Culturally Responsive Teaching, Social and Emotional Learning, and any other unsolicited theories that may lead to student indoctrination"). The textbook standards also assert that the IFA does not allow instruction on the ideas of "[s]eeking to eliminate undeserved disadvantages for selected groups" or the notion that "[u]ndeserved disadvantages are from mere chance of birth and are factors beyond anyone's control, thereby landing different groups in different conditions." *Id.* at 24. These standards even indicate that the IFA prohibits lessons aimed at "[m]anaging emotion," "[d]eveloping relationships," and "[s]ocial awareness." *Id.* at 25.

When a law is as vague as the IFA, those who must attempt to comply with it look for guidance to the behavior of public officials and agencies that enforce it. Yet, no one aware of the IFA would have predicted that that law could or would be bent to prohibit the discussion of topics as disparate as ending pretrial detention and managing emotions. To put it bluntly, actions like this have validated and amplified every fear that the vagueness doctrine is meant to protect against. The IFA not only could be—but is now—being wielded to "encourage arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319–20 (cleaned up). Its enforcement must remain enjoined.

## II. ALLOWING THE IFA TO GO INTO EFFECT WILL HAVE FAR-REACHING NEGATIVE CONSEQUENCES FOR HIGHER EDUCATION IN FLORIDA

Allowing a law as incorrigibly vague as the IFA to go into effect will harm more than just the faculty who must try to abide by it. The law will damage the quality of higher education in the state and degrade the economic and political vitality of its citizenry.

A.    **The IFA Will Diminish the Ability of Florida's Public Colleges and Universities to Attract and Retain Faculty**

As we have explained, the IFA is a vague law that chills academic speech and inquiry, fails to give faculty fair warning as to what it prohibits, and operates as an open invitation to arbitrary and politicized enforcement. Moreover, the State's steadfast position in this litigation has been that faculty at public colleges and universities must be treated as little more than the mouthpieces for politicians currently holding power in the statehouse and governor's mansion. *See* State's Br. at 24–30. If that view prevails, and the IFA is permitted to go into effect, the state's public colleges and universities will be placed at a tremendous disadvantage in their efforts to attract, hire, and retain talented faculty.

"Scholarship cannot flourish in an atmosphere of suspicion and distrust," *Sweezy*, 354 U.S. at 250, which is why well-regarded scholars value their academic freedom so highly. If their academic environment is not one where they "always remain free to inquire, to study and to

evaluate, to gain new maturity and understanding," *id.*, it stands to reason that they will seek out opportunities elsewhere.

Indeed, there is anecdotal evidence of this occurring already. A recent report from the American Association of University Professors relates preliminary indications that "faculty members of color and those teaching in the humanities and social sciences in particular are seeking to leave" and that "filling . . . positions with any qualified candidates is becoming difficult." Am. Ass'n of Univ. Professors, *Preliminary Report of the Special Committee on Academic Freedom and Florida* at 16 (May 24, 2023), https://www.aaup.org/file/Preliminary_Report_Florida.pdf. The same report also indicates that "candidates are turning down job offers in Florida even without having any other offers in hand." *Id.; see also* Larry Seward, *Are Florida universities suffering a crisis in the classroom?*, CBS NEWS (Apr. 27, 2023) (noting reports of "talent leaving and potential new professors choosing jobs out-of-state"), https://www.cbsnews.com/miami/news/are-florida-universities-suffering-a-crisis-in-the-classroom/.

These reports are consistent with information that Amici UFF has received from its own members indicating that hiring has become more difficult and professors employed by public universities are seeking employment elsewhere. One member, for example, noted that the applicant pools for new faculty positions have "changed dramatically, are of much lower quality, and would be largely unqualified if not for the handful of international applicants seeking US employment."

## B. The IFA Will Increase Bureaucracy and Politicization in Florida's Public Colleges and Universities

Efforts to comply with the IFA will also create bloated university bureaucracies filled with administrators who will wield unguided power to censor classroom speech and content. Several factors make this outcome nearly unavoidable if the IFA is allowed to go into effect.

The first is that the IFA's reach is pervasive. Compliance is seemingly required for every bit of instruction that the institution offers —every syllabus, every lecture, every reading, and every guest speaker. As a result, administrators will need to be involved at every stage of course development and delivery to ensure that the risk of violations is minimized.

- 33 -

The second is the IFA's manifest vagueness. Making sense of what the IFA restricts and then implementing the institution's understanding of the law in a consistent way will require significant administrative oversight and intervention.

The third is that the IFA's enforcement mechanisms expose institutions to costly repercussions for violations. *See supra* at 10–13. As a matter of risk management, institutions will have to institute compliance monitoring and will likely adopt overly restrictive policies to steer far clear of possible violations.

### C. The IFA Will Leave Graduates of Florida's Public Colleges and Universities Ill-Equipped to Participate in the Workforce and in Our Democracy

Above all else, allowing the IFA to go into effect will do an enormous disservice to students at Florida's public colleges and universities, who will be left less prepared to participate in both the workplace and the polity.

"Nothing less than the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Grutter*, 539 U.S. at 324

(cleaned up). Yet, as we have detailed above, the IFA will drastically limit what faculty are willing to teach, will drive accomplished scholars out of the state, and will "cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

"[T]he skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330. The IFA, however, is incompatible with developing those skills. An emaciated and white-washed educational experience that steers far clear of the IFA's vague restrictions will leave graduates of Florida schools at sea and unable to compete with their peers from across the country.

The same will be true for their roles as citizens and voters. The Supreme Court has long recognized that "education . . . is the very foundation of good citizenship." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). But "[p]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.). Yet that is precisely how the

IFA would operate. Not only will individual educators and university administrators be naturally reluctant to expose students to matters that could violated the IFA's vague commands, but it is also now clear that state officials will deploy the IFA in arbitrary and politicized ways to censor a broad range of speech and ideas. *See supra* at 27–29.

Florida students will suffer as a result. "Now that eighteen-year-olds have the right to vote, it is obvious that they must be allowed the freedom to form their political views on the basis of uncensored speech . . . , so that their minds are not a blank slate when they first exercise the franchise." *Am. Amusement Mach. Ass'n*, 244 F.3d at 577. Affirmance of the district court's preliminary injunction is required.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Craig Goodmark
Craig Goodmark
GOODMARK LAW FIRM
1425 A Dutch Valley Pl NE
Atlanta, GA 30324
(404) 719-4848

Alice O'Brien
Jason Walta
Michele Bastacky
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036-3290
(202) 822-7035
jwalta@nea.org

*Counsel for Amici Curiae*

June 23, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,440 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32–4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Century Schoolbook 14-point font.

<u>/s/ Craig Goodmark</u>
Craig Goodmark
GOODMARK LAW FIRM
1425 A Dutch Valley Pl NE
Atlanta, GA 30324
(404) 719-4848

*Counsel for Amici Curiae*

- 38 -

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on June 23, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Craig Goodmark
Craig Goodmark
GOODMARK LAW FIRM
1425 A Dutch Valley Pl NE
Atlanta, GA 30324
(404) 719-4848

*Counsel for Amici Curiae*