Nos. 22-13992 & 22-13994

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

LeRoy Pernell, et al.,

*Plaintiffs-Appellees*,

v.

Brian Lamb, et al.,

*Defendants-Appellants*.

Adriana Novoa, et al.,

*Plaintiffs-Appellees*,

v.

Manny Diaz, Jr., et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of Florida
Case Nos. 4:22-CV-304-MW-MAF & 4-22-CV-324-MW-MAF

## BRIEF OF *AMICUS CURIAE* LATINOJUSTICE PRLDEF
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Peter E. Seley
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3689

Mark J. Cherry
Apratim Vidyarthi
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
(212) 351-3978

Roberto Cruz
LatinoJustice PRLDEF
523 West Colonial Drive
Orlando, FL  32804
(321) 250-2853

Rafaela Uribe
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY  10115
(212) 219-2322

*Counsel for* Amicus Curiae

Nos. 22-13992 & 22-13994

*Pernell, et al. v. Lamb, et al.*; *Novoa, et al. v. Diaz, et al.*

## CORPORATE DISCLOSURE STATEMENT
## & CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29, as well as Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, *amicus curiae* LatinoJustice PRLDEF state as follows:

LatinoJustice PRLDEF has no parent corporations, and no publicly held corporations own 10% or more of their stock. LatinoJustice PRLDEF is a 501(c)(3) nonprofit corporation. LatinoJustice PRLDEF certifies that it is not aware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal.

LatinoJustice PRLDEF further certifies that the Certificate of Interested Persons contained in Defendants-Appellants' Brief and Plaintiffs-Appellees' Brief is complete, other than the following additions:

1.    Cherry, Mark J.

2.    Cruz, Roberto

3.    Gibson, Dunn & Crutcher LLP

4.    LatinoJustice PRLDEF

5.    Seley, Peter E.

6.    Uribe, Rafaela

Nos. 22-13992 & 22-13994
*Pernell, et al. v. Lamb, et al.*; *Novoa, et al. v. Diaz, et al.*

7.    Vidyarthi, Apratim

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT  & CERTIFICATE OF INTERESTED PERSONS .......................................................... C-1

TABLE OF CONTENTS .......................................................... i

TABLE OF CITATIONS .......................................................... iii

INTERESTS OF *AMICUS CURIAE* .......................................................... 1

STATEMENT OF ISSUES .......................................................... 2

SUMMARY OF ARGUMENT .......................................................... 3

ARGUMENT .......................................................... 5

   I. The Stop W.O.K.E. Act Will Have a Devastating Impact on Florida's Professors and Students of Latino History and Culture .......................................................... 5

      A. Professor Cox .......................................................... 5

      B. Professor Aranda .......................................................... 9

      C. Professor Mustaine .......................................................... 15

      D. Professor Martínez-Fernández .......................................................... 20

      E. Getulio Gonzalez-Mulattieri .......................................................... 23

      F. Yesenia Yataco .......................................................... 25

  II. The *Bishop* Balancing Test Weighs Strongly in Favor of Rejecting the Stop W.O.K.E. Act. .......................................................... 28

      A. Context .......................................................... 29

      B. The Universities' Position .......................................................... 31

      C. Academic Freedom .......................................................... 33

CONCLUSION ........................................................................35

FRAP 32(g)(1) CERTIFICATE OF COMPLIANCE ............................37

CERTIFICATE OF SERVICE...............................................................38

# TABLE OF CITATIONS

**Page(s)**

**CASES**

*Bishop v. Aronov*,
  926 F.2d 1066 (11th Cir. 1991)................................ 4, 28, 31, 32, 33, 34

*Edwards v. Aguillard*,
  482 U.S. 578 (1987).............................................................34

*Faculty Senate of Florida Intern. Univ. v. Winn*,
  477 F. Supp. 2d 1198 (S.D. Fla. 2007)................................................31

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
  385 U.S. 589 (1967)..................................................... 4, 31, 34

*Pernell v. Florida Board of Governors*,
  2022 WL 16985720 (N.D. Fla. Nov. 17, 2022)...........................28, 29

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)..............................................................34

**STATUTES**

Fla. Stat. Ann. §1000.05 (West 2022) ........................................... *passim*

**RULES**

Federal Rule of Appellate Procedure 29 ...................................................1

## INTERESTS OF *AMICUS CURIAE*

LatinoJustice PRLDEF (formerly known as the Puerto Rican Legal Defense and Education Fund) was founded in 1972. Its mission is to protect the civil rights of Latinos and to promote justice for the pan-Latino community, including by serving its educational interests. LatinoJustice PRLDEF helped establish bilingual education in New York City and has since combated the forced segregation of Latino children. In addition to creating pathways for success for Spanish-speaking children in public schools, it has five decades of experience increasing the cadre of Latino law students and attorneys in the country with its pre-law counseling and mentoring programs. LatinoJustice PRLDEF's Southeast Regional is located in Orlando, Florida, and as a civil rights legal defense fund supports and advocates for protecting academic freedoms in higher education. Accordingly, LatinoJustice PRLDEF has an interest in these proceedings, and urges affirmance of the decisions below.[1]

