**Nos. 22-13992 & 22-13994**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

LEROY PERNELL, ET AL.,

*Plaintiffs-Appellees*,

v.

BRIAN LAMB, ET AL.,

*Defendants-Appellants*.

ADRIANA NOVOA, ET AL.,

*Plaintiffs-Appellees*,

v.

MANNY DIAZ, JR., ET AL.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Florida
(Nos. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF)

## BRIEF OF *AMICI CURIAE* POLICING & CRIMINAL JUSTICE
## ORGANIZATIONS AND SCHOLARS IN SUPPORT OF AFFIRMANCE

James A. Goldston*
Genevieve Quinn*
Natasha Arnpriester*
Open Society Justice Initiative
224 West 57th Street
New York, NY 10019

Justin B. Cox
Law Office of Justin B. Cox
PO Box 1106
Hood River, OR 97031
justin@jcoxconsulting.org

*pro hac vice motion forthcoming*

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

All parties have consented to the filing of this amicus brief.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, counsel for *amici* hereby certify that the Certificates of Interested Persons and Corporate Disclosure Statements contained in the Appellants' and Appellees' briefs are complete, with the additional entities and individuals listed below.

Counsel for *amici* also certify that none of the entities listed below are publicly traded corporations, and that there are no parent corporations or publicly traded corporations that own 10% or more of any stock of any of the entities listed.

1.   Arnpriester, Natasha, *attorney for Amici Curiae*

2.   Chavis, Kami, *Amicus Curiae*

3.   Cox, Justin, *attorney for Amici Curiae*

4.   Fair and Just Prosecution, a project of the Tides Center, *Amicus Curiae*

5.   Friedman, Barry, *Amicus Curiae*

6.   Goldston, James A., *attorney for Amici Curiae*

7.   Keesee, Tracie L., *Amicus Curiae*

8.   Law Enforcement Action Partnership, *Amicus Curiae*

9.   National Coalition Building Institute, *Amicus Curiae*

10.  Quinn, Genevieve, *attorney for Amici Curiae*

11.  Quinn McGough, Maureen, *Amicus Curiae*

C-1 of 2

12.     Smith-Kea, Nicola, *Amicus Curiae*

13.     Strategies for Justice, BWMP LLC, *Amicus Curiae*

14.     The Black Police Experience, *Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... i

IDENTITIES AND INTERESTS OF *AMICI CURIAE* ........................................ 1

SUMMARY OF THE ARGUMENT .................................................... 7

ARGUMENT ......................................................................... 8

  I.  EDUCATING AND TRAINING LAW ENFORCEMENT ON HUMAN DIVERSITY AND IMPLICIT BIASES IMPROVE THEIR ABILITY TO FULFILL THEIR MISSION, AS FLORIDA HAS LONG RECOGNIZED .......................... 8

  II.  THE PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST BECAUSE THE ACT UNDERMINES THE ABILITY OF LAW ENFORCEMENT ACROSS FLORIDA TO FULFILL THEIR CRITICAL MISSION OF PROTECTING THE PUBLIC ................................................... 16

CONCLUSION .................................................................... 20

CERTIFICATE OF COMPLIANCE.................................................. 21

i

# TABLE OF AUTHORITIES

## STATUTORY AUTHORITIES

1991 Fla. Sess. Law Serv. Ch. 91-74 ("An act relating to bias in Florida's court and justice systems and law enforcement standards and training")......14-16

1997 Fla. Sess. Law Serv. Ch. 97-225 ("An act relating to criminal justice standards and training") ..........................................................................16

Fla. Stat. § 943.10(20) ("Definitions; Diverse population") ............................ 16, 18

Fla. Stat. § 943.13 ("Officers' minimum qualifications for employment or appointment") ......................................................................................17

Fla. Stat. § 943.1715 ("Basic skills training relating to diverse populations") ..........................................................................................14-15, 17-19

Fla. Stat. § 943.1716 ("Continued employment training relating to diverse populations")................................................................................ 15, 17

Fla. Stat. § 943.1755 ("Florida Criminal Justice Executive Institute")............ 14, 16

Fla. Stat. § 943.1757 ("Criminal justice executives; training; policy report") ..........................................................................................................16

Fla. Stat. § 943.1758 ("Curriculum revision for diverse populations; skills training")...............................................................................................15

Stop Wrongs Against Our Kids and Employees Act, Fla. Stat. § 1000.05(04)................................................................................. *passim*

