Nos. 22-13992 & 22-13994

# In the United States Court of Appeals for the Eleventh Circuit

LEROY PERNELL, ET AL.,
*Plaintiffs–Appellees*,

v.

BRIAN LAMB, ET AL.,
*Defendants–Appellants*.

ADRIANA NOVOA, ET AL.,
*Plaintiffs–Appellees*,

v.

MANNY DIAZ, JR., ET AL.,
*Defendants–Appellants*.

**REPLY BRIEF OF DEFENDANTS-APPELLANTS**

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NOS. 4:22-CV-304-MW-MAF & 4:22-CV-324-MW-MAF

Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9660
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants-Appellants*

*Pernell, et al. v. Lamb, et al.*, *Novoa, et al. v. Diaz, et al.*
Nos. 22-13992 & 22-13994

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Circuit Rule 26.1-2(b), Defendants-Appellants certify that the Certificates

of Interested Persons contained in previous briefs are complete.

Dated: July 7, 2023

Respectfully submitted,

/s/Charles J. Cooper
Charles J. Cooper
John D. Ohlendorf
Megan M. Wold
John D. Ramer
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendant-Appellants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .............................................................................C-1

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................6

I.      Plaintiffs Lack Standing to Challenge the Act's First, Third, Fifth, and Sixth Concepts...............................................................................................6

II.     The Act Does Not Violate the First Amendment. ...........................8

        A.      *Bishop* Squarely Controls This Case.....................................8

        B.      The Speech at Issue Is Government Speech. .......................13

        C.      Plaintiffs' Proposed Test Is Wholly Unworkable and Would Lead to Unacceptable Results.  .........................................................19

III.    The Act Is Not Unconstitutionally Vague.....................................21

IV.     Any Unconstitutional Provisions Are Severable..........................27

V.      Equitable Considerations Favor Reversal. ....................................27

CONCLUSION ..........................................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*303 Creative LLC v. Elenis*, No. 21-476, (U.S. June 30, 2023) .......................13, 17

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ...............................................................27

*Access Now, Inc. v. Sw. Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004) ......................................................................7

*Amalgamated Transit Union Local 85 v. Port Auth.*,
    39 F.4th 95 (3d Cir. 2022) ............................................................................18

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ...............................................19, 22

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)......... 1, 2, 3, 4, 5, 8, 9, 10, 12, 21

*Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019).........................................16

*City of San Diego v. Roe*, 543 U.S. 77 (2004) .......................................................11

*Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237 (6th Cir. 2006).........12

*Connick v. Myers,* 461 U.S. 138 (1983)...................................................................1

*Davis v. FEC,* 554 U.S. 724 (2008) .....................................................................7, 8

*Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014)....................................................17

*Fla. Dep't of State v. Martin*, 916 So. 2d 763 (Fla. 2005)......................................27

*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ........................................................1, 13

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).................................10

*Jones v. Gov. of Fla.*, 975 F.3d 1016 (11th Cir. 2020) ...........................................24

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967)..................................................................................5, 12

*Lee v. York Cnty. Sch. Div.*, 484 F.3d 687 (4th Cir. 2007)....................................16

*Matal v. Tam*, 582 U.S. 218 (2017) ......................................................................15

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) ..............14

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .............................................16

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...............................24

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022)..........................21

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist.,*
    391 U.S. 563 (1968)................................................................................1, 17

ii

*Pleasant Grove City v. Summum,* 555 U.S. 460 (2009) ....................................13, 15

*Rosenberger v. Univ. of Va.*, 515 U.S. 819 (1995) ........................................5, 13, 14

*Rust v. Sullivan*, 500 U.S. 173 (1991)......................................................................13

*San Filippo v. Bongiovanni*, 961 F.2d 1125 (3d Cir. 1992) ....................................21

*Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022) ..........................................14, 15

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    No. 20–1199 (U.S. June 29, 2023) .........................................................25, 26

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) .....................................................12

*United States v. Hansen*, No. 22-179, (U.S. June 23, 2023)........................7, 22, 23

*United States v. NTEU*, 513 U.S. 454 (1995) ..........................................................11

*Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649 (2018)......................26, 27

*Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000)...................................................22

*Vill. of Hoffman v. Flipside*, 455 U.S. 489 (1982)..................................................24

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ............................16, 17

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)..................................................................................14, 15

*Waters v. Churchill,* 511 U.S. 661 (1994) ...........................................................1, 21

*Wolfe v. Barnhart*, 446 F.3d 1096 (10th Cir. 2006) ................................................18

## Statutes and Regulations

Fla. Stat.

    § 1000.05(4)(a) .............................................................................................11
    § 1000.05(4)(a)1 .............................................................................................2
    § 1000.05(4)(b)...............................................................................................15

Regulation 10.005 ...................................................................................................11

**INTRODUCTION**

"[C]onstitutional review of government employment decisions," whether under the First Amendment or the Due Process Clause, "must rest on different principles than the review of speech restraints imposed by the government as sovereign" on private citizens. *Waters v. Churchill,* 511 U.S. 661, 674 (1994). Accordingly, a government employee's speech on a matter of purely private concern is not protected by the First Amendment from employer sanctions. *Connick v. Myers,* 461 U.S. 138, 146-149 (1983). And even when a government employee comments as a citizen on a matter of public concern, the employee's speech can be sanctioned if the employee's interest in uttering it is outweighed by the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.,* 391 U.S. 563, 568 (1968). And when government employees speak "pursuant to their official duties," their speech is the government's speech, wholly unprotected by the First Amendment. *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006).

