Nos. 22-13992 & 22-13994

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# ELEVENTH CIRCUIT

LEROY PERNELL, ET AL.,

*Plaintiffs-Appellees,*

v.

BRIAN LAMB, ET AL.,

*Defendants-Appellants.*

---

ADRIANA NOVOA, ET AL.,

*Plaintiffs-Appellees,*

v.

MANNY DIAZ, JR., ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the Northern District of Florida, Nos. 4:22cv304-MW/MAF & 4:22cv324-MW/MAF

## BRIEF OF *AMICUS CURIAE* FIRST AMENDMENT LAWYERS ASSOCIATION IN SUPPORT OF APPELLEES FOR AFFIRMANCE

Marc J. Randazza
Randazza Legal Group, PLLC
2 S. Biscayne Boulevard
Suite 2600
Miami, FL 33131
(786) 800-3500
ecf@randazza.com

Jay M. Wolman
Randazza Legal Group, PLLC
100 Pearl Street
14th Floor
Hartford, CT 06103
(203) 539-6666
jmw@randazza.com

D. Gill Sperlein
Law Offices of D. Gill Sperlein
345 Grove Street
San Francisco, CA 94102
(415) 404-6616
gill@sperleinlaw.com

Attorneys for *Amicus Curiae First Amendment Lawyers Association*

## CERTIFICATE OF INTERESTED PARTIES AND CORPO-
## RATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case, and were omitted from the Certificates of Interested Persons in briefs that were previously filed per 11th Cir. R. 26.1-2(b):

- First Amendment Lawyers Association, *amicus curiae*

- D. Gill Sperlein, *counsel for amicus curiae*

- Marc J. Randazza, *counsel for amicus curiae*

- Jay Marshall Wolman, *counsel for amicus curiae*

The First Amendment Lawyers Association is a not-for-profit corporation exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501 (c)(3). It does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest in the company.

Date: June 23, 2023.                    RANDAZZA LEGAL GROUP, PLLC

/s/ Jay M. Wolman
Jay M. Wolman

*Attorney for Amicus Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
DISCLOSURE STATEMENT .................................................... 1

INTEREST OF *AMICUS CURIAE* ........................................ 1

STATEMENT OF THE ISSUES ............................................. 3

SUMMARY OF ARGUMENT................................................. 3

ARGUMENT ............................................................ 4

    I.    Pre-Enforcement Anticipatory Challenges Serve an Important Role in
Crafting First Amendment Free Speech Doctrine. .................................. 4

        A.    Election Speech ........................................ 5

        B.    Commercial Speech and Related Corporate  Expression ................ 7

        C.    Sexually Explicit Speech .................................. 9

        D.    Licensing and Permitting Regulations on Speech ......................... 11

    II.    Absent the Ability to Raise a Pre-Enforcement Challenge, Speakers will
be Forced to Engage in Conduct Antithetical to the First Amendment. ............... 14

    III.    The District Court's Standing Analysis was Overly Narrow and
Dangerously Restricts the Important Right to Bring Pre-Enforcement First
Amendment Challenges .................................................... 16

        A.    *Davis v. FEC* ........................................ 19

        B.    *Camp v. City of Atlanta* ................................ 20

        C.    *Harrell v. Fla. Bar* .................................... 23

    IV.    Conclusions ............................................ 25

# TABLE OF AUTHORITIES

### Cases

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) --------------------------------------------------------- 7

*Ashcroft v. Free Speech Coalition, Inc.,*
    535 U.S. 234 (2002) --------------------------------------------------- 1, 10, 15

*Bochese v. Town of Ponce Inlet,*
    405 F.3d 964 (11th Cir. 2005) --------------------------------------------21, 22, 25

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786------------------------------------------------------------------- 8

*Camp Legal Def. Fund, Inc. v. City of Atlanta,*
    451 F.3d 1257 (11th Cir. 2006) ----------------------------------- 18, 19, 20, 21, 25

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,*
    447 U.S. 557 (1980) --------------------------------------------------------- 9

*Citizens United v. Federal Election Comm'n,*
    558 U.S. 310 (2010) ------------------------------------------------------- 5, 6

*City of Lakewood v. Plain Dealer,*
    486 U.S. 750 (1988) ------------------------------------------------- 11, 12, 13, 22

*City of Littleton v. Z.J. Gifts D-4, LLC,*
    2004 WL 199239 (U.S., Jan. 26, 2004)--------------------------------------- 2

*Corbett v. Transp. Sec. Admin.,*
    930 F.3d 1225 (11th Cir. 2019) --------------------------------------------25

*Davis v. FEC,*
    501 F. Supp. 2d 22, 27 (D.D.C. 2007) ----------------------------------- 19, 20

*Davis v. FEC,*
    554 U.S. 724 (2008) ------------------------------------------------------ 18, 19

*Doe v. Bolton,*
    410 U.S. 179 (1973) --------------------------------------------------------- 5

i

*Edenfield v. Fane,*
    507 U.S. 761 (1993) -------------------------------------------------------- 7

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) --------------------------------------------------------- 4

*Federal Election Commission v. Wisconsin Right to Life, Inc.,*
    551 U.S. 449 (2007) ------------------------------------------------------ 5, 6

*Gilles v. Davis,*
    427 F.3d 197 (3d Cir. 2005)-------------------------------------------------18

*Hallandale Professional Fire Fighters Local 2238 v. Hallandale,*
    922 F.2d 756 (11th Cir. 1991) ---------------------------------------------23

