**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 22-13992

————————————————

LEROY PERNELL,
SHARON WRIGHT AUSTIN,
SHELLEY PARK,
JENNIFER SANDOVAL, et al.,

*Plaintiffs-Appellees,*

*versus*

FLORIDA BOARD OF GOVERNORS
OF THE STATE UNIVERSITY, et al.,

*Defendants,*

BRIAN LAMB,
ERIC SILAGY,
TIMOTHY CERIO,
RICHARD CORCORAN,
AUBREY EDGE, et al.,

*Defendants-Appellants.*

2                    Opinion of the Court                    22-13992

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00304-MW-MAF
————————————————


————————————————
No. 22-13994
————————————————

ADRIANA NOVOA,

SAMUEL RECHEK,

FIRST AMENDMENT FORUM AT

UNIVERSITY OF SOUTH FLORIDA,

*Plaintiffs-Appellees,*

*versus*


MANNY DIAZ, JR.,

TIMOTHY M. CERIO,

RICHARD CORCORAN,

AUBREY EDGE,

PATRICIA FROST, et al.,

*Defendants-Appellants.*


————————————————
Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00324-MW-MAF
————————————————

Before GRANT, LAGOA, and WILSON, Circuit Judges.

GRANT, Circuit Judge:

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend I. The First Amendment, incorporated against the States in 1868, is this country's written commitment to the idea that freedom of speech is essential to freedom of thought, and that both are essential to maintaining our liberty. The Supreme Court has long been clear that teaching and scholarship are due some measure of protection under the Amendment. But how much? And in what contexts? That Court has not had to say, but this one is now put to the test. The State of Florida legislated a broad set of speech restrictions banning certain viewpoints relating to race, color, sex, and national origin in various settings. The provision at issue here bars Florida's educators from promoting or endorsing those disfavored ideas when instructing students. Its prohibition applies not only in primary and secondary education, where states traditionally exercise a great deal of control, but also in public colleges and universities, where the state government's role has been far more limited.

When several groups of professors challenged Florida's new restrictions, the State cast about for an existing case or doctrine that could support its speech ban in the university setting. Finding none, it tried to marry public-employee speech cases with government speech doctrine, resulting in a new rule: if the

government pays a professor's salary, it has total control over her classroom speech.

That is not a blessed union.  Florida's salary-for-speech rule is a breathtaking assertion of power to ban unpopular ideas from public discourse in the very places the State's own statutes recognize as centers of inquiry—classrooms where students are trusted to puzzle through ideas that are good and bad, easy and hard, ideally getting ever closer to the truth.  This new rule also runs headlong into the Supreme Court's repeated, if imprecise, endorsements of academic freedom.  If the First Amendment offers any boundary of protection at all for public university classrooms, this statute crosses it.

Nor does this Court's leading academic speech precedent, *Bishop v. Aronov*, demand the outcome Florida seeks.  926 F.2d 1066 (11th Cir. 1991).  In fact, it counsels the opposite.  The restriction in that case was imposed by one university, against one professor, relating to speech about one thing—personal religious views that got in the way of the course's well-understood parameters.

That precedent makes clear that universities and even other government entities have crucial authority to shape curricular content, discipline teachers, and take other steps to guide and govern postsecondary education.  But the speech ban Florida's political leaders seek to impose here is different in both nature and degree from these ordinary concerns.  The rule Florida developed for this case does not withstand scrutiny.

The ideas Florida targets may well be noxious. Or maybe not. Either way, in this context the First Amendment trusts students to figure it out for themselves. We affirm the district court's preliminary injunction.

## I.

The Individual Freedom Act amends the Florida Education Equality Act, implementing new speech restrictions on a range of actors. Fla. Stat. § 1000.05(4)(a). The provision at issue here disallows any "training or instruction that espouses, promotes, advances, inculcates, or compels" students at Florida's public colleges and universities to believe any of eight concepts relating to topics like race and sex:

> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
>
> 2. A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
>
> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

6                          Opinion of the Court                    22-13992

5.   A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.   A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.  A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.   Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

22-13992                Opinion of the Court                          7

*Id.*[1]    Though "promot[ing]" any of these concepts is barred, criticizing them is not.  *Id.*  Beyond that, the Act allows instructors to introduce the ideas in a neutral fashion, permitting discussion "as part of a larger course"—so long as "instruction is given in an objective manner without endorsement of the concepts."   *Id.* § 1000.05(4)(b).   And the law does not say how far past the classroom its restrictions extend—off-campus speeches and other settings may be in play.  *See* § 1000.05(4)(a).  *Contra* Dissenting Op. at 15.

The penalties for endorsing these disfavored viewpoints are steep—for both individuals and universities.  As directed by the Act, Florida's Board of Governors adopted a comprehensive enforcement regime, requiring public colleges and universities to implement the Act's proscriptions and provide a way to report violations.  *See* Fla. Bd. of Govs., Reg. No. 10.005, Prohibition of Discrimination in University Training or Instruction (2022).  Under those regulations, if the Board of Governors decides that a university "willfully and knowingly" failed to correct a violation of the Act's speech ban, the university will not receive "performance funding for the next fiscal year."  *Id.* § (4)(d).  That kind of loss would be financially devastating.  The University of South Florida, for example, stood to lose just over $73 million during the 2021–

---

[1] The Act's terms apply to all public schools, starting with kindergarten and going through graduate school, but the plaintiffs challenge only its application to postsecondary schools.

8                        Opinion of the Court                    22-13992

2022 academic year—about fifteen percent of its total state appropriations.

Individual consequences can be severe too. Students (as well as unnamed other observers) can turn in professors whenever they perceive a violation. *Id.* § (2)(a). Those reports trigger investigative protocols for universities, who are then required to investigate any "credible" complaints. *Id.* § (3)(b). If a university finds any instruction or training that is "inconsistent with" the Act, it must self-report that violation to the Board of Governors. *Id.* § (3)(c). The university must separately "mandat[e]" that professors modify their lectures "to be consistent with" the Act. *Id.* And if a professor refuses? Potential termination. But even compliance offers no safe haven—according to the regulations, a university can impose unspecified "disciplinary measures" for violative content, even after the coursework is corrected.[2] *Id.*

Two groups of plaintiffs sued various state officials and university administrators in separate lawsuits.[3] In *Pernell v. Florida Board of Governors*, the plaintiffs are five current professors and one

---

[2] The State seeks to assuage our concerns by assuring us that no professor will be disciplined unless she refuses to correct her lecture. But that is not what the regulation says. Instead, it says that universities may discipline professors "where appropriate." The regulation goes on to escalate the consequences to termination for those who fail to "comply with the mandate." Fla. Bd. of Govs., Reg. No. 10.005(3)(c), Prohibition of Discrimination in University Training or Instruction (2022).

[3] For ease of reference, we generally refer to the defendants collectively as "Florida."

student, all in public universities across the state. In *Novoa v. Diaz*, the challengers are one professor, one student, and one student group at the University of South Florida.[4] Both sets of plaintiffs allege that the Act violates their First Amendment rights because it suppresses politically disfavored viewpoints, and that the Act is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment because it defines the banned concepts with abstract language.[5] Both sets of plaintiffs moved for preliminary injunctive relief.

The district court did not consolidate the two cases, but it addressed both motions in a single order. In *Pernell*, the court enjoined the members of the Florida Board of Governors of the State University System—all in their official capacities—from enforcing § 1000.05(4)(a)–(b) of the Florida Statutes and Regulation 10.005(2)–(3) and (4)(d). And in *Novoa*, the court enjoined the same Board of Governors members from enforcing the Act and Regulation as applied to concepts 1, 2, 3, 5, and 7. It also enjoined the members of the University of South Florida Board of Trustees, in their official capacities, from enforcing the laws as applied to those concepts. In the end, though not every plaintiff had standing to challenge every concept or sue every defendant, at least one

[4] No party challenges the district court's conclusion that the students' First Amendment rights rise and fall with those of the professors.

[5] The *Pernell* plaintiffs also brought an equal protection claim and the *Novoa* plaintiffs also sued under the Campus Free Expression Act. The plaintiffs did not seek preliminary injunctive relief for those claims, however, so we do not address them here.

10                    Opinion of the Court                    22-13992

plaintiff had standing to challenge each concept.[6]  The defendants appealed, and this Court consolidated the two cases.

## II.

We review the district court's order granting a preliminary injunction for abuse of discretion.  *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020).  To succeed, the moving party must show four things: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs

---

[6] We agree with the district court's well-reasoned conclusion that at least one individual plaintiff has standing to challenge each enumerated concept.  *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1245–68 (N.D. Fla. 2022).  The plaintiffs bring as-applied challenges to the Act, seeking to vindicate their own First Amendment rights—not the rights of others, say, K–12 teachers.  *See DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007).  Because we conclude that the Act is unconstitutional as applied to any public postsecondary-school professor, it is unconstitutional as applied to the plaintiff professors.  But nothing in this opinion should be construed as applying outside the limited context of postsecondary education.

Even so, the dissenting opinion attempts to raise unbriefed questions about facial and as-applied challenges.  *See* Dissenting Op. at 6–8.  We are not quite sure why, because this opinion draws the very boundary that the Supreme Court said was missing in *Moody*; we consider whether the law is constitutional as it applies to one group of people (college professors) in one context (college instruction).  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) ("What activities, by what actors, do the laws prohibit or otherwise regulate?").  To the extent that one could also say that the opinion carries out a facial analysis for college professors, we have no objection because they have straightforwardly satisfied "our standards for a facial challenge to the extent of that reach."  *See Doe v. Reed*, 561 U.S. 186, 194 (2010).

22-13992                Opinion of the Court                11

whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (quotation omitted).

**III.**

This Court has already concluded that another provision of Florida's Act—the one prohibiting mandatory workplace meetings endorsing these same ideas about race, sex, and nationality— enforced unconstitutional viewpoint discrimination. *See Honeyfund*, 94 F.4th at 1277. The language here is identical, but the academic context puts us at an unprecedented First Amendment intersection: viewpoint discrimination meets public-employee speech, meets government speech, meets academic freedom.

Viewpoint-based restrictions on speech are widely disfavored in almost any context—"the greatest First Amendment sin." *Id.* "When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular opinion or perspective individuals may express on that subject, the violation of the First Amendment is all the more blatant." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quotation omitted). At the same time, when the government acts as an employer it has discretion to restrict employee speech in ways that it could not for private parties. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). That authority, though, is designed to allow the government to effectively manage its workplaces, not drive out speech it disfavors. *See Garcetti v. Ceballos*, 547 U.S. 410, 418–23 (2006). Of course, if the

12                    Opinion of the Court                    22-13992

government itself is the speaker, the rules change yet again. Exempt from First Amendment scrutiny, the government may choose what to say and what not to say. *Shurtleff v. City of Boston*, 596 U.S. 243, 251–52 (2022). And on top of all that hovers our Nation's tradition of academic freedom—celebrated with vigor, but constitutionally defined with only the haziest of lines. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 104–05 (1968).

A decades-old precedent from this Circuit does not give all the answers, but it does mark a path. In *Bishop v. Aronov*, we considered whether the University of Alabama could bar a professor from interjecting personal religious beliefs into his physiology classes. 926 F.2d at 1067–68. Recognizing the tension between the Supreme Court's homages to academic freedom and its precedents on employee speech, this Court sought a constitutional balance between the two. As *Bishop* explains, the Supreme Court's pronouncements on academic freedom "cannot be extrapolated to deny schools command of their own courses." *Id.* at 1075. Indeed, the opinion rejects the idea of academic freedom as an "independent First Amendment right." *Id.* But that does not mean the Constitution has nothing to say. To the contrary, *Bishop* emphasized that "[o]ur Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us" and "a special concern of the First Amendment." *Id.* (quoting *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967)).

Then, as now, none of the Supreme Court's precedents provided a controlling answer. *Id.* at 1072–74. So the *Bishop* Court started with *Pickering v. Board of Education*, the first case in the Supreme Court's public-employee-speech trio, "because of the balancing it suggests." *Id.* at 1072; *see Pickering*, 391 U.S. at 568. The result was a three-part inquiry. We *first* considered the context of the professor's speech; *second*, the university's rights, both as a public employer and as an arbiter of curricular offerings; and *third*, "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Bishop*, 926 F.2d at 1074–75.

This Court thus has already set out a way to evaluate the competing constitutional interests in the context of postsecondary education. But before we apply those factors here, one more consideration demands our attention: whether *Garcetti v. Ceballos* shifted the foundation of the analysis. That case, decided fifteen years after *Bishop*, defines employee speech in a more expansive way than its predecessors, including *Pickering*. *See Garcetti*, 547 U.S. at 422–24. But *Garcetti* too fails to offer a clear answer. Recognizing the "additional constitutional interests" implicated by classroom expression, *Garcetti* explicitly declined to say whether its expansion of the employee speech category would apply to teaching and scholarship. *Id.* at 425.