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no counsel for any party authored this brief in whole or in part and that no entity or person, aside from *amicus*, its members, and its counsel, made any monetary contribution toward the preparation or

## STATEMENT OF ISSUES

1.      Whether the Stop Wrongs to Our Kids and Employees Act ("Stop W.O.K.E. Act" or "Act") violates the First Amendment by banning endorsement of viewpoints disfavored by the legislature while permitting denunciation of the same viewpoints; and

2.      Whether the Act is unconstitutionally vague.

submission of this brief. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Stop W.O.K.E. Act would throttle academic freedom in higher education, forcing educators to cancel core classes, eviscerate curricula, ignore well-settled scientific facts, and parrot state-approved political talking points. The District Court rightly enjoined enforcement of the Stop W.O.K.E. Act to prevent these clear violations of the First Amendment's protection of academic freedom. LatinoJustice PRLDEF urges this Court to uphold that injunction.

This brief presents the voices and experiences of individuals who teach and study Latino culture and history and who would be affected by the Stop W.O.K.E. Act. For the professors whose stories are highlighted here, the Stop W.O.K.E. Act presents an existential threat to their jobs, scholarship, and the disciplines they teach. The Act would prohibit them from promoting or advancing eight concepts, many of which are core to their disciplines, including that race and privilege are intrinsically connected and that meritocracy and racial colorblindness can lead to racist results.

The mere threat of the Stop W.O.K.E. Act has already caused professors to drop courses they regularly teach and censor existing

curricula.  If it is allowed to go into effect, the Stop W.O.K.E. Act will prevent professors from teaching fundamental concepts in their disciplines, including facts that shed light on the history of Latino countries, the discrimination Latino people have faced, and the structural challenges they continue to face in modern society.  For the students who have shared their thoughts here, the Stop W.O.K.E. Act would impede their ability to learn and to reap the full rewards that higher education is meant to offer in this country, including the opportunity to better understand themselves and the world around them.

When weighed using the balancing test articulated in *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991), these concerns heavily favor rejection of the Stop W.O.K.E. Act.  If the Act is permitted to go into effect, "constitutional freedoms," which are meant to be most vigilantly protected "in the community of American schools," would be snuffed out. *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967).  Scholars and students of Latino culture and history would be unable to fully engage in the study of a major part of the American population.  All of Florida would suffer from the resulting erosion of understanding.

4

## ARGUMENT

I.    **The Stop W.O.K.E. Act Will Have a Devastating Impact on Florida's Professors and Students of Latino History and Culture.**

### A.    Professor Cox

Dr. Jonathan Cox is an Assistant Professor of Sociology at the University of Central Florida ("UCF"),[2] where he has taught for six years. As part of his Ph.D., he authored a dissertation titled "I Am but I Do Not See: Colorblind Racial Ideology in College Millennials."  At the undergraduate level, he teaches courses titled Race and Ethnicity, Education and Social Achievement, Race and Social Media, and Social Problems.  At the graduate level, he teaches the courses Inequalities in Education and Critical Race Theory.

Professor Cox is concerned that the Stop W.O.K.E. Act will impact the way he teaches all of his courses.  Each of his courses requires instruction and discussion of at least one of the eight topics prohibited by the Act.  For example, Professor Cox regularly instructs his classes on

---

[2] UCF is an Hispanic-Serving Institution ("HSI"), an institute of higher education with 25% or more total undergraduate Hispanic or Latino full-time equivalent student enrollment.

the concept of colorblindness as a form of systemic racism. This discussion would be forbidden by the Act.[3] Similarly, Professor Cox frequently instructs his students on how oppression and privilege are intrinsic to our social systems. This, too, would be prohibited by the Act.[4] Professor Cox believes that these concepts, which are based on decades of empirical evidence and not mere conjecture or opinion, are essential to teaching sociology and how historical structures lead to modern inequalities in society.

Class discussion is critical to Professor Cox's teaching style. He provides his students with information based on sound social science, including scientific investigations and statistical analysis, and encourages students to discuss this information. Through these discussions, students can think through their ideas, hear the perspectives of other students with different experiences, and develop

---

[3] The Stop W.O.K.E. Act provides that it shall violate the Act to subject any student to instruction that espouses the concept that "[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Fla. Stat. Ann. §1000.05(4)(a)(3) (West 2022). The Stop W.O.K.E. Act also prohibits instruction that espouses the concept that "[s]uch virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist…." *Id.* §1000.05(4)(a)(8).
[4] *Id.* §1000.05(4)(a)(3), (8).

critical thinking skills rather than taking the information given to them as absolute truth.    Professor Cox believes that his students' understanding of both history and the current reality is enhanced when they can hear about their fellow students' personal stories.  This includes discussion of students' exposure to discrimination and the impact of segregation in their own lives.  Professor Cox worries that the Stop W.O.K.E. Act will chill students from engaging in these frank discussions of the ongoing effects of racism.  Professor Cox has already noticed that the Act has made students afraid to raise their hands to discuss topics relating to race.