## OTHER AUTHORITIES

Bocar A. Ba, et al., *The Role of Officer Race and Gender in Police-Civilian Interactions in Chicago*, 371 Science 696 (2021), *available at* scholar.princeton.edu/sites/default/files/bkmr_0.pdf ...........................................12

Luke Barr, *Officers Dying in Line of Duty During a Felony Down 18% in 2022: FBI*, ABC News, May 9, 2023, abcn.ws/3qU1su7 ....................................10

Emily Buehler, Bureau of Just. Stats., U.S. Dep't of Justice, *State & Local Law Enforcement Training Academies, 2018–Statistical Tables* (2021), bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/slleta18st.pdf............11

Civil Rights Division, U.S. Department of Justice, *The Civil Rights Division's Pattern and Practice Police Reform Work* (2017), *available at* justice.gov/crt/file/922421/download ..................................................................9

Patricia G. Devine, et al., *Long-Term Reduction in Implicit Race Bias: A Prejudice Habit-Breaking Intervention*, 48 J. Experimental Psych. 1267 (2012), *available at* ncbi.nlm.nih.gov/pmc/articles/PMC3603687 .....................13

Florida Department of Law Enforcement, *Criminal Justice Training Centers*, fdle.state.fl.us/CJSTC/Training-Resources/Training-Centers.aspx ........................................................................................................17

Florida Department of Law Enforcement, *How to Become a Certified Officer in Florida*, fdle.state.fl.us/CJSTC/Officer-Requirements/How-to-Become-an-Officer.aspx ................................................................................17

Julie M. Hughes, et al., *Consequences of Learning About Historical Racism Among European American and African American Children*, 78 Child Dev. 1689 (2007) .....................................................................................15

International Association of Chiefs of Police, *Bias-Free Policing* (2020), pstc.nh.gov/publications/documents/policing-bias-free-iacp.pdf.........................9

Law Enforcement Epidemiology Project, University of Illinois Chicago, *Civilian Death in Police Shootings and Interventions*, policeepi.uic.edu/civilian-deaths-in-police-shootings-and-interventions.............10

Joscha Legewie and Jeffrey Fagan, *Group Threat, Police Officer Diversity and the Deadly Use of Police Force* (2016), Columbia Public Law Research Paper No. 14-512, *available at* ssrn.com/abstract=2778692 ...............13

Cheryl Pritlove, et al., *The Good, the Bad, and the Ugly of Implicit Bias*, 393 Lancet 502 (2019) ...........................................................................13

Rich Morin and Andrew Mercer, Pew Research Center, *A Closer Look at Police Officers Who Have Fired Their Weapon on Duty*, Feb. 8, 2017, pewrsr.ch/3CIILMC.............................................................................12

National Center for Women and Policing, *Recruiting and Retaining Women* (2001), *available at* ojp.gov/pdffiles1/bja/185235.pdf........................................11

Candice Norwood, *Racial Bias Trainings Surged After George Floyd's Death. A Year Later, Experts Are Still Waiting for 'Bold' Change*, PBS News Hour, May 25, 2021, to.pbs.org/43R03Db ..................................................13

Office of Community Oriented Policing Services, U.S. Department of Justice, *Law Enforcement Recruitment Toolkit* (2018), *available at* theiacp.org/sites/default/files/2018-08/RecruitmentToolkit.pdf .........................17

Cara E. Rabe-Hemp, *Female Officers and the Ethic of Care: Does Officer Gender Impact Police Behaviors?*, 36 J. Crim. Just. 426 (2008) ........................12

President's Task Force on 21st Century Policing, Office of Community Oriented Policing Services, U.S. Department of Justice, *Final Report of the President's Task Force on 21st Century Policing* (2015), *available at* cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf .................................. 8-10

U.S. Department of Justice and the Equal Employment Opportunity Commission, *Advancing Diversity in Law Enforcement* ii (2016), justice.gov/d9/advancing_diversity_in_law_enforcement_report_october_2016.pdf.........................................................................................12

U.S. Holocaust Memorial Museum, *Outreach Programs: Law Enforcement*, ushmm.org/outreach-programs/law-enforcement ...........................19

## IDENTITIES AND INTERESTS OF *AMICI CURIAE*[1]

The **Law Enforcement Action Partnership** is a nonprofit organization consisting of more than 300 law enforcement officials, including police officers, prosecutors, judges, and corrections officials, who are dedicated to promoting practical and ethical policies from a public safety perspective. A key focus for LEAP is to address the underlying causes of crime so as to foster improvements in public safety, while rebuilding trust between police and communities. As part of their mission, they underscore the critical need for law enforcement to acknowledge and address the intersection of law enforcement, racial bias, and public safety.