These principles apply no less to public educators than to all other government employees, and they compelled the conclusion that the State, in this Court's prescient words in *Bishop*, "must have the final say in ... a dispute" with a professor "about a matter of content in the courses he teaches." *Bishop v. Aronov*, 926 F.2d 1066, 1076 (11th Cir. 1991).

1

But Plaintiffs say this Court's decision in *Bishop* is not their foe, but rather their friend, supporting their claim that the First Amendment vests them with the "academic freedom" to espouse in their classrooms such "pedagogically relevant" personal beliefs as, for example, that "[m]embers of one race ... are morally superior to members of another race." *See* FLA. STAT. § 1000.05(4)(a)1. They argue that the Individual Freedom Act's ("Act") prohibition on their classroom advocacy of this concept and seven similar concepts cannot survive scrutiny under *Bishop*'s three-factor balancing test for, as this Court put it, "calibrat[ing] the Constitution" in cases such as this. 926 F.2d at 1074.

One would expect, then, that Plaintiffs would make some effort to explain how their argument can possibly be squared with the *rule* established in *Bishop* as a result of the Court's calibration: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments," and so "the University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id.* at 1077. But Plaintiffs do not even *mention Bishop*'s unequivocal *rule* that "[t]he University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078.

2

Even if Plaintiffs could expunge the dispositive passages from *Bishop* simply by ignoring them, a straightforward application of *Bishop's* three-factor balancing test is no less fatal to their constitutional claim.

With respect to the first factor—the classroom context of Dr. Bishop's speech—the Court emphasized "the coercive effect upon students that a professor's speech inherently possesses and that the University may wish to avoid," *id.* at 1074, lest the professor's speech "create[] the appearance of *endorsement* of that position by the University," *id.* at 1078 (emphasis added). Just as the university in *Bishop* insisted on "the separation of [Dr. Bishop's] personal views from his professorial duties," *id.* at 1076 n.7, the Act insists that university professors not use their inherent influence with students to inculcate their personal views endorsing the prohibited concepts. Plaintiffs argue that *their* personal opinions endorsing the concepts are pedagogically relevant to their classes, while *Dr. Bishop*'s personal religious beliefs were wholly irrelevant to his physiology courses. *Pernell*, Doc. 52 at 25 (June 16, 2023) ("Pernell Br."); *Novoa*, Doc. 31 at 32 (June 16, 2023) ("Novoa Br."). But the *Bishop* Court expressly accepted that Dr. Bishop's "religious viewpoint" "represents his professional opinion about his subject matter," 926 F.2d at 1077, 1076 n.7, and yet the Court upheld the university's (that is, the State's) authority to demand that he keep his personal views to himself.

The second factor balanced in *Bishop*—the university's status as Dr. Bishop's "public employer which may reasonably restrict the speech rights of employees"—obviously cuts against Plaintiffs' First Amendment claim, given "the University's authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.* at 1074. But Plaintiffs say this factor cuts in their favor for two reasons.

First, Plaintiffs argue that *Bishop* dealt with a restriction on a single professor, while the Act restricts professors in all state institutions. Pernell Br. 26; Novoa Br. 38. There is no doubt at all, however, that *Bishop* would have come out the same way if the Court had been reviewing a university-wide policy. Indeed, this Court said as much: "The University necessarily has dominion over what is taught by its *professors* and may so manage *them*." *Bishop*, 926 F.2d at 1078 (emphasis added). Second, Plaintiffs argue that *Bishop* is distinguishable because it involved a classroom speech restriction imposed by the university, while this case involves restrictions imposed by the *legislature*. Pernell Br. 25-26. This is true, but Plaintiffs are reading the organization chart for public universities upside down: the *legislature* clearly has the authority to define and prevent invidious discrimination in the universities that it creates and funds, and Plaintiffs can cite no case supporting the notion that a public university has constitutional autonomy from legislative control.

4

The final *Bishop* factor was "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." 926 F.2d at 1075. Throughout their briefs, Plaintiffs repeatedly quote the "pall of orthodoxy" dictum from *Keyishian* as an all-purpose trump card decisively supporting their academic freedom claim. *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967). The *Bishop* Court also quoted this same passage from *Keyishian*, but did not accord it significant, let alone dispositive, weight—holding instead that *Keyishian's* "pronouncements about academic freedom" "cannot be extrapolated to deny schools command of their own courses" and that the Court could "not find support to conclude that academic freedom is an independent First Amendment right." 926 F.2d at 1075.