*Harrell v. Fla. Bar,*
    608 F.3d 1241 (11th Cir. 2010) ------------------------------- 18, 19, 23, 24, 25

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) --------------------------------------------------- 2

*McConnell v. Federal Election Comm'n,*
    540 U.S. 93 (2003) ------------------------------------------------------ 5, 6

*N.J. Coalition Against War in the Middle E. v. J.M.B. Realty Corp.,*
    138 N.J. 326 (1994) ------------------------------------------------------17

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ------------------------------------------------------- 4

*Pennsylvania v. West Virginia,*
    262 U.S. 553 (1923) ------------------------------------------------------- 4

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,*
    No. 4:22-cv-304-MW/MAF, 2022 U.S. Dist. LEXIS 208374
    (N.D. Fla. Nov. 17, 2022) ---------------------------------------------17, 18, 20

*Pittman v. Cole,*
    267 F.3d 1269 (11th Cir. 2001) ---------------------------------------------23

*Plain Dealer Publishing Co. v. City of Lakewood,*
    794 F.2d 1139 (6th Cir. 1986) ---------------------------------------------11

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
696 F.3d 1205 (D.C. Cir. 2012)-------------------------------------------------------------- 9

*Reno v. American Civil Liberties Union,*
521 U.S. 844 (1997) -------------------------------------------------------------------9, 10

*Rowe v. Forrester*,
368 F. Supp. 1355 (M.D. Ala. 1974)-------------------------------------------------- 18

*Steffel v. Thompson,*
415 U.S. 452 (1974) ------------------------------------------------------------------------ 4

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ------------------------------------------------------------------------ 2

*Thompson v. W. States. Med. Ctr.,*
535 U.S. 357 (2002) ------------------------------------------------------------------------ 9

*United States v. 12,200-ft Reels of Super 8mm Film,*
409 U.S. 909 (1972) ------------------------------------------------------------------------ 2

*United States v. Fox,*
248 F.3d 394 (5th Cir. 2001) ------------------------------------------------------------ 15

*United States v. Mento,*
231 F.3d 912 (4th Cir. 2000) ------------------------------------------------------------ 15

*United States v. Playboy Entertainment Group, Inc.,*
529 U.S. 803 (2000) -------------------------------------------------------------- 1, 6, 8, 10

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
425 U.S. 748 (1976) ------------------------------------------------------------------------ 15

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,*
536 U.S. 150 (2002) ------------------------------------------------------------------------ 13

*Wisconsin Right to Life, Inc. v. Federal Election Comm'n,*
546 U.S. 410 (2006) ------------------------------------------------------------------------ 6

*Younger v. Harris,*
401 U.S. 37 (1971) ------------------------------------------------------------------------- 15

iii

<u>S</u><small>TATUTES</small>

501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501 (c)(3)---------------------- 1

Bipartisan Campaign Reform Act of 2002 --------------------------------------------6, 19

Cal. Civ. Code § 1746.3 ------------------------------------------------------------------- 8

Child Pornography Prevention Act of 1996, 18 U.S.C. § 2251 ------------------1, 10

Communications Decency Act of 1996-------------------------------------------------9, 10

Florida Stat. § 1000.05(4) ----------------------------------------------------------------20

Lakewood, Ohio Codified Ordinance §§ 901.18, 901.181 (1984) ------------------11

Village of Stratton, Ohio Ordinance § 1998-5------------------------------------------13

<u>O</u><small>THER</small> <u>A</u><small>UTHORITIES</small>

Stephen E. Siwek, *Video Games in the 21st Century: The 2010 Report,*
    Entertainment Software Association (2010) ----------------------------------------- 9

# INTEREST OF *AMICUS CURIAE*[1]

The First Amendment Lawyers Association ("FALA") is a not-for-profit organization comprised of approximately 200 attorneys who routinely represent businesses and individuals that engage in constitutionally-protected expression. FALA's members advocate against governmental forms of censorship. Member attorneys frequently litigate the facial validity of speech-restrictive legislation, often by way of anticipatory challenges that arise when a law is newly enacted and has not yet been enforced. In fact, many of the Supreme Court's recent pre-enforcement First Amendment cases were either argued by FALA attorneys or involved the participation of FALA attorneys in some capacity. *See, e.g., Ashcroft v. Free Speech Coalition, Inc.,* 535 U.S. 234 (2002) (successful challenge to Child Pornography Prevention Act argued by FALA member and former president H. Louis Sirkin); *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000) (successful challenge to "signal bleed" portion of Telecommunications Act argued by FALA member and former president Robert Corn-Revere). In addition, FALA has a tradition of submitting

---

[1] This brief was authored by the counsel for *amicus curiae* First Amendment Lawyers Association ("FALA") as listed above; neither the parties nor their counsel have authored this brief in whole or in part. No other person or entity, including the parties and their counsel, besides FALA has contributed to the costs of preparing and submitting this brief. Counsel for both Appellants and Appellees consented to the filing of this *amicus* brief.

1

*amicus* briefs, including to the Supreme Court, on issues pertaining to the First Amendment. *See, e.g., Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) (*amicus* brief submitted by FALA); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (*amicus* brief on the importance of pre-enforcement challenges submitted by FALA); *City of Littleton v. Z.J. Gifts D-4, LLC,* 2004 WL 199239 (U.S., Jan. 26, 2004) (*amicus* brief submitted by FALA); *United States v. 12,200-ft Reels of Super 8mm Film,* 409 U.S. 909 (1972) (order granting FALA's motion to submit *amicus* brief).