Here, we have no way to avoid that question. So we first consider whether *Garcetti* extends, full-force, to professors teaching in classrooms, thereby qualifying their lectures as "employee

speech" subject to control and discipline well beyond what the First Amendment would otherwise allow.  It does not, at least here and for at least two reasons.

To start, though the employee speech cases provide a useful framework for balancing interests, their primary rationale—managing government workplaces—does not apply here.  Florida's speech restrictions are designed to ban disfavored speech on a broad scale before it happens, not respond to internal workplace issues on an individual level.  A second objection is more structural. Blessing an extension of *Garcetti* here would leave no room—none at all—for the traditional value of academic freedom.  True, the Supreme Court has not been precise about the boundaries of that freedom or its relationship to the First Amendment.  But expanding *Garcetti* to cover every word of every college lecture would imperil academic freedom to a degree that is incompatible with the Supreme Court's precedents.

For its part, Florida seeks to evade any First Amendment limitations at all by rigging together several speech doctrines to create a new rule that would quietly remove all free speech protections from the classroom.  Because the government pays the professors' salaries, Florida says, their speech is the State's speech. Emphatically no.  The Florida defendants cannot "put together half a donkey and half a camel, and then ride to victory on the synthetic hybrid."  David F. Cavers, *The Choice-of-Law Process* 39 (1965) (quotation omitted).  When we read the cases Florida cites—rather

than the quotations it pulls from them—the doctrinal connections quickly unravel.

Taking *Bishop* as our guide, then, we conclude that the Act violates the First Amendment as applied to these plaintiffs. Viewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting, and they are especially pernicious in the classroom context. That goes double for broadly worded yet imprecise regulations like these, which are sure to leave both professors and their students guessing about what kind of speech might violate the rules. And instead of asserting traditionally recognized concerns of effective workplace management, or even legitimate pedagogical values, Florida weakly suggests that the Act is meant to penalize discrimination. No—that suggestion is belied by the Act's own text. Here, as in the companion workplace provision, "speech is not regulated incidentally as a means of restricting discriminatory conduct—restricting speech is the point of the law." *Honeyfund*, 94 F.4th at 1283.

More credibly, the State explains that it also seeks to protect its "most cherished ideals." But that justification fails, too. Though the government has plenty of ways to promote its own viewpoint, puppeteering every university professor in the state is not one of them. Forcing an official government line—in a college classroom of all places—is exactly the "pall of orthodoxy" that the First Amendment will not tolerate. *Keyishian*, 385 U.S. at 603.

That is not to say that universities, and even sometimes state governments, cannot exercise ordinary employee management, make ordinary curriculum decisions (like which majors or courses to offer), or otherwise ensure competent academic instruction. But there is nothing ordinary about the authority Florida seeks here. The level of control that Florida demands—total—would be inconsistent not only with our Nation's traditional constitutional protections for academic freedom, but also with the doctrines Florida cobbles together to support its suppression of disfavored viewpoints.

### A.

We first examine how *Garcetti* changed the employee speech landscape, expanding the government's ability to control civil servants' work-related communications on an individual basis.

### 1.

The Supreme Court has long emphasized that the "interplay between free speech rights and government employment" requires "a delicate balancing of the competing interests surrounding the speech and its consequences." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–28 (2022) (quotation omitted). But respecting the government's prerogatives as an employer while also protecting employees' rights to speak as citizens has not been easy. Over time, this balancing act blossomed into a multi-step framework used to analyze free speech claims made by government employees who are subjected to after-the-fact discipline.

One early case was *Pickering v. Board of Education*, in which a high school teacher was dismissed after he penned an article in the local paper criticizing the School Board's allocation of funds between academics and athletics. 391 U.S. at 566. After the teacher objected to his firing on First Amendment grounds, the Supreme Court worked to balance the interests of both government and speaker, while also keeping in mind the "public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment." *Id.* at 573.

Public employees, the Court reasoned, do not forfeit their First Amendment rights simply because they work for the government. *Id.* at 568. At the same time, the Court recognized that a state's interests in regulating speech as an employer "differ significantly" from its interests in regulating the speech of private citizens. *Id.* Governments, like all other employers, need to run efficient and productive offices. To account for this tension, courts must balance the interests of the employee, "as a citizen, in commenting upon matters of public concern," against the interests of the state, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* One interest not considered? The government's bare desire to avoid public criticism. *See id.* at 570–71. Ultimately, the school in *Pickering* could not penalize the teacher's speech because that expression had neither "impeded the teacher's proper performance of his daily duties in the classroom" nor "interfered with the regular operation of the schools generally." *Id.* at 572–73.

The Court further refined this analysis in *Connick v. Myers*, a First Amendment challenge brought by an assistant district attorney after she was fired for soliciting her coworkers' opinions on internal management issues. 461 U.S. 138, 140–42 (1983). In considering the employee's constitutional claim, the Court emphasized that *Pickering*'s balancing test applies only when the employee is speaking on a matter of public concern. *Id.* at 146. Otherwise, government officials "enjoy wide latitude in managing their offices." *Id.* For Myers, that distinction was bad news. Tolerating her speech would have resulted in "disruption of the office and the destruction of working relationships." *Id.* at 152. After all, allowing free-range employee comments on any topic, internal or external, could breed both chaos and hard feelings. Together, *Pickering* and *Connick* stood for a two-part standard protecting employee speech: (1) "as a threshold matter, the speech must be fairly characterized as constituting speech on a matter of public concern"; and (2) the employee's "First Amendment interests in commenting on matters of public concern must outweigh the government's interests" as the employer. *Maggio v. Sipple*, 211 F.3d 1346, 1351 (11th Cir. 2000) (quotation omitted).

That test held for more than twenty years, until *Garcetti v. Ceballos*, 547 U.S. 410 (2006). There, an assistant district attorney authored internal memoranda attacking a search warrant affidavit's validity and advocating that the follow-on prosecution be dismissed. *Id.* at 413–14. The difficulty was that while these topics were matters of public concern, they were also matters of concern within the office—and even their internal communication

created serious workplace challenges.  The Supreme Court solved that problem by declaring that on-the-job communications, even on matters of public concern, were not protected by the First Amendment.  *Id.* at 421, 423.  So "when public employees make statements pursuant to their official duties"—as opposed to when they speak as citizens on matters of more general public concern— "the Constitution does not insulate their communications from employer discipline."  *Id.* at 421.  Because Garcetti had spoken as an employee "pursuant to his duties," his speech was unprotected. *Id.*

**2.**

The *Garcetti* Court itself recognized that "expression related to academic scholarship or classroom instruction" may implicate "additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425.  But rather than opining on that fraught question, the Court reserved it: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."  *Id.*  Here, we do not have the luxury of avoiding that question.

We answer in the negative.  To start, the rationale underlying the *Pickering–Connick–Garcetti* trio of cases does not apply with equal force to curricular speech by university professors.  The chief concerns motivating those decisions were about workplace management, not content restriction for its own

sake. Just like other employers, public agencies "need a significant degree of control over their employees' words and actions"—every workplace grievance need not take on a constitutional dimension. *Id*. at 418, 420.

So when an employee's speech would "disrupt the office, undermine [the manager's] authority, and destroy close working relationships"—in short, when it would impede "the administration of a government office"—the government can generally take the same actions that a private employer might. *Connick*, 461 U.S. at 154; *see also id*. at 151–52. Otherwise, government offices would face "displacement of managerial discretion by judicial supervision," with "little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418, 423. But when an employee's speech does not hinder the "proper performance of his daily duties" or "interfere[] with the regular operation of the [workplace] generally," the government's legitimate interest in limiting that expression is no greater than its interest in limiting similar expression from a private citizen— which means it cannot do so. *Pickering*, 391 U.S. at 572–73.

These kinds of managerial concerns are not at play here. Florida has not asserted that its law plays any role in allowing proper performance of professors' daily duties, avoiding classroom disruptions, or the like. Instead, the law is a "per se ban on speech the state disagrees with." *Honeyfund*, 94 F.4th at 1283. An interest in banning disfavored viewpoints is not in line with the workplace

management concerns that give the government extra leeway in the employee speech cases.

Nor are the university professors here similarly situated to the employees in the *Pickering–Connick–Garcetti* trio. They are not civil servants; their jobs do not involve administering government programs. Public universities of course perform important civic functions—chief among them training and educating the next generation of leaders—but these are different in kind than the ordinary business of public administration. These distinctions carry weight, and the Supreme Court has recognized that not all state actors are treated equally when it comes to on-the-job expression. The speech of elected officials, for example, receives greater protection than that of traditional civil servants. *See Wood v. Georgia*, 370 U.S. 375, 394–95 & n.21 (1962) (sheriff); *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966) (legislator). In First Amendment cases, the context always matters, and university professors are not in the same box as civil servants.

What's more, this case involves a broad legislative speech ban enacted by political authorities—the Florida legislature and the Governor—who are not the professors' employers and who exercise no direct supervision or control over their employment. *See, e.g.*, Fla. Stat. § 1001.741(1)–(2) (university president has final say on employment decisions); Fla. Const. art. IX § 7(d) (Board of Governors is responsible for management and operation of the university system). The "*Pickering* test is inapplicable" when "the State is not acting in a traditional employer role," and seeking to

enforce a legislative speech ban is not remotely equivalent to a boss supervising her employee. *Harris v. Quinn*, 573 U.S. 616, 652 (2014). Indeed, it is even a far cry from a state board's exercise of control over K–12 curriculum. *See, e.g.*, Fla. Stat. § 1001.03(1) (granting the State Board of Education power over public K–12 curricular standards).

One other feature of the public-employee speech cases dissuades us from extending their reasoning here. All three centered on disciplining a single employee who had already spoken—"a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467 (1995). Here, the government's attempt to control employee speech is at the other end of the spectrum. The Act is a wide-ranging, ex ante restriction on the speech of every public university professor in the state. Because the Act "chills potential speech before it happens," the State's "burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." *Id.* at 468.

### 3.

Those contrasts would likely be enough to counsel against extending *Garcetti*. But one other consideration looms large: if *Garcetti* applies to all aspects of scholarship and teaching, academic freedom is a nullity. And that cannot be—though the Supreme Court has been stingy about the details of academic freedom, it has

22-13992              Opinion of the Court              23

been generous in its declarations that scholarship and teaching are part of the First Amendment package.

Time and again, the Supreme Court has made clear that "teachers do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 597 U.S. at 531 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). "The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). This Court has said so, too: "The protections of the First Amendment have been given special meaning when teachers have been involved." *Pred v. Bd. of Pub. Instruction*, 415 F.2d 851, 855 (5th Cir. 1969).[7] Because academic freedom "is of transcendent value to all of us and not merely to the teachers concerned," the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

We could go on—as noted, the Supreme Court has been unsparing in its praise for academic freedom and in tying that value to the First Amendment.[8] The trouble, of course, is that apart from

---

[7] Decisions by the former Fifth Circuit handed down before October 1, 1981, are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[8] *See, e.g.*, *Sweezy*, 354 U.S. at 250; *Barenblatt v. United States*, 360 U.S. 109, 112 (1959); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *Keyishian*, 385 U.S. at 603; *Whitehill v. Elkins*, 389 U.S. 54, 59–60 (1967); *Epperson*, 393 U.S. at 104; *Tinker*,

24                    Opinion of the Court                    22-13992

these declarations about its importance, the Supreme Court's discussions of the nature of academic freedom are murky at best: "Lacking definition or guiding principle, the doctrine floats in the law, picking up decisions as a hull does barnacles." J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 253 (1989). But the fact remains that these decisions are unequivocal in their recognition that the First Amendment protects at least some core aspects of teaching and scholarship, even in public universities. Extending *Garcetti*'s rationale to allow a state to ban every professor at every public university from promoting a set of viewpoints while teaching would swiftly transform academic freedom from a constitutional value into a constitutional nullity. And it would soon lead to orthodoxy displacing inquiry in our classrooms.

★        ★        ★

Several features of the Supreme Court's public-employee speech precedents motivate our decision not to extend *Garcetti*: the mismatch between the workplace-management rationales behind those decisions and the motivations at play here, the kinds of employees *Garcetti* and its predecessors applied to, the nature of the speech restrictions at issue, and the traditional importance of

---

393 U.S. at 511–12; *Healy v. James*, 408 U.S. 169, 180–81 (1972); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985); *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 198 n.6 (1990).

academic freedom.[9]   To be sure, *Garcetti* may still apply to a professor's speech in another context, including when that speech impedes the proper administration of the school.   But if there is anything *Garcetti* cannot cover, it is broad legislative bans on disfavored speech—not if academic freedom has any constitutional weight at all.

**B.**

To be fair, even the Florida defendants do not push for a straightforward application of *Garcetti*.   Instead, they hitch employee speech cases to government speech cases, resulting in a new rule altogether: because these professors were hired by and are paid by the government, everything they say in their classrooms is really the government speaking.   That assertion is no less remarkable than it sounds.   But Florida's rule is not one that emerges neatly—or at all—from any one case.   Instead, it requires connecting doctrines together in a way that *almost* makes sense when bouncing from quote to quote.