Professor Cox has already been impacted by the Stop W.O.K.E. Act. In the fall of 2022, after the law was enacted, Professor Cox cancelled two courses out of fear that they could no longer be taught:  Race and Social Media and Race and Ethnicity.  If the injunction is lifted and the Act becomes enforceable, Professor Cox believes he would need to restructure his other courses by teaching "both sides" of certain issues and concepts to comply with the law.  But, as Professor Cox puts it, the "'other side' of every social phenomenon or topic within the study of society does not always have merit or need to be taught.  For example, in a lesson about

7

the Holocaust, there is no other side to be examined other than the Holocaust should not have happened. Some issues are clear cut negative, and that negative impact can be shown through decades of empirical research and evidence."

Professor Cox's courses relating to Latino history and culture address issues such as colorism, assimilation, media representation, and discrimination against the Latino community in the United States. Professor Cox believes that the Stop W.O.K.E. Act would prohibit discussion of the discrimination these communities continue to face.[5] Preventing Latino students from learning about how racial dynamics have impacted and continue to impact Latino individuals would prevent them from fully understanding their culture and might cause them to feel they have no choice but to assimilate with other groups.

Professor Cox also believes the Stop W.O.K.E. Act will have a significant impact on student recruitment to the Sociology Department, because teachers will be required to drop classes or water down their curricula. Students who want to learn about issues of inequality are unlikely to choose a university in a state where discussion of fundamental

---

[5] *Id.*

concepts around inequality is illegal.  The Stop W.O.K.E. Act will impact the degrees UCF can award students, including a current minor in Sociology related to diversity, as well as a gender studies certificate.  And Professor Cox is concerned about the impact the law will have on him, personally.  Recently, Professor Cox decided he will leave his tenured position at UCF and the state of Florida.  The Stop W.O.K.E. Act was a factor in that decision.

To Professor Cox, the most nefarious outcome of the Stop W.O.K.E. Act is its reinforcement to students that our society is beyond the need to discuss race.  Professor Cox knows that stifling education about the history of racism and discrimination and their ongoing effects will perpetuate exclusion in our society.  This will in turn limit access to knowledge and a full education which will have an impact on how individuals understand the impact of public policies and engage with our increasingly diverse society.

### B.    Professor Aranda

Dr. Elizabeth Aranda is a Professor of Sociology at the University of South Florida ("USF"), where she has taught for more than 15 years, and is the Director of the USF's Immigrant Well-Being Research Center.

Professor Aranda has published 20 peer-reviewed articles, two books, and six book chapters on the Latin American community as well as race and ethnicity. Among the classes she teaches at USF are Race and Ethnicity, Latino/a Lives, Contemporary Racism and Immigration, Immigrants to America, Race and Immigration, Immigrant Communities, and the Latinx Diaspora in the U.S. When graduate students at USF requested that the Sociology Department offer a graduate level Race and Ethnicity course in 2023, the department agreed to offer it and Professor Aranda volunteered to teach the course.

Professor Aranda is acutely concerned about how she would teach most of her courses if the injunction staying enforcement of the Stop W.O.K.E. Act is dissolved. If the Stop W.O.K.E. Act is enforced, she does not see how she can effectively teach a Race and Ethnicity course without violating the law or losing her job. Many of the concepts at the core of the curriculum are banned by the Stop W.O.K.E. Act,[6] including scholarship regarding "colorblind" racism and academic research suggesting that notions such as meritocracy ignore centuries of slavery, segregation, and institutionalized racism. Based on the language of the

---

[6] Fla. Stat. Ann. §1000.05(4)(a)(8).

Stop W.O.K.E. Act, Professor Aranda believes that teaching these topics in a purely objective way would violate the Act because scholarship on these topics presents a point of view that is specifically banned. She is worried that anyone attending or even just obtaining the syllabus for her class could use the Act to put her job in jeopardy. Out of fear of the Act, Professor Aranda has chosen not to teach the requested Race and Ethnicity course, and no other professors have taken on the course. In short, a class about race and ethnicity that students expressly wanted to take, and that the department agreed served its educational mission, cannot be offered because the Stop W.O.K.E Act prohibits classroom discussion on topics that would be central to the class. Describing how this made her feel, Professor Aranda said, "I feel like I am doing a disservice to pedagogy because I'm not brave enough to teach what I was trained to teach."