**Fair and Just Prosecution**, a project of the Tides Center, is a nonprofit organization that brings together elected prosecutors from around the nation as part of a network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility. The elected prosecutors with whom it works hail from urban and rural areas alike, and they collectively represent nearly 20 percent of our nation's population. The leaders in its network have an unwavering commitment to public safety along with a deep understanding of the connection between the public's trust in law enforcement, which helps grant legitimacy to the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party or its counsel authored this brief in whole or in part; and that no person other than the *amici*'s counsel have contributed money intended to support the preparation or submission of this brief.

criminal legal system, and public safety. Prosecutors further depend upon the public's trust and belief in the legitimacy of law enforcement and the entire justice system in order to carry out their responsibilities and to secure case outcomes that are just and serve the interests of public safety. To that end, Fair and Just Prosecution works to promote community trust and police accountability, including through policy recommendations to address, *inter alia*, racial injustice in policing.

The **National Coalition Building Institute** is an international leadership nonprofit organization that provides training in diversity, equity, and inclusion in community organizations, K-12 schools, college and university campuses, corporations, and law enforcement. NCBI has received numerous awards in recognition of its excellent diversity training programs, including the Nelson Mandela Award for outstanding international work on fighting racism; and recognition from the United States Department of Education Gender Equity Expert Panel, which cited NCBI's work on college campuses as a national "best practice" and awarded it the rating of "excellent" regarding educational significance, quality, usefulness, and replicability.

**Strategies for Justice, BWMP LLC** is a speaking and training organization that focuses on issues of gender, disability, and racial equity within law enforcement. Its mission is to provide the tools necessary to help individuals, social justice organizations, and institutions of higher education work in collaboration with law

enforcement, to engage in civil dialogue, and to help create meaningful changes in the communities they serve.

**The Black Police Experience** promotes education concerning the intersection of law enforcement and the Black community. BPX was founded by Sonia Y.W. Pruitt, a retired police captain and former Chairwoman of the National Black Police Association. Captain Pruitt works in conjunction with other law enforcement partners—think tanks, sociologists, and anthropologists—to create training, education, and programming. She is also a professor of Criminal Justice at Howard University and Montgomery College in Maryland.

**Kami Chavis** is the R. Hugh and Nolie Haynes Professor of Law and Director of the W&M Center of Criminal Justice Policy and Reform at William & Mary Law School. Professor Chavis frequently makes presentations on law-enforcement issues and is a leader in the field of police accountability. She has substantial practice experience and writes and teaches in areas related to criminal law, criminal procedure, and criminal justice reform. In 2003, she became an Assistant United States Attorney for the District of Columbia, involving her in a wide range of criminal prosecutions. Professor Chavis has published numerous articles in legal journals; she writes in the areas of police and prosecutorial accountability, federal hate crimes legislation and enforcement, racial profiling, and structural reform of law enforcement agencies. She was elected to the American Law Institute in 2012.

**Barry Friedman** is the Founder and Faculty Director of the Policing Project at New York University School of Law, where he is the Jacob D. Fuchsberg Professor of Law and Affiliated Professor of Politics. The Policing Project partners with communities and police to promote public safety through transparency, equity, democratic engagement, and data-driven best practices. Mr. Friedman has taught, litigated, and written about constitutional law, the federal courts, policing, and criminal procedure for over thirty years. He is the author of *Unwarranted: Policing Without Permission* (2017), and has written numerous articles in scholarly journals, including on democratic policing, alternatives to police responses to 911 calls, and the Fourth Amendment. Mr. Friedman additionally serves as the Reporter for the American Law Institute's *Principles of the Law: Policing*.

**Dr. Tracie L. Keesee** is the Co-founder, President, and COO of the Center for Policing Equity, a nonprofit organization that partners with communities, law enforcement, legislators, and other decision-makers to provide the evidence-based resources they need to reimagine public safety, build community trust, and achieve racial equity. Dr. Keesee previously served as the first-ever Deputy Commissioner of Equity and Inclusion for the New York Police Department, in which capacity she was responsible for overall organizational development and implementation of the NYPD's Equity and Inclusion strategic framework. She also served as an advisor to the Police Commissioner on the implementation of accountability systems in order

4

to help the organization attract and retain an inclusive and diverse workforce. Dr. Keesee additionally served as the Deputy Commissioner of Training for NYPD; is a retired 25-year veteran of the Denver Police Department; and is a graduate of the 203rd Session of the FBI National Academy at Quantico, Virginia. Dr. Keesee has published numerous articles across a variety of collected anthologies and peer-reviewed scientific journals.