*Bishop* was actually a harder case than this one, for it was decided before the Supreme Court's subsequent cases establishing the government speech doctrine. Those cases hold that when the government itself speaks, "it is entitled to say what it wishes." *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 833 (1995). And speech uttered by government employees "pursuant to their official duties" is the government's own speech and thus not constitutionally protected from the government's restrictions. *Garcetti*, 547 U.S. at 421. The essential official duty of public university educators is to speak; that is the very purpose of their job. If any public employees are within the government speech doctrine, surely they are.

5

Plaintiffs, and the court below, argue that public university educators, uniquely among all government employees, lie outside the scope of the doctrine; that they stand alone, as the "priests of democracy" according to the district court, on a First Amendment pedestal, free to say what they please no matter what their government employers, including even the State Legislature, think about it. This is not a tenable understanding of the First Amendment.

Finally, Plaintiffs' efforts to rescue the district court's vagueness analysis also fail. Plaintiffs dispute the district court's application of the relaxed "ordinary, common sense" vagueness standard for public employees, but they fail to grapple with the binding precedent that establishes it. And on the merits, Plaintiffs' vagueness arguments are, like the district court's reasoning, all fatally flawed for the reasons explained in our opening brief and below. *Pernell*, Doc. 45 at 45-53 ("Op. Br.").

## ARGUMENT

## I.    Plaintiffs Lack Standing To Challenge the Act's First, Third, Fifth, and Sixth Concepts.

As explained in our opening brief, Op. Br. 19-23, Plaintiffs did not demonstrate—nor even adequately allege—that their prior or intended instruction would plausibly violate every concept in the Act. Plaintiffs do not dispute that the district court made their standing arguments for them, searching the record and concluding that Plaintiffs had standing for a preliminary injunction with respect to

6

every provision of the Act. Yes, "courts routinely review allegations from the movant's declarations, in addition to the complaint and legal briefs," Pernell Br. 17, but surely a district court's advocacy for *standing arguments* that the Plaintiffs *never made anywhere* "depart[s] so drastically from the principle of party presentation as to constitute an abuse of discretion." *United States v. Hansen*, No. 22-179, slip op. at 3 (U.S. June 23, 2023) (internal quotation marks omitted).[1]

On appeal, the Plaintiffs attempt to cure their failure by adopting the district court's arguments explaining why particular facts from the record suffice to demonstrate standing to challenge every concept in the Act. *See* Pernell Br. 18-20; Novoa Br. 22-25. These arguments, first offered on appeal, are forfeited. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

And Plaintiffs' suggestion that they may "challenge … the Act as a whole," Pernell Br. 22, without identifying what intended instruction is arguably proscribed by any particular provision within the Act cannot be squared with the bedrock

---

[1] Perhaps the most vivid example was the district court's mining of Dr. Park's declaration for standing arguments with respect to the concepts as applied to speech about "sex." *See* App.352-54. In their preliminary-injunction memorandum, Plaintiffs referenced Dr. Park's teaching regarding "sex" *only* with respect to concept 8. *See* Pernell, Doc. 13 at 25 (N.D. Fla. Aug. 24, 2022). But the district court held that Dr. Park *also* had standing for a preliminary injunction against the enforcement of concepts 1, 3, 4, 5, and 7. App.354. Although Dr. Park's *declaration* could possibly have supported additional standing theories apart from concept 8, Plaintiffs did not make those arguments.

7

principle that "[s]tanding is not dispensed in gross," *Davis v. FEC,* 554 U.S. 724, 734 (2008); App.335.

## II.    The Act Does Not Violate the First Amendment.

### A. *Bishop* Squarely Controls This Case.

Plaintiffs' arguments, like the district court's analysis, squarely conflict with this Court's decision in *Bishop*. There, this Court made clear that public-university professors do not hold a First Amendment license to determine what is taught in the classroom. To the contrary, when a professor and the university disagree "about a matter of content in the courses he teaches," the "University must have the final say in such a dispute." *Bishop*, 926 F.2d at 1076. Ignoring this clear holding of *Bishop*, Plaintiffs argue primarily that *Bishop*'s three-factor balancing analysis yields a contrary result here. They misread *Bishop* at every turn.

To start, Plaintiffs steadfastly refuse to acknowledge that *Bishop* established *a rule* in the context of in-class instruction. *Bishop* was unequivocal: "The University's conclusions about course content must be allowed to hold sway over an individual professor's judgments," and so "the University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id.* at 1077. This is so, according to *Bishop*, because the "University necessarily has dominion over what is taught by its professors and may so manage them." *Id.* at 1078. Thus, although *Bishop* set forth a balancing test

8

governing speech by professors generally, the Court *conclusively resolved* the balance with a per se rule governing instructional speech in the classroom.

Even if the court below were somehow free to conduct *Bishop*'s balancing anew, all three of the factors show that the Act is well within the State's constitutional authority to control the classroom speech of the State's educators.