Given the nationwide span of their experience and the specialized nature of their practices, FALA attorneys can better comment upon the practical application of pre-enforcement standing jurisprudence than perhaps any other singular person, body, client, or corporate entity. FALA's members have repeatedly witnessed the difficult choices speakers are required to make when faced with a law that possibly restricts or even criminalizes their expression. Absent the ability to challenge the validity of such laws prior to their threatened enforcement, the clients of FALA members would likely engage in self-censorship or, worse, cease their expression altogether. Such a result adversely affects the clients of nearly every FALA attorney, and contravenes the First Amendment protections FALA members are dedicated to preserving. FALA can therefore offer a unique perspective on the valid role that pre-enforcement facial challenges serve in shaping the Court's free speech jurisprudence.

## STATEMENT OF THE ISSUES

1. Whether a plaintiff must separately demonstrate standing for each of 8 concepts, when those concepts appear together as a unified theme within the challenged statute and where the statute contains viewpoint based prohibitions on speech.

2. Whether a plaintiff being "subject to a law" is sufficient to show injury-in-fact when bringing First Amendment and other constitutional challenges to a law that creates a likelihood of self-censorship.

## SUMMARY OF ARGUMENT

Pre-enforcement anticipatory challenges serve an important role in crafting First Amendment Free Speech doctrine. Nowhere is it more important to ensure open debate than in the university setting.

The District Court narrowly applied "injury-in-fact" standing requirement in a way that unnecessarily restricts the ability for professors and students affected by the relevant provisions of law to challenge those provisions in federal court. Nothing in this Court's prior jurisprudence prohibits the Court from considering the 8 viewpoint-based concepts as a whole for the purpose of analyzing standing. Moreover, even if the Court analyzes standing separately for each of the 8 concepts, the Court should nonetheless find standing for each plaintiff to challenge each of the concepts because: a) the 8 concepts represent a single unified theme within a singular subsection of the statute; and b) because the  viewpoint based nature of the statute creates

3

a high likelihood of self-censorship and therefore to establish standing, plaintiffs merely need to demonstrate that they are subject to the law.

## ARGUMENT

### I.    Pre-Enforcement Anticipatory Challenges Serve an Important Role in Crafting First Amendment Free Speech Doctrine.

Federal courts, including the Supreme Court, have enjoyed a long history of permitting speakers to challenge laws restricting their speech in advance of being levied with sanctions. As part of this tradition, parties wishing to challenge a statute before its enforcement need only demonstrate a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974). Speakers have never been required "to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia,* 262 U.S. 553, 593 (1923). "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Steffel v. Thompson,* 415 U.S. 452, 459 (1974); *see also Epperson v. Arkansas,* 393 U.S. 97 (1968). When a plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, he "should not be required to await and undergo a criminal

4

prosecution as the sole means of seeking relief." *Doe v. Bolton,* 410 U.S. 179, 188 (1973).

As discussed below, anticipatory challenges provide the mechanism to invalidate a wide swath of unconstitutional regulations that would otherwise silence protected expression. It is precisely because pre-enforcement lawsuits provide the vehicle by which the courts can safeguard First Amendment rights that the Court should reject the District Court's restrictive approach and should instead retain its traditional relaxed standing principles in the free speech context.

## A.   Election Speech

By way of example, the Supreme Court's doctrine regarding core political speech has arisen in large part due to anticipatory challenges to laws restricting campaign contributions and political advertisements. The development of election speech doctrine through a triumvirate of cases - *McConnell v. Federal Election Comm'n,* 540 U.S. 93 (2003); *Federal Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449 (2007); and *Citizens United v. Federal Election Comm'n,* 558 U.S. 310 (2010) - demonstrates this point. As noted by the Court in *Citizens United,* "[p]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence… [because] [t]he right of a citizen to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened

self-government and a necessary means to protect it." *Citizens United,* 558 U.S. at 339-340.

A pre-enforcement challenge to Section 203 of the Bipartisan Campaign Reform Act of 2002 ("BRCA"), which extended restrictions on independent corporate expenditures, was unsuccessful in *McConnell. Id.* Nevertheless, the same provision was attacked in an as-applied challenge in *Wisconsin Right to Life, Inc. v. Federal Election Comm'n,* 546 U.S. 410 (2006), a challenge which the Supreme Court held could be maintained. *Id.* A year later, in *Federal Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449 (2007) (*"WRTL II"*), the Court sustained an as-applied challenge raising a similar claim to the validity of BCRA Section 203. *Id.* In a careful attempt to simultaneously avoid overruling *McConnell* and to vindicate the First Amendment claims made by the *WRTL II* parties, the controlling opinion in *WRTL II* refrained from invalidating the statute, except as applied to the facts immediately before it. *Id.* This series of holdings ultimately led to the *Citizens United* majority's specific admonition that consideration of a facial challenge was absolutely necessary, as "[a]ny other course of decision would prolong the substantial, nationwide chilling effect caused by … prohibitions on corporate expenditures." *Citizens United,* 558 U.S at 333. Thus, although *McConnell* did not result in the facial invalidation of the BRCA, it laid the foundation for subsequent as-applied and constitutional challenges to the provision. As a result, even where unsuccessful,

6

anticipatory challenges laid the groundwork for future decisions that protect and preserve political expression.