The first stop is a few lines from *Rosenberger v. Rector & Visitors of University of Virginia*, which Florida characterizes as a government speech case.   It is not.   *Rosenberger* instead explained that a university must be viewpoint neutral in sponsoring student

---

[9] We are not alone in this conclusion.  *See e.g.*, *Reges v. Cauce*, 175 F.4th 1014, 1030–33 (9th Cir. 2026); *Kilborn v. Amiridis*, 131 F.4th 550, 557–58 (7th Cir. 2025); *Heim v. Daniel*, 81 F.4th 212, 224–28 (2d Cir. 2023); *Meriwether v. Hartop*, 992 F.3d 492, 504–06 (6th Cir. 2021); *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011).

groups. In so holding, the Supreme Court noted that the University need not be viewpoint neutral in its own speech, "which is controlled by different principles." 515 U.S. 819, 833–34 (1995). Of course—universities have control over their own curriculums. How would it be otherwise? They need not offer, for instance, every class a student would like to take. But that does not resolve, or really even address, the issues in this case. For one, *Rosenberger* is about a university's decision, not a state legislature's mandate. That's true, in fact, of all the cases Florida cites in support of curricular control—it is the university's view of the curriculum that is privileged, not the legislature's. Same goes for the dissent, which repeatedly overlooks that the precedents it cites—all of them— reserve space for universities to discipline their employees, not for state political bodies to discipline public dialogue.[10] *See* Dissenting Op. at 1–2, 14–15.

---

[10] The dissent looks to a Third Circuit opinion by then-Judge Alito for support, but will not find it there. *See* Dissenting Op. at 27–28. Why? Because that case, unlike this one, was about an ordinary disciplinary decision against one professor by one university. And that opinion does not make the same mistake as the dissent—mixing up the state and the university, treating one as the equivalent of the other. *See Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488 (3d Cir. 1998). Justice Alito noted, for example, that "the First Amendment does not place restrictions on a public *university's* ability to control its curriculum." *Id.* at 491 (emphasis added). Agreed. He also explained that "the *University* was acting as speaker and was entitled to make content-based choices in restricting [the individual professor's] syllabus." *Id.* at 492 (emphasis added). Yes—universities can make just that sort of decision. He went on to say that "the *University* can make content-based decisions when shaping its curriculum." *Id.* (emphasis added). Again, yes—we are three for

22-13992                Opinion of the Court                27

Another fundamental problem with Florida's argument is that *Rosenberger* never so much as suggests that in-class speech by a professor is per se government speech. While *Rosenberger* explains that a university speaks through "the content of the education it provides," reading those words in isolation, as Florida invites us to do, distorts their meaning. 515 U.S. at 833. *Rosenberger* was a case *restricting* the government's ability to impose speech limitations on student groups, with the Supreme Court concluding that a university's selective denial of funding to religious groups was unconstitutional viewpoint-based discrimination. *Id*. at 836–37. By Florida's logic, *Rosenberger* would have gone the other way—because the University was funding the groups, it could control their speech.

---

three. And in summing up his conclusions, he rejected the idea that an individual professor has "a constitutional right to choose curriculum materials in contravention of the *University's* dictates"—but not before noting that "academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking *by the academy itself*." *Id*. (alteration adopted, emphasis added, and quotation omitted). We agree with both the reasoning and the result of Justice Alito's opinion, and reject the dissent's suggestion that it undermines anything about this one. And, like *Edwards*, all of the other cases cited by the dissent deal with a university exercising ordinary supervision over its professors and instructors on an individual basis; none come close to endorsing total legislative control over academic speech. Dissenting Op. at 15–17; *see Ferguson v. Thomas*, 430 F.2d 852, 853–55 (5th Cir. 1970); *Duke v. N. Texas State Univ.*, 469 F.2d 829, 831–33 (5th Cir. 1972); *Megill v. Bd. of Regents*, 541 F.2d 1073, 1080–85 (5th Cir. 1976); *Pred*, 415 F.2d at 853–54.

The same thing goes for the cherry-picked quotations from *Board of Regents of University of Wisconsin System v. Southworth*, in which the Supreme Court upheld a university's mandatory student activity fee. 529 U.S. 217, 221 (2000). Here, too, the challenge was from students, who did not want to financially support, even indirectly, student groups they disagreed with. And in approving the university's viewpoint-neutral policy, the Court again suggested that different "principles applicable to government speech would have to be considered" if the speech at issue were "by an instructor or a professor in the academic context." *Id.* at 235. What it did *not* say is that an individual professor's speech is invariably government speech. The *Southworth* Court thus was carving out, rather than deciding, the question of academic speech. It was also reserving academic freedom for universities. Those moves sound familiar.

After reciting these acontextual quotations, the defendants' briefing shifts to government speech cases, arguing that because Florida "appropriates public funds" to support public education at the State's universities, it is "entitled to say what it wishes" at those universities.[11] That is a sweeping assertion, and one that is unsupported by the cited government speech precedents. Those cases are about public monuments, license plates, and the like—

---

[11] *See Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009) (city's placement of a privately funded monument in a public park was government speech); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219–20 (2015) (state's specialty license plate designs were government speech).

not anything close to academic teaching. The thrust of their holdings is that when the government speaks it can choose its message. There is no need, as the Supreme Court put it, for a local government that supports recycling to include a counterargument from the local trash company. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). The classic government speech cases Florida leans on are also about the government itself expressing certain ideas—not banning employees from endorsing others. Even so, the State asserts that "if the speech of private individuals proposing license plate slogans is government speech, then surely the classroom speech of state-employed educators at state universities is too." But why? Florida does not say.

Not only is Florida's government speech argument wrong, it also amounts to double-dealing, because the State later asserts that the actual government speech doctrine is "wholly inapplicable here." Rather than asking us to conduct the analysis dictated by case law, the Florida defendants would have us conclude—by ipse dixit apparently—that *all* speech, by any professor at a public university, is government speech, completely unprotected by the First Amendment. But the Supreme Court has never endorsed anything like that idea, and we decline to take Florida's word for it. In fact, we are rightfully wary of this very sleight of hand: the government speech doctrine may not be used "as a subterfuge for favoring certain private speakers over others based on viewpoint." *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009). And in service of that same concern, we "exercise great caution before

extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

A variety of factors are at play when considering whether the government is speaking, reflecting the Supreme Court's guidance that the inquiry is a "holistic" one, neither "mechanical" nor a "rote application of rigid factors," but "driven by a case's context." *Shurtleff*, 596 U.S. at 252. Several considerations may be relevant, including "whether the government maintains control over the speech," "whether the type of speech has traditionally communicated government messages," and "whether the public would reasonably believe that the government has endorsed the speech." *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023); *see also Shurtleff*, 596 U.S. at 252.

We first consider whether the government maintains control over the speech here. The State has traditionally exercised relatively little control over postsecondary education, especially as compared to public primary or secondary education. Florida imposes few curricular requirements by statute. And those that it does impose involve basic general education requirements—things like how many core classes students must take to graduate and what standards a communications course must meet. (Such a course "must afford students the ability to communicate effectively.") *See* Fla. Stat. § 1007.25(3). And the "purpose and mission" of Florida's postsecondary educational system, as defined by state law, is to "enable[] all students to participate in the search for knowledge and individual development," to "discover and

disseminate knowledge," to "foster[] diversity of educational opportunity," and to "develop in students heightened intellectual, cultural, and humane sensitivities." Fla. Stat. § 1004.01. These broad ambitions are inconsistent with unrestricted control over the messages conveyed by university professors.

The relative independence of Florida's universities diverges from the State's near plenary authority over primary and secondary education, where "state academic standards establish the core content of the curricula to be taught in the state." Fla. Stat. § 1003.41(1). In exercising this broad authority, the State Board of Education has adopted a comprehensive list of educational standards—nearing 7,300 in number and spanning every subject and every grade. *See Browse and Search Standards*, CPALMS, https://www.cpalms.org/Public/search/Standard [https://perma.cc/92R9-FR7Y]; *see also Learning Systems Institute*, Florida State University, https://lsi.fsu.edu/projects/current/cpalms [https://perma.cc/PC2Z-LLBK]. To meet these standards, moreover, public school teachers must "us[e] the books and materials required," "follow[] the prescribed courses of study," and only "employ[] approved methods of instruction." Fla. Stat. § 1003.42(2). The state government, in short, has traditionally controlled the curriculum in primary and secondary schools, but offers only minimal statutory guidance in the postsecondary education context.

The State's relative detachment from college lectures is even more revealing when compared to the level of state control we see

in the government speech context—nearly total.  A few examples illustrate the point.  In one case about the use of a stadium loudspeaker during a state championship game, this Court explained that the announcer's remarks were "entirely scripted," with "[e]very word" written by a state employee.  *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1293–94 (11th Cir. 2024).  And in another involving a USDA-sponsored pro-beef campaign, the Supreme Court noted that the government exercised "final approval authority over every word used."  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005).  Florida does not—and could not—exercise that kind of control over every postsecondary class lecture.  Indeed, Florida does not argue that it *has* controlled every word that university professors say, only that it *can*.  And common sense also has a role to play here.  Does anyone really think that every professor in every class at every public university is putting forward the official line of the State's political branches?  So while the government speech doctrine "does not require omnipotence," Florida has not come close to exhibiting the degree of control necessary to classify professors' lectures as government speech.  *Leake v. Drinkard*, 14 F.4th 1242, 1250 (11th Cir. 2021).

The second and third factors—whether the speech has traditionally communicated government messages and whether the public would view the speech as endorsed by the government—are closely related here.  Certainly at some level the public perceives a seal of approval from the State for the curricular decisions of its universities.  And courts have recognized that the

universities themselves at least have control over "the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quotation omitted). But the text of this law does not seek to develop the curriculum of a university, of a major, or even of a class. Instead, it seeks to bar disfavored speech on one set of topics at every university and in any class. And it does so in a way that contradicts Florida's longstanding (and presumably still valid) statutes governing its universities.

Florida law, for instance, requires state universities to continually assess "the intellectual freedom and viewpoint diversity" and "the extent to which competing ideas and perspectives are presented" at the school. Fla. Stat. § 1001.706(13)(b). And the Board of Governors is forbidden from limiting students' "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive," if that speech is protected by the First Amendment. *Id.* § 1001.706(13)(a)(2), (c). These principles are consistent with the Supreme Court's recognition that the "classroom is peculiarly the 'marketplace of ideas.'" *Keyishian*, 385 U.S. at 603. And they are *inconsistent* with the idea that university professors communicate government messages as mouthpieces of the state. These statutes (together with common sense) make clear that the public—and even the State—both recognize that university professors speak independently and without government endorsement of every idea they communicate.

So neither the defendants' cherry-picked quotations, nor a true government speech analysis (which the defendants disclaim), supports their far-reaching conclusion.  And the combination of the two fares no better—zero plus zero is still zero.  The defendants' mashed-up theory of government speech results in an astonishing assertion: if the government pays your salary, it can dictate every word you say as part of your job.  Even in the academic context.  And Florida leans into this assertion rather than minimizing it, agreeing at oral argument that a state legislature could constitutionally ban any negative classroom statements about a particular gubernatorial administration.  We give the State credit for not feigning limits that its theory lacks, but the chimeric government speech doctrine it conjures cannot withstand constitutional scrutiny.

## C.

With both *Garcetti* and Florida's salary-for-speech approach to academic freedom off the table, we are still left with a difficult question: can the Individual Freedom Act's speech restrictions be constitutionally applied to these professors?  After all, though it offers little direct control, Florida (like other states) is fundamentally in charge of its public universities, appointing most members of the Board of Governors, providing considerable funding, and establishing certain core curricular standards. "Federal judges should not be ersatz deans or educators." *Bishop*, 926 F.2d at 1075.  And because "States historically have been sovereign" in the field of education, the "traditional role in the formulation and execution of educational policy" belongs to

them—not us. *United States v. Lopez*, 514 U.S. 549, 564 (1995); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 n.30 (1982). That leaves federal courts "reluctan[t] to trench on the prerogatives of state and local educational institutions." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985); *see also Virgil v. Sch. Bd.*, 862 F.2d 1517, 1520 (11th Cir. 1989). But these precedents, like their counterparts reserving space in the First Amendment catalogue for academic freedom, fail to provide a direct answer to the question we consider today.