The Stop W.O.K.E. Act also has caused Professor Aranda to reconsider whether she can teach her Latinx Diaspora course. The course begins with a history of the treatment of Hispanics and Latinos in the United States including historical beliefs of inferiority and colorism. In prior years, the class has been filled with mostly Latino students who

often tell Professor Aranda they are hearing their history for the first time.  Professor Aranda has always loved teaching the course, but she believes that significant portions of the course, which teach about the obstacles Latino people have faced and continue to face, would run afoul of the Act.  For example, the course examines the educational and occupational outcomes of adult children of immigrants and analyzes why some ethnic groups do better than others.  A common misconception is that some groups are simply "harder working" than others.  The course considers the context and outside forces affecting each ethnic group including differing immigration policies, race, and the existence or lack of pre-established immigrant communities within the country, among other external factors.  Presentation of the academic research evaluating these issues may be interpreted as "espousing" the idea that the "virtue" of "hard work" is racist, in violation of the Act.

Professor Aranda believes that nearly every course she teaches, including those she has taught for more than a decade, would need to be fundamentally changed or eliminated to comply with the Stop W.O.K.E.

Act.[7]  Major areas of her teaching and scholarship could not be discussed if the Stop W.O.K.E. Act is enforced.  Describing how her curriculum would suffer by eliminating the topics prohibited by the Stop W.O.K.E. Act, Professor Aranda said: "It is like giving me a piece of sheet music and telling me to skip every third measure.  There is no song to be played."

Professor Aranda understands that other classes that the university previously offered to students would be impacted by the Stop W.O.K.E. Act.  She is aware of at least one undergraduate general education course regarding race that may have to be eliminated because no professors are willing to teach the course under the threat of the Act.

Professor Aranda believes that changing her teaching to comply with the Stop W.O.K.E. Act will be detrimental to her students.  Students will not be able to take classes about or learn about subjects fundamental to their own Latino cultural history.  Classroom discussion and the role

---

[7] Courses requiring alteration include: Social Problems; Sociology of Families; U.S. Latinos; Latino/a Lives; U.S. Immigration; Immigrants to America; Immigration and Transnationalism; Immigration, Gender, and Transnationalism; Immigrant Communities; the Latinx Diaspora in the United States.  Courses facing potential elimination include: Race and Ethnic Minorities; Contemporary Racism and Immigration; Race and Immigration; Race and Ethnicity.

of college classes as a "marketplace of ideas" will suffer as a result of the law's censorship of important topics. Professor Aranda will not be able to answer student questions about fundamental concepts in her field or delve into complex issues and debates around race for fear of violating the Stop W.O.K.E. Act. As just one example, students frequently ask "Can white Latinos be discriminated against?" Professor Aranda says that, without being allowed to discuss institutional and colorblind racism, she cannot answer this question. When asked, she would be left to decide whether to risk violation of the Act or tell her students "Unfortunately, I cannot answer your question because doing so would violate Florida law."[8]

USF sociology students will be behind their peers in other states if they are unable to study scholarship concerning institutionalized racism. They would be unable, for example, to address sociological issues around colorblind racism or structural racism if they have not been educated on these topics. As a proud educator, Professor Aranda's view is: "I can't send someone out there unprepared, and I can't prepare them adequately in this state" as a result of the Stop W.O.K.E. Act.

---

[8] *Id.* §1000.05(4)(a)(3), (8).

14

Professor Aranda says the stress of the potential impact of the Act on her students, her family, and her career have been extraordinary and have led to depression and her questioning whether she can continue teaching.  She is considering leaving the state of Florida and forfeiting her tenured position at the university to move somewhere she can freely and fully teach sociology.

### C.    Professor Mustaine

Dr. Elizabeth Mustaine is a Professor of Sociology at UCF, where she has taught for more than 29 years.  She is also the Chair of UCF's Department of Sociology, which includes courses addressing Latino culture and history.  In her capacity as professor, she teaches courses on Child Abuse in Society; Social Research and Policy; Women, Culture, and Law; Sociology of Law; Criminal Victimization; Sociology of Murder; Violence in Society; and Social Problems.  Professor Mustaine also conducts research and has been widely published, including in *Criminology*, *Criminology and Public Policy*, *Journal of Criminal Justice*, and *Deviant Behavior*.  Some of her articles have examined ethnicity and race as important independent variables in criminal justice outcomes.

Professor Mustaine believes that the Stop W.O.K.E. Act would make Sociology, the department she chairs, "sort of illegal." Sociology examines how multiple dimensions of identity—race, gender, sexuality, and ethnicity—correlate with societal outcomes. For example, sociology looks at how historical choices relating to race, like redlining (the documented practice of banks being less willing to lend to people of color), result in continued advantages to white individuals and disadvantages to people of color. Similarly, sociology teaches that slavery "still continues to advantage white people." But the Act forbids teaching about the continuing effect of redlining or slavery, because the law prohibits instruction that privilege is "necessarily determined by . . . race."[9] The Act also prohibits teaching concepts that promote the belief that "an individual . . . must feel guilt, anguish or other forms of psychological distress" because of actions committed in the past.[10] While Professor

---

[9] Fla. Stat. Ann. §1000.05(4)(a)(3).