**Maureen Quinn McGough** co-founded the 30x30 Initiative to Advance Women in Policing to remove inherent bias from policing policies, assessments, and procedures and to transform agency culture so that under-represented groups have an equitable chance to thrive within the profession. The ultimate goal is to raise the representation of women in police recruit classes to 30 percent by the year 2030. To date, the Initiative has partnered with over 300 law enforcement agencies across the country and has also established a formal collaboration with the US Department of Justice. Ms. McGough is also the Chief of Strategic Initiatives for the Policing Project at the New York University School of Law, where she oversees national efforts to develop and measure standards for fair and effective policing. She joined the Policing Project from the National Police Foundation, where she was the Director of National Programs. Prior to that, Ms. McGough spent a decade with the federal government in various roles, including as Senior Policy Advisor to the Director of the National Institute of Justice, where she led agency efforts to advance

evidence-based policing, improve the representation of women in policing, and implement systems-level criminal justice reform initiatives. Ms. McGough is a member of the FBI's Law Enforcement Education and Training Council and an executive board member for the American Society of Evidence-Based Policing.

**Nicola Smith-Kea**, PhD, is the Founder and Principal of Smith-Kea Consulting LLC, which focuses on exploring strategies that improve outcomes, drive transformative solutions and policy change, and cultivate trust between communities and police. She also currently serves as a Stoneleigh Fellow and Executive in Residence, in which capacity she works towards promoting and developing internal accountability, officer safety and wellness practices, and healthy police-community engagement in a major city police department. Previously, she served as the Criminal Justice Manager of the Policing team at Arnold Ventures, overseeing a diverse portfolio and managing a variety of stakeholders, including law enforcement practitioners, policymakers, research institutes, national membership organizations, and advocates. She also served as a project manager and senior policy analyst and technical assistance manager at the Council of State Governments Justice Center, where she worked closely with a broad spectrum of law enforcement agencies across the United States.

## SUMMARY OF ARGUMENT

1.      For decades, law enforcement agencies across Florida and the country have made training and education on human diversity and implicit biases an integral part of preparing their officers for the realities of working with and serving diverse communities. The State of Florida, in fact, has mandated for more than 30 years that new recruits and veteran officers alike undergo training on "interpersonal skills" relating to diverse populations, "with an emphasis on the awareness of cultural differences." Integrating training and education reflecting diverse perspectives in the law enforcement context brings numerous benefits: enhanced recruitment and retention of a diverse workforce that better reflects the communities served; fewer officer-involved shootings; and an overall improved ability to build, maintain, and deepen the trust of diverse communities essential to the maintenance of law, order, and safety.

2.      The district court did not abuse its discretion in concluding that the balance of harms and the public interest weigh heavily in favor of preliminarily enjoining the higher education provisions of the Stop Wrongs Against Our Kids and Employees Act, Fla. Stat. § 1000.05(4) ("the Act"). Were it not enjoined, the Act would negatively impact Florida educators' ability to prepare students to succeed in their careers—including those in law enforcement. Florida law enforcement agencies rely heavily on public institutions of higher learning to train and educate

new recruits, as well as to retrain veteran officers, as required by state law. The Act's ambiguity—particularly when combined with its penalty provisions—would significantly chill instructors' willingness and ability to provide education or training on basic concepts of diversity, implicit bias, and community relations crucial to modern policing. This would undermine the capacity of law enforcement across Florida to fulfill its critical mission of protecting the public. *Amici* therefore urge this Court to affirm.