With respect to the first factor, "the context" of the speech at issue here is exactly the same as in *Bishop*: "the university classroom during specific in-class time." *Id.* at 1074. And that context here raises precisely the same dangers—"the coercive effect upon students that a professor's speech inherently possesses," *id.,* and the "appearance of endorsement" of that speech by the university, *id.,* at 1078. Like the district court, Plaintiffs contend that the First Amendment permits the State to regulate instructional speech only based on its *relevance* to the *subjects* taught in the curriculum; it may not, say Plaintiffs, restrict a professor's advocacy of personal viewpoints that are relevant to his or her course subjects. According to Plaintiffs, the Court allowed the university to regulate Dr. Bishop's speech only because his personal religious beliefs "had nothing to do with" his physiology courses. *See* Pernell Br. 41; Novoa Br. 35. But *Bishop* says precisely the opposite: the Court *expressly accepted* that Dr. Bishop's "religious viewpoint" "represents his professional opinion about his subject matter." 926 F.2d at 1077, 1076 n.7. And it is

the university, not the professor, that has "the final say" on the relevance of the professor's viewpoints to the courses it offers in its classrooms. *Id.* at 1076.

Plaintiffs argue that the ban on Dr. Bishop's religious viewpoint was not viewpoint discrimination because it was merely excluding "religious views" from a "secular class." Pernell Br. 25. But a restriction on "religious" expression is perforce viewpoint discriminatory. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111-12 (2001). The *Bishop* Court's repeated references to Dr. Bishop's religious *viewpoint* was neither accidental nor mistaken.

*Bishop*'s second factor—the university's authority as a "public employer" to "reasonably restrict the speech rights of employees" and "reasonably control the content of its curriculum, particularly that content imparted during class time," 926 F.2d at 1074—also decisively favors the Act's constitutionality. Plaintiffs resist this conclusion, pointing out that *Bishop* involved a lone university's action against one professor, while this case involves a state-wide regulation of curricular speech. But the principles articulated by this Court were not targeted at Dr. Bishop: the Court would not have struck down a university-wide or state-wide policy barring all professors from espousing their personal religious beliefs in class. It held, after all, that the "University necessarily has dominion over what is taught by its *professors* and may so manage *them*." *Id.* at 1078 (emphasis added).

10

Nor is Plaintiffs' cause helped by the Supreme Court's decision in *United States v. NTEU*, 513 U.S. 454 (1995). *See* Novoa Br. 36-39. *NTEU* struck down a statute prohibiting federal employees from receiving compensation for their writing and speeches not because it involved a government-wide regulation, but "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment" and took "place outside the workplace" on the employees' own time. 513 U.S. at 470; *see also City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). Here, in contrast, the speech at issue *only* involves the subject matter of government employment and takes place *only* in the classroom or other instructional setting. *See* FLA. STAT. § 1000.05(4)(a). The Act does not apply to Plaintiffs' "academic scholarship," Pernell Br. 3, speeches outside of class, or publications. Nor does the Act, contrary to Plaintiffs' and the district court's claims, reach speeches or debates by guest speakers or other invitees, unless they speak with the imprimatur of the State. *See* Op. Br. 40-41 & n.6; Regulation 10.005 (defining "instruction" as teaching "by a university employee" or other person "authorized to provide instruction by the university within a course")

Plaintiffs also argue that *Bishop*'s resolution of the second factor is distinguishable because *Bishop* involved a restriction imposed by "the academy," while this case involves restrictions imposed by the *legislature*. Pernell Br. 31-32; *see also* Novoa Br. 32. This remarkable argument, not surprisingly, is unsupported

by citation to any authority. The idea that "[u]niversities, as subordinate organs of the State, have First Amendment rights against" or above "the State or its voters" is antithetical to any proper understanding of State sovereignty. *See Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006); *see also* Op. Br. 39-40.

Finally, just as "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment" did not outweigh the university's authority in *Bishop* to control how its own professors taught its own courses, Plaintiffs repeated incantation of dicta about academic freedom from *Keyishian* ("pall of orthodoxy") and *Sweezy* ("free to inquire") cannot yield a different result here. *See* Pernell Br. 31, 35. The *Bishop* Court quoted this same passage from *Keyishian*, *see* 926 F.2d at 1075, and yet squarely held that the Supreme "Court's pronouncements about academic freedom" in such cases "cannot be extrapolated to deny schools command of their own courses." *Id.* And *Keyishian* and *Sweezy* are inapposite in any event, for they involved state laws that excluded from public employment *any* person who engaged in *any* "subversive" speech or associations, including teachers, whether such speech occurred in or out of the classroom. *Keyishian*, 385 U.S. 592; *Sweezy v. New Hampshire*, 354 U.S. 234, 236 (1957).