## B.  Commercial Speech and Related Corporate Expression

Although the Court reviews laws curtailing commercial speech under a somewhat more relaxed standard than other forms of protected expression, *Edenfield v. Fane,* 507 U.S. 761, 767 (1993), pre-enforcement challenges are allowed in this context in order to preserve First Amendment values. As the Court has previously stated, "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 503 (1996). Yet, in order to treat as skeptical those regulations that potentially curtail the First Amendment guarantee to free speech, the courts must have the opportunity to review provisions as they affect the messages contained in protected commercial expression, not after the Government has drawn its sword.

For example, at issue in *Edenfield v. Fane* was a provision of Florida's administrative code prohibiting certified public accountants (CPAs) from "direct, in-person, uninvited solicitation." *Id.* at 764. A CPA sued in district court, claiming the anti-solicitation rule violated the First Amendment. The Court agreed that the CPA's solicitation activities constituted protected commercial speech, and found that commercial solicitation "may have considerable value," because there are benefits to

allowing "direct and spontaneous communication between buyer and seller." *Id.* at 766. It is difficult to imagine a situation where "direct and spontaneous communication" would be more important than in the classroom of a university, the form of speech currently before the Court.

Pre-enforcement challenges are critical to protecting corporate speech across many spectrums. In *Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786 (2011)[2] organizations representing the "video-game and software industries," brought a pre-enforcement challenge to a California law prohibiting the sale or rental of "violent video games" to minors and requiring the packaging to contain the label "18." *Id.* at 2732-33. The district court concluded the California law violated the First Amendment on its face. *Id.* The Court of Appeals affirmed, as did the Supreme Court. *Id.* Applying strict scrutiny, the Court found no compelling justification for California's differential treatment of video games. *Id.* at 2741. If instead of challenging the statute in federal court, the plaintiffs had voluntarily violated the statute and risked enforcement, they could have been penalized up to $1,000 for each separate offense. *See* Cal. Civ. Code § 1746.3 (West 2006). Considering that more than 298 million new video games are sold in the United States each year, the cost of violating the statute

---

[2] Although not technically a commercial speech case, *Brown* emphasizes that anticipatory challenges can preserve speech that is related to or an integral part of a significant corporate industry. *United States v. Playboy Entm't Grp.,* 529 U.S. 803 (2000), is instructive on this point as well.

was simply too prohibitive to risk. *See* Stephen E. Siwek, *Video Games in the 21st Century: The 2010 Report,* Entertainment Software Association (2010), available at http://www.theesa.com/facts/pdfs/VideoGames21stCentury_2010.pdf. Without the opportunity to bring a pre-enforcement challenge, the video game and software industries would potentially have been silenced.

Similar restrictions on commercial speech were invalidated in pre-enforcement challenges brought by the pharmacy industry, *Thompson v. W. States. Med. Ctr.,* 535 U.S. 357, 360 (2002); the alcohol industry, *44 Liquormart,* 517 U.S. 484; the utility industry, *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557 (1980); and, in the tobacco industry, *see, R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,* 696 F.3d 1205 (D.C. Cir. 2012) (vacating cigarette labeling requirement and remanding to FDA). Thus, anticipatory challenges play a significant role in preserving the right of commercial speech across a wide range of enterprise.

## C.    Sexually Explicit Speech

In *Reno v. American Civil Liberties Union,* 521 U.S. 844, 861 (1997), the Supreme Court allowed plaintiffs to bring a First Amendment challenge to provisions of the Communications Decency Act of 1996 "immediately after the President signed the statute." The provisions prohibited the knowing: 1) transmission of obscene images to anyone under 18 years of age, and 2) "sending or displaying of

9

patently offensive messages in a manner that is available to a person under 18 years of age." *Id.* at 859. The Court permitted the plaintiffs' First Amendment challenge to proceed without requiring proof that they faced imminent, real, and likely prosecution. The plaintiffs' ability to challenge the statute prior to its enforcement was significant, because the Court ultimately invalidated the provisions in question. *Id.* at 885 ("The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship."); *see also Playboy Entertainment,* 529 U.S. at 826-27.

Similarly, in *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 243 (2002), the Supreme Court permitted plaintiffs to bring a First Amendment facial challenge to provisions of the Child Pornography Prevention Act of 1996, 18 U.S.C. § 2251 *et seq.* ("CPPA"), that prohibited the possession or distribution of sexually explicit images that appeared to depict minors, even if the images were in fact produced without using minors. *Id.* at 239. The Court allowed the plaintiffs to proceed with their challenge - without having to prove an imminent threat of prosecution - because "a law imposing criminal penalties on protected speech is a stark example of speech suppression." *Id.* at 244. And as the Court pointed out, "few legitimate … speakers … would risk distributing [material] in or near the uncertain reach of this law." *Id.* As was the case with *Reno v. ACLU,* the Court granted the Free Speech Coalition's challenge to the law and invalidated the CPPA on overbreadth grounds. *Id.* at 258.

In both the *ACLU* and *Free Speech Coalition* cases, online expression was protected from government censorship directly because the plaintiffs were permitted to sue before the laws in questions were enforced against their members. As in those cases, few legitimate professors would risk teaching their usual and customary lessons in or near the uncertain reach of Florida's prohibition.