We thus return to *Bishop*, which asked as we do here, "to what degree a school may control classroom instruction before touching the First Amendment rights of a teacher." *Bishop*, 926 F.2d at 1073. As we explained earlier, that case arose when the University of Alabama barred one of its professors from using class time to describe his religious views. *Id.* at 1068–70. Some of his comments concerned his belief in "the creative force behind human physiology." *Id.* at 1068. Others were made to share his faith, be open about his biases, and offer suggestions for students on how to deal with academic stress. *Id.* But the students sought something else—an uninterrupted course on exercise physiology. After enough complaints, the University directed Bishop to stop, forbidding him from "presenting his religious viewpoint during instructional time, even to the extent that it represent[ed] his professional opinion about his subject matter." *Id.* at 1069, 1077. We ultimately rejected the professor's free speech challenge to that restriction. *Id.* at 1076–77.

Here, Florida suggests that a direct line connects the constitutionality of the University's response to Bishop with the constitutionality of the Florida political branches' prophylactic speech ban on all public college and university professors.  Not so. *Bishop* itself instructs that there is "no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech."  *Id.* at 1074 (quotation omitted).  We are thus surprised by the dissenting opinion's insistence that *Bishop* has already decided this very different case (and presumably every other case about academic freedom) in favor of state control.  *See* Dissenting Op. at 22 ("In short, *Bishop* held that professors have no First Amendment right to overrule their employer's judgment concerning the content of classroom instruction.").

As directed by this Court's precedent, we take as our starting point *Pickering*'s baseline balancing test for assessing when governmental interests outweigh a government employee's First Amendment rights.  *See Pickering*, 391 U.S. at 568; *Bishop*, 926 F.2d at 1072.  And again following *Bishop*'s lead, we recognize "the 'basic educational mission'" of the university system, which authorizes "the use of 'reasonable restrictions' over in-class speech that [the State] could not censor outside the classroom."  *Bishop*, 926 F.2d at 1074 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266–67 (1988)).  Along those same lines, we recognize *Kuhlmeier*'s holding (endorsed in *Bishop*) that "educators do not offend the First Amendment by exercising editorial control over the style and content of student or professor speech in school-sponsored

22-13992                Opinion of the Court                37

expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* (alteration adopted) (quoting *Kuhlmeier*, 484 U.S. at 273).

These factors cash out to the recognition that here, as in other First Amendment cases, we are called to balance the professors' interests against the State's. But the government's interests in this equation are rather circumscribed: editorial control is taken for granted, but restrictions must be reasonable and related to legitimate pedagogical concerns. In conducting this analysis, we consider *Bishop*'s three general factors: the context of the speech; the state's "position as a public employer"; and the "strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1074–75.

*First*, context. Here the context is the same as in *Bishop*: "the university classroom during specific in-class time." *Id.* at 1074. *Bishop* also noted that the "University's interest is most obvious when student complaints suggest apparent coercion—even when not intended by the professor." *Id.* The word coercion, to be sure, has echoes of Establishment Clause precedents (particularly around the time of *Bishop*), but we think that concern is relevant here, too.[12] Florida's restrictions are, as the State admits, an attempt to force uniformity of thought on students by curtailing the free exchange of ideas in universities—the very environments traditionally regarded as laboratories for expression and truth

---

[12] *Bishop* rejected the Free Exercise claim and Establishment Clause claim brought by the professor. *Bishop*, 926 F.2d at 1077–78.

seeking. *See Healy v. James*, 408 U.S. 169, 180–81 (1972); *Rosenberger*, 515 U.S. at 835–36. Compelling certain beliefs by suppressing "individual thought and expression" is "especially" dangerous in the classroom context, "where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835. Unlike in *Bishop*, where the University was furthering an anti-coercion goal, Florida here asserts the opposite interest—coercing university faculty (and by extension the students) into avoiding a certain set of ideas. Whether Florida is right or wrong about how dangerous these viewpoints are is irrelevant, at least to our inquiry as a court. "No matter how controversial the ideas, allowing the government to set the terms of the debate is poison, not antidote." *Honeyfund*, 94 F.4th at 1283; *see also Sweezy*, 354 U.S. at 251; *id.* at 261–63 (Frankfurter, J., concurring).

*Second*, we consider the State's interests as an employer. "Courts agree that the school's administration may at least establish the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quotation and ellipses omitted). No doubt. And "[t]angential to the authority over its curriculum, there lies some authority over the conduct of teachers in and out of the classroom that significantly bears on the curriculum or that gives the appearance of endorsement by the university." *Id.* at 1074. This recognition, we think, significantly mitigates the risk that enforcing the First Amendment in the academic context would leave universities or other government authorities powerless to set overall curricular decisions or exclude

speech that veers outside of well-understood parameters—personal tangents irrelevant to the subject matter, conspiracy theories, and the like.

Our own early cases support this same point. In one, we found no constitutional error when a university fired a professor whose speech "seriously impair[ed] . . . his effectiveness as an instructor." *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir. 1970). In another, we rejected a First Amendment challenge to a university's decision to deny tenure when the professor gave students two course credits for effectively taking only one course; awarded most students high grades for little work; made "untrue and misleading public statements"; and demonstrated a lack of "professionalism and maturity." *Megill v. Bd. of Regents*, 541 F.2d 1073, 1082–83, 1085 (5th Cir. 1976). And in *Bishop*, we again found no First Amendment violation when the university determined that a professor's tangential speech impeded his ability to properly teach physiology. *Bishop*, 926 F.2d at 1076–77. These cases show that even when reserving space for academic freedom, university administrators (and perhaps other government officials too) have a legitimate interest in ensuring that a professor's in-class speech is both "germane" to the curriculum and "professionally competent." *See* Keith E. Whittington, *Professorial Speech, the First Amendment, and Legislative Restrictions on Classroom Discussions*, 58 Wake Forest L. Rev. 463, 501–07 (2023); *see also* Matthew W. Finkin & Robert C. Post, *For the Common Good* 87–100 (2009); Henry Reichman, *Understanding Academic Freedom* 66–69 (2021).

Florida's justifications are not in line with those rationales. Rather than asserting an interest in promoting classroom efficiency or appropriately educating students, Florida says its "sovereign judgment" is that the forbidden viewpoints are "contrary to the State's most cherished ideals." But advancing cherished state ideals is a far cry from ordinary workplace management concerns, much less a legitimate pedagogical interest. What's more, even if many of these ideas are dead wrong, they are not at all irrelevant, at least in certain coursework. Florida itself seems to recognize this fact by allowing discussion of the viewpoints, even while barring their endorsement.

The State does assert one other justification for its law—an "interest in preventing invidious racial discrimination in public education." But as we have already held when considering the companion provision limiting private employers' speech, the Act does no such thing. Discrimination "generally means to treat differently," and "the Act does not regulate differential treatment"—it restricts speech that State political authorities find objectionable. *Honeyfund*, 94 F.4th at 1281 (quotation omitted). Preventing professors from positively discussing a viewpoint is not the same as regulating discrimination, which the State can certainly do. A professor who espouses a particular idea does not stand in the same shoes as one who ridicules a student, threatens a student, or targets a student. The Act does not limit (and does not purport to limit) *actual* discrimination of any kind. It instead assumes that mere exposure to what the State views as the wrong viewpoint is

itself a serious harm.    But a difference of opinion is not discrimination.[13]

Under the First Amendment, "Florida has no compelling interest in creating a per se rule that some speech, regardless of its context or the effect it has on the listener, is offensive and discriminatory.  It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."  *Id.* (quotation omitted).

Even outside the academic context, higher standards are necessary to vindicate broad, prophylactic restrictions on the speech of a large number of employees than to justify case-by-case punishment of an errant employee.  *See Nat'l Treasury Emps. Union*, 513 U.S. at 466–68.  Here, the law simply suppresses certain viewpoints that Florida disfavors.

At a minimum, then, the State's interests as an employer do not line up with the priorities that we have recognized in *Bishop* and other early cases in the educational context.  Nor, as discussed earlier, are they similar to those that the Supreme Court approved

---

[13] We are sincerely confused by the dissent's insistence that *Bob Jones University v. United States* has any bearing on this case.  461 U.S. 574 (1983); *see* Dissenting Op. at 2–3, 25–26.  *Bob Jones* upheld an Internal Revenue Service ruling revoking the tax-exempt status of private universities that refused to admit applicants who were part of an interracial marriage or spoke in support of interracial marriage.  461 U.S. at 577–82.  That case was not about free speech, and this case is not about racial discrimination.

in the *Pickering* line of cases.  And at their maximum, the State's interests run headlong into bedrock First Amendment principles. The Supreme Court said it best: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

*Third*, we consider what we called in *Bishop* the "strong predilection for academic freedom."[14]  *Bishop*, 926 F.2d at 1075.  As we noted there (and here), scholarly freedom is "abundant[ly]" celebrated in First Amendment caselaw, and the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Id.* (quoting *Keyishian*, 385 U.S. at 603).  Indeed, our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather

---

[14] The dissent transforms *Bishop's* fact-intensive conclusion (that one university's curricular authority to require one professor to avoid religious coercion outweighed that professor's asserted interest in academic freedom) into a far grander one: that *Bishop* has already done the work for us, weighing state control against academic freedom, and "resolv[ing] that balance in favor of the State's authority within the classroom."  *See* Dissenting Op. at 22 & n.7. No.  As we have already explained, *Bishop* itself directs a context-specific inquiry, and does not remotely offer a blanket rule ranking academic freedom below any state interest.  *See* 926 F.2d at 1074–75.  And again, *Bishop* offers no holding about a *state*'s authority to control curriculum; it protects a *university*'s authority to control curriculum.  *See id.* at 1078.

than through any kind of authoritative selection." *Id.* (alteration adopted) (quoting *Keyishian*, 385 U.S. at 603).

Again, *Bishop* proves the point. True, that court also noted that "pronouncements about academic freedom" in other contexts "cannot be extrapolated to deny schools command of their own courses." *Id.* To that end, we nod our heads along with *Bishop* as it recognizes that "academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Id.* (alteration adopted and quotation omitted). Florida's Act, in contrast, removes any decisionmaking by the academy about the topics it bars. And the State's rationale is not limited—it would allow the legislature to block any speech on any topic for any reason.

Even in other contexts where the government has greater latitude to impose constraints on speech, it still "may not aim at the suppression of dangerous ideas." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 587 (1998) (alteration adopted and quotation omitted). In the university context, then, where the dangers of censorship are heightened, a state prohibiting disfavored messages inspires even more skepticism. The broader the restriction, and the more people whose speech it limits, the more scrutiny it must receive. *See Nat'l Treasury Emps. Union*, 513 U.S. at 466–68. Case-by-case restrictions on a single problematic professor's teaching are the bread and butter of First Amendment cases affirming the curricular authority of universities. But Florida tries to stretch

those precedents to fit an entirely new context: not a university disciplining one professor for discrete misconduct, but a state government barring all professors from sharing politically disfavored ideas.

**D.**

We acknowledge that the *Bishop* factors can sometimes point in different directions.  In *Bishop* itself they did—the professor's control over his own in-class speech was set against his university's decisions about the overall content of that class.  But here, we think they point the same way—toward free speech.

The distinctions between this case and *Bishop* are fundamental.  For starters, these statutory speech restrictions are not the considered academic judgment of a university, and these disagreements are not between a university and its professor.  That is not to say that states cannot play an important or even decisive role, but it is far less likely that the more workaday employment and curricular concerns that can survive First Amendment review will capture the imagination of legislative majorities.  What's more, the restriction in *Bishop* was directed to one professor, about one class, and involved one type of objection to his teaching.  *See Bishop*, 926 F.2d at 1068–70.  The Individual Freedom Act, in contrast, applies to all state professors, in every class, and targets eight broad and disfavored topics.  *See* Fla. Stat. § 1000.05(4).  It is a naked prohibition on disfavored speech, not a limited restraint on one professor's religious views.  And its tiered enforcement scheme

applies not only to professors, but also to universities, hitting both with dramatic financial consequences for noncompliance.

Normally, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. And we have previously "emphasized that the dangers of viewpoint discrimination are *heightened* in the university setting." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (quotation omitted). As Florida itself recognizes, at least in other statutes, universities are where new ideas germinate, where solutions take shape, and where orthodoxy falls. Or, they should be—sometimes groupthink or even more sinister patterns take hold. But make no mistake, "standardization of ideas either by legislatures, courts, or dominant political or community groups" is not the answer. *Terminiello v. Chicago*, 337 U.S. 1, 4–5 (1949). Instead, "for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Florida has made no such showing.

This Act's effect on academic freedom is compounded by its lack of clear definitions. The uncertainties about the Act's coverage are yet another difference between the restrictions placed on Bishop and those sought here. "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious

46                    Opinion of the Court                    22-13992

freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted). The Act's language is full of imprecision, which leaves us with some idea of the viewpoints that Florida targets, but little information about the boundaries of those concepts or what it would take to "endorse" them. For example, when a professor assigns a reading for class that promotes one of the prohibited concepts, is that professor subjecting the student to "instruction that espouses, promotes, advances, inculcates, or compels such student . . . to believe" in the concept? What about when a professor hosts a guest speaker who presents only one side of the debate?[15] Or how about a professor who teaches about one of the forbidden concepts using the Socratic method? Would those discussions be "objective"? The parties disagree on every front.[16] And that is to say nothing of the lack of clear language in the individual concepts' definitions. Just to name one, what does "morally superior" encompass, and against whose perspective is it measured?