[10] The Stop W.O.K.E. Act provides that it shall violate the Act to subject any student to instruction that espouses the concept that "[a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, sex, or national origin." Fla. Stat. Ann. §1000.05(4)(a)(7).

Mustaine's department does not intend to make students feel guilt or anguish for historical wrongs, such feelings may naturally occur when students learn about topics like slavery, and the Stop W.O.K.E. Act may be interpreted to make teaching topics that engender those feelings illegal.

Professor Mustaine knows that the Stop W.O.K.E. Act would have a particular impact on her department's teaching relating to Latino history and culture. This is partially because race and national origin are essential to understanding Latino culture: different Latino groups have different histories, impacting the modern day economic and social outcomes of each group, including their relative privileges and disadvantages.[11] These histories include colonialism, and its continued impact on different Latino groups, a concept that would be impacted by the Act's prohibition on teaching that could lead a student to feel guilt concerning their own race or national origin.[12]

Professor Mustaine has noted that professors in the Sociology Department are "fearful" of what will happen if the injunction on the Stop

---

[11] *Id.* §1000.05(4)(a)(3).
[12] *Id.* §1000.05(4)(a)(7).

17

W.O.K.E. Act is lifted.  They are worried that "a student will complain [about concepts taught in sociology courses], and the professor will get fired."  As one example, Professor Mustaine discussed the sociological concept of pay disparity between men and women, which shows that, controlling for other factors, men make more money than women in the same position.  But explaining why women earn less than men requires exploring power disparities between men and women—which fundamentally undermines the image of a purely meritocratic system that the Stop W.O.K.E. Act attempts to protect.[13]  So to avoid being targeted by the Act, professors have to self-censor their teaching of the facts and water down their findings.  Because of this phenomenon, Professor Mustaine foresees that syllabuses for courses in sociology will become "more generic, and the course material will become much more basic, and there will be less contextualizing."  Professors in her department have already begun asking Professor Mustaine how they can use standard textbooks to teach core classes like Introduction to Sociology, when those textbooks contain chapters on topics like race and

---

[13] *Id.* §1000.05(4)(a)(8).

ethnicity, and teach that a person's race, gender, and national origin have a direct impact on benefits or challenges the person faces.[14]

UCF administrators are also struggling with how vague the law is. The university has not been able to give sociology professors helpful guidance about how to teach their subjects while complying with Stop W.O.K.E. Act's vague prohibition on making students feel guilt, anguish, or sociological distress. Without guidance about how to comply with the Act, professors may be chilled and self-censor their teaching. Professor Mustaine has heard her colleagues theorize that they might avoid violating the law by phrasing their teaching as opinion rather than fact, even though the concepts being taught are supported by rock-solid research. This would only delegitimize the field of sociology in the minds of students and inject uncertainty where none should exist.

Though the Stop W.O.K.E. Act is stayed, Professor Mustaine has already seen its impacts. A member of the Sociology Department retired because she "didn't want to put up with" the Act. UCF's College of Science has been unable to hit its hiring targets because not enough candidates want to face the teaching climate in Florida, with the number

---

[14] *Id.* §1000.05(4)(a)(3).

of applicants declining dramatically over the last year. Professor Mustaine is certain that the Act had a lot to do with that exponential drop. During interviews, applicants have told Professor Mustaine that they are concerned with teaching sociology in Florida.

### D.    Professor Martínez-Fernández

Dr. Luis Martínez-Fernández is a Professor of Latin American and Caribbean history at UCF. He has taught there since 2004 and, in 2021, was awarded a Pegasus Professorship, UCF's highest academic honor. He teaches a number of courses covering Caribbean and Latin American history, including History of the Caribbean, History of Cuba, and History of Puerto Rico. Professor Martínez-Fernández has published numerous articles and books, including three widely acclaimed books, *Fighting Slavery in the Caribbean*, *Revolutionary Cuba: A History*, and *Key to the New World*. In 2005, he founded the annual Latin American Cultural Festival of Orlando, served on the Board of Trustees of the College Board and, serves as Board Secretary for the Board of Directors of the National Council for History Education.

Professor Martínez-Fernández has been instructed by the university's administration "not to break" the Stop W.O.K.E. Act. But

because the Act is so vague, the university cannot give professors clear guidelines to help them navigate the law.  This vagueness subjects professors to the myriad and often inconsistent ways that students and outside observers—all of whom would have discretion to report professors—are offended.  As he has observed in nearly two decades of teaching, different people are capable of being offended by different things, including simple facts.  For instance, he recalls teaching a class facts about how the American dairy industry once flooded another country's market with cheap milk, damaging the country's native milk industry.  In response, a student came to him and told him how he was offended by the lesson because he felt as though the material used in that class attacked his family, who were American dairy farmers.  Under the Stop W.O.K.E. Act, Professor Martínez-Fernández may be reported if a student takes similar offense to his teaching on slavery and slavery systems in his Latin American history courses, claiming that they feel offended because of their own family history or skin color.[15]  Professor Martínez-Fernández is concerned that students and outside observers

---

[15]  Fla. Stat. Ann. §1000.05(4)(a)(7).

who are offended by his teaching of historical facts may complain he is violating the Act.