## ARGUMENT

### I. EDUCATING AND TRAINING LAW ENFORCEMENT ON HUMAN DIVERSITY AND IMPLICIT BIASES IMPROVE THEIR ABILITY TO FULFILL THEIR MISSION, AS FLORIDA HAS LONG RECOGNIZED

Decades of experience and research have taught law enforcement officers and agencies that nurturing community trust and legitimacy are invaluable to crime reduction, the integrity of our criminal justice system, and the safe and effective delivery of policing services.[2] Today, it is overwhelmingly accepted among law enforcement and academia that working with communities to tackle the immediate

---

[2] *See, e.g.*, President's Task Force on 21st Century Policing, Office of Community Oriented Policing Services, U.S. Dep't of Justice, *Final Report of the President's Task Force on 21st Century Policing* 1 (2015), *available at* cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

and longer-term causes of crime through joint problem-solving reduces crime and makes officers and the communities they serve safer.[3]

Obtaining community trust and legitimacy requires (*inter alia*) treating individuals of that community with dignity and respect, understanding the negative impacts of explicit and implicit bias on police-community relations, and proactively putting in place a comprehensive system which prevents discrimination, including by educating and training officers on how to recognize and mitigate biases at all levels.[4] Be it along racial, ethnic, gender, age, socioeconomic or other lines, intimate familiarity with, and recognition of, the respective identities of law enforcement officers and the individuals and communities with whom they interact daily can play a significant role—particularly at the aggregate level—in making communities and the officers that serve them safer.[5]

What is more, there are particularly good reasons to take account of human diversity and biases within the law enforcement context. For one, the stakes are

---

[3] *Final Report*, *supra* note 2, at 41-50. Indeed, community engagement requirements are now common in consent decrees with police departments, as one important component of reform and oversight. *See* Civil Rights Division, U.S. Dep't of Justice, *The Civil Rights Division's Pattern and Practice Police Reform Work* 29-30 (2017), *available at* justice.gov/crt/file/922421/download.

[4] *See generally* Int'l Ass'n of Chiefs of Police, *Bias-Free Policing* (2020), pstc.nh.gov/publications/documents/policing-bias-free-iacp.pdf.

[5] Jesse Jannetta et al., Urban Institute, *Learning to Build Police-Community Trust* 79-81 (2019), *available at* urbn.is/43RxMwd.

higher. The job of law enforcement is a dangerous one: police are expected to run *toward* danger,[6] and they are also equipped and empowered, in limited circumstances, to use deadly force.[7]

For another, the history of law enforcement in Florida and the United States more generally is replete with patterns of bias and discrimination that have undermined community trust and legitimacy. Until recently, law enforcement officers have been overwhelmingly one race and gender, and for generations police officers were the front-line enforcers of *de jure* and *de facto* discrimination against historically marginalized groups and individuals.

In short, the role and reality of law enforcement in the United States—particularly in states as diverse as Florida—demand educating and training officers on the real-world challenges of building trust and legitimacy with diverse communities and promoting fair and unbiased policing.[8] Reflecting these challenges,

---

[6] According to the FBI, last year 118 law enforcement officers were killed in line-of-duty incidents, with more than half of those killed feloniously. Luke Barr, *Officers Dying in Line of Duty During a Felony Down 18% in 2022: FBI*, ABC News, May 9, 2023, abcn.ws/3qU1su7 (last visited June 23, 2023).

[7] According to Center for Disease Control data, in 2020 (the last year for which data is fully available) at least 780 civilians died as a result of contact with law enforcement. *See* Law Enforcement Epidemiology Project, University of Illinois Chicago, *Civilian Death in Police Shootings and Interventions*, policeepi.uic.edu/civilian-deaths-in-police-shootings-and-interventions (last visited June 23, 2023).

[8] *Final Report*, *supra* note 2, at 51-52.

nearly all law enforcement agencies in the United States now incorporate to some degree education and training on issues of diversity and implicit bias.[9]

Law enforcement leaders have recognized a number of benefits from recruiting a diverse officer base that better reflects the communities they serve. Research has shown, for example, that hiring and retaining more female police officers can help to reduce problems of sex discrimination and harassment within law enforcement.[9] Having officers from a wider diversity of backgrounds can also help law enforcement agencies improve their hiring and promotion processes to focus on the aspects of traditional selection criteria that are truly job-related, making them fairer for everyone.[10]

Diversity within law enforcement agencies also improves their relationships with the communities they serve, particularly when it is just one part of a wider package of reforms. "[D]ecades of research [have] confirm[ed] that when members of the public believe their law enforcement organizations represent them, understand them, and respond to them—and when communities perceive authorities as fair, legitimate, and accountable—it deepens trust in law enforcement, instills public

---

[9] Emily Buehler, Bureau of Justice Statistics, U.S. Dep't of Justice, *State and Local Law Enforcement Training Academies, 2018 – Statistical Tables* 10 (2021), bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/slleta18st.pdf (last visited June 23, 2023).