12

**B. The Speech at Issue Is Government Speech.**

The *Bishop* Court was ahead of its time, accurately anticipating the Supreme Court's now well-established "government speech" doctrine, which holds that the government has control over the content, including viewpoints, of its own speech. Under *Rosenberger*, it is the State "speaking" when it "determines the *content of the education* it provides." 515 U.S. at 833 (emphasis added). Under *Rust*, when the State of Florida "appropriates *public funds* to promote a particular policy of its own it is entitled to say what it wishes." *Id.* (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). Under *Pleasant Grove City v. Summum*, the government may "express its views" when "delivering a government-controlled message" on the *government's property*—even when "it receives assistance from private sources for the purpose of delivering [that] message." 555 U.S. 460, 468 (2009). And under *Garcetti*, when "*public employees* make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421 (emphasis added).[2] The Act touches all these bases: Florida's educators are the

---

[2] The Supreme Court's recent decision in *303 Creative LLC v. Elenis*, No. 21-476, slip op. (U.S. June 30, 2023), provides yet another illustration of this critical distinction. There, the Court held that Colorado could not compel a private website designer "to speak in ways that align with [the State's] views but defy her conscience about a matter of major significance." *Id.* at 25. But the Court did not call into any question Colorado's obvious authority to direct the website designers that *the State itself employs to work on its own websites* to "align with its views" when they are redesigning, say, the Office of the Governor's website.

State's employees, hired to teach the State's curriculum, in the State's classrooms, in return for a State paycheck. The Act is thus constitutional four times over.

As detailed in our opening brief, Op. Br. at 29-30, several circuits, including this one, have applied the principles from the government-speech cases to in-class speech by public educators. Plaintiffs' efforts to avoid these cases are meritless. First, contrary to Plaintiffs' suggestion, Novoa Br. 40-41, *Garcetti*'s *reservation* of the question whether it applied to the academic context is obviously not a *holding* that it does *not* so apply. And *the reasoning* of *Garcetti* clearly supports its application to classroom teachers, whose essential official duty is speaking. *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007).

The *Novoa* (but not *Pernell*) Plaintiffs next assert that Defendants "waived" reliance on a "government-funding theory." Novoa Br. 50-51. But Defendants' invocation of the government-funding line of government speech cases is not a standalone "theory." Instead, the seminal government-funding case, *Rust*, forms part of the bedrock of the government-speech doctrine—which is why it is cited in the major government-speech cases and on the very pages that Defendants cited below. *See, e.g.*, *Rosenberger*, 515 U.S. at 833; *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015). The same goes for the leading government-property case, *Pleasant Grove*. *See Walker*, 576 U.S. at 207; *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022).

14

Plaintiffs also contend that the Act is unconstitutional because it seeks to "suppress the expression" of particular viewpoints. Pernell Br. 27. As an initial matter, the Act expressly permits classroom discussion of *any* viewpoint "in an objective manner without endorsement." FLA. STAT. § 1000.05(4)(b). More importantly, "imposing a requirement of viewpoint-neutrality on government speech would be paralyzing. When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture." *Matal v. Tam*, 582 U.S. 218, 234 (2017).

Plaintiffs next spend several pages arguing that classroom speech by public educators does not qualify as government speech under the three-factor test outlined in *Shurtleff*. Pernell Br. 35-37. But that analysis is wholly inapplicable here; it applies only in determining whether a message that is the result of a "government-public engagement"—meaning the government has "invite[d] the people to participate in a[n expressive] program"—is the government's own speech or private speech. *Shurtleff*, 142 S. Ct. at 1589 (privately owned flags flown on city flagpole expressed the flag owner's message); *Walker*, 576 U.S. at 213 (designs proposed by private groups for state license plates expressed state's message); *Pleasant Grove City*, 555 U.S. at 470-73 (privately funded and donated monuments on public property express government's message). But governments speak through the words

15

of their employees, and here, the State *hires* educators—for the purpose of speaking on its behalf—to teach the State's curriculum.

Plaintiffs vastly overstate the extent to which other circuits have interpreted the government speech cases differently in this context. Plaintiffs say *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), "considered *Garcetti*'s open question" and "concluded that academic speech—including in the classroom—is *not* government speech subject to *Garcetti*." Novoa Br. 42 & n.19. But although *Buchanan* applied the *Pickering* balancing test to a teacher's classroom comments, it does not even cite, let alone analyze, *Garcetti*. Plaintiffs also say the Fourth Circuit has refused to apply *Garcetti* to in-class speech, *id*., but they leave out a crucial detail: The Fourth Circuit has *also* held that speech that is "curricular in nature" is "not protected by the First Amendment," *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696-97 (4th Cir. 2007)—which leads to the same result as applying *Garcetti* to in-class speech.

Plaintiffs also highlight the Sixth Circuit's decision in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), which does conclude that *Garcetti* is not applicable to higher education. But the university there sought to compel a university professor to profess a personal *belief* that the professor did not hold—indeed, that he rejected as a matter of religious faith. *See* 992 F.3d at 503. And it is well established that the government cannot constitutionally compel any person, including an employee, to falsely profess a personal belief. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S.

16

624, 642 (1943) (West Virginia could not constitutionally require schoolchildren to recite a pledge that contravened their convictions); *303 Creative*, slip op., at 11. Defendants have acknowledged throughout this litigation that the First Amendment does not permit the State to compel "expression of *beliefs* that professors do not hold." App.300 n.7. Under the Act, no professor is required to express any personal belief that he does not hold.