### D.    Licensing and Permitting Regulations on Speech

Anticipatory challenges also play a significant role in shaping the First Amendment analysis applied to licensing and permitting regulations. In fact, one of the Court's leading pronouncements on First Amendment standing - *City of Lakewood v. Plain Dealer,* 486 U.S. 750 (1988) - arose in a pre-enforcement capacity. When the City of Lakewood denied the Plain Dealer newspaper's request for permission to install newspaper boxes on public property, the newspaper sought injunctive relief and a declaration that an ordinance the City cited in denying the request violated the First and Fourteenth Amendments. *See Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139, 1149 (6th Cir. 1986). The district court found the prohibition unconstitutional, but delayed entry of a permanent injunction to give the city time to amend its law. *Id.* at 1141. In response, Lakewood adopted two ordinances allowing the placement of structures on city property under certain conditions. Lakewood, Ohio Codified Ordinance §§ 901.18, 901.181 (1984) (cited in *Plain Dealer,* 486 U.S. at 753). One ordinance gave the mayor authority to grant or

deny annual news rack permit applications, subject to various conditions, including any "other terms and conditions deemed necessary and reasonable by the Mayor." *Id.* at § 901.18. The newspaper amended its complaint to assert a facial challenge to the amended enactments. *Plain Dealer,* 794 F.2d at 1143. After the district court rejected the newspaper's claims, the case was appealed to the Sixth Circuit, which upheld the news rack prohibition but found the three licensing conditions to be unconstitutional. *Id.* at 1146.

In affirming and remanding the Sixth Circuit's decision, the Supreme Court held that the newspaper had standing to facially challenge the ordinance without first applying for and being denied a permit. *Plain Dealer,* 486 U.S. 750. As the Court explained, a licensing statute that gives government officials unbridled discretion over the permission or denial of expressive activity constitutes a prior restraint. *Id.* at 757. A facial challenge was necessary because "the mere existence of a licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* Moreover, as the Court explained, when a licensing regime lacks standards limiting the licensor's discretion, it is difficult for courts to discern whether the licensor is engaged in impermissible content-based discrimination. *Id.* The delay and challenges "inherent in the 'as applied' challenge can itself discourage litigation,"

making any eventual relief "too little too late." *Id.* at 758. In this event, opportunities for speech will have been permanently lost. *Id.*

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton,* 536 U.S. 150 (2002), involved a Village of Stratton ordinance which made it a misdemeanor to engage in door-to-door advocacy for any "cause" without first registering for and receiving a permit from the office of the mayor. Village of Stratton, Ohio Ordinance § 1998-5; *Watchtower Bible,* 536 U.S. at 165-66. The ordinance also required that a permit bearing the permit-holder's name be carried on one's person and be produced upon demand by police or residents. *Id.* A group of Jehovah's Witnesses mounted a pre-enforcement facial challenge on First Amendment grounds, alleging that the ordinance interfered with their protected free speech and exercise rights. *Id.* at 153. The Court agreed. *Id.* at 150. Considering the ordinance as it applied to religious proselytizing, anonymous political speech, and the distribution of handbills, the Court found: 1) that the ordinance necessarily resulted in surrender of anonymity; 2) that the permitting requirements imposed an objective burden on religious and political speech; 3) that the ordinance effectively banned a significant amount of spontaneous speech; and 4) that the ordinance was not narrowly tailored to the village's interest in protecting the privacy of residents or preventing fraud and crime. *Id.*

The Florida law here also burdens speech, effectively bans a significant amount of spontaneous speech, and is not narrowly tailored to any legitimate state interest. And like the ordinances in *Plain Dealer* and *Watchtower*, the Act is likely to result in self-censorship, redressable only via pre-enforcement challenges.

## II.   Absent the Ability to Raise a Pre-Enforcement Challenge, Speakers will be Forced to Engage in Conduct Antithetical to the First Amendment.

In light of the significant role anticipatory challenges play in preserving free expression across a wide range of content, any narrowing of requirements for pre-enforcement facial challenges would pose significant risks to both the quality and quantity of speech available in the marketplace of ideas. For example, in the commercial speech context, speakers proposing business transactions may be reluctant to place their professional reputations and livelihoods at stake by waiting until prosecution is imminent to file suit. As highlighted by the *Fane* case, it is imperative that commercial speakers have advance knowledge of whether their speech is constitutionally protected and therefore permitted or otherwise subject to governmental regulation. *Fane,* 507 U.S. at 763, 766. Absent the ability to seek a declaratory judgment prior to enforcement, companies are not likely to invest financial and human resources in advertisements and solicitations that may result in criminal charges or hefty civil fines. And, of course, curtailing speech proposing commercial

14

transactions is likely to have an overall impact on commerce as well. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 765 (1976).

Moreover, as was the case with the statute invalidated in *Free Speech Coalition,* 535 U.S. 234, speakers could fail to time the filing of their lawsuits appropriately and could instead wind up being criminally prosecuted under unconstitutional laws. Prior to the *Free Speech Coalition* decision, several individuals had been charged with and convicted of federal felonies for violating the act. *See, e.g., United States v. Fox,* 248 F.3d 394,398-99 (5th Cir. 2001); *United States v. Mento,* 231 F.3d 912 (4th Cir. 2000). These individuals shouldered the weighty burden of defending themselves against unconstitutional criminal charges, as well as serving prison sentences for invalid convictions, before the law was declared invalid. *See Yeager v. United States,* 557 U.S. 110, 117-18 (2009) (noting that criminal prosecution subjects defendant to "embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty"). And, once an individual faces criminal charges, it is unlikely that he will be able to separately challenge the facial validity of the law in a civil suit or to otherwise obtain relief from prosecution. *See Younger v. Harris,* 401 U.S. 37 (1971) (requiring federal courts to abstain from ruling upon constitutional issues with state criminal prosecutions while the state

criminal charges are pending). Thus, limiting anticipatory challenges as a vehicle for vindicating First Amendment rights would lead to the filing of improper and increased criminal charges against those who engage in protected speech.