---

[15] The defendants tell us that a professor would not violate the Act by hosting a guest speaker who promotes one of the eight concepts unless that professor endorses the guest's speech. This exacerbates rather than solves the problem, layering imprecision on imprecision.

[16] Under Florida's theory of the case, the State's authority over professors' scholarship would likewise be unlimited—after all, research is part of what they are hired and paid to do. *Bishop* rejected precisely this argument. *See* 926 F.2d at 1076–77 (government may not regulate what professor does as a "researcher").

Florida, unlike the defendants in *Bishop*, has not offered us a narrow reading of the speech restrictions it seeks to impose. Instead, it offers the broadest possible rule: because the government pays these professors' salaries, it can restrict their speech however it wishes. Moderation is said to be found in the fact that professors will have the opportunity to clean up their courses after shortcomings are identified. What a remarkable suggestion—that we should bless an unclear, viewpoint-based speech ban simply because the government says it will refrain from penalizing the speaker until after it gives a warning. That is a dark kind of mercy.

In the end, the State's interests are insufficient to support the Act's restrictions. Whatever the boundaries of the government's control over in-class, curricular speech, this set of restrictions exceeds them. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases). Try as it might, the State of Florida may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642. The "First Amendment rests instead on a simple truth: The people lose whenever the government transforms prevailing opinion into enforced conformity." *Chiles*, 146 S. Ct. at 1029 (alteration adopted

and quotation omitted). The Act violates the First Amendment's guarantee of freedom of speech.[17]

⋆    ⋆    ⋆

A few words about the dissent. Our decision today does not authorize "viewpoint discrimination under exceptions created, interpreted, and enforced by the judiciary." Dissenting Op. at 32. To the contrary, it simply reserves space for the same kinds of curricular and disciplinary decisions that universities have always made. Nor do we make any judgment about the value of the ideas Florida seeks to ban—it is not our place to do so. "As in every case, our single duty is to determine the issues presented in accord with the Constitution and the law." *Coolidge v. New Hampshire*, 403 U.S. 443, 445 (1971); *see also Biden v. Nebraska*, 600 U.S. 477, 506–07 (2023). For its part, the dissent does not so much as attempt to reconcile its view with the Supreme Court's repeated invocations of academic freedom. Perhaps it finds them inconvenient, or even incorrect (though it offers no analysis of why that would be so). But the only way to uphold this law is to disregard those precedents, and as lower court judges we do not have that option.

The dissent also attempts to clothe itself in originalism without offering any originalist inquiry. For one, it makes a show of the lack of pre-twentieth-century discussion of "academic

---

[17] Because we conclude that the Act's speech restrictions directly violate the First Amendment, we need not address the plaintiffs' separate vagueness and overbreadth arguments.

freedom," but that is easy enough to explain—if one considers the matter. *See* Dissenting Op. at 9–10. To start, the First Amendment was not incorporated against the States until 1868, and the federal government was not in the business of chartering universities, so there was no reason to consider its specific impact on state universities until much later.

Jurisprudential factors were at play, too. The First Amendment had "no general bite in 1900 because of the American judiciary's extremely cramped view of the amendment's scope." William W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme Court of the United States: An Unhurried Historical Review*, 53 Law. & Contemp. Probs. 79, 82 (1990). That was not, the reader will note, an originalist era. On top of that, the Supreme Court's view of public employment at the time left no room at all for freedom of speech—a government employer had total control over an employee's speech, both in and out of the workplace. *Id.* at 83–84. Then-Judge Holmes offered the most memorable (if troubling) description of this view: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. . . . The servant cannot complain, as he takes the employment on the terms which are offered him." *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517–18 (Mass. 1892). Though the dissent endorses this long-retired view of public employee speech, its place in the law is thankfully gone.

Even considering all this, it is clear that the concept of academic freedom, if not the term, was well recognized early in

our Nation's history.  One of the very scholars the dissent cites explains that "[p]ractical autonomy from government control has characterized American colleges and universities . . . at least since disestablishment of the state churches at the beginning of the nineteenth century."  J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 321 (1989).  Indeed, early sources reflect a respect for keeping politics out of teaching and scholarship.  When the New Hampshire legislature tried to take over Dartmouth College, Daniel Webster persuaded the Supreme Court to side with the College.  In what turned out to be the most famous oral argument in this Nation's history, Webster stressed that it would be "a dangerous, a most dangerous, experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuations of political opinions."  *See Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 599 (1819).  So too for freedom of inquiry in the university setting.  Around the same time, when planning for the University of Virginia, Thomas Jefferson wrote, "this institution will be based on the illimitable freedom of the human mind.  For here we are not afraid to follow truth wherever it may lead, nor to tolerate any error so long as reason is left free to combat it."  Letter from Thomas Jefferson to William Roscoe (Dec. 27, 1820), *in* 16 *The Papers of Thomas Jefferson: Retirement Series* 499 (J. Jefferson Looney et al. eds., 2019).

We share the dissent's view that the federal courts do not police curriculum.  But we do police the First Amendment.  And if the history of that Amendment tells us anything, it is that the government cannot forbid what it perceives as heresy.  As between

allowing a state to tamp down discussion of disfavored viewpoints on the one hand, and allowing free debate about those topics on the other, which do we think is more consistent with the founding generation's commitment to the freedom of speech? The question answers itself.

## IV.

"Because the plaintiffs have shown a likelihood of success on the merits, the remaining requirements necessarily follow." *Honeyfund*, 94 F.4th at 1283. The Act is "an unconstitutional direct penalization of protected speech," so "continued enforcement, for even minimal periods of time, constitutes a per se irreparable injury." *Otto*, 981 F.3d at 870 (quotation omitted). And because neither the State nor the public has a legitimate interest in the enforcement of an unconstitutional law, the third and fourth requirements are met. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The plaintiffs have therefore satisfied all four requirements for a preliminary injunction.

★    ★    ★

Florida seeks to strip public university professors—and by extension their students—of the ability to fully engage with ideas that are, for better or for worse, very popular in some academic circles. The State asks us to consider its rules a means of targeting discrimination. But hearing an idea you disagree with is not discrimination; it is an opportunity to come up with a better idea, or maybe even change your mind.

This is not the first time that the State has tried to lead us down the garden path about the purpose and effect of a law banning speech. We have once before rejected its reframing of the Individual Freedom Act's proscriptions, and we do so again here. *See Honeyfund*, 94 F.4th at 1283. Section 1000.05(4) cannot be constitutionally applied to these plaintiffs. The Act strikes at the core of the First Amendment's commitment to open dialogue, transforming the classroom into a place where a "deadening dogma takes the place of free inquiry." *Adler v. Bd. of Educ.*, 342 U.S. 485, 510 (1952) (Douglas, J., dissenting), *overruled by Keyishian*, 385 U.S. 589.

The proper role of universities in our society has long been a topic of fierce debate. Universities and professors do not always get it right. Neither does the government. But as we said not long ago, "[i]ntellectual and cultural tumult do not last forever, and our Constitution is unique in its commitment to letting the people, rather than the government, find the right equilibrium." *Honeyfund*, 94 F.4th at 1283. We **AFFIRM** the district court's preliminary injunction.

22-13992                    LAGOA, J., Dissenting                    1

LAGOA, Circuit Judge, Dissenting:

Our task here is not to decide what the State *should* do, but what it *may* do.

The professor-plaintiffs are state employees, and the speech at issue here occurs during their state-sponsored instruction in a course taken for credit by students enrolled in the State's public universities. According to the majority, a state can restrict a professor's speech so long as the restriction is "reasonable and related to legitimate pedagogical concerns." Maj. Op. at 37. The majority also tells us that the State may legitimately prohibit a professor from discussing "irrelevant" material, "professionally [in]competent" material, "conspiracy theories, and the like." *Id.* at 39. The majority reassures that these are "well-understood parameters." *Id.* But in practice, these "parameters" install a judge-made test that is unworkable and whose "policy-driven approach to the Constitution," *McKee v. Cosby*, 586 U.S. 1172, 1173 (2019) (Thomas, J., concurring in the denial of certiorari), reduces the First Amendment to a reflection of judicial preference, regardless of the State's interests in its classroom instruction.

The State's authority in this context is not the nullity the majority suggests. We have repeatedly decided cases of this kind, and from those decisions emerges a consistent principle: the State's authority is at its zenith in its public classrooms, including the classrooms in its public universities. *See Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991); *Ferguson v. Thomas*, 430 F.2d 852, 859 (5th Cir.

2                    LAGOA, J., Dissenting                    22-13992

1970);[1] *Megill v. Bd. of Regents of State of Fla.*, 541 F.2d 1073, 1081–82 (5th Cir. 1976); *Pred v. Bd. of Pub. Instruction of Dade Cnty., Fla.*, 415 F.2d 851, 859 (5th Cir. 1969); *Duke v. N. Texas State Univ.*, 469 F.2d 829, 835–40 (5th Cir. 1972). And "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

A public university's classroom "is not an open forum." *Bishop*, 926 F.2d at 1071. During instructional periods, "the University's classrooms are reserved for other intended purposes," namely "the teaching of a particular university course for credit." *Id.* (internal quotation marks omitted). Our precedent is clear that states retain authority to restrict a professor's "viewpoint" in a public classroom, even if the professor's viewpoint "represents his professional opinion." *Id.* at 1076–77.

To be clear, the First Amendment protects all viewpoints in the public square, whether they are conventional or controversial. But it does not compel all viewpoints to be worthy of state-sponsored endorsement. Indeed, in a case involving a private religious university, the Supreme Court held that the government has a "compelling" and "overriding interest in eradicating racial discrimination in education." *Bob Jones Univ. v. United States*, 461 U.S. 574,

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Id.* at 1209.

22-13992              LAGOA, J., Dissenting                3

604 (1983). Florida asserts the same interest here. And if the government has a compelling interest in eradicating racial discrimination in a private university, how much greater is Florida's interest in eradicating what it deems to be racial discrimination in its own classrooms? We need not agree or disagree with Florida that the viewpoints at issue here constitute racial discrimination; we need only acknowledge that the State is allowed to decide what is endorsed by its professors in its own classrooms.

Because Plaintiffs have not shown a likelihood of success on the merits that the Individual Freedom Act ("IFA"), Fla. Stat. § 1000.05(4)(a), is unconstitutional, I respectfully dissent.

## I.

The IFA makes it an act of discrimination "on the basis of race, color, national origin, or sex" to subject any student or employee to "training" or "instruction" that "espouses, promotes, advances, inculcates, or compels" belief in any of eight concepts. Fla. Stat. § 1000.05(4)(a). Those concepts are:

1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2. A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

4                         LAGOA, J., Dissenting                         22-13992

3.  A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.  Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.  A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.  A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.  A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.  Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

22-13992              Lagoa, J., Dissenting                    5

*Id.* § (4)(a)(1)–(8).[2]

The IFA expressly permits a professor to assign texts containing such concepts to his students, discuss their contents in the classroom, and even dissect their underlying ideologies. *See id.* § (4)(b) (providing an exception for "discussion of the concepts listed," provided that "such training or instruction is given in an *objective manner without endorsement*" of those concepts) (emphases added). Put simply, the statute distinguishes between the discussion and debate of discriminatory ideologies, which is permissible, and their endorsement or promotion by the professor, which is not.

Plaintiffs—two students, several professors, and a student organization at six of Florida's public universities—contend that these nondiscrimination provisions violate the First Amendment.[2]

---

[2] As outlined by the district court, Plaintiff Professor LeRoy Pernell intends to teach his students that "racism is embedded in the criminal justice system." *Pernell v. Florida Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1246 (N.D. Fla. 2022). Plaintiff Dana Thompson Dorsey "typically assigns her own articles that discuss white privilege and critique the concept of colorblindness." *Id.* Plaintiff Sharon Austin "endorses critical race theory and assigns reading materials that advocate for affirmative action." *Id.* at 1246–47. Plaintiff Shelley Park "teaches that merit, objectivity, and colorblindness function to solidify systems of oppression as foundational truths rather than academic theories." *Id.* at 1247. Plaintiff Jennifer Sandoval's seminar "includes sections on 'whiteness' and race discrimination in academia." *Id.* Plaintiff Russell Almond asserts that "the IFA impacts his ability to instruct on institutionalized racism." *Id.* Plaintiff Adriana Novoa alleges that several of her course materials treat "the existence of racial privilege as a given." *Id.* at 1259.

6                         Lagoa, J., Dissenting                      22-13992

Before turning to the merits, I clarify the nature of Plaintiffs' challenges. The majority assumes that "[t]he plaintiffs bring *as-applied* challenges to the Act." Maj. Op. at 10 n.6 (emphasis added). That view is understandable; this doctrine is not always a model of clarity. The Supreme Court has recognized that "the distinction between facial and as-applied challenges is not so well defined," *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010), and that some claims "obviously ha[ve] characteristics of both." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). This case is a good example.