While Professor Martínez-Fernández has committed, for now, to not changing his courses as a result of the Stop W.O.K.E. Act, he knows that adjunct and non-tenured professors, who teach a majority of the university's classes, are far more vulnerable to complaints and adverse actions resulting from the Act. As a result, they will be more concerned about complying with the Act and will be more susceptible to changing their teaching to try to comply with it. He worries that individuals who want to be promoted within the university may begin to act more cautiously. Even administrators who disagree with the law might nevertheless enforce it out of fear of the repercussions that might follow if they challenge it. As a result, all will have an incentive to censor their speech, regardless of whether they believe in the positions mandated by the Act.

Professor Martínez-Fernández is also concerned the Stop W.O.K.E. Act will have a significant impact on academic freedom. Already, his colleagues have been uncertain about whether Latino, gender, and African American studies programs will continue to be offered under the

Act.  Professor Martínez-Fernández believes that Latino studies program courses may no longer be offered.  This is particularly unfair to students at a university like UCF which enrolls large proportions of Latino and Latin-American students.  Professor Martínez-Fernández is certain, if the Act is allowed to go into effect, UCF students' education will suffer.

### E.    Getulio Gonzalez-Mulattieri

Getulio Gonzalez-Mulattieri is an Air Force veteran who graduated from Hillsborough Community College ("HCC")[16] in Florida in 2023 with an associate's degree in Sociology.  As a child of Brazilian immigrants, Getulio is passionate about the Latino community, organizing and attending community events and participating in city council and school board meetings.  Getulio plans to continue his education by pursuing a bachelor's degree in political science.  He planned to enroll at a Florida university, but the Stop W.O.K.E. Act has changed his mind.  He now plans to attend university out of state.

Getulio has observed how the Act chills speech in the classroom. During his time at HCC, as a result of the Stop W.O.K.E. Act, Getulio's

---

[16] HCC is an HSI.

professors "had to walk on eggshells" when teaching about issues like slavery and diversity. He felt that professors spent more time preemptively apologizing for potential offenses than teaching. In response, Getulio tried to take charge of his education. He asked probing questions about course material touching on diversity issues to draw professors into offering information. Getulio said "I felt I had the obligation to help teach the class with [professors] because I'm a student so I'm not under the same restrictions. I can ask as many questions as I want and will not get in trouble, but the professor has to worry about whether they're violating state law." Professors indicated to him that they were grateful for his participation, because it allowed them to lecture on critical topics they were otherwise afraid to teach about.

Getulio doesn't think he can get a full education in Florida under the Stop W.O.K.E. Act. He has seen professors leave and watched as resources are diverted from social sciences. He doesn't believe that he will be able to learn about topics that interest him in Florida, like Latino history and culture and critical race theory. "I feel like I'm making an ethical tradeoff between my community and my education," he said. Getulio worries that by leaving Florida to further his education, he will

24

lose the connections he has cultivated through years of active community leadership in the Latino community.  Despite the difficulty of reentering the job market with an out-of-state degree, Getulio plans to return to Florida because "this is where our people aren't represented."  But he will return only after completing his studies in a state where the classroom is not a "hostile working environment where students feel like they can't learn anything because of a teacher being afraid to open their mouth."

### F.    Yesenia Yataco

Yesenia Yataco, a daughter of Latino immigrants, is a rising senior at Florida State University ("FSU").  She is pursuing a bachelor's degree in political science and criminology.  Yesenia is an active member of her college community, holding leadership positions in student government and the Latino affinity group.  She hopes to become an immigration lawyer to work with underserved communities, but she believes the Stop W.O.K.E. Act will prevent her from getting the education she needs to do so.

Yesenia has taken many classes at FSU describing how societal structures have failed the Latino community within the United States. Sociology of U.S. Latinos taught her how Latinos have been

systematically disadvantaged and erased from American history. Other courses like Hate and Bias Crimes or Drugs and Crimes demonstrated that race plays a significant role in sentencing outcomes. Together, Yesenia's collegiate education has taught her how people's identity and race play a substantial role in shaping their outcomes.

If the Stop W.O.K.E. Act were in effect, Yesenia believes that the classes that taught her how racism continues to prevent an equitable society would be eliminated or dramatically changed.[17] Classes she plans to take, like Latino History, could also be dropped. The Act would make Yesenia uncomfortable with sharing her personal experiences with immigration, impeding her ability to actively participate in class discussions for fear that the discussions might cost professors their jobs. Yesenia fears the Act would force professors to sugarcoat the realities of American life for the sake of avoiding difficult topics. As she said, "it hurts to learn about these things but it is important to learn the whole story." Otherwise, "you'd essentially be teaching a lie."