[10] *See, e.g.*, Nat'l Center for Women and Policing, *Recruiting and Retaining Women* 27 (2001), *available at* ojp.gov/pdffiles1/bja/185235.pdf.

confidence in government, and supports the integrity of democracy."[11] The community trust fostered by a diverse police force "is essential to defusing tension, to solving crimes, and to creating a system in which residents view law enforcement as fair and just."[12]

Perhaps most starkly: Diversity initiatives in the law enforcement context can literally save lives. Studies have shown, for example, that female police officers are less likely to escalate up the use-of-force continuum,[13] and similarly, that Black and Hispanic officers tend to use less force than white officers.[14] One study of officer-involved killings over a three-and-a-half-year period found that a diverse police

---

[11] U.S. Dep't of Justice and the Equal Employment Opportunity Comm'n, *Advancing Diversity in Law Enforcement* ii (2016), justice.gov/d9/advancing_diversity_in_law_enforcement_report_october_2016.pdf.

[12] *Advancing Diversity*, *supra* note 11, at ii.

[13] *See, e.g.*, Cara E Rabe-Hemp, *Female Officers and the Ethic of Care: Does Officer Gender Impact Police Behaviors?*, 36 J. Crim. Just. 426 (2008) ("Consistent with previous literature, the research suggests that women were much less likely than men to use extreme controlling behavior, such as threats, physical restraints, searches, and arrest.").

[14] *See, e.g.*, Bocar A. Ba, et al., *The Role of Officer Race and Gender in Police-Civilian Interactions in Chicago*, 371 Science 696 (2021), *available at* scholar.princeton.edu/sites/default/files/bkmr_0.pdf; Rich Morin and Andrew Mercer, Pew Research Center, *A Closer Look at Police Officers Who Have Fired Their Weapon on Duty*, Feb. 8, 2017, pewrsr.ch/3CIILMC (last visited June 23, 2023).

force reduces both the number and rate of officer-involved killings of Black Americans.[15]

More recently, law enforcement has begun to recognize and appreciate the importance of learning about implicit biases and the ways that they affect everyone simply by virtue of being human. Training on implicit bias in the law enforcement context is now common, including in Florida. Researchers have found that implicit bias training gives trainees a better understanding of common human biases, better awareness of their own personal biases, and improved knowledge of how biases can affect decision making in practice.[16] Although training law enforcement officers about implicit bias has become relatively common only in the last few years, in the wake of high-profile officer-involved killings of Black men,[17] there is evidence that training courses can reduce participants' implicit biases.[18]

---

[15] Joscha Legewie and Jeffrey Fagan, *Group Threat, Police Officer Diversity and the Deadly Use of Police Force* (2016), Columbia Public Law Research Paper No. 14-512, *available at* ssrn.com/abstract=2778692.

[16] Cheryl Pritlove et al., *The Good, the Bad, and the Ugly of Implicit Bias*, 393 Lancet 502 (2019).

[17] Candice Norwood, *Racial Bias Trainings Surged After George Floyd's Death. A Year Later, Experts Are Still Waiting for 'Bold' Change*, PBS News Hour, May 25, 2021, to.pbs.org/43R03Db (last visited June 23, 2023).

[18] *See, e.g.*, Patricia G. Devine, et al., *Long-Term Reduction in Implicit Race Bias: A Prejudice Habit-Breaking Intervention*, 48 J. Experimental Psych. 1267 (2012), *available at* ncbi.nlm.nih.gov/pmc/articles/PMC3603687.

To its credit, the State of Florida recognized the need for diversity initiatives and training in the law enforcement context more than 30 years ago. In 1991, its Legislature identified and codified the need to improve the relationship between law enforcement agencies and communities of color,[19] as well as the imperative for training to facilitate improving those relationships.[20]

To address these needs, the Legislature directed the Criminal Justice Standards and Training Commission ("the Commission")—which certifies law enforcement officers in Florida—to develop training focused on "interpersonal skills relating to racial and ethnic minorities,[21] with an emphasis on the awareness of cultural differences."[22] The Legislature further mandated that initial certification as

---

[19] 1991 Fla. Sess. Law Serv. Ch. 91-74 § 13 ("The Legislature . . . finds that there exists a need to improve relationships between law enforcement agencies and the racial and ethnic minorities they serve."), *codified as amended at* Fla. Stat. § 943.1755(b).