That leaves the Ninth Circuit's decision in *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). And yes, *Demers* states that "*Garcetti* does not apply to speech related to scholarship or teaching." *Id.* at 406 (internal quotation marks omitted). But even in *Demers*, the relevant speech was *not* in-class curricular speech, but rather the "distributing [of] a short pamphlet and drafts from an in-progress book" unrelated to the professor's classroom instruction. *See id.* at 406-408. *Demers*'s nonbinding holding that *Pickering*'s balancing test applies in that different context does not dictate the result here.

Moreover, even if the Court were to decide this case under *Pickering*, Plaintiffs' claims would still fail. Recognizing a right of public educators to *contradict* the State's prescribed curriculum would unquestionably "imped[e] the teacher's proper performance of his daily duties in the classroom." *Pickering*, 391 U.S. at 572-73. Indeed, it would *subvert* the teacher's classroom duties.

Plaintiffs assert that viewpoint discrimination is *per se* unlawful under *Pickering*, Novoa Br. 29, citing two out-of-circuit cases. But those cases actually held that a viewpoint restriction failed under *Pickering* when the relevant speech was *unrelated* to the employee's duties. *See Amalgamated Transit Union Local 85 v. Port Auth.*, 39 F.4th 95, 103 (3d Cir. 2022) (expressive displays on facemasks worn by port authority workers); *Wolfe v. Barnhart*, 446 F.3d 1096, 1097 (10th Cir. 2006) (textbook published by an ALJ). Where, as here, the relevant speech—teaching the State's curriculum—*is the very purpose* of the employee's job, the *Pickering* balance tilts entirely in the government's favor.

Plaintiffs acknowledge that the First Amendment does not protect a professor's harassing or hostile instructional speech if it is so "severe, pervasive, and objectively offensive" that it triggers Title VI or Title IX liability for the university. Novoa Br. 33-34; *see also* Pernell Br. 28-29. The cases Plaintiffs cite dealt with the question of when the harassing or hostile speech of a *teacher or student* is severe enough to impose damages liability on *the university*. *See* Novoa Br. 33-34 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). But these cases are lethal to Plaintiffs' First Amendment claims. For surely a State may constitutionally discipline *its own employees* for official-duty speech that falls short of triggering damages liability for the State under a federal statute. Plaintiffs' argument would effectively give Title VI and Title IX preemptive effect—setting the constitutional

floor for what speech States must tolerate from their own employees. Plaintiffs offer no authority for that proposition, and the Supreme Court's government speech cases refute it.

Finally, the Act would satisfy even strict scrutiny. As explained, the Act serves the compelling government interest of preventing invidious racial discrimination, Op. Br. 58, and "reducing racism," *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up). Remarkably, Plaintiffs assert that this government interest identified in *Arce* is not even "a legitimate" interest at the university level. *See* Novoa Br. 29.[3] But the State of Florida believes that "reducing racism," *Arce*, 793 F.3d at 985-86, is a compelling interest at both K-12 schools *and* public universities.

### C. Plaintiffs' Proposed Test Is Wholly Unworkable and Would Lead to Unacceptable Results.

Plaintiffs' (and the district court's) theory that the State may regulate instructional speech based on *content* (the *subjects* taught in the curriculum) but not *viewpoint* (the personal viewpoints espoused by educators during classes on those subjects), Pernell Br. 32, would yield startling and unacceptable consequences.

In Plaintiffs' view, once the State offers a particular course subject, no viewpoint is off limits. *See* Novoa Br. 26 (asserting the Act is unconstitutional

---

[3] Plaintiffs effectively concede that the Act is constitutional as applied to K-12 schools. *See* Novoa Br. 49 n.25; Pernell Br. 30.

simply "because it is viewpoint-discriminatory"). As explained in our opening brief (at 41-42), that theory would require a State to silently endure a professor who denies the Holocaust in a class discussing World War II or champions white supremacy in a class discussing Jim Crow. Plaintiffs dismiss these instances as "imagined hypotheticals," Novoa Br. 18, even though one of them is reported in a published federal decision and the other in recent news stories, Op. Br. 41-42.

Second, perhaps sensing the unacceptable implications of their all-viewpoints-allowed theory, Plaintiffs claim that "[v]iewpoint-neutral academic standards" that confine a professor's instruction to "relevant" and "pedagogically appropriate" instruction "are more than sufficient to address Holocaust denial." Pernell Br. 30-31. But how can that be? Surely, a viewpoint regarding the Holocaust would be "relevant" to a class discussing any variety of topics—World War II, genocide, the history of the German or Jewish people. Plaintiffs utterly fail to explain what does and does not count as "relevant" under their test. The same goes for the district court, which held that "critical race theory" is not relevant to "botany," but theories of "systemic discrimination" are somehow relevant to *statistics*. *See* Op. Br. 33 n.5. And it is no answer for Plaintiffs to say that "Holocaust denial" is "factually wrong," Novoa Br. 46, because it is Florida's judgment that the Act's enumerated concepts—*e.g.*, the proposition that one race is morally superior to another race—are also "factually wrong." In the end, Plaintiffs' proposed limit simply returns the

20

Court to the critical question: Who is to decide what is "relevant"? And *Bishop* clearly answered that question: "Federal judges should not be ersatz deans or educators," and the "University necessarily has dominion over what is taught by its professors and may so manage them." 926 F.2d at 1075, 1078.