In the face of possible prosecution, risk-averse speakers will self-censor their speech in burdensome ways or forego the opportunity to speak altogether. And, that is ultimately what the risk is in the matter before the Court. Speakers who chose not to present expression because it may trigger a criminal or civil penalty do not wind up in court; rather, their First Amendment injury by its very nature occurs privately, quietly, and outside the view of the judiciary. Each of these outcomes is fundamentally antithetical to the ideal of free expression protected by the First Amendment.

## III.  The District Court's Standing Analysis was Overly Narrow and Dangerously Restricts the Important Right to Bring Pre-Enforcement First Amendment Challenges.

Although the District Court determined that the plaintiff-appellees had standing, a determination defendant-appellants challenge on appeal, it did so too narrowly.  Plaintiff-Appellees do not need to demonstrate that each and every restriction will apply to them in order to challenge the statute.

While there is no dispute that the District Court identified the correct standard for determining standing, namely a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision" (*Lujan*, supra, at 560-561 (internal quotation marks omitted) ) the Court applied the

16

standard in an overly restrictive manner, finding student plaintiff Johana Dauphin had no standing.

The purpose of the injury-in-fact requirement is to help ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Warth* v. *Seldin*, 422 U. S. 490, 498 (1975) (internal quotation marks omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U. S. 398, 408 n. 5 (2013). A plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt* v. *Farm Workers,* 442 U. S. 289, 298 (1979).

The District Court acknowledged that, "[w]hen First Amendment rights are involved, courts apply the injury in fact requirement most loosely, 'lest free speech be chilled even before the law or regulation is enforced.'" *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,* No. 4:22-cv-304-MW/MAF, 2022 U.S. Dist. LEXIS 208374, at *54 (N.D. Fla. Nov. 17, 2022) *citing Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). However, the Court then went on to apply an exceedingly tight application of the injury in fact requirement despite the fact that this matter involves First Amendment challenges to a law that restricts speech in the university setting, where open debate is most important. *See, e.g., N.J. Coalition Against War in the Middle E. v. J.M.B. Realty Corp.,* 138 N.J. 326, 395 (1994) ("the primary purpose of a university is to educate, *i.e.,* to increase the wealth of human knowledge, which can be done only through discourse and discussion, free and open debate.");

17

*Rowe v. Forrester*, 368 F. Supp. 1355, 1357 n. 5 (M.D. Ala. 1974) (noting "the critical role of the First Amendment's guarantee of free speech and open debate on a state college campus."); *Gilles v. Davis*, 427 F.3d 197, 214 (3d Cir. 2005) ("university students" have a "peculiar vocation … to engage in free and open debate[.]").

Judge Walker rejected the *Novoa* plaintiffs' implication that because, "the 'overbreadth doctrine allows [them] to demonstrate the chilling effect of the law without pleading every possible application,' they need not show a personal injury under each of the IFA's eight concepts," as well as the defendants' "exaggerate[d]" position that "Professor Plaintiff's intended promotion or compulsion to believe one or more of the eight concepts must be a near-perfect match for the IFA's eight concepts" in order to demonstrate injury in fact. *Pernell* at *56-5

To set up the method he would follow, Judge Walker noted that in *Davis v. FEC*, 554 U.S. 724 (2008), the Supreme Court held a plaintiff challenging political campaign regulations "must show an injury under each provision to demonstrate standing," but failed to explain, "what qualifies as a separate statutory provision requiring a separate injury." He therefore turned to this Court's decisions in *Camp Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257 (11th Cir. 2006) and *Harrell v. Fla. Bar*, 608 F.3d 1241 (11th Cir. 2010) to "fill in this gap." *Pernell* at *59. Looking to those cases, Judge Walker concluded that in this case, "the Professor Plaintiffs must show their intent to arguably promote or compel belief in each of the challenged concepts to establish standing." *Id*. at *62. The District Court needlessly applied the holdings in *Davis*, *CAMP*, and *Harrell* quite narrowly and overlooked

18

the requirement to loosely apply the injury-in-fact requirement in First Amendment cases.

Because the District Court relied heavily upon *Davis*, *CAMP*, and *Harrell*, we take a closer look at the holdings in those cases and show why they are inapt here.

### A.    *Davis v. FEC*

*Davis* involved a House of Representative candidate's First Amendment challenge to § 319 of the Bipartisan Campaign Reform Act of 2002 (BCRA), 2 U.S.C. § 441a-1(a) (the Millionaires' Amendment). 554 U.S. 724. Under certain conditions, § 319(a) set asymmetrical contribution levels whereby a self-financing candidate remained subject to the normal limitations, but a non-self-financing candidate could receive individual contributions at treble the normal limit. Section 319(b) required self-financing candidates to file an initial declaration of intent revealing the amount of personal funds the candidate intends to spend and to make additional disclosures as the candidate's personal expenditures exceed certain benchmarks. *Id*. at 728-31. Davis challenged § 319's procedural requirements on First Amendment grounds.