Here, "[t]he claim is 'as applied' in the sense that it does not seek to strike the [IFA] in all its applications, but only to the extent it covers [public university professors]. The claim is 'facial' in that it is not limited to plaintiffs' *particular case*, but challenges application of the law more broadly to *all* [public university professors]." *Reed*, 561 U.S. at 194 (emphases added). In other words, the claim, and the injunction entered below, "reach beyond the particular circumstances of these plaintiffs," *id.*, barring the Board of Governors "from enforcing the IFA and Regulation 10.005 against any state university." *Pernell v. Florida Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1288 (N.D. Fla. 2022). As *Reed* explains, when a claim reaches that far, it "must therefore satisfy our standards for a facial challenge to the extent of that reach." 561 U.S. at 194.

The district court understood as much. It "agree[d] that Plaintiffs bring facial challenges in both their First Amendment viewpoint discrimination and Fourteenth Amendment vagueness

22-13992                 Lagoa, J., Dissenting                          7

claims[,]" and issued "facial relief" accordingly. *Pernell*, 641 F. Supp. 3d at 1287–88. In short, "[Plaintiffs] chose to litigate these cases as facial challenges, and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

For facial challenges, Plaintiffs must show that the IFA "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Admittedly, because the majority considers the IFA to be impermissibly "viewpoint discriminatory" under the First Amendment, it is unclear whether this analysis is required in the context of public university professors. *See Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019). Even so, *Moody*'s threshold directive is clear: "*Before a court can do anything else* with these facial challenges, it must address that set of issues—in short, must 'determine what [the law] covers.'" 603 U.S. at 725 (quoting *Hansen*, 599 U.S. at 770) (emphasis added). That is no less true "in the First Amendment context[.]" *Id.* at 744.

The majority does not undertake that threshold task. Instead, it asserts that the IFA provides "little information about the boundaries of those concepts or what it would take to 'endorse' them" and then poses a series of unanswered hypotheticals. *See* Maj. Op. at 46 & n.16. But it does so without first identifying the statute's scope, an error the Supreme Court has already admonished this Court for doing once before. *Moody*, 603 U.S. at 726 ("Neither the Eleventh Circuit nor the Fifth Circuit performed the facial analysis in the way just described."). Regardless of

8                    LAGOA, J., Dissenting                    22-13992

whether the facial analysis described in *Moody* is strictly required to establish viewpoint discrimination, "[a] court cannot invalidate the challenged laws if it has to speculate about their applications." *Id.* at 790 (Alito, J., concurring in the judgment). We should be careful not to repeat that mistake here. [3]

All in all, the district court granted Plaintiffs a sweeping preliminary injunction against the State, an "extraordinary" remedy that is "never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (internal quotation marks omitted). The

---

[3] *Iancu* explained that, once a statute is "interpreted fairly" and found unconstitutionally viewpoint discriminatory on its face, a court need not save it by sorting applications. 588 U.S. at 394–99. But that rule presupposes a facial finding of unconstitutionality that is not present here. If it were, the majority would have no reason to pose those hypotheticals at all. Indeed, even accepting the majority's reading of *Bishop*, the majority describes that inquiry as "fact-intensive," Maj. Op. at 42 n.14, while affirming categorical relief. Its proposed "irrelevant"-instruction carveout shows why that matters. *Id.* at 38–39. An electrical-engineering professor has no apparent reason in his ordinary classroom instruction to endorse race-based discrimination because of "past [acts] by other members of the same race." Fla. Stat. § 1000.05(4)(a)(5). Yet he is swept into the injunction all the same. Because the IFA's speech restrictions do not violate the First Amendment, the majority likewise "errs in upholding the scope of the District Court's injunction." *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1266 (11th Cir. 2025) (Tjoflat, J., dissenting), *reh'g en banc granted, opinion vacated sub nom. HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. Dec. 1, 2025). As Judge Tjoflat cautioned, facial challenges "strain the limits of the federal courts' constitutional authority to decide only actual 'Cases' and 'Controversies.'" *Id.* (quoting U.S. Const. art. III, § 2).

22-13992                LAGOA, J., Dissenting                9

majority labors to affirm that result.  But the law in this Circuit is neither novel nor uncertain.  It simply points the other way.

## II.

The First Amendment provides, in relevant part, "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  And there is no serious dispute that, before the twentieth century, no one believed that the First Amendment enshrined a professorial right to freedom of speech in the classroom.

Indeed, "[t]here were no American legal precedents for academic freedom prior to its acceptance by the Supreme Court into the pantheon of First Amendment rights in 1957.  Neither the common law nor any federal or state statute granted the university professor any more security than that granted in her contract of employment."  J. Peter Byrne, *Academic Freedom: A "Special Concern of the First Amendment,"* 99 Yale L.J. 251, 256 (1989); Walter P. Metzger, *Profession and Constitution: Two Definitions of Academic Freedom in America*, 66 Tex. L. Rev. 1265, 1285 (1988) ("Before the middle of [the twentieth] century, no American court had ruled that any provision of the federal constitution protected academic freedom."); Robert C. Post, *Academic Freedom and Legal Scholarship*, 64 J. Legal Educ. 530, 530, 533 (2015) ("Academic freedom did not always exist in the United States.  It emerged during the first few decades of the twentieth century.  Its birth was a result of a transformation of the mission of higher education in America."); William W. Van Alstyne, *Academic Freedom and the First Amendment in the Supreme*

*Court of the United States: An Unhurried Historical Review*, 53-Sum. L. & Contemp. Probs. 79, 82 (1990) ("At the turn of the twentieth century, the first amendment was virtually in a state of pre-history so far as academic freedom was concerned.").

Before the Civil War, "the concept of academic freedom was literally inconceivable." Byrne, *supra*, at 269. The objective of university education was to train students to have the character and "mental discipline" to one day become lawyers, doctors, or members of the clergy. *Id.* And for better or worse, "no one" understood the role of a professor to include "producing scholarship" or "criticizing prevailing dogma." *Id.* Instead, "[f]aculty performed essentially fixed if learned operations within a traditional curriculum under the sanction of established truth." *Id.*

Academic freedom was first argued for—as a policy ideal, not as a constitutional right—at the turn of the twentieth century. This development was triggered by Americans who studied at German universities—where professors enjoyed *Lehrfreiheit* ("teaching freedom") and students enjoyed *Lernfreiheit* ("learning freedom"). Metzger, *supra*, at 1269–70. As American students returned home, they brought the concept of academic freedom with them. *Id.* In 1915, the American Association of University Professors ("AAUP") released a report containing the first "authoritative definition of academic freedom" that endorsed the concept of *Lehrfreiheit*, though it was "couched in American terms." *Id.* at 1267–85; Byrne, *supra*, at 276–78; *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (citing Metzger, *supra*, at 1267–85). But "[s]ignificantly, the AAUP

22-13992               Lagoa, J., Dissenting               11

conceived academic freedom as a professional norm, not a legal one: The AAUP justified academic freedom on the basis of its social utility as a means of advancing the search for truth, rather than its status as a manifestation of First Amendment rights." *Urofsky*, 216 F.3d at 411 (citing Richard Hofstadter & Walter P. Metzger, *The Development of Academic Freedom in the United States* 398–400 (1955); Byrne, *supra*, at 277–78); *see also* Byrne, *supra*, at 256 ("[A]cademic freedom was a matter of professional ideology and custom."). And as a 1937 comment in the Yale Law Journal recognized, "[a]cademic freedom is not . . . a constitutional privilege, or even a legal term defined by a history of judicial usage and separately listed in the digests and *Words and Phrases*." Comment, *Academic Freedom and the Law,* 46 Yale L.J. 670, 671 (1937).

Twenty years later, a plurality of the Supreme Court alluded—for the first time—to the "essentiality of freedom in the community of American universities." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) (plurality opinion). Later cases, such as *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967), also acclaim academic freedom. But these cases were the first of their kind. *See* Byrne, *supra*, at 256. A 1961 article frankly admits:

> It must be added, however, that while these statements are eloquent and incisive defenses of academic freedom, they were all made in the past ten years, and a search of the 363 volumes of the United States Supreme Court Reports will not yield much more on this subject, if anything at all. While there has been no dearth of litigation in the state appellate courts on

> subjects involving teachers and education, a reading of hundreds of cases has yielded very few opinions which pay any attention to the subject of academic freedom, and, much less, show any genuine appreciation of either its meaning or importance.

David Fellman, *Academic Freedom in American Law*, 1961 Wis. L. Rev. 3, 17 (1961).

To this day, "the Supreme Court has never set aside a state regulation on the basis that it infringed a First Amendment right to academic freedom." *Urofsky*, 216 F.3d at 412. And in *Bishop*, we discussed the "strong predilection" in favor of "academic freedom as an adjunct of the free speech rights of the First Amendment," but held that "academic freedom" is nonetheless not "an independent First Amendment right." 926 F.2d at 1075. We noted the "abundant cases which acclaim academic freedom," and identified *Keyishian*, 385 U.S. 589, as "the most applicable" to the context of a public university's classroom. *Id.* But we understood *Keyishian* as dealing "with that brand of regulation most offensive to a free society: loyalty oaths." *Id.* We clarified that *Keyishian*'s "pronouncements about academic freedom in that context" "cannot be extrapolated to deny" public universities "command of their own courses." *Id.*

Even so, the majority's opinion offers no account of how the First Amendment's text was originally understood. *See Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1332 (11th Cir. 2024) (affirming the "fundamental canon" that words in a legal provision take their "ordinary meaning at the time" of their

enactment) (quoting *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019)); *McKee*, 586 U.S. at 1173 (Thomas, J., concurring in the denial of certiorari) ("We should not continue to reflexively apply this policy-driven approach to the Constitution. Instead, we should carefully examine the original meaning of the First and Fourteenth Amendments."). For that matter, the majority offers only a partial account of how the First Amendment has been understood—relative to the college classroom—for most of American history.

### III.

Finding little support in historical understandings of the First Amendment in this context, the majority turns to precedent and concludes that we confront "an unprecedented First Amendment intersection." Maj. Op. at 11–12. But we do not.

To provide some background, we usually analyze a public employee's First Amendment claims under the *Pickering-Garcetti* framework. For most public employees, the framework proceeds in two steps. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527–28 (2022). At the first step, we analyze whether a public employee speaks "pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If so, the First Amendment "does not insulate their communications." *Id.* But if a public employee instead speaks in their capacity as a citizen, we proceed to the *Pickering* balancing test at step two. *See Kennedy*, 597 U.S. at 527–28 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968)). At the second step, we analyze the employee's claim by balancing the "interests" of the employee "as a citizen, in

14                    Lagoa, J., Dissenting                    22-13992

commenting upon matters of public concern" against "the interest of the State, as an employer." *Pickering*, 391 U.S. at 568.

In *Garcetti*, however, the Supreme Court reserved the question of whether the *Garcetti* test applies to the "scholarship or teaching" of professors at public universities. 547 U.S. at 425.[4] And five other circuits have declined to apply *Garcetti* to a professor's classroom speech. *See Kilborn v. Amiridis*, 131 F.4th 550, 557–58 (7th Cir. 2025); *Heim v. Daniel*, 81 F.4th 212, 224–28 (2d Cir. 2023); *Adams v. Trs. of the Univ. of North Carolina-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011); *Meriwether v. Hartop*, 992 F.3d 492, 504–06 (6th Cir. 2021); *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014).

We need not resolve that question here because, regardless of *Garcetti*'s application, Florida still prevails under the *Pickering* test at step two.[5] *See Kennedy*, 597 U.S. at 527–28; *see also Heim*, 81 F.4th

---

[4] The district court's reading of *Garcetti* reflects its view that the Supreme Court closed the door on applying the government speech doctrine to public university professors. *See Pernell*, 641 F. Supp. 3d at 1240 ("Refusing to take 'no' for an answer, Defendants assert this Court must apply *Garcetti*'s reasoning to the professor speech at issue here, notwithstanding the *Supreme Court's explicit refusal to do so*.") (emphasis added). But that characterization is mistaken. Rather than "refusing" to extend its reasoning to professors' speech, the Supreme Court simply declined to address an issue not before it. *See Garcetti*, 547 U.S. at 425 ("*We need not, and for that reason do not, decide* whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching.") (emphasis added). At best, the application of *Garcetti* to state university professors is an open question.