These are not imaginary fears. When Yesenia spoke with some professors about how they would teach courses relating to minority

---

[17] Fla. Stat. Ann. §1000.05(4)(a)(3), (8).

communities, they indicated that "they are at the point that they are going to lose their jobs or are willing to leave the university, and I don't blame them at all." Yesenia is aware that professors are looking for new jobs and plan to leave FSU if the Act is enforced.

Affinity-based student organizations are also being silenced and told to "tone down" their programming. Faculty advisors fear having their names associated with the organizations' speech and activities. Yesenia's Latino student group was encouraged to move forward with its advocacy by its advisors while the Act is not in effect, because if the Act goes into effect it may make their advisors unwilling to participate with the group.

This silencing and erasure of students' identities is an inevitable consequence of the law. Students and professors alike are being forced to downplay their lived experiences to adhere to a point of view mandated by the Stop W.O.K.E. Act. As Yesenia put it, "I walked onto this campus trying to hide my *Latinidad*. Now, I don't want to hide it from anyone, I'm a proud Latina, I am a proud daughter of immigrants, and I deserve to be here."

27

## II.   The *Bishop* Balancing Test Weighs Strongly in Favor of Rejecting the Stop W.O.K.E. Act.

The experiences of these professors and students make clear that the factors established in *Bishop* weigh strongly against the Stop W.O.K.E. Act.   In *Bishop*, this Court crafted a multi-factored test to balance the interests of regulating curriculum against the free speech rights guaranteed by the First Amendment.   These factors include: (i) "the context"; (ii) "the University's position as a public employer which may reasonably restrict the speech right of employees," specifically with respect to reasonably controlling the content of its curriculum; and (iii) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment."  *Id*. at 1074-75.  As the District Court held, the *Bishop* factors provide the analytical framework for evaluating Appellee's First Amendment claims, *Pernell v. Florida Board of Governors*, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022).  Together, these factors make clear that the Stop W.O.K.E. Act violates the First Amendment.

### A.    Context

The *Bishop* test first looks to the context of the regulation on speech.  Here, the State of Florida enacted sweeping legislation, banning teaching that promotes or advances vaguely defined categories of information.  As the District Court noted, this legislation "affects potentially thousands of professors and serves as an *ante hoc* deterrent that 'chills potential speech before it happens,'" "giv[ing] rise to far more serious concerns than could any single supervisory decision."  *Pernell*, 2022 WL 16985720, at *36 (citations omitted).

The experiences of the professors and students reflected in this brief make clear that the District Court's concerns about the state "impos[ing] its own orthodoxy of viewpoint about the content it allow[s] within university classrooms" were well founded.  *Id.* at *37.  For example, the Act prohibits professors from contradicting the message that this country's systems are meritocratic and all people start life on equal footing, regardless of race or national origin.[18]  By requiring adherence to this factually incorrect party line, educators are foreclosed from teaching students that scientific evidence shows that precisely the

---

[18] Fla. Stat. Ann. §1000.05(4)(a)(3), (8).

opposite is true: historical factors and institutionalized racism continue to produce inequalities in society. Under the Act, Professor Aranda could not educate students about how centuries of slavery, segregation, and institutionalized racism make a true meritocratic society impossible. Nor could she teach about how the historical obstacles Latino people face continue to impact their life outcomes. Similarly, Professor Cox could no longer teach how "colorblindness" can perpetuate systemic racism.[19] Professor Mustaine could not express her views on how race, gender, and national origin have historically "oppressed" some communities, while "privilege[ing]" others.[20] Nor could she teach freely about sensitive topics like slavery, for fear of causing students to feel "guilt" or "anguish."[21] And Professor Martínez-Fernández would be foreclosed from discussing how slavery and its consequences impact Latinos in the country today.

While the Act facially allows for the "objective" discussion of the enumerated concepts, its true effect (however "objective" is defined) will be to prohibit teaching or discussing topics altogether. As Professor Cox said, with some concepts, there are not two sides to teach. To the

---

[19] *Id.* §1000.05(4)(a)(8).
[20] *Id.* §1000.05(4)(a)(3).
[21] *Id.* §1000.05(4)(a)(7).

professors whose stories are shared here, historical systems like racism continue to have lasting impacts on the lives and outcomes of the Latino community.    No countervailing opinion bears academic scrutiny. Nevertheless, the Stop W.O.K.E. Act would prohibit these professors from teaching that race and privilege play a role in American society and a perfectly neutral meritocracy does not exist in this country.  As Yesenia put it, by forcing professors not to teach the full story of race and privilege, the Act would effectively force them to teach a lie.  Placed in this context, the Stop W.O.K.E. Act can only impede the teaching of Latino history and culture, along with other important disciplines, by casting a "pall of orthodoxy over the classroom." *Faculty Senate of Florida Intern. Univ. v. Winn*, 477 F. Supp. 2d 1198, 1207 (S.D. Fla. 2007) (quoting *Keyishian*, 385 U.S. 589).