[20] *See, e.g.*, 1991 Fla. Sess. Law Serv. Ch. 91-74 § 12 ("The Legislature finds that there exists a need to provide training to criminal justice executives in the subject of interpersonal skills relating to racial and ethnic minorities, with an emphasis on the awareness of cultural differences.").

[21] *See* 1991 Fla. Sess. Law Serv. Ch. 91-74 § 9(1) ("'Racial and ethnic minorities' means members of a socially or economically disadvantaged group which includes Blacks, Hispanics, and American Indians.").

[22] 1991 Fla. Sess. Law Serv. Ch. 91-74 § 10, *codified as amended at* Fla. Stat. § 943.1715; *see also id.* § 14 ("The curriculum shall include standardized proficiency instruction relating to high-risk and critical tasks which include, but are not limited to, stops, use of force and domination, and other areas of interaction between law enforcement officers and racial and ethnic minorities. Culturally

a law enforcement officer require at least 8 hours of this new diversity training;[23] that at least 8 of the 40 hours of retraining needed for continuing employment as an officer be dedicated to diversity training;[24] and that such training be integrated into instructor training courses as well.[25] Florida's decision to structure diversity training in this way—i.e., requiring it early, before even becoming an officer, and then again as part of periodic mandatory retraining—is consistent with research showing that training on matters of diversity and implicit biases is most effective when it begins early and is reinforced often.[26]

Finally, the Legislature in 1991 also created a new entity—the Florida Criminal Justice Executive Institute—and directed it to: "identify the needs of criminal justice executives in racially and ethnically sensitive areas," "ensure that such needs are met through appropriate training," and "conduct research projects,

---

sensitive lesson plans, up-to-date videotapes, and other demonstrative aids developed for use in racial and ethnic minorities-related training shall be used as instructional materials."), *codified as amended at* Fla. Stat. § 943.1758(1)(b).

[23] 1991 Fla. Sess. Law Serv. Ch. 91-74 § 10, *codified as amended at* Fla. Stat. § 943.1715.

[24] 1991 Fla. Sess. Law Serv. Ch. 91-74 § 11, *codified as amended at* Fla. Stat. § 943.1716.

[25] 1991 Fla. Sess. Law Serv. Ch. 91-74 § 14, *codified as amended at* Fla. Stat. § 943.1758(1)(b).

[26] *See, e.g.*, K. Bezrukova, et al., *A Meta-analytical Integration of Over 40 years of Research on Diversity Training Evaluation*, 142 Psych. Bulletin 1227 (2016); Julie M. Hughes, et al., *Consequences of Learning About Historical Racism Among European American and African American Children*, 78 Child Dev. 1689 (2007).

utilizing the resources of community colleges and universities, for the purpose of improving law enforcement interaction and intervention in the communities of racial and ethnic minorities."[27]

Six years later, the Legislature broadened these diversity training mandates by replacing "racial and ethnic minorities" in the aforementioned statutory provisions with the more expansive "diverse populations,"[28] which it defined as "members of a cultural group with common origins, customs, and styles of living," expressly "includ[ing] both ethnic and religious minorities."[29] These state law mandates remain in effect today.

## II.    THE PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST BECAUSE THE ACT UNDERMINES THE ABILITY OF LAW ENFORCEMENT ACROSS FLORIDA TO FULFILL THEIR CRITICAL MISSION OF PROTECTING THE PUBLIC

The district court did not abuse its discretion in preliminarily enjoining the Act, including because of the adverse effects it would have on Florida law enforcement's ability to carry out their mission.

Law enforcement agencies in Florida rely heavily on state institutions of higher education to educate and train future and existing law enforcement officers,

---

[27] 1991 Fla. Sess. Law Serv. Ch. 91-74 §§ 12-13, *codified as amended at* Fla. Stat. §§ 943.1755, 943.1757.

[28] 1997 Fla. Sess. Law Serv. Ch. 97-225 §§ 2, 6-7, 9-11.

[29] 1997 Fla. Sess. Law Serv. Ch. 97-225 § 1, *codified at* Fla. Stat. § 943.10(20).