## III.    The Act Is Not Unconstitutionally Vague.

Plaintiffs also failed to demonstrate a likelihood of success on their vagueness claim. Plaintiffs dispute that the Court has established a relaxed vagueness standard *for public employees*, Pernell Br. 38; Novoa Br. 51, n.26, but this Court's precedent says this:

> In the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge. Such standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge.

*O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022); *see also Churchill*, 511 U.S. at 673 ("[S]urely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." (citing *Arnett v. Kennedy*, 416 U.S. 134, 159 (1974))). And Plaintiffs cannot explain how the Act could be unconstitutionally vague while a standard governing dismissal of educators for "failure to maintain standards of sound scholarship and competent teaching" is permissible. *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992).

Plaintiffs suggest that a "more stringent standard" should apply to "higher education" rather than the vagueness standard that applies to *all other* public employees, Novoa Br. 51 n.26, thus enlarging the professoriate's supposed First Amendment pedestal to include due process as well. This "argument raises the specter of a constitutional right enjoyed by only a limited class of citizens"—a contention that is "audaci[ous]" and "manifestly at odds with a constitutional system premised on equality." *Urofsky v. Gilmore*, 216 F.3d 401, 411 n.13 (4th Cir. 2000) (en banc). Nor does *Keyishian* support Plaintiffs' bespoke "for-higher-education-only" vagueness standard, since that case (1) did not address the plaintiffs' status as government employees, or the implications of that status for the vagueness analysis; and (2) predates the binding precedent adopting a relaxed vagueness standard for government employees.

On substance, Plaintiffs offer no response to the fact that the operative verbs in the Act require *scienter* and thus mitigate any vagueness concern. *See* Op. Br. 48; *Arce*, 793 F.3d at 988-89 (verbs like "advocate" and "promote" "impl[y] an affirmative act and intent"). Nor do Plaintiffs respond to the fact that the Board's implementing regulation offers professors an opportunity to cure before any punishment can be imposed. *See* Op. Br. 48. Instead, Plaintiffs seem to ask this Court to "apply a canon of 'constitutional collision'" rather than constitutional avoidance. *Hansen*, slip op. at 16. But when "legislation and the Constitution brush up against

each other," the Court's "task is to seek harmony, not to manufacture conflict." *Id.* at 16-17. Thus, even if the Court believes that Defendants' reading of the Act is not the better one, the *constitutional* reading should prevail.

Like the district court, Plaintiffs contend the word "objective" is unconstitutionally vague. First, the word "objective" does not stand alone in describing permissible "instruction" under the Act. It is part of a phrase—"in an objective manner *without endorsement*"—whose plain meaning is clear to anyone not determined to misunderstand it. Second, Plaintiffs repeat the refrain that the Act "redefined" the word "objectivity" because the Act permits professors to criticize but not endorse the concepts. Novoa Br. 52-53. As previously explained, that argument rests on a "fundamental and obvious misunderstanding of the Act's text and structure." *See* Op. Br. 52. The Act prohibits endorsement in one section, expressly permits discussion in an objective manner without endorsement in a separate section, and simply does not address criticism anywhere (meaning criticism is allowed). Nothing about this structure "redefines" objectivity.

Next, Plaintiffs say the meaning of "objectively" eludes them. *See* Pernell Br. 45. But Plaintiffs repeatedly acknowledge, apparently oblivious to the irony, that for speech to trigger a federal funding recipient's liability under Title VI and Title IX, it must be "objectively offensive." Novoa Br. 33-34. Nowhere do they suggest that this standard is "far too evanescent to permit the imposition of legal penalties in the

classroom." Pernell Br. at 14. The "objective" standard is ubiquitous in American law, *see* Op. Br. 51, and declaring it void for vagueness would call into question our entire legal system.

Finally, Plaintiffs and some *amici* conjure a litany of hypotheticals that, they say, show the Act is vague. As an initial matter, "a law is not rendered vague by the possibility that it will sometimes be difficult to determine the existence of an incriminating fact." *Jones v. Gov. of Fla.*, 975 F.3d 1016, 1047 (11th Cir. 2020) (*en banc*) (cleaned up). This principle partly explains why the Court should be "reluctant" to "invalidate legislation on the basis of its hypothetical application to situations not before the Court." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 584 (1998).

Moreover, because Plaintiffs bring a *pre-enforcement* vagueness challenge, "the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness." *Vill. of Hoffman v. Flipside*, 455 U.S. 489, 503 (1982). The State cannot be accused of "arbitrary" enforcement when it has never enforced the law in the first place.