The District Court *sue sponte* addressed Davis's standing to challenge § 319, first discussing § 319's disclosure requirements and then concluding that those "requirements impose an injury-in-fact on self-financed candidates that can be traced directly to the Millionaires' Amendment and that would be removed by a favorable decision from this court." *Davis v. FEC*, 501 F. Supp. 2d 22, 27 (D.D.C. 2007). "Davis therefore has standing to challenge the Amendment." *Ibid*.

On direct appeal to the Supreme Court, the FEC disputed Davis's standing to challenge § (a) but did not dispute his standing to challenge § (b). The Supreme

Court first found Davis had standing to challenge § (b) and then turned to section § 319(a) stating that, "[t]he fact that Davis has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319 (a) comes into play." *Id*. at 733-34. Nonetheless, the Court found that Davis also had standing to challenge § 319(a). Importantly, § 319 (a) and § 319 (b) were procedural requirements that would limit the ability of a candidate to finance speech, but, unlike here, they in no way affected the content of speech, and thus there was no risk that the challenged regulation would cause speakers to self-censor. Notably, as Judge Walker correctly reported in *Pernell*, the Court, "did not explain […] what qualifies as a separate statutory provision requiring a separate injury." While *Davis* was about two different procedures, Florida Stat. § 1000.05(4) is a single scheme of unconstitutional viewpoint-based restrictions within a larger statute and should not require a separate injury for each provision.

## B.    *Camp v. City of Atlanta*

*Camp* involved challenges to Atlanta's Outdoor Festivals Ordinance of 2003, which governs the permits, location, size, and fees of public gatherings in the City of Atlanta. 451 F.3d 1257. When an earlier version of the ordinance was amended in 2003, Atlanta imposed a moratorium on festival permit applications from November 27, 2002, until January 13, 2003, when the new ordinance would become effective. *Id*. at 1266. A coalition advocating against marijuana prohibition challenged various sections of the ordinance. The plaintiff argued that because it was unable to apply for a permit during the moratorium, it had established Article III standing under the overbreadth doctrine to challenge the entirety of the statute. This Court

20

rejected that argument finding that nothing in the overbreadth doctrine allowed the plaintiff to challenge provisions wholly unrelated to its activities and, therefore, Camp had to demonstrate that it had sustained, or was immediately in danger of sustaining, a direct injury as the result of each of the provisions of the Festival Ordinance that it wanted to challenge. *Id*. at 1274. Accordingly, this Court analyzed Camp's standing for each of the provisions it sought to challenge. Relevant here, the Court noted that, "[w]hat a plaintiff must prove to establish standing 'depends on the nature of the challenge to his or her standing.'" *Id*., *quoting Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005).

The Court placed Camp's challenges in two buckets. First it addressed challenges to permit provisions that conferred too much discretion with the governing body. Camp argued that because it had applied for permits in the past and intended to apply for permits in the future, it was subject to these procedural regulations and had standing to challenge certain provisions on the basis that each of them vested unbridled discretion in a government official over whether to permit or deny expressive activity. The Court agreed that Camp had standing as to these claims because, "[t]he Supreme Court has 'long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to, or will imminently be subject to the law has standing to challenge it facially without the necessity of first applying for, and being denied, a license.'" *Id*. at 1274, *citing City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 755-56 (1988).

Next, the Court considered Plaintiff's argument that it had standing to challenge five unrelated procedural provisions unrelated to content as unconstitutional prior restraints on speech.  In analyzing Camp's standing with regard to these claims, the Court noted that the claims did not implicate concerns over the use of shifting or illegitimate criteria for parties applying for permits. Rather, the Court explained that, "[i]n a challenge of a prior restraint on speech the plaintiff must establish that the challenged provision pertains to its activity, and not merely that it is 'subject to the law.'" *Id*. at 1276, citing *City of Lakewood*, 486 U.S. at 755-56. The Court denied standing for two of the claims because Camp failed to present evidence that it had, or imminently would be, denied a permit for failure to abide those two unrelated procedural provisions. *Id*.

Though the District Court relied heavily on *Camp*, it failed to acknowledge the Court's discussion that in some cases, such as when a licensing law confers unbridled discretion, a plaintiff can establish standing simply by showing that it is "subject to the law." Moreover, the ordinances in *Camp* were a scattered series of unrelated procedural restrictions, whereas, here, the restrictions are merely interrelated subparts of a single scheme restricting speech on the basis of viewpoint.

Further, in the matter the Court considers here, the regulations do not simply *risk* potential viewpoint discrimination because the statute confers undue discretion on the licensing body, but the viewpoint discretion is *built into the statute*. As a result, the statute has the same effect as the unbridled discretion statutes in *Camp*—it creates the risk that professors will self-censor to avoid sanctions. Students will be denied the right to engage with professors too afraid to approach the boundaries of

22

sanctionable speech. A single remark in class can prompt numerous questions, the answers to which might violate all eight interrelated subparts--where even saying "I can't answer that question because of the law" could be a violation itself. Therefore, Plaintiffs establish standing by demonstrating that they are professors or students in courses where one or more of the eight topics the state seeks to regulate are discussed without having to prove that the professor specifically anticipates violating all eight third-rail topics.