[5] In light of *Pickering* and cases like *Bishop*, this case does not require us to decide whether *Garcetti* should be extended to university professors. The majority tells us that *Garcetti* does not apply in this context, but because resolution

at 228–34 (turning to *Pickering* after holding that *Garcetti* is inapplicable); *Adams*, 640 F.3d at 564–65 (same); *Meriwether*, 992 F.3d at 507–12 (same); *Demers*, 746 F.3d at 412 (same).  And here, our own binding precedent leaves no room for the majority's result.  *See Bishop*, 926 F.2d at 1074–77; *Ferguson*, 430 F.2d at 859; *Megill*, 541 F.2d at 1081–82; *Pred*, 415 F.2d at 859; *see also Duke*, 469 F.2d at 835–40.

The IFA concerns classroom instruction, allowing professors to discuss discriminatory concepts but not endorse or compel them.  *See* Fla. Stat. §§ 1000.05(2), (4).  And our precedent has already struck this balance in the classroom, finding that the state's interest as an employer outweighs a professor's interest in teaching his personal views.

*Ferguson* is illustrative.  There, we recognized that although a state institution normally has "no right to control" a professor's speech, it does "have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor."  430 F.2d at 859; *see id.* at 860 (Thornberry, J., dissenting) ("The majority recognizes that the *State of Texas* could terminate Dr. Ferguson's employment…") (emphasis added).

In *Megill*, we likewise held that the Florida Board of Regents "in no way infringed" on a professor's First Amendment rights

---

of that question is not required for the majority to reach its holding, I would leave it for a case that actually requires its answer.

when it denied him tenure in part because he failed to teach a philosophy course in accordance with the University of Florida's course catalog.  541 F.2d at 1082.  We noted that "[i]t is essential that an academic board review a teacher's classroom activities in determining whether to grant or deny tenure."  *Id.*

And in *Pred*, we distinguished between a professor's speech in the classroom and outside the classroom:

> [T]he two activities for which this claimed discrimination was meted out are quite different.  One, relating to the effort to organize teachers for effective action is quite removed from the classroom-schoolhouse variety.  The other, involving possible propaganda or agitation within the classroom and the course of instruction, comes much closer to collision with the need for discipline, both within the classroom and within the school as a whole.  This may well limit the extent or kind of expression of ideas under the First Amendment's umbrella.

415 F.2d at 859.

In *Duke*, we reaffirmed *Ferguson*'s holding that a public university has "a right to terminate . . . a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor."  469 F.2d at 838 (quoting *Ferguson*, 430 F.2d at 859).  And although *Duke* did not involve a restriction on classroom speech, it is relevant because we credited the University's argument that the plaintiff's speech

"demonstrated a lack of academic responsibility," which suggested that she was unfit to serve as an instructor.  *Id.* at 838–40.

And then there is *Bishop*, which ought to end the matter.  In *Bishop*, we held that it is the "public employer"—not the professor—who determines what may and may not be taught in the classroom.  926 F.2d at 1074–77.  *Bishop* concerned an exercise physiology professor at the University of Alabama who, from 1984 through the 1987 spring semester, "occasionally referred to his religious beliefs during instructional time."  926 F.2d at 1068.  The professor told students that he was a Christian and sometimes explained in class why human physiology contained evidence supporting intelligent design.  *Id.*  He also occasionally interjected his religious views when advising students "on coping with academic stresses."  *Id.*

In April 1987, he organized an optional after-class lecture explaining why the complexity of human physiology suggests that humans are "created by God" and are "not the by-product of evolution."  *Id.* at 1068–69.  After that lecture, his supervisor sent him a memorandum directing him to stop "interject[ing] [his] religious beliefs . . . during instructional time periods" and to stop hosting "optional classes where a 'Christian Perspective' of an academic topic is delivered."  *Id.* at 1069.  When the University refused to rescind the memorandum, the professor sued and obtained an injunction in district court.  *Id.* at 1069–70.

On appeal, we reversed.  Applying the *Pickering* balancing test, we held that the University "as an employer and educator can

direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id.* at 1072, 1076–77. We balanced three interests. First, we looked to "the context: the university classroom during specific in-class time and the visage of the classroom as part of a university course in an after-class meeting." *Id.* at 1074. Second, we considered the "University's position as a public employer" and its "authority to reasonably control the content of its curriculum, particularly that content imparted during class time." *Id.* Finally, we considered "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id.* at 1075. But this final consideration was not dispositive. *Id.* We acknowledged "the invaluable role academic freedom plays in our public schools," yet held that the professor's "interest in academic freedom and free speech do not displace the University's interest inside the classroom." *Id.* at 1075–76.

We repeatedly emphasized that the University restricted the professor's speech only in the "classroom"—"wherever he purports to conduct a class for the University." *Id.* at 1075–76 ("[T]he University seeks only to prevent Dr. Bishop from making assertions about his religious beliefs vis-a-vis the subject matter of his courses."). We concluded that "Dr. Bishop and the University disagree about a matter of content in the courses he teaches. The University must have the final say in such a dispute." *Id.* at 1076. And "[t]hough Dr. Bishop's sincerity cannot be doubted, his educational judgment can be questioned and redirected by the University

22-13992            LAGOA, J., Dissenting            19

when he is acting under its auspices as a course instructor." *Id.* at 1076–77.[6]

Like *Bishop*, this case involves restrictions on a professor's speech in the classroom. *See* Fla. Stat. §§ 1000.05(2), (4). And *Bishop* already held that, concerning classroom instruction, the State's interests outweigh those of the individual professor. 926 F.2d at 1076–77. The majority recognizes *Bishop*'s applicability and analyzes the factors that we considered there. Maj. Op. at 35–44. But its attempt to distinguish *Bishop* fails.

First, the majority acknowledges that "[h]ere the context is the same as in *Bishop*: 'the university classroom during specific in-class time.'" Maj. Op. at 37 (quoting *Bishop*, 926 F.2d at 1074). In *Bishop*, we noted that the University of Alabama legitimately feared that the professor's speech would have a "coercive effect" on his students: that students would feel compelled to show interest in the professor's religious views to obtain a good grade. 926 F.2d at 1069, 1074. The majority says this case is "[u]nlike" *Bishop* because there "the University was furthering an anti-coercion goal." Maj. Op. at 38. Here, Florida supposedly "asserts the opposite interest—

---

[6] *Bishop* clarified twice that its decision had nothing to do with the Establishment Clause. 926 F.2d at 1077 ("In any event, we do not reach the establishment questions raised by Dr. Bishop's conduct. The University can restrict speech that falls short of an establishment violation, and we have already disposed of the University's restrictions of Dr. Bishop under the free speech clause."); *id.* at 1078 (same).

20                    LAGOA, J., Dissenting                    22-13992

coercing [its] university faculty" to avoid "a certain set of ideas."
*Id.*

Respectfully, that distinction does not hold up. *Bishop* ad-
dressed coercion directed at *students*; we expressed no concern
about any coercion suffered by a professor. *See* 926 F.2d at 1074.
In other words, the professor in *Bishop*, like the professor-plaintiffs
here, was—in the majority's words—"coerc[ed]" to "avoid[] a cer-
tain set of ideas." Maj. Op. at 38. That is why Bishop brought the
suit. *See Bishop*, 926 F.2d at 1068–70. The majority's attempt to
cast Florida's interest as somehow "opposite" of the interests in
*Bishop* simply does not follow.

Second, regarding the State's interest as an employer, the
majority claims that *Bishop* is different because the professor's reli-
gious speech was irrelevant to his physiology course. Maj. Op. at
38–40. The majority says that, unlike this case, the professor's
speech in *Bishop* was professionally incompetent. *Id.* at 39. The
trouble with the majority's distinctions is that they overlook what
*Bishop* actually held.

On the question of relevance, *Bishop* assumed that the pro-
fessor's religious views informed his professional viewpoint about
exercise physiology. 926 F.2d at 1076–77 & n.7. We held that the
University could prevent him "from presenting his religious view-
point during instructional time, *even to the extent that it represents his
professional opinion* about his subject matter." *Id.* at 1077 (emphasis
added). We likewise recognized that the professor expressed
"opinions *about his work* that happen[ed] to have a religious

source." *Id.* at 1076 (emphasis added). Yet the University could still conclude—consistent with the First Amendment—that the professor's "opinions should not be represented in the courses he teaches at the University." *Id.* The crux of *Bishop* is not, as the majority suggests, that religion is irrelevant to science, but that the State, as a public employer, may decide what is taught in its classrooms. *Id.* at 1076–77 & n.7.

On the question of professional competence, we expressly refused to "gauge" whether the professor's views were "well-founded." *Id.* at 1076 n.7. Our decision thus had nothing to do with "professional[] competen[ce]." Maj. Op. at 39 (quotation omitted). In any event, a carveout for so-called "professionally incompetent" speech would permit, what the majority elsewhere condemns, "naked prohibition[s] on disfavored" viewpoints. Maj. Op. at 44. Whether labeled "incompetent" or "unreasonable," the result is the same: the State may determine which viewpoints its employees may *endorse* during classroom instruction and which they may not. *See Bishop*, 926 F.2d at 1076–77.

Third, *Bishop* considered the First Amendment's "strong predilection for academic freedom as an adjunct of the free speech rights." 926 F.2d at 1075. The majority cites this interest, Maj. Op. at 42–43, and I agree that it weighs in favor of professorial speech. But the majority fails to meaningfully consider that *Bishop* held that a professor's "interest in academic freedom and free speech" does not ultimately "displace the University's interest inside the classroom." 926 F.2d at 1076. We noted that the state could not restrict

22                          LAGOA, J., Dissenting                          22-13992

a professor's speech "when he acts as an independent educator or researcher," but the state could restrict a professor's speech when he acts "as a course instructor." *Id.* at 1076–77; *see id.* at 1075 ("[W]e do not find support to conclude that academic freedom is an independent First Amendment right.").

In short, *Bishop* held that professors have no First Amendment right to overrule their employer's judgment concerning the content of classroom instruction. And the majority overlooks that *Bishop* already balanced these interests and resolved that balance in favor of the State's authority within the classroom.[7]

---

[7] The majority is "surprised" by the view that *Bishop* has already balanced the relevant interests in this case. Maj. Op. at 36. But that is not a reason to disregard what *Bishop* actually did. *Bishop* balanced three interests: (1) "the university classroom during specific in-class time," (2) "the University's position as a public employer which may reasonably restrict the speech rights of *employees* more readily than [sic] those of other persons," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." 926 F.2d at 1074–75 (emphasis added). And we concluded that "the University's interests in the classroom conduct of its professors are sufficient, *in the balance we have suggested*, to warrant the reasonable restrictions it has imposed on Dr. Bishop." *Id.* at 1076 (emphasis added). Those are the same interests here. The IFA concerns "training" and "instruction," § 1000.05(4)(a)—terms the Florida Board of Governors has limited to structured university activities, teaching directed at students or "within a course." *See 10.005 Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (Aug. 26, 2022). The plaintiff-professors are employed by the State. Academic freedom again enters the analysis, though constrained by *Bishop*'s express recognition that it is not "an independent First Amendment right." 926 F.2d at 1075. It does not "transform" *Bishop*, *contra* Maj. Op. at 41–42 n.14, to take the principles and interests we considered there, observe they are the same here, and apply its holding accordingly.

22-13992            LAGOA, J., Dissenting            23

In my view, the only legitimate difference here is that *Bishop* involved restrictions on one professor's speech while this case involves a statute of general application enacted by the Florida legislature.  But that difference should not change the outcome of this case.

To start, *Bishop* did not treat "reasonable[ness]" as a license to rebalance interests in every new case.  What made the restrictions "reasonable" was a single, concrete fact: "they appl[ied] only to [] classroom speech."  *Bishop*, 926 F.2d at 1075–76.  That limitation carried the entire analysis.  And when the IFA is read— as *Bishop* requires—"narrowly because [its restrictions] implicate First Amendment freedoms," *id.* at 1075, its reach is likewise confined to classroom instruction.  *See* Fla. Stat. § 1000.05(4)(a) (limiting its restrictions to "training" and "instruction" of "such student or employee").  Moreover, the Act expressly permits "discussion of the concepts listed," provided that any "training or instruction is given in an objective manner without endorsement of the concepts."  Fla. Stat. § 1000.05(4)(b).  It does not "ban" or reject any idea.  *Contra* Maj. Op. at 3, 4, 14, 48.  The IFA bars Florida instructors from coercing students into believing they must embrace a prescribed viewpoint (possibly to receive good grades or preferential treatment in class, for instance).  The same balance *Bishop* struck therefore resolves this case.

---

That is simply following precedent.  If the majority disagrees, the proper course is to take this case en banc and overrule *Bishop*, not to reinterpret it beyond recognition.

The majority nevertheless invokes *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454 (1995), for the proposition that "higher standards are necessary to vindicate broad, prophylactic restrictions on speech of a large number of employees . . .." Maj. Op. at 41 (citing *NTEU*, 513 U.S. at 466–68). But the majority stops there, overlooking that *NTEU* itself confronted a statutory speech restriction and still turned to *Pickering*. *NTEU*, 513 U.S. at 468–70. Although the Court opined that laws with a "widespread impact" on public employee speech raise more serious concerns than "any single supervisory decision," *id.* at 468, it accounted for this concern by altering the *Pickering* test, not abandoning it. The Court held that "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571).