### B.    The Universities' Position

Next, the Court considers the University's position as a public employer.  *Bishop* states that a university may reasonably restrict its employees' speech rights to control the contents of the curriculum. *Bishop*, 926 F.2d at 1074.   Here, however, it is the State, and not universities, that are restricting universities' curricula.   As Professor

31

Mustaine, chair of UCF's Sociology Department, made clear, university administrations are not the driving force behind the Stop W.O.K.E. Act and are not even capable of advising their faculty on how to comply with its requirements. Instead, the Act is usurping universities' ability to control the contents of curricula by preventing universities from offering courses that they believe further their educational missions.

Even if the State could act in place of universities, which for purposes of the *Bishop* analysis it cannot, the restrictions placed by the Act do not reasonably relate to pedagogical goals. As the professors highlighted here consistently state, the Stop W.O.K.E. Act will have catastrophic effects on their ability to effectively teach their disciplines. They will have to eliminate courses wholesale or sterilize their syllabi, eliminating important subjects and source materials that are critical to teaching Latino culture and history. The students who take those courses will leave with a poorer education than they would have had they taken the courses before the Act came into effect. The State can have no reasonable basis to impede education in this manner.

### C.    Academic Freedom

The final *Bishop* factor acknowledges "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1075.  As the professors' and students' narratives establish, the Stop W.O.K.E. Act is an anathema to academic freedom.  The Act has already had a chilling effect on speech and teaching at universities.  Professor Cox, for example, cancelled two courses when the law was passed and would have to significantly modify his other courses in an effort to comply with the law's vague requirements. Professor Aranda believes that the law will cause her to fundamentally change or eliminate altogether nearly every course she teaches, including courses on Latino culture and history.  The Act has had such a chilling effect that USF will no longer offer a previously approved, student-requested course on Race and Ethnicity because no professor is willing to teach it.  And Getulio has observed that, for the classes that have not yet been cancelled, the Act has already impacted professors' teaching, forcing them to walk on eggshells, afraid of addressing important topics that touch on race.

If the Act is permitted to go into effect, more classes, including Professor Aranda's Latin Diaspora class, are all but certain to be impacted.  Professor Mustaine believes the Stop W.O.K.E. Act will cause sociology courses to become more basic and generic and less educational. And Professor Martínez-Fernández worries that more junior faculty, who make up the majority of university educators, will be chilled in their teaching and abandon important concepts and class discussions to comply with the Act.  As Yesenia described, the Act's impact on university curricula, including on classes she has taken and plans to take, would impede students from learning about the impact race continues to have on society and understanding the Latino experience in this country.  All of these actions will only serve to impoverish the marketplace of ideas that university classrooms are meant to encourage. *Keyishian*, 385 U.S. at 603; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Edwards v. Aguillard*, 482 U.S. 578, 581 (1987).

As the professors' and students' experiences demonstrate, the Stop W.O.K.E. Act would prevent universities and professors from determining their own curricula, and force educators to conform to the views of the government.  It flies in the face of *Bishop*'s expressly

34

recognized predilection for academic freedom as a corollary of the First Amendment.  Combined with the coercive context of the Act, and the fact that the State, not universities, are attempting to control educators' speech, all three of the *Bishop* factors weigh heavily in favor of striking down the Stop W.O.K.E. Act.

## CONCLUSION

This Court should affirm the district court's grant of a preliminary injunction.

DATED: June 23, 2023                    Respectfully submitted,

       / s /    *Peter E. Seley*

Peter E. Seley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 887-3689
Email:  pseley@gibsondunn.com

Mark J. Cherry
Apratim Vidyarthi
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone:  (212) 351-3978
Email:  mcherry@gibsondunn.com

Roberto Cruz
LATINOJUSTICE PRLDEF
523 West Colonial Drive
Orlando, FL  32804

Telephone:  (321) 250-2853
Email:  rcruz@latinojustice.org

Rafaela Uribe
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY  10115
Telephone:   (212) 219-3360
Email:  ruribe@latinojustice.org

*Counsel for* Amicus Curiae
*LatinoJustice PRLDEF*

## FRAP 32(g)(1) CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation set forth in FRAP 29(a)(5) and 32(a)(7)(B)(i). This document contains 6,499 words, excluding the parts exempted by FRAP 32(f) and 11th Cir. R. 32-4. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

 /s/      *Peter E. Seley*
Peter E. Seley

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June 2022, I electronically filed the foregoing Brief of *Amicus* LatinoJustice PRLDEF using the CM/ECF system.  I further certify that a true and correct copy of the foregoing Brief of *Amicus* LatinoJustice PRLDEF was served via the Court's CM/ECF System upon all counsel of record.

 /s/      *Peter E. Seley*
Peter E. Seley