16

making the Act relevant to Florida law enforcement in a way that might not be true of a comparable law in another state. Absent an exception, becoming a law enforcement officer in Florida requires completing a "basic recruit training program" approved by the Commission[30]—and nearly all Commission-approved basic recruit training programs are given by Florida public institutions of higher learning.[31] Of Florida's approximately 367 local law enforcement agencies, only a handful have their own training academy, while the rest depend on 31 regional training academies "housed in community colleges, junior colleges, or vocational or technical institutions."[32] As discussed *supra*, the basic recruit training program must include at least 8 hours of state-mandated diversity training. *See* Fla. Stat. § 943.1715. Florida similarly requires retraining of veteran officers on the same topic as a condition of continuing employment, *see* Fla. Stat. § 943.1716, which relies on the same public institutions of higher education.

---

[30] Fla. Stat. § 943.13(9); *accord* Fla. Dep't of Law Enforcement, *How To Become a Certified Officer in Florida*, fdle.state.fl.us/CJSTC/Officer-Requirements/How-to-Become-an-Officer.aspx (last visited June 23, 2023).

[31] *See* Fla. Dep't of Law Enforcement, *Criminal Justice Training Centers*, fdle.state.fl.us/CJSTC/Training-Resources/Training-Centers.aspx (listing locations for Commission-approved training) (last visited June 23, 2023).

[32] Office of Community Oriented Policing Services, U.S. Dep't of Justice, *Law Enforcement Recruitment Toolkit* 55 (2018), *available at* theiacp.org/sites/default/files/2018-08/RecruitmentToolkit.pdf.

The Act, if allowed to take effect, would thus put Florida law enforcement agencies, executives, and instructors in a difficult position: mandated by state law (and by the realities of policing in a state as diverse as Florida) to train and educate law enforcement officers on interacting with diverse communities, "with an emphasis on cultural differences," but with the threat of discipline if they do so in a way that runs afoul of the Act's prohibitions on promoting ill-defined concepts related to that same subject matter. This untenable position threatens both the safety of the officers themselves as well as the communities that they police.

For example, per the Act's concept four, law enforcement training instructors in Florida may not "espouse[], promote[], advance[], inculcate[], or compel[] . . . student[s] or employee[s] to believe" that "Members of one race . . . cannot and should not attempt to treat others without respect to race." Yet those same instructors are also required to provide training to law enforcement officers in a way that explicitly recognizes and *emphasizes* cultural differences along racial, ethnic, and other lines. *See* Fla. Stat. §§ 943.1715, 943.10(20). The Act makes Florida's law enforcement training mandate incoherent.

Due to their ambiguity, other parts of the Act would chill, if not outright deter, training and education on concepts basic to modern law enforcement and essential, in the view of law enforcement, to fulfilling their mission. The Act's concept two, for example, will likely discourage instruction on implicit bias, notwithstanding that

18

most law enforcement agencies across the country have decided for themselves that such training is a good investment. Concepts five and six would similarly chill discussions about the many benefits (noted above) of having a diverse set of officers, as long recognized by the profession of law enforcement itself. More than one concept could chill discussions about an individual's lived experience, *see, e.g.*, App. 300-02 (discussing how concept six would preclude inviting Justice Sotomayor as a guest speaker to share "poignant reflection[s] about her own lived experience," because doing so "endorses affirmative action"); or uncomfortable facts about the historical relationship between law enforcement and marginalized communities, such as those discussed in the U.S. Holocaust Memorial Museum's officer training program on the key role played by police in the Holocaust,[33] which could run afoul of concepts five and seven.

As the district court rightly found, the Act would chill instruction and discussion on the covered concepts. This would negatively impact Florida educators' ability to prepare their students for law enforcement careers, thereby depriving Florida law enforcement agencies and the communities they serve of the many benefits of that education and training. Were it not for the preliminary injunction, police officers in Florida would, over time, be tangibly less prepared for their jobs

---

[33] U.S. Holocaust Memorial Museum, *Outreach Programs: Law Enforcement*, ushmm.org/outreach-programs/law-enforcement (last visited June 23, 2023).

and they and their communities measurably less safe. Preventing that outcome is plainly in the public interest.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

Respectfully submitted,

/s/ Justin B. Cox

James A. Goldston*                    Justin B. Cox
Genevieve Quinn*                      Law Office of Justin B. Cox
Natasha Arnpriester*                  PO Box 1106
Open Society Justice Initiative       Hood River, OR 97031
224 West 57th Street                  justin@jcoxconsulting.org
New York, NY 10019

*pro hac vice motion forthcoming      *Counsel for Amici Curiae*

20

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because this brief contains 4,456 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Dated: June 23, 2023.

/s/ Justin Cox