In any event, nearly all the hypotheticals proffered by Plaintiffs and their *amici* are based on misreadings of the Act's provisions. First, all the hypotheticals incorrectly assume that the statute lacks a *scienter* requirement. For example, Plaintiffs say that violation of the statute turns on "the reaction of the student." *See*

Pernell Br. 47; Novoa Br. 53. But as already explained, the Act's operative verbs require *scienter*, so a violation of the statute turns on the professor's *mens rea*, not on how someone else "may perceive" the comment at issue.

Next, Plaintiffs and their *amici* suggest that a professor will violate the Act by engaging in standard teaching methods, such as the Socratic method or "devil's advocacy." But they offer no explanation how a professor merely asking Socratic questions could reasonably be said to have *endorsed* any of the Act's concepts. Similarly, a professor employing "devil's advocacy" is, by definition, adopting a position purely for *argument's sake*, not to *actually endorse it*. And again, the Act's scienter requirement—when combined with the professor's opportunity to cure— would eliminate any vagueness concern as applied to this practice. The same goes for "guest speakers," "assigned reading," or providing "written material." *See* Novoa Br. 3, 7. Those acts do not violate the Act if the professor does not *intend* to endorse one of the prohibited concepts by carrying them out.

Plaintiffs repeatedly place advocacy for "affirmative action" at the head of their parade of speech banned by the Act. At the heart of the Act is the fundamental principle that an immutable characteristic such as race "may never be used as a 'negative' and ... may not operate as a stereotype," *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, No. 20–1199, slip op. at 27 (U.S. June 29, 2023), for "it demeans the dignity and worth of a person to be judged by

[such characteristics] instead of by his or her own merit and essential qualities," *id.* at 29. If by "affirmative action," Plaintiffs mean, per concept 6, "discriminating against" a person "by virtue of his or her race ... to achieve diversity, equity, or inclusion"—the very practice that the Supreme Court just held is unlawful racial discrimination, *see id.* at 22—then yes, the State may prohibit its educators from endorsing racial discrimination while speaking on behalf of the State, in a State classroom, and in return for a State paycheck.

One *amicus* spins a series of hypotheticals regarding the application of concepts 4 and 6 to speech about "sex." *See Pernell,* Br. for Academic Freedom Alliance as *Amicus Curiae* Supporting Defendants-Appellees, Doc. 55 (June 19, 2023). But the Act's application to speech concerning "sex" was not pressed below. The Novoa Plaintiffs' preliminary-injunction memorandum does not even contain the word "sex," *see Novoa*, Doc. 19 (N.D. Fla. Sep. 15, 2022), and the Pernell plaintiffs' memorandum referenced "sex" only with respect to Dr. Park, and that reference was limited to the oblique claim, with respect to concept 8's prohibition on espousing that "[s]uch virtues as ... objectivity are racist or sexist," that "objectivity frequently reflects dominant white, straight, male values," *Pernell*, Doc. 13 at 25 (N.D. Fla. Aug. 24, 2022) (cleaned up). Because this is a Court of review, not "first view," it should not address *amicus*'s arguments regarding the application of concepts 4 and 6 to speech regarding "sex" in this preliminary injunction appeal.

*See Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1654 (2018) (declining to consider arguments that "ma[d]e their appearance" only in an *amicus* brief after filing of opening brief).

## IV.    Any Unconstitutional Provisions Are Severable.

To the extent the Court deems any concept or any *part* of a concept unconstitutional, the Court should sever the unconstitutional provision and leave the rest of the Act intact. *See* Op. Br. 53-54. Plaintiffs use catchphrases like "cohesive framework" to justify throwing out the Act entirely. Novoa Br. 57. But more than jargon is required to overcome "the *obligation* of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." *Fla. Dep't of State v. Martin*, 916 So. 2d 763, 773 (Fla. 2005) (emphasis added).

## V.    Equitable Considerations Favor Reversal.

Finally, Plaintiffs' various arguments that they will suffer irreparable harm if the preliminary injunction is stayed are all parasitic on their merits claims, *see* Pernell Br. 53-55; Novoa Br. 58-59, and thus collapse alongside those claims. By contrast, the district court's preliminary injunction causes the ongoing irreparable harm of preventing Florida from enforcing its law. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed and the preliminary injunction should be vacated.

Dated: July 7, 2023                  Respectfully submitted,

                                     /s/ Charles J. Cooper
                                     Charles J. Cooper
                                     John D. Ohlendorf
                                     Megan M. Wold
                                     John D. Ramer
                                     COOPER & KIRK, PLLC
                                     1523 New Hampshire Avenue, N.W.
                                     Washington, D.C. 20036
                                     Telephone: (202) 220-9600
                                     Facsimile: (202) 220-9601
                                     ccooper@cooperkirk.com
                                     johlendorf@cooperkirk.com
                                     mwold@cooperkirk.com
                                     jramer@cooperkirk.com

                                     *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i) because this brief contains 6,495 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and 11th CIR. R. 32-4.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: July 7, 2023                          /s/Charles J. Cooper
                                             Charles J. Cooper
                                             *Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on July 7, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 7, 2023                    /s/Charles J. Cooper
                                       Charles J. Cooper
                                       *Counsel for Defendants-Appellants*