### C.   *Harrell v. Fla. Bar*

In *Harrell*, an attorney challenged various provisions of Florida's laws restricting certain forms of attorney advertising as being impermissibly vague and violative of his First Amendment rights. 608 F.3d 1241. The Court began its standing analysis by noting that controlling case law dictated that it apply the injury-in-fact requirement loosely since First Amendment rights were involved, otherwise free speech might be chilled even before the law is enforced. *Id*. at 1254, *citing Hallandale Professional Fire Fighters Local 2238 v. Hallandale,* 922 F.2d 756, 760 (11th Cir. 1991). The Court noted that, "it is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance . . ., the injury is self-censorship." *Id. citing Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001).

The *Harrell* Court then examined plaintiff's vagueness claims and found standing to challenge five of the nine rules. Harrell provided ample proof that he intended to advertise services for his firm and if it were not for the rules' prohibitions

on the use of various advertising techniques, he would use those techniques in his advertisements. The Court wrote,

> "[h]aving considering the text of the five foregoing rules … and the evidence presented by Harrell of their inconsistent application, we are satisfied that Harrell has made an adequate threshold showing of vagueness in the application of the rules to his proposed advertisements, so that he may credibly claim to have suffered an injury-in-fact in the form of self-censorship."

*Id*. at 1256-57. As to the other rules the Court found that Harrell had "not shown an injury-in-fact," stating that "he therefore lack[ed] standing to challenge them. Specifically, he [had] not explained, either textually or by example, how there is any arguable *vagueness*." *Id*. 1257. The Court continued,

> …we will not merely assume for purposes of standing that these phrases are sufficiently vague to cause Harrell an injury-in-fact in the form of self-censorship. Indeed, we are fairly confident that Harrell can derive the core meaning from these rules, and, absent some indication to the contrary, we hold that Harrell lacks an injury-in-fact flowing from any supposed vagueness in these rules, and therefore lacks standing to challenge them broadly on vagueness grounds.

*Id*. (internal citations omitted).

It seems, therefore, that the *Harrell* Court engaged in improper reasoning.  It determined that he could not succeed on the vagueness claim on the merits, which meant there was no injury-in-fact, and therefore no standing to make a vagueness challenge on the merits.  This Court has "repeatedly held that '[s]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.'" *Corbett v. Transp. Sec. Admin*., 930 F.3d 1225, 1228

24

(11th Cir. 2019) *quoting Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005).

Absent from *Harrell* is any discussion of why the "separate" provisions were adjudicated separately.  608 F.3d at 1250.  However, it is notable that Harrell did not argue these rules were part of a single scheme, and he did not contest all of the restrictions, which, unlike here, were codified across a scattering of rules.  Thus, *Harrell* is neither informative nor dispositive of the standing question here.

## IV.  Conclusions

There is no dispute that when First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely. However, *Camp* and *Bochese* tell us that even within the "loose application" standard, what a plaintiff must prove to establish standing depends on the nature of the claims. When there is a risk of self-censorship, as is present here, a plaintiff merely needs to establish that he is "subject to the law." Thus, any professor who teaches on concepts relating to race is "subject to the law" —and correspondingly any student who is enrolled in or intends to enroll in a class that includes discussions on race—is "subject to the law." Accordingly, the District Court should have found that Johana Dauphin has standing and where the District Court found that other plaintiffs had standing to challenge one of the 8 concepts, those plaintiffs have standing to challenge the entire set of concepts.[3] Nothing in this Court's prior jurisprudence prohibits considering the 8 viewpoint-

---

[3] FALA understands that the District Court's finding that Dr. Dunn did not have standing was due to a lack of evidence that any FIU students or employees participated in the bus tour as part of a course or training put on by the university. FALA does not question that ruling.

based concepts as a whole for the purpose of analyzing standing as prior case law is distinguishable. However, even if the Court follows the granular examination of each plaintiff to each concept, the Court should nonetheless find standing for each plaintiff to challenge each of the concepts, because the plaintiffs merely need to demonstrate that they are "subject to the law." All plaintiffs except Dr. Dunn have met that standard.

Within the university setting, it is all the more critical that professors and students be able to challenge laws that would negatively impact the opportunity for open debate.

Date: June 23, 2023                    RANDAZZA LEGAL GROUP, PLLC

                                       /s/ Jay M. Wolman
                                       Jay M. Wolman
                                       Randazza Legal Group, PLLC
                                       100 Pearl Street
                                       14th Floor
                                       Hartford, CT 06103
                                       (203) 539-6666
                                       jmw@randazza.com

                                       Marc J. Randazza
                                       Randazza Legal Group, PLLC
                                       2 S. Biscayne Boulevard
                                       Suite 2600
                                       Miami, FL 33131
                                       (786) 800-3500
                                       ecf@randazza.com

                                       D. Gill Sperlein
                                       Law Offices of D. Gill Sperlein
                                       345 Grove Street

26

San Francisco, CA 94102
(415) 404-6616
gill@sperleinlaw.com

*Attorneys for Amicus Curiae,*
*First Amendment Lawyers Asso-*
*ciation*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
## AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of FRAP 29(b)(4) because, excluding the parts of the document exempted by FRAP 32(f) and 11th Cir. R. 32-4, this document contains 6,403 words.

2. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Date: June 23, 2023                 RANDAZZA LEGAL GROUP, PLLC

                                    /s/ Jay M. Wolman
                                    Jay M. Wolman
                                    *Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of June 2023, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to all counsel of record.

Date: June 23, 2023                    RANDAZZA LEGAL GROUP, PLLC

                                       /s/ Jay M. Wolman
                                       Jay M. Wolman

                                       *Attorneys for Amicus Curiae*

29