The majority never explains why *NTEU*'s standard materially alters *Bishop*'s rule in this context. It is undisputed that, unlike *Bishop*, the IFA applies to the classroom instruction of all professors at public universities in Florida. *See* Fla. Stat. § 1000.05(2), (4). But why does that make a difference? *NTEU* involved speech that was unrelated to a public employee's duties at work. *See* 513 U.S. at 466 (noting that the plaintiffs' "expressive activities" fell "within the protected category of citizen comment on matters of public concern" and "involved content largely unrelated to their government employment"). This case, by contrast, concerns speech by

Florida's professors while they are performing their instructional duties. *See Wood v. Florida Dep't of Educ.*, 142 F.4th 1286, 1293 (11th Cir. 2025) ("[W]hen [a teacher] addressed her students in the classroom, she was very much on the clock, discharging the very obligation the state had hired her to discharge."); *see also Bishop*, 926 F.2d at 1076 n.7. And *Bishop* expressly held that when an individual professor and his employer disagree "about a matter of content in the courses he teaches," the employer "must have the final say in such a dispute." 926 F.2d at 1076. There is little reason to think that balance changes when applied on a broader scale.

And the State's interests here are substantial in any event. The IFA prohibits instruction that people should be judged by their skin color, that people "should not attempt to treat" other races equally, and that other races "should be discriminated against." Fla. Stat. §§ 1000.05(4)(a)(1), (4), (6). In *Bob Jones*, which involved a private university, the Supreme Court held that "the Government has a fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history." 461 U.S. at 604; *see also Arce v. Douglas*, 793 F.3d 968, 986 (9th Cir. 2015) (holding that Arizona had a "legitimate pedagogical interest in reducing racism" in public school coursework and curriculum). Surely, the State's interest here is even greater than what was recognized in *Bob Jones*, because this case involves only state-sponsored universities.

26                          LAGOA, J., Dissenting                          22-13992

Although the majority does not meaningfully address *Bob Jones*, the majority tells us that "hearing an idea you disagree with is not discrimination." Maj. Op. at 51. No one disagrees with that generality, but it glosses over the classroom reality, where a professor's endorsement of a particular viewpoint carries weight that can distort genuine academic exchange. As *Bishop* explained, a professor's words do not operate in a vacuum; they carry a "coercive effect" because the professor maintains authority over the students' grades. 926 F.2d at 1074.

Consider a professor who says that Hamas's October 7th attack on Israel was "exhilarating"[8] and something to be celebrated and encouraged. If the professor made that statement as part of classroom instruction, would a Jewish student feel at liberty to wear his kippah or voice contrary views in the classroom, in a graded paper, or on an exam? Doubtful. The majority's assurance that "a professor who espouses a particular idea does not stand in the same shoes as one who ridicules a student, threatens a student, or targets a student," Maj. Op. at 40, does little to account for that reality. Florida acts well within its authority to curb professorial endorsements of that kind within its own classrooms.[9]

---

[8] Jackson Walker, *Cornell professor who called Hamas terrorist attacks 'exhilarating' returns to teaching*, WJAC (Sept. 16, 2024), at https://perma.cc/E45G-LMFK.

[9] The majority states that it is "sincerely confused" by my reference to *Bob Jones*. Maj. Op. at 41 n. 13. It need not be. The majority dismisses *Bob Jones* on the ground that it is not a "free speech" case. *Id.* But that characterization misses the point. *Bob Jones* identified a compelling governmental interest in eradicating racial discrimination—an interest that Florida expressly invokes

Indeed, the Supreme Court has said, even if in dicta, that "when the State" makes choices regarding "the content of the education it provides," the First Amendment permits the State to decide "what is or is not expressed." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). The majority claims that this reading misleadingly quotes *Rosenberger* "in isolation," and that "*Rosenberger* was really a case restricting the government's ability to impose speech limitations on student groups." Maj. Op. at 25–26. Not so.

True, *Rosenberger* involved student rather than professor speech. 515 U.S. at 822–26. But as *Rosenberger* itself says, the right of a state-sponsored university to decide what it will teach is "controlled by different principles." *Id.* at 833–34; *see also Widmar v. Vincent*, 454 U.S. 263, 276 (1981) ("Nor do we question the right of [a state] University . . . 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'") (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in result)).

Furthermore, if I am misreading *Rosenberger*, then so did the Third Circuit in an opinion authored by then-Judge Alito. *See*

---

here. 461 U.S. at 604. And because the IFA addresses "discrimination on the basis of race, color, national origin, or sex," the majority's claim that this case "is not about racial discrimination" is unavailing. *See* Maj. Op. at 41 n. 13. To the extent the majority believes that, despite *Bishop*, additional balancing of interests is required, Florida's assertion of "the government's interest in preventing invidious racial discrimination in public education" is relevant for the reasons stated here, in *Bob Jones*, and *Arce*.

*Edwards v. California Univ. of Pennsylvania*, 156 F.3d 488, 491–92 (3d Cir. 1998) (Alito, J.).  In *Edwards*, the Third Circuit rejected the First Amendment claim of a professor who was directed not to discuss religion in his classroom.  *Id*. at 489–92.  Writing for the court, then-Judge Alito quoted the same passage of *Rosenberger*—concluding that the University could restrict the professor's classroom speech because his speech "concerned the 'content of the education [that the University] provides.'"  *See id*. at 491–92 (quoting *Rosenberger*, 515 U.S. at 833).

In short, we do not face "an unprecedented First Amendment intersection."  Maj. Op. at 11–12.  And discerning the correct result is not so difficult.  Our controlling precedents and the original meaning of the First Amendment point in the same direction.  The majority veers away from both to adopt a position that does not even remedy the problem it perceives.  *See infra* at 31–33.

"Though we are mindful of the invaluable role academic freedom plays in our public schools, *particularly at the post-secondary level*, we do not find support to conclude that academic freedom is an independent First Amendment right."  *Bishop*, 926 F.2d at 1075 (emphasis added); *see also Edwards*, 156 F.3d at 491 (Alito, J.) ("[W]e conclude that a public university professor does not have a First Amendment right to decide what will be taught in the classroom.").

This panel is not free to rewrite precedent simply because we dislike where it leads.  That decision must be made "by the

22-13992                LAGOA, J., Dissenting                29

Supreme Court or by this court sitting *en banc*." *Archer*, 531 F.3d at 1352.

★   ★   ★

Much of the majority's criticism of this dissent reduces to a supposed distinction between "a *state*'s authority to control curriculum" and "a *university*'s authority to control the curriculum." *See* Maj. Op. at 25–26 & n.10, 41 n.14.

But Florida law leaves the majority's university–State distinction with nowhere to stand. *Contra id.* at 26 n.10, 41–42 n.14. Florida's Constitution provides that "[t]here shall be a single state university system," that "[a] board of trustees shall administer each public university," and that "a board of governors shall govern the state university system." Fla. Const. art. IX, § 7(b). Florida lists each of the universities associated with the professor-plaintiffs as a "[s]tate university." Fla. Stat. § 1000.21(9). And Florida declares that the "boards of trustees [of state universities] are a part of the executive branch of state government." Fla. Stat. § 1001.71(3); *see id.* § 1001.705(1)(c) (defining "[university] Board of Governors" as "public officer[s]"); *id.* § 1001.705(1)(d) (defining "[s]tate university" and "state universities" as "agencies of the state which belong to and are part of the executive branch of state government"). Indeed, in the Eleventh Amendment context, Florida's grip on its public education system is so tight that its Boards of Trustees function as "arm[s] of the state." *Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.*, 861 F.3d 1234, 1238 (11th Cir. 2017) (citation omitted).

Not to be overlooked, the suit underlying *Bishop* was brought "against the Board of Trustees of the University." 926 F.2d at 1070. In that case, our reference to the "University" meant "the University of Alabama *through its Board of Trustees.*" *Id.* at 1067 (emphasis added). The same was true in its relevant predecessors. *See Pred*, 415 F.2d at 853 n.3 ("Board of Public Instruction of Dade County, Florida"); *Megill*, 541 F.2d at 1076 ("State Board of Regents"); *Duke*, 469 F.2d at 837 (same). So the majority's claim that *Bishop* speaks only to "a university's authority" and not to "a state's authority," *see* Maj. Op. at 26–27 & n.10, 42 n.14, has limited force—particularly in Florida, where a university's Board of Trustees is itself an instrumentality of the State. *See* Fla. Const. art. IX, § 7(b).

As to *Edwards*, *see* Maj. Op. at 26–27 n.10, then-Judge Alito explained that "[o]ur conclusion that the First Amendment does not place restrictions on a public university's ability to control its curriculum is consistent with the Supreme Court's jurisprudence *concerning the state's ability* to say what it wishes *when it is the speaker.*" *Edwards*, 156 F.3d at 491 (Alito, J.) (emphases added). The same principle appears in our own decisions. *See Megill*, 541 F.2d at 1086 ("When his statements and actions fell short of those that the Board [of Regents] could rightfully expect of its tenured *professors, the state's strong interest* in a quality university system and effective teacher contribution to the educational process prevailed.") (emphases added); *Duke*, 469 F.2d at 837 (categorizing, in the Fourteenth Amendment context, "universities" as "creatures of *the state*") (emphasis added); *Pred*, 415 F.2d at 856 ("What is at stake is

the vindication of constitutional rights—the right not to be punished *by the State* or to suffer retaliation at its hand because a public employee persists in the exercise of First Amendment rights.") (emphasis added).[10]

Taken together, these authorities make clear that Florida's public universities speak and act subject to the State's control and administration. *Cf. Waugh v. Bd. of Trs. of Univ. of Miss.*, 237 U.S. 589, 596 (1915) ("It is to be remembered that the University was established by the state, and is under the control of the state…"). Indeed, the IFA functions as the State's directive to its own employees, setting the standards that govern classroom instruction when, as Florida puts it, they teach "the State's curriculum, in the State's classrooms, on the State's time, in return for a State paycheck." And as this Court recognized in *Bishop*, the public employer has authority "to reasonably control the content of its curriculum, particularly that content imparted during class time." *Bishop*, 926 F.2d at 1074.

## IV.

The majority's rule, meant to avoid what it believes is the State's improper viewpoint discrimination, nonetheless endorses

---

[10] The Supreme Court has distinguished between a state's "attempts to direct the content of speech at private universities," where "[o]bvious First Amendment problems would arise," and a state's "attempts to direct the content of speech at public educational institutions," where "complicated First Amendment issues are presented because government *is simultaneously both speaker and regulator.*" *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 198 n.6 (1990) (citing *Meese v. Keene,* 481 U.S. 465, 484, n.18 (1987)) (emphasis added).

32                    Lagoa, J., Dissenting                    22-13992

its own form of viewpoint discrimination.  Of course, some amount of viewpoint discrimination is necessary to ensure the effective operation of any academic institution.  The majority acknowledges as much, retaining vague carveouts—like "reasonable[ness]"—to distinguish between prohibitions that are and are not permissible under the First Amendment.  Maj. Op. at 37.  The majority emphasizes that the boundary lines are "well-understood." *Id.* at 38–39.  It assures that "conspiracy theories" and "the like" will not be tolerated.  *Id.* at 39.  But these exceptions do not eliminate viewpoint discrimination.  Put differently, the majority recognizes that *someone* must set the limits of what can be taught at public universities.  And through its carveouts, the majority shifts that decision-making authority from the people to federal judges. The test now is: Does the presiding judge believe that the professor's viewpoint is within the range of permissible views?

As *Bishop* recognized, we are in "no position to gauge" the legitimacy of viewpoints in fields we know little about.  926 F.2d at 1076 n.7.  The majority's rule still allows "naked prohibition[s] on disfavored speech," Maj. Op. at 44, but authorizes that viewpoint discrimination under exceptions created, interpreted, and enforced by the judiciary.[11]  Because neither our precedents nor the original

---

[11] Despite its assurance that it declines to "make any judgment about the value of the[se] ideas," the majority does exactly that.  Maj. Op. at 48.  By its own account, it believes "universities *or other government authorities*" may *"exclude speech* that veers outside of well-understood parameters." *Id.* at 38–39 (emphases added).  But what does "veer outside of well-understood parameters" mean and why must it be this majority who decides?  Those questions go

22-13992                LAGOA, J., Dissenting                33

meaning of the First Amendment compels that conclusion, I re-spectfully dissent.

---

unanswered.  Rather, the majority simultaneously labels certain categories of speech as properly excludable while insisting that "it is not our place" to judge the value of contested viewpoints.  *Id.* 48.  At bottom, the majority acknowl-edges that some speech may permissibly be excluded in Florida's classrooms, but it removes that decision from the elected representatives of the State of Florida and vests it instead in the judiciary.  I maintain that, in this context, this "is not our place."